IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALCOA, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 06-451-SLR |
| | ) | |
| ALCAN, INC., ALCAN ROLLED PRODUCTS- | ) | |
| RAVENSWOOD LLC f/k/a PECHINEY ROLLED | ) | |
| PRODUCTS INC., LLC, PECHINEY CAST | ) | |
| PLATE, INC. AND CENTURY ALUMINUM | ) | |
| COMPANY, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF CHRISTINE F. ROUSSEL

I, Christine F. Roussel, declare as follows:

1.      I am an attorney at Latham & Watkins, LLP, counsel for Century Aluminum Company ("Century"), in connection with this action.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would testify completely to such facts under oath.  I make this declaration in support of Century's Motion to Dismiss for Failure to Join a Party Under Rule 19.

2.      Attached hereto as Exhibit A is a true and correct copy of the City of Vernon ("the City") Ordinance No. 961, Article IV, Section 13.48, Hazardous Materials Monitoring Program.

3.      Attached hereto as Exhibit B is a true and correct copy of the Acquisition Agreement between Alcoa and Century Aluminum Co. ("Century"), dated December 22, 1998.

4.    Attached hereto as Exhibit C is a true and correct copy of a letter from Leonard Grossberg, Environmental Health Specialist for the City of Vernon Environmental Health Department, to Alcoa, dated September 2, 1999 ("NFA letter").

5.    Attached hereto as Exhibit D is a true and correct copy of the Stock and Asset Purchase Agreement between Century and Pechiney Rolled Products LLC ("Pechiney"), dated July 26, 1999.

6.    Attached hereto as Exhibit E is a true and correct copy of the Vernon Indemnification Agreement between Century and Pechiney, dated September 20, 1999.

7.    Attached hereto as Exhibit F is a true and correct copy of the Purchase Agreement between the City and Pechiney, dated March 20, 2006.

8.    Attached hereto as Exhibit G is a true and correct copy of the Addendum to the Purchase Agreement between the City and Pechiney, dated March 20, 2006.

9.    Attached hereto as Exhibit H is a true and correct copy of a letter from David LeDuff, Environmental Health Specialist for the City of Vernon Environmental Health Department, to Pechiney, dated March 28, 2006.

10.    Attached hereto as Exhibit I is a true and correct copy of a letter from Lewis Pozzebon, Director and Health Officer for the City of Vernon Health Department, to Pechiney, dated July 26, 2006 ("the Order").

11.    Attached hereto as Exhibit J is a true and correct copy of a letter, dated April 17, 2006, sent from John Cermak, Jr. of Jenkins & Gilchrist, LLP, to Century.

12.    Attached hereto as Exhibit K is a true and correct copy of a letter, dated April 17, 2006, sent from John Cermak, Jr. of Jenkins & Gilchrist, LLP, to Century.

13.    Attached hereto as Exhibit L is a true and correct copy of a letter, dated May 8, 2006, from Peter McGuire, Vice President and Associate General Counsel of Century, to Alcoa.

14.    Attached hereto as Exhibit M is a true and correct copy of a letter, dated June 2, 2006, from John Wilson, Vice President and Deputy General Counsel of Alcoa to the General Counsel of Century.

15.    Attached hereto as Exhibit N is a true and correct copy of a letter, dated August 4, 2006, from Peter McGuire, Vice President and Associate General Counsel of Century, to Alcoa.

16.    In August and September, 2006, I supervised extensive research that was conducted in multiple databases to determine whether the City conducts or has conducted any business in Delaware. Various web-based searches were conducted, including searches in the Delaware Business License Office, the Delaware Office of Consumer Affairs, the Delaware Better Business Bureau, the Delaware Department of State website, the Delaware corporate records database on Westlaw.com, and the Delaware UCC index and databases. Our research indicated that the City does not conduct business of any kind in Delaware, and has not done so in the past.

17.    In August and September, 2006, I supervised extensive research that was conducted in relevant databases to determine whether the City possesses, uses, or has an interest of any kind in any real property located in Delaware. Various web-based searches were conducted, including searches in the Delaware Tax Assessor database on Lexis.com. Our research showed that the City has no current or past interest of any kind in any real property located in Delaware.

18.    Finally, in August and September, 2006, I supervised extensive research that was conducted in multiple databases to determine whether the City has caused tortious injury in Delaware by any acts or omissions occurring in the state. Various web-based searches were

conducted, including searches in Westlaw's case law databases for Delaware state courts, the

U.S. District Court for the District of Delaware, the Judicial District on Multidistrict Litigation,

and the U.S. Court of Appeals for the Third Circuit, as well as a database of unreported Delaware

cases. Our research did not uncover any instances where the City caused tortious injury of any

kind in the State of Delaware.

Executed on October 27, 2006 at Washington, D.C. I declare under penalty of perjury

under the laws of the United States of America that the foregoing is true and correct.

*Christine F. Roussel*

Christine F. Roussel

LATHAM & WATKINS LLP
555 Eleventh Street, N.W., Suite 1000
Washington, D.C. 20004-1304
Telephone: (202) 637-2200
Facsimile: (202) 637-2201

# EXHIBIT A

# City Of Vernon
# ORDINANCE NO. 961

### Article IV. Hazardous Materials Monitoring Program

**Sec. 13.48. Purpose.**

The declared purpose of this Article is (I) to provide for the establishment of a program to monitor establishments where hazardous materials are produced, stored, handled, disposed of, treated, emitted, discharged, or recycled; (ii) to provide that said program be administered by the Health Officer; and (iii) to provide that the Fire Department be assigned the responsibility to be the Emergency Response Agency and to direct and coordinate emergency response in the event of releases of hazardous materials.

**Sec. 13.49. State Law Adopted by Reference.**

The City Council of the City of Vernon hereby adopts by reference the requirements of the State Hazardous Waste Control Law. Chapter 6.5 of the Health and Safety Code and the minimum standards for the management of hazardous and extremely hazardous waste as specified in Chapter 30, Division 4, Title 22 of the California Administrative Code, and the requirements for the hazardous materials release response plans and inventory law, Chapter 6.95 of the Health and Safety Code of the State of California.

**Sec. 13.50. Definitions.**

For the purposes of this Article, the following words and phrases shall have the meanings respectively ascribed to them by this section:

"CAS Number" means the unique identification number assigned by the Chemical Abstracts Service to specific chemical substances.

"City Council" means the City Council of the City of Vernon.

"Contingency Plan" means a business plan or area plan setting out an organized, planned and coordinated course of action to be followed in case of a fire, explosion or unplanned release of hazardous material so as to minimize exposure and hazards to human health and the environment.

"Emergency Response Agency" means the Fire Department of the City of Vernon.

"Extremely Hazardous Waste" means any hazardous waste or mixture of hazardous wastes which, if human exposure should occur, may likely result in death, disabling personal injury or serious illness caused by hazardous waste because of its quantity, concentration or chemical characteristics.

"Fire Chief" means the Fire Chief of the Vernon Fire Department, or his duly authorized representative.

"Handle" means to use, generate, process, produce, package, treat, store, emit, discharge, incinerate, recycle or dispose of a hazardous material in any fashion.

"Hazardous Material" means any material that, because of its quantity, concentration, or physical or chemical characteristics, poses a significant present or potential hazard to human health and safety or to the environment if released into the workplace or the environment. "Hazardous Materials" include, but are not limited to. Hazardous substances, hazardous waste, and any material which a handler of the local agency has a reasonable basis for believing that it would be injurious to the health and safety of persons or harmful to the environment if released into the workplace or the environment.

"Hazardous Materials Establishment" means any room, building or place, or portion thereof, maintained, used or operated where hazardous materials are produced, stored, handled, disposed of, emitted, treated or recycled.

"Hazardous Waste" means a waste or combination of wastes which, because of its quantity, concentration, or physical, chemical, or infectious characteristics, may either:

      (a) Cause, or significantly contribute to an increase in mortality or an increase in serious irreversible, or incapacitating reversible illness; or

      (b) Pose a substantial present or potential hazard to human health or environment when improperly treated, stored, transported or disposed of, or otherwise managed.

The term "Hazardous Waste" shall be understood to also include "Extremely Hazardous Waste", unless expressly provided and mislabeled or inadequately labeled hazardous materials; and hazardous materials packaged in deteriorated containers.

"Health Officer" means the City Health Officer, or his duty authorized representative. The duties of the Health Officer are those set forth in the Health and Safety Code of the State. Whenever a power is granted to or a duty imposed upon the Health Officer in this Article, the power may be exercised or the duty performed by a duly authorized representative of the Health Officer, unless this Article expressly provides otherwise.

"Local Agency" means the Health and Environmental Control Section of the City of Vernon.

"MSDS" means a "Material Safety Data Sheet" prepared pursuant to Section 6390 of the California Labor Code. For any hazardous material for which a Material Safety Data Sheet is not required to be prepared pursuant to Section 6390 of the California Labor Code, a MSDS which contains the information specified in Section 6391 of the California Labor Code shall satisfy the definition of a MSDS under this Article.

### Sec. 13.51. Enforcement Responsibility.

      (a) It shall be the duty of the Health Officer to enforce the provisions of the State Health and Safety code, Chapter 6.5, and Chapter 6.95 pertaining to hazardous wastes and hazardous materials and the minimum standards specified in Chapter 30, Division 4, Title 22 of California Administrative Code and any additional requirements specified in this Article;

      (b) It shall be the duty of the Fire Chief to review and approve contingency plans to be implemented in the event of an unauthorized release;

      (c) The local agency is hereby designated to be responsible for the administration and enforcement of the provisions of this Article;

      (d) The emergency response agency shall review and approve contingency plans required by Sections 13.60 and 13.61 and shall establish a city wide contingency plan to be implemented in the event of an unauthorized release of hazardous materials that may extend beyond the premises where the release occurred.

### Sec. 13.52. Inspection of Hazardous Materials Establishments.

It shall be the duty of the local agency to make periodic inspections of all hazardous materials establishments in the City of Vernon. The local agency shall closely coordinate its inspection activities with the emergency response agency and other city departments and public agencies. Such inspections by other city departments and public agencies shall be coordinated so as to reduce duplication of effort and assure consistency of enforcement.

### Sec. 13.53. Permit Requirement.

(a) It shall be unlawful for a person to establish, operate, or maintain a hazardous materials establishment without first obtaining a hazardous materials establishment permit from the local agency.

(b) Owners and operators of permitted hazardous materials establishments shall report in writing any change of ownership, business name or address information within thirty (300 days of the occurrence of the change, and request an amendment to their permit or a new permit.

(c) No permit issued pursuant to this Article shall be transferable.

(d) A copy of the current permit or amended permit shall be provided the emergency response agency by the local agency with two (2) working days of approval.

**Sec. 13.54. Permit Application.**

(a) Every applicant for a permit, required by this Article, shall file a written application, before commencing operation, on a form provided by the local agency and shall be accompanied by the appropriate fee, as specified in section 13.55. Those hazardous materials establishments in operation prior to the effective date of this ordinance shall file an application within thirty (30) days of notification by the City of Vernon.

(b) An application shall include, but not be limited to, the following information:
   (1) The name and address of the property owner and the owner-operator of the establishment;
   (2) The address and location of the establishment activity;
   (3) The name(s) and 24 hour phone number(s) of contact person(s) qualified and authorized to act as emergency coordinators;
   (4) A listing of the chemical name, any common name and the CAS number for each hazardous material handled;
   (5) A MSDS for each hazardous material handled;
   (6) The approximate annual quantity of each hazardous material handled;
   (7) The maximum quantity of each hazardous material on the premises at any one time;
   (8) A description of the hazardous material activity being conducted;
   (9) A statement that appropriate permits to operate and discharge have been obtained from Federal, State, Regional and local agencies and a list of such agencies, permit number, permit type and expiration dates.

(c) A permittee shall notify the local agency, in writing, of any changes in items b(1) through b(9) above within thirty (30) days, and the local agency shall amend the permit accordingly.

(d) A copy of the application and attached documents shall be provided the emergency response agency by the local agency within two (2) working days of receipt.

**Sec. 13.55. Permit Fee.**

(a) A fee shall be paid to the local agency by each person who submits an application for a permit to operate a hazardous materials establishment or to renew, amend or terminate a permit required by this Article. Such permit fees shall be established by resolution of the City Council of the City of Vernon, at a level sufficient to pay the necessary and reasonable costs incurred in administering this Article, including, but not limited to, permitting and inspection services. The City Council may provide for the waiver fees when a public agency makes an application for a permit or renews a permit;

(b) There shall be added to and collected with the permit or other fees a penalty equal to ten percent (10%) of the fee for all fees that are delinquent for thirty (30) days. For each additional month or fraction thereof in which a delinquency continues, an additional ten percent (10%) penalty shall be collected. In no event shall the total penalty exceed sixty percent (60%) of the permit fee.

(c) No refund or rebate of a permit fee shall be allowed by reason of the fact that the permit is denied or the permittee discontinue operation of the facility prior to expiration of the term or that the permit is suspended or revoked prior to the expiration of the term.

**Sec. 13.56. Permit Renewal.**

The initial hazardous materials establishment permit shall be renewed annually upon payment of the renewal fee. An application shall be submitted for each seceding renewal period and shall include all pertinent changes made since the previous application. Permits shall become effective on July 1st and expire on the following June 30th of each year. Permits that are not renewed by August 1st become delinquent and are subject to the penalty indicated in Section 13.55(b).

**Sec. 13.57. Notice of Approval of Disapproval.**

The local agency shall determined, after conducting an inspection of the hazardous materials establishment, whether the initial application filed by the applicant is accurate and complete and shall issue a written notice of approval or disapproval of the issuance of a permit to the establishment operator within 60 days of the evaluation inspection. The permittee may appeal the determination to the City Council. Failure to file a written appeal with the City Clerk within thirty (30) days of said determination shall be deemed a waiver of the right to appeal.

**Sec. 13.58. Permit Revocation or Suspension.**

The hazardous materials establishment permit shall be subject to revocation or suspension by the local agency upon the determination by the local agency of a violation by the holder of such permit, his employee, or agent, or any other person acting with his consent or under his authority of any provision of this Article or any referenced law of the State of California. The permittee may appeal the ruling to the City Council. Failure to file a written appeal with the City Clerk within thirty (30) days of said ruling shall be deemed a waiver of the right to appeal.

**Sec. 13.59. Responsibility for Proper Storage, Handling, Treatment and Disposal of Hazardous Material.**

It shall be the responsibility of the establishment operator to operate and maintain the hazardous materials establishment in a manner whereby all hazardous material is stored, handled, treated or disposed of in a lawful and safe manner. An establishment operator shall operate and maintain all areas used for storage, treatment or handling of hazardous material in a manner which minimizes possibility of a fire, explosion or unplanned release, whether sudden or slow, into the air, soil or water.

**Sec. 13.60. Requirement for Contingency Plan.**

The owner or operator of each hazardous materials establishment permitted by this Article shall prepare and maintain a contingency plan which shall be filed with the local agency. The local agency shall file said plan with emergency response agency. The provisions of said plan shall be carried out immediately whenever there is a fire, explosion, or release of hazardous materials.

### Sec. 13.61. Contents of Contingency Plans.

Contingency plans shall include, but not be limited to, the following information:
(a) General description of the establishment;
(b) A listing of the chemical name or common name of all hazardous materials generated or handled;
(c) A listing of a chemical and physical analysis for each hazardous material, including the known proper method(s) of handling treatment, storage, and disposal of the materials;
(d) A list of name(s), address(es) and day and night phone numbers of all persons qualified to act as emergency coordinators;
(e) A list of emergency response agencies with phone numbers to be contacted in the event of a fire, explosion or unplanned release of hazardous materials;
(f) A description of procedures, equipment and materials to be used to contain and clean-up spills of hazardous materials;
(g) A list, description and location of emergency equipment available at the facility that will prevent to mitigate the exposure of humans and the environment to hazardous materials;
(h) An evacuation plan for all buildings and premises;
(i) An identification of all access driveways which will be maintained and be continually available for emergency response vehicles.

### Sec. 13.62. Responsibilities of Emergency Coordinator(s).

Emergency coordinators shall have the following responsibilities in the event of a fire, explosion or any unplanned release of hazardous material:
(a) Compliance with Sec. 13.63;
(b) Assist the emergency response agency authorized officer by providing information and assisting in expediting appropriate evacuation plans.

### Sec. 13.63. Notification of the Emergency Response Agency and Local Agency.

The emergency response agency as well as the local agency shall be **immediately** notified of any release of hazardous materials.

### Sec. 13.64. Hazardous Materials Spills or Release.

The emergency response agency shall have scene management authority of hazardous materials spills or release on streets, roads, public and private property, except freeways, within the city limits of the City of Vernon. Other city departments shall assist by providing their normal support roles of perimeter control establishing access routes for emergency equipment, assisting in evacuations of non-contaminated areas, providing equipment and personnel for containment and clean-up as directed by the authorized officer. The local agency shall consult with scene manager, take samples, make tests and otherwise assist in evacuations and clean-up as requested.

**Sec. 13.65. Personnel Training.**

The establishment operator shall be responsible for the training of all personnel that work with hazardous materials at the establishment. The training shall include classroom or on-the-job instruction which teaches facility personnel hazardous material management safety procedures, contingency plans and laws relevant to the positions in which they are assigned. Records shall be maintained by the establishment operator of names of personnel receiving training, dates of instruction and subject matter.

**Sec. 13.66. Requirements for the Termination of Hazardous Material Activities or Closure.**

The owner or operator of a hazardous materials establishment shall notify the local agency at least thirty (30) days before the date of termination of hazardous material activities or closure and apply for a Certificate of Closure. If the owner or operator has less than thirty (30) days advance knowledge of closure, he shall notify the local agency on the next working day after receiving such information.

**Sec. 13.67. Removal Requirement.**

Within ninety (90) days of closure of termination of hazardous material activities, all hazardous materials and hazardous material residues shall be properly removed from equipment, structure and premises.

**Sec. 13.68. Requirement for Certification of Closure of Hazardous Material Activities.**

(a) Both the owner or operator of a hazardous materials establishment and an independent qualified engineer registered in California, or a chemist with an appropriate degree in chemistry, shall submit to the local agency a certification that the establishment has complied with Sec. 13.67. The certificate shall detail the method of sampling or testing, as well as clean-up procedures followed. The disposition of hazardous materials formerly stored at the establishment shall be stated in the report;

(b) The premises shall not be reoccupied until the Certificate of Closure is approved by the local agency;

(c) A copy of the Certificate of Closure shall be provided the emergency response agency by the local agency within two (2) working days following approval.

**Sec. 13.69. Variance Applications.**

(a) Any permit holder or permit applicant who handles only a limited amount of hazardous materials which is generally available as an over-the-counter product to the public, may apply to the local agency for a variance from certain or all portions of this Article;

(b) Any permit holder or permit applicant may apply to the local agency for a variance from specific requirements of this Article;

(c) Variances will be considered based on the submission of clear and convincing justification or evidence that the granting of a variance will not pose a significant threat to public health, public safety, or the environment. Should the variance be denied, the applicant may appeal the denial to the City Council. Failure to file a written appeal with the City Clerk within thirty (30) days of said determination shall be deemed a waiver of the right to appeal.

(d) Variances may be revoked by the local agency upon ten (10) days written notice sent to applicant by regular mail at applicant's last address contained in applicant's last filed application. Said variance may be revoked because of operational changes such as, but not limited to, a change in the justification or evidence submitted with the original variance application, or for violations of applicable laws and/or regulations.

## Sec. 13.70. Further Regulations.

The local agency may promulgate regulations to further refine or clarify the requirements of this Article. Such regulation shall be contained in a resolution and shall be effective after the approval by the City Council. Upon approval, such regulations shall have the same force and effect as other provisions of this Article.

## Sec. 13.71. Applicability of Other Laws and Regulations.

Laws and regulations of other State, Regional and local agencies may apply, in addition to those of the California Department of Health Services listed in this Article.

## Sec. 13.72. Unsafe Handling of Hazardous Materials, Notices, Penalties.

The local agency is authorized to issue written orders to comply with provisions of this Article in cases where in the judgement of the local agency hazardous material is being improperly handled, used, stored or disposed of. Failure to comply with written orders issued by the local agency within the time specified could result in permit suspension or revocation and/or the assessment of civil penalties, fines, and imprisonment.

## Sec. 13.73. Penalties for Violation.

Any person violating any of the provisions of this Article shall be guilty of a misdemeanor and upon conviction thereof shall be punishable by a fine of not more than five hundred dollars ($500) or by imprisonment in the county jail for a period of not more than six (6) months, or by both such fine and imprisonment.

APPROVED AND ADOPTED this 24<u>th</u> day of <u>June,</u> 1986.

LEONIS C. MALBURG, Mayor

ATTEST:

BRUCE V. MALKENHORST, City Clerk

# EXHIBIT B

## ACQUISITION AGREEMENT

THIS ACQUISITION AGREEMENT (this "**Agreement**") is made the 22nd day of December, 1998, by and between **ALUMINUM COMPANY OF AMERICA**, a Pennsylvania corporation (hereinafter "**Seller**"), and **CENTURY ALUMINUM COMPANY**, a Delaware corporation (hereinafter "**Buyer**").

### BACKGROUND

1.   Seller owns the Cast Plate Business (defined below), located at 5401 Alcoa Avenue, Vernon, California 90058 (the "**Facility**").

2.   Seller transferred certain of the assets of the Cast Plate Business to "Newco," a newly created, wholly owned subsidiary of Seller.

3.   Seller desires to sell all of the common stock of Newco to Buyer, and Buyer desires to purchase the same from Seller, upon the terms and conditions set forth below.

NOW, **THEREFORE**, in consideration of the premises and the covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE 1
### DEFINITIONS

**Section 1.01  Certain Definitions.**  As used in this Agreement, the following terms have the following meanings unless the context otherwise requires:

(a)   "**Affiliate**" means any Person, directly or indirectly, controlling, controlled by, or under common control with Seller. Without limiting the generality of the foregoing, a Person is considered to be in control of or to be controlled by another Person if such Person holds 50% or more of the outstanding voting equity interest in such other Person or such other Person holds 50% or more of its outstanding voting equity interest.

(b)   "**Assets**" means all of the assets of Seller of every kind, character and description, tangible and intangible (other than the Excluded Assets), used in the Cast Plate Business, located at the Facility or otherwise necessary for operation of the Cast Plate Business, including without limitation:

   (1)   all tangible assets located at the Facility, including without limitation the cast plate manufacturing facility and Real Property (defined below), all manufacturing assets including capital equipment, vehicles, supplies, personal property, inventory (including the European Inventory), office furniture, fixed assets and fixtures, materials, on-site warehouse or storage facilities, and other tangible property or improvements used in the Cast Plate Business; all licenses, permits and authorizations issued by any

governmental organization relating to the Cast Plate Business; all contracts, agreements, leases, commitments and understandings pertaining to the Cast Plate Business; all customer lists, contracts, accounts and credit records located at the Facility; and all other Books and Records.

 (2) Transferred Property Rights.

 (3) all research data concerning historic and current research and development efforts relating to the Cast Plate Business located at the Facility, including designs of experiments and the results of unsuccessful designs and experiments.

(c) "**Assumed Liabilities**" means those obligations of Seller being assumed by Buyer pursuant to this Agreement, as identified on **Schedule 1.01(c)** hereto.

(d) "**Books and Records**" means all books and records and operating data solely relating to the Cast Plate Business, including, but not limited to, all lists of customers, lists of suppliers, all sales and credit information, advertising and purchasing materials and correspondence, quotation records, resume files, payroll master files and all collection, credit and accounting records.

(e) "**Cast Plate Business**" means the cast plate manufacturing and sales business and supporting activities of Seller as conducted at or from the Facility in Vernon, California.

(f) "**Code**" means the Internal Revenue Code of 1986, as amended. All citations to the Code or to the regulations promulgated thereunder include any amendments or any substitute or successor provisions thereto.

(g) "**Confidentiality Agreement**" means that certain non-disclosure agreement between Buyer and Seller, dated July 21, 1998.

(h) "**Encumbrance**" means any mortgage, covenant, condition, restriction, easement, right of way, option, lien, pledge, lease, charge, equity, claim, conditional sales contract, or security interest.

(i) "**Excluded Assets**" means those assets of Seller of the Cast Plate Business that Seller will retain, which assets are identified on **Schedule 1.01(i)** to this Agreement.

(j) "**GAAP**" means generally accepted accounting principles as applied by Seller in preparation of its financial statements, as further described in **Schedule 1.01(j)**. The methodology described therein will be the methodology used to prepare the WOC Statement.

(k) "**Intangible Assets**" means all patents, license and sublicenses, intellectual property, technical information, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, quality assurance and control procedures, design tools and simulation capability, and all manuals and technical information Seller provides to its own employees, customers, suppliers, agents or licensees.

(l) "**Net Working Capital**" means all of Newco's accounts receivables (including for this calculation purpose the International Accounts Receivable) and inventory (including for this calculation purpose the European Inventory), minus trade payables and all other current liabilities, all properly valued to reflect actual

condition and collectability on the Closing Date and consistently prepared in accordance with GAAP.

(m) **"Newco Employees"** means all of the salaried and hourly employees of the Cast Plate Business who are actively employed (including those employees currently on an authorized leave of absence, but excluding any employee on layoff status and any employee who retires from Seller effective January 1, 1999) by Seller as of the day before the Closing identified on **Schedule 4.06(b).**

(n) **"Normal Levels"** with respect to Net Working Capital means the cumulative amounts required by Newco to permit normal ongoing operation of the Cast Plate Business under normal business conditions as of the Closing Date, provided that it is any amount between $6.5 million and $7.0 million.

(o) **"Person"** means a natural person, a corporation, a partnership or any other entity.

(p) **"Permitted Encumbrances"** means liens disclosed on **Schedule 1.01(p),** liens for taxes and assessments not yet payable or being contested in good faith, and other imperfections of title, the existence of which does not and is not expected to have a material adverse effect on the operation of the Cast Plate Business.

(q) **"Property Rights"** means collectively Transferred Property Rights and Licensed Property Rights (as defined in Section 2.01).

(r) **"Return"** or **"Returns"** means all returns, declarations, reports, statements, and other documents required to be filed in respect of Taxes.

(s) **"Shares"** means all of the issued and outstanding capital stock of Newco.

(t) **"Tax"** or **"Taxes"** means any federal, state, local, foreign or other taxes (including, without limitation, income (net or gross), gross receipts, profits, alternative or add-on minimum, franchise, license, capital, capital stock, intangible, services, premium, mining, transfer, sales, use, ad valorem, payroll, wage, severance, employment, occupation, property (real or personal), windfall profits, import, excise, custom, stamp, withholding or governmental charges of any kind whatsoever (including interest, penalties, additions to tax or additional amounts with respect to such items).

(u) **"Transferred Property Rights"** means the intellectual property identified in **Schedule 4.04** and all trademarks, trade names, service marks and services names (except to the extent such intangible assets contain the name "Alcoa") used exclusively by the Cast Plate Business, as identified in Section 4.04 and as further provided in Section 9.14.

(v) **"European Inventory"** means the product inventory held and owned by Seller's wholly-owned subsidiary, Alcoa Europe S.A., for sale to the European customers of the Cast Plate Business.

(w) **"International Accounts Receivable"** means all accounts receivable of Seller's International selling companies for product sold to customers outside the United States and all products directly en route to customers outside the United States (and related accounts receivable).

ARTICLE 2
PURCHASE AND SALE

**Section 2.01 Transfer of Cast Plate Business to Newco.** Except as otherwise provided in this Agreement, before the Closing Date, Seller will have transferred all of the Assets to Newco, except that on the Closing Date Seller will cause its wholly-owned subsidiary, Alcoa Europe S.A., to directly transfer the European Inventory from Seller's Paal, Belgium warehouse (operated by Seller's wholly-owned subsidiary, N.V. AISC Belgium) to Buyer or Buyer's designee. In addition, prior to the Closing Date, Seller will grant a perpetual, nonexclusive, fully paid-up license to Newco in the form of **Schedule 2.01** (the **"License Agreement"**), to use, in manufacturing cast plate within the United States, all Intangible Assets, wherever located, that have been used in the manufacture of cast plate at the Facility ("**Licensed Property Rights**").

**Section 2.02 Purchase and Sale of the Shares.** Subject to the terms and conditions set forth in this Agreement, on the Closing Date, Seller hereby agrees to transfer, sell and convey the Shares to Buyer free and clear of all Encumbrances, and Buyer hereby agrees to purchase the Shares from Seller and assume the Assumed Liabilities for the consideration specified in this Agreement. Buyer's assumption of the Assumed Liabilities will be evidenced by the execution and delivery of an Assignment and Assumption Agreement in the form of **Schedule 2.02**.

**Section 2.03 Purchase Price.** As consideration for the sale of the Shares and the European Inventory to Buyer and the License Agreement, Buyer will pay to Seller (or Seller's designee) $8 million. This sum, as it may be adjusted pursuant to Article 3 below, is the "**Purchase Price.**"

**Section 2.04 Payment of the Purchase Price.**
(a)  Buyer will pay the Purchase Price to Seller by means of:
  (1)  Seller's retention of the International Accounts Receivable as of the Closing Date;
  (2)  a cash payment at Closing by Buyer or Buyer's designee to Alcoa Europe S.A. for the European Inventory in the amount of (book value of the European Inventory/.82) as of the Closing Date; and
  (3)  a cash payment equal to $8 million less the value of items (1) and (2) of this Section 2.04(a).
The parties agree that the value of the European Inventory and International Accounts Receivable reflected on the Financials (defined below) as at November 30, 1998 will be used for purposes of calculating the Purchase Price to be paid on the Closing Date.
(b)  On the Closing Date, Buyer will transfer to banks specified by Seller and Alcoa Europe S.A. by wire transfer of immediately available funds no later than 1:00 (one o'clock) in the afternoon (Eastern Standard Time) the amount of the Purchase Price due and owing each of Seller and Alcoa Europe S.A. as set forth in Section 2.03 above and in accordance with Section 2.04(a). If the payment is

made after 1:00 (one o'clock) in the afternoon on the day after the Closing Date, Buyer must pay to Seller, in the manner set forth above, interest on such amount at an annual rate equal to five percent (5%) from that date until payment is made, but not including the day on which payment is made.

## ARTICLE 3
## ADJUSTMENT TO PURCHASE PRICE

**Section 3.01  Preparation of WOC Statement.**  As soon as practicable, but in any event within 60 days after the Closing Date, Seller will prepare and deliver to Buyer an unaudited statement of Net Working Capital as of the Closing Date ("**WOC Statement**"). Buyer will give Seller and its independent auditors access at all reasonable times to the properties, books and records of Newco comprised in the Assets for such purpose.  The WOC Statement will be prepared in accordance with GAAP.

**Section 3.02  Review of WOC Statement.**  Buyer will have 30 days from the date of submission of the WOC Statement to review the WOC Statement.  Within such 30 day period, Buyer must advise Seller in writing of any adjustment Buyer believes is required to cause the WOC Statement to be consistent with GAAP.  If Buyer does not request an adjustment within the 30 day period, the WOC Statement will be considered final.  If any such adjustment is requested and is then disputed by Seller, Buyer and Seller must negotiate in good faith to resolve such dispute.  If the parties agree that the proposed adjustment is required, the WOC Statement will be adjusted accordingly and it will then be final.  If, after a period of 30 days following the date on which notice of any proposed adjustment is given, any adjustment still remains disputed, then Seller and Buyer will engage by mutual agreement (or failing mutual agreement, by lot) an independent auditor from one of the "Big Five" accounting firms (excluding the firms regularly used by Seller and Buyer) (the "**Auditor**") to resolve any remaining disputes.  The decision of the Auditor is final and binding on the parties.  The fees and expenses of the Auditor will be borne equally by Seller and Buyer, unless the Auditor reasonably concludes that another allocation of his or her fees and expenses is more equitable and appropriate given the legitimacy of the dispute.

**Section 3.03  Adjustment to Purchase Price.**
(a)  The Purchase Price will be adjusted as follows:
 (1)  If the value of the European Inventory as of the Closing Date is less than the November 30, 1998 value, the Purchase Price will be increased by such difference.  If the value of the European Inventory as of the Closing Date is greater than the November 30, 1998 value, the Purchase Price will be decreased by such difference.
 (2)  If the value of the International Accounts Receivable as of the Closing Date is less than the November 30, 1998 value, the Purchase Price will be increased by such difference.  If the value of the International Accounts Receivable as of the Closing Date is greater than the November 30, 1998 value, the Purchase Price will be decreased by such difference.

5

(3)  The Purchase Price is based on Normal Levels of Net Working Capital. If the Net Working Capital as determined by the WOC Statement exceeds $7.0 million, the Purchase Price will be increased by such excess. If the Net Working Capital as determined by the WOC Statement is less than $6.5 million, the Purchase Price will be decreased by such shortfall.

(b)  Any Purchase Price Adjustment required under Section 3.03(a)(1) must be made between Buyer and Alcoa Europe S.A. within seven days of finalization of the WOC Statement and paid in immediately available funds by the party owing such amount within seven business days following the determination of such adjustment. The net amount of all Purchase Price Adjustments required under either Section 3.03(a)(2) or (3) must be made within seven days of finalization of the WOC Statement and paid in immediately available funds by the party owing such amount within seven business days following the determination of such adjustment.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

As a material inducement to the execution, delivery and performance of this Agreement by Buyer, except as disclosed in the schedules hereto, Seller, for itself and as appropriate for Newco, hereby makes the following representations and warranties to Buyer.

**Section 4.01  Authority.** Seller has full corporate power and authority to execute and deliver this Agreement and each of the other related agreements and instruments to be executed and delivered by Seller pursuant hereto, and to consummate the transactions contemplated thereby. This Agreement and each of the related agreements are valid and binding agreements of Seller, are enforceable in accordance with their respective terms. No further action, approvals or consents are necessary for Seller to obtain from any third persons, governmental or otherwise (other than the consents and approvals listed on **Schedule 4.01** attached hereto), to make this Agreement and the related agreements valid and binding upon and enforceable against Seller in accordance with their respective terms, or to enable Seller to perform this Agreement and the related agreements and the transactions contemplated thereby, or to enable Buyer to operate the Cast Plate Business as conducted by Seller immediately prior to the Closing Date, it being understood that Seller will, subject to Section 9.06, obtain the consents and novations of the contracting parties listed on **Schedule 4.01**.

**Section 4.02  Organization and Good Standing.**

(a)  Seller is duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and has full corporate power and authority to consummate the transactions contemplated hereby. Newco is duly organized, validly existing and in good standing under the laws of the state of Delaware and has full corporate power and authority to consummate the transactions contemplated hereby.

(b)     Newco does not own, either directly or indirectly, and has no obligation, commitment or understanding to purchase or otherwise acquire, any interest or investment (whether equity or debt) in any joint venture, corporation, partnership, proprietorship or other entity or business. Seller has delivered to Buyer true and correct copies of (i) Newco's Articles of Incorporation, (ii) its Bylaws (duly certified by the Corporate Secretary of Newco), and (iii) the minute and stock books of Newco. Newco's minute book delivered to the Buyer contains minutes of all meetings of Newco's shareholders and Board of Directors and all other actions taken by such shareholder and Board of Directors since Newco's inception, and no other minutes or actions exist.

**Section 4.03 Capitalization; Title to Shares.**
(a)     Capital Shares.  The capital stock of Newco consists solely of 100 Shares of common stock, par value of One Dollar ($1.00) per share, of which 100 Shares are issued and outstanding. All of the issued and outstanding Shares are validly issued and outstanding, fully paid and non-assessable. The Shares have been issued and will be transferred to Buyer in compliance with all applicable federal, state and foreign securities laws. There are no outstanding subscriptions, options, warrants, calls or rights of any kind to purchase or otherwise acquire, and no securities convertible into, capital stock or other securities of Newco.
(b)     Title to Shares.  Seller is the owner, beneficially and of record, of all of the Shares. All of the Shares are free and clear of all Encumbrances. Seller has marketable title to all Shares.

**Section 4.04 Intellectual Property Rights.**  Schedule 4.04 contains a complete and correct list and description (including the name of the owner thereof) of the Transferred Property Rights. Seller or Newco is the registered and beneficial owner of all of the Property Rights free and clear of any royalty claims or other Encumbrances except as stated on Schedule 4.04. To Seller's knowledge, the rights of Seller and Newco in or to such Property Rights do not conflict with or infringe on the rights of any other person, and Seller has not received any claim or notice from any person to such effect nor, to Seller's knowledge, is any other person infringing such Property Rights.

**Section 4.05 Financial Information.**  The unaudited income statement and balance sheet of the Cast Plate Business dated as of November 30, 1998, for the eleven months then ended (the "Financials") are correct and complete and present fairly the financial position of the Cast Plate Business and Newco and the results of its operations for the respective period indicated, prepared in accordance with GAAP as consistently applied and described on Schedule 1.01(j).

**Section 4.06 Labor and Employment.**  Except as set forth in Schedule 4.06(a), Newco and the Cast Plate Business are not subject to any (i) collective bargaining or other labor agreement; or (ii) employment, retainer, or consulting agreement. Neither Seller nor Newco has committed, nor have been notified in writing of any claim to have committed, any unfair labor practice with respect to the Cast Plate Business. Schedule 4.06(b)

7

contains a complete and accurate list of all Newco Employees and their remuneration. Except as set forth on Schedule 4.06(b), none of the Newco Employees has given Seller or Newco notice that he/she will, or intends to, resign or seek other employment.

**Section 4.07  Title to Assets; Absence of Liens.** Newco has good and marketable title to, or, in the case of leased assets, has a valid leasehold interest in, all of the Assets, except (i) as disclosed in **Schedule 4.07(a)** and (ii) for Permitted Encumbrances. **Schedule 4.07(b)** sets forth a full and complete list of all items leased by Newco. Such leases are valid and assignable to Newco.

**Section 4.08  Real Property. Schedule 4.08** sets forth a complete description of the real property owned or leased by Newco used in operation of the Cast Plate Business (the "Real Property"). All improvements on the Real Property are in good condition and repair, reasonable wear and tear excepted, and have been maintained in accordance with the Facility's usual business practices.

**Section 4.09  Absence of Undisclosed Liabilities.** Except for the Assumed Liabilities, Newco does not have any other liabilities or obligations, secured or unsecured, whether accrued, absolute, contingent or otherwise. The representations and warranties of Seller contained in this Agreement do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make such representations and warranties not misleading. Seller is not aware of any fact which Seller reasonably believes has or is likely to have a material adverse effect on the Cast Plate Business which has not been disclosed in writing to Buyer.

**Section 4.10  Contracts.**

(a)     Copies of all material (for purposes of this Section 4.10 **"material"** means involving payment of at least $50,000 in one lump sum or during any 12 month period) contracts, agreements or arrangements relating to the Cast Plate Business have been delivered or made available to Buyer. Such contracts are valid and binding on the parties thereto in accordance with their respective terms and are in full force and effect and are not in default in any material respect.

(b)     Except as set forth on **Schedule 4.10**, neither Newco nor the Cast Plate Business is a party to or bound by:

(1)     any forward contract or option for the sale or purchase of any commodity;

(2)     any contract which, by reason of the sale of the Shares or any provision of this Agreement, gives any contracting party the right to increase or otherwise modify any obligation, right or liability of Newco or the Cast Plate Business;

(3)     any contract under which a third party guarantees any obligation of Newco or the Cast Plate Business; or

(4)     any contract, arrangement or understanding with Seller or an Affiliate of Seller, except to the extent Newco and Seller or an Affiliate of Seller contract for the supply of PMT header board.

8

(c)     No material supplier or customer of the Cast Plate Business has made a serious and credible threat to cease doing business with the Cast Plate Business.

**Section 4.11  Agreement Will Not Cause Breach.**  Neither the execution and delivery of this Agreement nor the consummation of the transactions herein contemplated will result in or constitute any of the following: (i) a default, breach or violation of any contract, lease, license, permit, franchise, promissory note, conditional sales contract, commitment, indenture, mortgage, deed of trust, security or pledge agreement or other agreement, instrument or arrangement to which Newco is a party or to which Seller is a party in relation to the Cast Plate Business; (ii) the creation or imposition of any Encumbrance on the Shares or the Assets; (iii) a violation or breach of any writ, injunction or decree of any court or governmental instrumentality to which Newco or Seller is subject; or (iv) a breach of the Articles of Incorporation of Newco or any amendment thereto or restatement thereof.

**Section 4.12  Legal Compliance.**  Except as set forth on **Schedule 4.12,** Seller and Newco have complied in all material respects with all applicable laws (including regulations, codes, plans, judgments, orders and rulings thereunder) of federal, state, local, and foreign governments (and all agencies thereof) in operating the Cast Plate Business, and no action, hearing, investigation, claim or demand has been filed or commenced, or to Seller's knowledge, threatened against Seller or Newco alleging any failure to comply.

**Section 4.13  Litigation and Proceedings; Insurance Claims.**  Except as set forth on **Schedule 4.13(a),** there are no claims, actions, suits, proceedings or investigations, judicial or administrative, pending related to or involving the Cast Plate Business or Newco.  **Schedule 4.13(b)** sets forth a true and complete list of all claims made in the last four years against Seller's insurance policies related to the Cast Plate Business.

**Section 4.14  The Cast Plate Business.**
(a)     As a result of this Agreement and the transactions provided for herein, except for the Excluded Assets, Buyer will acquire direct or indirect beneficial ownership of all of the assets owned or used by or useful to Seller and Newco in their operation of the Cast Plate Business.
(b)     Seller hereby represents the following:
    (i)     The Cast Plate Business will be operational on the Closing Date in substantially the same manner as conducted immediately prior to the Closing Date.
    (ii)    There are no defects in the environmental, zoning or other permits pertaining to operation of the Cast Plate Business, and Seller will not undertake, directly or indirectly, any challenges to the environmental, zoning or other permits pertaining to operation of the Cast Plate Business after the Closing Date.

**Section 4.15  Approvals, Permits and Authorizations.**  Except as set forth on **Schedule 4.15,** all governmental licenses, permits, certificates of inspection, other

9

authorizations, filings and registrations which are necessary for Newco to operate the Cast Plate Business as presently conducted (collectively, the "**Authorizations**") have been duly and lawfully secured or made by Newco and are in full force and effect. There is no proceeding pending or, to Seller's knowledge, threatened to revoke or limit any Authorization, and Seller represents that it will not undertake, directly or indirectly, any challenges to the Authorization after the Closing Date. With respect to renewal of Authorizations, Seller or Newco has made, in a timely manner, all necessary filings, reports, notices and other communications with the appropriate governmental body, and has otherwise taken, in a timely manner, all other action, known or anticipated to be required to be taken by Seller or Newco, reasonably necessary to secure the renewal of the respective Authorizations prior to the date of their respective expirations.

**Section 4.16  Tax Matters.**  Seller or Newco has filed, or will prepare and timely file, all tax returns or reports that are required to be filed by it for all periods prior to or including the Closing Date for the Cast Plate Business, and such returns or reports are (or to the extent filed between the date hereof and the Closing Date will be) correct and complete. All taxes (whether or not requiring the filing of returns or reports) of Seller and Newco related to the Cast Plate Business for the aforementioned periods have been timely and fully paid or adequately reserved.

**Section 4.17  Equipment.**
(a)    Seller has provided to Buyer a complete and correct list of all items of furniture, fixtures, vehicles, machinery and equipment owned or leased by Newco and used in operating the Cast Plate Business. Each of these items is in good working condition, reasonable wear and tear excepted, and has been maintained in accordance with Seller's usual business practices. Seller makes no representation with regard to idle equipment located at the Facility and transferred with the Cast Plate Business (a list of which is attached as **Schedule 4.17(a)**), except with respect to tooling and parts acquired in anticipation of the Alca Max casting project, which tooling and parts Seller represents are in good working condition, reasonable wear and tear excepted, and have been maintained in accordance with Seller's usual business practices.
(b)    Except as set forth on **Schedule 4.17(b)**, to the knowledge of Seller, the computer hardware and software contained in the Assets as part of the Cast Plate Business (including without limitation peripherals, communication links and storage media) are Year 2000 compliant and will not require any modification, development or upgrading to allow the Cast Plate Business to operate in the same manner as it currently operates after the year 1999.

**Section 4.18  Inventory.**  The inventory of the Cast Plate Business, such as raw materials, work in process and finished goods, has been manufactured and/or maintained in accordance with Seller's usual business practices and is marketable in the ordinary course.

**Section 4.19 Employee Benefits**

(a)     Schedule 4.19 lists each employee welfare benefit or employee pension benefit plan (individually, each an "**Employee Benefit Plan**" and collectively "**Employee Benefit Plans**") for the Cast Plate Business that Seller or Newco maintains or to which Seller or Newco contributes or in which the Newco Employees participate.

(b)     Each such Employee Benefit Plan (and each related trust, insurance contract, or fund) complies in form and in operation in all respects with the applicable requirements of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), the Code, and other applicable laws.

**Section 4.20  Accounting Records.**  The Books and Records and Financials are true and correct in all material respects, and neither Seller nor Newco has received any notice or allegation that any of the same is incorrect or should be rectified.

**Section 4.21  Loss of Rights.**

(a)     Except as set forth on **Schedule 4.21**, execution of this Agreement will not cause the Cast Plate Business to lose the benefit of any right or privilege it presently enjoys.

(b)     To the best of Seller's knowledge, except as disclosed on Schedule 4.06(b), execution of this Agreement will not cause any officer or senior Newco employee to leave his or her employment with Newco.

**Section 4.22  Disclosure.**  Seller and Newco have taken and will continue to take reasonable steps to preserve the confidential nature of all technical knowledge, confidential information and know-how of the Cast Plate Business.  Neither Seller nor Newco is aware that any such knowledge, information or know-how is in the unauthorized possession of, or is in unauthorized use, by any third party.  Buyer acknowledges that Seller has within its corporate organization some residual knowledge of the technical knowledge, confidential information and know-how of the Cast Plate Business.

**Section 4.23  Creditors.**  Seller and Newco have paid all of the creditors of the Cast Plate Business within the credit periods normally applied to the Cast Plate Business by such creditors.

**Section 4.24  No Other Warranties or Representations.**  BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, THE ASSETS OF THE CAST PLATE BUSINESS ARE BEING CONVEYED ON AN "AS IS, WHERE IS, WITH ALL FAULTS" BASIS.  NEITHER SELLER NOR NEWCO MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, EXCEPT AS SET FORTH IN THIS ARTICLE FOUR.  BUYER HAS INSPECTED, HAS HAD AN OPPORTUNITY AND WILL CONTINUE TO HAVE THE OPPORTUNITY TO INSPECT THE ASSETS, OBLIGATIONS AND LIABILITIES OF THE CAST PLATE

11

BUSINESS AND IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, NEWCO OR THEIR AGENTS OR REPRESENTATIVES, AS TO ANY MATTERS CONCERNING THE SAME EXCEPT AS PROVIDED IN THIS AGREEMENT. NOTHING HEREIN CONTAINED IS INTENDED TO CREATE ANY THIRD PARTY BENEFICIARY RIGHTS.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

As a material inducement to the execution and delivery of this Agreement by Seller, Buyer represents and warrants to Seller as follows:

**Section 5.01  Authority.**  Buyer has full corporate power and authority to execute and deliver this Agreement and each of the other related agreements and instruments to be executed and delivered by Buyer pursuant hereto, and to consummate the transactions contemplated thereby.  This Agreement and each of the related agreements are valid and binding agreements of Buyer, are enforceable in accordance with their respective terms, and no further action, approvals or consents are necessary for Buyer to obtain any actions, approvals or consents from any third persons, governmental or otherwise (other than the consents and novations listed on **Schedule 5.01** attached hereto), to make this Agreement and the related agreements valid and binding upon and enforceable against Buyer in accordance with their respective terms, or to enable Buyer to perform this Agreement and the related agreements and the transactions contemplated thereby.

**Section 5.02  Organization and Good Standing.**  Buyer is duly organized, validly existing and in good standing under the laws of Delaware and has full corporate power and authority to consummate the transactions contemplated hereby.

**Section 5.03  Validity of Contemplated Transactions.**  Neither the execution and delivery of this Agreement nor the consummation of the transactions herein contemplated will contravene or violate any law, regulation, ordinance or governmental rule to which Buyer is subject, which violation would have an adverse effect on Buyer's ability to consummate the transactions contemplated hereby.  Buyer further represents and warrants that the execution and delivery of this Agreement and the consummation of the transactions herein contemplated will not cause any breach of the Articles of Incorporation or Code of Regulations or similar corporate documents of Buyer or any amendment thereto or restatement thereof.

**Section 5.04  Intent to Operate.**  Buyer is acquiring the Shares with the intention of operating the Cast Plate Business, and not with a view to the sale or distribution thereof and Buyer has no commitment or present intention to liquidate Newco or otherwise discontinue operation of the Cast Plate Business.

**Section 5.05  Litigation and Proceedings.**  Except as set forth on **Schedule 5.05**, Buyer is unaware of any claims, actions, suits, proceedings or investigations, judicial or administrative, pending or involving Buyer that seeks to restrain, prohibit or invalidate the transactions contemplated by this Agreement or that might affect the ability of the parties to consummate the transactions contemplated hereby.

**Section 5.06  Availability of Funds.**  Buyer will have available on the Closing Date sufficient funds to enable it to consummate the transactions contemplated by this Agreement.

**ARTICLE 6**
**COVENANTS OF SELLER PENDING CLOSING**

Seller, for itself and Newco, covenants and agrees that, from and after December 1, 1998, until the Closing Date:

**Section 6.01  Conduct of Business.**  Seller and Newco will, except as otherwise required by the Final Judgment (defined below):

(a)    conduct the Cast Plate Business and market the products and services in the ordinary course and in substantially the same manner as heretofore conducted and marketed;

(b)    maintain and keep its properties and equipment of the Cast Plate Business in substantially as good repair, working order and condition as at the date hereof, except for ordinary wear and tear;

(c)    keep in full force and effect insurance comparable in amount and scope of coverage to that maintained by it with respect to the Cast Plate Business before the date hereof (Seller's current insurance coverage with respect to the Cast Plate Business is set forth as **Schedule 6.01**);

(d)    not make any capital expenditure for the Cast Plate Business, or any commitment with respect thereto in excess of $100,000, except as provided in the capital budget of the Cast Plate Business;

(e)    use its best efforts to retain its present employees of the Cast Plate Business so that they will be available to provide service to the Cast Plate Business after the Closing, but not grant any compensation or benefits increases outside the ordinary course (except for retention bonuses, if any, granted by Seller to be paid by Seller for employment prior to the Closing Date);

(f)    not interfere with any negotiations by Buyer to employ any employee of the Cast Plate Business;

(g)    use its best efforts to maintain the existing relationships of the Cast Plate Business with its suppliers and customers so that they will be preserved after the Closing;

(h)    not take any affirmative action that would render Seller's representations and warranties hereunder inaccurate as of the Closing Date; and

(i)    not remove the Assets from the Facility except in the ordinary course of business.

Section 6.02 **Supplements to Disclosure.** From time to time prior to the Closing, Seller, upon notice to and agreement of Buyer, will promptly supplement or amend the Schedules hereto with respect to any matter hereafter arising which, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in such schedules.

## ARTICLE 7
## CONDITIONS PRECEDENT TO THE CLOSING

Section 7.01 **Conditions to the Obligations of Both Parties.** The obligations of Buyer and Seller to consummate the transactions contemplated hereby are, at the option of each party hereto, subject to the fulfillment of the following conditions precedent:

(a)    Government Order. No injunction, writ, temporary restraining order or any order of any nature issued by any court or governmental agency may exist directing that the transactions contemplated by this Agreement not be consummated.

(b)    Government Action. No pending or known to be threatened action, proceeding or investigation may exist before any court or governmental agency seeking as to any party hereto any injunction, writ, temporary restraining order or other such order.

(c)    Government Approval. The United States government, in its sole discretion, must approve Buyer as an acceptable purchaser of the Cast Plate Business, and must agree that the transactions contemplated by this Agreement satisfy the requirements of the Final Judgment among the United States of America, Seller and Alumax Inc., dated June 15, 1998 ("**Final Judgment**"). Buyer and Seller may not waive this condition precedent to Closing.

(d)    No Unreasonable Conditions on Government Approval. The United States government, in approving Buyer as an acceptable purchaser of the Cast Plate Business, must not have imposed any unreasonable conditions on Buyer to grant such approval.

Section 7.02 **Conditions Precedent to Obligation of Buyer.** The obligation of Buyer to purchase the Shares and assume the Assumed Liabilities at the Closing is subject to the satisfaction, or the waiver by Buyer in writing, at or prior to the Closing, of the following conditions precedent:

(a)    Accuracy of Representations and Warranties. The representations and warranties of Seller and Newco contained in this Agreement (i) qualified as to materiality must have been true and correct in all respects when made and must be true and correct in all respects at and as of Closing; and (ii) not qualified as to materiality must be true and correct in all material respects when made and must be true and correct in all material respects at and as of the Closing, except as affected by the transactions contemplated hereby.

(b)    Performance by Seller and Newco. Seller and Newco must have duly performed and complied with, in all material respects, the terms, agreements, covenants and

conditions required by this Agreement to be performed or complied with by them prior to or at the Closing.

(c)    Board Approval. This Agreement and the transactions contemplated hereby must have been approved by Buyer's Board of Directors.

(d)    Material Changes. Between the date of this Agreement and the Closing, there shall not have been any material adverse change to the Assets or the Cast Plate Business.

(e)    Closing Documents. Buyer must have received all of the documents required to be delivered to Buyer pursuant to Sections 8.02 and 8.04.

**Section 7.03 Conditions Precedent to Obligation of Seller.** The obligation of Seller to sell the Shares at the Closing is subject to the satisfaction, or waiver by Seller in writing, at or prior to the Closing, of the following conditions precedent:

(a)    Accuracy of Representations. The representations and warranties of Buyer contained in this Agreement must have been true and correct in all material respects when made and must be true and correct in all material respects at and as of the Closing, except as affected by the transactions contemplated hereby.

(b)    Performance by Buyer. Buyer must have duly performed and complied with, in all material respects, the terms, agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

(c)    Closing Documents. Seller must have received all of the documents and the Purchase Price required to be delivered to Seller pursuant to Sections 8.03 and 8.04.

(d)    Final Judgment. Buyer must have agreed to be bound by the provisions of the Final Judgment. Seller may not waive this condition precedent to Closing.

## ARTICLE 8
## THE CLOSING

**Section 8.01 Time, Date and Place of Closing.** The closing of the transactions contemplated in this Agreement (the "**Closing**") will take place at the offices of Aluminum Company of America, 201 Isabella Street, Pittsburgh, Pennsylvania at 10:00 a.m. on December 31, 1998, or at such other place and time as agreed to by Seller and Buyer (the "**Closing Date**").

**Section 8.02 Seller's Obligations at the Closing.** At the Closing, Seller will deliver or cause to be delivered to Buyer the following:

(a)    the share certificate or certificates evidencing the Shares, duly endorsed for transfer to Buyer;

(b)    a Deed of Transfer in substantially the form of **Schedule 8.02(b)** in form and substance reasonably satisfactory to Buyer and sufficient to sell, transfer and assign to Buyer (or Buyer's designee) all right, title and interest of Alcoa Europe S.A. in the European Inventory;

(c)     resignations of all officers and directors of Newco, as well as resignations of all authorized signatories on bank accounts to the extent requested by Buyer;

(d)     copies of all consents, waivers and approvals required under this Agreement, to the extent failure to obtain any such consent, waiver or approval is or is reasonably likely to be materially adverse to the Cast Plate Business;

(e)     the License Agreement attached hereto as **Schedule 2.01**, executed by Newco and Seller; and

(f)     such other evidence of the performance of all covenants and satisfaction of all conditions required of Seller and Newco at or prior to Closing as Buyer may reasonably require; and

**Section 8.03  Buyer's Obligations at the Closing.**  At the Closing, Buyer will deliver or cause to be delivered to Seller the following:

(a)     a wire transfer of funds in an amount equal to the Purchase Price;

(b)     the Assignment and Assumption Agreement attached hereto as **Schedule 2.02**, executed by Buyer; and

(c)     such other evidence of the performance of all covenants and satisfaction of all conditions required of Buyer at or prior to Closing as Seller may reasonably require.

**Section 8.04  Joint Obligations at the Closing.**  At the Closing, Buyer and Seller will execute and deliver to the other all other documents reasonably required by Seller or Buyer to consummate the transactions contemplated by this Agreement.

## ARTICLE 9
## ADDITIONAL COVENANTS OF BUYER AND SELLER

**Section 9.01  Press Releases.**  Except as may be required by applicable law, neither Buyer nor Seller nor any of their respective Affiliates will issue any press release or other public communication relating to this Agreement or the transactions contemplated hereby without the prior consent of the other party hereto.

**Section 9.02  Alcoa Name.**  After the Closing Date, Buyer may not use the names "Alcoa," "Aluminum Company of America" or any associated trademarks for any purpose whatsoever; provided, however, that Buyer (i) may use preprinted advertising brochures that use or contain the Alcoa name or trademark for up to three months so that Buyer may obtain new brochures; and (ii) will have no obligation to repackage cast plate products packaged in materials containing the Alcoa name or trademark in inventory on the Closing Date (though Buyer may not use after the Closing Date any packaging containing the Alcoa name or trademark in inventory on the Closing Date if not actually packaging cast plate).  Buyer will use its best efforts to eliminate the Alcoa name and trademarks, through the use of stickers or otherwise, from the packaging and brochures during this three month transition period.

16

**Section 9.03  Further Assurances.** After the Closing and for no further consideration, Buyer and Seller will perform all such other actions and will execute, acknowledge and deliver all such assignments, transfers, consents and other documents as the other may reasonably request to complete the transactions contemplated hereby.

**Section 9.04  PMT Header Board.** After the Closing, Buyer, at its option, may buy from Seller, under reasonable terms and conditions of sale and purchase, PMT Header Grade calcium silicate board for ingot casting molds, machined by Seller to Buyer's specifications as approved by Seller, in an amount up to Buyer's actual requirements for the Cast Plate Business at the Facility.

**Section 9.05  Pre-Closing Diligence.** Between the date of this Agreement and the Closing, Seller will give Buyer and its representatives (including, without limitation, its accountants, counsel and employees), upon reasonable notice and during normal business hours, reasonable access to the assets, properties, contracts, books, records, personnel and affairs of Seller relating to the Cast Plate Business (including without limitation all environmental, zoning and other permit documentation and information) and will cause Seller's officers and employees to furnish or otherwise make available to Buyer all documents, records and information (including without limitation financial, operational and other such information customarily provided as part of the diligence process) concerning the affairs of Seller relating to the Cast Plate Business as Buyer may reasonably request. Upon prior notice to Seller, Buyer, in connection with its due diligence, may contact customers and/or suppliers of the Cast Plate Business and make other reasonable inquiries with other third parties regarding the status of their relationship with Seller and the Cast Plate Business.

**Section 9.06  Cooperation and Assignments.** From the date hereof and after the Closing Date, Seller will use its best efforts, and Buyer will cooperate with Seller, to secure all necessary consents, approvals, authorizations, exemptions and waivers from third parties required to enable Buyer to obtain the benefit of the transactions contemplated hereby. If Seller is unable to obtain any such consent, Seller may, but is not required to, enter into a reasonable arrangement with Buyer, at Seller's expense, designed to provide for Buyer the benefit of any such right, including enforcement of any and all rights of Seller against the other party to any contract, commitment or other similar agreement arising out of the breach or cancellation thereof by such party or otherwise.

**Section 9.07  Post-Closing Access and Cooperation.**

(a)     After the Closing Date as either party may from time to time reasonably request, the other party will provide the requesting party with such information regarding Newco and the Cast Plate Business as such party reasonably requires. But, neither party will be obligated to provide the other party with any information of a commercially sensitive nature, relating to trade secrets or in violation of the Final Judgment, applicable law, rule or regulation or any contractual provision prohibiting disclosure.

17

(b)      Seller and Buyer will cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim (as defined below), including making available records relating to such Claim and furnishing, without expense to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Claim or for testimony as a witness in any proceeding relating to such Claim.

**Section 9.08  Liabilities.**  Buyer agrees to pay, as they become due, the Assumed Liabilities and all debts and liabilities of Newco incurred after the Closing Date.  Buyer understands and agrees that from and after the Closing, except as specifically provided in this Agreement to the contrary, Seller has no liability nor responsibility for any liability or obligation of Newco of whatever kind or nature, whether contingent or absolute, and whether arising prior to or on or after the Closing Date.  Except as otherwise provided in this Agreement, however, Seller will retain responsibility for all claims, including without limitation third party claims for personal injury, filed after the Closing Date to the extent such claims relate to actions or inactions of Seller prior to the Closing Date.

**Section 9.09  Employee Matters.**  The parties intend that the sale of Newco is as an ongoing business and therefore it will not constitute a shutdown for purposes of entitling any Newco Employees to immediate payment of pension or severance benefits or any other shutdown related benefits under Seller's existing labor agreements, pension or severance plans or employment policies applicable to such employees immediately prior to the Closing.  Consistent with such intent of the parties, the parties agree to the following:

(a)      Comparable Employment.  Buyer will offer employment to all of the non-represented Newco Employees actively at work at the Cast Plate Business on the date of the Closing ("**Non-Represented Employees**") on substantially the same terms and conditions in the aggregate as that on which they were employed at the Closing.  Nothing contained herein prohibits Buyer from terminating, discharging or laying off any employees after the Closing Date.  Recall to bargaining unit positions will be governed by the provisions of the applicable labor agreement. Non-Represented and represented Newco Employees who are absent from work at the Closing for reasons other than layoff (e.g., leave of absence or disability) will be offered employment by Buyer.  Buyer will offer employment to any active employee of Seller for the Cast Plate Business who applies for retirement from employment with Seller, effective January 1, 1999, after the date of this Agreement and prior to five days prior to the Closing Date.  Seller will provide Buyer with a list of those employees who so apply to retire within five days of the Closing Date.

(b)      Successorship.  Buyer is the successor to Seller's rights and obligations in the collective bargaining agreement and the Pension Agreement identified in **Schedule 4.06(a)** with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, its local No. 808 (the "**Union**").

(c)      Compensation and Benefit Plans.  For a period of one year after the Closing Date, the benefits, benefit plans and rates of pay established by Buyer and applicable to

Non-Represented Employees at the Cast Plate Business who go to work for Buyer will be substantially similar in the aggregate as those applicable to such employees as of the Closing. Buyer's benefits, benefit plans and rates of pay applicable to represented Newco Employees will be as set forth in the applicable collective bargaining agreement. If any Non-Represented Employees participate in Buyer's benefit plans, Buyer will provide credit to such employees hired by Buyer for prior service as employees of Seller for all purposes under Buyer's plans. For those employees who retire prior to the Closing and are hired by Buyer after the Closing, such employees will receive credit for years of prior service with Seller or an Affiliate of Seller for eligibility and vesting purposes only for all benefit plans of Buyer, except Buyer's severance plan, defined benefit plans and other post-employment benefits. Such employees also will receive service credit for seniority purposes under the bargaining agreement with the Union.

(1)    Employee Welfare Benefit Plans. As of the Closing Date, Buyer will cause Newco to maintain in accordance with their terms plans identical to Employees Group Benefit Plan of Aluminum Company of America, Plans I & II, which will exclusively cover the Newco Employees hired by Buyer (and not any other employees of Seller). As of the Closing Date, Buyer will establish new employee welfare benefit plans comparable to the employee welfare benefit plans of Seller, under which other welfare benefits will be provided to the Newco Employees hired by Buyer (e.g., Optional Life, Severance and SUB).

(2)    Defined Contribution Plans. As of the Closing Date, the Newco Employees will not be eligible for, and may no longer make contributions (or have contributions made on their behalf) to, Seller's defined contribution plans (the "Seller DC Plans"), other than contributions payable for periods prior to the Closing Date which have not been remitted as of the Closing Date. Seller will make all matching contributions to all Seller DC Plans with respect to the period prior to the Closing Date. Seller will cause each Newco Employee to be fully vested in such Newco Employee's account balance in a Seller DC Plan in which such Newco Employee participates as of the Closing Date. Buyer will designate one or more defined contribution plans in which the Newco Employees hired by Buyer will be eligible to participate effective as of the Closing Date (the "Buyer DC Plans"), and the Newco Employees hired by Buyer will be immediately eligible to participate in the Buyer DC Plans. Within 90 days of the Closing, Seller will distribute account balances of the Seller DC Plans to the Newco Employees who so elect to receive distributions. During this 90 day period, Buyer and Newco will allow the Newco Employees hired by Buyer to transfer their account balances to the Buyer DC Plans.

(3)    Defined Benefit Plans. As of the Closing Date, the Newco Employees will cease to accrue additional benefits under Seller's defined benefit pension plans. Seller will cause each such Newco Employee to be fully

19

vested in such Newco Employee's accrued benefit under each Seller defined benefit plan in which such Newco Employee participates as of the Closing Date. As soon as practicable after the Closing Date, Seller and Buyer will transfer all benefit liabilities accrued under Seller's defined benefit plans with respect to the Newco Employees hired by Buyer, together with a corresponding amount of cash assets (as further defined below), from Seller's defined benefit plans and related trust to Buyer's defined benefit plans and related trust. Upon the completion of such liability and asset transfers, neither Seller nor Seller's defined benefit plans will have any further liability with respect to such accrued benefits, and such accrued benefits will be the sole responsibility of Buyer under its defined benefit plans. With respect to the transfer of assets and liabilities from Seller's defined benefit plans, Buyer and Seller agree that Seller will transfer assets in an amount of cash necessary to comply with Code Section 414(l) as of the Closing Date using actuarial assumptions as determined by Seller and Buyer.

(4)     Vacation Pay. Buyer will assume responsibility for accrued but unpaid (as of the Closing Date) vacation pay of Newco Employees hired by Buyer.

(5)     OPEB. Buyer will assume responsibility and liability for other post-employment benefits (retiree medical and life insurance) for the Newco Employees hired by Buyer after the Closing Date. Seller will transfer no cash assets to Buyer for assuming this liability.

(d)     Obligations Post-Closing. Neither Buyer nor Newco will assume or be responsible for any liability in respect of benefits under Seller's benefit plans which are payable at any time to, or in respect of, any former or present employee of the Cast Plate Business not employed by Buyer after the Closing. Furthermore, Seller will be responsible for all claims of the Newco Employees of the Cast Plate Business who are employed by Buyer which (i) arise, within the meaning of any existing benefit program maintained by Seller for the employees of the business, prior to the date of the Closing (including without limitation claims for benefits filed after the Closing Date that Buyer can reasonably demonstrate relate to incidents that occurred prior to the Closing Date) and (ii) are payable under the terms and conditions of such program. Buyer will be responsible for all such claims for benefits which (i) arise, within the meaning of any benefit program maintained by Buyer for its employees, on or after the date of the Closing and (ii) are payable under the terms and conditions of such program.

(e)     Shutdown Post-Closing. Buyer will assume any pension or severance pay benefit liability or any other shutdown related benefit liability arising on account of shutdowns after the Closing. Seller will have no obligation to Buyer with respect to any liability incurred by Buyer for pension or severance pay benefits or any other shutdown of any operation after the Closing.

(f)     Cooperation. After the Closing, Buyer and Seller will each provide the other on a continuing basis at no cost to the other such information regarding former employees of Seller who are employed by Buyer as the other will reasonably

20

request in order to permit proper administration of its various benefit plans applicable to such employees.

### Section 9.10  Seller's Right and Responsibilities for Taxes.

(a)     Seller is responsible for preparing and filing all Returns required by law to be filed by Seller relating to the Cast Plate Business and covering or including periods ending on or before the Closing Date and for the payment of all Taxes due with respect to such periods.  Buyer will cooperate in such preparation and filing of all such Returns, including the preparation and execution of tax forms and related schedules for inclusion in Seller's Returns when such data becomes available to Buyer.  Seller will retain any refunds received of federal, state or other taxes paid for periods ending on or before the Closing Date relating to the Cast Plate Business.

(b)     With respect to any future claims by taxing authorities arising from tax Returns relating to the Cast Plate Business and covering or including periods ending on or before the Closing Date, Seller may contest such claims at Seller's expense.  Seller also may, at Seller's expense, amend any returns relating to the Cast Plate Business for the period prior to and including the Closing Date.  But, to the extent that such amendment causes a Tax liability to Buyer for the period prior to the Closing Date, Seller will indemnify Buyer against such Tax liability.

### Section 9.11  Buyer's Rights and Responsibilities for Taxes

(a)     Buyer will provide to Seller within a reasonable period of time any information, including Books and Records, in its possession for the period ending on or before the Closing Date necessary to complete the Returns required to be filed by Seller or necessary in connection with any contest of any claims by or against a taxing authority.

(b)     Except as otherwise provided in this Agreement, Buyer is responsible, after the Closing Date, for the preparation and filing of all federal, state and other tax Returns required to be filed by it or Newco and the payment of all Taxes due thereunder with respect to the Cast Plate Business subsequent to the Closing Date. Seller will reimburse Buyer for all Taxes and interest or penalties, if any, paid by Buyer related to the Cast Plate Business for periods prior to the Closing Date.

### Section 9.12  Other Tax Matters.

(a)     At Buyer's option, exercisable in its sole discretion, at any time prior to the Closing, Buyer and Seller will jointly make the election provided for by Sections 338(g) and 338(h)(10) of the Code and Treasury Regulation Section 1.338(h)(10)-1 (and any comparable election under state or local tax law) with respect to Buyer's purchase of the Shares.  In connection with such election, Buyer and Seller will cooperate with each other to take all actions as may be reasonably required, including execution and delivery by Seller within 30 days of the Closing Date a Form 8023 and the reporting by each of Seller and Buyer of the purchase of the Shares commitment with the election to any and all taxing authorities and on all Tax returns.  Further, in the event of such election, the parties will in good faith, not later than 30 days after the Closing Date, agree upon

21

and be bound by the "Modified Aggregate Deemed Sales Price" of the Assets and related allocations in accordance with Code Section 338(b)(5) and Treasury Regulation Section 1.338(h)(10)-(1)(f).

(b) Buyer is responsible for all sales and transfer Taxes arising from the transfer of the Cast Plate Business to Buyer, including without limitation VAT on the sale of the European Inventory and sales and transfer Taxes arising from the transfer of the Assets to Newco. To the extent that transfer of the Assets to Newco causes a sales or transfer Tax liability to Seller, Buyer will indemnify Seller against such Tax liability.

**Section 9.13  Cash Dividends.** Seller may cause Newco to dividend or otherwise transfer to Seller, or to any Affiliate of Seller, the cash receipts of Newco received from time to time before the Closing Date.

**Section 9.14  Alcoa Alca Plus.** Seller agrees to cooperate with Buyer to the extent necessary to perfect ownership of that portion of the *Alcoa Alca Plus* trademark that can be transferred to Buyer without transfer of the "Alcoa" portion of that trademark. As soon as practicable after the Closing Date, Buyer will file trademark registrations in the countries of its choice in the name of Newco to perfect its own ownership in the "Alca Plus" portion of this trademark. Buyer may not use the *Alcoa Alca Plus* trademark.

**Section 9.15  Covenant Regarding Transferred Property Rights.** Neither Newco nor Buyer will sue Seller or an Affiliate of Seller for infringement of the trade secrets and know-how contained in the Transferred Property Rights by Seller after the Closing Date, so long as Seller can reasonably demonstrate that Seller or an Affiliate of Seller was using such trade secrets or know-how prior to the Closing Date. This covenant not to sue does not prohibit either Newco or Buyer from suing Seller or an Affiliate of Seller for unauthorized use of any trademark, tradename, service mark or service name contained in the Transferred Property Rights.

**Section 9.16  Subdivision of the Real Property.** The parties acknowledge that the Real Property intended to be sold by Seller and purchased by Buyer as part of the Cast Plate Business under this Agreement is not currently a legal parcel in compliance with the Subdivision Map Act of the State of California, as interpreted by Los Angeles County or the City of Vernon. The parties will cooperate and at Seller's expense use their best efforts to obtain a final parcel or subdivision map of the Real Property ("**Final Parcel Map**"), including without limitation cooperating with all governmental authorities. If the Final Parcel Map has not been obtained by the Closing Date, the parties agree to enter into a leasing arrangement under which Seller will lease to Buyer, for no additional consideration, the Real Property. Upon approval of the Final Parcel Map, Seller will immediately transfer, for no new consideration, the Real Property to Buyer in accordance with the terms of this Agreement.

**Section 9.17  Transition Services.** For up to one year from the Closing Date, Seller will, at Buyer's cost and expense, provide such assistance and cooperation to Buyer as Buyer may

22

reasonably request to ensure a smooth and efficient transfer of control of the Cast Plate Business from Seller to Buyer. Seller will make the administrative services identified in **Schedule 9.17** available on a reasonable basis, after request by Buyer, giving appropriate consideration to Seller's ongoing business requirements.

**Section 9.18  Buyer Bound by Final Judgment.**  Buyer hereby agrees to be bound by all of the terms of the Final Judgment, as required by Article III.B of the Final Judgment.

# ARTICLE 10
## REAL PROPERTY AND ENVIRONMENTAL MATTERS

**Section 10.01  Definitions.**

(a)     Hazardous Substance.  For purposes of this Article, "**Hazardous Substance**" means any substance, chemical or waste that is listed or defined as hazardous, toxic, or dangerous under Applicable Law (defined below).

(b)     Applicable Law.  For purposes of this Article, "**Applicable Law**" means any and all federal, state and local laws concerning the protection of human health and the environment, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act ("**CERCLA**"), 42 U.S.C. §§ 9601 et seq.; the Resource Conservation and Recovery Act ("**RCRA**"), 42 U.S.C. §§ 6901, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.; the Clean Air Act, 42 U.S.C. §§ 7401, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1471 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; and the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; each, as amended from time to time, or any successor laws thereto, together with the rules and regulations promulgated thereunder, together with any and all environmental or land use laws, rules, ordinances, or regulations.

(c)     Cleanup.  For purposes of this Article, "**Cleanup**" means all actions required to: (i) clean up, remove, treat or remediate any Hazardous Substance in the indoor or outdoor environment; (ii) prevent the Release of Hazardous Substances so that they do not migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations and post-remedial monitoring and care; or (iv) respond to any government requests for information or documents in any way relating to cleanup, removal, treatment or remediation of the indoor or outdoor environment.

(d)     Release.  For purposes of this Article, "**Release**" means any release, spill, emission, discharge, leaking, pumping, injection, deposit, disposal, dispersal, leaching or migration into the indoor or outdoor environment (including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the movement of any Hazardous Substance through or in the air, soil, surface water, groundwater or property.

(e)     Environmental Liabilities.  For purposes of this Article, "**Environmental Liabilities**" means all Losses (as defined in Article 12 below) incurred or required to be paid as a result of or arising out of:

(i)    Hazardous Substances that are or were at, upon, in or under the Real Property prior to the Closing due to the actions or inactions of Seller or an Affiliate of Seller, the Cleanup of which either is required by a directive or order of a governmental agency or if the parties agree that Cleanup is reasonably required pursuant to Applicable Law,

(ii)    Hazardous Substances Released at anytime at any location other than the Real Property (including Hazardous Substances emanating from the Real Property) if such Hazardous Substances were generated, stored, disposed of, recycled, Released, used or transported, by or on behalf of Seller or an Affiliate of Seller prior to the Closing, or

(iii)    acts, omissions or any noncompliance with any Applicable Law by Seller or an Affiliate of Seller prior to the Closing if Cleanup of Hazardous Substances either is required by a directive or order of a governmental agency or if the parties agree that Cleanup is reasonably required pursuant to Applicable Law.

**Section 10.02 Buyer's Assessment.** Buyer may conduct and complete, at its sole cost and expense, an environmental transfer assessment of the Real Property prior to Closing ("**Buyer's Assessment**"). Seller will permit Buyer or its representatives to enter upon any and all of the Real Property for the purposes of inspection, making tests, taking samples and soil borings, and/or conducting groundwater studies, upon prior notice and consent by Seller, in order to complete Buyer's Assessment. Buyer must provide upon request a copy, excluding any portion thereof containing attorney-client privileged communications, to Seller of any reports, studies or analyses prepared by or for Buyer related to the Real Property as a result of Buyer's Assessment. All such reports, studies and analyses and any information prepared for or received or obtained by Buyer related to the Real Property must be held in strict confidence by Buyer in accordance with the Confidentiality Agreement. Seller may establish reasonable rules related to Buyer's access of the Real Property to conduct Buyer's Assessment, which will be consistent with Seller's responsibilities under the Final Judgment.

**Section 10.03 Environmental Indemnification and Remediation Activities.**

(a)    Seller will, subject to the limitations set forth in Section 12.06, indemnify, defend and hold Buyer, Affiliates of Buyer and Buyer's lenders harmless from and against any and all Environmental Liabilities. Except as disclosed to Buyer in Seller's Phase I Environmental Health and Safety Assessment Report and Limited Phase II Environmental Site Investigation and in Section 10.03(c), to Seller's knowledge, no radioactive materials, underground storage tanks, active or inactive landfills or active or inactive surface impoundments are located at the Real Property or the Facility.

(b)    Scope of Remediation. Seller and Buyer will cooperate in response to any directive or order of a governmental agency concerning any Cleanup or any Third Party Claim (as defined in Section 12.04) seeking to hold Buyer responsible for Environmental Liabilities in accordance with this Section 10.03(b).

24

(i)    Notwithstanding Section 12.04 and 12.05, upon receipt by Buyer or Seller of any directive or order of a governmental agency concerning a Cleanup for which Buyer believes it is entitled to indemnification from Seller under this Article 10, Buyer and Seller will cooperate in the development of a response to the directive or order for the purposes of achieving cost effective results, consistent with Buyer's operational needs.

(ii)    Notwithstanding the foregoing, Seller shall have the sole right and obligation to defend, consistent with the requirements of Article 12, any Third Party Claim for which it is solely liable hereunder, and Buyer shall have no right or obligation to participate or conduct the defense of such Third Party Claim.

(c)    Activities Assumed by Seller. Seller is responsible for and will complete the remedial actions set forth below. With respect to the remedial activities set forth in Sections 10.03(c)(1)-(4) and (6), Seller will remediate to the levels required by an authorized governmental agency to obtain a "no further action" statement (or other equivalent approval). With respect to the remedial activities set forth in Section 10.03(c)(5), Seller will alleviate the notice of violation ("**NOV**") as required by the governmental agency that issued the NOV. With respect to the remedial activities set forth in Section 10.03(c)(7), Seller will remediate in accordance with the requirements set forth therein.

(1) Cleanup of all Releases of TPH and VOC known or suspected at the Real Property arising out of Stoddard solvent system contamination and one gasoline underground storage tank, as more fully described in Seller's Phase I Assessment of the Real Property or the reports referenced therein;

(2) Cleanup of all Releases of Hazardous Substances near storm water outfalls #6 and 7, as more fully described in Seller's Phase I Assessment of the Real Property, including without limitation additional investigation and characterization of the condition of the Real Property as necessary and appropriate;

(3) Cleanup of all Releases of PCB, VOC and TPH at the former waste disposal pit sump, as more fully described in Seller's Phase I Assessment of the Real Property or the reports referenced therein;

(4) Investigation and Cleanup, as required by Applicable Law, of all Releases of PCB, VOC, arsenic and TPH in the subsurface soils inside and outside the southwest area of Building 112A by the scalper and planer equipment, as more fully described in Seller's Phase I Assessment of the Real Property;

(5) Resolution of the Notice of Violation from the South Coast Air Quality Management District (AQMD) for Seller's violation of the $NO_2$ emission limit when operating furnace #5 in December 1996 and January and February 1997;

(6) Investigation, characterization, and as required by Applicable Law, Cleanup of PCB and metals in the sludge and in the soil adjacent to the recirculating hot water system south of building 104; and

(7) Removal of flaking lead paint and friable galbestos from interior wall areas and removal of accumulated dust and grime (composed of PCB, Title 22 heavy metals, silica and refractory fibers) from overhead steel rafters and

certain horizontal surfaces at the Facility existing on the Closing Date, all at those surface areas that are described in Seller's Phase I Assessment of the Real Property and agreed to by Seller and Buyer. Seller also will conduct industrial hygiene exposure monitoring for dust using such methods and at such times as the parties agree are appropriate to ensure that the remediation activities undertaken by Seller under this Section 10.03(c)(7) have reduced the contaminants to an appropriate clean up level. Seller will provide a written management program to Buyer, which Buyer may use to manage such contaminants at the Facility after the Closing Date.

(d)     Seller's Failure to Remediate. Seller will indemnify Buyer for any and all liabilities, obligations, responsibilities, losses, damages, deficiencies, costs of Cleanup, remediation or compliance, other costs and expenses, fines, penalties, restitutions and monetary sanctions sustained, incurred or required to be paid by Buyer as a result of Seller's failure to complete any or all of the items listed in Section 10.03(c).

(e)     Business Disruption. In conducting remediation or Cleanup activities as required by this Article 10, Seller will use reasonable efforts to minimize disruption to Buyer's operation of the Facility. But, Seller will have no liability to Buyer for any loss of business or lost profits incurred by Buyer if Buyer suspends operation of the Cast Plate Business during Seller's remediation or Cleanup activities.

(f)     Limitations. Seller's obligation of indemnification or reimbursement under this Section 10.03, except for Environmental Liabilities outlined in Section 10.01(e)(ii) and Section 10.03(c), is subject to, and will apply against, the Deductible and limitations set forth in Section 12.06, including without limitation the $14 million limit on liability. All claims for indemnification under this Article 10 must be made in accordance with the notice requirements and limitations of Article 12.

(g)     Duration. The express indemnification set forth in this Section 10.03 of this Agreement will remain in full force and effect and will survive the Closing Date for a period of 12 years. The representation contained in the second sentence of Section 10.03(a) will remain in full force and effect and will survive the Closing Date for a period of 24 months. Liabilities included within the scope of Sections 10.01(e)(ii) and 10.03(c) will remain the sole obligation of Seller, and Seller will indemnify Buyer for these liabilities, in perpetuity.

Section 10.04 Procedures. Buyer will enter into such agreements with Seller, on reasonable terms and conditions, to cooperate with Seller and provide access to Seller to the Real Property to conduct the remediation activities provided in this Article 10.

Section 10.05 Transfer of Liability. Except as otherwise provided in this Agreement, as of the date of this Agreement, Buyer will assume all environmental liabilities associated with operation of the Cast Plate Business. The parties acknowledge that, except as otherwise provided in this Agreement, after expiration of the 12 year indemnification period, this Agreement shifts all liabilities arising under any Applicable Law from Seller to Buyer, and Buyer will have no claim for contribution from or against

26

Seller, for environmental liabilities, arising out of Seller's operation of the Cast Plate Business or ownership of the Real Property prior to the Closing Date.

## ARTICLE 11
## SURVIVAL OF REPRESENTATIONS AND WARRANTIES

**Section 11.01. Survival.** All of the representations and warranties set forth in this Agreement or in any exhibit, schedule, document or other instrument delivered under this Agreement will (unless waived in writing by the party for whose benefit such representation or warranty was made) remain in full force and effect regardless of any investigation, verification or approval by or on behalf of any party hereto, and will survive the Closing Date for a period of 24 months, except that with respect to the representations made in Section 4.16 will survive for the applicable statute of limitations plus 60 days.

## ARTICLE 12
## INDEMNIFICATION

For purposes of this Agreement, "Losses" (or "Loss" in the singular) means all damages, claims, losses, costs, expenses, interest, penalties, charges and liabilities (including, without limitation, reasonable attorneys' fees, costs and expenses, reasonable expert witness and consulting fees and reasonable costs of investigation and feasibility studies incurred in investigating and defending against the assertion of any of the foregoing).

**Section 12.01 Indemnification of Buyer by Seller.** Seller agrees to indemnify, defend and hold harmless Buyer from and against any Loss arising out of or based upon or in connection with or as a result of:

(a)     the untruth, inaccuracy or breach of any representation and warranty of Seller contained in or made pursuant to this Agreement, including in any Schedule or other agreement, document or instrument delivered under this Agreement; or

(b)     the breach or nonfulfillment of any covenant or agreement of Seller contained in this Agreement or in any other agreement, document or instrument delivered under this Agreement.

(c)     the failure of Seller to discharge in full any liability or obligation of Seller or Newco related to the Cast Plate Business that existed or occurred prior to the Closing Date, which was not expressly assumed by the Buyer under this Agreement.

**Section 12.02 Indemnification of Seller by Buyer.** Buyer agrees to indemnify, defend and hold harmless Seller from and against any Loss arising out of or based upon or in connection with or as a result of:

(a)   the untruth, inaccuracy or breach of any representation and warranty of Buyer contained in or made pursuant to this Agreement, including in any Schedule or other agreement, document or instrument delivered under this Agreement;

(b)   the breach or nonfulfillment of any covenant or agreement of Buyer contained in this Agreement or in any other agreement, document or instrument delivered under this Agreement; or

(c)   the assertion against Seller of any liability or obligation included in the Assumed Liabilities.

**Section 12.03  Procedures for Indemnification.**  "**Indemnitor**" means the party against whom indemnity is sought, and "**Indemnitee**" means the party seeking indemnification.

(a)   A claim for indemnification hereunder ("**Indemnification Claim**") must be made by Indemnitee by delivery of a written declaration to Indemnitor requesting indemnification and specifying to the extent available the basis on which indemnification is sought and, if possible, the amount of asserted Losses.

(b)   The Indemnitor will have 30 days to object to such Indemnification Claim by delivery of a written notice of such objection to Indemnitee specifying in reasonable detail the basis for such objection.  Objections under this provision will not relieve the Indemnitor of its obligations to defend and indemnify Indemnitee under this Agreement.  Failure to timely so object will constitute acceptance of the Indemnification Claim by the Indemnitor and the Indemnification Claim will be paid in accordance with Section 11.03(c).

(c)   Upon determination of the amount of an Indemnification Claim, whether by agreement between Indemnitor and Indemnitee or otherwise, Indemnitor will pay the amount of such Indemnification Claim within 10 days of the date such amount is determined.

**Section 12.04  Defense of Third Party Claims.**  Should any claim or demand be made, cost incurred, or suit or proceeding (including, without limitation, a binding arbitration or an audit by any taxing authority) be instituted against Indemnitee which, if prosecuted successfully, could reasonably be a matter for which Indemnitee is entitled to indemnification under this Agreement (a "**Third Party Claim**"), the Indemnitor shall defend Indemnitee in a timely manner and may participate in the defense of such Third Party Claim at its cost and expense.  If Indemnitor fails to defend Indemnitee, Indemnitee may select its own counsel and seek recovery of its defense costs from Indemnitor.

**Section 12.05  Settlement of Third Party Claims.**  No settlement of a Third Party Claim may be made without the prior written consent of the Indemnitor and Indemnitee, which consents may not be unreasonably withheld, conditioned or delayed.  Consent is presumed in the case of settlements of $100,000 or less where the Indemnitor has not responded within 10 business days of notice of a proposed settlement.

Section 12.06  **Limitations**.

(a)    Neither Seller nor Buyer will be entitled to any recovery for indemnification unless a claim for indemnification is made in accordance with Section 12.03 and within the specified time period, whether established under Section 10.03 or Section 11.01 (regardless of whether the Loss for which the party is seeking indemnification is actually incurred after expiration of such specified time periods).

(b)    Notwithstanding anything herein to the contrary, Seller is not liable to Buyer for indemnification under this Agreement except to the extent that the aggregate amount of all damages which are demanded in a valid claim(s) and thereafter are reasonably demonstrated to have been suffered by Buyer exceeds $200,000 (the "**Deductible**"), in which event the amount which Buyer is entitled to recover in respect of such claim(s) less the Deductible will be payable; provided, however, that no Deductible will apply to claims for indemnification made by Buyer against Seller under Section 12.01(c).

(c)    Except as to liabilities within the scope of Section 10.01(e)(ii) and Seller's remediation responsibilities as set forth in Section 10.03(c), in no event will Seller's liability to Buyer under this Agreement exceed in the aggregate $14 million.  Liabilities within the scope of Section 10.01(e)(ii) and costs of remediation in accordance with Section 10.03(c) will not be subject to an aggregate limit or the Deductible.

(d)    The remedies provided in this Agreement are in lieu of all other remedies available to Seller and Buyer, as the case may be, at law or in equity (except injunctive relief to the extent appropriate) arising under this Agreement or related to the subject matter of this Agreement.


## ARTICLE 13
## MISCELLANEOUS PROVISIONS

Section 13.01  **Books and Records**.  Buyer and the Facility will retain all Books and Records relating to the Cast Plate Business for all periods from January 1, 1992 up to and including the Closing Date in a readily retrievable location for a period of 10 years from the Closing Date, and thereafter will destroy such Books and Records only after having notified Seller of its intention to do so and having offered to provide the other party with copies or the original of such Books and Records.

Section 13.02  **Expenses**.  Each of the parties will pay all costs and expenses incurred or to be incurred by it in negotiating and preparing this Agreement and in closing and carrying out the transactions contemplated by this Agreement.

Section 13.03  **Notices**.  Any notice or other communication required or permitted to be given hereunder must be in writing and hand delivered or sent by certified mail (return receipt requested) or by reputable overnight courier, or sent by telex, telegram, facsimile or cable, delivered to the respective addresses set forth below or, as to each party, at such

other address as designated by such party. All such notices and communications are effective when hand delivered or, in the case of notice by mail, telex, telegram, facsimile or cable, on the next succeeding business day following the date when sent addressed as set forth below:

If to Seller:                      Aluminum Company of America
                                   Alcoa Corporate Center
                                   201 Isabella Street
                                   Pittsburgh, PA 15212-5858
                                   Attention: General Counsel

If to Buyer:                       Century Aluminum Company
                                   2511 Garden Road
                                   Building A, Suite 200
                                   Monterey, CA 93940
                                   Attention: General Counsel

**Section 13.04 Entire Agreement.** This Agreement, including the Schedules and other documents referred to herein which form a part hereof, represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and supersedes all other agreements or understandings, written or oral, between the parties with respect to the subject matter hereof. This Agreement may not be amended, supplemented or changed, nor can any provision hereof be waived, except by a written instrument signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

**Section 13.05 Successors.** This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and assigns. Neither party may assign its rights hereunder without the prior written consent of the other party, except that Seller may assign this Agreement or performance of any part hereof to any Affiliate, in whole or in part, without the consent of Buyer.

**Section 13.06 Section Headings.** The section headings contained in this Agreement are for convenience of reference only and do not affect in any way the meaning or interpretation of this Agreement.

**Section 13.07 Bulk Transfer Laws.** Buyer hereby waives compliance by Seller with the provisions of any so-called bulk transfer law in any jurisdiction in connection with the sale of the Assets to Buyer. Seller will indemnify Buyer for any liability with respect to such bulk transfer laws.

**Section 13.08 Governing Law.** This Agreement has been executed and delivered in and will be construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflict of laws doctrine.

**Section 13.09  Severability.** If at any time subsequent to the date hereof, any provision of this Agreement is held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision will be of no force and effect, but the illegality or unenforceability of such provision will have no effect upon and will not impair the enforceability of any other provision of this Agreement.

**Section 13.10  Counterparts.** This Agreement may be executed in one or more counterparts, each of which is an original, but all of which together constitute one and the same instrument.

**Section 13.11  Parties in Interest.** Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any person other than the parties to it, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor does any provision give any third persons any right of subrogation or action over against any party to this Agreement.

**Section 13.12  Termination.** This Agreement may be terminated and the transactions contemplated hereby abandoned:
(1)    at any time prior to the Closing Date, by mutual consent of Buyer and Seller; or
(2)    as of the Closing Date, by Seller, if Buyer has not complied with any of the conditions set forth in Article 7 by the Closing Date; provided that Seller may not terminate this Agreement under this Section 13.12 if Seller's willful breach of this Agreement has prevented Buyer's compliance with the conditions in Article 7; or
(3)    as of the Closing Date, by Buyer, if Seller has not complied with any of the conditions provided in Article 7 by the Closing Date; provided that Buyer may not terminate this Agreement under this Section 13.12 if Buyer's willful breach of this Agreement has prevented Seller's compliance with the conditions in Article 7.

**Section 13.13  Time of the Essence.** Time is of the essence in this Agreement.

**Section 13.14  Expenses; Prorations.** Each of the parties to this Agreement will bear all the expenses incurred by it in connection with the negotiation and preparation of this Agreement and the consummation of the transactions contemplated by this Agreement regardless of whether this Agreement is terminated. Except as otherwise provided in this Agreement, the following taxes, charges and payments ("**Charges**") will be prorated on a per diem basis as indicated and apportioned between Seller and Buyer as of the date of the Closing: real property (annually), use (monthly), intangible taxes (monthly), utility charges (monthly), rental or lease charges (term of lease), license fees (term of lease), general assessments (taxable year) imposed with respect to the Assets and employee payrolls (monthly). Seller will be liable for that portion of the Charges relating to, or arising in respect of, period on or prior to the date of the Closing and Buyer will be liable for that portion of the Charges relating to, or arising in respect of, any periods after the date of the Closing.

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement, as of the day and year first above written.

    **SELLER:**
    **ALUMINUM COMPANY OF AMERICA**

        By: _Barbara S. Jeremiah_

        Title: _V. P. Corporate Development_

    **BUYER:**
    **CENTURY ALUMINUM COMPANY**

        By: _____

        Title: _Exec. Vice President_

c:\cei\arizona\Vernon Cal Comm Acqn Agt - Final.doc
12/18/98 2:07 PM

32

| 1. | Schedule 1.01(c) | Assumed Liabilities |
| 2. | Schedule 1.01(i) | Excluded Assets |
| 3. | Schedule 1.01(j) | GAAP Principles |
| 4. | Schedule 1.01(p) | Permitted Encumbrances |
| 5. | Schedule 2.01 | License Agreement |
| 6. | Schedule 2.02 | Assignment and Assumption Agreement |
| 7. | Schedule 4.01 | Required Consents of Seller |
| 8. | Schedule 4.04 | Transferred Property Rights; Property Rights Encumbrances Assignment of Transferred Property Rights |
| 9. | Schedule 4.06(a) | Collective Bargaining Agreements; Employment Contracts |
| 10. | Schedule 4.06(b) | Newco Employees |
| 11. | Schedule 4.07(a) | Asset Encumbrances |
| 12. | Schedule 4.07(b) | Leased Items |
| 13. | Schedule 4.08 | Real Property Exhibit A Exhibit B |
| 14. | Schedule 4.10 | Certain Contracts of Newco |
| 15. | Schedule 4.12 | Non-Compliance Matters |
| 16. | Schedule 4.13(a) | Litigation |
| 17. | Schedule 4.13(b) | Insurance Claims |
| 18. | Schedule 4.15 | Exceptions to Authorizations |
| 19. | Schedule 4.17(a) | Idle Equipment |
| 20. | Schedule 4.17(b) | Equipment Requiring Modification for Year 2000 |
| 21. | Schedule 4.19 | Employee Benefit Plans |
| 22. | Schedule 4.21 | Loss of Rights |
| 23. | Schedule 5.01 | Required Consents of Buyer |
| 24. | Schedule 5.05 | Litigation of Buyer |
| 25. | Schedule 6.01 | Seller's Insurance Coverage |
| 26. | Schedule 8.02(b) | Deed of Transfer |
| 27. | Schedule 9.17 | Transition Services |

Schedule 1.01(c)
Assumed Liabilities

All post-closing obligations under all of the contracts of the Cast Plate Business, including without limitation the Union Contract, but excluding the contracts listed as Excluded Assets

Environmental liabilities of Buyer as described in Article 10

Employment liabilities as described in Article 9, including without limitation OPEB (other post employment benefits/retiree medical) liability, defined benefit plan (pension) liability for Newco Employees and those employment liabilities identified on the Financials as current liabilities

Except as otherwise provided in the Agreement, all current liabilities of the Cast Plate Business reflected on the Financials as of December 31, 1998, excluding the following:

    (a) Trade payables that the Cast Plate Business has tendered to Seller's corporate headquarters for payment on the due date (as of November 30, 1998, these payables totaled approximately $309,000);

    (b) Accrued medical costs for Newco Employees of the Cast Plate Business under the employee welfare benefit plans for costs actually incurred in 1998;

    (c) Layoff reserve; and

    (d) Payroll taxes

Schedule 1.01(i)
Excluded Assets

Cash
All International Accounts Receivable
Alcoa trademark and trade name and associated goodwill
Alcoa Alca Plus trademark
All sales tax exemption certificates
All checkbooks and canceled checks of Alcoa Cast Plate
Personnel records of employees of the Cast Plate Business not hired by Buyer
Medical records of employees of the Cast Plate Business not hired by Buyer
All Alcoa Cast Plate credit cards
All intellectual property used by the Cast Plate Business, except the Transferred Property
    Rights and Licensed Property Rights
Computer Hardware:
    1.  Wide area network server and ACTNET router
    2.  All hardware used by the Cast Plate Business to participate in Seller's "Cii"
        initiative
    3.  Two ELS servers used by the Cast Plate Business to transfer data to the corporate
        headquarters
    4.  Hewlett-Packard leased personal computers:
        3-Memory
        3-HP Docking System & Monitor Stands
        3-HP Omnibook 5500CT 5/133 Model 1350's
        3-HP CD Rom Drive, Internal 6x, OB5500's
Computer Software:
    1.  All software currently installed on or used by the computer hardware retained by
        Seller as described above
    2.  All systems software for Seller's administrative systems, including without
        limitation accounting, employment and payroll
    3.  SAROS document management software
    4.  All sofware used by the Cast Plate Business to participate in Seller's "Cii"
        initiative
All claims (and benefits associated with such claims) against third parties to the extent
    the claims exclusively relate to non-assumed liabilities or Excluded Assets
Seller's insurance policies and rights in connection therewith
All assets held in and for Seller benefit plans, except the defined benefit (pension) plan
    assets
Rights arising from any refunds due with respect to Taxes as outlined in Article 8
All rights and obligations under that certain commitment by the Cast Plate Business to
    use hedging services of Seller through December 31, 1998
All equipment used and records maintained by Alcoa's remediation work group in
    conducting their remediation activities at the Real Property, including without
    limitation:

1. One Mitsubishi forklift Model FG40LP Serial # AF29-5022 leased from CITICORP Dealer Finance.
2. Two Trailers and contents including office furniture, computers, fax machines, copier, phone systems and personal items.
3. The contents of the Pack and Ship office in Building 112A, including drawings, cabinets, records and some personal items.
4. Miscellaneous items in the hazardous cleanup area in the northeast corner of Building 112.
5. One golf cart number 74.
6. Numerous pieces of contractor equipment located at the Facility.

Contracts retained or terminated by Seller and not transferred to Buyer:

1. SAROS software license agreement
2. Utilities: electrical, water, sewage, phone
3. Hazardous waste disposal motor carrier contracts, to the extent not assigned to Buyer:
   a. United States Pollution Control, Inc.
   b. Heritage Environmental Services, Inc.
   c. Waste Management, Inc.
4. Motor carrier contracts, to the extent not assigned to Buyer:
   a. System Transport, Inc.
   b. F&S Distributing Company, Inc.
   c. Piazza Trucking
   d. Mercer Transportation Company
   e. Rich Doss, Inc.
   f. Davis Transport, Inc.
   g. Fleetwood Transportation Services, Inc.
5. Paal warehouse space
6. All distribution contracts under which Seller sells its mill products, including without limitation cast plate products produced by the Cast Plate Business, to its distributors

<u>Schedule 1.01(j)</u>
<u>GAAP Principles; Exception to GAAP</u>

1. Revenues include all sales of the Cast Plate Business production to customers at third party prices, including those sold through Seller's international selling companies (Alcoa Europe S.A., and Alcoa International (Asia) Limited).

2. PAE and GA&SE include some allocated costs and the balance sheet includes some allocated assets and liabilities. These amounts are allocated to the Cast Plate Business from Seller's corporate headquarters. Such allocations have been made on a consistent basis.

3. Accounts receivable includes receivables on international selling company books.

4. Inventory includes inventory on international selling company books. This inventory will be included as part of the sale.

5. Fixed assets includes only those assets attributable to the Cast Plate Business (the financial statements do not include the extrusion building and the land on which Building 114 was located).

6. The financial statements exclude all pension assets and liabilities and do not reflect the liability for post-employment medical and insurance benefits (OPEB).

Schedule 1.01(p)
Permitted Encumbrances

Personal Property:

1. UCC-1 filing # 9600860617 for Misubishi Models FG40LP, serial #s AF29-00651, AF29-00642, AF29-00625, AF29-86363, leased to Seller by CITICORP Dealer Finance. Buyer will assume the lease and obtain a release for Seller for this leased equipment.
2. UCC-1 filing # 9723160151 for two Toshiba copiers (Toshiba 4550 and Toshiba 9240) leased to Seller by TAIS Credit. Buyer will assume the lease and obtain a release for Seller for this leased equipment.

Real Property:

1. Liens for Taxes and assessments not yet payable
2. Liens for Taxes, assessments and charges and other claims, the validity of which are being contested in good faith, provided that such Taxes, assessments and charges and other claims are included in the Assumed Liabilities
3. Imperfections of title, the existence of which, individually or in the aggregate, do not have a material adverse effect and which do not interfere in any material manner, either individually or in the aggregate, with the operation of the Cast Plate Business and the use (based upon historical usage) of the Real Property in connection therewith. The easements, restrictions on use and other imperfections of title applicable to the entire parcel currently owned by Alcoa, a portion of which will be sold to Xebec LLC, are set forth in Exhibit A. Seller will provide to Buyer by the later of the transfer of the Real Property to Buyer or the Closing Date a survey and property description that reflect the easements, restrictions on use and other imperfections of title solely applicable to the Real Property.
4. Inchoate mechanic's and materialmen's liens for construction in progress to the extent such liens arise from Assumed Liabilities
5. Workmen's, repairmen's, warehousemen's and carrier's liens arising in the ordinary course of the Cast Plate Business to the extent such liens arise from Assumed Liabilities

# EXHIBIT C

CITY COUNCIL

LEONIS C. MALBURG
Mayor

THOMAS A. YBARRA
Mayor Pro-Tem

Wm. "BILL" DAVIS
Councilman

H. "LARRY" CONZALES
Councilman

W. MICHAEL McCORMICK
Councilman

BRUCE V. MALKENHORST
City Administrator / City Clerk
FAX (323) 581-7924



DAVID B. BREARLEY
City Attorney
FAX: (626) 330-5816

KEVIN WILSON
Director of Community Services & Water
FAX: (323) 583-2761

KENNETH J. DeDARIO
Director of Municipal Utilities
FAX: (323) 583-1923

DAVE TELFORD
Fire Chief
FAX: (323) 581-1385

BRUCE W. OLSON
Police Chief
FAX: (323) 583-5236

## CITY HALL

4305 SANTA FE AVENUE, VERNON, CALIFORNIA 90058
TELEPHONE (323) 583-8811

ENVIRONMENTAL HEALTH DEPARTMENT

September 2, 1999

Aluminum Company of America
c/o Century Cast Plate
3200 Fruitland Ave.
Vernon, CA  90058
Attn: A. J. Ursic, Jr.

SUBJECT: Final Closure Documents for Parcels 6, 7, and 8 at the Aluminum Company of
America (Alcoa) site located at 5151 Alcoa Ave., Vernon, CA

Dear Mr. Ursic:

This letter acknowledges our receipt and review of the following documents related to closure
activities at the subject site:

+ Environmental Activities report dated May 7, 1999 for Parcel 6

+ Environmental Activities report dated July 26, 1999 for Parcel 8, Volumes 1 & 2

+ Limited Phase II Environmental Site Investigation for the Alcoa Cast Plate Facility,
  Volumes I and II, prepared by McCulley, Frick & Gilman, Inc., dated September 15,
  1998

+ Environmental Activities-Final Report dated August 16, 1999 for parcels 6, 7, and 8

Based on our review of the documents, we concur with your recommendations to close the
subject site with no further environmental assessment or remedial action at this time, and
consider the site remediation project closed.  The City of Vernon Environmental Health
Department will continue to monitor Alcoa's acknowledgement of its continuing responsibilities
regarding the Stoddard Solvent issues.

Our acknowledgment of a satisfactory closure is based on the assumption that the information submitted in the documentation is complete and accurate. Further review or determinations may be necessary if subsequent information, which significantly affects any decision, is found.

If you have any questions or require further information, please feel free to contact us.

Please note that our department is very appreciative of the ongoing cooperation we have received from Alcoa representatives during this long and complicated closure project. The commitment to environmental compliance by Alcoa, and especially you, is exemplary.

Sincerely,

Lewis J. Pozzebon
Director/Health Officer

Leonard Grossberg, M.P.A., R.E.H.S.
Environmental Health Specialist

Xc: Tom Reynolds, Facility Manager, Century Cast Plate, 3200 Fruitland Ave., Vernon, CA 90058
A. J. Ursic Jr., P.O. Box 1814, Upland, CA 91785-1814
City of Vernon Community Services & Public Works Dept., Attn Richard Lucas

Lg:CLOSURE:Alcoafinal.doc

# EXHIBIT D

PRIVILEGED AND CONFIDENTIAL

STOCK AND ASSET PURCHASE AGREEMENT

among

CENTURY ALUMINUM COMPANY,

CENTURY ALUMINUM OF WEST VIRGINIA, INC.

and

PECHINEY ROLLED PRODUCTS LLC

Dated as of July 26, 1999

TABLE OF CONTENTS

ARTICLE I

DEFINITIONS

SECTION 1.01. *Certain Defined Terms* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
SECTION 1.02. *Other Defined Terms* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARTICLE II

PURCHASE AND SALE

SECTION 2.01. *Purchase and Sale of Assets* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
SECTION 2.02. *Assumption and Exclusion of Liabilities* . . . . . . . . . . . . . . . . . . . . 14
SECTION 2.03. *Purchase and Sale of Shares* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
SECTION 2.04. *Purchase Price; Allocation of Purchase Price* . . . . . . . . . . . . . . . . 16
SECTION 2.05. *Closing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
SECTION 2.06. *Closing Deliveries by the Sellers* . . . . . . . . . . . . . . . . . . . . . . . . . 18
SECTION 2.07. *Closing Deliveries by the Purchaser* . . . . . . . . . . . . . . . . . . . . . . 18
SECTION 2.08. *Pre-Closing Adjustment of Purchase Price* . . . . . . . . . . . . . . . . . . 18
SECTION 2.09. *Post-Closing Adjustment of Purchase Price* . . . . . . . . . . . . . . . . . 19

ARTICLE III

REPRESENTATIONS AND WARRANTIES
OF THE SELLERS

SECTION 3.01. *Organization, Authority and Qualification of the Sellers* . . . . . . . . . 21
SECTION 3.02. *Capital Stock and Ownership* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
SECTION 3.03. *Subsidiaries* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
SECTION 3.04. *Books and Records* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
SECTION 3.05. *No Conflict* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
SECTION 3.06. *Governmental Consents and Approvals* . . . . . . . . . . . . . . . . . . . . . 23
SECTION 3.07. *Financial Information; Books and Records* . . . . . . . . . . . . . . . . . . 24
SECTION 3.08. *No Undisclosed Liabilities* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
SECTION 3.09. *Receivables* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
SECTION 3.10. *Inventories* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
SECTION 3.11. *Public Filings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
SECTION 3.12. *Sales and Purchase Order Backlog* . . . . . . . . . . . . . . . . . . . . . . . 26
SECTION 3.13. *Conduct in the Ordinary Course; Absence of Certain Changes, Events and
Conditions* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
SECTION 3.14. *Litigation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
SECTION 3.15. *Compliance with Laws* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
SECTION 3.16. *Environmental Matters* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

ii

SECTION 3.17. *Material Contracts* . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
SECTION 3.18. *Intellectual Property* . . . . . . . . . . . . . . . . . . . . . . . . . . 33
SECTION 3.19. *Real Property* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
SECTION 3.20. *Assets* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
SECTION 3.21. *Customers* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
SECTION 3.22. *Employee Benefit Matters* . . . . . . . . . . . . . . . . . . . . . . . . 39
SECTION 3.23. *Labor Matters* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
SECTION 3.24. *Century CP Labor and Employment Matters* . . . . . . . . . . . . . . . 42
SECTION 3.25. *Employees* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
SECTION 3.26. *Taxes* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
SECTION 3.27. *Insurance* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43
SECTION 3.28. *Accounts; Lockboxes; Safe Deposit Boxes; Powers of Attorney* . . . . . . 43
SECTION 3.29. *Year 2000 Compliance* . . . . . . . . . . . . . . . . . . . . . . . . . . 44
SECTION 3.30. *Governmental Licenses and Permits* . . . . . . . . . . . . . . . . . . . 44
SECTION 3.31. *Disclosure Schedule Supplements.* . . . . . . . . . . . . . . . . . . . 44
SECTION 3.32. *Opinion of Financial Advisor* . . . . . . . . . . . . . . . . . . . . . . 44
SECTION 3.33. *Brokers* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES
## OF THE PURCHASER

SECTION 4.01. *Organization and Authority of the Purchaser* . . . . . . . . . . . . . . 45
SECTION 4.02. *No Conflict* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
SECTION 4.03. *Governmental Consents and Approvals* . . . . . . . . . . . . . . . . . . 45
SECTION 4.04. *Litigation* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46
SECTION 4.05. *Brokers* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

## ARTICLE V

## ADDITIONAL AGREEMENTS

SECTION 5.01. *Conduct of Business Prior to the Closing* . . . . . . . . . . . . . . . . 46
SECTION 5.02. *Access to Information* . . . . . . . . . . . . . . . . . . . . . . . . . . 47
SECTION 5.03. *Confidentiality* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48
SECTION 5.04. *Regulatory and Other Authorizations; Notices and Consents* . . . . . . 49
SECTION 5.05. *Disclosure Schedule Supplements; Notice of Developments* . . . . . . . 51
SECTION 5.06. *Use of Intellectual Property* . . . . . . . . . . . . . . . . . . . . . . 51
SECTION 5.07. *Non-Competition* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51
SECTION 5.08. *Bulk Transfer Laws* . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
SECTION 5.09. *Cash; Other Communications* . . . . . . . . . . . . . . . . . . . . . . 52
SECTION 5.10. *Further Action* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
SECTION 5.11. *Environmental Permits* . . . . . . . . . . . . . . . . . . . . . . . . . 53

iii

SECTION 5.12.  *Intellectual Property*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

## ARTICLE VI

## EMPLOYEE MATTERS

SECTION 6.01.  *Offer of Employment*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53
SECTION 6.02.  *Collective Bargaining Agreements*  . . . . . . . . . . . . . . . . . . . . . . .  54
SECTION 6.03.  *Defined Benefit Pension Plans*  . . . . . . . . . . . . . . . . . . . . . . . . .  54
SECTION 6.04.  *Welfare Benefit Plans*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  56
SECTION 6.05.  *Retiree Medical and Life Insurance Plans*  . . . . . . . . . . . . . . . . . . .  57
SECTION 6.06.  *Workers' Compensation Claims*  . . . . . . . . . . . . . . . . . . . . . . . .  57
SECTION 6.07.  *PBGC Agreement*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  57
SECTION 6.08.  *Management Services Agreement*  . . . . . . . . . . . . . . . . . . . . . . . .  58
SECTION 6.09.  *Incentive Plans*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58
SECTION 6.10.  *Employment Agreements*  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58
SECTION 6.11.  *401(k) Plan*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  58
SECTION 6.12.  *Century CP Plans*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  59
SECTION 6.13.  *Century CP Pension Plan*  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  59
SECTION 6.14.  *Century CP Annual Performance Pay Plan*  . . . . . . . . . . . . . . . . . .  59

## ARTICLE VII

## TAX MATTERS

SECTION 7.01.  *Indemnity*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  60
SECTION 7.02.  *Returns and Payments*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61
SECTION 7.03.  *Tax Refunds and Credits*  . . . . . . . . . . . . . . . . . . . . . . . . . . . .  61
SECTION 7.04.  *Time of Payment*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  62
SECTION 7.05.  *Cooperation and Exchange of Information*  . . . . . . . . . . . . . . . . . .  62
SECTION 7.06.  *Conveyance Taxes*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  63
SECTION 7.07.  *Section 338(h)(10) Election*  . . . . . . . . . . . . . . . . . . . . . . . . . .  63
SECTION 7.08.  *Contests*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  64
SECTION 7.09.  *Miscellaneous*  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  65

## ARTICLE VIII

## CONDITIONS TO CLOSING

SECTION 8.01.  *Conditions to Obligations of the Sellers*  . . . . . . . . . . . . . . . . . . . .  66
SECTION 8.02.  *Conditions to Obligations of the Purchaser*  . . . . . . . . . . . . . . . . . .  67

## ARTICLE IX

iv

## INDEMNIFICATION

SECTION 9.01. *Survival of Representations and Warranties* . . . . . . . . . . . . . . . . . . 71
SECTION 9.02. *Indemnification by the Sellers* . . . . . . . . . . . . . . . . . . . . . . . . . 71
SECTION 9.03. *Indemnification by the Purchaser* . . . . . . . . . . . . . . . . . . . . . . . 74
SECTION 9.04. *Notification of Claims* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75
SECTION 9.05. *Limits on Environmental Indemnification* . . . . . . . . . . . . . . . . . . 75
SECTION 9.06. *Limits on Indemnification* . . . . . . . . . . . . . . . . . . . . . . . . . . . 77
SECTION 9.07. *Indemnification Agreements* . . . . . . . . . . . . . . . . . . . . . . . . . . 77
SECTION 9.08. *Exclusive Remedies* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78
SECTION 9.09. *Sellers' Indemnity Support* . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

## ARTICLE X

## TERMINATION AND WAIVER

SECTION 10.01. *Termination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79
SECTION 10.02. *Effect of Termination* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
SECTION 10.03. *Waiver* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

## ARTICLE XI

## GENERAL PROVISIONS

SECTION 11.01. *Expenses* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
SECTION 11.02. *Notices* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80
SECTION 11.03. *Public Announcements* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81
SECTION 11.04. *Headings* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
SECTION 11.05. *Severability* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
SECTION 11.06. *Entire Agreement* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
SECTION 11.07. *Assignment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
SECTION 11.08. *No Third Party Beneficiaries* . . . . . . . . . . . . . . . . . . . . . . . . . 82
SECTION 11.09. *Amendment* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
SECTION 11.10. *Governing Law* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
SECTION 11.11. *Counterparts* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

v

## EXHIBITS

A      Assumption Agreement
B      Bill of Sale
C      Deed
D      Management Services Agreement
E      Molten Aluminum Purchase Agreement
F      Ravenswood Indemnity Agreement
G      Vernon Indemnity Agreement

## SCHEDULES

1.01(a)      Leased Real Property
1.01(b)      Current Assets and Current Liabilities
1.01(c)      Permitted Property Encumbrances
1.01(d)      Senior Managers
1.01(e)      Ravenswood Owned Real Property
1.01(f)      Vernon Owned Real Property
8.02(r)      Easements

# STOCK AND ASSET PURCHASE AGREEMENT

STOCK AND ASSET PURCHASE AGREEMENT, dated as of July 26, 1999 (this *"Agreement"*), among Century Aluminum Company, a Delaware corporation (*"Century"*), Century Aluminum of West Virginia, Inc., a Delaware corporation (*"Century WV"* and, together with Century, the *"Sellers"*) and Pechiney Rolled Products LLC, a Delaware limited liability company (the *"Purchaser"*).

## W I T N E S S E T H:

WHEREAS, the Sellers, directly and indirectly, are engaged in the Business (as defined herein);

WHEREAS, Century WV desires to sell to the Purchaser, and the Purchaser desires to purchase from Century WV, all right, title and interest of Century WV in and to property and assets relating to the Rolling Business (as defined herein), and in connection therewith the Purchaser is willing to assume certain liabilities of Century WV and Century relating thereto, all upon the terms and subject to the conditions set forth herein; and

WHEREAS, Century desires to sell to the Purchaser, and the Purchaser desires to purchase from Century, 100 shares (the *"Shares"*) of common stock (*"Common Stock"*), par value $1.00 per share, of Century Cast Plate, Inc. (*"Century CP"*), upon the terms and subject to the conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants hereinafter set forth, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS

SECTION 1.01. *Certain Defined Terms.* As used in this Agreement, the following terms shall have the following meanings:

*"Action"* means any claim, action, charge, suit, arbitration, inquiry, proceeding or investigation by or before any Governmental Authority.

"*Adjusted Reference Net Working Capital*" means an amount equal to the Net Working Capital reflected on the Reference Balance Sheet plus (a) the Adjusted Pre-Closing NWC Increase in the event the Purchase Price is adjusted upward pursuant to Section 2.08(b) or (b) minus the Adjusted Pre-Closing NWC Decrease in the event the Purchase Price is adjusted downward pursuant to Section 2.08(b); *provided* that if the Purchase Price is not adjusted pursuant to Section 2.08, the Adjusted Reference Net Working Capital shall equal the Net Working Capital reflected on the Closing Balance Sheet.

"*Affiliate*" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such specified Person.

"*Agreement*" means this Stock and Asset Purchase Agreement, dated as of July 26, 1999, among the Sellers and the Purchaser (including the Exhibits and Schedules hereto and the Disclosure Schedule) and all amendments hereto made in accordance with the provisions of Section 11.09.

"*Ancillary Agreements*" means the Bill of Sale, the Deed, the Assumption Agreement, the Molten Aluminum Purchase Agreement, the Shared Services Agreement, the Management Services Agreement, the Vernon Indemnity Agreement and the Ravenswood Indemnity Agreement.

"*Assets*" means the Shares and the Rolling Assets.

"*Assumption Agreement*" means the Assumption Agreement to be executed by the Purchaser and Century WV on the Closing Date substantially in the form of Exhibit A.

"*Bill of Sale*" means the Bill of Sale and Assignment to be executed by Century WV on the Closing Date substantially in the form of Exhibit B.

"*Business*" means the Rolling Business and the business of the manufacture by Century CP and sale thereof of cast aluminum plate (meaning all products that are cast through a horizontal or vertical process which produces plates with thickness of more than 1/4 inch) as conducted immediately prior to the date hereof.

"*Business Day*" means any day that is not a Saturday, a Sunday or other day on which banks are required or authorized by Law to be closed in The City of New York.

"*Closing Balance Sheet*" means the statement of assets and liabilities of the Business, to be prepared pursuant to Section 2.09(a) and to be dated as of the Closing Date.

"*Code*" means the Internal Revenue Code of 1986, as amended through the date hereof.

"*Confidentiality Agreement*" means the letter agreement dated January 4, 1999 between Century and Pechiney, a French *société anonyme*.

"*Control*" (including the terms "*Controlled by*" and "*under common Control with*"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by contract or otherwise, including, without limitation, the ownership, directly or indirectly, of securities having the power to elect a majority of the board of directors or similar body governing the affairs of such Person.

"*Deed*" means the deed to be executed by Century WV on the Closing Date substantially in the form of Exhibit C in order to convey to the Purchaser the Ravenswood Owned Real Property.

"*Designated Amount*" means U.S.$1,000,000.

"*Disclosure Schedule*" means the Disclosure Schedule attached hereto, dated as of the date hereof, and forming a part of this Agreement.

"*Encumbrance*" means any security interest, pledge, mortgage, lien (including, without limitation, environmental and tax liens), charge, encumbrance, adverse claim, preferential arrangement, or restriction of any kind, including, without limitation, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership.

"*Environmental Claims*" means any and all actions, suits, demands or demand letters by any Governmental Authority, claims, liens, notices of noncompliance or violation by any Governmental Authority, notices of liability or potential liability by any Governmental Authority, investigations, proceedings, consent orders or consent agreements relating in any way to any Environmental Law, any Environmental Permit or any Hazardous Materials.

"*Environmental Law*" means any Law, and any legally binding judicial or administrative interpretation thereof, in each case in effect as of the Closing, including any judicial or administrative order, consent decree or judgment, relating to pollution or protection of the environment, health, safety or natural resources, including, without limitation, those relating to the use, handling, transportation, treatment, storage, disposal, release or discharge of Hazardous Materials.

"*Environmental Permit*" means any permit, approval, identification number, license or other authorization required under any applicable Environmental Law.

"*Essential Facilities*" means the real property and assets identified as such in the Shared Services Agreement.

"*Governmental Authority*" means any United States federal, state or local or any foreign government, governmental, regulatory or administrative authority, agency or commission or any court, tribunal, or judicial or arbitral body.

"*Governmental Order*" means any order, writ, judgment, injunction. decree, stipulation, determination or award entered by or with any Governmental Authority.

"*Hazardous Material*" means petroleum and petroleum products, by-products or breakdown products, radioactive materials, asbestos-containing materials, polychlorinated biphenyls ("PCB" or "PCBs") and any other chemicals, materials or substances, in each case and to the extent regulated under any applicable Environmental Law.

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"*Indebtedness*" means, with respect to any Person, (a) all indebtedness of such Person, whether or not contingent, for borrowed money, (b) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (c) all obligations of such Person as lessee under leases that have been or should be, in accordance with U.S. GAAP, recorded as capital leases, (d) all obligations, contingent or otherwise, of such Person under acceptance, letter of credit or similar facilities, (e) all obligations of such Person to purchase, redeem, retire, defease or otherwise acquire for value any capital stock of such Person or any warrants, rights or options to acquire such capital stock, valued, in the case of redeemable preferred stock, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends, (f) all Indebtedness of others referred to in clauses (a) through (e) above guaranteed directly or indirectly in any manner by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (i) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness, (ii) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness or to assure the holder of such Indebtedness against loss, (iii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (iv) otherwise to assure a creditor against loss, and (i) all Indebtedness referred to in clauses (a) through (e) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Encumbrance on property (including, without limitation, accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"*Intellectual Property*" means (a) inventions, whether or not patentable, whether or not reduced to practice or whether or not yet made the subject of a pending patent

application or applications, (b) ideas and conceptions of potentially patentable subject matter, including, without limitation. any patent disclosures, whether or not reduced to practice and whether or not yet made the subject of a pending patent application or applications. (c) national (including the United States) and multinational statutory invention registrations, patents, patent registrations and patent applications (including all reissues, divisions, continuations, continuations-in-part, extensions and reexaminations) and all rights therein provided by multinational treaties or conventions and all improvements to the inventions disclosed in each such registration, patent or application, (d) trademarks, service marks. trade dress, logos, trade names and corporate names, whether or not registered. including all common law rights, and registrations and applications for registration thereof, including, but not limited to, all marks registered in the United States Patent and Trademark Office, the Trademark Offices of the States and Territories of the United States of America, and the Trademark offices of other nations throughout the world, and all rights therein provided by multinational treaties or conventions, (e) copyrights (registered or otherwise) and registrations and applications for registration thereof, and all rights therein provided by multinational treaties or conventions, (f) computer software, including, without limitation, source code. operating systems and specifications, data, data bases, files, documentation and other materials related thereto, data and documentation, (g) trade secrets and confidential, technical or business information (including ideas, formulas, compositions, inventions, and conceptions of inventions whether patentable or unpatentable and whether or not reduced to practice), (h) whether or not confidential, technology (including know-how and show-how), manufacturing and production processes and techniques, research and development information, drawings, specifications, designs, plans, proposals. technical data, copyrightable works, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information, (i) copies and tangible embodiments of all the foregoing, in whatever form or medium, (j) all rights to obtain and rights to apply for patents, and to register trademarks and copyrights. and (k) all rights to sue and recover and retain damages and costs and attorneys' fees for present and past infringement of any of the Intellectual Property rights hereinabove set out.

"*Inventories*" means all inventory, merchandise, work-in-progress, finished goods, and raw materials related to the Business, maintained, held or stored by or for the Sellers or Century CP in respect of the Business on the Closing Date and any prepaid deposits for any of the same.

"*IRS*" means the Internal Revenue Service of the United States.

"*knowledge of the Sellers*" or "*to the Sellers' knowledge*" means the knowledge of any of (a) any officer of the Sellers or Century CP or (b) any Senior Manager, but only in respect of a Senior Manager's department or area: which in each case shall be deemed to include the knowledge which any such person would have had if they had made reasonable inquiry.

"*Law*" means any federal, state, local or foreign statute, law, ordinance, regulation, rule, code, order, requirement or rule of common law.

"*LLC*" means the limited liability company established pursuant to the LLC Agreement to own the Essential Facilities.

"*LLC Agreement*" means the limited liability company agreement to be entered into between Century WV and the Purchaser pursuant to the Shared Services Agreement.

"*Leased Real Property*" means the real property leased pursuant to the office leases listed in Schedule 1.01(a).

"*Liabilities*" means any and all debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, known or unknown, or determined or determinable, including, without limitation, those arising under any Law (including, without limitation, any Environmental Law), Action or Governmental Order and those arising under any contract, agreement, arrangement, commitment or undertaking.

"*Licensed Intellectual Property*" means all Intellectual Property licensed or sublicensed from a third party by (a) Century WV and used in connection with the Business or (b) Century CP.

"*Major Customer*" means The Boeing Company.

"*Management Services Agreement*" means the Management Services Agreement to be entered into between Century and the Purchaser, in the form attached hereto as Exhibit D.

"*Material Adverse Effect*" means any circumstance, change in, or effect on, the Business that, individually or in the aggregate with any other circumstances, changes in, or effects on, the Business: (a) is, or is reasonably likely to be, materially adverse to the Business or the assets or liabilities (including, without limitation, contingent liabilities), results of operations or the condition (financial or otherwise) of the Business, taken as a whole, or (b) materially adversely affects, or is reasonably likely to materially adversely affect, the ability of the Purchaser to operate or conduct the Business in the manner in which it is currently operated or conducted, except, in each case for such circumstances, changes or effects resulting from changes in general economic market conditions or changes that generally affect businesses of the same type as the Business.

"*Molten Aluminum Purchase Agreement*" means the Molten Aluminum Purchase Agreement to be entered into between Century WV and the Purchaser, in the form attached hereto as Exhibit E.

"*Net Working Capital*" means the excess of the current assets over the current liabilities (in each case as set forth on Schedule 1.01(b)) shown on any specified statement of assets and liabilities of the Business prepared on a basis consistent with the preparation of the Reference Balance Sheet.

"*Owned Intellectual Property*" means all Intellectual Property in and to which Century WV or Century CP holds, or has a right to hold, right, title and interest and which, in the case of Century WV, is used in connection with the Business.

"*Owned Real Property*" means the Ravenswood Owned Real Property and the Vernon Owned Real Property.

"*PBGC*" means the Pension Benefit Guaranty Corporation.

"*PBGC Agreement*" means the agreement described in Section 6.07.

"*Permitted Encumbrances*" means such of the following as to which no enforcement, collection, execution, levy or foreclosure proceeding shall have been commenced: (a) liens for Taxes, assessments and governmental charges or levies not yet due and payable; (b) Encumbrances imposed by Law, such as materialmen's, mechanics', carriers', workmen's, converters', warehousemen's and repairmen's liens and other similar liens arising in the ordinary course of business securing obligations; (c) pledges or deposits to secure obligations under workers' compensation laws or similar legislation or to secure public or statutory obligations; and (d) minor survey exceptions, reciprocal easement agreements and other customary encumbrances on title to real property that (i) were not incurred in connection with any Indebtedness, (ii) do not render title to the property encumbered thereby unmarketable and (iii) do not, individually or in the aggregate, materially adversely affect the value of or the use of such property for its present purposes.

"*Permitted Property Encumbrances*" means the encumbrances listed in Schedule 1.01(c).

"*Person*" means any individual, partnership, firm, corporation, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Securities Exchange Act of 1934, as amended.

"*Purchaser's Accountants*" means PricewaterhouseCoopers, independent accountants of the Purchaser.

"*Ravenswood Indemnity Agreement*" means the indemnification agreement relating to the Rolling Business to be entered into between Century WV and the Purchaser, in the form attached hereto as Exhibit F.

"*Ravenswood Owned Real Property*" means the real property listed in Schedule 1.01(d), together with all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

"*Real Property*" means the Leased Real Property and the Owned Real Property.

"*Receivables*" means any and all accounts receivable, notes and other amounts receivable from customers arising from the conduct of the Business before the Closing Date, whether or not in the ordinary course, together with any unpaid financing charges accrued thereon.

"*Reference Balance Sheet*" means the statement of assets and liabilities of the Business, dated as of December 31, 1998, a copy of which is set forth in Section 3.07(a)(i) of the Disclosure Schedule.

"*Reference Balance Sheet Date*" means December 31, 1998.

"*Regulations*" means the Treasury Regulations (including Temporary Regulations) promulgated by the United States Department of Treasury with respect to the Code or other federal tax statutes.

"*Release*" means disposing, discharging, injecting, spilling, leaking, leaching, dumping, emitting, escaping, emptying, seeping, placing and the like of Hazardous Materials into or upon any land or water or air or otherwise entering into the environment.

"*Remedial Action*" means all action to (i) clean up, remove, treat or handle in any other way Hazardous Materials in the environment; (ii) restore or reclaim the environment or natural resources with respect to Hazardous Materials; (iii) prevent the Release of Hazardous Materials so that they do not migrate, endanger or threaten to endanger public health or the environment; or (iv) perform remedial investigations, feasibility studies, corrective actions, closures and postremedial or postclosure studies, investigations, operations, maintenance and monitoring on, about or in any Real Property in each case in respect of Hazardous Materials.

"*Rolling Business*" means the business of the casting operation and the manufacture of flat-rolled sheet aluminum (including, without limitation, plate and coil, distributor coil, flat sheet and brazing sheet), in each case at the Ravenswood, West Virginia facility of Century WV and the sale of such products, all as conducted immediately prior to the date hereof.

"*Sellers' Accountants*" means Deloitte & Touche, L.P., independent accountants of the Sellers.

"*Senior Managers*" means the individuals holding, or performing the functions corresponding to, the positions listed in Schedule 1.01(e).

"*Shared Services Agreement*" means the Shared Services Agreement dated the date hereof between Century WV and the Purchaser.

"*Subsidiaries*" means any and all corporations, partnerships, joint ventures, associations and other entities controlled by Century directly or indirectly (other than Century WV) through one or more intermediaries.

"*Tax*" or "*Taxes*" means any and all taxes, fees, levies, duties, tariffs, imposts, and other charges of any kind (together with any and all interest, penalties, additions to tax and additional amounts imposed with respect thereto) imposed by any government or taxing authority, including, without limitation: taxes or other charges on or with respect to income, franchises, windfall or other profits, gross receipts, property, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, or net worth; taxes or other charges in the nature of excise, withholding, ad valorem, stamp, transfer, value added, or gains taxes; license, registration and documentation fees; and customs' duties, and similar charges.

"*U.S. GAAP*" means United States generally accepted accounting principles and practices in effect from time to time applied consistently throughout the periods involved.

"*Vernon Indemnity Agreement*" means the indemnification agreement relating to Century CP to be entered into between Century and the Purchaser, in the form attached hereto as Exhibit G.

"*Vernon Owned Real Property*" means the real property listed in Schedule 1.01(f), together with all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

SECTION 1.02. *Other Defined Terms.* The following terms have the meanings defined for such terms in the Sections set forth below:

| Term | Section |
| --- | --- |
| Adjusted Pre-Closing NWC Decrease | 2.08(b) |
| Adjusted Pre-Closing NWC Increase | 2.08(b) |
| Agreed Estimated Net Working Capital | 2.08(a) |
| Alcoa | 3.17(a)(x) |
| Alcoa Agreement | 6.12 |
| Alcoa Plans | 6.13(a) |
| Allocation Statement | 2.04(b) |

| Term | Section |
|------|---------|
| Assumed Liabilities | 2.02(a) |
| Business Assets | 3.20(a) |
| Century | Preamble |
| Century Common Stock | Recitals |
| Century CP | Recitals |
| Century CP Plan | 3.22(h) |
| Century CP Plans | 3.22(h) |
| Century WV | Preamble |
| Century WV Shares | 3.02(a) |
| Closing | 2.05 |
| Closing Date | 2.05 |
| Code section 338(h)(10) Election | 7.07(a) |
| Collateral | 8.02(d) |
| Common Stock | Recitals |
| Covered Products | 5.07(a) |
| Default Estimated Net Working Capital | 2.08(a) |
| Disclosure Schedule Supplements | 3.31 |
| Disclosure Schedule Supplement | 5.05(a) |
| Elections | 7.07(a) |
| Employee Amounts | 6.06 |
| ERISA | 3.22(a) |
| Excluded Assets | 2.01(b) |
| Excluded Liabilities | 2.02(b) |
| Final Determination | 7.04 |
| Financial Statements | 3.07(a) |
| Form 8023 | 7.07(b) |
| Former Employees | 6.03(b) |
| Indemnified Party | 9.04(a) |
| Indemnifying Party | 9.04(a) |
| Independent Accounting Firm | 2.09(b)(ii) |
| Independent Expert | 9.05(b) |
| Initial Transfer Amount | 6.03(e) |
| Kaiser | 3.17(a)(x) |
| Lockheed | 8.02(l) |
| Loss | 9.02(a) |
| Market Risk Period | 6.03(g) |
| Material Contracts | 3.17(a) |
| Material Licenses | 3.30 |
| Money Market Vehicle | 6.03(g) |
| Multiemployer Plan | 3.22(b) |
| Multiple Employer Plan | 3.22(b) |
| New Collective Bargaining Agreement | 2.10(a) |
| New Defined Benefit Plans | 6.03(a) |

10

| Term | Section |
|------|---------|
| New Vernon Plans | 6.13(a) |
| Old Collective Bargaining Agreement | 2.10(a) |
| PBO Amount | 6.03(g) |
| Plans | 3.22(a) |
| Purchase Price | 2.04(a) |
| Purchaser | Preamble |
| Purchaser Indemnified Party | 9.02(a) |
| Purchaser's Actuary | 6.03(d) |
| Purchaser's Defined Contribution Plans | 6.11 |
| Reduction Facility | 2.01(b)(v) |
| Restricted Period | 5.07(a) |
| Returns | 7.02 |
| Rolling Assets | 2.01(a) |
| Safe Harbor Assumptions | 6.03(d) |
| Section 9.02(a)(iii) Loss | 9.05(b) |
| Section 9.03 Loss | 9.05(b) |
| Selected Business Assets | 3.20(a) |
| Seller Indemnified Party | 9.03(a) |
| Sellers' Actuary | 6.03(d) |
| Sellers' Defined Contribution Plans | 6.11 |
| Sellers Estimated Net Working Capital | 2.08(a) |
| Sellers' Pension Plans | 6.03(b) |
| Sellers' Recitals | |
| Shared Intellectual Property | 5.12 |
| Shares | Recitals |
| Third Party Claims | 9.04(a) |
| Title Company | 8.02(n) |
| Title Policy | 8.02(n) |
| Transferred Benefits | 6.03(b) |
| Transferred Employee | 6.01 |
| True-Up Amount | 6.03(e) |
| True-Up Date | 6.03(e) |
| USWA | 8.02(k) |
| Vernon Employees | 6.13(a) |
| WARN | 3.22(g) |

## ARTICLE II

## PURCHASE AND SALE

SECTION 2.01. *Purchase and Sale of Assets.* (a) On the terms and subject to the conditions of this Agreement, Century WV shall, on the Closing Date, sell, assign, transfer, convey and deliver to the Purchaser or cause to be sold, assigned, transferred, conveyed and delivered to the Purchaser, and the Purchaser shall purchase from Century WV, on the Closing Date, all the assets, properties, goodwill and business of every kind and description and wherever located, whether tangible or intangible, real, personal or mixed, directly or indirectly owned by Century WV or to which Century WV is directly or indirectly entitled and, in any case, belonging to or used in the Rolling Business, other than the Excluded Assets described in Section 2.01(b) (the assets to be purchased by the Purchaser being referred to as the "*Rolling Assets*"), including, without limitation, the following:

(i)     the Rolling Business as a going concern;

(ii)     all the Ravenswood Owned Real Property, and all rights in respect of the Leased Real Property;

(iii)     all furniture, fixtures, equipment, machinery, spare parts, packaging materials, oil and other tangible personal property used or held for use by the Sellers at the locations at which the Rolling Business is conducted (including, without limitation, tangible personal property held in storerooms), or otherwise owned or held by the Sellers at the Closing Date for use in the conduct of the Rolling Business and not otherwise included in clause (ii) above, including, without limitation, the items listed in Schedule 2.01(a)(iii);

(iv)     all vehicles and transportation equipment, including, without limitation, the items listed in Schedule 2.01(a)(iv);

(v)     all Inventories of the Rolling Business;

(vi)     all Receivables of the Rolling Business;

(vii)     all books of account, general, environmental, health and safety, financial, tax and personnel records, claim and grievance records, environmental reports, invoices, technical records and drawings, shipping records, supplier lists, correspondence and other documents, records and files and all computer software and programs and any rights thereto owned, associated with or employed by the Sellers or used in, or relating to, the Rolling Business at the Closing Date, other than organization documents, minute and stock record books and the corporate seal of the Sellers;

(viii)    the goodwill of the Sellers relating to the Rolling Business;

(ix)    subject to Section 5.12, all the Sellers' right, title and interest in, to and under the Owned Intellectual Property and, the Licensed Intellectual Property used in, or relating to, the Rolling Business;

(x)    all claims, causes of action, choses in action, rights of recovery and rights of set-off of any kind (including rights to insurance proceeds relating to an Assumed Liability and rights under and pursuant to all warranties, representations and guarantees made by suppliers of products, materials or equipment, or components thereof), pertaining to, or arising out of, the Rolling Business and enuring to the benefit of the Sellers;

(xi)    all sales and promotional literature, customer lists and other sales-related materials owned, used, associated with or employed by the Sellers at the Closing Date used in, or relating to, the Rolling Business;

(xii)    all rights of the Sellers under all contracts, licenses, sublicenses, agreements, leases, commitments, and sales and purchase orders, and under all commitments, bids and offers (to the extent such offers are transferable), used in, or relating to, the Rolling Business including, without limitation, those listed in Schedule 2.01(a)(xii);

(xiii)    all municipal, state and federal franchises, permits, licenses, agreements, waivers and authorizations held or used by the Sellers in connection with, or required for, the Rolling Business, to the extent transferable, including, without limitation, those listed in Schedule 2.01(a)(xiii);

(xiv)    all the Sellers' right, title and interest on the Closing Date in, to and under all other assets, rights and claims of every kind and nature used in the operation of, or residing with, the Rolling Business;

(xv)    to the extent contemplated in the Shared Services Agreement, the membership interest in the LLC; and

(xvi)    all assets of the Rolling Business to the extent specifically reflected in the Closing Balance Sheet.

(b)    The Rolling Assets shall exclude the following assets owned or leased by Century WV (the "*Excluded Assets*"):

(i)    all real property, whether owned or leased, together with, to the extent owned or leased, all buildings and other structures, facilities or improvements currently or hereafter located thereon, and all fixtures, systems and equipment attached or

appurtenant thereto other than the Ravenswood Owned Real Property and the Leased Real Property;

(ii)    all cash, cash equivalents and bank accounts owned by the Century WV at the Closing Date, including, without limitation, all deposits of Century WV as security for workers' compensation claims;

(iii)    all rights of Century WV under this Agreement and the Ancillary Agreements;

(iv)    the Oracle GEMMS software and any rights or claims in respect thereof;

(v)    all the assets, properties and goodwill belonging to or used by Century WV in connection with its operation of its reduction facility in Ravenswood, West Virginia ("*Reduction Facility*") which are not also used in the operation of the Business;

(vi)    in respect of assets, properties and goodwill used by both the Reduction Facility and the Rolling Business, such assets, properties and goodwill used primarily by the Reduction Facility;

(vii)    the assets and properties ownership of which is to be retained by Century WV pursuant to the Shared Services Agreement; and

(viii)    all rights to insurance proceeds, except to the extent relating to an Assumed Liability, under insurance policies of the Sellers.

SECTION 2.02. *Assumption and Exclusion of Liabilities.* (a) On the terms and subject to the conditions of this Agreement, the Purchaser shall, on the Closing Date, assume and shall agree to pay, perform and discharge when due the following Liabilities of Century WV (the "*Assumed Liabilities*"):

(i)    all Liabilities relating to or arising from the operation of the Rolling Business on or after the Closing Date, except as otherwise provided in Article VI with respect to employee benefit matters;

(ii)    subject to clause (iii) below, all Liabilities relating to or arising from the ownership or use of the Rolling Assets on or after the Closing Date, including, without limitation, all Liabilities under all claims, suits, actions, contracts, licenses, sublicenses, agreements, leases, commitments, and sales and purchase orders, and under all commitments, bids and offers;

(iii)    all Liabilities relating to or arising out of Actions brought against the Rolling Business associated with employment actions, omissions or events, including,

without limitation, employment discrimination claims and claims for workplace related injuries by employees which occurred or were incurred or accrued on or before the Closing Date; *provided* that no such Liabilities (other than workers' compensation claims) shall be assumed to the extent they (together with all Liabilities relating to or arising out of Actions (other than workers' compensation claims) brought against Century CP associated with employment actions, omissions or events which were incurred or accrued on or before the Closing Date) exceed $600,000, individually or in the aggregate;

       (iv)    all Liabilities relating to or arising from the matters set forth in Section 3.16(a) of the Disclosure Schedule (other than the Excluded Liabilities as set forth in Section 2.02(b)(vi));

       (v)    subject to Section 2.02(a)(iii), all Liabilities relating to or arising out of Actions brought against the Rolling Business before, on or after the Closing Date; and

       (vi)    all accrued liabilities of the Rolling Business to the extent specifically reflected in the Closing Balance Sheet.

       (b)    Notwithstanding subsection (a) above, Century WV shall retain responsibility for, and the Purchaser shall not assume or have any responsibility for, all Liabilities of Century WV as of the Closing Date other than the Assumed Liabilities (the "*Excluded Liabilities*"), including, without limitation:

       (i)    except to the extent accrued on the Closing Balance Sheet in respect of the Rolling Business, all Taxes now or hereafter owed by the Sellers or any Affiliate of the Sellers, or attributable to the Rolling Assets or the Rolling Business, relating to any period, or any portion of any period, ending on or prior to the Closing Date (as provided in Section 7.01);

       (ii)    except as otherwise provided in Article VI, any Liabilities for benefits, or under any of the Rolling Business' Plans;

       (iii)    all Liabilities relating to or arising out of the Excluded Assets;

       (iv)    all Liabilities relating to or arising out of Actions brought against the Rolling Business (other than workers' compensation claims) associated with employment actions, omissions or events, including, without limitation, employment discrimination claims, and claims for workplace related injuries by employees which occurred or were incurred or accrued on or before the Closing Date, but only to the extent such Liabilities (together with all Liabilities relating to or arising out of Actions (other than workers' compensation claims) brought against Century CP associated with employment actions, omissions or events which were incurred or accrued on or before the Closing Date), individually or in the aggregate, exceed $600,000;

(v)     all Liabilities in the nature of product liability claims relating to or arising out of allegations of personal injury or property damage suffered by any third party (A) on or prior to the Closing Date or (B) attributable to products sold or shipped, or Inventory purchased or manufactured, in each case in respect of the conduct of the Rolling Business on or prior to the Closing Date;

(vi)     all Liabilities under Environmental Laws relating to or arising out of (A) Hazardous Material transported from the Ravenswood Real Property pre-Closing; (B) any off-site migration of Hazardous Material resulting from any pre-Closing off-site disposal or Release of such Hazardous Material; (C) any off-site migration of Hazardous Material from the Ravenswood Real Property resulting from any pre-Closing disposal or Release at the Ravenswood Real Property, except (I) in respect of matters set forth in Section 3.16(a) of the Disclosure Schedule, if the Purchaser's actions or inactions are the cause of such off-site migration or (II) in respect of any other pre-Closing disposal or Release at the Ravenswood Real Property, if the Purchaser's negligence is the cause of such off-site migration; and (D) any on-site PCB contamination existing or occurring on or before the Closing at the Ravenswood Real Property, or any off-site PCB contamination, whether existing or occurring before or after the Closing, resulting from or arising out of operations at the Ravenswood Real Property on or before the Closing, in each case requiring investigation or remediation or other action under applicable Environmental Law; it being understood that for purposes of this clause 2.02(b)(vi)(D), "Environmental Laws" include regulations adopted by the State of West Virginia or a subdivision thereof after the Closing Date pursuant to statutes enacted before the Closing Date;

(vii)     all Liabilities in respect of the Oracle GEMMS software and any claims in respect thereof; and

(viii)    any Indebtedness (other than obligations under equipment leases that have, or should have, been recorded as capital leases) of the Rolling Business.

SECTION 2.03.  *Purchase and Sale of Shares*.  On the terms and subject to the conditions of this Agreement, on the Closing Date, Century shall sell to the Purchaser, and the Purchaser shall purchase from Century, all the Shares.  The sale and purchase of the Shares shall not be consummated unless the sale and purchase of the Rolling Assets is consummated simultaneously, nor shall the sale and purchase of the Rolling Assets be consummated unless the sale and purchase of the Shares is consummated simultaneously.

SECTION 2.04.  *Purchase Price; Allocation of Purchase Price*.  (a)  Subject to the adjustments set forth in Sections 2.08 and 2.09, the purchase price for the Rolling Assets and the Shares shall be U.S.$247,000,000, and the purchase price for the covenants contained in Section 5.07 shall be U.S.$1,000,000 (collectively, the "*Purchase Price*").  Within thirty (30) calendar days following the date hereof, the Sellers and the Purchaser shall agree to allocate between the Rolling Assets and the Shares, in accordance with the respective fair market values of the Rolling Assets and the assets of Century CP, the portion of the Purchase

Price not allocated to the covenants contained in Section 5.07. Under no circumstances, will the allocations between the Rolling Assets and the Shares be inconsistent with the allocations set forth under Section 7.07(b) of this Agreement. `

      (b)    Within sixty (60) calendar days following the Closing, the Purchaser shall prepare and deliver to the Sellers an allocation statement (the *"Allocation Statement"*), setting forth the allocation of the Purchase Price among the Rolling Assets and any related liability in accordance with Section 1060 of the Code. If, within 30 calendar days after the date of the Purchaser's delivery of the Form 8594, the Sellers reasonably dispute one or more of the computations and allocations reflected on the Form 8594, the Sellers will give written notice to the Purchaser setting forth the computations and allocations that the Sellers believe should be reflected on Form 8594, and the Sellers and the Purchaser will attempt in good faith to promptly agree on a revised Form 8594. If the parties cannot resolve any such dispute within 30 Business Days of the delivery by the Purchaser of the Form 8594 to the Sellers, the items remaining in dispute shall be submitted to an independent accounting firm of international reputation selected by, and mutually acceptable to, the Sellers and the Purchaser. If the independent accounting firm so selected determines that the allocation with respect to any item or items remaining in dispute is incorrect and that the Sellers would be materially adversely affected by the incorrectness of such allocation, then the Sellers and the Purchaser shall be bound by the allocation of such items as determined by the independent accounting firm. Otherwise, the Purchaser and the Sellers shall be bound by the allocation with respect to such item or items as prepared by the Purchaser. The independent accounting firm shall make any such determination within 30 Business Days after submission of the remaining disputed items. Any subsequent adjustments to the Purchase Price shall be reflected in the Allocation Statement as revised hereunder in a manner consistent with Treasury Regulation § 1.1060 1T(f). For all Tax purposes, the Purchaser and the Sellers agree to report the transactions contemplated in this Agreement in a manner consistent with the terms of this Agreement, including the allocations under Section 2.04(a), and that none of them will take any position inconsistent therewith in any Tax return, in any refund claim, in any litigation, or otherwise. Each of the Sellers and the Purchaser agree to cooperate with each other in preparing Form 8594 for filing by each and to furnish the other with a copy of such form prepared in draft within a reasonable period before its filing due date, as well as copies of such forms as filed.

      SECTION 2.05. *Closing.* Subject to the terms and conditions of this Agreement, the sale and purchase of the Assets and the assumption of the Assumed Liabilities contemplated by this Agreement shall take place at a closing (the *"Closing"*) to be held at the offices of Shearman & Sterling, 599 Lexington Avenue, New York, New York at 10:00 A.M. New York time on the later to occur of (i) September 30, 1999 or (ii) the last Business Day of the month following the fifth Business Day after the later to occur of the (A) expiration or termination of all applicable waiting periods under the HSR Act and (B) satisfaction or waiver of all other conditions to the obligations of the parties set forth in Article VIII, or at such other place or at such other time or on such other date as the Sellers and the Purchaser may mutually agree upon in writing (the day on which the Closing takes place being the *"Closing Date"*).

SECTION 2.06. *Closing Deliveries by the Sellers*. At the Closing, the Sellers shall deliver or cause to be delivered to the Purchaser:

(a)    the Bill of Sale, the Deed and such other instruments, in form and substance reasonably satisfactory to the Purchaser, as may be requested by the Purchaser to transfer the Rolling Assets to the Purchaser or evidence such transfer on the public records;

(b)    stock certificates evidencing the Shares duly endorsed in blank, or accompanied by stock powers duly executed in blank, in form reasonably satisfactory to the Purchaser and with all required stock transfer tax stamps affixed;

(c)    executed counterparts of the Assumption Agreement, the Molten Aluminum Purchase Agreement, the Shared Services Agreement, the Management Services Agreement, the Vernon Indemnity Agreement and the Ravenswood Indemnity Agreement;

(d)    a receipt for the Purchase Price; and

(e)    the certificates, deliveries and other documents required to be delivered pursuant to Section 8.02.

SECTION 2.07. *Closing Deliveries by the Purchaser*. At the Closing, the Purchaser shall deliver to the Sellers:

(a)    the Purchase Price by wire transfer in immediately available funds to an account or accounts designated at least three Business Days prior to the Closing Date by the Sellers in a written notice to the Purchaser;

(b)    executed counterparts of the Assumption Agreement, the Molten Aluminum Purchase Agreement, the Shared Services Agreement, the Management Services Agreement, the Vernon Indemnity Agreement and the Ravenswood Indemnity Agreement; and

(c)    the certificates, deliveries and other documents required to be delivered pursuant to Section 8.01.

SECTION 2.08. *Pre-Closing Adjustment of Purchase Price*. (a) On or around the tenth Business Day preceding the Closing Date, the Sellers shall in good faith estimate the Net Working Capital as of the last calendar day of the immediately preceding month (the "*Sellers Estimated Net Working Capital*") and deliver to the Purchaser in accordance with Section 11.02 a notice specifying the Sellers Estimated Net Working Capital and the basis, in reasonable detail, for such calculation. The Purchaser shall have three Business Days to review the Sellers Estimated Net Working Capital during which time the Sellers shall in good

faith assist the Purchaser in such review. After such three Business Day review period shall have terminated, either (i) the parties shall have, acting in good faith, mutually agreed an estimate of the Net Working Capital as of the last calendar day of the immediately preceding month (the "*Agreed Estimated Net Working Capital*") or (ii) the Sellers, on the one hand, and the Purchaser, on the other hand, shall have, acting in good faith, each determined an estimate of the Net Working Capital as of the last calendar day of the immediately preceding month (the determination closest to the Net Working Capital reflected on the Reference Balance Sheet being hereinafter referred to as the "*Default Estimated Net Working Capital*").

(b)    Following determination of the Agreed Estimated Net Working Capital or the Default Estimated Net Working Capital, as the case may be, the Purchase Price shall be adjusted as follows:

(i)    in the event that the Agreed Estimated Net Working Capital or the Default Estimated Net Working Capital, as the case may be, exceeds the Net Working Capital reflected on the Reference Balance Sheet, then the Purchase Price shall be adjusted upward by an amount equal to 50% of such excess (the "*Adjusted Pre-Closing NWC Increase*"); and

(ii)    in the event that the Agreed Estimated Net Working Capital or the Default Estimated Net Working Capital, as the case may be, is less than the Net Working Capital reflected on the Reference Balance Sheet, then the Purchase Price shall be adjusted downward by an amount equal to 50% of such shortfall (the "*Adjusted Pre-Closing NWC Decrease*").

SECTION 2.09. *Post-Closing Adjustment of Purchase Price*. The Purchase Price shall be subject to adjustment after the Closing as specified in this Section 2.09:

(a)    *Closing Balance Sheet*. As promptly as practicable, but in any event within 90 calendar days following the Closing Date, the Purchaser shall deliver to the Sellers the Closing Balance Sheet, together with a certificate of the Purchaser thereon that the Closing Balance Sheet was prepared on a basis consistent with the preparation of the Reference Balance Sheet.

(b)    *Disputes*. (i) Subject to clause (ii) of this Section 2.09(b), the Closing Balance Sheet delivered by the Purchaser to the Sellers shall be deemed to be and shall be final, binding and conclusive on the parties hereto.

(ii)    The Sellers may dispute any amounts reflected on the Closing Balance Sheet to the extent the net effect of such disputed amounts in the aggregate would affect the Net Working Capital reflected on the Closing Balance Sheet by more than the Designated Amount, but only on the basis that the amounts reflected on the Closing Balance Sheet were not prepared in accordance with the same U.S. GAAP, applied on a basis consistent with the preparation of the Reference Balance Sheet; *provided,*

*however*, that the Sellers shall have notified the Purchaser in writing of each disputed item, specifying the amount thereof in dispute and setting forth, in reasonable detail, the basis for such dispute, within 30 Business Days of the Purchaser's delivery of the Closing Balance Sheet to the Sellers. In the event of such a dispute, the Sellers' Accountants and the Purchaser's Accountants shall attempt to reconcile their differences, and any resolution by them as to any disputed amounts shall be final, binding and conclusive on the parties hereto. If any such resolution by the Purchaser's Accountants and the Sellers' Accountants leaves in dispute amounts the net effect of which in the aggregate would not affect the Net Working Capital reflected on the Closing Balance Sheet by more than the Designated Amount, all such amounts remaining in dispute shall then be deemed to have been resolved in favor of the Closing Balance Sheet delivered by the Purchaser to the Sellers. If the Sellers' Accountants and the Purchaser's Accountants are unable to reach a resolution with such effect within 20 Business Days after receipt by the Purchaser of the Sellers' written notice of dispute, the Sellers' Accountants and the Purchaser's Accountants shall submit the items remaining in dispute for resolution to an independent accounting firm of international reputation mutually acceptable to the Purchaser and the Sellers (the "*Independent Accounting Firm*"), which shall, within 60 Business Days after such submission, determine and report to the Purchaser and the Sellers upon such remaining disputed items, and such report shall be final, binding and conclusive on the Sellers and the Purchaser. The fees and disbursements of the Independent Accounting Firm shall be allocated between the Sellers and the Purchaser in the same proportion that the aggregate amount of such remaining disputed items so submitted to the Independent Accounting Firm that is unsuccessfully disputed by each such party (as finally determined by the Independent Accounting Firm) bears to the total amount of such remaining disputed items so submitted.

(iii)   In acting under this Agreement, the Purchaser's Accountants, the Sellers' Accountants and the Independent Accounting Firm shall be entitled to the privileges and immunities of arbitrators.

(iv)   No adjustment to the Purchase Price pursuant to Section 2.09(c) shall be made with respect to amounts disputed by the Sellers pursuant to this Section 2.09(b), unless the net effect of the amounts successfully disputed by the Sellers in the aggregate is to increase the Net Working Capital reflected on the Closing Balance Sheet by at least the Designated Amount.

(c)   *Purchase Price Adjustment.* The Closing Balance Sheet shall be deemed final for the purposes of this Section 2.09 upon the earlier of (A) the failure of the Sellers to notify the Purchaser of a dispute within 30 Business Days of the Purchaser's delivery of the Closing Balance Sheet to the Sellers, (B) the resolution of all disputes, pursuant to Section 2.09(b)(ii), by the Purchaser's Accountants and the Sellers' Accountants and (C) the resolution of all disputes, pursuant to Section 2.09(b)(ii), by the Independent Accounting Firm. Subject to the limitation set forth in Section

2.09(b)(iv), within three Business Days of the Closing Balance Sheet being deemed final, a Purchase Price adjustment shall be made as follows:

(i)     In the event that the Adjusted Reference Net Working Capital exceeds the Net Working Capital reflected on the Closing Balance Sheet by at least the Designated Amount, then the Purchase Price shall be adjusted downward in an amount equal to the full amount by which the Adjusted Reference Net Working Capital exceeds the Net Working Capital shown on the Closing Balance Sheet, the Purchaser shall deliver written notice to the Sellers specifying the amount of such downward adjustment of the Purchase Price, and the Sellers shall, within three Business Days of their receipt of such notice, pay such amount to the Purchaser in immediately available funds.

(ii)     In the event that the Net Working Capital reflected on the Closing Balance Sheet exceeds the Adjusted Reference Net Working Capital by at least the Designated Amount, then the Purchase Price shall be adjusted upward in an amount equal to the full amount by which the Net Working Capital shown on the Closing Balance Sheet exceeds the Adjusted Reference Net Working Capital and the Purchaser shall, within three Business Days of such determination, pay the amount of such excess to the Sellers by wire transfer in immediately available funds.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES
## OF THE SELLERS

As an inducement to the Purchaser to enter into this Agreement, the Sellers hereby represent and warrant, jointly and severally, to the Purchaser as follows:

SECTION 3.01. *Organization, Authority and Qualification of the Sellers.* Each of the Sellers is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary power and authority to enter into this Agreement and the Ancillary Agreements to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. Each of the Sellers is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed or qualified would not adversely affect (i) the ability of such Seller to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement and the Ancillary Agreements to which it is a party and (ii) the ability of the Sellers and the Subsidiaries to conduct the Business in any material respect. The execution and delivery by each of the Sellers of this Agreement and the Ancillary Agreements to which it is a party, the

performance by each of the Sellers of its obligations hereunder and thereunder and the consummation by each of the Sellers of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of each of the Sellers. This Agreement has been, and upon their execution the Ancillary Agreements will be, duly executed and delivered by each of the Sellers that is a party thereto, and (assuming due authorization, execution and delivery by the Purchaser) this Agreement constitutes, and upon their execution the Ancillary Agreements to which each Seller is a party will constitute, legal, valid and binding obligations of such Seller enforceable against such Seller in accordance with their respective terms.

SECTION 3.02. *Capital Stock and Ownership.* (a) Century owns all of the authorized, issued and outstanding shares of capital stock of Century WV (the "*Century WV Shares*") free and clear of all Encumbrances. There are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the capital stock of Century WV or obligating either Century WV or Century to issue or sell any shares of capital stock of, or other interest in, Century WV.

(b)    The Shares constitute all the authorized, issued and outstanding shares of capital stock of Century CP. The Shares have been duly authorized and validly issued and are fully paid and nonassessable. None of the issued and outstanding shares of Common Stock was issued in violation of any preemptive rights. There are no options, warrants, convertible securities or other rights, agreements, arrangements or commitments of any character relating to the capital stock of Century CP or obligating either Century CP or Century to issue or sell any shares of capital stock of, or other interest in, Century CP. There are no outstanding contractual obligations of Century CP to repurchase, redeem or otherwise acquire any shares of Common Stock or to provide funds to, or make any investment (in the form of a loan, capital contribution or otherwise) in, any other Person. The Shares are owned of record and beneficially by Century free and clear of all Encumbrances. Upon consummation of the transactions contemplated by this Agreement, the Purchaser will own all the issued and outstanding capital stock of Century CP, free and clear of all Encumbrances, and the Shares will be fully paid and nonassessable. There are no voting trusts, stockholder agreements, proxies or other agreements or understandings in effect with respect to the voting or transfer of any of the Shares.

SECTION 3.03. *Subsidiaries.* (a) Century CP owns, whether of record or beneficially, no direct or indirect equity or other interest in any corporation, partnership, joint venture, association or other entity or any right (contingent or otherwise) to acquire the same. Century CP is not a member of (nor is any part of the Business conducted through) any partnership, nor is Century CP a participant in any joint venture or similar arrangement.

(b)    Century CP: (i) is a corporation duly organized and validly existing under the laws of its jurisdiction of incorporation, (ii) has all necessary power and authority to own, operate or lease the properties and assets owned, operated or leased by it and to carry on its business as it has been and is currently conducted and (iii) is in all material respects duly

licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary or desirable.

        (c)     All material corporate actions taken by Century CP have been duly authorized and it has taken no material action that conflicts with, constitutes a default under or results in a violation of any provision of its charter or By-laws (or similar organizational documents). True and complete copies of the charter and By-laws (or similar organizational documents), in each case as in effect on the date hereof, of Century CP have been delivered by the Sellers to the Purchaser.

        SECTION 3.04.  *Books and Records.* The minute books of Century CP contain in all material respects accurate records of all meetings and accurately reflect in all material respects all other actions taken by the stockholders, Board of Directors and all committees of the Board of Directors of Century CP. Complete and accurate copies of all such minute books of Century CP and of the stock register of Century CP have been provided by the Sellers to the Purchaser. Complete and accurate copies of all minute books of meetings held since January 1, 1996 of the stockholders, Boards of Directors, and all committees thereof, of the Sellers, which contain references to matters material, or which with the passage of time could reasonably be expected to become material, to the Business, have been provided by the Sellers to the Purchaser (but only to the extent of discussions of such matters).

        SECTION 3.05.  *No Conflict.* Except as may result from any facts or circumstances relating solely to the Purchaser or as described in Section 3.06, the execution, delivery and performance by each of the Sellers of this Agreement and the Ancillary Agreements to which it is a party do not and will not (a) violate, conflict with or result in the breach of any provision of the charter or By-laws (or similar organizational documents) of any of the Sellers or Century CP, (b) materially conflict with or violate (or cause an event which would be reasonably likely to have a Material Adverse Effect as a result of) any Law or Governmental Order applicable to any of the Sellers, Century CP or any of their respective assets, properties or businesses or (c) except as set forth in Section 3.05(c) of the Disclosure Schedule or as would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect, conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, or result in the creation of any Encumbrance on any of the Rolling Assets or the assets or properties of Century CP pursuant to, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which any of the Sellers or Century CP is a party or by which any of such assets or properties is bound or affected.

        SECTION 3.06.  *Governmental Consents and Approvals.* The execution, delivery and performance by each of the Sellers of this Agreement and each Ancillary Agreement to which it is a party does not and will not require any consent, approval,

authorization or other order of, action by, filing with or notification to, any Governmental Authority, except (a) as described in Section 3.06 of the Disclosure Schedule and (b) the requirements of the HSR Act.

SECTION 3.07. *Financial Information; Books and Records*. (a) True and complete copies of the Reference Balance Sheet and the related statement of operations of the Business (collectively referred to herein as the "*Financial Statements*") have been delivered by the Sellers to the Purchaser. Except as set forth in Section 3.07(a) of the Disclosure Schedule, the Financial Statements (i) were prepared in all material respects from the books of account and other financial records of the Sellers and Century CP, (ii) present fairly in all material respects the financial condition and results of operations of the Business as of the dates thereof or for the periods covered thereby and (iii) have been prepared in accordance with the same U.S. GAAP as applied in the preparation of the consolidated financial statements of Century as of, and for the year ended, December 31, 1998.

(b)     The books of account and other financial records of the Sellers and Century CP for fiscal years 1997, 1998 and 1999 and, in the case of Century CP, since its formation in December 1998: (i) fairly present in all material respects all items of income and expense and all assets and Liabilities required to be reflected therein in accordance with U.S. GAAP applied on a basis consistent with the past practices of the Sellers, and throughout the periods involved, (ii) are in all material respects complete and do not contain or reflect any material inaccuracies or discrepancies and (iii) have been maintained in all material respects in accordance with good business and accounting practices.

SECTION 3.08. *No Undisclosed Liabilities*. There are no Liabilities of the Business, other than Liabilities (i) reflected or reserved against on the Reference Balance Sheet, (ii) disclosed in Section 3.08 of the Disclosure Schedule (or as otherwise disclosed in the Disclosure Schedule if the relevance to this Section 3.08 is reasonably apparent from the facts specified in such disclosure), (iii) incurred since the date of this Agreement in the ordinary course of business, consistent with past practice, of the Business and which do not and would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect or (iv) of a kind and type that would not be required to be disclosed in a financial statement prepared in accordance with U.S. GAAP and which do not and would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect. Reserves are reflected on the Reference Balance Sheet against all Liabilities of the Business as of the date thereof, other than Liabilities relating to the Excluded Liabilities, in amounts that have been established on a basis consistent with the past practices of the Sellers and in accordance with U.S. GAAP.

SECTION 3.09. *Receivables*. Section 3.09 of the Disclosure Schedule is an aged list of the Receivables as of the Reference Balance Sheet Date showing separately those Receivables that as of such date had been outstanding (i) for less than the due date, (ii) 1 to 15 days past due, (iii) 16 to 30 days past due, (iv) 31 to 60 days past due and (v) over 60 days past due. Except to the extent, if any, reserved for on the Reference Balance Sheet, all

Receivables reflected on the Reference Balance Sheet arose in all material respects from, and the Receivables existing on the Closing Date will have arisen in all material respects from, the sale of Inventory or services to Persons in the ordinary course of the Business consistent with past practice and, except as reserved against on the Reference Balance Sheet, constitute or will constitute in all material respects, as the case may be, only valid, undisputed claims of the Business not subject to valid claims of set-off or other defenses or counterclaims other than normal cash discounts accrued in the ordinary course of the Business consistent with past practice. All Receivables reflected on the Reference Balance Sheet or arising from the date thereof until the Closing are, or will be, reserved for in accordance with the same U.S. GAAP as applied in the preparation of the consolidated financial statements of Century as of and for the year ended, December 31, 1998.

SECTION 3.10. *Inventories.* (a) Subject to amounts reserved therefor on the Reference Balance Sheet, the values at which all Inventories are carried on the Reference Balance Sheet reflect the historical inventory valuation policy of Century WV and Century CP of stating such Inventories at the lower of cost (determined principally on the last-in, first-out method) or market value. Except as set forth in Section 3.10 of the Disclosure Schedule and for Encumbrances described in clause (b) of the definition of "Permitted Encumbrances", the Business has good and marketable title to the Inventories free and clear of all Encumbrances. The Inventories do not consist of any items held on consignment. The Business is not under any obligation or liability with respect to accepting returns of items of Inventory or merchandise in the possession of its customers other than in the ordinary course of the Business consistent with past practice. No clearance or extraordinary sale of the Inventories has been conducted since the Reference Balance Sheet Date. The Business has not acquired or committed to acquire or manufactured Inventory for sale which is not of a quality and quantity usable in the ordinary course of the Business within a reasonable period of time and consistent with past practice nor has the Business changed the price of any Inventory except for (i) price reductions to reflect any reduction in the cost thereof to the Business, (ii) reductions and increases responsive to normal competitive conditions and consistent with the Business' past sales practices, (iii) increases to reflect any increase in the cost thereof to the Business and (iv) increases and reductions made with the written consent of the Purchaser. Section 3.10 of the Disclosure Schedule contains a complete list of the addresses of all warehouses and other facilities in which the Inventories are located.

(b)    The Inventories are in all material respects in a condition such that they can be sold in the ordinary course of the Business consistent with past practice. All Inventories reflected in the Reference Balance Sheet or arising from the date hereof until the Closing are, or will be, recorded in accordance with the same U.S. GAAP as applied in the preparation of the consolidated financial statements of Century as of and for the year ended, December 31, 1998.

SECTION 3.11. *Public Filings.* None of Century WV or the Subsidiaries is required to file any forms, reports or other documents with the SEC.

SECTION 3.12. *Sales and Purchase Order Backlog.* (a) As of the Reference Balance Sheet Date, open sales orders accepted by the Business totaled approximately $117,000,000, and, as of a date not more than ten days prior to the date hereof, open sales orders accepted by the Business totaled approximately $126,000,000. Section 3.12(a) of the Disclosure Schedule lists all sales orders exceeding $100,000 per order, which have been accepted by the Business, and which were open either as of the Reference Balance Sheet Date or as of such date not more than ten days prior to the date hereof.

(b)    As of the Reference Balance Sheet Date, open purchase orders issued by the Business totaled approximately $17,000,000, and, as of the date referred to in Section 3.12(a) not more than ten days prior to the date hereof, open purchase orders issued by the Business totaled approximately $15,000,000. Section 3.12(b) of the Disclosure Schedule lists all purchase orders exceeding $100,000 per order, which have been issued by the Business, and which were open either as of the Reference Balance Sheet Date or as of such date not more than ten days prior to the date hereof.

SECTION 3.13. *Conduct in the Ordinary Course; Absence of Certain Changes, Events and Conditions.* Since the Reference Balance Sheet Date, except as disclosed in Section 3.13 of the Disclosure Schedule, the Business has been conducted in the ordinary course and consistent with past practice. As amplification and not limitation of the foregoing, except as disclosed in Section 3.13 of the Disclosure Schedule and except as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect, since the Reference Balance Sheet Date, none of the Sellers or Century CP has:

(a)    permitted or allowed any of the assets or properties (whether tangible or intangible) of the Business to be subjected to any Encumbrance, other than Permitted Encumbrances and Encumbrances that will be released at or prior to the Closing;

(b)    except in the ordinary course of the Business consistent with past practice, discharged or otherwise obtained the release of any Encumbrance relating to the Business or paid or otherwise discharged any Liability of the Business, other than current liabilities reflected on the Reference Balance Sheet and current liabilities incurred in the ordinary course of the Business consistent with past practice since the date of the Reference Balance Sheet;

(c)    written down or written up (or failed to write down or write up) the value of any Inventories or Receivables or revalued any assets of the Business other than in the ordinary course of the Business consistent with past practice and in accordance with the same U.S. GAAP as applied in the preparation of the consolidated financial statements of Century as of and for the year ended, December 31, 1998;

(d)    made any change in any method of accounting or accounting practice or policy related to the Business, other than such changes required by U.S. GAAP;

(e)    amended, terminated, canceled or compromised any material claims of the Business or waived any other rights of substantial value to the Business;

(f)    sold, transferred, leased, subleased, licensed or otherwise disposed of any properties or assets, real, personal or mixed (including, without limitation, leasehold interests and intangible property), other than in the ordinary course of the Business consistent with past practice;

(g)    issued or sold any capital stock, notes, bonds or other securities, or any option, warrant or other right to acquire the same, of Century CP;

(h)    redeemed any of the capital stock of Century CP or declared, made or paid any dividends or distributions (whether in cash, securities or other property) to the holders of Century CP's capital stock;

(i)    in relation to Century CP or the Business, merged with, entered into a consolidation with or acquired an interest of 5% or more in any Person or acquired a substantial portion of the assets or business of any Person or any division or line of business thereof, or otherwise acquired any material assets other than in the ordinary course of the Business consistent with past practice;

(j)    made any commitment for any capital expenditure in respect of the Business that will not be expended as of the Closing Date in excess of $1,000,000 in the aggregate;

(k)    made any material changes in the customary methods of operations of the Business, including, without limitation, practices and policies relating to manufacturing, purchasing, marketing, selling and pricing;

(l)    made any express or deemed election or settled or compromised any liability, with respect to Taxes of the Business;

(m)    in the case of Century CP, incurred any Indebtedness which will not be repaid in full prior to Closing, except for obligations under letters of credit or in respect of bonds posted in the ordinary course of business consistent with past practice;

(n)    in the case of Century CP, made any loan to, guaranteed any Indebtedness of or otherwise incurred any Indebtedness on behalf of any Person;

(o)    failed in any material respect to pay any creditor any amount owed to such creditor when due;

(p)    (A) established or increased or promised to increase the benefits under any bonus, insurance, severance, deferred compensation, pension, retirement, profit

sharing, stock option (including, without limitation, the granting of stock options, stock appreciation rights, performance awards or other restricted stock awards), stock purchase or other employee benefit plan or otherwise increased or promised to increase the compensation payable or to become payable to any directors, officers or employees of the Business, or (B) paid any benefit not required by any plan or agreement as in effect as of the date hereof; in either case except as required by Law or any collective bargaining agreement or involving ordinary increases consistent with the past practice of the Business;

(q)    entered into any employment or severance agreement with any of the employees of the Business;

(r)    terminated, discontinued, closed or disposed of any plant, material facility or other material business operation, or laid off any employees (other than layoffs in the ordinary course of the Business consistent with past practice) or implemented any early retirement, separation or program providing early retirement window benefits within the meaning of Section 1.401(a)-4 of the Regulations or announced or planned any such action or program for the future;

(s)    entered into any collective bargaining agreement or contract with the labor union or collective bargaining representative without the prior written consent of the Purchaser (other than the New Collective Bargaining Agreement);

(t)    disclosed any material secret or confidential Intellectual Property (except by way of issuance of a patent) or permitted to lapse or go abandoned any material Intellectual Property (or any registration or grant thereof or any application relating thereto) to which, or under which, the Business has any right, title, interest or license;

(u)    allowed any Material License or material Environmental Permit that was issued or relates to the Business to lapse or terminate;

(v)    failed to maintain the Business' plants, property and equipment in good repair and operating condition, as compared to the condition thereof as of the Reference Balance Sheet Date, ordinary wear and tear excepted;

(w)    suffered any casualty loss or damage with respect to any of the Rolling Assets or Century CP's properties or assets which in the aggregate have a replacement cost of more than $500,000, whether or not such losses or damages shall have been covered by insurance;

(x)    amended or restated the charter or By-laws (or other organizational documents) of Century CP;

(y)    suffered any Material Adverse Effect;

(z)     entered into any contract or agreement in respect of the Business (i) between or among the Sellers or any Affiliate of the Sellers or (ii) with Glencore International AG or any of its Affiliates;

(aa)     (i) amended any policy of the Business relating to the payment of accounts payable or accounts receivable; (ii) cancelled, or modified the terms and conditions of payment of, any amounts due the Business in respect of accounts receivable; or (iii) accelerated, or modified the terms and conditions of payment of, any amounts payable by the Business in respect of accounts payable; except in the case of clauses (i) or (ii), in the ordinary course of business consistent with past practice; or

(bb)     agreed, whether in writing or otherwise, to take any of the actions specified in this Section 3.13 or granted any options to purchase, rights of first refusal, rights of first offer or any other similar rights with respect to any of the actions specified in this Section 3.13, except as expressly contemplated by this Agreement and the Ancillary Agreements.

SECTION 3.14.  *Litigation.*  Except as set forth in Section 3.14 of the Disclosure Schedule, there are no material Actions by or against the Business, or affecting any of the properties or assets of the Business, including, without limitation, the Assets, pending before any Governmental Authority (or, to the knowledge of the Sellers, threatened to be brought by or before any Governmental Authority), *provided* that for purposes hereof an Action shall not be deemed material if the sole damages are monetary and the monetary Liability is less than $250,000.  None of the matters disclosed in Section 3.14 of the Disclosure Schedule, individually or in the aggregate, has had or would be reasonably likely to have a Material Adverse Effect or could adversely affect the legality, validity or enforceability of this Agreement, any Ancillary Agreement or the consummation of the transactions contemplated hereby or thereby.

SECTION 3.15.  *Compliance with Laws.*  Except as set forth in Section 3.15 of the Disclosure Schedule and except for environmental matters, real property matters, employee, compensation and benefit matters, labor matters and tax matters, as to which the provisions of Sections 3.16, 3.19, 3.22, 3.23 and 3.25, respectively, shall apply, the Sellers have conducted and continue to conduct the Business in all material respects in accordance with all Laws and Governmental Orders applicable to the Business or any of the properties or assets of the Business, including, without limitation, the Assets, and the Business is not in violation of any such Law or Governmental Order in any material respect.

SECTION 3.16.  *Environmental Matters.*  (a)  Except as disclosed in Section 3.16(a) of the Disclosure Schedule:

(i)     Each of the Sellers and Century CP is in material compliance with all applicable Environmental Laws and all Environmental Permits related to the Business or the Real Property.  All noncompliance with Environmental Laws or Environmental

Permits in respect of the Business in the last three years has been resolved without any material pending, ongoing or future obligation, cost or liability.

(ii)    There are no underground or aboveground storage tanks or any surface impoundments, septic tanks, pits, sumps or lagoons in which Hazardous Materials are being or have been treated, stored or disposed on any of the Real Property, except where the existence thereof would not be reasonably likely to result in any material Liability.

(iii)    None of the Sellers or Century CP has, and to the knowledge of the Sellers, no other Person has, Released Hazardous Materials on any of the Real Property in a manner that would be reasonably likely to result in material Liability.

(iv)    None of the Sellers or Century CP is conducting, or has undertaken or completed, any Remedial Action relating to any Release or threatened Release at the Real Property currently or formerly owned or operated by the Sellers or Century CP or at any other off-site location in respect of the Business, either voluntarily or pursuant to the order of any Governmental Authority or the requirements of any Environmental Law or Environmental Permit.

(v)    There is no asbestos or asbestos-containing material on any of the Real Property.

(vi)    To the knowledge of the Sellers, none of the Real Property is listed or has been proposed for listing on the National Priorities List or the Comprehensive Environmental Response, Compensation and Liability Information System under the federal Comprehensive Environmental Response, Compensation, and Liability Act or any analogous federal, state or local list.

(vii)    There are no material Environmental Claims pending or, to the knowledge of the Sellers, threatened against (a) any of the Sellers or Century CP relating to the Business, (b) the Business or (c) the Real Property, and to the knowledge of the Sellers, there are no circumstances that can reasonably be expected to form the basis of any such Environmental Claim in respect of the Business, including without limitation with respect to any off-site disposal location presently or formerly used by any of the Sellers or Century CP or any of their predecessors' or with respect to any previously owned or operated facilities.

(viii)    There are no wetlands or any areas subject to any legal requirement or restriction in any way related to wetlands (including, without limitation, requirements or restrictions related to buffer or transition areas or open waters) at or affecting the Real Property.

(b)     The Sellers have provided the Purchaser the opportunity to review copies of any environmental assessment or audit reports or other material studies or analyses in their possession relating to the Business or the Real Property (excluding routine in-house reporting, monitoring and correspondence).

(c)     Except as disclosed in Section 3.16(c) of the Disclosure Schedule, and for notices, petitions and filings as may be required for the transfer of Environmental Permits to the Purchaser or, if such transfer is not permitted under applicable Law, for the Purchaser to obtain such Permits, neither the execution of this Agreement nor the consummation of the transactions contemplated herein will require any Remedial Action or notice to or consent of Governmental Authorities or third parties pursuant to any applicable Environmental Law or Environmental Permit.

(d)     For avoidance of doubt, the Sellers shall, in respect of the Ravenswood Real Property, retain, and in respect of the Vernon Owned Real Property, hold the Purchaser harmless for, all Liabilities relating to or arising from (i) Hazardous Material transported from the Real Property pre-Closing; (ii) any off-site migration of Hazardous Material resulting from any pre-Closing off-site disposal or Release of such Hazardous Material; (iii) any off-site migration of Hazardous Material from the Real Property resulting from any pre-Closing disposal or Release at the Real Property, except (I) in respect of matters set forth in Section 3.16(a) of the Disclosure Schedule, if the Purchaser's actions or inactions are the cause of such off-site migration or (II) in respect of any other pre-Closing disposal or Release at the Real Property, if the Purchaser's negligence is the cause of such off-site migration; and (iv) any on-site PCB contamination existing or occurring on or before the Closing at the Real Property, or any off-site PCB contamination, whether existing or occurring before or after the Closing, resulting from or arising out of operations at the Real Property on or before the Closing, in each case requiring investigation or remediation or other action under applicable Environmental Law; it being understood that for purposes of this clause 3.16(d)(iv), "Environmental Laws" include regulations adopted by the State of West Virginia or the State of California, as the case may be, or a subdivision thereof, after the Closing Date pursuant to statutes enacted before the Closing Date.

(e)     For avoidance of doubt, notwithstanding anything to the contrary contained in Section 3.16(a) of the Disclosure Schedule, the Purchaser shall also be indemnified for environmental matters to the extent provided in the Ravenswood Indemnity Agreement and the Vernon Indemnity Agreement.

(f)     Section 3.16(f) of the Disclosure Schedule lists all Environmental Permits used or held in the conduct of the Business.

(g)     Except as disclosed in Section 3.16(g) of the Disclosure Schedule, to the knowledge of the Sellers, no PCBs have been Released at, on or beneath any of the Real Property or are migrating to or from any of the Real Property; it being understood, for avoidance of doubt, that the requirement of disclosure under this Section 3.16(g) is not

intended to alter the allocation of liability with respect to PCBs as otherwise provided for in this Agreement.

SECTION 3.17. *Material Contracts.* (a) Section 3.17(a) of the Disclosure Schedule lists each of the following contracts and agreements (including, without limitation, oral and informal arrangements) of the Sellers or Century CP in respect of the Business (such contracts and agreements, together with all contracts, agreements, leases and subleases concerning the management or operation of any Real Property (including, without limitation, brokerage contracts) listed or otherwise disclosed in Section 3.19(a) or 3.19(b) of the Disclosure Schedule to which any Seller or Century CP is a party and all agreements relating to Intellectual Property set forth in Section 3.18(a) of the Disclosure Schedule, being "*Material Contracts*"):

(i)     each contract, agreement, invoice, purchase order and other arrangement, for the purchase of Inventory, spare parts, other materials or personal property with any supplier or for the furnishing of services to the Business under the terms of which the Business is likely to pay or otherwise give consideration of more than $500,000 in the aggregate over the remaining term of such contract;

(ii)    each contract, agreement, invoice, sales order and other arrangement, for the sale of Inventory or other personal property or for the furnishing of services by the Business which is likely to involve consideration of more than $500,000 in the aggregate over the remaining term of such contract;

(iii)   all material broker, distributor, dealer, manufacturer's representative, franchise, agency, sales promotion contracts and agreements, and all material market research, marketing consulting and advertising contracts and agreements;

(iv)    all material contracts and agreements in respect of the Business with any Governmental Authority;

(v)     all employment, termination, severance or consulting contracts or agreements with a current employee or former employee or current or former director of or consultant of the Business that is not terminable at will by the employer;

(vi)    all collective bargaining agreements or contracts relating to the Business with any labor union;

(vii)   all contracts and agreements that limit the ability of the Business to compete in any line of business or with any Person or in any geographic area or during any period of time;

(viii)  all contracts, agreements, hedges and other arrangements in respect of the Business (A) between or among the Sellers or any Affiliate of the Sellers, (B) with

Glencore International AG or any of its Affiliates or (C) relating to and between the Business and the Reduction Facility;

(ix)    all contracts and agreements for the provision of utilities (including, without limitation, electricity, gas and conversion services) to the Business;

(x)    all contracts and agreements with Kaiser Aluminum & Chemical Corporation ("*Kaiser*") or Aluminum Company of America ("*Alcoa*") or any of their Affiliates pursuant to which Kaiser or Alcoa has agreed to indemnify the Sellers or Century CP in respect of the Business, pursuant to which the Business may be liable to Kaiser or Alcoa or pursuant to which Kaiser or Alcoa would have Liabilities owing to the Business;

(xi)    all contracts and agreements related to the provision of services pursuant to any employee health or welfare benefit plans; and

(xii)    all other contracts and agreements, whether or not made in the ordinary course of the Business, the absence of which, individually or in the aggregate, would be reasonably likely to have a Material Adverse Effect.

For purposes of this Section 3.17 and Sections 3.19 and 3.20, the term "*lease*" shall include any and all leases, subleases, sale/leaseback agreements or similar arrangements.

(b)    Except as disclosed in Section 3.17(b) of the Disclosure Schedule, each Material Contract s valid and binding on the Sellers and/or Century CP, as the case may be, and is in all material respects in full force and effect. None of the Sellers or Century CP is in any material respect in breach of, or default under, any Material Contract. The failure to obtain any consents or waivers in respect of the Material Contracts in connection with the execution, delivery and consummation of this Agreement will not, individually or in the aggregate, have a Material Adverse Effect.

(c)    Except as disclosed in Section 3.17(c) of the Disclosure Schedule, to the knowledge of the Sellers, no other party to any Material Contract is in any material respect in breach thereof or default thereunder.

(d)    Alcoa and its Affiliates have fully performed all their obligations under the Transition Services Agreement dated as of December 31, 1998 between Century and Alcoa. and have no further Liabilities to the Business under such Agreement.

SECTION 3.18. *Intellectual Property.* (a) Section 3.18(a)(i) of the Disclosure Schedule sets forth a true and complete list and a brief description of all material Owned Intellectual Property and Section 3.18(a)(ii) of the Disclosure Schedule sets forth a true and complete list and a brief description of all material Licensed Intellectual Property. Except as disclosed in Section 3.18(a)(iii) of the Disclosure Schedule, the rights of the Sellers or Century CP in or to such material Owned Intellectual Property or, to the knowledge of the Sellers,

such material Licensed Intellectual Property do not in any material respect conflict with or infringe on the rights of any other Person and none of the Sellers or Century CP has received any claim or written notice from any Person to such effect.

(b)    Except as disclosed in Section 3.18(b) of the Disclosure Schedule: (i) all the material Owned Intellectual Property is owned by a Seller or Century CP, as the case may be, free and clear of any Encumbrance, (ii) no material Actions have been made or asserted or are pending (nor, to the knowledge of the Sellers has any such Action been threatened) against a Seller or Century CP either (A) based upon or challenging or seeking to deny or restrict the use by the Business of any of the Owned Intellectual Property or (B) alleging that any services provided, or products manufactured or sold by the Business are being provided, manufactured or sold in violation of any patents or trademarks, or any other rights of any Person and (iii) to the knowledge of the Sellers, no Person is using any patents, copyrights, trademarks, service marks, trade names, trade secrets or similar property that are confusingly similar to the material Owned Intellectual Property or that infringe upon the material Owned Intellectual Property or upon the rights of the Sellers or Century CP therein. Except as disclosed in Section 3.18(b) of the Disclosure Schedule, none of the Sellers or any of their Affiliates has granted any license or other right to any other Person with respect to the material Owned Intellectual Property. The consummation of the transactions contemplated by this Agreement and the Ancillary Agreements will not result in the termination or material impairment of any of the material Owned Intellectual Property.

(c)    The Sellers have, or have caused to be, delivered to the Purchaser correct and complete copies of all licenses and sublicenses for Licensed Intellectual Property set forth in Section 3.18(a)(ii) of the Disclosure Schedule and any and all ancillary documents pertaining thereto (including, but not limited to, all amendments, consents and evidence of commencement dates and expiration dates). With respect to each of such material licenses and material sublicenses:

(i)    any such license or sublicense, together with all ancillary documents delivered pursuant to the first sentence of this Section 3.18(c), is legal, valid, binding, enforceable and in full force and effect and represents the entire agreement between the respective licensor and licensee with respect to the subject matter of such license or sublicense;

(ii)    except as otherwise disclosed in Section 3.18(a)(ii) of the Disclosure Schedule, with respect to each such license or sublicense: (A) none of the Sellers or Century CP has received any notice of cancellation or termination under such license or sublicense, (B) none of the Sellers or Century CP has received any notice of a breach or default under such license or sublicense, which breach or default has not been cured, and (C) none of the Sellers or Century CP has granted to any other Person any rights, adverse or otherwise, under such license or sublicense;

(iii)    none of the Sellers, Century CP or (to the knowledge of the Sellers) any other party to any such license or sublicense, is in material breach or default, and, to the knowledge of the Sellers, no event has occurred that, with notice or lapse of time would constitute such a breach or default or permit termination, modification or acceleration under such license or sublicense;

(iv)    no Actions have been made or asserted or are pending (nor, to the knowledge of the Sellers has any such Action been threatened) against a Seller or Century CP either (A) based upon or challenging or seeking to deny or restrict the use by the Business of any of the material Licensed Intellectual Property or (B) alleging that any material Licensed Intellectual Property is being licensed, sublicensed or used in violation of any patents or trademarks, or any other rights of any Person; and

(v)    to the knowledge of the Sellers, no Person is using any patents, copyrights, trademarks, service marks, trade names, trade secrets or similar property that are confusingly similar to the material Licensed Intellectual Property or that infringe upon the material Licensed Intellectual Property or upon the rights of the Sellers or Century CP therein.

(d)    Except as disclosed in Section 3.18(d) of the Disclosure Schedule, (i) all rights of the Sellers and Century CP in each item of material Owned Intellectual Property or material Licensed Intellectual Property are transferable to the Purchaser as herein contemplated, and (ii) as a result of the transactions contemplated hereby, upon the Closing, the Purchaser shall own or possess, or own or possess adequate and enforceable licenses, sublicenses or other rights to use, without payment of any fee, all such material Owned Intellectual Property or such material Licensed Intellectual Property.

(e)    The Owned Intellectual Property and the Licensed Intellectual Property constitute all the Intellectual Property used or held in the conduct of the Business.

SECTION 3.19.  *Real Property*.  (a) Section 3.19(a) of the Disclosure Schedule lists: (i) the location of Owned Real Property, (ii) the current owner of such Owned Real Property, (iii) information relating to the recordation of the deed of each parcel of Owned Real Property and (iv) the current use of each such parcel of Owned Real Property.

(b)    Section 3.19(b) of the Disclosure Schedule lists: (i) the street address of each parcel of Leased Real Property, (ii) the identity of the lessor, lessee and current occupant (if different from lessee) of each such parcel of Leased Real Property, and (iii) the term (referencing applicable renewal periods) and rental payment terms of the leases (and any subleases) pertaining to each such parcel of Leased Real Property.

(c)    Except as described in Section 3.19(c) of the Disclosure Schedule, there is no material violation of any Law (including, without limitation, any building, planning or zoning Law) relating to any of the Real Property. The Sellers have made available to the Purchaser true and correct copies of the deeds for each parcel of Owned Real Property and, to

the extent available, all title reports, surveys, certificates of occupancy, permits, and other documents relating to or otherwise affecting the Real Property. A Seller or Century CP, as the case may be, is in peaceful and undisturbed possession of each parcel of Real Property and there are no contractual or legal restrictions that preclude or restrict in any material respect the ability to use the premises for the purposes for which they are currently being used. All existing water, sewer, steam, gas, electricity, telephone and other utilities required for the use, occupancy, operation and maintenance of the Real Property are adequate for the conduct of the Business as it has been and currently is conducted. None of the officers or Senior Managers of the Sellers have actual knowledge of any physical condition of the Real Property which would prevent the Business from continuing to be conducted in the manner in which it is presently being conducted within existing capital and operating budgets taken as a whole. The parties recognize and agree that portions of the Real Property have been used in manufacturing operations for more than fifty years, that conditions can change suddenly and that the preceding sentence shall not constitute in any manner a representation, warranty or covenant with respect to latent defects or specific budget items. Except as set forth in Section 3.19(c) of the Disclosure Schedule, none of the Sellers or Century CP has leased or subleased any portion of the Real Property to any other Person, nor has any Seller or Century CP assigned its interest under any lease or sublease listed in Section 3.19(b) of the Disclosure Schedule to any third party.

(d)    The Sellers have, or have caused to be, delivered to the Purchaser correct and complete copies of all leases and subleases listed in Section 3.19(b) of the Disclosure Schedule and any and all ancillary documents pertaining thereto (including, but not limited to, all amendments, consents for alterations and documents recording variations and evidence of commencement dates and expiration dates). Except as would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect, with respect to each of such leases and subleases:

(i)    such lease or sublease, together with all ancillary documents delivered pursuant to the first sentence of this Section 3.19(d), is legal, valid, binding, enforceable and in full force and effect and represents the entire agreement between the respective landlord and tenant with respect to such property;

(ii)    except as otherwise disclosed in Section 3.19(b) of the Disclosure Schedule, with respect to each such lease or sublease: (A) none of the Sellers or Century CP has received any notice of cancellation or termination under such lease or sublease, and (B) none of the Sellers or Century CP has received any notice of a breach or default under such lease or sublease, which breach or default has not been cured; and

(iii)    none of the Sellers, Century CP or (to the knowledge of the Sellers any other party to such lease or sublease, is in breach or default in any material respect, and, to the knowledge of the Sellers, no event has occurred that, with notice or lapse of

time would constitute such a breach or default or permit termination, modification or acceleration under such lease or sublease.

(e)    There are no condemnation proceedings or eminent domain proceedings of any kind pending or, to the knowledge of the Sellers, threatened against the Real Property.

(f)    All the Real Property is occupied under a valid and current certificate of occupancy or similar permit and, to the knowledge of the Sellers, except for such consents that may be required from Office Lease landlords with respect to any assignment to the Purchaser of the Office Leases, there are no facts that would prevent the Real Property from being occupied after the Closing in the same manner as immediately prior to the Closing.

(g)    All improvements on the Real Property constructed by or on behalf of the Sellers or Century CP or, to the knowledge of the Sellers, constructed by or on behalf of any other Person were constructed in compliance with all applicable Laws (including, but not limited to, any building, planning or zoning Laws) affecting such Real Property and Leased Real Property, except for failures to comply that would not be reasonably likely to result in a Material Adverse Effect.

(h)    No improvements on the Real Property and none of the current uses and conditions thereof violate any applicable deed restrictions or other applicable covenants, restrictions, agreements, existing site plan approvals, zoning or subdivision regulations or urban redevelopment plans as modified by any duly issued variances, and no permits, licenses or certificates pertaining to the ownership or operation of all improvements on the Real Property, other than those which are transferable with the Real Property, are required by any Governmental Authority having jurisdiction over the Real Property, except for violations, and the absence of permits, licenses or certificates, which would not, individually or in the aggregate, be reasonably likely to have a Material Adverse Effect.

(i)    Except to the extent contemplated in the Shared Services Agreement, (i) all improvements on any Real Property are wholly within the lot limits of such Real Property and do not encroach on any adjoining premises or easements, and (ii) there are no encroachments on any Real Property by any improvements located on any adjoining premises, except for Permitted Encumbrances.

(j)    Except as otherwise set forth in Section 3.19(j) of the Disclosure Schedule, there have been no improvements of a value in excess of $100,000 in the aggregate made to or construction on any Real Property within the applicable period for the filing of mechanic's liens.

(k)    The rental set forth in each lease or sublease of the Leased Real Property is the actual rental being paid, and there are no separate agreements or understandings with respect to the same.

(l)    A Seller or Century CP, as the case may be, has, and upon the Closing the Purchaser will have, the full right to exercise any renewal options contained in the leases and subleases, if any, pertaining to the Leased Real Property on the terms and conditions contained therein and upon due exercise would be entitled to enjoy the use of each Leased Real Property for the full term of such renewal options.

(m)    Seller or Century CP, as the case may be, owns, leases or has the legal right to use all of the Real Property used in the conduct of the Business. A Seller or Century CP, as the case may be, has in all material respects good and marketable title to the Owned Real Property and valid and subsisting leasehold interests in the material Leased Real Property, free and clear of all Encumbrances other than Permitted Encumbrances and Permitted Property Encumbrances.

SECTION 3.20. *Assets.* (a) Except as disclosed in Section 3.20(a) of the Disclosure Schedule, a Seller or Century CP, as the case may be, owns, leases or has the legal right to use, in all material respects, all the properties and assets (except for the Environmental Permits, the contracts (whether or not Material Contracts), the Owned Intellectual Property and the Licensed Intellectual Property, the Real Property and the licenses (whether or not Material Licenses) as to which the provisions of Sections 3.16, 3.17, 3.18, 3.19 and 3.31, respectively, shall apply) and any other tangible personal property, used in the conduct of the Business or relating to the conduct of the Business, all of which properties, assets and rights (other than the Excluded Assets) constitute the "*Selected Business Assets*" and, together with the Environmental Permits, the contracts (whether or not Material Contracts), the Owned Intellectual Property and the Licensed Intellectual Property, the Real Property and the licenses (whether or not Material Licenses) constitute the "*Business Assets*". A Seller or Century CP, as the case may be, has in all material respects good and marketable title to, or, in the case of leased or subleased Selected Business Assets, valid and subsisting leasehold interests in, all the Selected Business Assets, free and clear of all Encumbrances, except (i) as disclosed in Section 3.20(a) of the Disclosure Schedule; and (ii) Permitted Encumbrances.

(b)    The Business Assets (taken together with the Shared Services Agreement) constitute all the properties, assets and rights used or held in, and all such properties, assets and rights as are necessary to the conduct of, the Business. None of the officers or Senior Managers of the Sellers have actual knowledge of any physical condition, facts or circumstances relating to the Business Assets which would prevent the Business from continuing to be conducted in the manner in which it is presently being conducted within existing capital and operating budgets taken as a whole. The parties recognize and agree that portions of the Real Property have been used in manufacturing operations for up to fifty years, that conditions can change suddenly and that the preceding sentence shall not constitute in any manner a representation, warranty or covenant with respect to latent defects or specific budget items.

(c)    Except as set forth in Section 3.20(a) or 3.20(c) of the Disclosure Schedule, the Sellers have the right to sell, assign, transfer, convey and deliver the Selected

Business Assets to the Purchaser without material penalty or other material adverse consequences. Following the consummation of the transactions contemplated by this Agreement and the execution of the instruments of transfer contemplated by this Agreement, the Purchaser will own, with good, valid and marketable title, or lease, under valid and subsisting leases, or otherwise acquire the interests of the Sellers in the Selected Business Assets, free and clear of any Encumbrances, other than Permitted Encumbrances, and without incurring any material penalty or other material adverse consequence.

(d)    The electric motors of the hot line (including, without limitation, the rewinders) have the nominal performance specifications, specified in Section 3.20(d) of the Disclosure Schedule.

SECTION 3.21. *Customers.* Listed in Section 3.21 of the Disclosure Schedule are the names and addresses of the ten most significant customers (by revenue) of the Business for the twelve-month period ended December 31, 1998 and the amount for which each such customer was invoiced during such period.

SECTION 3.22. *Employee Benefit Matters.* (a) *Century WV Plans and Material Documents.* Section 3.22(a) of the Disclosure Schedule lists with respect to the current and former employees, directors or officers of the Rolling Business (other than any such Person who is currently a director, officer or employee of Century) (i) all employee benefit plans (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("*ERISA*") and all bonus, stock option, stock purchase, restricted stock, incentive, deferred compensation, retiree medical or life insurance, supplemental retirement, severance or other benefit plans, programs or arrangements, and all employment, termination, severance or other contracts or agreements, to which any of the Sellers is a party, with respect to which any of the Sellers has any obligation or which are maintained, contributed to or sponsored by any of the Sellers, (ii) each employee benefit plan for which any of the Sellers could incur liability under Section 4069 of ERISA in the event such plan has been or were to be terminated, (iii) any plan in respect of which any of the Sellers could incur liability under Section 4212(c) of ERISA and (iv) any contracts, arrangements or understandings between a Seller or any of its Affiliates and any employee of any of the Sellers, including, without limitation, any contracts, arrangements or understandings relating to a sale of any Seller (collectively, the "*Plans*"). Each Plan is in writing and the Sellers have furnished the Purchaser with a complete and accurate copy of each Plan and a complete and accurate copy of each material document prepared in connection with each such Plan or will furnish such Plan or document prior to the Closing Date unless otherwise provided in Section 3.22(a) of the Disclosure Schedule, including, without limitation, (i) a copy of each trust or other funding arrangement, (ii) each summary plan description, (iii) the most recently filed IRS Form 5500, (iv) the most recently received IRS determination letter for each such Plan, if applicable, and (v) the most recently prepared actuarial report and financial statement in connection with each such Plan if applicable. Except as disclosed on Section 3.22(a) of the Disclosure Schedule with respect to the current and former employees, directors or officers of the Rolling Business (other than any such Person who is currently a director, officer or employee of Century), there

are no other employee benefit plans, programs, arrangements or agreements, whether formal or informal, whether in writing or not, to which any of the Sellers or any Subsidiary is a party, with respect to which any of the Sellers or any Subsidiary has any obligation or which are maintained, contributed to or sponsored by any of the Sellers or any Subsidiary. With respect to the Business, none of the Sellers has any express or implied commitment (i) to create, incur liability with respect to or cause to exist any other employee benefit plan, program or arrangement, (ii) to enter into any contract or agreement to provide compensation or benefits to any individual or (iii) to modify, change or terminate any Plan, other than with respect to a modification, change or termination required by ERISA or the Code.

(b)    *Absence of Certain Types of Plans.*  None of the Plans is a multiemployer plan (within the meaning of Section 3(37) or 4001(a)(3) of ERISA) (a "*Multiemployer Plan*") or a single employer pension plan (within the meaning of Section 4001(a)(15) of ERISA) for which any of the Sellers could incur liability under Section 4063 or 4064 of ERISA (a "*Multiple Employer Plan*").  Except as provided in Section 3.22(b) of the Disclosure Schedule, none of the Plans provides for the payment of separation, severance, termination or similar-type benefits to any Person or obligates any of the Sellers to pay separation, severance, termination or similar-type benefits solely as a result of any transaction contemplated by this Agreement or as a result of a "change in control", within the meaning of such term under Section 280G of the Code.  Except as provided in Section 3.22(b) of the Disclosure Schedule, none of the Plans provides for or promises retiree medical, disability or life insurance benefits to any current or former employee, officer or director of any of Century CP or the Business.  Each of the Plans is subject only to the laws of the United States or a political subdivision thereof.

(c)    *Compliance with Applicable Law.*  Except as otherwise provided in Section 3.22(c) of the Disclosure Schedule, each Plan is now and always has been operated in all material respects in accordance with the requirements of all applicable Law, including, without limitation, ERISA and the Code, and all persons who participate in the operation of such Plans and all Plan "fiduciaries" (within the meaning of Section 3(21) of ERISA) have always acted in all material respects in accordance with the provisions of all applicable Law, including, without limitation, ERISA and the Code.  Each of the Sellers has performed in all material respects all obligations required to be performed by it under, is not in any material respect in default under or in violation of, and has no knowledge of any material default or violation by any party to, any Plan.  No legal action, suit or claim is pending or, to Sellers' knowledge, threatened with respect to any Plan (other than claims for benefits in the ordinary course) and no fact or event exists that could give rise to any such action, suit or claim.

(d)    *Qualification of Certain Plans.*  Except as otherwise provided in Section 3.22(d) of the Disclosure Schedule, each Plan which is intended to be qualified under Section 401(a) of the Code or Section 401(k) of the Code has received a favorable determination letter from the IRS after 1985 that it is so qualified and each trust established in connection with any Plan which is intended to be exempt from federal income taxation under Section 501(a) of the Code has received a determination letter from the IRS after 1985 that it is so exempt, and, to

Sellers' knowledge, no material fact or event has occurred since the date of such determination letter from the IRS to adversely affect the qualified status of any such Plan or the exempt status of any such trust.

(e)    *Absence of Certain Liabilities and Events.*  Except as disclosed in Section 3.22(e) of the Disclosure Schedule, none of the Sellers has incurred any liability under, arising out of or by operation of Title IV of ERISA (other than liability for premiums to the Pension Benefit Guaranty Corporation arising in the ordinary course), including, without limitation, any liability in connection with (i) the termination or reorganization of any employee benefit plan subject to Title IV of ERISA or (ii) the withdrawal from any Multiemployer Plan or Multiple Employer Plan, and no fact or event exists which is reasonably likely to give rise to any such liability.  No complete or partial termination has occurred within the five years preceding the date hereof with respect to any Plan.  Except with respect to the transfer of plan assets contemplated in Section 6.03, or as disclosed in Section 3.22(e) of the Disclosure Schedule, no reportable event (within the meaning of Section 4043 of ERISA) has occurred or, to the knowledge of the Sellers, is expected to occur with respect to any Plan subject to Title IV of ERISA.  No Plan had an accumulated funding deficiency (within the meaning of Section 302 of ERISA or Section 412 of the Code), whether or not waived, as of the most recently ended plan year of such Plan.  Except as disclosed in Section 3.22(e) of the Disclosure Schedule, none of the assets of any of the Sellers is the subject of any lien arising under Section 302(f) of ERISA or Section 412(n) of the Code; none of the Sellers has been required to post any security under Section 307 of ERISA or Section 401(a)(29) of the Code; and no fact or event exists which is reasonably likely to give rise to any such lien or requirement to post any such security.

(f)    *Plan Contributions and Funding.*  All contributions, premiums or payments required to be made with respect to any Plan have been made on or before their due dates.  All such contributions which have been deducted for income tax purposes have not been challenged or disallowed by any government entity.

(g)    *WARN Act.*  The Sellers and the Subsidiaries are in compliance with the requirements of the Workers Adjustment and Retraining Notification Act ("*WARN*") and have no liabilities pursuant to WARN.

(h)    *Century CP Plans.*  Section 3.22(h) of the Disclosure Schedule lists each employee welfare benefit or employee pension benefit plan (individually, each a "*Century CP Plan*" and, collectively, "*Century CP Plans*") Century maintains or to which Century contributes or in which the Century CP employees participate.  Each such Century CP Plan (and related trust, insurance contract, or fund) complies in form and in operation in all material respects with the applicable requirements of ERISA, the Code and other applicable laws.

SECTION 3.23.  *Labor Matters.*  Except as detailed in Section 3.17 of the Disclosure Schedule and the book of grievances which the Sellers have furnished to the

Purchaser, solely in respect of employees engaged in the Business, (a) none of the Sellers is a party to any collective bargaining agreement or other labor union contract applicable to persons employed by any of the Sellers, or in the Business and, to the knowledge of the Sellers, currently there are no organizational campaigns, petitions or other unionization activities seeking recognition of a collective bargaining unit which could affect any of the Sellers; (b) there are no strikes, slowdowns or work stoppages pending or, to the knowledge of the Sellers, threatened between any of the Sellers and any of their respective employees, and none of the Sellers has experienced any such strike, slowdown or work stoppage within the past three years; (c) none of the Sellers has breached in any material respect or otherwise failed to comply with the provisions of any collective bargaining or union contract and there are no written grievances outstanding against any of the Sellers under any such agreement or contract; (d) there are no unfair labor practice complaints pending against any of the Sellers before the National Labor Relations Board or any other Governmental Authority or any current union representation questions involving employees of any of the Sellers; (e) each of the Sellers is currently in compliance in all material respects with all applicable Laws relating to the employment of labor, including those related to wages, hours, collective bargaining and the payment and withholding of taxes and other sums as required by the appropriate Governmental Authority and has withheld and paid to the appropriate Governmental Authority or is holding for payment not yet due to such Governmental Authority all amounts required to be withheld from employees of any of the Sellers and is not liable for any arrears of wages, taxes, penalties or other sums for failure to comply with any of the foregoing; (f) each of the Sellers has paid in full to all their respective employees or adequately accrued for in accordance with U.S. GAAP consistently applied all material wages, salaries, commissions, bonuses, benefits and other compensation due to or on behalf of such employees; (g) there is no material claim with respect to payment of wages, salary or overtime pay that has been asserted or is now pending or threatened before any Governmental Authority with respect to any Persons currently or formerly employed by any of the Sellers; (h) none of the Sellers is a party to, or otherwise bound by, any consent decree with, or citation by, any Governmental Authority relating to employees or employment practices; (i) there is no charge or proceeding with respect to a violation of any occupational safety or health standards that has been asserted or is now pending or threatened with respect to any of the Sellers; and (j) there is no charge of discrimination in employment or employment practices, for any reason, including, without limitation, age, gender, race, religion or other legally protected category, which has been asserted or is now pending or threatened before the United States Equal Employment Opportunity Commission, or any other Governmental Authority in any jurisdiction in which any of the Sellers has employed or currently employs any such Person.

SECTION 3.24.  *Century CP Labor and Employment Matters.*  Except as set forth in Section 3.24 of the Disclosure Schedule, Century CP is not subject to any (i) collective bargaining or other labor agreement; or (ii) employment, retainer, or consulting agreement.  The Sellers have not committed, nor have been notified in writing of any claim to have committed, any unfair labor practice with respect to Century CP.  The Sellers have delivered to the Purchaser a complete and accurate list of all Century CP employees and their remuneration.  Except as set forth in Section 3.24, as of the date hereof, none of the Century

CP employees has given the Sellers formal notice that he/she will, or intends to, resign or seek other employment.

SECTION 3.25. *Employees*. (a) The Sellers have delivered to the Purchaser a complete and accurate list containing the name, place of employment, the current annual salary rates, bonuses, deferred or contingent compensation (whether payable in cash or otherwise), pension, accrued vacation, "golden parachute" and other like benefits paid or payable (in cash or otherwise), the date of employment and a description of position and job function of each current employee listed on Section 6.01 of the Disclosure Schedule engaged in the Business.

(b)    All salaried employees of the Business are now, or will by the Closing be, under written obligation to a Seller or a Subsidiary to maintain in confidence all confidential or proprietary information acquired by them in the course of their employment and to assign to a Seller or a Subsidiary all inventions made by them in connection within the scope of their employment during such employment and for a reasonable period thereafter.

SECTION 3.26. *Taxes*. (a) Except as set forth in Section 3.26 of the Disclosure Schedule: (i) all returns and reports in respect of Taxes required to be filed as of the date hereof with respect to each of the Sellers and each Subsidiary and the Business have been timely filed; (ii) all Taxes shown to be due on such returns and reports have been timely paid; (iii) all such returns and reports are true, correct and complete in all material respects; (iv) no adjustment relating to such returns has been proposed formally or informally by any Tax authority and, to the knowledge of the Sellers, no basis exists for any such adjustment; (v) there are no pending or, to the knowledge of the Sellers, threatened actions or proceedings for the assessment or collection of Taxes against any of the Sellers or any Subsidiary or (insofar as either relates to the activities or income of any of the Sellers or any Subsidiary or the Business or could result in liability of any of the Sellers or any Subsidiary on the basis of joint and/or several liability) any corporation that was includible in the filing of a return with any of the Sellers on a consolidated or combined basis; (vi) no consent under Section 341(f) of the Code has been filed with respect to Century CP; and (vii) there are no Tax liens on any assets of the Business.

(b)    Except as disclosed in Section 3.26 of the Disclosure Schedule: (i) there are no outstanding waivers or agreements extending the statute of limitations for any period with respect to any Tax to which any of the Sellers or any Subsidiary or the Business may be subject; (ii) there are no requests for information currently outstanding that could affect the Taxes of any of the Sellers, any Subsidiary or the Business; and (iii) to the knowledge of the Sellers there are no proposed reassessments of any property owned by any of the Sellers or any Subsidiary or other proposals that could increase the amount of any Tax to which any of the Sellers, any Subsidiary or the Business would be subject.

SECTION 3.27. *Insurance*. Section 3.27 of the Disclosure Schedule sets forth all insurance coverage of the Sellers with respect to the Business. and, to the extent available

to the Sellers, details for the last three years of the Business' loss experience with respect to such coverage.

SECTION 3.28. *Accounts; Lockboxes; Safe Deposit Boxes; Powers of Attorney.* Section 3.28 of the Disclosure Schedule is a true and complete list of (i) the names of each bank, savings and loan association, securities or commodities broker or other financial institution in which the Business (in the name of a Seller or Century CP) has an account, including cash contribution accounts, and the names of all persons authorized to draw thereon or have access thereto, (ii) the location of all lockboxes and safe deposit boxes of the Business and the names of all Persons authorized to draw thereon or have access thereto and (iii) the names of all Persons, if any, holding powers of attorney from the Sellers or Century CP relating to the Business. At the time of the Closing, none of the Sellers shall have any such account, lockbox or safe deposit box for use in respect of the Business other than those listed in Section 3.28 of the Disclosure Schedule, nor shall any additional Person have been authorized, from the date of this Agreement, to draw thereon or have access thereto or to hold any such power of attorney, without the prior written consent of the Purchaser. At the time of the Closing, all monies and accounts of the Business shall be held by, and be accessible only to, the Business.

SECTION 3.29. *Year 2000 Compliance.* The Sellers have initiated reviews and committed resources that, to the Sellers' knowledge, are sufficient to ensure that on the Closing Date (a) all computer software necessary for the conduct of the Business designed to be used prior to, during, and after December 31, 1999 will operate in all material respects during each such time period without error relating to the year 2000, specifically including any error relating to, or being the product of, date data which represents or references different centuries or more than one century and (b) such computer software will accept, calculate, sort, extract and otherwise process date inputs and date values, and return and display date values, in a consistent manner regardless of the dates used, whether before, on, or after January 1, 2000.

SECTION 3.30. *Governmental Licenses and Permits.* Section 3.30 of the Disclosure Schedule lists all material governmental qualifications, registrations, filings, privileges, franchises, licenses, permits, approvals or authorizations other than the Environmental Permits (collectively, the "*Material Licenses*") used or held in the conduct of the Business. All of such Material Licenses are in full force and effect, and the Sellers and Century CP are in material compliance with each such Material License.

SECTION 3.31. *Disclosure Schedule Supplements.* The facts, events or circumstances referenced in the Disclosure Schedule Supplements, taken as a whole, do not, and will not, individually or in the aggregate, result in Losses to the Business of more than $1,000,000.

SECTION 3.32. *Opinion of Financial Advisor.* The Sellers have received the opinion of Morgan Stanley Dean Witter, dated a date prior to the date hereof, to the effect that, as of such date, the Purchase Price is fair from a financial point of view to the Sellers.

SECTION 3.33. *Brokers.* No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from the Business in connection with the transactions contemplated by this Agreement or the Ancillary Agreements based upon arrangements made by or on behalf of the Sellers.

## ARTICLE IV

### REPRESENTATIONS AND WARRANTIES
### OF THE PURCHASER

As an inducement to the Sellers to enter into this Agreement, the Purchaser hereby represents and warrants to the Sellers as follows:

SECTION 4.01. *Organization and Authority of the Purchaser.* The Purchaser is duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and has all necessary corporate power and authority to enter into this Agreement and the Ancillary Agreements to which it is a party, to carry out its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby. The execution and delivery by the Purchaser of this Agreement and the Ancillary Agreements to which it is a party, the performance by the Purchaser of its obligations hereunder and thereunder and the consummation by the Purchaser of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of the Purchaser. This Agreement has been, and upon their execution by the Purchaser the Ancillary Agreements will be, duly executed and delivered by the Purchaser, and (assuming due authorization, execution and delivery by the Sellers) this Agreement constitutes, and upon their execution the Ancillary Agreements will constitute, legal, valid and binding obligations of the Purchaser in accordance with their respective terms.

SECTION 4.02. *No Conflict.* Assuming compliance with the notification requirements of the HSR Act and the making and obtaining of all filings, notifications, consents, approvals, authorizations and other actions referred to in Section 4.03, except as may result from any facts or circumstances relating solely to the Sellers, the execution, delivery and performance of this Agreement and the Ancillary Agreements by the Purchaser do not and will not (a) violate, conflict with or result in the breach of any provision of the Charter or by-laws (or other organizational documents) of the Purchaser (b) materially conflict with or violate any Law or Governmental Order applicable to the Purchaser or (c) conflict with, or result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of,

or result in the creation of any Encumbrance on any of the assets or properties of the Purchaser pursuant to, any note, bond, mortgage or indenture, contract, agreement, lease, sublease. license, permit, franchise or other instrument or arrangement to which the Purchaser is a party or by which any of such assets or properties is bound or affected, which would, individually or in the aggregate, have a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement or by the Ancillary Agreements.

SECTION 4.03. *Governmental Consents and Approvals.* The execution, delivery and performance of this Agreement and each Ancillary Agreement to which it is a party by the Purchaser do not and will not require any consent, approval, authorization or other order of, action by, filing with, or notification to, any Governmental Authority, except the notification requirements of the HSR Act.

SECTION 4.04. *Litigation.* No claim, action, proceeding or investigation is pending or, to the best knowledge of the Purchaser after due inquiry, threatened, which seeks to materially delay or prevent the consummation of, or which would be reasonably likely to materially adversely affect the Purchaser's ability to consummate the transactions contemplated by this Agreement and the Ancillary Agreements.

SECTION 4.05. *Brokers.* No Broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from the Sellers in connection with the transactions contemplated by this Agreement or the Ancillary Agreements based upon arrangements made by or on behalf of the Purchaser.

## ARTICLE V

## ADDITIONAL AGREEMENTS

SECTION 5.01. *Conduct of Business Prior to the Closing.* (a) The Sellers covenant and agree that, except with the prior written consent of the Purchaser (which shall not be unreasonably withheld), between the date hereof and the Closing, the Sellers shall, and shall cause Century CP to, conduct the Business only in the ordinary course and consistent with the Sellers' and Century CP's prior practice. Without limiting the generality of the foregoing, except with the prior written consent of the Purchaser and except in the ordinary course of business consistent with past practice to meet market conditions, the Sellers shall, and shall cause Century CP to, (i) continue their promotional activities, and pricing and purchasing policies, in accordance with past practice; (ii) not shorten or lengthen the customary payment cycles, or otherwise change the terms, for any payables or receivables; (iii) continue to acquire, produce and maintain Inventory (including, without limitation, the mix of Inventory) in accordance with past practice; (iv) use commercially reasonable efforts to (A) preserve intact its business organization and the business organization of the Business, (B) keep available to the Purchaser the services of the employees of the Business, (C) continue in full force and effect without material modification all existing policies or binders of

insurance currently maintained in respect of the Business and (D) preserve current relationships with customers, suppliers and other persons with which the Business has significant business relationships; (v) exercise, but only after notice to the Purchaser and receipt of the Purchaser's prior written approval (which shall not be unreasonably withheld), any rights of renewal pursuant to the terms of any of the leases or subleases set forth in Section 3.19(b) of the Disclosure Schedule which by their terms would otherwise expire; (vi) renew or apply for renewal all Material Licenses and Environmental Permits; (vii) not amend, modify or consent to the termination of any Material Contract or the Business' rights thereunder; and (viii) not engage in any practice, take any action, fail to take any action or enter into any transaction which could cause any representation or warranty of the Sellers to be untrue in any material respect or result in a material breach of any covenant made by the Sellers in this Agreement.

(b)     The Sellers covenant and agree, jointly and severally, that, prior to the Closing, without the prior written consent of the Purchaser (which shall not be unreasonably withheld), none of the Sellers or Century CP will do any of the things enumerated in the second sentence of Section 3.13 (including, without limitation, clauses (a) through (bb) thereof).

(c)     The Sellers covenant and agree that except with the prior written consent of the Purchaser, between the date hereof and the Closing, the Sellers shall not issue or sell any shares of capital stock or any option, warrant or other right to acquire the same.

SECTION 5.02. *Access to Information.* (a) From the date hereof until the Closing, upon reasonable notice to the Sellers' officers designated below and for purposes of facilitating the transfer of the Business, the Sellers shall, and shall cause Century CP and each of the Sellers' and Century CP's officers, directors, managers, agents, accountants and counsel to (i) afford to up to two officers, employees or authorized agents or representatives of the Purchaser at any given facility at any given time for an aggregate of 12 days (i.e., 24 man days) reasonable access during normal business hours to the offices, properties, plant and other facilities of the Business (and to those officers, directors, employees. agents, accountants and counsel of the Sellers and Century CP who have knowledge relating to the Business) and (ii) furnish to such representatives of the Purchaser such additional access, data and other information regarding the Business and the Assets as the Purchaser may from time to time reasonably request. The Purchaser acknowledges that nothing in this Section 5.02 shall require the Sellers to grant access to officers, employees, agents and representatives of the Purchaser in order to permit the Purchaser to implement any expansion plans that it may contemplate in respect of the Business. The parties hereto further agree that with respect to this Section 5.02 (i) all requests by the Purchaser for access or information will be submitted or directed only to Century's President and Chief Operating Officer (in respect of manufacturing and technical matters). Chief Financial Officer (in respect of financial and accounting matters and management information and control systems) and General Counsel and Chief Administrative Officer (in respect of contractual, environmental, human resource and any other matters); (ii) that the Purchaser shall not interfere with any of the businesses or operations of the Sellers or Century CP; and (iii) that nothing in this Section 5.02 shall restrict

the Purchaser's access to the offices, properties, plant and other facilities of the Business (and to those offices, directors, employees, agents, accountants and counsel of the Sellers and Century CP who have knowledge relating to the Business) or financial, operating, technical and environmental data and other information regarding the Business and the Assets to the extent reasonably required or contemplated under the Shared Services Agreement and the Molten Aluminum Purchase Agreement.

(b)     In order to facilitate the resolution of any claims made against or incurred by the Sellers prior to the Closing, for a period of seven years after the Closing, the Purchaser shall (i) retain the books and records of the Business which are transferred to the Purchaser pursuant to this Agreement relating to periods prior to the Closing in a manner reasonably consistent with the prior practices of the Sellers and (ii) upon reasonable notice, afford the officers, employees and authorized agents and representatives of the Sellers reasonable access (including the right to make, at the Sellers' expense, photocopies), during normal business hours, to such books and records.

(c)     In order to facilitate the resolution of any claims made by or against or incurred by the Purchaser after the Closing, for a period of seven years following the Closing, the Sellers shall (i) retain all books and records of the Sellers which are not transferred to the Purchaser pursuant to this Agreement and which relate to the Business for periods prior to the Closing and which shall not otherwise have been delivered to the Purchaser and (ii) upon reasonable notice, afford the officers, employees and authorized agents and representatives of the Purchaser, reasonable access (including the right to make photocopies at the expense of the Purchaser), during normal business hours, to such books and records.

SECTION 5.03.  *Confidentiality*.  (a)  For a period of two years from the Closing Date, the Sellers agree to, and shall cause their agents, representatives, Affiliates, Senior Managers, officers and directors to, and shall use commercially reasonable efforts to cause their other employees to:  (i) treat and hold as confidential (and not disclose or provide access to any Person to) all information relating to trade secrets, processes, patent or trademark applications, product development, price, customer and supplier lists, pricing and marketing plans, policies and strategies, operations methods, product development techniques, business acquisition plans, new personnel acquisition plans and any other confidential information with respect to the Business, (ii) in the event that the Sellers or any such agent, representative, Affiliate, Senior Manager or employee, officer or director becomes legally compelled to disclose any such information, to the extent legally possible provide the Purchaser with prompt written notice of such requirement so that the Purchaser may seek a protective order or other remedy or waive compliance with this Section 5.03(a), (iii) in the event that such protective order or other remedy is not obtained, or the Purchaser waives compliance with this Section 5.03(a), furnish only that portion of such confidential information which is legally required to be provided and exercise commercially reasonable efforts to obtain assurances that confidential treatment will be accorded such information, and (iv) promptly furnish (prior to, at, or as soon as practicable following, the Closing) to the Purchaser any and all copies (in whatever form or medium) of all such confidential information then in the

possession of the Sellers or any of their agents, representatives, Affiliates, Senior Managers or employees, officers and directors and destroy any and all additional copies then in the possession of the Sellers or any of their agents, representatives, Affiliates, Senior Managers or employees, officers and directors of such information and the portion of any analyses, compilations, studies or other documents prepared on the basis thereof; *provided, however,* that clauses (i), (ii) and (iii) of this sentence shall not apply to any information that, at the time of disclosure, is available publicly and was not disclosed in breach of this Agreement by the Sellers, their agents, representatives, Affiliates, Senior Managers or employees, officers or directors. The Sellers agree and acknowledge that remedies at Law for any breach of their obligations under this Section 5.03(a) are inadequate and that in addition thereto the Purchaser shall be entitled to seek equitable relief, including injunction and specific performance, in the event of any such breach, without the necessity of demonstrating the inadequacy of monetary damages.

(b)    For a period of two years from the Closing Date, the Purchaser agrees to, and shall cause its agents, representatives, Affiliates, senior managers, officers and directors to, and shall use commercially reasonable efforts to cause their other employees to: (i) treat and hold as confidential (and not disclose or provide access to any Person to) all information obtained in connection with transactions contemplated by this Agreement and the Ancillary Agreements relating to trade secrets, processes, patent or trademark applications, product development, price, customer and supplier lists, pricing and marketing plans, policies and strategies, operations methods, product development techniques, business acquisition plans, new personnel acquisition plans and any other confidential information with respect to the business of the Sellers (other than the Business), (ii) in the event that the Purchaser or any such agent, representative, Affiliate, senior manager or employee, officer or director becomes legally compelled to disclose any such information, to the extent legally possible provide the Sellers with prompt written notice of such requirement so that the Sellers may seek a protective order or other remedy or waive compliance with this Section 5.03(b), (iii) in the event that such protective order or other remedy is not obtained, or the Sellers waive compliance with this Section 5.03(b), furnish only that portion of such confidential information which is legally required to be provided and exercise commercially reasonable efforts to obtain assurances that confidential treatment will be accorded such information, and (iv) promptly furnish (prior to, at, or as soon as practicable following, the Closing) to the Sellers any and all copies (in whatever form or medium) of all such confidential information then in the possession of the Purchaser or any of its agents, representatives, Affiliates, senior managers or employees, officers and directors and destroy any and all additional copies then in the possession of the Purchaser or any of its agents, representatives, Affiliates, senior managers or employees, officers and directors of such information and the portion of any analyses, compilations, studies or other documents prepared on the basis thereof; *provided, however,* that clauses (i), (ii) and (iii) of this sentence shall not apply to any information that, at the time of disclosure, is available publicly and was not disclosed in breach of this Agreement by the Purchaser, its agents, representatives, Affiliates, senior managers or employees, officers or directors. The Purchaser agrees and acknowledges that remedies at Law for any breach of its obligations under this Section 5.03(b) are inadequate and that in addition

thereto the Sellers shall be entitled to seek equitable relief, including injunction and specific performance, in the event of any such breach, without the necessity of demonstrating the inadequacy of monetary damages.

SECTION 5.04. *Regulatory and Other Authorizations; Notices and Consents.* (a) Each of the Sellers and the Purchaser will use commercially reasonable efforts to obtain (or in the case of the Sellers cause Century CP to obtain) all authorizations, consents, orders and approvals of all Governmental Authorities and officials that may be or become necessary for their execution and delivery of, and the performance of their obligations pursuant to, this Agreement and the Ancillary Agreements and will cooperate fully with such other parties in promptly seeking to obtain all such authorizations, consents, orders and approvals, it being understood that (i) nothing in this Section 5.04(a) is intended to be a covenant that the Sellers shall in fact obtain on the Purchaser's behalf any such authorizations, consents, orders or approvals, or (ii) except as provided in Section 8.02, obtaining any such authorizations, consents, orders and approvals shall not be a condition to Closing. Each party hereto agrees to make an appropriate filing, if necessary, pursuant to the HSR Act with respect to the transactions contemplated by this Agreement within fifteen Business Days of the date hereof and to supply as promptly as practicable to the appropriate Governmental Authorities any additional information and documentary material that may be requested pursuant to the HSR Act. Each party to this Agreement shall promptly notify the other parties of any communication it or any of its Affiliates receives from any Governmental Authority relating to the matters that are the subject of this Agreement and permit the other parties to review in advance any proposed communication by such party to any Governmental Authority.

(b)     The Sellers shall, or shall cause Century CP to, give promptly such notices to third parties and use commercially reasonable efforts to obtain such third party consents as the Purchaser may reasonably deem necessary or desirable in connection with the transactions contemplated by this Agreement, including, without limitation, all third party consents that are necessary or desirable in connection with the transfer of the Material Contracts, it being understood that (i) nothing in this Section 5.04(b) is intended to be a covenant that the Sellers shall in fact obtain on the Purchaser's behalf any such consents or (ii), except as provided in Section 8.02(l), obtaining any such consents shall not be a condition to Closing.

(c)     The Purchaser shall cooperate and use commercially reasonable efforts to assist the Sellers in giving such notices and obtaining such consents; *provided, however,* that the Purchaser shall have no obligation to give any guarantee or other consideration of any nature in connection with any such notice or consent or to consent to any change in the terms of any Material Contract which the Purchaser may deem adverse to the interests of the Purchaser or the Business.

(d)     The Sellers and the Purchaser agree that, in the event any consent, approval or authorization necessary or desirable to preserve for the Business or the Purchaser any right or benefit under any lease, license, contract, commitment or other agreement or

arrangement to which the Sellers or Century CP is a party and which is to be transferred to the Purchaser pursuant to Section 2.01(a) is not obtained prior to the Closing, the Sellers will, subsequent to the Closing, cooperate with the Purchaser in attempting to obtain such consent, approval or authorization as promptly thereafter as practicable. If such consent, approval or authorization cannot be obtained, the Sellers will use commercially reasonable efforts to provide the Purchaser on a back-to-back or similar basis with the rights and benefits of the affected lease, license, contract, commitment or other agreement or arrangement for the term of such lease, license, contract or other agreement or arrangement, and, if the Sellers provide such rights and benefits, the Purchaser shall assume the obligations and burdens thereunder.

SECTION 5.05. *Disclosure Schedule Supplements; Notice of Developments*. (a) The Purchaser and the Sellers agree that the Sections of the Disclosure Schedule qualifying Article III are not final and are subject to further review and revision. The Sellers may supplement such Sections of the Disclosure Schedule qualifying Article III by including, to the extent appropriate, a description (in reasonable detail) of facts, events or circumstances affecting the Business and existing prior to the date hereof and delivering to the Purchaser within 20 days of the date hereof supplemental sections of the Disclosure Schedule qualifying Article III (each, "*Disclosure Schedule Supplement*"); *provided* that nothing in this Section 5.05(a) will permit the Sellers to include in the Disclosure Schedule Supplements any references to any facts, events or circumstances which, taken as a whole, individually or in the aggregate, (i) reflect Liabilities of the Business greater than $1,000,000, (ii) result in, or may be reasonably likely to result in, Losses to the Business of more than $1,000,000 or (iii) would materially and adversely affect the Purchaser's ability to conduct the Business on the Closing Date.

(b) Prior to the Closing, the Sellers shall promptly notify the Purchaser in writing of (i) all events, circumstances, facts and occurrences arising subsequent to the date of this Agreement which result in any material breach of a representation or warranty or covenant of the Sellers in this Agreement or which have the effect of making any representation or warranty of the Sellers in this Agreement untrue or incorrect in any material respect and (ii) all other developments materially affecting the Business or the Business Assets.

SECTION 5.06. *Use of Intellectual Property*. (a) Except as determined by the committee to be established pursuant to the Shared Services Agreement in respect of the Shared Intellectual Property or as set forth in Section 5.06 of the Disclosure Schedule, from and after the Closing, none of the Sellers or the Subsidiaries (other than Century CP) shall use any of the Owned Intellectual Property or the Licensed Intellectual Property.

SECTION 5.07. *Non-Competition*. (a) In partial consideration of the payment of the Purchase Price, as set forth in Section 2.04, the Sellers and the Purchaser agree that, for a period of five (5) years after the Closing (the "*Restricted Period*"), none of the Sellers or the Subsidiaries (other than Century CP) shall acquire, directly or indirectly, any ownership, equity, or similar interest (whether through a stock, asset or other type of transaction) in any multipurpose aluminum rolling mill in North America having a production capacity of at least

500,000,000 pounds per year that manufactures, produces or supplies heat-treated aluminum products or brazing products ("*Covered Products*"), *provided* that nothing herein shall restrict the Sellers from acquiring an interest in a Person that manufactures, produces or supplies Covered Products if such activities did not represent or account for more than 20% of such Person's revenues, assets or income during, or as of the end of, any of the three fiscal years preceding the proposed date of acquisition.

(b)     As a separate and independent covenant, the Sellers agree with the Purchaser that, for a period of five (5) years following the Closing, none of the Sellers or the Subsidiaries (other than Century CP) will in any way, directly or indirectly, interfere or attempt to interfere with any contractual relationship in North America of the Business with any customer or supplier relationship in existence on the date hereof.

(c)     The Restricted Period shall be extended by the length of any period during which the Sellers are in breach of the terms of this Section 5.07.

(d)     The Sellers acknowledge that the covenants of the Sellers set forth in this Section 5.07 are an essential element of this Agreement and that, but for the agreement of the Sellers to comply with these covenants, the Purchaser would not have entered into this Agreement. The Sellers acknowledge that this Section 5.07 constitutes an independent covenant and shall not be affected by performance or nonperformance of any other provision of this Agreement by the Purchaser. The Sellers has independently consulted with its counsel and after such consultation agrees that the covenants set forth in this Section 5.07 are reasonable and proper.

SECTION 5.08. *Bulk Transfer Laws.* Without prejudice to Section 9.02(a)(vi), the Purchaser hereby waives compliance by the Sellers with any applicable bulk sale or bulk transfer laws of any jurisdiction in connection with the sale of the Assets to the Purchaser.

SECTION 5.09. *Cash; Other Communications.* From and after the Closing, (a) the Sellers shall use commercially reasonable efforts to take, or cause to be taken, all appropriate action, and do or cause to be done all things necessary, proper or advisable under the applicable Laws to put the Purchaser in effective possession, ownership and control of the Business Assets and the Purchaser shall cooperate with the Sellers for that purpose and (b) the Purchaser shall use commercially reasonable efforts to take, or cause to be taken, all appropriate action, and do or cause to be done all things necessary, proper or advisable under applicable Laws to put the Sellers in effective possession, ownership and control of assets not included within the Business Assets and the Sellers shall cooperate with the Purchaser for that purpose. Subject to the terms of the Shared Services Agreement, all cash and other remittances, mail and other communications relating to the Business Assets or the Business received by the Sellers or their Affiliates shall be promptly turned over to the Purchaser by the Sellers and, until sent to the Purchaser, shall be deemed held in trust by the Sellers for the benefit of the Purchaser. Subject to the terms of the Shared Services Agreement, all cash and other remittances, mail and other communications relating to any business of the Sellers not

included within the Business being purchased by the Purchaser hereunder that are received by the Purchaser shall be promptly turned over to the Sellers by the Purchaser and, until sent to the Sellers, shall be deemed held in trust by the Purchaser for the benefit of the Sellers.

SECTION 5.10. *Further Action.* (a) Each of the parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all appropriate action, do or cause to be done all things necessary, proper or advisable under applicable Laws, and execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and the Ancillary Agreements and consummate and make effective the transactions contemplated by this Agreement and the Ancillary Agreements, including, without limitation, fulfill, or cause to be fulfilled, the conditions set forth in Article VIII.

(b)    The Purchaser agrees with the Sellers that, for a period of two (2) years following the Closing Date, none of the Purchaser or its Affiliates on the one hand, or the Sellers or their respective Affiliates on the other hand, will, in any way, directly or indirectly, solicit, offer to hire or induce (except through advertisements to the general public for positions) any person who is an employee of the other, to accept employment by it or enter into a business relationship with it.

SECTION 5.11. *Environmental Permits.*   The Sellers will assist the Purchaser in the transfer or the reissue of such Environmental Permits or in any arrangement for their continued use by the Purchaser, including assisting in filing applications for any new Environmental Permits, it being understood that (a) nothing in this Section 5.11 is intended to be a covenant that the Sellers shall in fact obtain on the Purchaser's behalf any such Environmental Permits, or (b) except as provided in Section 8.02, obtaining any such Environmental Permits shall not be a condition to Closing

SECTION 5.12. *Intellectual Property.* The Sellers agree to provide to the Purchaser within 15 Business Days of the date hereof a list of all Owned Intellectual Property and all Licensed Intellectual Property that is currently used by Century WV in its operations other than the Business (collectively, the "*Shared Intellectual Property*"), *provided* that the parties agree that the Shared Intellectual Property shall not include any Owned Intellectual Property or Licensed Intellectual Property that is material to the Business or used in the manufacturing activities of the Business. The parties agree to refer to the committee to be established pursuant to the Shared Services Agreement matters relating to the Shared Intellectual Property and that the Shared Intellectual Property shall thereafter be deemed a "Shared Service" under such agreement.

## ARTICLE VI

## EMPLOYEE MATTERS

SECTION 6.01.  *Offer of Employment*.  No later than 10 days prior to the Closing Date, the Purchaser shall offer employment to each of the hourly and salaried employees listed on a schedule previously provided to the Purchaser who remains actively employed by the Sellers as of the Closing Date in the Rolling Business (excluding individuals on short or long term disability or leave of absence or layoff).  Each such employee who accepts such offer of employment by the Purchaser, and each employee hired after the date hereof by the Sellers to work in the Rolling Business and who accepts an offer of employment by the Purchaser on or prior to the Closing Date shall hereinafter be referred to as a *"Transferred Employee"*.

SECTION 6.02.  *Collective Bargaining Agreements*.  As of the Closing Date, the Purchaser agrees to assume any existing collective bargaining agreements sponsored by the Sellers and listed on Section 3.23 of the Disclosure Schedule.

SECTION 6.03.  *Defined Benefit Pension Plans*.  (a)  Effective as of the Closing Date, the Transferred Employees shall no longer participate in the Sellers' defined benefit pension plans.  Effective as of such date, the Purchaser shall establish replacement defined benefit pension plans (the *"New Defined Benefit Plans"*) that are intended to be qualified under Section 401(a) of the Code, and a related trust or trusts that are intended to be exempt from taxation under Section 501(a) of the Code for the benefit of the Transferred Employees, the terms of which plans and trust(s) shall be substantially comparable to the terms of the Sellers' defined benefit pension plans (and in compliance with any applicable collective bargaining agreement).  The Purchaser agrees that the new Defined Benefit Plans and their related trusts and funding arrangements shall be operative in all respects on the Closing Date and the Purchaser agrees to deliver to the Seller the certificate of an officer or an opinion of counsel representing that the New Defined Benefit Plans meet the requirements for qualification under Section 401(a) of the Code.  The Purchaser agrees as soon as practicable after the Closing Date to apply for, and take all actions necessary to secure, a determination letter from the Internal Revenue Service to the effect that the New Defined Benefit Plans are qualified under the applicable provisions of the Code.  The Purchaser further agrees that if such a determination letter is not obtained, any liability resulting from the failure to obtain such letter shall be the responsibility of the Purchaser.  The Purchaser shall recognize the Transferred Employees' service prior to the Closing Date with the Sellers for all purposes under the New Defined Benefit Plans.

(b)     As soon as practicable after the Closing Date, the Sellers shall cause to be transferred from the Sellers' defined benefit pension plans (the *"Sellers' Pension Plans"*) to the New Defined Benefit Plans all accrued benefits and other liabilities of the Sellers' Pension Plans relating to the Transferred Employees and to the employees of the Rolling Business whose employment terminated prior to the Closing Date (*"Former Employees"*) in the manner

described below (the "*Transferred Benefits*").  Following completion of the transfer of assets and liabilities from the Sellers' Pension Plans to the New Defined Benefit Plans, the Sellers shall have no further liability whatsoever with respect to the Former Employees and the Transferred Employees for benefits under the Sellers' Pension Plans, other than liability for any breach of fiduciary duties or any nonexempt prohibited transaction occurring prior to such transfer.  As of the Closing Date, the Sellers shall cause the Sellers' Pension Plans to be amended so as to cease further accrual of benefits with respect to the Former Employees and Transferred Employees.  Section 6.03(b) of the Disclosure Schedule lists all Former Employees together with relevant data concerning their age, date of hire, date of termination and accrued pension benefits.

(c)    As a condition of making the transfer of assets and liabilities described below in this section, the Sellers and the Purchaser shall be entitled to receive the following: (i) in the case of the Sellers, a certificate from an officer or an opinion of counsel of the Purchaser representing that the New Defined Benefit Plans meet the requirements for qualification under Section 401(a) of the Code and that the Purchaser has timely requested a determination letter from the Internal Revenue Service confirming such qualification; (ii) in the case of the Purchaser, a certificate from an officer or an opinion of counsel of the Sellers representing that the Sellers' Plans have received a recent favorable determination from the Internal Revenue Service to the effect that the Sellers' Plans meet such requirements for qualification; and (iii) to Sellers' knowledge, there have been no amendments or actions since the issuance of such favorable determination letter which adversely affect such plans' qualifications.

(d)    The Sellers shall cause Deloitte & Touche (the "*Sellers' Actuary*") to determine the amount of assets required by Section 414(l) of the Code for the Transferred Benefits obligation based on allocating assets by priority categories described in Section 4044(a) of ERISA (the "*414(l) Amount*"), to be transferred from the Sellers' Plans to the New Defined Benefit Plans.  The 414(l) Amount shall be determined as of the Closing Date by the Sellers' Actuary on the basis of the Pension Benefit Guaranty Corporation's safe harbor plan termination assumptions set forth in Section 4044 of ERISA and the remaining assumptions used in the most recent ERISA actuarial valuation of the Sellers' Plans (the "*Safe Harbor Assumptions*").  In connection therewith, the Sellers shall cause the Sellers' Actuary to determine the amounts of charges and credits to the funding standard account under Section 412 of the Code, the funding standard account credit balance and the annual amortization charges and credits (such amounts determined under the provisions of Internal Revenue Service Revenue Ruling 81-212 and other applicable guidance) to be allocated between the Sellers' Plans and the New Defined Benefit Plans as a result of the transfer of assets and liabilities anticipated under this section.  Such amounts shall be determined without regard to use of the de minimis option contained in such revenue ruling and the regulations promulgated under Section 414(l) of the Code.  The actuarial calculation of the liabilities by Pension Benefit Guaranty Corporation priority categories underlying the 414(l) Amount determined by the Sellers' Actuary shall be reviewed and verified by an actuarial firm designated by the Purchaser (the "*Purchaser's Actuary*").

(e)    As soon as practicable after the Closing Date, but in no event later than 30 days from the Closing Date, the Sellers shall prepare and file Form 5310A with respect to the transfer required by this section, and within 60 days of the Closing Date, the Sellers shall cause to be transferred from the trusts for the Sellers' Plans to the trusts established for the New Pension Plans an amount in cash and marketable securities acceptable to the parties equal to 80% of the amount reasonably estimated by the Sellers' Actuary in good faith, after verification and approval by the Purchaser's Actuary, to be equal to the 414(l) Amount; *provided, however,* that such estimated amount shall be calculated prior to the last day of the month subsequent to the execution of this Agreement (the "*Initial Transfer Amount*"). As soon as practicable after the final determination of the 414(l) Amount, calculated as of the Closing Date (the "*True-Up Date*"), but in no event later than 6 months from the Closing Date, the Sellers shall cause a second transfer to be made to the New Pension Plans in cash and marketable securities acceptable to the parties, of the "*True-Up Amount*". The True-Up Amount shall be equal to the 414(l) Amount (A) minus the sum of (i) the Initial Transfer Amount and (ii) distributions, if any, made with respect to Transferred Employees and Former Employees from the Closing Date through the True-Up Date, and (B) plus earnings in the Money Market Vehicle described in (g) below. Such True-Up Amount shall be determined by the Sellers' Actuary, after verification and approval by the Purchaser's Actuary. Once the Sellers' Actuary and the Purchaser's Actuary shall reach agreement, the Sellers' Actuary shall verify that the completed transfers comply with the requirements of Section 414(l). Nothing in this Section 6.03(e) shall prevent the Sellers from filing the Form 5310A in their discretion prior to the Closing Date.

(f)    The Sellers' Actuary shall provide the Purchaser's Actuary with the results of the calculations made under paragraphs (d) and (e) above and with records and other information in support of such calculations as required by the Purchaser's Actuary to verify and approve such calculations. The Sellers and the Purchaser will cause their respective actuaries to work together in good faith to promptly resolve any differences between them with respect to such calculations. The expenses of the Sellers' Actuary shall be borne by the Sellers, and the expenses of the Purchaser's Actuary shall be borne by the Purchaser. In the event such differences cannot be resolved, the two actuaries shall appoint a third actuary to resolve such differences, and the cost of such third actuary shall be equally borne by the Sellers and the Purchaser. The decision of such third actuary shall be final and binding on the Sellers and the Purchaser.

(g)    Notwithstanding any provisions to the contrary in this Section 6.03, it is the intention of the parties that the Sellers shall attempt to minimize the market risk from the Closing Date to the date the True Up Amount is transferred (the "*Market Risk Period*") by placing 125% of the Initial Transfer Amount into a money market account or other fixed income investment vehicle offered by the Sellers' Trustee on the Closing Date (the "*Money Market Vehicle*"), and it is agreed that the return on such investment during the Market Risk Period shall be paid to the Purchaser's New Defined Benefit Plans at the time of transfer of the True Up Amount. The Initial Transfer Amount and any distributions made with respect to Transferred Employees and Former Employees during the Market Risk Period shall be paid

from the Money Market Vehicle. Promptly after the date hereof the Sellers and the Purchaser shall contact the PBGC and seek to have the PBGC terminate the PBGC Agreement and release the PBGC lien on the Ravenswood Owned Real Property. If the PBGC does not terminate the PBGC Agreement prior to the Closing or does not agree to postpone until after the Closing the quarterly installment contributions to the Sellers' Pension Plans described in Section 2(c)(ii) of the PBGC Agreement, and the Sellers are required to make any such quarterly installment contribution before the Closing, the Purchase Price shall be increased by the after-tax effective cost to the Sellers of such contribution, multiplied by 78%, representing the agreed upon share of such contribution attributable to the Transferred Benefits, plus interest at 6% from the date of such contribution to the Closing Date.

SECTION 6.04. *Welfare Benefit Plans*. The Sellers shall be responsible for providing COBRA benefits to all employees of the Rolling Business whose employment terminated on or before the Closing Date, and for providing COBRA notices to all Transferred Employees, as required by applicable law. Effective as of the Closing Date, the Purchaser shall be responsible for all employee welfare plan benefits or payments for Transferred Employees whether accruing before or after the Closing Date. Except as provided in Section 6.05 on and after the Closing Date, the Purchaser shall provide to the Transferred Employees such welfare benefit plans, which are substantially comparable to those enjoyed by such Transferred Employees immediately prior to the Closing Date which comply with applicable collective bargaining agreements; *provided, however*, that nothing contained in this Section 6.04 shall obligate or commit the Purchaser to continue any welfare benefit plan, program or arrangement after the Closing Date for any particular length of time, or to limit the right of the Purchaser to amend, modify, suspend, revoke or terminate any such plan, subject, however, to the provisions of any applicable collective bargaining agreement.

SECTION 6.05. *Retiree Medical and Life Insurance Plans*. On and after the Closing Date, the Purchaser shall assume all retiree medical and life insurance obligations of the Sellers for Transferred Employees and former employees of the Rolling Business who are identified in Section 6.05 of the Disclosure Schedule but only to the extent that such obligations relate to claims that are accrued on the Closing Balance Sheet, and the Purchaser shall provide to the Transferred Employees retiree medical and life insurance benefits substantially comparable to those enjoyed by such employees immediately prior to the Closing Date and in accordance with any applicable collective bargaining agreement; *provided, however*, that nothing contained in this Section 6.05 shall limit the right of the Purchaser to amend, modify, suspend, revoke or terminate any such obligations or benefits, it being understood that the Sellers shall not be liable to such former employees or Transferred Employees solely by reason of the Purchaser's amendment, modification, suspension, revocation or termination of obligations or benefits.

SECTION 6.06. *Workers' Compensation Claims*. Effective as of the Closing Date, the Sellers agree to assign all workers' compensation insurance policies relating to employees of the Business to the Purchaser. The Purchaser agrees to assume all workers' compensation claims brought by employees or former employees of the Rolling Business,

including by Transferred Employees, whether such claims accrue or are brought before or after the Closing Date, and the Sellers shall have no further liability therefor on or after the Closing Date.

SECTION 6.07. *PBGC Agreement*. (a) The Sellers and the Purchaser agree that each Party will be entitled to participate in discussions with the PBGC and will use commercially reasonable efforts to obtain, on or prior to the Closing Date, the release of the Collateral described in the Agreement made as of January 23, 1996, between Century, the PBGC and certain other parties (the "*PBGC Agreement*") which is related to the Rolling Business, such that the PBGC no longer has a security interest in any Assets purchased hereunder, *provided*, *however*, that the Sellers do not guaranty the release of such security interest nor shall a release of such security interest be a condition to Closing.

(b)     Each of the Sellers and the Purchaser, respectively, agrees to comply with any requirements set forth by the PBGC, including without limitation payments, guarantees or the provision of other security to the extent, in the case of the Sellers, such requirements apply to the Reduction Facility and in the case of the Purchaser to the Rolling Business.

(c)     The Purchaser and the Sellers agree to cooperate with each other in attempting to effect the release of the Collateral described in (a) above, including the disclosure of information relating to the Purchaser and the Sellers and their Affiliates that may be requested by the PBGC in connection with the PBGC's review of the transaction contemplated thereby.

SECTION 6.08. *Management Services Agreement*. The Sellers agree that prior to the Closing Date, Century shall have entered into the Management Services Agreement, under which Century agrees to provide the services of certain key executives of Century on a limited basis to the Purchaser for a fee after the Closing Date. Such services and the times the services shall be provided are specified in such agreement.

SECTION 6.09. *Incentive Plans*. The Sellers shall be responsible for all payments to any Transferred Employees under any incentive, bonus, stock option, stock purchase or similar plans of the Sellers, and for the payment of any benefits under such plans, which are accelerated, or become payable, as a result of the Closing, and the Purchaser shall have no responsibility for any such payments. The Purchaser shall have no responsibility to continue any such plans after the Closing or to make any payments under such plans.

SECTION 6.10. *Employment Agreements*. The Purchaser agrees to assume the Employment Agreements disclosed in Section 3.22(a) of the Disclosure Schedule, to the extent the same are in effect on the Closing Date with respect to the Transferred Employees.

SECTION 6.11. *401(k) Plan*. Effective as of the Closing Date, Transferred Employees shall no longer actively participate in the Ravenswood Aluminum Corp. United

Steelworkers of America Savings Plan or the Ravenswood Aluminum Corp. Salaried Employees Defined Contribution Plan (together, the "*Sellers' Defined Contribution Plans*"). Effective as of the Closing Date, the Purchaser shall establish or make available one or more defined contribution plans for Transferred Employees containing terms substantially identical (other than employer stock terms) to those of the Sellers' Defined Contribution Plans (the "*Purchaser's Defined Contribution Plans*") and in compliance with applicable collective bargaining agreements and shall credit Transferred Employees for their service with the Sellers for participation and vesting purposes under the Purchaser's Defined Contribution Plans. As soon as practicable following the Closing Date, and upon receipt by the Sellers and by the Purchaser of the officer's certificates or opinions of counsel referred to below, the Sellers shall cause to be transferred from the Sellers' Defined Contribution Plans to the Purchaser's Defined Contribution Plans, and the Purchaser shall cause to be received, assets equal to the finalized account balances of such Transferred Employees who participated in the Sellers' Defined Contribution Plans. Effective as of the Closing Date, the Sellers shall cause each Transferred Employee to be fully vested in his or her account balance. The Sellers shall insure that such Transferred Employees do not receive in service distributions from the Sellers' Defined Contribution Plans in advance of such transfer. As a condition to such transfer, the Sellers and the Purchaser shall each be entitled to receive from the other an officer's certificate or an opinion of counsel to the effect that the Sellers' Defined Contribution Plans, and the Purchaser's Defined Contribution Plans, as the case may be, either (a) have received a recent favorable determination letter as to their qualification under the Code, and nothing has occurred since the date of such letter which would cause the loss of such qualification or (b) substantially complies by its terms with the relevant qualification provisions of the Internal Revenue Code, and the plan sponsor has timely applied for a favorable determination letter with respect to the plans, and will make whatever changes to the plans as are requested by the Internal Revenue Service as a condition of qualification.

SECTION 6.12. *Century CP Plans.* The Purchaser shall assume all the rights and obligations of Century under the Acquisition Agreement made as of December 22, 1998 between Alcoa and Century (the "*Alcoa Agreement*") with respect to Employee Matters described in Section 9.09 of the Alcoa Agreement.

SECTION 6.13. *Century CP Pension Plan.* (a) Effective as of the Closing Date, the employees employed by Century CP (the "*Vernon Employees*") shall no longer participate in the relevant Alcoa defined benefit pension plans (the "*Alcoa Plans*"). Effective as of such date, the Purchaser shall establish replacement defined benefit pension plans (the "*New Vernon Plans*") in compliance with applicable collective bargaining agreements that are intended to be qualified under Section 401(a) of the Code, and related trusts that are intended to be exempt from taxation under Section 501(a) of the Code for the benefit of the Vernon Employees, the terms of which plans and trusts shall be substantially comparable to the terms of the Alcoa Plans. The Purchaser agrees as soon as practicable after the Closing Date to apply for, and take all actions necessary to secure, determination letters from the Internal Revenue Service to the effect that the New Vernon Plans are qualified under applicable provisions of the Code. Assuming assets are transferred as provided in (b) below, the

Purchaser shall recognize the Vernon Employees' service prior to the Closing Date with Alcoa and with the Sellers for all purposes under the New Vernon Plans.

(b)    The Sellers agree, to the extent provided by the terms of the Alcoa Agreement, to cause Alcoa to transfer assets on a timely basis from the Alcoa Plans to the New Vernon Plans in accordance with the provisions of Section 9.09(c)(3) of the Alcoa Agreement.

SECTION 6.14. *Century CP Annual Performance Pay Plan*. The Sellers agree that the Closing Balance Sheet will show, as a liability of the Business, amounts earned on a pro rata basis by the Vernon Employees who participate in the Performance Pay Plan pursuant to the collective bargaining agreement dated May 16, 1997 between UAW Local No. 808 and Century CP and the Purchaser shall pay such amounts to such employees in accordance with the collective bargaining agreements of Century CP following the delivery of the Closing Balance Sheet.

# ARTICLE VII

# TAX MATTERS

SECTION 7.01. *Indemnity*. (a) Each of Century and Century WV agree, on a joint and several basis, to indemnify and hold the Purchaser, Century CP and their Affiliates harmless from and against any and all of the following Taxes (other than payroll and other employment taxes to the extent accrued on the Closing Balance Sheet), including reasonable attorneys' and accountants' fees and other reasonable out-of-pocket expenses incurred in connection therewith:  (i) Taxes imposed on or payable by Century CP or in respect of the Rolling Assets with respect to taxable periods ending on or before the Closing Date; (ii) with respect to taxable periods beginning before the Closing Date and ending after the Closing Date, Taxes imposed on Century CP or in respect of the Rolling Assets which are allocable, pursuant to Section 7.01(b) hereof, to the portion of such period ending on the Closing Date; (iii) Taxes imposed on any member of an affiliated, consolidated, unitary or other combined group with which Century CP files or has filed a Tax return in a period ending on or prior to the Closing Date on a consolidated, unitary or other combined basis or with which one or more of the Sellers file a Tax return on such basis after the Closing Date; (iv) Taxes imposed on or payable by Century CP as a result of (A) the Code section 338(h)(10) Election with respect to Century CP referred to in Section 7.07 and (B) an actual or deemed election under a state or local provision which is analogous or comparable to Code Section 338(h)(10); (v) Taxes relating to any payments required to be made after the Closing Date under any Tax indemnity, Tax sharing, or Tax allocation agreement between the Sellers and Century CP under which Century CP was obligated, or was a party, on or prior to the Closing Date; and (vi) Taxes arising from the breach of any representation, warranty or covenant of the Sellers with respect to Taxes under this Agreement. For purposes of this Section 7.01(a), the Sellers agree, on a joint and several basis, to indemnify the Purchaser for any and all out-of-pocket

costs and expenses (including reasonable fees for attorneys and other outside consultants) incurred in connection with any contest of any Tax liability for which the Sellers are liable under this Article VII.

(b)    In the case of Taxes that are payable with respect to a taxable period that begins before the Closing Date and ends after the Closing Date, the portion of any such Tax that is allocable to the portion of the period ending on the Closing Date shall be:

(i)    in the case of Taxes that are either (x) based upon or related to income or receipts, or (y) imposed in connection with any sale or other transfer or assignment of property (real or personal, tangible or intangible) (other than conveyances pursuant to this Agreement, as provided under Section 7.06), deemed equal to the amount which would be payable if the taxable year ended with the Closing Date; and

(ii)    in the case of Taxes imposed on a periodic basis with respect to the assets of the Sellers or any Subsidiary, or otherwise measured by the level of any item, deemed to be the amount of such Taxes for the entire period (or, in the case of such Taxes determined on an arrears basis, the amount of such Taxes for the immediately preceding period) multiplied by a fraction the numerator of which is the number of calendar days in the period ending on the Closing Date and the denominator of which is the number of calendar days in the entire period.

SECTION 7.02. *Returns and Payments.* From the date of this Agreement through and after the Closing Date, the Sellers shall prepare and file or otherwise furnish in proper form to the appropriate Governmental Authority (or cause to be prepared and filed or so furnished) in a timely manner all Tax returns, reports and forms ("*Returns*") relating to the Sellers, Century CP and the Business that is due on or before or relates to any taxable period ending on or before the Closing Date (and the Purchaser shall do the same for Returns relating to Century CP and the Business with respect to any taxable period ending after the Closing Date). Returns of Century CP and the Business not yet filed for any taxable period that begins before the Closing Date shall be prepared in a manner consistent with past practices employed with respect to Century CP, but only if the preparation of such Returns in a manner inconsistent with past practices would have a Material Adverse Effect on the non-preparing party (except (i) to the extent counsel for the Sellers renders a legal opinion stating that there is no reasonable basis in law therefor or that a Return cannot be so prepared and filed without being subject to penalties or (ii) with the consent of the Purchaser, which shall not be unreasonably withheld). With respect to any Return required to be filed by the Purchaser or the Sellers with respect to Century CP and the Business and as to which an amount of Tax is allocable to the other party under Section 7.01(b), the filing party shall provide the other party and its authorized representatives with a copy of such completed Return and a statement certifying the amount of Tax shown on such Return that is allocable to such other party pursuant to Section 7.01(b), together with appropriate supporting information and schedules at least 20 Business Days prior to the due date (including any extension thereof) for the filing of such Return, and such other party and its authorized representatives shall have the right to

review and comment on such Return and statement prior the filing of such Return. The Sellers and the Purchaser agree to consult and resolve in good faith any issue arising out of the review of any such Tax Return. In the event the parties are unable to resolve any dispute within thirty (30) days following the delivery of such Tax Return by the filing party to the non-filing party, the parties shall resolve their dispute by jointly requesting that a mutually acceptable accounting firm which is not the past or then current principal auditors of the Purchaser or the Sellers resolve any issue before the due date of such Tax Return, in order that such Tax Return may be timely filed. The scope of the accounting firm's review shall be limited to the disputed items. The Sellers and the Purchaser shall each pay one-half of the accounting firm's fees and expenses.

SECTION 7.03. *Tax Refunds and Credits.* The Purchaser shall, within forty-five (45) days following receipt of any tax refund, credit or offset, pay to the Sellers the amount of any Tax refund or credit or offset (including any interest paid or credited or any offset allowed with respect thereto), but reduced by any Taxes that the Purchaser or Century CP shall be required to pay with respect thereto, received or used, in the case of a credit or offset, by the Purchaser or Century CP of Taxes (i) relating to taxable periods or portions thereof ending on or before the Closing Date (including any taxes allocated to such period under Section 7.01(b) hereof), or (ii) attributable to an amount paid by the Sellers under Section 7.01(a) hereof. The amount of any refunds or credits or offsets (including any interest paid or credited with respect thereto) received by the Purchaser or Century CP shall be for the account of the Purchaser if the refund, credit or offset is of Taxes relating to taxable periods that begin after the Closing Date (including any taxes allocated to such period under Section 7.01(b) hereof). The Purchaser may, for its own account, claim a refund, credit or offset that relates to an adjustment to a taxable period that begins before the Closing Date that arises from an adjustment to a taxable period beginning on or after the Closing Date, *provided, however,* that the Sellers must consent to any such refund claim, which consent may not be unreasonably withheld (for this purpose, withholding of consent shall be reasonable if such refund claim could reasonably be expected to have a material tax cost or otherwise materially adversely affect the Sellers. The Purchaser shall, if the Sellers so request and at the Sellers' expense, cause the relevant entity to file for and use commercially reasonable efforts to obtain and expedite the receipt of any refund to which the Sellers are entitled under this Section 7.03, *provided, however,* that the Purchaser must consent to any such refund claim, which consent may not be unreasonably withheld (for this purpose, withholding of consent shall be reasonable if such refund claim could reasonably be expected to have a material tax cost or otherwise materially adversely affect the Purchaser, Century CP or any of their Affiliates).

SECTION 7.04. *Time of Payment.* Payment by the Sellers of any amount due under this Article VII shall be made within thirty (30) days following written notice by the Purchaser that payment of such amounts to the appropriate Tax authority or other appropriate party is due; *provided* that in the case of any payment due to a Tax authority or other appropriate party the Sellers shall not be required to make any payment earlier than two days before it is due to the appropriate Tax authority. In the case of a Tax that is contested in accordance with the provisions of Section 7.08 (other than a Tax contested in any

administrative or judicial proceeding in which the Tax contested must be paid prior to or upon commencement of such proceeding), payment of the Tax to the appropriate Tax authority will not be considered to be due earlier than the date a final determination has been made as defined in Section 1313(a) of the Code or as finally determined pursuant to any similar rule or provision of any relevant applicable Tax laws of any state, local, foreign or other Tax jurisdiction (a *"Final Determination"*).

SECTION 7.05. *Cooperation and Exchange of Information.* Upon the terms set forth in Section 5.02, the Sellers and the Purchaser will provide each other with such cooperation and information as either of them reasonably may request of the other in facilitating an appraisal of the assets of the Business, preparing and filing any Return, amended Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, participating in or conducting any audit or other proceeding in respect of Taxes or making representations to or furnishing information to parties subsequently desiring to purchase all or a part of the Business from the Purchaser. Such cooperation and information shall include providing copies of relevant Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings or other determinations by Tax authorities. The Sellers shall make its employees available on a basis mutually convenient to both parties to provide explanations of any documents or information provided hereunder. Each of the Sellers and the Purchaser shall retain all Returns, schedules and work papers, records and other documents in its possession relating to Tax matters of the Business for each taxable period first ending after the Closing Date and for all prior taxable periods until the later of (i) the expiration of the statute of limitations of the taxable periods to which such Returns and other documents relate, without regard to extensions except to the extent notified by the other party in writing of such extensions for the respective Tax periods, or (ii) six years following the due date (without extension) for such Returns. Any information obtained under this Section 7.05 shall be kept confidential except as may be otherwise necessary in connection with the filing of Returns or claims for refund or in conducting an audit or other proceeding.

SECTION 7.06. *Conveyance Taxes.* The Sellers and the Purchaser shall be equally liable for and each shall pay one-half of any real property transfer or gains, sales, use, transfer, value added, stock transfer, and stamp taxes, any transfer, recording, registration, and other fees, and any similar Taxes which become payable in connection with the transactions contemplated by this Agreement. The Sellers, after the review and consent by the Purchaser, shall file such applications and documents as shall permit any such Tax to be assessed and paid on or prior to the Closing Date in accordance with any available pre-sale filing procedure. The Purchaser shall execute and deliver all instruments and certificates necessary to enable the Sellers to comply with the foregoing. The Purchaser shall complete and execute a resale or other exemption certificate with respect to the inventory items sold hereunder, and shall provide the Sellers with an executed copy thereof.

SECTION 7.07. *Section 338(h)(10) Election.* (a) Century and the Purchaser shall jointly make a deemed asset sale election described under Code section 338(h)(10) (the *"Code section 338(h)(10) Election"*) and shall make all corresponding or similar elections

under applicable state or local law with respect to the qualified stock purchase of Shares by the Purchaser hereunder (collectively, "*Elections*"). Century and the Purchaser shall file all such Elections on a timely basis and comply with all rules and regulations applicable to such Elections. Century and the Purchaser shall cooperate with each other to take all actions necessary and appropriate (including filing such forms, returns, elections, schedules and documents on a joint or separate basis as may be required) to effect and preserve timely Elections in accordance with applicable Treasury Regulations under Code section 338 and comparable state or local laws.

(b)     Within sixty (60) calendar days following the Closing Date, the Purchaser will deliver to Century a completed Internal Revenue Service Form 8023, and the required schedules thereto ("*Form 8023*"), providing for the Section 338(h)(10) Election. If, within 30 calendar days after the date of Purchaser's delivery of the Form 8023, Century disputes one or more of the allocations reflected in items 9a or 11a of Form 8023, Century will give written notice to the Purchaser setting forth the allocations that Century believes should be reflected on Form 8023 (but in no event will Century's allocations reflected in items 9a and 11a of Form 8023 be less than that of the Purchaser's), and Century and the Purchaser shall be bound by Century's allocations so long as such allocations are consistent with the terms of this Agreement, which allocations shall be contained in a revised Form 8023. If Century reasonably disputes any other allocations or computations reflected on the Form 8023, Century and the Purchaser will attempt in good faith to promptly agree on a revised Form 8023. If the parties cannot resolve any such dispute within 30 Business Days of the delivery by the Purchaser of the Form 8023 to Century, the items remaining in dispute shall be submitted to an independent accounting firm of international reputation selected by, and mutually acceptable to, Century and the Purchaser. If the independent accounting firm so selected determines that the allocation with respect to any item or items remaining in dispute is incorrect and that Century would be materially adversely affected by the incorrectness of such allocation, then Century and the Purchaser shall be bound by the allocation of such items as determined by the independent accounting firm. Otherwise, the Purchaser and Century shall be bound by the allocation with respect to such item or items as prepared by the Purchaser. The independent accounting firm shall make any such determination within 30 Business Days after submission of the remaining disputed items.

SECTION 7.08. *Contests.* (a) After the Closing Date, each of the Sellers and the Purchaser shall promptly notify the other party in writing upon receipt of written notice of the commencement of any Tax audit or administrative or judicial proceeding or of any demand or claim on the Sellers, the Purchaser or Century CP which, if determined adversely to the taxpayer or after the lapse of time, would be grounds for indemnification by the other party under Section 7.01. Such notice shall contain factual information (to the extent known to the notifying party) describing the asserted Tax liability in reasonable detail and shall include copies of any notice or other document received from any taxing authority in respect of any such asserted Tax liability. If the indemnitee under Section 7.01 fails to give the indemnitor under Section 7.01 prompt notice of an asserted Tax liability as required by this Section 7.08, then the indemnitor shall not have any obligation to indemnify for any loss arising out of such

asserted Tax liability but only to the extent that failure to give such notice results in a detriment to the indemnitor.

(b)     In the case of an audit or administrative or judicial proceeding that relates to periods ending on or before the Closing Date, the Sellers shall have the sole right, at their expense, to control the conduct of such audit or proceeding, but only to the extent that such audit or proceeding relates to a Tax for which the Sellers have a potential indemnification obligation under Section 7.01; *provided, however*, that if the results of such contest could reasonably be expected to have a material Tax cost to the Purchaser or Century CP for any taxable period including or ending after the Closing Date, then the Sellers and the Purchaser shall jointly control the defense and settlement of any such contest and each party shall cooperate with the other party at its own expense and there shall be no settlement or closing or other agreement with respect thereto without the consent of the other party, which consent shall not be unreasonably withheld and, if the Sellers do not assume the defense of any such audit or proceeding, the Purchaser may defend the same in such manner as it may deem appropriate, including, but not limited to, settling such audit or proceeding; *provided, however*, that the Purchaser shall not settle any such audit or proceeding without the consent of the Sellers, which consent shall not be unreasonably withheld. If the Sellers choose to control the contest, the Purchaser shall promptly empower and shall cause Century CP or other party promptly to empower (by power of attorney and such other documentation as may be appropriate) such representatives of the Sellers as they may designate to represent the Purchaser or Century CP or other party or its successor in the contest insofar as the contest involves an asserted tax liability for which the Sellers would be liable under Section 7.01. The Purchaser shall have sole control over the defense and settlement of any contest relating to taxable periods or portions thereof that begin on or after the Closing Date (including, subject to Section 7.08(c) hereof, any Taxes allocated to such period under Section 7.01(b) hereof) or relating to taxable periods or portions thereof ending on or before the Closing Date provided the Taxes to which such contest relates are Taxes for which Sellers are not liable under Section 7.01(a) hereof, *provided, however*, that if the results of any such contest otherwise controlled by the Purchaser could reasonably be expected to have a material Tax cost or otherwise materially adversely affect the Sellers, then the Sellers and the Purchaser shall jointly control the defense and settlement of any such contest and each party shall cooperate with the other party at its own expense and there shall be no settlement or closing or other agreement with respect thereto without the consent of the other party, which consent shall not be unreasonably withheld.

(c)     With respect to periods beginning before the Closing Date and ending after the Closing Date, (i) each party may participate in an audit or proceeding which relates to any such period and (ii) such audit or proceeding shall be controlled by that party which would bear the burden of the greater portion of the sum of the adjustment and any corresponding adjustments that may reasonably be anticipated for future Tax periods; *provided* that neither party shall settle any such audit or proceeding without the consent of the other, which consent shall not be unreasonably withheld. The principle set forth in the preceding sentence shall govern also for purposes of deciding any issue that must be decided jointly (in particular, choice of judicial forum) in situations in which separate issues are otherwise controlled hereunder by the Purchaser and the Sellers.

(d)     The Purchaser and the Sellers agree to cooperate, and the Purchaser agrees to cause Century CP to cooperate, in the defense against or compromise of any claim in any audit or proceeding.

(e)     The Sellers shall promptly notify the Purchaser of the commencement of any claim, audit, examination or other written change or adjustment received by the Sellers, in each case relating to Century CP, by any taxing authority which could reasonably be expected to affect the liability of the Purchaser or Century CP for a material amount of Taxes, and the Sellers shall keep the Purchaser informed of the progress thereof. The failure to provide such notice shall not affect the indemnification obligations under this Article VII unless the indemnified party is materially prejudiced as a result of such failure.

SECTION 7.09. *Miscellaneous*. (a) The Sellers and the Purchaser agree to treat all payments made under Section 2.09 and this Article VII and under any other indemnity provision contained in this Agreement as adjustments to the Purchase Price for Tax purposes and that such treatment shall govern for purposes hereof.

(b)     The covenants and obligations of parties under this Article VII, and the representations and warranties of Sellers set forth in Section 3.25 hereof, shall survive the Closing and shall remain in full force and effect until the expiration of all statutes of limitations on assessment or collection of Tax plus 180 days with respect to any Taxes that would be indemnifiable by the Sellers under this Agreement.

(c)     From and after the date of this Agreement, the Sellers shall not without the prior written consent of the Purchaser (which consent may not be unreasonably withheld) make, or cause or permit to be made, any Tax election not consistent with prior practices that could be reasonably expected to have a Material Adverse Effect.

(d)     The Sellers and the Purchaser agree that the fair market value of the assets of Century CP, in the aggregate, generally equals the adjusted tax basis in those assets as of the date of this Agreement.

(e)     For purposes of this Article VII, all references to the Purchaser, the Sellers, Century CP and the Subsidiaries include successors.

(f)     All tax sharing agreements or similar agreements with respect to or involving the Sellers and Century CP shall be terminated with respect Century CP as of the Closing Date and, after the Closing Date, Century CP shall not be bound thereby or have any liability thereunder.

## ARTICLE VIII

## CONDITIONS TO CLOSING

SECTION 8.01. *Conditions to Obligations of the Sellers.* Subject to the proviso in Section 10.01(b), the obligations of the Sellers to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a) *Representations, Warranties and Covenants.* (i) The representations and warranties of the Purchaser contained in this Agreement shall be true and correct as of the Closing, with the same force and effect as if made as of the Closing Date; except to the extent that any inaccuracies as of the Closing Date in the representations and warranties would not be reasonably likely to have, individually or in the aggregate, a material adverse effect on the ability of the Purchaser to consummate the transactions contemplated by this Agreement (*provided* that for purposes of determining whether any representation or warranties are inaccurate as of the Closing Date any representation or warranty that is qualified by a standard of materiality shall be required to be true in all respects without giving effect to such materiality standard), (ii) the covenants and agreements contained in this Agreement to be complied with by the Purchaser on or before the Closing shall have been complied with in all material respects, and (iii) the Sellers shall have received a certificate from the Purchaser to such effect signed by a duly authorized officer thereof;

(b) *HSR Act.* Any waiting period (and any extension thereof) under the HSR Act applicable to the purchase of the Assets contemplated by this Agreement shall have expired or shall have been terminated;

(c) *No Proceeding or Litigation.* No Action shall have been commenced by or before any Governmental Authority against either the Sellers or the Purchaser, seeking to restrain or materially and adversely alter the transactions contemplated by this Agreement which is reasonably likely to render it impossible or unlawful to consummate such transactions; *provided, however*, that the provisions of this Section 8.01(c) shall not apply if the Sellers have directly or indirectly solicited or encouraged any such Action;

(d) *Ancillary Agreements.* The Purchaser shall have executed and delivered to the Sellers each of the Ancillary Agreements to which it or any of its Affiliates is a party;

(e) *Resolutions of the Purchaser.* The Sellers shall have received a true and complete copy, certified by a duly authorized officer of the Purchaser, of the resolutions duly and validly adopted by the Board of Directors of the Purchaser evidencing its authorization of the execution and delivery of this Agreement and the

Ancillary Agreements and the consummation of the transactions contemplated hereby and thereby.

SECTION 8.02. *Conditions to Obligations of the Purchaser.* Subject to the proviso in Section 10.01(a), the obligations of the Purchaser to consummate the transactions contemplated by this Agreement shall be subject to the fulfillment, at or prior to the Closing, of each of the following conditions:

(a)    *Representations, Warranties and Covenants.* (i) The representations and warranties of the Sellers contained in this Agreement shall be true and correct as of the Closing with the same force and effect as if made as of the Closing, except to the extent that any inaccuracies as of the Closing Date in the representations and warranties would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect (*provided* that for purposes of determining whether any representations or warranties are inaccurate as of the Closing Date any representation or warranty that is qualified by a standard of materiality shall be required to be true in all respects without giving effect to such materiality standard; *provided* that solely for purposes of this Section 8.02(a), if there is any circumstance, change in or effect on the Business whose adverse effect on the Business is monetary, such circumstance, change or effect shall be deemed to be a Material Adverse Effect if such monetary liability is greater than $15,000,000); (ii) the covenants and agreements contained in this Agreement to be complied with by the Sellers on or before the Closing shall have been complied with in all material respects except that the Sellers shall have complied in all respects with their obligations under Article II hereof, and (iii) the Purchaser shall have received a certificate of the Sellers to such effect signed by duly authorized officers thereof;

(b)    *HSR Act.* Any waiting period (and any extension thereof) under the HSR Act applicable to the purchase of the Assets contemplated hereby shall have expired or shall have been terminated;

(c)    *No Proceeding or Litigation.* No Action shall have been commenced by or before any Governmental Authority against either the Sellers or the Purchaser, seeking to restrain or materially and adversely alter the transactions contemplated by this Agreement which is reasonably likely to render it impossible or unlawful to consummate such transactions or which would be reasonably likely to have a Material Adverse Effect; *provided, however,* that the provisions of this Section 8.02(c) shall not apply if the Purchaser has solicited or encouraged any such Action;

(d)    *Resolutions of the Sellers.* The Purchaser shall have received a true and complete copy, certified by the Secretary or an Assistant Secretary of each of the Sellers, of the resolutions duly and validly adopted by the Board of Directors of each of the Sellers and the stockholders of Century WV evidencing their authorization of the execution and delivery of this Agreement and the Ancillary Agreements to which it is a party and the consummation of the transactions contemplated hereby and thereby;

(e)    *Consents and Approvals.* The Purchaser and the Sellers shall have received, each in form and substance reasonably satisfactory to the Purchaser, all authorizations, consents, orders and approvals of all Governmental Authorities and officials which are necessary for the consummation of the transactions contemplated by this Agreement and the Ancillary Agreements or for the conduct of the Business by the Purchaser immediately after giving effect to the Closing, except where the failure to obtain any such authorizations, consents, orders or approvals would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect after giving effect to consummation of the transactions contemplated by this Agreement and the Ancillary Agreements;

(f)    *Resignations.* The Purchaser shall have received the resignations, effective as of the Closing, of all directors and officers of Century CP, except for such persons as shall have been designated in writing prior to the Closing by the Purchaser to the Sellers;

(g)    *Minute Books.* The Purchaser shall have received a copy of the minute books and stock register of Century CP, certified by the Secretary or Assistant Secretary of Century CP, as of the Closing;

(h)    *Good Standing; Qualification to Do Business.* The Purchaser shall have received good standing certificates for Century CP from the secretary of state of the jurisdiction in which such entity is incorporated or organized and from the secretary of state in each other jurisdiction in which the failure of Century CP to qualify to do business as a foreign corporation would be reasonably likely to have a material and adverse effect on the business of Century CP, in each case dated as of a date not earlier than ten Business Days prior to the Closing Date and accompanied by bring-down telegrams dated the Closing Date;

(i)    *Ancillary Agreements.* Each of the Sellers or its Affiliates shall have executed and delivered to the Purchaser each of the Ancillary Agreements to which a Seller or any of its Affiliates is a party;

(j)    *No Material Adverse Effect.* No circumstance, change in, or effect on the Business shall have occurred which has or, with the passage of time is reasonably expected to have, individually or in the aggregate, a Material Adverse Effect; *provided* that to the extent any such circumstance, change or effect on the Business results in an inaccuracy as of the Closing Date in the representations and warranties of the Sellers, such circumstance, change or effect shall not be separately considered under this Section 8.02(j) for purposes of determining whether a Material Adverse Effect has occurred or is reasonably expected to occur;

(k)    *New Collective Bargaining Agreement.* The collective bargaining agreement with the United Steelworkers of America (the "*USWA*") entered into and

agreed upon by Century WV effective June 1, 1999 and the terms thereof are effective and binding on the parties and have not been amended since such date;

(l)    *Major Customer.* (i) The Major Customer shall have consented to the assignment to the Purchaser of the Sellers' rights and obligations under the agreements entered into with such Major Customer and the Major Customer shall not have terminated or materially and adversely altered, or given notice that it intends to terminate or materially and adversely alter, its commercial arrangements with the Business and (ii) The Lockheed Martin Corporation (*"Lockheed"*) shall have consented to the assignment to the Purchaser of Century WV's rights and obligations under the agreements entered into with Lockheed in October 1998;

(m)    *Taxes and Fees.* The Sellers shall have paid one-half of all transfer, deed, gains, stamp and all other similar taxes and special assessments and recording charges, if any;

(n)    *Title Policy.* The Purchaser shall have received, at its sole cost and expense, an owner's form of policy or policies of title insurance, dated or updated to the Closing Date (the *"Title Policy"*) with liability in the amount reasonably specified by the Purchaser, insuring that the Purchaser has a good and marketable fee estate in and to the Owned Real Property subject only to the Permitted Encumbrances and the Permitted Property Encumbrances. The Title Policy shall be issued by a title company satisfactory to the Purchaser (the *"Title Company"*), and shall insure (to the extent insurable) any easements, leasehold estates or other matters appurtenant to or benefitting the Owned Real Property as part of the insured estate. In the event delivery of the Title Policy is not possible as of the Closing, Purchaser shall have received at the Closing the irrevocable and unconditional binding commitment of the Title Company to issue the Title Policy in the form of a so-called "pro-forma policy", or "marked binder";

(o)    *Title Indemnity.* The Sellers shall have provided to the Title Company a "gap" indemnity, indemnifying the Title Company against matters affecting title (other than Permitted Encumbrances) between the Closing Date and the date of recordation of the Deed or Deeds;

(p)    *Title Proof.* The Sellers shall have provided to the Title Company such reasonable and customary title affidavits, indemnities, undertakings and "proofs" as may be customary in the jurisdiction in which the Owned Real Property is situated or as may be reasonably required by the Title Company;

(q)    *Survey.* The Purchaser shall have received, at least ten (10) days prior to the Closing, at the Sellers' sole cost and expense, an "as-built" survey or surveys of the Owned Real Property reasonably satisfactory to the Purchaser, certified to the Purchaser and the Title Company by a licensed surveyor approved by the Purchaser,

dated or updated not earlier than sixty (60) days prior to the Closing, complying with the latest edition of the ALTA and ASCM Minimum Standard Detail Requirements for Land Title Surveys, including Table A items reasonably requested by the Purchaser;

(r)    *Easements.*  The Sellers, at their sole cost and expense, shall have executed, acknowledged and recorded such easements as shall be necessary for the Purchaser to operate the Business, including, without limitation, those easements contemplated in Schedule 8.02(r);

(s)    *Conveyance.*  The conveyance of the Owned Real Property shall be in compliance with all material zoning, subdivision, land use, and other Laws, and the Owned Real Property shall be assessed as a separate tax lot for real property tax assessment purposes;

(t)    *Certificate of Non-Foreign Status.*  The Purchaser shall have received a certificate from the Sellers (which complies with Section 1445 of the Code) of non-foreign status executed in accordance with the provisions of the Foreign Investment in Real Property Tax Act; and

(u)    *Utilities.*  The Purchaser shall have rights to obtain from the utility provider utilities on terms and conditions, including cost, similar to those currently in effect.

(v)    *Environmental Permits.*  All Environmental Permits required for the Purchaser, as the new owner of the Assets, to conduct the Business as of the Closing shall be in full force and effect except (i) as would not be reasonably likely to have, individually or in the aggregate, a Material Adverse Effect, and (ii) as would not materially and adversely affect the Purchaser's ability to operate the Business.

## ARTICLE IX

## INDEMNIFICATION

SECTION 9.01.  *Survival of Representations and Warranties.*  The representations and warranties of the Purchaser and the Sellers contained in this Agreement shall survive the Closing until the second anniversary thereof; *provided, however,* that (a) the representations and warranties of the Sellers dealing with Tax matters shall survive as provided in Article VII, (b) insofar as any claim is made by the Purchaser for the breach of any representation or warranty of the Sellers contained herein relating to environmental matters, such representations and warranties shall, for purposes of such claims by the Purchaser, survive the Closing until the sixth anniversary of the Closing, and (c) the representations and warranties contained in Section 3.01 (other than the second sentence thereof) shall survive the Closing until the fourth anniversary thereof.  Neither the period of survival nor the liability of

the Sellers with respect to the Sellers' representations and warranties shall be reduced by any investigation made at any time by or on behalf of the Purchaser. If written notice of a claim has been given in good faith prior to the expiration of the applicable representations and warranties by the Purchaser to the Sellers pursuant to Section 9.04, then the relevant representations and warranties shall survive as to such claim until the claim has been finally resolved.

SECTION 9.02. *Indemnification by the Sellers*. (a) Subject to Section 9.01, the Sellers shall, jointly and severally, indemnify, defend and hold harmless the Purchaser and its Affiliates, officers, directors, employees, agents, successors and assigns (each a "*Purchaser Indemnified Party*") for any and all Liabilities, losses, damages, claims, costs and expenses, interest, awards, judgments and penalties (including, without limitation, reasonable attorneys' and consultants' fees and expenses) actually suffered or incurred (including, without limitation, any Action brought or otherwise initiated by any of them) (hereinafter a "*Loss*") by them, arising out of or resulting from:

(i)    the breach of any representation or warranty made by the Sellers contained in this Agreement (other than in respect of Taxes and other amounts indemnified against under Article VII, it being understood that the rights and obligations of the parties with respect to indemnification for any and all Tax matters shall be governed by Article VII); or

(ii)    the breach of any covenant or agreement by the Sellers contained in this Agreement (other than any covenant in Article VII, it being understood that the rights and obligations of the parties with respect to indemnification for any and all Tax matters shall be governed by Article VII); or

(iii)    with the exception of Losses associated with items set forth in Section 3.16(a) of the Disclosure Schedule, (A) any Releases of Hazardous Material requiring an investigation or remediation under any applicable Environmental Law at, on, under, migrating from (but only to the extent migrating on or prior to the Closing) or to, or transported from (but only to the extent transported on or prior to the Closing) the Real Property, or any property formerly owned, leased, occupied or used by the Sellers, Century CP or the Business but only during the period in which such former property was owned, leased, occupied or used by any such Person, in any such case on or prior to the Closing; or any continuing migration of such Hazardous Material from the Real Property after the Closing (including, without limitation, any Remedial Action at any time after the Closing relating to such Hazardous Material), except (I) in respect of matters set forth in Section 3.16(a) of the Disclosure Schedule, if the Purchaser's actions or inactions are the cause of such off-site migration or (II) in respect of any other pre-Closing disposal or Release at the Real Property, if the Purchaser's negligence is the cause of such off-site migration; (B) any Environmental Claim arising at any time that relates to the Sellers, Century CP, the Business or the Real Property on or prior to the Closing; or (C) any noncompliance with or violation of any applicable

Environmental Law or Environmental Permit relating in any way to the Sellers or the Business on or prior to the Closing, or any continuation of such violation or non-compliance after the Closing; or

(iv)    Liabilities relating to or arising from employee claims described in Section 2.02(b)(iv) to the extent such claims exceed the amount described in such Section; or

(v)    without prejudice to Section 6.07, any action taken by the PBGC relating to the defined benefit pension plans maintained prior to the Closing by the Sellers for the Transferred Employees or to the assets of the Sellers which are not the Shares and Rolling Assets purchased hereunder; or

(vi)    Liabilities arising from or related to any failure to comply with laws relating to bulk transfers or bulk sales with respect to the transactions contemplated by this Agreement; or

(vii)    the Excluded Liabilities; or

(viii)    except as otherwise provided in Article VI, Liabilities for benefits, or under any of Century CP's Plans; or

(ix)    Liabilities relating to or arising out of Actions brought against Century CP (other than worker's compensation claims) associated with employment actions, omissions or events, including, without limitation, employment discrimination claims, and claims for workplace related injuries by employees which occurred or were incurred or accrued on or before the Closing Date, but only to the extent such Liabilities (together with all Liabilities relating to or arising from employee claims described in Section 2.02(b)(iv)), individually or in the aggregate, exceeded $600,000; or

(x)    all Liabilities of Century CP in the nature of product liability claims relating to or arising out of allegations of personal injury or property damage suffered by any third party (A) on or prior to the Closing Date or (B) attributable to products sold or shipped, or Inventory purchased or manufactured, in each case in respect of the conduct of the Rolling Business on or prior to the Closing Date; or

(xi)    Liabilities under Environmental Laws relating to or arising out of (A) Hazardous Material transported from the Vernon Owned Real Property pre-Closing; (B) any off-site migration of Hazardous Material resulting from any pre-Closing off-site disposal or Release of such Hazardous Material; (C) any off-site migration of Hazardous Material from the Vernon Owned Real Property resulting from any pre-Closing disposal or Release at the Vernon Owned Real Property, except (I) in respect of matters set forth in Section 3.16(a) of the Disclosure Schedule, if the Purchaser's

actions or inactions are the cause of such off-site migration or (II) in respect of any other pre-Closing disposal or Release at the Vernon Owned Real Property, if the Purchaser's negligence is the cause of such off-site migration; and (D) any on-site PCB contamination existing or occurring on or before the Closing at the Vernon Owned Real Property, or any off-site PCB contamination, whether existing or occurring before or after the Closing, resulting from or arising out of operations at the Vernon Owned Real Property on or before the Closing, in each case requiring investigation or remediation or other action under applicable Environmental Law; it being understood that for purposes of this clause 9.02(a)(xi)(D), "Environmental Laws" include regulations adopted by the State of California or a subdivision thereof after the Closing Date pursuant to statutes enacted before the Closing Date; or

(xii)    Indebtedness of Century CP, other than obligations under equipment leases that have, or should have, been recorded as capital leases.

(b)    To the extent that the Sellers' undertakings set forth in this Section 9.02 may be unenforceable, each Seller shall contribute the maximum amount that it is permitted to contribute under applicable Law to the payment and satisfaction of all Losses incurred by a Purchaser Indemnified Party.

(c)    The Sellers shall not be required to indemnify any Purchaser Indemnified Party under (1) Section 9.02(a)(i) (except to the extent a claim relates to or arises from the breach of any representation or warranty contained in Sections 3.01 (other than the second sentence thereof) or 3.31), (2) Section 9.02(a)(ii), (3) Section 9.02(a)(iii) (except to the extent a claim relates to or arises from the Excluded Liabilities set forth in Section 2.02(b)(vi) (other than Section 2.02(b)(vi)(C) or Section 9.02(a)(xi) (other than Section 9.02(a)(xi)(C)), for which there is no indemnity limit) and (4) Section 9.02(a)(v), unless (x) such claim or demand involves Losses in excess of $50,000 and (y) the aggregate amount of all Losses for which indemnity is due exceeds $2,000,000, after which (subject to Section 9.06) the Sellers shall be obligated for all Losses of the Purchaser Indemnified Parties in excess of such amount. Claims or demands which are based on the same or similar or related facts shall be treated as a single claim when determining whether the threshold set out in Section 9.02(c)(x) has been reached. Any indemnifiable liability with respect to any breach or non-performance by the Sellers of a representation, warranty or covenant shall be limited to the amount of damages sustained by a Purchaser Indemnified Party by reason of such breach or non-performance net of any reserves provided for such liability on the Reference Balance Sheet.

SECTION 9.03.    *Indemnification by the Purchaser*.    (a)    Subject to Section 9.01, the Purchaser shall indemnify, defend and hold harmless the Sellers and their Affiliates (other than Century CP), officers, directors, employees, agents, successors and assigns (each a "*Seller Indemnified Party*") for any and all Losses actually suffered or incurred by them, arising out of or resulting from:

(i)    the breach of any representation or warranty made by the Purchaser contained in this Agreement; or

(ii)    the breach of any covenant or agreement by the Purchaser contained in this Agreement (including, without limitation, any covenant in Article VII); or

(iii)    any liabilities or obligations resulting from or arising out of the conduct of the Business on or after the Closing Date, except for any liabilities or obligations with respect to which the Sellers are obligated to indemnify a Purchaser Indemnified Party; or

(iv)    any action taken by the PBGC relating to the New Defined Benefit Plans or to the Shares and Rolling Assets purchased hereunder; or

(v)    liabilities and obligations arising from employee claims described in Section 2.02(a)(iii) to the extent such claims do not exceed the amounts described in such Section.

(b)    To the extent that the Purchaser's undertakings set forth in this Section 9.03 may be unenforceable, the Purchaser shall contribute the maximum amount that it is permitted to contribute under applicable Law to the payment and satisfaction of all Losses incurred by a Seller Indemnified Party.

SECTION 9.04.  *Notification of Claims.*  (a)  A party that may be entitled to be indemnified pursuant to Section 9.02 or 9.03 (the "*Indemnified Party*") shall promptly notify the party liable for such indemnification (the "*Indemnifying Party*") in writing of any pending or threatened claim or demand which the Indemnified Party has determined has given or could give rise to a right of indemnification under this Agreement (including a pending or threatened claim or demand asserted by a third party ("*Third Party Claims*") against the Indemnified Party), describing in reasonable detail the facts and circumstances with respect to the subject matter of such claim or demand; *provided, however*, that the failure to provide such notice shall not release the Indemnifying Party from any of its obligations under this Article IX except to the extent the Indemnifying Party is materially prejudiced by such failure.  Subject to the Indemnifying Party's right to defend in good faith Third Party Claims as hereinafter provided, the Indemnifying Party shall (whether in respect of a claim which is not a third party claim or in respect of a Third Party Claim) satisfy or contest its obligations under this Article IX within 15 days after the receipt of written notice thereof from the Indemnified Party.

(b)    If the Indemnifying Party acknowledges in writing its obligation to indemnify the Indemnified Party hereunder against any Losses that may result from such Third Party Claim, then the Indemnifying Party shall be entitled to assume and control the defense of such Third Party Claim at its expense and through counsel of its choice if it gives notice of its intention to do so to the Indemnified Party within 15 days of the receipt of such notice from the Indemnified Party; *provided, however*, that the Indemnified Party may participate in such defense and retain separate counsel at its own cost and expense, without prejudice to the rights of the parties to control the defense of their respective interests.  In the event the Indemnifying Party exercises the right to undertake any such defense against any such Third Party Claim as provided above, the Indemnified Party shall cooperate with the Indemnifying Party in such

defense and make available to the Indemnifying Party, at the Indemnifying Party's expense, all witnesses, pertinent records, materials and information in the Indemnified Party's possession or under the Indemnified Party's control relating thereto as is reasonably required by the Indemnifying Party. Similarly, in the event the Indemnified Party is, directly or indirectly, conducting the defense against any such Third Party Claim, the Indemnifying Party shall cooperate with the Indemnified Party in such defense and make available to the Indemnified Party, at the Indemnifying Party's expense, all such witnesses, records, materials and information in the Indemnifying Party's possession or under the Indemnifying Party's control relating thereto as is reasonably required by the Indemnified Party. No such Third Party Claim may be settled by the Indemnifying Party without the written consent of the Indemnified Party (which consent shall not be unreasonably withheld).

SECTION 9.05. *Limits on Environmental Indemnification.* (a) The Purchaser and the Sellers, as the case may be, may investigate, or cause to be investigated, the existence or the nature or extent of any release of Hazardous Materials and conduct any Remedial Action at or from the Real Property if such investigation is required by applicable Environmental Laws. The Sellers and the Purchaser shall consult with a view to determining what Remedial Action, if any is required, and any Remedial Action and any compliance activities shall be designed to assure the most cost effective action possible, consistent with applicable Environmental Laws. Any payments or expenses expended as required by a Governmental Order, a written demand for remedial or compliance action or a written demand for payment by any Governmental Authority shall be deemed to be consistent with the exercise of reasonable business judgment. The Purchaser shall mitigate to the extent practicable, any environmental Loss for which indemnification is claimed. If the Purchaser, by expenditure of money, reasonably can mitigate or otherwise reduce or eliminate any environmental Loss for which indemnification otherwise would be claimed, the Purchaser shall take such action and shall be entitled to prompt reimbursement from the Sellers for such expenditures and all related expenses.

(b)    If the Purchaser and the Sellers are unable, after reasonable inquiry, to determine whether a particular environmental Loss falls within Section 9.02(a)(iii) ("*Section 9.02(a)(iii) Loss*") or Section 9.03 ("*Section 9.03 Loss*"), the parties shall refer the matter to a mutually acceptable environmental lawyer (the "*Independent Expert*"). The Independent Expert shall be experienced in the environmental issues involved in the dispute and shall not in the past have been engaged by either the Purchaser or the Sellers and shall not otherwise be affiliated with either the Purchaser or the Sellers. Within ten (10) Business Days following the selection of the Independent Expert the Purchaser and the Sellers shall each submit to such Independent Expert, in writing not to exceed ten (10) pages in length, such party's proposed resolution of the matter in question, together with reasonable documentary evidence supporting such proposed resolution. The Independent Expert shall have the authority to request additional facts or evidence from each of the parties, and if such Independent Expert so requires, a hearing to present the same. The Independent Expert, shall within 40 Business Days from his or her appointment, make a determination as to whether, and to what extent, such Loss (i) is a Section 9.02(a)(iii) Loss, (ii) is a Section 9.03 Loss or (iii) in his or her expert opinion, cannot be clearly determined to be either a Section 9.02(a)(iii) Loss or a

Section 9.03 Loss in whole or in part. The Independent Expert's determination shall be final and binding on the parties. The costs and expenses of the Independent Expert shall be shared equally by the parties.

(c)    If the Independent Expert cannot clearly determine whether a particular Loss is, in whole or in part, a Section 9.02(a)(iii) Loss or a Section 9.03 Loss, the Sellers and the Purchaser will indemnify each other so as to allocate responsibility between themselves, according to the time when such Loss occurs, as follows:

| Time Loss Occurs | Sellers' Share of Responsibility | Purchaser's Share of Responsibility |
|---|---|---|
| From the Closing Date through one year after the Closing Date | 100% | 0% |
| Thereafter through two years after the Closing Date | 83.3% | 16.7% |
| Thereafter through three years after the Closing Date | 67.7% | 33.3% |
| Thereafter through four years after the Closing Date | 50% | 50% |
| Thereafter through five years after the Closing Date | 33.3% | 67.7% |
| Thereafter through six years after the Closing Date | 16.7% | 83.3% |
| After six years of the Closing Date | 0% | 100% |

SECTION 9.06. *Limits on Indemnification.* Notwithstanding anything to the contrary contained in this Agreement, the maximum amount of indemnifiable Losses which may be recovered from the Sellers arising out of or resulting from the causes enumerated in (a) Section 9.02(a)(i) (with the exception of any Losses relating to arising from the breach of any representation or warranty contained in Sections 3.01 (other than the second sentence thereof) or 3.31) or (b) Section 9.02(a)(iii) (with the exception of any Losses relating to or arising from the Excluded Liabilities set forth in Section 2.02(b)(vi) (other than Section 2.02(b)(vi)(C)) or Section 9.02(a)(xi) (other than Section 9.02(a)(xi)(C)) for which there is no indemnity limit) shall be an amount equal to $25,000,000.

SECTION 9.07. *Indemnification Agreements.* The parties hereto agree that to the extent the Purchaser or any other Purchaser Indemnified Party may be entitled to indemnification pursuant to either the Vernon Indemnity Agreement or the Ravenswood Indemnity Agreement, on the one hand, or this Agreement, on the other hand, the Purchaser or any other Purchaser Indemnified Party, as the case may be, shall be entitled to seek

indemnification under any one or more of such agreements; *provided* that to the extent a claim is made under one or more of such agreements, the validity of such claim shall be determined separately under each such agreement and to the extent valid under more than one such agreement, the Purchaser may elect under which agreement or agreements the Sellers shall make such indemnification payment (and any amounts payable in respect of such claim shall be determined in accordance with the terms and conditions of the agreement or agreements designated by the Purchaser and such amounts paid shall not be taken into consideration for purposes of determining the deductible or the maximum amount recoverable under any other agreement), *provided* that any recovery in respect of such claim shall be limited to the amount of Loss in respect of such claim.

SECTION 9.08.  *Exclusive Remedies.*  The parties hereto acknowledge and agree that following the Closing the indemnification provisions of this Article IX, the Vernon Indemnity Agreement and the Kaiser Indemnity Agreement shall be the sole and exclusive remedies of, on the one hand, the Sellers against the Purchaser, and on the other hand, the Purchaser against the Sellers, for any breach of the representations, warranties, covenants or agreements herein or therein (as applicable in accordance with the terms of the indemnity provisions of each such agreement), except (i) for performance of the obligations set forth in Article II and Sections 5.03, 5.07, and 5.12, (ii) for performance of the obligations set forth in Article VII, as to which the obligations of the parties with respect to indemnification shall be exclusively governed by Article VII, (iii) for injunctive relief or specific performance to the extent available at Law, and (iv) in the event of willful breach, willful misrepresentation or fraud.

SECTION 9.09.  *Sellers' Indemnity Support.*  The parties hereto agree that for so long as and at such times as the consolidated net worth of Century is less than $200,000,000, at the Seller's option:

(a)    for so long as the Purchaser shall be entitled to be indemnified pursuant to Article VII or Article IX, the Vernon Indemnity Agreement or the Ravenswood Indemnity Agreement, upon delivery pursuant to Article VII or Section 9.04, the Vernon Indemnity Agreement or the Ravenswood Indemnity Agreement by a Purchaser Indemnified Party of a notice regarding an indemnification claim or potential claim, the Purchaser is hereby authorized at any time and from time to time, to the fullest extent permitted by Law, to set off (for so long as such claim is pending) against any and all amounts due and payable by the Purchaser to the Sellers under this Agreement, any Ancillary Agreement or otherwise an amount equal to the amount of such claim, but in no event shall any such set-off pursuant to this Section 9.09(a) exceed $5,000,000; *provided* that the Purchaser shall promptly return any amount set off (plus interest thereon accruing at the average of the prime rate applicable during the period of set off) if and to the extent a court or judicial body of applicable jurisdiction shall determine that the Sellers are not liable to the Purchaser Indemnified Party for such claim; or

(b)    the Sellers shall obtain (and maintain in effect for so long as the Purchaser shall be entitled to be indemnified pursuant to Article VII or IX, the Vernon

Indemnity Agreement or the Ravenswood Indemnity Agreement) an insurance policy, in form and substance reasonably satisfactory to the Purchaser, issued in favor of the Purchaser and its Affiliates from an insurer acceptable to the Purchaser, in its reasonable judgment, providing at least $5,000,000 of coverage for amounts that are payable by the Sellers to a Purchaser Indemnified Party pursuant to the indemnification provisions set forth in Article VII or IX, the Vernon Indemnity Agreement or the Ravenswood Indemnity Agreement; and the Sellers and the Purchaser agree that the Sellers, on the one hand, and the Purchaser, on the other hand, shall each pay one half of the premiums payable in connection with obtaining and maintaining such insurance policy; *provided* that in no event shall the Purchaser be required to pay more than $100,000 in the aggregate in premiums or other payments in connection with obtaining and maintaining such insurance policy.

## ARTICLE X

## TERMINATION AND WAIVER

SECTION 10.01. *Termination.* This Agreement may be terminated at any time prior to the Closing:

(a)    by the Purchaser, if between the date hereof and the time scheduled for the Closing, any Seller or Subsidiary makes a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against any Seller or Subsidiary seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up or reorganization, arrangement, adjustment, protection, relief or composition of its debts under any Law relating to bankruptcy, insolvency or reorganization and such proceeding is not dismissed within 90 days, *provided* that the Purchaser shall not be required to consummate the transactions contemplated by this Agreement until such proceeding has been dismissed; or

(b)    by the Sellers, if between the date hereof and the time scheduled for the Closing, the Purchaser makes a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against the Purchaser seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up or reorganization, arrangement, adjustment, protection, relief or composition of its debts under any Law relating to bankruptcy, insolvency or reorganization and such proceeding is not dismissed within 90 days, *provided* that the Sellers shall not be required to consummate the transactions contemplated by this Agreement until such proceeding has been dismissed; or

(c)    by either the Sellers or the Purchaser if the Closing shall not have occurred by January 26, 2000; *provided, however*, that the right to terminate this Agreement under this Section 10.01(c) shall not be available to any party whose failure

to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to such date; or

     (d)   by either the Purchaser or the Sellers in the event that any Governmental Authority shall have issued an order, decree or ruling or taken any other action restraining, enjoining or otherwise prohibiting the transactions contemplated by this Agreement and such order, decree, ruling or other action shall have become final and nonappealable; or

     (e)   by the mutual written consent of the Sellers and the Purchaser.

SECTION 10.02. *Effect of Termination.* In the event of termination of this Agreement as provided in Section 10.01, this Agreement (including, without limitation, Section 5.07) shall forthwith become void and there shall be no liability on the part of either party hereto except (a) as set forth in Sections 10.02(b), 11.01 and 11.03 and (b) that nothing herein shall relieve either party from liability for any breach of this Agreement.

SECTION 10.03. *Waiver.* Either party to this Agreement may (a) extend the time for the performance of any of the obligations or other acts of the other party, (b) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered by the other party pursuant hereto or (c) waive compliance with any of the agreements or conditions of the other party contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party to be bound thereby. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition, of this Agreement. The failure of any party to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

## ARTICLE XI

## GENERAL PROVISIONS

SECTION 11.01. *Expenses.* Except as otherwise specified in this Agreement, all costs and expenses, including, without limitation, fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred, *provided* that Century shall pay all such costs and expenses incurred by the Sellers.

SECTION 11.02. *Notices* All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by courier service, by telecopy or by registered or certified mail (postage prepaid, return receipt requested) to the

respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 11.02):

    (a)    if to the Sellers:

> Century Aluminum Company
> 2511 Garden Road
> Building A, Suite 200
> Monterey, California 93490
> Telecopy: (831) 642-9328
> Attention: General Counsel and Chief Administrative Officer

> with a copy to:

> Curtis, Mallet-Prevost, Colt & Mosle
> 101 Park Avenue
> New York, NY 10178
> Telecopy: (212) 697-1559
> Attention: Matias A. Vega, Esq.

    (b)    if to the Purchaser:

> Pechiney Rolled Products LLC
> 8770 West Bryn Mawr Avenue
> Telecopy: (773) 399-3527
> Attention: Eileen Burns Lerum

> with a copy to:

> Pechiney
> 7, place du Chancelier Adenauer
> 75016 Paris
> France
> Telecopy: (33-1) 56 28 33 07
> Attention: Mark L. Cohen

> and

> Shearman & Sterling
> 599 Lexington Avenue
> New York, NY 10022
> Telecopy: (212) 848-7179
> Attention: David W. Heleniak, Esq.
>             Alfred J. Ross, Jr., Esq.

SECTION 11.03. *Public Announcements*. Until a public announcement has been made pursuant to this Section 11.03, except as may be required by Law or stock exchange rules, no party to this Agreement shall make, or cause to be made, any press release or public announcement in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other parties, and the parties shall cooperate as to the timing and contents of any such press release or public announcement. Notwithstanding the foregoing, where an announcement is required by Law or stock exchange rules, the party required to make such an announcement shall notify the other parties of such requirement (and provide a copy of such announcement to the other parties) as soon as practicable in advance of such announcement and, to the extent practical, take the views of the other parties in respect of such announcement into account prior to making such announcement.

SECTION 11.04. *Headings*. The descriptive headings contained in this Agreement are for convenience of reference only and shall not affect in any way the meaning or interpretation of this Agreement.

SECTION 11.05. *Severability*. If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

SECTION 11.06. *Entire Agreement*. This Agreement and the Ancillary Agreements constitute the entire agreement of the parties hereto with respect to the subject matter hereof and thereof and supersede all prior agreements and undertakings, both written and oral, between the Sellers and the Purchaser with respect to the subject matter hereof.

SECTION 11.07. *Assignment*. This Agreement may not be assigned without the express written consent of the Sellers and the Purchaser (which consent may be granted or withheld in the sole discretion of the Sellers and the Purchaser); *provided, however*, that prior to the Closing the Purchaser may assign this Agreement to an Affiliate of the Purchaser without the consent of the Sellers.

SECTION 11.08. *No Third Party Beneficiaries*. This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other Person, including, without limitation, any union or any employee or former employee of the Sellers or Century CP, any legal or equitable right, benefit or remedy of any nature whatsoever,

including, without limitation, any rights of employment for any specified period, under or by reason of this Agreement.

SECTION 11.09. *Amendment.* This Agreement may not be amended or modified except (a) by an instrument in writing signed by, or on behalf of, the parties hereto or (b) by a waiver in accordance with Section 10.03.

SECTION 11.10. *Governing Law.* This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, applicable to contracts executed in and to be performed entirely within that state. All actions and proceedings arising out of or relating to this Agreement shall be heard and determined in any New York state or federal court sitting in the City of New York.

SECTION 11.11. *Counterparts.* This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, the Sellers and the Purchaser have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

CENTURY ALUMINUM COMPANY

By_____
   Name:
   Title:

CENTURY ALUMINUM OF WEST VIRGINIA, INC.

By_____
   Name:
   Title:

PECHINEY ROLLED PRODUCTS LLC

By_____
   Name:
   Title:

IN WITNESS WHEREOF, the Sellers and the Purchaser have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

CENTURY ALUMINUM COMPANY


By_____
  Name:
  Title:


CENTURY ALUMINUM OF WEST VIRGINIA, INC.


By_____
  Name: *Gerald J. Kitchen*
  Title: *Vice President*


PECHINEY ROLLED PRODUCTS LLC


By_____
  Name:
  Title:

IN WITNESS WHEREOF, the Sellers and the Purchaser have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

CENTURY ALUMINUM COMPANY

By_____
   Name:
   Title:

CENTURY ALUMINUM OF WEST VIRGINIA, INC.

By_____
   Name:
   Title:

PECHINEY ROLLED PRODUCTS LLC

By_____
   Name:  J. M. Schumm
   Title:  Vice President

NYDOCS02/460128 23

# EXHIBIT E

EXECUTION COPY

### VERNON
### INDEMNIFICATION AGREEMENT

AGREEMENT dated as of September 20, 1999, between Century Aluminum Company, a Delaware corporation ("Century") and Pechiney Rolled Products LLC, a Delaware limited liability company (the "Purchaser").

### WITNESSETH

WHEREAS, Century, Century Aluminum of West Virginia, Inc. and the Purchaser are parties to the Stock and Asset Purchase Agreement dated as of July 26, 1999 (the "Purchase Agreement");

WHEREAS, Century and Aluminum Company of America, a Pennsylvania corporation ("Alcoa"), are parties to an Acquisition Agreement dated December 22, 1998 (the "Alcoa Agreement"). All capitalized terms not defined herein are used as defined in the Alcoa Agreement;

WHEREAS, pursuant to the Purchase Agreement, the execution and delivery of this Agreement constitute a condition to the Purchaser's obligations to consummate the transactions contemplated by the Purchase Agreement; and

NOW, THEREFORE, in consideration of the premises and the mutual agreements and covenants set forth herein and in the Purchase Agreement, and intending to be legally bound hereby, the parties hereto hereby agree as follows:

### ARTICLE I
### INDEMNIFICATION

SECTION 1.1 Indemnification. Century shall indemnify, defend and hold harmless the Purchaser and its Affiliates (as defined in the Purchase Agreement), officers, directors, employees, agents, successors and assigns (each a "Purchaser Indemnified Party") from and against any Loss arising out of or based upon or in connection with or as a result of:

(a) the untruth, inaccuracy or breach of any representation and warranty (including, without limitation, the representation contained in and limited by the second sentence of Section 10.03(a) of the Alcoa Agreement) of Alcoa contained in or made pursuant to the Alcoa Agreement, including in any Schedule or other agreement, document or instrument delivered thereunder;

NYDOCS02/471611 8

2

(b)     the breach or nonfulfillment of any covenant or agreement of Alcoa contained in the Alcoa Agreement or in any other agreement, document or instrument delivered thereunder;

(c)     the failure of Alcoa to discharge in full any liability or obligation of Alcoa or Newco related to the Cast Plate Business that existed or occurred prior to the Closing Date, which was not expressly assumed by Century under the Alcoa Agreement; or

(d)     any threatened or pending claims or actions related to or involving matters which are referenced in the notices set forth in Schedule A hereto.

SECTION 1.2  Environmental Indemnification.  Notwithstanding anything to the contrary herein or in the Purchase Agreement, Century shall indemnify, defend and hold harmless the Purchaser Indemnified Parties from and against:

(a)     any and all Losses incurred or required to be paid as a result of or arising out of:

(i)     Hazardous Substances that are or were at, upon, in or under the Real Property prior to the Closing due to the actions or inactions of Alcoa or an Affiliate of Alcoa, the Cleanup of which either is required by a directive or order of a governmental agency or if the parties hereto agree that Cleanup is reasonably required pursuant to Applicable Law,

(ii)     Hazardous Substances Released at any time at any location other than the Real Property (including Hazardous Substances emanating from the Real Property) if such Hazardous Substances were generated, stored, disposed of, recycled, Released, used or transported, by or on behalf of Alcoa or an Affiliate of Alcoa prior to the Closing, or

(iii)     acts, omissions or any noncompliance with any Applicable Law by Alcoa or an Affiliate of Alcoa prior to the Closing if Cleanup of Hazardous Substances either is required by a directive or order of a governmental agency or if the parties hereto agree that Cleanup is reasonably required pursuant to Applicable Law; and

(b)     any and all liabilities, obligations, responsibilities, losses, damages, deficiencies, costs of Cleanup, remediation or compliance, other costs and expenses, fines, penalties, restitutions and monetary sanctions sustained, incurred or required to be paid by any Purchaser Indemnified Party as a result of Alcoa's failure to complete any or

3

all of the remedial actions contained in paragraphs (1) through (7) of Section 10.03(c) of the Alcoa Agreement.

SECTION 1.3 <u>Notification of Claims</u>. (a) A Purchaser Indemnified Party shall notify Century in writing of any pending or threatened claim or demand which the Purchaser Indemnified Party has determined has given or could give rise to a right of indemnification under this Agreement (including a pending or threatened claim or demand asserted by a third party ("<u>Third Party Claims</u>") against the Purchaser Indemnified Party), describing in reasonable detail the facts and circumstances with respect to the subject matter of such claim or demand and, if possible, the amount of asserted Losses. Subject to Century's right to defend in good faith Third Party Claims as hereinafter provided, Century shall (whether in respect of a claim which is not a third party claim or in respect of a Third Party Claim) satisfy or contest its obligations under this Article I within 60 days after the receipt of written notice thereof from the Purchaser Indemnified Party.

(b)    If Century acknowledges in writing its obligation to indemnify the Purchaser Indemnified Party hereunder against any Losses that may result from such Third Party Claim, then Century shall be entitled to assume and control the defense of such Third Party Claim at its expense and through counsel of its choice if Century gives notice of their intention to do so to the Purchaser Indemnified Party within 60 days of the receipt of such notice from the Purchaser Indemnified Party; <u>provided</u> that the Purchaser Indemnified Party may participate in such defense and retain separate counsel at its own cost and expense, without prejudice to the rights of the parties to control the defense of their respective interests. In the event Century exercises the right to undertake any such defense against any such Third Party Claim as provided above, the Purchaser Indemnified Party shall cooperate with Century in such defense and make available to Century, at Century's expense, all witnesses, pertinent records, materials and information in the Purchaser Indemnified Party's possession or under the Purchaser Indemnified Party's control relating thereto as is reasonably required by Century. Similarly, in the event the Purchaser Indemnified Party is, directly or indirectly, conducting the defense against any such Third Party Claim, Century shall cooperate with the Purchaser Indemnified Party in such defense and make available to the Purchaser Indemnified Party, at Century's expense, all such witnesses, records, materials and information in Century's possession or under Century's control relating thereto as is reasonably required by the Purchaser Indemnified Party. No such Third Party Claim may be settled by Century without the written consent of the Purchaser Indemnified Party, which consent shall not be unreasonably withheld, conditioned or delayed, provided that consent will be presumed in the case of settlements of $100,000 or less where the Purchaser Indemnified Party has not responded within 10 Business Days of a proposed settlement.

SECTION 1.4 <u>Limitations</u>. (a) Century shall not be liable to the Purchaser for indemnification under this Agreement except to the extent that the aggregate amount of all damages which are demanded in a valid claim or claims and thereafter are reasonably

4

demonstrated to have been suffered by the Purchaser exceeds $200,000 (the "Deductible"), in which event the amount which the Purchaser is entitled to recover in respect of such claim or claims less the Deductible will be payable by Century; provided, however, that no Deductible will apply to claims for indemnification made by the Purchaser against Century under Section 1.1(c) of this Agreement.

(b)    Except as to liabilities within the scope of Section 1.2(a)(ii) and the remediation responsibilities set forth in Section 1.2(b) of this Agreement, in no event will Century's liabilities to the Purchaser under this Agreement exceed in the aggregate $14 million. Liabilities within the scope of such Section 1.2(a)(ii) and costs of remediation in accordance with Section 1.2(b) of this Agreement will not be subject to an aggregate limit or the Deductible.

(c)    Except to the extent Alcoa fails to use reasonable efforts to minimize disruption to the operation of the Cast Plate Business, Century shall not be liable to any Purchaser Indemnified Party for any loss of business or lost profits incurred by such Purchaser Indemnified Party if such Purchaser Indemnified Party suspends operation of the Cast Plate Business during Alcoa's remediation or Cleanup activities.

(d)    Notwithstanding anything to the contrary contained herein, if any court, tribunal, judicial or arbitral body of applicable jurisdiction (each a "Court") shall finally determine that Alcoa is liable to Century pursuant to the terms and conditions of the Alcoa Agreement in respect of any claim brought against Century hereunder by any Purchaser Indemnified Party, (i) Century shall not have any liability to any Purchaser Indemnified Party hereunder to the extent that Century is unable to enforce or collect upon the judgment of the Court by reason of the bankruptcy or insolvency of Alcoa, and (ii) if Century has made any payment to any Purchaser Indemnified Party hereunder prior to enforcement or collection by Century from Alcoa pursuant to the Alcoa Agreement, such Purchaser Indemnified Party shall promptly return such payment to Century (plus interest thereon accruing at the average of the prime rate applicable to the period commencing on the date such payment was paid to the Purchaser Indemnified Party and ending on the date returned) to the extent Century is unable to collect the same from Alcoa by reason of the bankruptcy or insolvency of Alcoa.

SECTION 1.5 Duration. (a) Century's indemnification obligations under Section 1.1(a) of this Agreement shall continue for a period of 24 months following the Closing Date; provided that Century's indemnification obligations under Section 1.1(a) of this Agreement with respect to the representations made in Section 4.16 of the Alcoa Agreement shall survive for the applicable statute of limitations plus 60 days.

(b)    Century's indemnification obligations under Section 1.2 of this Agreement shall continue for a period of 12 years following the Closing Date.  Except as otherwise provided in this Agreement, after the expiration of such 12-year indemnification period, no Purchaser

5

Indemnified Party will have any claim for contribution under this Agreement from or against Century for Environmental Liabilities arising out of Alcoa's operation of the Cast Plate Business or ownership of the Real Property prior to the Closing Date.

(c)    Notwithstanding anything to the contrary contained herein or in the Purchase Agreement, Century's obligations under Section 1.2(a)(ii) and Section 1.2(b) of this Agreement shall continue in perpetuity.

(d)    Notwithstanding anything to the contrary contained herein, no Purchaser Indemnified Person shall be entitled to indemnification hereunder unless a claim for indemnification is made to Century within the applicable time periods set forth in clauses (a) and (b) of this Section 1.5 (regardless of whether the Loss for which the Purchaser Indemnified Party is seeking indemnification is actually incurred after the expiration of such specified time periods).

SECTION 1.6 <u>Mitigation, Cooperation and Limitation</u>.  Any Purchaser Indemnified Party seeking indemnification hereunder shall be subject to all obligations of record retention, cooperation, reasonableness and mitigation of damages imposed upon Century by the Alcoa Agreement to the same extent as if such obligations were specifically set forth herein effective as of the date hereof and made applicable to such Purchaser Indemnified Party for the benefit of Century, including but not limited to such obligations set forth in Sections 4.16, 9.02, 9.07, 9.10, 9.11, 10.03(b), 10.04 and 13.01 of the Alcoa Agreement.  To the extent a breach of the obligations referred to in the preceding sentence by the Purchaser causes Century to incur a Loss or prevents Century from recovering against Alcoa, Century's indemnity obligations hereunder shall be reduced in a corresponding amount.

SECTION 1.7 <u>Representations and Warranties of Century</u>.  Century represents and warrants that the notices set forth in Schedule A hereto are the only notices delivered by Century to Alcoa in accordance with Article 12 of the Alcoa Agreement on or prior to the date hereof.

ARTICLE II

GENERAL PROVISIONS

SECTION 2.1 <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law or public policy, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party.  Upon such determination that any term or other

6

provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

SECTION 2.2 Notices. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by courier service, by telecopy or by registered or certified mail (postage prepaid, return receipt requested) to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 2.2):

    (a)    if to Century:

        Century Aluminum Company
        2511 Garden Road
        Building A, Suite 200
        Monterey, California 93490
        Telecopy:  (831) 642-9328
        Attention:  General Counsel and Chief Administrative Officer

        with a copy to:

        Curtis, Mallet-Prevost, Colt & Mosle
        101 Park Avenue
        New York, NY  10178
        Telecopy: (212) 697-1559
        Attention:  Matias A. Vega, Esq.

    (b)    if to the Purchaser:

        Pechiney Rolled Products LLC
        8770 West Bryn Mawr Avenue
        Telecopy: (773) 399-3527
        Attention: Eileen Burns Lerum

        with a copy to:

        Pechiney
        7, place du Chancelier Adenauer
        75016 Paris

7

France
Telecopy: (33-1) 56 28 33 07
Attention: Mark L. Cohen

8

and

Shearman & Sterling
599 Lexington Avenue
New York, NY 10022
Telecopy: (212) 848-7179
Attention: David W. Heleniak, Esq.
            Alfred J. Ross, Jr., Esq.

SECTION 2.3 Assignment. This Agreement may not be assigned without the express written consent of Century and the Purchaser, which consent may be granted or withheld in the sole discretion of Century and the Purchaser.

SECTION 2.4 No Third Party Beneficiaries. This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person, including, without limitation, any union or any employee or former employee of Century, Century WV or Century CP, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

SECTION 2.5 Amendment. This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, the parties hereto.

SECTION 2.6 Governing Law. (a) This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, applicable to contracts executed in and to be performed entirely within that state.

(b)    The Purchaser hereby irrevocably consents to the jurisdiction of any court, tribunal, panel or forum in which there is ongoing any dispute, action or proceeding to which Century is a party arising out of, relating to or in connection with the Alcoa Agreement for the resolution of any and all related disputes between the Purchaser and Century arising out of, relating to or in connection with this Agreement. The Purchaser hereby irrevocably waives any and all jurisdictional defenses to such jurisdiction, including *in personam* and *forum non conveniens* defenses. The Purchaser hereby irrevocably consents that any dispute, action or proceeding involving the Purchaser to which Century is a party arising out of, relating to or in connection with the Alcoa Agreement may be consolidated with any dispute between Purchaser and Century arising out of, relating to or in connection with this Agreement and that such dispute may be tried before the same trier of fact as the action or dispute relating to the Alcoa Agreement.

NYDOCS02/471611 8

9

(c)    If the dispute, action or proceeding to which Century is a party, as referenced in subsection (b) above, is an arbitration proceeding, the Purchaser agrees that any controversy or claim arising out of or relating to this Agreement, or any breach thereof, may be settled by that pending arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award rendered by the Arbitrators may be entered in any Court having jurisdiction thereof.

(d)    The Purchaser hereby agrees that any dispute initiated by the Purchaser against Century arising out of, relating to or in connection with this Agreement shall be brought by Purchaser in a state or federal court within the State of New York or the State of California. The Purchaser further agrees that such suit initiated by the Purchaser against Century may be transferred and/or consolidated with any dispute in any jurisdiction in which Century is a party arising out of, relating to or in connection with the Alcoa Agreement and hereby waives any and all defenses relating to such transfer and/or consolidation.

(e)    The Purchaser acknowledges that, but for the agreement of the Purchaser to comply with clauses (b), (c) and (d) of Section 2.6, Century would not have entered into this Agreement.

(f)    Notwithstanding the foregoing agreements of the Purchaser to submit to jurisdiction and agree to consolidation as set forth in clauses (b) and (c) above, such agreements shall not be deemed breached by the Purchaser if a Third Party Claim brought against the Purchaser cannot be removed or consolidated after good faith efforts and procedures by the Purchaser to remove or consolidate.

SECTION 2.7 Counterparts.  This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original but all of which taken together shall constitute one and the same agreement.

IN WITNESS WHEREOF, Century and the Purchaser have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

CENTURY ALUMINUM COMPANY

By: _____
Name: Gerald J. Kitchen
Title: Executive Vice President

PECHINEY ROLLED PRODUCTS LLC

By: _____
Name: J. M. Schreun
Title: Vice President

SCHEDULE A

# EXHIBIT F



# STANDARD OFFER, AGREEMENT AND ESCROW
## INSTRUCTIONS FOR PURCHASE OF REAL ESTATE
### (Non-Residential)
AIR Commercial Real Estate Association

<u>March 20, 2006</u>
(Date for Reference Purposes)

1.  **Buyer.**
    1.1 <u>City of Vernon</u>
hereby offers to purchase the real property, hereinafter described, from the owner thereof ("Seller") (collectively, the "Parties" or individually, a "Party") , ("Buyer")
through an escrow ("Escrow") to close 30 or ~~days after the waiver or expiration of the Buyer's Contingencies, ("Expected Closing~~
Date") to be held by <u>North American Title Company (Tina DeBow)</u>                                            ("Escrow Holder") whose address is
<u>5 2 0   N o r t h   B r a n d   B o u l e v a r d ,   G l e n d a l e ,   C a l i f o r n i a   9 1 2 0 3</u>
upon the terms and conditions set forth in this agreement ("Agreement"). Buyer shall have the right to assign Buyer's rights hereunder, but any such
, Phone No.  <u>(818) 551-5370</u> , Facsimile No.  <u>(818) 240-9884</u>
~~assignment shall not relieve Buyer of Buyer's obligations herein unless Seller expressly releases Buyer.~~
    1.2  The term "Date of Agreement" as used herein shall be the date when by execution and delivery (~~as defined in paragraph 20.2)~~ of this
document or a subsequent counteroffer thereto, Buyer and Seller have reached agreement in writing whereby Seller agrees to sell, and Buyer agrees to
purchase, the Property upon terms accepted by both Parties.
2.  **Property.**
    2.1 The real property ("Property") that is the subject of this offer consists of (insert a brief physical description) <u>an approximately</u>
<u>1,174,740 square foot industrial site</u>

is located in the City of <u>City of Vernon</u>
State of <u>California</u>                                             , County of <u>Los Angeles</u>
<u>California  90058</u>                           , is commonly known by the street address of <u>3200 Fruitland Avenue, Vernon,</u>
and is legally described as:

(APN: <u>6310-008-010, 011, 012 & 013</u>   ).
    2.2  If the legal description of the Property is not complete or is inaccurate, this Agreement shall not be invalid and the legal description shall be
completed          or          corrected          to          meet          the          requirements          of
<u>Fidelity National Title Company (Jeff Dassel, Phone (800) 359-2625, Fax (818) 758-3263</u>
("Title Company"), which shall issue the title policy hereinafter described.
    2.3  The Property includes, ~~at no additional cost to Buyer, the permanent~~ includes all improvements thereon, except those which
~~including those items which pursuant to applicable law are a part of the property, as well as the following items, if any, owned by Seller and at present~~
~~located on the Property: electrical distribution systems (power panel, bus ducting, conduits, disconnects, lighting fixtures); telephone distribution~~
~~systems (lines, jacks and connections only); space heaters; heating, ventilating, air conditioning equipment ("HVAC"); air lines; fire sprinkler systems;~~
~~security~~ ~~and~~ ~~fire~~ ~~detection~~ ~~systems;~~ ~~carpets;~~ ~~window~~ ~~coverings;~~ ~~wall~~ ~~coverings;~~ ~~and~~
<u>will be demolished</u> by Seller prior to the Closing, as provided herein.  In addition, the
<u>purchase and sale shall include the sale and assignment by</u>
<u>Seller to Buyer, at no additional cost to Buyer, of all of Seller's existing sewer capacity</u>
<u>water discharge units ("Units") which apply to the Property.  The Units shall be conveyed</u>
<u>to Buyer at the Close of Escrow by means of a bill of sale, which shall contain no</u>
<u>representations or warranties other than the representation of Seller that the Units are</u>
<u>free and clear of all liens, claims and encumbrances.  The exact number of Units shall be</u>
<u>determined prior to the Close of Escrow.</u>

~~(collectively, the "Improvements").~~
    ~~2.4  The fire sprinkler monitor ☐ is owned by Seller and included in the Purchase Price, ☐ is leased by Seller, and Buyer will need to negotiate a~~
~~new lease with the fire monitoring company, or ☐ ownership will be determined during Escrow.~~

INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM OFA-5-3/04E

2.5 ~~Except as provided in Paragraph 2.3, the~~ The Purchase Price does not include Seller's personal property, furniture or and furnishings, and all of ~~which shall be removed by Seller prior to Closing.~~

3.  Purchase Price.

3.1 The purchase price ("Purchase Price") to be paid by Buyer to Seller for the Property shall be $36,500,000.00 _____ , payable in cash (including the Deposit) at Closing ~~as follows:~~

~~(a) Cash down payment, including the Deposit as defined in paragraph 4.3 (or if an all-cash transaction, the Purchase Price):~~

~~(Strike if not applicable)~~   ~~(b) Amount of "New Loan" as defined in paragraph 5.1, if any:~~   $_____

~~(c) Buyer shall take title to the Property subject to and/or assume the following existing deed(s) of trust ("Existing Deed(s) of Trust") securing the existing promissory note(s) ("Existing Note(s)):~~

~~(i) An Existing Note ("First Note") with an unpaid principal balance as of the Closing of approximately:~~   $_____

~~(Strike if not applicable)~~   ~~Said First Note is payable at $_____ per month, including interest at the rate of _____ % per annum until paid (and/or the entire unpaid balance is due on _____ ).~~

~~(ii) An Existing Note ("Second Note") with an unpaid principal balance as of the Closing of approximately:~~   $_____

~~Said Second Note is payable at $_____ per month, including interest at the rate of _____ % per annum until paid (and/or the entire unpaid balance is due on _____ ).~~

~~(Strike if not applicable)~~   ~~(d) Buyer shall give Seller a deed of trust ("Purchase Money Deed of Trust") on the property, to secure the promissory note of Buyer to Seller described in paragraph 6 ("Purchase Money Note") in the amount of:~~   $_____

~~Total Purchase Price:~~   $_____

~~3.2 If Buyer is taking title to the Property subject to, or assuming, an Existing Deed of Trust and such deed of trust permits the beneficiary to demand payment of fees including, but not limited to, points, processing fees, and appraisal fees as a condition to the transfer of the Property, Buyer agrees to pay such fees up to a maximum of 1.5% of the unpaid principal balance of the applicable Existing Note.~~

4.  Deposits.

4.1 ☐ ~~Buyer has delivered to Broker a check in the sum of $_____ , payable to Escrow Holder, to be held by Broker until both Parties have executed this Agreement and the executed Agreement has been delivered to Escrow Holder, or~~ ☒ Buyer shall deliver to Escrow Holder a check or wire transfer in the sum of $600,000.00 _____ when both Parties have executed this Agreement and the executed Agreement has been delivered to Escrow Holder. When cashed, the check (or such wire-transferred funds, when received) shall be deposited into the Escrow's trust account to be applied toward the Purchase Price of the Property at the Closing. Should Buyer and Seller not enter into an agreement for purchase and sale, Buyer's check or funds shall, upon request by Buyer, be promptly returned to Buyer.

4.2 Additional deposits:

~~(a) Within 5 business days after the Date of Agreement, Buyer shall deposit with Escrow Holder the additional sum of $_____ to be applied to the Purchase Price at the Closing.~~

(b) Additional deposits shall be made pursuant to Paragraph 26.16 of the Addendum attached hereto.

~~Within 5 business days after the contingencies discussed in paragraph 9.1 (a) through (i) (k) are approved or waived, Buyer shall deposit with Escrow Holder the additional sum of $_____ to be applied to the Purchase Price at the Closing.~~

4.3 Escrow Holder shall deposit the funds deposited with it by Buyer pursuant to paragraphs 4.1 and 4.2 (collectively the "Deposit"), in a State or Federally chartered bank in an interest bearing account whose term is appropriate and consistent with the timing requirements of this transaction. The interest therefrom shall accrue to the benefit of Buyer, who hereby acknowledges that there may be penalties or interest forfeitures if the instrument is redeemed prior to its specified maturity. Buyer's Federal Tax Identification Number is _____ 95-60000808 _____ . NOTE: Such interest bearing account cannot be opened until Buyer's Federal Tax Identification Number is provided.

~~5. Financing Contingency. (Strike if not applicable)~~

~~5.1 This offer is contingent upon Buyer obtaining from an insurance company, financial institution or other lender, a commitment to lend to Buyer a sum equal to at least _____ % of the Purchase Price, at terms reasonably acceptable to Buyer. Such loan ("New Loan") shall be secured by a first deed of trust or mortgage on the Property. If this Agreement provides for Seller to carry back junior financing, then Seller shall have the right to approve the terms of the New Loan. Seller shall have 7 days from receipt of the commitment setting forth the proposed terms of the New Loan to approve or disapprove of such proposed terms. If Seller fails to notify Escrow Holder, in writing, of the disapproval within said 7 days it shall be conclusively presumed that Seller has approved the terms of the New Loan.~~

~~5.2 Buyer hereby agrees to diligently pursue obtaining the New Loan. If Buyer shall fail to notify its Broker, Escrow Holder and Seller, in~~

INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM OFA-5-3/04E

~~writing within _____ days following the Date of Agreement, that the New Loan has not been obtained, it shall be conclusively presumed that Buyer has either obtained said New Loan or has waived this New Loan contingency.~~
~~5.3   If, after due diligence, Buyer shall notify its Broker, Escrow Holder and Seller, in writing, within the time specified in paragraph 5.2 hereof, that Buyer has not obtained said New Loan, this Agreement shall be terminated, and Buyer shall be entitled to the prompt return of the Deposit, plus any interest earned thereon, less only Escrow Holder and Title Company cancellation fees and costs, which Buyer shall pay.~~
~~6.   Seller Financing (Purchase Money Note). (Strike if not applicable)~~
~~6.1   The Purchase Money Note shall provide for interest on unpaid principal at the rate of _____% per annum, with principal and interest paid as follows:~~

~~_____~~
~~_____~~
~~_____~~
~~The Purchase Money Note and Purchase Money Deed of Trust shall be on the current forms commonly used by Escrow Holder, and be junior and subordinate only to the Existing Note(s) and/or the New Loan expressly called for by this Agreement.~~
~~6.2   The Purchase Money Note and/or the Purchase Money Deed of Trust shall contain provisions regarding the following (see also paragraph 10.3 (b)):~~
~~(a)   Prepayment. Principal may be prepaid in whole or in part at any time without penalty, at the option of the Buyer.~~
~~(b)   Late Charge. A late charge of 6% shall be payable with respect to any payment of principal, interest, or other charges, not made within 10 days after it is due.~~
~~(c)   Due On Sale. In the event the Buyer sells or transfers title to the Property or any portion thereof, then the Seller may, at Seller's option, require the entire unpaid balance of said Note to be paid in full.~~
~~6.3   If the Purchase Money Deed of Trust is to be subordinate to other financing, Escrow Holder shall, at Buyer's expense, prepare and record on Seller's behalf a request for notice of default and/or sale with regard to each mortgage or deed of trust to which it will be subordinate.~~
~~6.4   WARNING: CALIFORNIA LAW DOES NOT ALLOW DEFICIENCY JUDGEMENTS ON SELLER FINANCING. IF BUYER ULTIMATELY DEFAULTS ON THE LOAN, SELLER'S SOLE REMEDY IS TO FORECLOSE ON THE PROPERTY.~~
**7.   Real Estate Brokers.**

7.1   The following real estate broker(s) ("Brokers") and brokerage relationships exist in this transaction and are consented to by the Parties (check the applicable boxes):

☑  CB Richard Ellis, Inc. _____  represents Seller exclusively ("Seller's Broker");

☑  Cushman & Wakefield _____  represents Buyer exclusively ("Buyer's Broker"); or

☐  _____  represents both Seller and Buyer ("Dual Agency").

The Parties acknowledge that Brokers are the procuring cause of this Agreement. See paragraph 24 regarding the nature of a real estate agency relationship. ~~Buyer shall use the services of Buyer's Broker exclusively in connection with any and all negotiations and offers with respect to the Property for a period of 1 year from the date inserted for reference purposes at the tops of page 1.~~
7.2   Buyer and Seller each represent and warrant to the other that he/she/it has had no dealings with any person, firm, broker or finder in connection with the negotiation of this Agreement and/or the consummation of the purchase and sale contemplated herein, other than the Brokers named in paragraph 7.1, and no broker or other person, firm or entity, other than said Brokers is/are entitled to any commission or finder's fee in connection with this transaction as the result of any dealings or acts of such Party. Buyer and Seller do each hereby agree to indemnify, defend, protect and hold the other harmless from and against any costs, expenses or liability for compensation, commission or charges which may be claimed by any broker, finder or other similar party, other than said named Brokers by reason of any dealings or act of the indemnifying Party.
**8.   Escrow and Closing.**

8.1   Upon acceptance hereof by Seller, this Agreement, ~~including any counteroffers incorporated herein by the Parties,~~ shall constitute not only the agreement of purchase and sale between Buyer and Seller, but also instructions to Escrow Holder for the consummation of the Agreement through the Escrow. Escrow Holder shall not prepare any further escrow instructions restating or amending the Agreement unless specifically so instructed by the Parties or a Broker herein. Subject to the reasonable approval of the Parties, Escrow Holder may, however, include its standard general escrow provisions so long as such standard general escrow provisions state that in the event of a conflict between the standard general escrow provisions and this Agreement, the terms of this Agreement shall control.
8.2   As soon as practical after the receipt of this Agreement ~~and any relevant counteroffers,~~ Escrow Holder shall ascertain the Date of Agreement as defined in paragraphs 1.2 ~~and 20.2~~ and advise the Parties and Brokers, in writing, of the date ascertained.
8.3   Escrow Holder is hereby authorized and instructed to conduct the Escrow in accordance with this Agreement, applicable law and custom and practice of the community in which Escrow Holder is located, including any reporting requirements of the Internal Revenue Code. In the event of a conflict between the law of the state where the Property is located and the law of the state where the Escrow Holder is located, the law of the state where the Property is located shall prevail.
8.4   Subject to satisfaction of the contingencies herein described, Escrow Holder shall close this escrow (the "Closing") by recording a general warranty grant deed ~~(a grant deed in California)~~ and the other documents required to be recorded, and by disbursing the funds and documents in accordance with this Agreement.
8.5   Buyer and Seller shall each pay one-half of the Escrow Holder's charges and Seller shall pay the usual recording fees and any required documentary transfer taxes. Seller shall pay the premium for a standard coverage owner's or joint protection policy of title insurance. Buyer shall pay for any charges for ALTA extended coverage (including the costs of any required survey), and for any title endorsements which Buyer may request.
8.6   Escrow Holder shall verify that all of Buyer's contingencies have been satisfied or waived prior to Closing. Other provisions of this

INITIALS _____

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS _____

FORM OFA-5-3/04E

Agreement which do not constitute instructions to Escrow Holder ~~The matters contained in paragraphs 8.1 subparagraphs (a),~~
~~(c), (d), (e), (g), (i), (n), and (o), 9.4, 8.5, 12, 13, 14, 16, 18, 20, 21, 22, and 24 are, however,~~ matters of agreement between the Parties with which
Escrow Holder need not be concerned ~~only and are not instructions to Escrow Holder.~~

8.7  If this transaction is terminated for non-satisfaction and non-waiver of a Buyer's Contingency, as defined in paragraph 9.2, then neither of the
Parties shall thereafter have any liability to the other under this Agreement, except to the extent of a breach of any affirmative covenant or warranty in
this Agreement and except for the Buyer's indemnities under Paragraph 14. In the event of such termination, Buyer shall be
promptly refunded all funds deposited by Buyer with Escrow Holder, less only Title Company and Escrow Holder cancellation fees and costs, all of
which shall be Buyer's obligation.

8.8  The Closing shall occur on the Expected Closing Date, or as soon thereafter as the Escrow is in condition for Closing; provided, however, that
if the Closing does not occur by the Expected Closing Date and said Date is not extended by mutual instructions of the Parties, a Party not then in
default under this Agreement may notify the other Party, Escrow Holder, and Brokers, in writing that, unless the Closing occurs within two (2) 5
business days following said notice, the Escrow shall be deemed terminated without further notice or instructions.

8.9  Except as otherwise provided herein, the termination of Escrow shall not relieve or release either Party from any obligation to pay Escrow
Holder's fees and costs or constitute a waiver, release or discharge of any breach or default that has occurred in the performance of the obligations,
agreements, covenants or warranties contained therein.

8.10  If this Escrow is terminated for any reason other than Seller's breach or default, then at Seller's request, ~~and as a condition to the return of~~
~~Buyer's deposit,~~ Buyer shall within 5 days after written request deliver to Seller, at no charge, copies of all surveys, engineering studies, soil reports,
maps, master plans, feasibility studies and other similar items prepared by or for Buyer that pertain to the Property, Provided, however, that Buyer shall
not be required to deliver any such report if the written contract which Buyer entered into with the consultant who prepared such report specifically
forbids the dissemination of the report to others.  Seller acknowledges that any reports described in this Paragraph 8.10
that are delivered by Buyer to Seller, including, without limitation, any reports obtained by Buyer or prepared by
any agency of Buyer, are being delivered to Seller merely as an accommodation, and without representation or
warranty as to the sufficiency, accuracy, completeness or validity of such reports.

9.  Contingencies to Closing.

9.1  The Closing of this transaction is contingent upon the satisfaction or waiver of the following contingencies. IF BUYER FAILS TO NOTIFY
ESCROW HOLDER AND SELLER, IN WRITING, OF THE APPROVAL ~~DISAPPROVAL~~ OF ANY OF SAID CONTINGENCIES WITHIN THE TIME
SPECIFIED THEREIN, IT SHALL BE CONCLUSIVELY PRESUMED THAT BUYER HAS DISAPPROVED ~~APPROVED~~ SUCH ITEM, MATTER OR
DOCUMENT. Buyer's conditional approval shall constitute disapproval, unless provision is made by the Seller within the time specified therefore by the
Buyer in such conditional approval or by this Agreement, whichever is later, for the satisfaction of the condition imposed by the Buyer. Escrow Holder
shall promptly provide all Parties with copies of any written disapproval or conditional approval which it receives. With regard to subparagraphs (a)
through (i) the pre-printed time periods shall control unless a different number of days is inserted in the spaces provided. With regard to the
contingencies set forth in this Paragraph 9.1, the time periods set forth in Paragraph 26.5 of the Addendum
shall control, to the extent that they are different from the time periods set forth in this Paragraph 9.1.
Further details as to Buyer's Contingencies are set forth in Paragraph 26.6 of the Addendum and shall
control over any terms set forth in the Pre-Printed Form.

(a)  Disclosure. Seller shall make to Buyer, through escrow, all of the applicable disclosures required by law (See the AIR Commercial Real
Estate Association ("AIR") standard form entitled "Seller's Mandatory Disclosure Statement" may be used for these purposes) and provide
Buyer with a completed Property Information Sheet ("Property Information Sheet") concerning the Property, duly executed by or on behalf of Seller in
the current form or equivalent to that published by the AIR within 10 or _____ days following the Date of Agreement. Buyer has 30 40 days from
the receipt of said disclosures to approve or disapprove the matters disclosed.

(b)  Physical Inspection. Buyer has 10 or  30  days from the receipt of the Property Information Sheet or the Date of Agreement,
~~whichever is later,~~ to satisfy itself with regard to the physical aspects and size of the Property.

(c)  Hazardous Substance Conditions Report. Buyer has 30 or _____ days from the receipt of the Property Information Sheet or the Date
of Agreement, ~~whichever is later,~~ to satisfy itself with regard to the environmental aspects of the Property. Seller recommends that Buyer obtain a
Hazardous Substance Conditions Report concerning the Property and relevant adjoining properties. Any such report shall be paid for by Buyer. A
"Hazardous Substance" for purposes of this Agreement is defined as any substance whose nature and/or quantity of existence, use, manufacture,
disposal or effect, render it subject to Federal, state or local regulation, investigation, remediation or removal as potentially injurious to public health or
welfare or the environment. A "Hazardous Substance Condition" for purposes of this Agreement is defined as the existence on, under or
relevantly adjacent to the Property of a Hazardous Substance that would require remediation and/or removal under applicable Federal, state or local
law.

(d)  Soil Inspection. Buyer has 30 or _____ days from the receipt of the Property Information Sheet or the Date of Agreement, whichever is
later, to satisfy itself with regard to the condition of the soils on the Property. Seller recommends that Buyer obtain a soil test report. Any such report
shall be paid for by Buyer. Seller shall provide Buyer copies of any soils report that Seller may have within 10 days of the Date of Agreement.

(e)  Governmental Approvals. Buyer has 30 or _____ days from the Date of Agreement to satisfy itself with regard to approvals and
permits from governmental agencies or departments which have or may have jurisdiction over the Property and which Buyer deems necessary or
desirable in connection with its intended use of the Property, including, but not limited to, permits and approvals required with respect to zoning,
planning, building and safety, fire, police, handicapped and Americans with Disabilities Act requirements, transportation and environmental matters.

PAGE 4 OF 14

INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM OFA-5-3/04E

Jun-02-2006  11:16am   From-(((                                    +0000000000          T-993  P.006/027  F-479

(f) *Conditions of Title.* Escrow Holder shall cause a current ~~commitment for title~~ report insurance ("Title *Report Commitment*") concerning the Property issued by the Title Company, as well as legible copies of all documents referred to in the Title *Report Commitment* ("Underlying Documents") to be delivered to Buyer within 10 or _____ days following the Date of Agreement. Buyer has ~~10~~ 30 days from the ~~receipt of the Title Commitment and Underlying Documents~~ *Date of Agreement* to satisfy itself with regard to the condition of title. The disapproval of Buyer of any monetary encumbrance, which by the terms of this Agreement is not to remain against the Property after the Closing, shall not be considered a failure of this contingency, as Seller shall have the obligation, at Seller's expense, to satisfy and remove such disapproved monetary encumbrance at or before the Closing.

(g) *Survey.* Buyer has 30 or _____ days from the ~~receipt of the Title Commitment and Underlying Documents~~ *Date of Agreement* to satisfy itself with regard to any ALTA title supplement based upon a survey prepared to American Land Title Association ("ALTA") standards for an owner's policy by a licensed surveyor, showing the legal description and boundary lines of the Property, any easements of record, and any improvements, poles, structures and things located within 10 feet of either side of the Property boundary lines. Any such survey shall be prepared at Buyer's direction and expense. If Buyer has obtained a survey and approved the ALTA title supplement, Buyer may elect within the period allowed for Buyer's approval of a survey to have an ALTA extended coverage owner's form of title policy, in which event Buyer shall pay any additional premium attributable thereto.

~~(h) *Existing Leases and Tenancy Statements.* Seller shall within 10 or _____ days of the Date of Agreement provide both Buyer and Escrow Holder with legible copies of all leases, subleases or rental arrangements (collectively, "Existing Leases") affecting the Property, and with a tenancy statement ("Estoppel Certificate") in the latest form or equivalent to that published by the AIR, executed by Seller and/or each tenant and subtenant of the Property. Seller shall use its best efforts to have each tenant complete and execute an Estoppel Certificate. If any tenant fails or refuses to provide an Estoppel Certificate than Seller shall complete and execute an Estoppel Certificate for that tenancy. Buyer has 10 days from the receipt of said Existing Leases and Estoppel Certificates to satisfy itself with regard to the Existing Leases and any other tenancy issues.~~

(i) *Other Agreements.* Seller shall within 10 or ___5___ days of the Date of Agreement provide Buyer with legible copies of all other agreements ("Other Agreements") known to Seller that will affect the Property after Closing. Buyer has 30 ~~10~~ days from the receipt of said Other Agreements to satisfy itself with regard to such Agreements.

~~(j) *Financing.* If paragraph 5 hereof dealing with a financing contingency has not been stricken, the satisfaction or waiver of such New Loan contingency.~~

~~(k) *Existing Notes.* If paragraph 3.1(c) has not been stricken, Seller shall within 10 or _____ days of the Date of Agreement provide Buyer with legible copies of the Existing Notes, Existing Deeds of Trust and related agreements (collectively, "Loan Documents") to which the Property will remain subject after the Closing. Escrow Holder shall promptly request from the holders of the Existing Notes a beneficiary statement ("Beneficiary Statement") confirming: (1) the amount of the unpaid principal balance, the current interest rate, and the date to which interest is paid, and (2) the nature and amount of any impounds held by the beneficiary in connection with such loan. Buyer has 10 or _____ days from the receipt of the Loan Documents and Beneficiary Statements to satisfy itself with regard to such financing. Buyer's obligation to close is conditioned upon Buyer being able to purchase the Property without acceleration or change in the terms of any Existing Notes or charges to Buyer except as otherwise provided in this Agreement or approved by Buyer, provided, however, Buyer shall pay the transfer fee referred to in paragraph 3.2 hereof.~~

~~(l) *Personal Property.* In the event that any personal property is included in the Purchase Price, Buyer has 10 or _____ days from the Date of Agreement to satisfy itself with regard to the title condition of such personal property. Seller recommends that Buyer obtain a UCC-1 report. Any such report shall be paid for by Buyer. Seller shall provide Buyer copies of any liens or encumbrances affecting such personal property that it is aware of within 10 or _____ days of the Date of Agreement.~~

~~(m) *Destruction, Damage or Loss.* There shall not have occurred prior to the Closing, a destruction of, or damage or loss to, the Property or any portion thereof, from any cause whatsoever, which would cost more than $10,000.00 to repair or cure. If the cost of repair or cure is $10,000.00 or less, Seller shall repair or cure the loss prior to the Closing. Escrow Holder shall have the option, within 10 days after receipt of written notice of a loss costing more than $10,000.00 to repair or cure, to either terminate this transaction or to purchase the Property notwithstanding such loss, but without deduction or offset against the Purchase Price. If the cost to repair or cure is more than $10,000.00, and Buyer does not elect to terminate this transaction, Buyer shall be entitled to any insurance proceeds applicable to such loss. Unless otherwise notified in writing, Escrow Holder shall assume no such destruction, damage or loss has occurred prior to Closing.~~

(n) *Material Change.* Buyer shall have 10 days following receipt of written notice of a Material Change within which to satisfy itself with regard to such change. "Material Change" shall mean a change in the physical status of the use, occupancy, tenants, or condition of the Property that occurs after the ~~date~~ *Date of Agreement* ~~of this offer~~ and prior to the Closing which would materially and adversely affect Buyer's use. Unless otherwise notified in writing, Escrow Holder shall assume that no Material Change has occurred prior to the Closing.

(o) *Seller Performance.* The delivery of all documents and the due performance by Seller of each and every undertaking and agreement to be performed by Seller under this Agreement.

(p) *Warranties.* That each representation and warranty of Seller herein be true and correct in all material respects as of the Closing. Escrow Holder shall assume that this condition has been satisfied unless notified to the contrary in writing by any Party prior to the Closing.

~~(q) *Brokerage Fee.* Payment at the Closing of such brokerage fee as is specified in this Agreement or later written instructions to Escrow Holder executed by Seller and Brokers ("Brokerage Fee"). It is agreed by the Parties and Escrow Holder that Brokers are a third party beneficiary of this Agreement insofar as the Brokerage Fee is concerned, and that no change shall be made with respect to the payment of the Brokerage Fee specified in this Agreement, without the written consent of Brokers.~~

9.2 All of the contingencies specified in subparagraphs (a) through (p) of paragraph 9.1 are for the benefit of, and may be waived by, Buyer, and may be elsewhere herein referred to as "Buyer's Contingencies." *Buyer's Contingencies are further described in Paragraph 26.6 of the Addendum and shall be in addition to those set forth in subparagraphs (a) through (g), (i), and (n) through (p) of Paragraph 9.1 of the Pre-Printed Form.*

9.3 If any Buyer's Contingency or any other matter subject to Buyers approval is *not approved* (with silence constituting

PAGE 5 OF 14

INITIALS _____                                                                    INITIALS _____

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                         FORM OFA-5-3/04E

disapproval) ~~disapproved as provided for herein in a timely manner~~ ("Disapproved Item"), Seller shall have the right *but not the obligation* within 10 days following the receipt of notice of Buyer's disapproval *(or the end of the relevant time period relating to such Buyer's Contingency)* to elect to cure such Disapproved Item prior to the Expected Closing Date ("Seller's Election"). Seller's failure to give to Buyer within such period, written notice of Seller's commitment to cure such Disapproved Item on or before the Expected Closing Date shall be conclusively presumed to be Seller's Election not to cure such Disapproved Item. If Seller elects, either by written notice or failure to give written notice, not to cure a Disapproved Item, Buyer shall have the election, within 10 days after Seller's Election to either accept title to the Property subject to such Disapproved Item, or to terminate this transaction. Buyer's failure to notify Seller in writing of Buyer's election to accept title to the Property subject to the Disapproved Item without deduction or offset shall constitute Buyer's election to terminate this transaction. ~~Unless expressly provided otherwise herein, Seller's right to cure shall not apply to the remediation of Hazardous Substance Conditions or to the Financing Contingency.~~ Unless the Parties mutually instruct otherwise, if the time periods for the satisfaction of contingencies or for Seller's and Buyer's said Elections would expire on a date after the Expected Closing Date, the Expected Closing Date shall be deemed extended for 3 business days following the expiration of: (a) the applicable contingency period(s), (b) the period within which the Seller may elect to cure the Disapproved Item, or (c) if Seller elects not to cure, the period within which Buyer may elect to proceed with this transaction, whichever is later.

~~9.4 Buyer understands and agrees that until such time as all Buyer's Contingencies have been satisfied or waived, Seller and/or its agents may solicit, entertain and/or accept back-up offers to purchase the Property.~~

9.5 The Parties acknowledge that extensive local, state and Federal legislation establish broad liability upon owners and/or users of real property for the investigation and remediation of Hazardous Substances. The determination of the existence of a Hazardous Substance Condition and the evaluation of the impact of such a condition are highly technical and beyond the expertise of Brokers. The Parties acknowledge that they have been advised by Brokers to consult their own technical and legal experts with respect to the possible presence of Hazardous Substances on the Property or adjoining properties, and Buyer and Seller are not relying upon any investigation by or statement of Brokers with respect thereto. The Parties hereby assume all responsibility for the impact of such Hazardous Substances upon their respective interests herein.
10.   Documents Required at or before Closing:

10.1 Five days prior to the Closing date Escrow Holder shall obtain an updated Title *Report* ~~Commitment~~ concerning the Property from the Title Company and provide copies thereof to each of the Parties.
10.2 Seller shall deliver to Escrow Holder in time for delivery to Buyer at the Closing:
      (a)  Grant ~~or general warranty~~ deed, duly executed and in recordable form, conveying fee title to the Property to Buyer.
      ~~(b) If applicable, the Beneficiary Statements concerning Existing Note(s).~~

      (c)  If applicable, ~~the Existing Leases and~~ Other Agreements together with duly executed assignments thereof by Seller *to* ~~and~~ Buyer. Notwithstanding anything herein to the contrary, any Other Agreements which involve Seller's right against any third parties (including, but not limited to, prior owners of the Property) to indemnification regarding the existence of any Hazardous Substance Condition shall not be assigned to Buyer and such rights shall belong exclusively to Seller. ~~The assignment of Existing Leases shall be on the most recent Assignment and Assumption of Lessors Interest in Lease form published by the AIR or its equivalent.~~

      ~~(d) If applicable, Estoppel Certificates executed by Seller and/or the tenant(s) of the Property.~~

      (e) An affidavit executed by Seller to the effect that Seller is not a "foreign person" within the meaning of Internal Revenue Code Section 1445 or successor statutes. If Seller does not provide such affidavit in form reasonably satisfactory to Buyer at least 3 business days prior to the Closing, Escrow Holder shall at the Closing deduct from Seller's proceeds and remit to Internal Revenue Service such sum as is required by applicable Federal law with respect to purchases from foreign sellers.

      (f) ~~If the Property is located in California, an~~ *A* affidavit executed by Seller to the effect that Seller is not a "nonresident" within the meaning of California Revenue and Tax Code Section 18662 or successor statutes. If Seller does not provide such affidavit in form reasonably satisfactory to Buyer at least 3 business days prior to the Closing, Escrow Holder shall at the Closing deduct from Seller's proceeds and remit to the Franchise Tax Board such sum as is required by such statute.

      ~~(g) If applicable, a~~ *A* bill of sale, duly executed, conveying title to *the Units* ~~any included personal property~~ to Buyer, *as described in* Paragraph 2.3.

      (h) If the Seller is a corporation, a duly executed corporate resolution authorizing the execution of this Agreement and the sale of the Property.
10.3 Buyer shall deliver to Seller through Escrow:
      (a) The cash portion of the Purchase Price and such additional sums as are required of Buyer under this Agreement shall be deposited by Buyer with Escrow Holder, by federal funds wire transfer, or any other method acceptable to Escrow Holder as immediately collectable funds, no later than 2:00 P.M. on the business day prior to the Expected Closing Date.
      ~~(b) If a Purchase Money Note and Purchase Money Deed of Trust are called for by this Agreement, the duly executed originals of those documents, the Purchase Money Deed of Trust being in recordable form, together with evidence of fire insurance on the improvements in the amount of the full replacement cost naming Seller as a mortgage loss payee, and a real estate tax service contract (at Buyer's expense), assuring Seller of notice of the status of payment of real property taxes during the life of the Purchase Money Note.~~
      ~~(c) The Assignment and Assumption of Lessor's Interest in Lease form specified in paragraph 10.2(c) above, duly executed by Buyer.~~
      ~~(d) Assumptions duly executed by Buyer of the obligations of Seller that accrue after Closing under any Other Agreements.~~
      ~~(e) If applicable, a written assumption duly executed by Buyer of the loan documents with respect to Existing Notes.~~
      (f) If the Buyer is a corporation, a duly executed corporate resolution authorizing the execution of this Agreement and the purchase of the Property.
10.4 At Closing, Escrow Holder shall cause to be issued to Buyer a standard coverage (or ALTA extended, if elected pursuant to 9.1(g)) owner's form policy of title insurance effective as of the Closing, issued by the Title Company in the full amount of the Purchase Price, insuring title to the Property vested in Buyer, subject only to the exceptions approved by Buyer. ~~In the event there is a Purchase Money Deed of Trust in this transaction, the policy of title insurance shall be a joint protection policy insuring both Buyer and Seller.~~

INITIALS _____                                                            INITIALS _____

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OFA-5-3/04E

IMPORTANT: IN A PURCHASE OR EXCHANGE OF REAL PROPERTY, IT MAY BE ADVISABLE TO OBTAIN TITLE INSURANCE IN CONNECTION WITH THE CLOSE OF ESCROW SINCE THERE MAY BE PRIOR RECORDED LIENS AND ENCUMBRANCES WHICH AFFECT YOUR INTEREST IN THE PROPERTY BEING ACQUIRED. A NEW POLICY OF TITLE INSURANCE SHOULD BE OBTAINED IN ORDER TO ENSURE YOUR INTEREST IN THE PROPERTY THAT YOU ARE ACQUIRING.

11. Prorations and Adjustments.

11.1 *Taxes.* Applicable real property taxes and special assessment bonds shall be prorated through Escrow as of the date of the Closing, based upon the latest tax bill available. The Parties agree to prorate as of the Closing any taxes assessed against the Property by supplemental bill levied by reason of events occurring prior to the Closing. Payment of the prorated amount shall be made promptly in cash upon receipt of a copy of any supplemental bill.

11.2 *Insurance.* WARNING: Any insurance which Seller may have maintained will terminate on the Closing. Buyer is advised to obtain appropriate insurance to cover the Property.

~~11.3 Rentals, Interest and Expenses. Scheduled rentals, interest on Existing Notes, utilities, and operating expenses shall be prorated as of the date of Closing. The Parties agree to promptly adjust between themselves outside of Escrow any rents received after the Closing.~~

~~11.4 Security Deposit. Security Deposits held by Seller shall be given to Buyer as a credit to the cash required of Buyer at the Closing.~~

~~11.5 Post-Closing Matters. Any item to be prorated that is not determined or determinable at the Closing shall be promptly adjusted by the Parties by appropriate cash payment outside of the Escrow when the amount due is determined.~~

~~11.6 Variations in Existing Note Balances. In the event that Buyer is purchasing the Property subject to an Existing Deed of Trust(s), and in the event that a Beneficiary Statement as to the applicable Existing Note(s) discloses that the unpaid principal balance of such Existing Note(s) at the closing will be more or less than the amount set forth in paragraph 3.1(c) hereof ("Existing Note Variation"), then the Purchase Money Note(s) shall be reduced or increased by an amount equal to such Existing Note Variation. If there is to be no Purchase Money Note, the cash required at the Closing per paragraph 3.1(a) shall be reduced or increased by the amount of such Existing Note Variation.~~

~~11.7 Variations in New Loan Balance. In the event Buyer is obtaining a New Loan and the amount ultimately obtained exceeds the amount set forth in paragraph 5.1, then the amount of the Purchase Money Note, if any, shall be reduced by the amount of such excess.~~

12. Representation and Warranties of Seller and Disclaimers.

12.1 Seller's warranties and representations shall survive the Closing and delivery of the deed but no action thereon may be brought by Buyer on a date which is more than 30 months after the Close of Escrow ~~for a period of 3 years~~, and, are true, material and relied upon by Buyer ~~and Brokers~~ in all respects. In the event that Buyer (independently or by Seller disclosure) learns that a Seller representation or warranty is untrue or incorrect prior to the Close of Escrow, and Buyer nevertheless elects to purchase the Property and Close Escrow, then in that event Buyer will be deemed to have waived any right that it may have to bring an action or proceeding against Seller regarding such representation or warranty. Seller hereby makes the following warranties and representations to Buyer ~~and Brokers~~:

(a) *Authority of Seller.* Seller is the owner of the Property and/or has the full right, power and authority to sell, convey and transfer the Property to Buyer as provided herein, and to perform Seller's obligations hereunder.

~~(b) Maintenance During Escrow and Equipment Condition At Closing. Except as otherwise provided in paragraph 9.1(m) hereof, Seller shall maintain the Property until the Closing in its present condition, ordinary wear and tear excepted. The HVAC, plumbing, elevators, loading doors and electrical systems shall be in good operating order and condition at the time of Closing.~~

(c) *Hazardous Substances/Storage Tanks.* Except as may be set forth in any environmental reports which are delivered to Buyer pursuant to this Agreement, Seller has no knowledge, except as otherwise disclosed to Buyer in writing, of the existence or prior existence (during the time period that Seller owned the Property) on the Property of any Hazardous Substance, nor of the existence or prior existence (during the time period that Seller owned the Property) of any above or below ground storage tank.

(d) *Compliance.* Except as may be set forth in any environmental reports which are delivered to Buyer pursuant to this Agreement, Seller has no knowledge of any aspect or condition of the Property (excluding any structures thereon) which violates applicable laws, rules, regulations, codes or covenants, conditions or restrictions, or of improvements or alterations made to the Property without a permit where one was required, or of any unfulfilled order or directive of any applicable governmental agency or casualty insurance company requiring any investigation, remediation, repair, maintenance or improvement be performed on the Property (excluding any structures thereon).

(e) *Changes in Agreements.* Prior to the Closing, Seller will not violate or modify any ~~Existing Lease or~~ Other Agreement, or create any new leases or other agreements affecting the Property, without Buyer's written approval, which approval will not be unreasonably withheld.

(f) *Possessory Rights.* ~~Seller has no knowledge that anyone~~ No one will, at the Closing, have any right to possession of the Property, ~~except as disclosed by this Agreement or otherwise in writing to Buyer.~~

(g) *Mechanics' Liens.* Seller has no knowledge of any ~~There are no~~ unsatisfied mechanics' or materialmens' lien rights concerning the Property. If any such unsatisfied liens exist as of the Close of Escrow, they shall be paid and satisfied from the funds due to Seller, unless Seller contests same, in which case Seller shall provide an appropriate bond so that such liens are not reflected on Buyer's title insurance policy.

(h) *Actions, Suits or Proceedings.* Seller has no knowledge of any actions, suits or proceedings pending or threatened before any commission, board, bureau, agency, arbitrator, court or tribunal that would affect the Property or the right to occupy or utilize same.

INITIALS

INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OFA-5-3/04E

(i) *Notice of Changes.* Seller will promptly notify Buyer and Brokers in writing of any Material Change (see paragraph 9.1(n)) affecting the Property that becomes known to Seller prior to the Closing.

~~(j) No Tenant Bankruptcy Proceedings. Seller has no notice or knowledge that any tenant of the Property is the subject of a bankruptcy or insolvency proceeding.~~

(k) *No Seller Proceedings.* Seller is not the subject of a bankruptcy, insolvency or probate proceeding.

~~(l) Personal Property. Seller has no knowledge that anyone will, at the Closing, have any right to possession of any personal property included in the Purchase Price nor knowledge of any liens or encumbrances affecting such personal property, except as disclosed by this Agreement or otherwise in writing to Buyer.~~

~~12.2 Buyer hereby acknowledges that, except as otherwise stated in this Agreement, Buyer is purchasing the Property in its existing condition and will, by the time called for herein, make or have waived all inspections of the Property Buyer believes are necessary to protect its own interest in, and its contemplated use of, the Property. The Parties acknowledge that Buyer is not relying on any statement or representation, no representations, inducements, promises, agreements, assurances, oral or written, concerning the Property, or any aspect of the occupational safety and health laws, Hazardous Substance laws, or any other act, ordinance or law, have been made by either Party or Brokers, or relied upon by either Party hereto.~~

12.2a  In the event that Buyer learns (independently or by Seller disclosure) that a Seller representation or warranty might be untrue prior to the Closing, and Buyer elects to purchase the Property anyway then, and in that event, Buyer waives any right that it may have to bring an action or proceeding against Seller or Brokers regarding said representation or warranty.

~~12.4 Any environmental reports, soils reports, surveys, and other similar documents which were prepared by third party consultants and provided to Buyer by Seller or Seller's representatives, have been delivered as an accommodation to Buyer and without any representation or warranty as to the sufficiency, accuracy, completeness, and/or validity of said documents, all of which Buyer relies on at its own risk. Seller believes said documents to be accurate, but Buyer is advised to retain appropriate consultants to review said documents and investigate the Property.~~

12.3    *Disclaimer of Representation or Warranties by Seller.*

(a)  Buyer acknowledges to Seller that as of the Closing it will have conducted any and all inspections, tests, analyses, reviews and studies that Buyer may have desired and will have evaluated the Property (including, without limitation, the physical and environmental condition of the Property), to the full and complete satisfaction of Buyer and that Buyer will acquire the Property solely on the basis of the foregoing and the title insurance protection afforded by the title insurance policy, and not on the basis of any information provided or any representations, warranties or covenants made by Seller, or any person acting on Seller's behalf, other than the express representations, warranties or covenants made by Seller set forth in this Agreement.

(b)  BUYER ACKNOWLEDGES AND AGREES THAT THE SALE OF THE PROPERTY HEREUNDER IS AND WILL BE MADE ON AN "AS-IS, WHERE-IS" BASIS AND WITH ALL FAULTS AS OF THE DATE OF THE CLOSE OF ESCROW, WITHOUT ANY REPRESENTATIONS OR WARRANTIES AS TO THE PHYSICAL CONDITION OR ENVIRONMENTAL CONDITION OF THE PROPERTY, OR ANY OTHER REPRESENTATIONS OR WARRANTIES, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT. EXCEPT TO THE EXTENT EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER HAS NOT MADE, DOES NOT MAKE, AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, COVENANTS OR OBLIGATIONS OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT, FUTURE OR OTHERWISE, OF, AS, TO, CONCERNING OR WITH RESPECT TO, THE PROPERTY, OR THE MERCHANTABILITY OR FITNESS OF THE PROPERTY FOR ANY PARTICULAR PURPOSE.

(c)  Buyer further acknowledges that certain information and materials provided or to be provided by Seller or any person acting on Seller's behalf with respect to the Property may have been obtained from third parties (the "Third Party Reports"), and that Seller has not made any independent investigation or verification of information and materials set forth in the Third Party Reports, and that Seller therefore disclaims any representations or warranties as to the accuracy or the completeness of information and materials set forth in the Third Party Reports. Seller will not be liable for any negligent misrepresentation set forth in the Third Party Reports that is not the result of a misrepresentation by the Seller or its agents or employees to the consultant preparing the Third Party Reports.

(d)  As used in this Agreement, the phrase "Seller's knowledge" (or similar phrase) means the actual, present knowledge of Greg Sutherland whose title is General Manager, without any duty of inquiry or investigation. Seller represents and warrants to Buyer that Greg Sutherland is the person employed by Seller who is most knowledgeable about the condition of the Property and best able to make the representations and

INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM OFA-5-3/04E

warranties set forth herein.

13.  Possession.

Possession of the Property shall be given to Buyer at the Closing free and clear of the possessory rights of any other person or entity ~~subject to the rights of tenants under Existing Leases.~~

14.  Buyer's Entry.

At any time during the Escrow period, Buyer, and its agents and representatives, shall have the right at reasonable times upon reasonable advance notice to Seller ~~and subject to rights of tenants,~~ to enter upon the Property for the purpose of making inspections and tests specified in this Agreement. No destructive or physically invasive testing shall be conducted, however, without Seller's prior approval which shall not be unreasonably withheld.  If Seller does not provide its consent to invasive testing within two (2) business days of request, the Contingency Periods set forth in Paragraph 9.1(b), (c), (d) and (g), and the date of Closing shall each be extended by the number of days of delays in Seller's consenting to such testing.  Following any such entry or work, unless otherwise directed in writing by Seller, Buyer shall return the Property to the condition it was in prior to such entry or work, including the recompaction or removal of any disrupted soil or material as Seller may reasonably direct. All such inspections and tests and any other work conducted or materials furnished with respect to the Property by or for Buyer shall be paid for by Buyer as and when due and Buyer shall indemnify, defend, protect and hold harmless Seller and the Property of and from any and all claims, liabilities, losses, expenses (including reasonable attorneys' fees), damages, including those for injury to person or property, to the extent arising out of or relating to any such work or materials or the acts or omissions of Buyer, its agents or employees in connection therewith.

15.  Further Documents and Assurances.

The Parties shall each, diligently and in good faith, undertake all actions and procedures reasonably required to place the Escrow in condition for Closing as and when required by this Agreement. The Parties agree to provide all further information, and to execute and deliver all further documents, reasonably required by Escrow Holder or the Title Company.

16.  Attorneys' Fees.

If any Party ~~or Broker~~ brings an action or proceeding (including arbitration) involving the Property whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term "Prevailing Party" shall include, without limitation, a Party ~~or Broker~~ who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party ~~or Broker~~ of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred.

17.  Prior Agreements/Amendments.

17.1 This Agreement supersedes any and all prior agreements between Seller and Buyer regarding the Property.

17.2 Amendments to this Agreement are effective only if made in writing and executed by Buyer and Seller.

~~18.  Broker's Rights.~~

~~18.1  If this sale is not consummated due to the default of either the Buyer or Seller, the defaulting Party shall be liable to and shall pay to Brokers the Brokerage Fee that Brokers would have received had the sale been consummated. If Buyer is the defaulting party, payment of said Brokerage Fee is in addition to any obligation with respect to liquidated or other damages.~~

~~18.2  Upon the Closing, Brokers are authorized to publicize the facts of this transaction.~~

19.  Notices.

19.1 Whenever any Party, Escrow Holder ~~or Brokers~~ herein shall desire to give or serve any notice, demand, request, approval, disapproval or other communication, each such communication shall be in writing and shall be delivered personally, by messenger or by mail, postage prepaid, to the address set forth in this Agreement or by facsimile transmission.

19.2 Service of any such communication shall be deemed made on the date of actual receipt if personally delivered. Any such communication sent by regular mail shall be deemed given 48 hours after the same is mailed. Communications sent by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed delivered 24 hours after delivery of the same to the Postal Service or courier. Communications transmitted by facsimile transmission shall be deemed delivered upon telephonic confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail. If such communication is received on a Saturday, Sunday or legal holiday or after 5:00 p.m. (Pacific Time), it shall be deemed received on the next business day.

19.3 Any Party ~~or Broker herein~~ may from time to time, by notice in writing, designate a different address to which, or a different person or additional persons to whom, all communications are thereafter to be made.

~~20.  Duration of Offer.~~

~~20.1  If this offer is not accepted by Seller on or before 5:00 P.M. according to the time standard applicable to the city of _____ on the date of _____ it shall be deemed automatically revoked.~~

~~20.2  The acceptance of this offer, or of any subsequent counteroffer hereto, that creates an agreement between the Parties as described in paragraph 1.2, shall be deemed made upon delivery to the other Party or either Broker herein of a duly executed writing unconditionally accepting the last outstanding offer or counteroffer.~~

21.  DEFAULT BY BUYER.  IN THE EVENT THAT THE CLOSING AND THE CONSUMMATION OF THE TRANSACTIONS HEREIN CONTEMPLATED DO NOT OCCUR BY REASON OF ANY DEFAULT OF BUYER, BUYER AND SELLER ACKNOWLEDGE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE

INITIALS

INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OFA-5-3/04E

THE DAMAGES WHICH SELLER WILL SUFFER. THEREFORE BUYER AND SELLER HEREBY AGREE THAT A REASONABLE ESTIMATE OF THE DAMAGES THAT SELLER WOULD SUFFER IN THE EVENT THAT BUYER SO DEFAULTS IS AND WILL BE AN AMOUNT EQUAL TO THE DEPOSIT (INCLUDING ALL ACCRUED INTEREST THEREON). SAID AMOUNT WILL BE THE FULL AGREED AND SOLE AMOUNT OF THE MONETARY DAMAGES AND SELLER'S SOLE AND EXCLUSIVE REMEDY (WHETHER AT LAW OR IN EQUITY) FOR THE DEFAULT OF BUYER, ALL OTHER CLAIMS TO DAMAGES OR OTHER REMEDIES, INCLUDING, WITHOUT LIMITATION, THE REMEDY OF SPECIFIC PERFORMANCE, BEING HEREIN EXPRESSLY WAIVED BY SELLER. THE PAYMENT OF SUCH AMOUNT IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO CALIFORNIA CIVIL CODE §§1671, 1676 AND 1677. SELLER HEREBY WAIVES THE PROVISIONS OF CALIFORNIA CIVIL CODE §3389. THIS AGREEMENT WILL THEREUPON BE TERMINATED AND NEITHER PARTY WILL HAVE ANY FURTHER RIGHTS OR OBLIGATIONS HEREUNDER, EXCEPT FOR THE RIGHT OF SELLER TO COLLECT SUCH LIQUIDATED DAMAGES FROM BUYER OR (IF APPLICABLE) FROM ESCROW HOLDER AND, IF LEGAL ACTION IS REQUIRED TO COLLECT SUCH LIQUIDATED DAMAGES, TO RECOVER ITS ATTORNEYS' FEES AND COSTS PURSUANT TO PARAGRAPH 16. NOTWITHSTANDING THE FOREGOING, AND NOTWITHSTANDING THE TERMINATION OF THE AGREEMENT, SELLER WILL STILL BE ENTITLED TO INDEMNIFICATION AS PROVIDED IN PARAGRAPH 14 OF THIS AGREEMENT.

~~21. LIQUIDATED DAMAGES. (This Liquidated Damages paragraph is applicable only if initialed by both Parties). THE PARTIES AGREE THAT IT WOULD BE IMPRACTICABLE OR EXTREMELY DIFFICULT TO FIX, PRIOR TO SIGNING THIS AGREEMENT, THE ACTUAL DAMAGES WHICH WOULD BE SUFFERED BY SELLER IF BUYER FAILS TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT. THEREFORE, IF, AFTER THE SATISFACTION OR WAIVER OF ALL CONTINGENCIES PROVIDED FOR THE BUYER'S BENEFIT, BUYER BREACHES THIS AGREEMENT, SELLER SHALL BE ENTITLED TO LIQUIDATED DAMAGES IN THE AMOUNT OF _____. UPON PAYMENT OF SAID SUM TO SELLER, BUYER SHALL BE RELEASED FROM ANY FURTHER LIABILITY TO SELLER, AND ANY ESCROW CANCELLATION FEES AND TITLE COMPANY CHARGES SHALL BE PAID BY SELLER.~~

Buyer Initials                           Seller Initials

22.   DEFAULT BY SELLER. IF ESCROW DOES NOT CLOSE DUE TO THE DEFAULT OR FAILURE TO PERFORM OF SELLER, BUYER MAY ELECT EITHER TO: (A) ENFORCE SPECIFIC PERFORMANCE OF THIS AGREEMENT AGAINST SELLER AND MAKE A CLAIM FOR DAMAGES RESULTING FROM SUCH DEFAULT (BUT EXCLUDING CONSEQUENTIAL DAMAGES SUCH AS, BUT NOT LIMITED TO, LOST PROFITS, LOSS OF USE OR DIMINUTION IN VALUE), BUT THE TOTAL AMOUNT OF DAMAGES WHICH BUYER MAY OBTAIN SHALL NOT EXCEED SIX HUNDRED THOUSAND DOLLARS ($600,000.00), PLUS BUYER'S REASONABLE ATTORNEYS' FEES AND COSTS, OR (B) TERMINATE THIS AGREEMENT AND ESCROW BY WRITTEN NOTICE DELIVERED TO SELLER, IN WHICH EVENT THE DEPOSIT SHALL BE RETURNED TO BUYER AND SELLER MAY MAKE A CLAIM ONLY FOR ACTUAL, OUT-OF-POCKET EXPENSES INCURRED IN CONNECTION WITH THIS TRANSACTION. FOLLOWING THE RESOLUTION OF ANY CLAIM MADE HEREUNDER (INCLUDING SELLER'S PAYMENT IN GOOD FUNDS OF ANY DAMAGES AWARDED TO BUYER), NEITHER PARTY HERETO SHALL HAVE ANY FURTHER OBLIGATION OR LIABILITY TO THE OTHER HEREUNDER, EXCEPT FOR THE INDEMNIFICATION OBLIGATIONS OF

INITIALS                                                                      INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                    FORM OFA-5-3/04E

## BUYER AS PROVIDED IN PARAGRAPH 14 OF THIS AGREEMENT.

~~22. ARBITRATION OF DISPUTES. (This Arbitration of Disputes paragraph is applicable only if initialed by both Parties.)~~
~~22.1 ANY CONTROVERSY AS TO WHETHER SELLER IS ENTITLED TO THE LIQUIDATED DAMAGES AND/OR BUYER IS ENTITLED TO THE RETURN OF DEPOSIT MONEY, SHALL BE DETERMINED BY BINDING ARBITRATION BY, AND UNDER THE COMMERCIAL RULES OF THE AMERICAN ARBITRATION ASSOCIATION ("COMMERCIAL RULES"). ARBITRATION HEARINGS SHALL BE HELD IN THE COUNTY WHERE THE PROPERTY IS LOCATED. ANY SUCH CONTROVERSY SHALL BE ARBITRATED BY 3 ARBITRATORS WHO SHALL BE IMPARTIAL REAL ESTATE BROKERS WITH AT LEAST 5 YEARS OF FULL TIME EXPERIENCE IN BOTH THE AREA WHERE THE PROPERTY IS LOCATED AND THE TYPE OF REAL ESTATE THAT IS THE SUBJECT OF THIS AGREEMENT. THEY SHALL BE APPOINTED UNDER THE COMMERCIAL RULES. THE ARBITRATORS SHALL HEAR AND DETERMINE SAID CONTROVERSY IN ACCORDANCE WITH APPLICABLE LAW, THE INTENTION OF THE PARTIES AS EXPRESSED IN THIS AGREEMENT AND ANY AMENDMENTS THERETO, AND UPON THE EVIDENCE PRODUCED AT AN ARBITRATION HEARING. PRE-ARBITRATION DISCOVERY SHALL BE PERMITTED IN ACCORDANCE WITH THE COMMERCIAL RULES OR STATE LAW APPLICABLE TO ARBITRATION PROCEEDINGS. THE AWARD SHALL BE EXECUTED BY AT LEAST 2 OF THE 3 ARBITRATORS, BE RENDERED WITHIN 30 DAYS AFTER THE CONCLUSION OF THE HEARING, AND MAY INCLUDE ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY PER PARAGRAPH 16 HEREOF. JUDGMENT MAY BE ENTERED ON THE AWARD IN ANY COURT OF COMPETENT JURISDICTION NOTWITHSTANDING THE FAILURE OF A PARTY DULY NOTIFIED OF THE ARBITRATION HEARING TO APPEAR THEREAT.~~
~~22.2 BUYER'S RESORT TO OR PARTICIPATION IN SUCH ARBITRATION PROCEEDINGS SHALL NOT BAR SUIT IN A COURT OF COMPETENT JURISDICTION BY THE BUYER FOR DAMAGES AND/OR SPECIFIC PERFORMANCE UNLESS AND UNTIL THE ARBITRATION RESULTS IN AN AWARD TO THE SELLER OF LIQUIDATED DAMAGES, IN WHICH EVENT SUCH AWARD SHALL ACT AS A BAR AGAINST ANY ACTION BY BUYER FOR DAMAGES AND/OR SPECIFIC PERFORMANCE.~~
~~22.3 NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.~~

~~WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION.~~

---

_Buyer Initials_          _Seller Initials_

**23. Miscellaneous.**

23.1 **Binding Effect.** This Agreement shall be binding on the Parties without regard to whether or not paragraphs 21 and 22 are initialed by both of the Parties. Paragraphs 21 ~~and 22 are each~~ is incorporated into this Agreement only if initialed by both Parties at the time that the Agreement is executed.

23.2 **Applicable Law.** This Agreement shall be governed by,~~and paragraph 22.3 is amended to refer to,~~ the laws of the state of _California_ ~~in which the Property is located.~~

23.3 **Time of Essence.** Time is of the essence of this Agreement.

23.4 **Counterparts.** This Agreement may be executed by Buyer and Seller in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Escrow Holder, after verifying that the counterparts are identical except for the signatures, is authorized and instructed to combine the signed signature pages on one of the counterparts, which shall then constitute the Agreement.

23.5 **Waiver of Jury Trial.** THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.

23.6 **Conflict.** Any conflict between the printed provisions of this Agreement and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

23.7 **1031 Exchange.** Both Seller and Buyer agree to cooperate with each other in the event that either or both wish to participate in a 1031 exchange. Any party initiating an exchange shall bear all costs of such exchange.

**24. Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

24.1 The Parties and Brokers agree that their relationship(s) shall be governed by the principles set forth in the applicable sections of the California Civil Code, as summarized in paragraph 24.2.

24.2 When entering into a discussion with a real estate agent regarding a real estate transaction, a Buyer or Seller should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Buyer and Seller acknowledge being advised by the Brokers in this transaction, as follows:

(a) _Seller's Agent._ A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or subagent has the following affirmative obligations: (1) _To the Seller:_ A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Seller. (2) _To the Buyer and the Seller:_ a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or

INITIALS

©2003 · AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM OFA-5-3/04E

within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(b) *Buyer's Agent.* A selling agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations. (1) *To the Buyer:* A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Buyer. (2) *To the Buyer and the Seller:* a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(c) *Agent Representing Both Seller and Buyer.* A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer. (1) In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer: a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Seller or the Buyer. b. Other duties to the Seller and the Buyer as stated above in their respective sections (a) or (b) of this paragraph 24.2. (2) In representing both Seller and Buyer, the agent may not without the express permission of the respective Party, disclose to the other Party that the Seller will accept a price less than the listing price or that the Buyer will pay a price greater than the price offered. (3) The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect their own interests. Buyer and Seller should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

(d) *Further Disclosures.* Throughout this transaction Buyer and Seller may receive more than one disclosure, depending upon the number of agents assisting in the transaction. Buyer and Seller should each read its contents each time it is presented, considering the relationship between them and the real estate agent in this transaction and that disclosure. Brokers have no responsibility with respect to any default or breach hereof by either Party. The liability (including court costs and attorneys' fees), of any Broker with respect to any breach of duty, error or omission relating to this Agreement shall not exceed the fee received by such Broker pursuant to this Agreement; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

24.3   *Confidential Information:* Buyer and Seller agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

26.   *Construction of Agreement.* In construing this Agreement, all headings and titles are for the convenience of the parties only and shall not be considered a part of this Agreement. Whenever required by the context, the singular shall include the plural and vice versa. Unless otherwise specifically indicated to the contrary, the word "days" as used in this Agreement shall mean and refer to calendar days. This Agreement shall not be construed as if prepared by one of the parties, but rather according to its fair meaning as a whole, as if both parties had prepared it. When the words "business days" are used in this Agreement, the term shall include Monday through and including Thursday, and shall exclude Friday, Saturday, Sunday, and all holidays, it being the long time practice of the City of Vernon to be closed on Fridays.

26   **Additional Provisions:**

Additional provisions of this offer, if any, are as follows or are attached hereto by an addendum consisting of paragraphs _____ 26.1
through _____ 26.17 _____ . (If there are no additional provisions write "NONE".)

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS AGREEMENT OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1.    SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS AGREEMENT.
2.    RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PROPERTY. SAID

INITIALS ____

INITIALS ____

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OFA-5-3/04E

INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PROPERTY, THE INTEGRITY AND CONDITION OF ANY STRUCTURES AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PROPERTY FOR BUYER'S INTENDED USE.

WARNING: IF THE PROPERTY IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THIS AGREEMENT MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED.

NOTE:
1.    THIS FORM IS NOT FOR USE IN CONNECTION WITH THE SALE OF RESIDENTIAL PROPERTY.
2.    IF THE BUYER IS A CORPORATION, IT IS RECOMMENDED THAT THIS AGREEMENT BE SIGNED BY TWO CORPORATE OFFICERS.

The undersigned Buyer offers and agrees to buy the Property on the terms and conditions stated and acknowledges receipt of a copy hereof.

BROKER:                                            BUYER:

                                                   CITY OF VERNON

Attn:                                              By: _____
Title:                                             Date:
Address:                                           Name Printed: Leonis C. Malburg
                                                   Title: Mayor
Telephone:(    )                                   Telephone:(    )
Facsimile:(    )                                   Facsimile:(    )
Email:
Federal ID No.

                                                   ATTEST:

                                                   By:
                                                   Date:
                                                   Name Printed: Bruce V. Malkenhorst, Jr.
                                                   Title: Acting City Clerk
                                                   Address: 4305 Santa Fe Avenue
                                                            Vernon, California   90058
                                                   Telephone:(323) 583-8811
                                                   Facsimile:(323) 826-1438
                                                   Email:
                                                   Federal ID No. 95-6000808

                                                   APPROVED AS TO FORM:

                                                   ERIC T. FRESCH, CITY ATTORNEY

27.  Acceptance.
    27.1  Seller accepts the foregoing offer to purchase the Property and hereby agrees to sell the Property to Buyer on the terms and conditions therein specified.
    27.2  Seller acknowledges that Brokers have been retained to locate a Buyer and are the procuring cause of the purchase and sale of the Property set forth in this Agreement. In consideration of real estate brokerage service rendered by Brokers, Seller agrees to pay CB Richard Ellis, Inc, Brokers a real estate Brokerage Fee pursuant to a separate agreement between Seller and CB Richard Ellis, Inc. Buyer shall pay Cushman & Wakefield a real estate brokerage fee for services rendered pursuant to a separate agreement between Buyer and Cushman & Wakefield in a sum equal to _____ % of the Purchase Price divided in such shares as said Brokers shall direct in writing. This Agreement shall serve as an irrevocable instruction to Escrow Holder to pay such Brokerage Fee to Brokers out of the proceeds accruing to the account of Seller at the Closing.
    27.3  Seller acknowledges receipt of a copy hereof and authorizes Brokers to deliver a signed copy to Buyer.

NOTE: A PROPERTY INFORMATION SHEET IS REQUIRED TO BE DELIVERED TO BUYER BY SELLER UNDER THIS AGREEMENT.

INITIALS                                                                    INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

BROKER:                              SELLER:

_____    PECHINEY CAST PLATE, INC., a Delaware
_____    corporation

Attn: _____    By: _____
Title: _____    Date: 1   4·3·06
Address: _____    Name Printed: John Buras
                                     Title: Manager of Insurance and Real Estate
Telephone:(___) _____    Telephone:(___) _____
Facsimile:(___) _____    Facsimile:(___) _____
Email: _____
Federal ID No. _____
                                     By: _____
                                     Date: _____
                                     Name Printed: _____
                                     Title: _____
                                     Address: 8870 West Bryn Mawr Avenue
                                          Chicago, Illinois  60631
                                     Telephone:(773) 399-8629
                                     Facsimile:(773) 399-8648
                                     Email: _____
                                     Federal ID No: _____

These forms are often modified to meet changing requirements of law and needs of the industry. Always write or call to make sure you are utilizing the most current form: AIR COMMERCIAL REAL ESTATE ASSOCIATION, 700 South Flower Street, Suite 600, Los Angeles, CA 90017. (213) 687-8777.

© Copyright 2003 By AIR Commercial Real Estate Association,
All rights reserved.

No part of these works may be reproduced in any form without permission in writing.

INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM OFA-5-3/04E

Jun-02-2006  11:22am  From-(((                      +0000000000      T-893  P.016/027  F-479

# ADDENDUM TO STANDARD OFFER, AGREEMENT

# AND ESCROW INSTRUCTIONS FOR PURCHASE OF REAL ESTATE

Buyer:      City of Vernon

Seller:     Pechiney Cast Plate, Inc.

Premises:   3200 Fruitland Avenue, Vernon, CA 90058

Dated:      March 20, 2006

In the event of a conflict between the terms of the Standard Offer, Agreement and Escrow Instructions (the "Pre-Printed Form") and this Addendum (the "Addendum"), the terms of the Addendum shall control. Any initially capitalized term used in this Addendum that is not defined herein shall have the meaning ascribed to such term in the Pre-Printed Form. Collectively, the Pre-Printed Form and this Addendum are referred to as the "Agreement."

26.1   Escrow shall close (the "Expected Closing Date") on a mutually agreed upon date which is not later than ten (10) business days after the completion of Seller's Work. The Seller's Work shall be deemed completed when the Health Department of the City of Vernon (the "Health Department") has issued a Certificate of Closure or No Further Action Letter (either being referred to herein as a "Certificate of Closure") with respect to the Remediation Work (as defined herein) and Seller has received the written approval, by the Community Services Department of the City of Vernon (the "Community Services Department"), with respect to the Demolition Work (as defined herein).

26.2   **Buyer's Due Diligence:** Upon mutual execution of the Agreement, Buyer and its agents shall have immediate access to the Property to allow for necessary inspections and testing, subject to the provisions of Paragraph 14 of the Pre-Printed Form. Notwithstanding anything in the Pre-Printed Form to the contrary, Buyer shall have the right to undertake, during the Contingency Period (as defined herein), a Phase II environmental study or other environmental studies of the Property, including, without limitation, any borings or other invasive studies required to complete the Phase II study or other studies (as long as the number of borings and locations thereof are approved by Seller which approval will not be unreasonably withheld); provided, however, that Buyer's right to obtain a Phase II report or other environmental studies shall not affect the obligation of Seller to undertake all studies, reports, and borings that may be required to obtain (a) a Certificate of Closure, and (b) a Phase II environmental report, each as further described below.

1

Jun-02-2006  11:22am   From-(((                    +0000000000        T-993  P.017/027  F-479

Notwithstanding any provisions of this Agreement to the contrary, Buyer may not conduct any invasive or other testing of the Property, including but not limited to any soil borings, groundwater sampling or Phase II site assessment investigation, unless prior written notice has been given by Seller and Seller has given its approval, which will not be unreasonably withheld.

26.3 **Seller's Reports:**

Prior to the Date of Agreement, Seller has delivered to Buyer all analyses, tests, reports, or studies that Seller currently has in its possession relating to the physical condition of the Property, including all soils and geological reports, appraisals, and environmental reports, including, without limitation, a Phase I environmental report and a Phase II environmental report prepared by Geo-Matrix (collectively, the "Due Diligence Reports"). The Phase I environmental report and the Phase II environmental report have been submitted to and approved by the Health Department. All Due Diligence Reports have been (and will be) delivered to Buyer subject to the provisions of Paragraph 12 of the Pre-Printed Form, and shall be promptly returned to Seller if the transaction fails to close for any reason. Until the Closing, all such materials shall be held in confidence as provided herein.

26.4 **Purchase Price:** The Purchase Price constitutes all consideration due to Seller for the Property and the Units, and Seller hereby waives and relinquishes any relocation assistance Seller may be entitled to under local, state, or federal law.

26.5 **Contingency Period:** As used herein, the term "Contingency Period" means the time period commencing on the Date of Agreement and ending at 5:00 p.m. (Pacific Time) on a date which is thirty (30) days thereafter provided, however, that the Contingency Period shall not expire until a date which is at least fifteen (15) days after Buyer has delivered to Seller all Due Diligence Reports, the disclosure required under Paragraph 9.1(a), the Title Report, and copies of the Other Agreements. Further, if the last day of the Contingency Period is not a business day, then the Contingency Period shall be extended until 5:00 p.m. (Pacific Time) on the next business day.

26.6 **Contingencies:** Buyer shall have until the end of the Contingency Period to determine, in its sole and absolute discretion, whether it is satisfied with all aspects of the Property and the transaction, including, without limitation, those contingencies set forth in Paragraph 9 of the Pre-Printed Form and all other matters related to the Property, including economic analyses, issues related to Hazardous Substances, condition of the Property, its fitness for a particular use, marketability, prospects for future development, use, or occupancy, and any other matter related to Buyer's use of the Property. Notwithstanding anything to the contrary in Paragraph 9.3 of the Pre-Printed Form, Buyer and Seller acknowledge that Buyer may determine, in its sole and absolute discretion, during the Contingency Period, that there are issues related to the condition of the Property, such as marketability or prospects for future development or existence of Hazardous Substances on the Property, that are not subject to cure by Seller, and that Buyer may terminate this Agreement, and obtain a full refund of its Deposit, if Buyer does not approve Buyer's Contingencies within the Contingency Period. Buyer, in its

2

sole and absolute discretion, may terminate the Agreement within the Contingency Period and receive a full refund of the Deposit.

26.7    **Demolition and Remediation Obligations:** Seller shall perform the Demolition Work (as described herein) and the Remediation Work (as described herein), at Seller's cost and expense. Collectively, the Demolition Work and the Remediation Work are referred to as "Seller's Work".

   (a)    <u>Demolition Work.</u> A description of the Demolition Work (including a timetable for the performance of the Demolition Work) shall be set forth in a plan (the "Demolition Work Plan") which shall be mutually agreed upon by Seller and Buyer prior to the end of the Contingency Period, which shall include a timetable for the performance of the Demolition Work. If the parties cannot in good faith mutually agree upon a Demolition Work Plan by the end of such time period, then unless the parties agree in writing to extend such time period, this Agreement and the escrow shall be deemed terminated and the provisions of Paragraph 8.7 of the Pre-Printed Form shall apply. Any changes proposed by Seller to the approved Demolition Work Plan shall be subject to written approval by Buyer and the Community Services Department. Buyer's approval shall not be unreasonably withheld. The Demolition Work shall be deemed complete when the Community Services Department has, in its reasonable judgment, approved the completion of the Demolition Work. The Demolition Work shall be performed by a contractor or contractors selected by Seller and reasonably approved by Buyer. The Demolition Work Plan shall include the following:

      (i)    All manmade improvements, items, structures, buildings, utilities, concrete, asphalt, foundations, footings, and general debris (collectively, "Structures") shall be removed. Any salvage value shall be retained by Seller. Buyer acknowledges that the buildings contain galbestos panels, and that the concrete within the buildings are contaminated with PCB's, all of which will be removed as part of the Demolition Work Plan (but subject to the performance standards for Remediation Work, as described herein).

      (ii)    After removal of all Structures, the site shall be left level and at current grade, in rough grade condition, with any holes filled with clean imported soil. The soil on the site shall be recompacted to 95%.

   (b)    <u>Remediation Work.</u> Based on the Phase I environmental report and the Phase II environmental report which have been delivered to Buyer and approved by the Health Department, if Remediation Work is required, Seller and Buyer shall mutually agree upon a plan (as it may be amended pursuant to this Agreement, the "Remediation Work Plan") for Seller's completion of the Remediation Work, including a timetable for the performance of the Remediation Work, that is required for the Health Department to issue the Certificate of Closure . The parties may, but shall not be required to establish an initial Remediation Work Plan which shall not take into account any Remediation Work described in subparagraph (c) below. Such initial Remediation Work Plan shall be subject to approval of the Health Department.

3

(c)    Final Remediation Work Plan. As soon as possible after the completion of the Demolition Work, Seller and Buyer shall mutually agree upon the scope of a final Remediation Work Plan (including changes to the initial Remediation Work Plan, if any) which are necessary to properly remediate the Property in order to obtain the Certificate of Closure, consistent with the standards customarily followed by the Health Department for the issuance of Certificates of Closure. Promptly after Seller notifies Buyer that it has completed the Demolition Work, Buyer shall notify Seller of any further environmental studies or tests (including, without limitation, supplements to the documents previously provided by Seller, or new studies) that are required by the Health Department to develop a final Remediation Work Plan and to obtain the Certificate of Closure. Seller shall be responsible for obtaining and paying for such studies or tests. If the parties cannot mutually agree upon a final Remediation Work Plan, then the arbitration provisions hereof shall apply. Any changes proposed by Seller to an approved Remediation Work Plan shall be subject to approval by Buyer and the Health Department. Buyer's approval shall not be unreasonably withheld. Issuance of the Certificate of Closure by the Health Department shall serve as evidence of satisfactory completion of the Remediation Work. Seller shall, at Seller's sole cost, obtain the Certificate of Closure prior to the Closing, which Certificate of Closure shall be issued in the name of Seller. The Remediation Work shall be performed by a contractor or contractors selected by Seller and reasonably approved by Buyer.

(d)    Performance of Seller's Work. The following provisions shall apply to Seller's Work:

(i)    Performance Standards for All of Seller's Work. Seller shall ensure that all of Seller's Work is conducted in a safe, prudent manner, in accordance with industry standards and in accordance with all applicable laws, including, without limitation, laws regulating the handling, transfer, storage, and disposal of all Hazardous Substances. Seller shall pay for all Seller's Work in accordance with the contracts between the Seller and the contractors, and shall ensure that all contractors and subcontractors are paid in full. Seller shall use best efforts to insure that no mechanics/ or materialmen's liens are filed against the Property, but if any such liens are filed, Seller will promptly (and in any event prior to any foreclosure sale related to such lien) bond around same and Seller shall indemnify Buyer from any liability in connection therewith. Seller shall obtain all permits required to perform Seller's Work.

(ii)    Performance Standards for Remediation Work. In addition to the standards set forth above, which shall apply to all of Seller's Work, the Remediation Work shall be performed by contractors competent and knowledgeable in removing and transporting Hazardous Substances. For purposes of applicable law, Seller (or another entity determined by Seller, but not Buyer) shall be named as the responsible party on all manifests, licenses, and documents regarding the storage, release, and transfer of Hazardous Substances, and shall be listed on all disposal manifests as the responsible party, and if Buyer elects to perform any of the Remediation Work under the "self-help" provisions hereof, Buyer may identify Seller as the responsible party on any such manifests, license or documents.

4

(iii)    Completion of Seller's Work. Seller shall use best efforts to cause the Seller's Work to be completed by the time periods set forth in the Demolition Work Plan and the Remediation Work Plan, subject to events which are beyond the Seller's reasonable control; provided, however, that failure to pay money shall not be an excuse for delay. Seller shall be excused from performance for the number of days of delay cause by events beyond Seller's reasonable control, and shall immediately thereafter commence and complete Seller's Work. The Title Policy obtained by Buyer at Closing shall not reflect any mechanics or materialmen's liens relating to the Seller's Work and Seller shall, prior to or at Closing, cause any such liens to be paid or bonded around in accordance with applicable law (to the extent that Seller contests any such liens). Seller shall execute and deliver all documents (including any indemnifications or other assurances) reasonably required by the Title Company to issue the Title Policy. If the Title Policy is a CLTA form policy, then Seller shall also pay for a mechanics' lien endorsement (CLTA 101 series).

(iv)    Indemnification. Notwithstanding anything herein to the contrary, Seller may elect to perform additional Remediation Work (beyond any Remediation Work which is required by Buyer and the Health Department to obtain a Certificate of Closure). In such event, all provisions of this Agreement pertaining to the establishment of a Remediation Work Plan and performance of the Remediation Work shall apply, as if Buyer had required such Remediation Work. In the event that complete remediation of the Property is not required pursuant to the Remediation Plan, and Seller elects not to do any additional Remediation Work, then Buyer shall indemnify, defend and hold Seller free and harmless from any and all liability relating to the existence or release of Hazardous Materials, or any Hazardous Materials Conditions which presently exist, previously existed or may arise in the future. Such indemnification obligation shall be evidenced by a formal indemnification agreement to be negotiated in good faith and executed by the parties at the Closing. Buyer shall not be released from its obligation to enter into such indemnification agreement as a result of any assignment of this Agreement prior to the Closing, or by any sale of the Property after the Closing.

26.8    **Role of Health Department:** It is understood that nothing in this Agreement affects or limits the Health Department's responsibilities in the administration of local, state and federal law with respect to remediation of the Property, if remediation is necessary. Seller agrees that neither Buyer's relationship to the Health Department nor anything required of Seller by the Health Department in carrying out its responsibilities under the law, shall excuse Seller's obligations under this Agreement. It is further understood that Buyer's approval of any contingency relative to the condition of the Property only includes approval by the Buyer, and does not necessarily constitute approval by the Health Department.

26.9    **INTENTIONALLY OMITTED:**

26.10   **Exclusivity:** Prior to the Closing, Seller agrees not to negotiate with other prospective buyers, or lease any or all of the Property, or enter into any other agreements which would bind the Property after the Closing without the prior written approval of the Buyer.

LOSANGELES 300320v13 49789-00010

26.11  **1031 Exchange:** Buyer and Seller agree to cooperate with exchanges allowed or provided by Internal Revenue Code Section 1031 (as amended), provided that the non-exchanging party incurs no liability and incurs no additional costs through such cooperation, and the Closing is not delayed.

26.12  **Confidentiality:** Without the prior written consent of Seller, Buyer will not disclose, and Buyer will direct its representatives, employees, agents and consultants not to disclose to any person or entity (i) the fact that Buyer has entered into this Agreement or the terms hereof, or (ii) any of the terms of this Agreement, except as disclosure may be required by law. Notwithstanding the foregoing, Buyer shall have the right to disclose all relevant facts related to the purchase of the Property and the terms of this Agreement to (a) all of Buyer's consultants, employees, agents, and representatives, including officials and staff of the City of Vernon, who are in any way involved with the transaction; (b) the City Council of the City of Vernon (and Seller acknowledges that the agenda and proceedings of the City Council are public and of public record, and that this Agreement will be attached to a Resolution adopted by the City Council that approves the Agreement); and (c) as otherwise necessary or appropriate in order to consummate this transaction and comply with all applicable laws, including, without limitation, Govt. Code Section 7275, which states that the Purchase Price is public information.

26.13  **City Council Approval:** This Agreement, and any amendments thereto, are subject to the review and approval of the City Council of the City of Vernon.

26.14  **Buyer's Representations and Warranties:** The following constitute representations and warranties of Buyer to Seller as of the Date of Agreement and as of the Closing:

    (a)  Buyer has the legal power, right and authority to enter into this Agreement and the documents required hereby to be executed by Buyer, and to consummate the transactions contemplated hereby.

    (b)  All requisite corporate action has been taken by Buyer in connection with the entering into this Agreement and the documents required hereby to be executed by Buyer, and the consummation of the transactions contemplated hereby.

    (c)  The individuals executing this Agreement and the documents required hereby to be executed by Buyer on behalf of Buyer have the legal power, right and actual authority to bind Buyer to the terms and conditions hereof and thereof.

    (d)  This Agreement and all documents required hereby to be executed by Buyer are and will be valid, legally binding obligations of and enforceable against Buyer n accordance with their terms, subject only to applicable bankruptcy, insolvency, reorganization, moratorium laws or similar laws or equitable principles affecting or limiting the rights of contracting parties generally.

    (e)  No representation, warranty or statement of Buyer in this Agreement or in any document furnished or to be furnished to Seller pursuant hereto contains or will contain any untrue statement of a material fact, or omits or will omit to state a material

6

fact necessary to make the statements or facts contained therein not misleading. Except to the extent set forth in writing from Buyer, Buyer's representations and warranties made in this Paragraph will be continuing and will be true and correct as of the Closing with the same force and effect as if remade by Buyer at that time.

(f)    The Demolition Work (to the extent that such Demolition Work is performed by Seller and not by Buyer pursuant to the "self-help" provisions hereof) will not be work performed under a contract "paid for in whole or in part out of public funds", as such phrase is used in California Labor Code §1720, *et seq.* (and case authority interpreting such statutes), and the Demolition Work therefore will not constitute a project to which "prevailing wage" laws apply.

Buyer agrees to and does hereby indemnify, defend and hold Seller free and harmless from any and all claims, demands, lawsuits, judgments, costs, expenses and liabilities of any nature whatsoever, including reasonable attorneys' fees and costs which result from any breach or inaccuracy of any of the foregoing representations or warranties (including any claims which allege facts which, if true, would result in the breach or inaccuracy of any such representations or warranties, regardless of the actual resolution of such claims).

26.15  **ARBITRATION OF DISPUTES:**

(a)    USE OF JAMS.  THE PARTIES AGREE THAT ANY DISPUTE OR CONTROVERSY ARISING OUT OF OR RELATING TO ANY INTERPRETATION, CONSTRUCTION, PERFORMANCE, TERMINATION OR BREACH OF THE AGREEMENT OR THE PURCHASE OF THE PROPERTY BY BUYER WILL BE SETTLED BY FINAL AND BINDING ARBITRATION BY A PANEL OF ARBITRATORS TO BE HELD IN LOS ANGELES COUNTY, CALIFORNIA, IN ACCORDANCE WITH THE RULES OF THE JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("JAMS").  WITHOUT LIMITING ANY OTHER PROVISION HEREIN, THIS PARAGRAPH 26.15 SHALL SURVIVE THE TERMINATION OF THE AGREEMENT AND WILL APPLY TO ANY CLAIM, DISPUTE, OR CONTROVERSY THAT ARISES DURING OR AFTER THE TERMINATION OF THE AGREEMENT.

(b)    PROCEDURE.  THE ARBITRATION SHALL TAKE PLACE BEFORE A PANEL OF THREE RETIRED JUDGES OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA OR ANY CALIFORNIA APPELLATE COURT (THE "ARBITRATORS") UNDER THE AUSPICES OF JAMS.  SUCH ARBITRATION SHALL BE INITIATED BY THE PARTIES, OR EITHER OF THEM, WITHIN TEN (10) CALENDAR DAYS AFTER EITHER PARTY BY SERVING A NOTICE OF DEMAND TO ARBITRATE (THE "ARBITRATION NOTICE") TO THE OTHER PARTY AND TO JAMS.  THE ARBITRATION NOTICE SHALL CONTAIN A DESCRIPTION OF THE SUBJECT MATTER OF THE ARBITRATION, THE DISPUTE WITH RESPECT THERETO, THE AMOUNT INVOLVED, IF ANY, AND THE REMEDY OR DETERMINATION SOUGHT.

7

(c)    SELECTION OF ARBITRATORS.  EACH PARTY SHALL SELECT
AN ARBITRATOR FROM THE JAMS PANEL, AND THE TWO SELECTED
ARBITRATORS SHALL MUTUALLY AGREE ON THE THIRD ARBITRATOR
FROM THE JAMS PANEL.  IF ONE OF THE PARTIES DOES NOT SELECT AN
ARBITRATOR FROM THE JAMS PANEL WITHIN 14 CALENDAR DAYS AFTER
RECEIPT OF THE PANEL FROM JAMS, JAMS WILL SELECT THE SECOND
ARBITRATOR, AND THE ARBITRATOR SELECTED BY JAMS AND THE
ARBITRATOR SELECTED BY THE OTHER PARTY WILL SELECT THE THIRD
ARBITRATOR FOR THE PANEL.   THE THIRD ARBITRATOR IS TO BE
SELECTED WITHIN 10 CALENDAR DAYS FOLLOWING THE SELECTION OF
THE FIRST TWO ARBITRATORS.  IN THE EVENT OF ANY SUBSEQUENT
VACANCIES OR INABILITIES TO PERFORM AMONG THE ARBITRATORS
APPOINTED, THE ARBITRATORS INVOLVED SHALL BE REPLACED IN
ACCORDANCE WITH THE PROVISIONS OF THIS PARAGRAPH 26.15 AS IF
SUCH REPLACEMENT WAS AN INITIAL APPOINTMENT TO BE MADE UNDER
THIS PARAGRAPH 26.15 WITHIN THE TIME CONSTRAINTS SET FORTH IN
THIS PARAGRAPH 26.15, MEASURED FROM THE DATE OF NOTICE OF SUCH
VACANCY OR INABILITY TO THE PERSON OR PERSONS REQUIRED TO
MAKE SUCH APPOINTMENT.  NOTWITHSTANDING THE FOREGOING, IF THE
AMOUNT IN CONTROVERSY IS LESS THAN ONE HUNDRED THOUSAND
DOLLARS ($100,000) THEN THERE SHALL BE ONLY ONE ARBITRATOR, TO BE
MUTUALLY AGREED UPON BY THE PARTIES.  IF THE PARTIES CANNOT, IN
GOOD FAITH, MUTUALLY AGREE UPON A SINGLE ARBITRATOR WITHIN
TEN (10) DAYS AFTER RECEIPT OF THE JAMES PANEL, THEN THERE SHALL
BE THREE (3) ARBITRATORS, SELECTED IN ACCORDANCE WITH THE
FOREGOING PROVISIONS.

(d)    THE DECISION.   ANY PARTY MAY BE REPRESENTED BY
COUNSEL OR OTHER AUTHORIZED REPRESENTATIVE.  IN RENDERING A
DECISION(S), THE ARBITRATORS SHALL DETERMINE THE RIGHTS AND
OBLIGATIONS OF THE PARTIES ACCORDING TO THE SUBSTANTIVE LAWS
OF THE STATE OF CALIFORNIA, THE PROCEDURES FOLLOWED BY JAMS
AND THE TERMS OF THE AGREEMENT.   THE DECISION OF THE
ARBITRATORS SHALL BE BASED ON THE EVIDENCE INTRODUCED AT THE
HEARING, AND SHALL BE BASED ON, AND ACCOMPANIED BY, A WRITTEN
STATEMENT OF DECISION EXPLAINING THE FACTUAL AND LEGAL BASIS
FOR THE DECISION AS TO EACH OF THE PRINCIPAL CONTROVERTED
ISSUES.  THE AGREEMENT OF TWO OF THE THREE ARBITRATORS AS TO
THE RESOLUTION OF THE DISPUTE SHALL BE A CONCLUSIVE RESOLUTION.
THE ARBITRATORS SHALL DELIVER THE WRITTEN DECISION TO THE
PARTIES WITHIN 30 CALENDAR DAYS FOLLOWING THE DATE OF THE
ARBITRATION HEARING, WHICH SHALL BE HELD AS EXPEDITIOUSLY AS
POSSIBLY, ON A DATE ESTABLISHED BY THE ARBITRATORS, BUT NOT
MORE THAN 180 DAYS AFTER THE DATE OF APPOINTMENT OF THE LAST
ARBITRATOR.  THE DECISION SHALL BE CONCLUSIVE AND BINDING, AND
IT MAY THEREAFTER BE CONFIRMED AS A JUDGMENT BY THE SUPERIOR

Jun-02-2006  11:26am   From-(((                          +0000000000        T-993  P.024/027  F-479

COURT OF THE STATE OF CALIFORNIA, SUBJECT ONLY TO CHALLENGE ON THE GROUNDS SET FORTH IN THE CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1286.2. THE VALIDITY AND ENFORCEABILITY OF THE DECISION OF THE ARBITRATORS IS TO BE DETERMINED EXCLUSIVELY BY THE CALIFORNIA COURTS. THE ARBITRATORS SHALL HAVE THE AUTHORITY TO GRANT EITHER PARTY ALL REMEDIES OTHERWISE AVAILABLE BY LAW, INCLUDING INJUNCTIONS.

(e)    PAYMENT OF ARBITRATORS AND ATTORNEYS' FEES. THE NON-PREVAILING PARTY SHALL PAY THE COSTS OF ALL ARBITRATORS AND THE ARBITRATION PROCESS, AND THE REASONABLE ATTORNEYS' FEES OF THE PREVAILING PARTY, AS DETERMINED BY THE ARBITRATORS.

(f)    NOTICE OF WAIVER. NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURES. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION BY NEUTRAL ARBITRATION.

_____          _____
BUYER'S INITIALS              SELLER'S INITIALS

26.16  **Additional Deposits; Releases of Deposit:**  In addition to the amount set forth in Paragraph 4.1 of the Preprinted Form, Buyer shall deposit with Escrow Holder the following additional sums, which shall all be considered a part of the "Deposit", and which shall all be applied to the Purchase Price at Closing:

(a)    Not later than the third (3rd) business day after the end of the Contingency Period, the sum of Eight Million Dollars ($8,000,000).

(b)    Not later than the third (3rd) business day after completion of the "above-grade" Demolition Work (which means the demolition and removal of all portions of buildings and other structures which are aboveground, excluding, without limitation, foundations, first-level building floors, footings, and basements, and also excluding

9

paved areas) the sum of Eight Million Eight Hundred Thousand Dollars ($8,800,000). Completion of the above-grade Demolition Work shall be evidenced by the written certification of GeoMatrix. Seller shall give Buyer at least ten (10) days' advance written notice of the expected date of completion of the above-grade Demolition Work and shall again give Buyer written notice upon completion of the above-grade Demolition Work.

      (c)    Not later than December 1, 2006, the sum of Eight Million Eight Hundred Thousand Dollars ($8,800,000).

      (d)    Not later than the ninth (9th) business day after the issuance of a Certificate of Closure by the Health Department, the balance of the Purchase Price (Ten Million Three Hundred Thousand Dollars ($10,300,000).

Immediately upon receipt of the additional amounts of the Deposit set forth in subparagraphs (a), (b) and (c) above, without further instructions from Seller or Buyer, and notwithstanding any unilateral instructions to the contrary which Escrow Holder may hereafter receive from a party, Escrow Holder shall, immediately upon receipt of each such amount, release the full amount thereof to Seller (pursuant to Seller's wire-transfer instructions). For clarification, the original amount deposited (Six Hundred Thousand Dollars ($600,000) will not be released to Seller until the Close of Escrow. Seller and Buyer each agree to hold Escrow Holder harmless and waive any claims against Escrow Holder relating in any way to such releases of the Deposit, Buyer acknowledging that at the time of the releases it will not hold legal title to the Property and that there will be unsatisfied conditions to the Close of Escrow at the time of the releases.

26.17  **Self-Help Remedy:** In addition to any other remedies which the Buyer may have at law or under this Agreement, and without any need to resort to the arbitration procedure as a condition to electing the remedy set forth in this Paragraph 26.17, in the event that Seller defaults under this Agreement or fails to perform the Seller's Work in accordance with the Demolition Work Plan and/or the Remediation Work Plan (including failure to perform within the timetables set forth in each Work Plan), Buyer may give notice to Seller specifying the default ("Default Notice"). Seller shall have ten (10) business days after receipt of the Default Notice to cure the default or, if the default is not reasonably capable of being cured during such ten (10) business day period, to commence the cure, provided that Seller diligently pursues the cure to completion. Seller shall not be deemed to be in default if the reason for Seller's non-performance is an event which is not within Seller's reasonable control such as, but not limited to, labor or material shortages, strikes, lockouts, adverse weather conditions, acts of war or civil insurrection. If the reason for Seller's default is the default of a contractor performing the Seller's Work, then Seller may effectuate a cure by terminating and replacing the contractor as promptly as reasonably possible. If Seller fails to cure (or commence the cure, as the case may be) within such ten (10) business day period, Buyer may elect to perform any of Seller's Work which has not yet been performed (the "Remaining Seller's Work"). Buyer may make such election by giving notice to Seller, which notice shall be at least three (3) business days before Buyer or Buyer's representatives enters upon the Property for the purpose of performing any Remaining Seller's Work. Seller hereby grants to Buyer an irrevocable license to enter upon the Property to perform the Remaining Seller's Work. The performance of the Remaining Seller's Work by Buyer shall be in conformance with

LOS ANGELES 300320v13 49789-00010

Jun-02-2006  11:27am    From-(((                    +0000000000        T-993  P.026/027  F-470

the performance standards set forth in Paragraph 26.7(d) of this Addendum, the Demolition Work Plan and the Remediation Work Plan. To the extent that the contractors performing Seller's Work are not then in default and such contracts are assigned to Buyer by Seller and honored by such contractors, Buyer will continue to use such contractors to perform the remaining Demolition Work or Remediation Work, as the case may be. The actual costs of completion of the Remaining Seller's Work shall reduce the Purchase Price. The costs of completion of the Remaining Seller's Work shall include a fee to Buyer for Buyer's costs in supervising such work, in the amount of five percent (5%) of the total cost of the Remaining Seller's Work, but not to exceed Five Hundred Thousand Dollars ($500,000). The costs of completion of the Remaining Seller's Work shall also include any additional amounts which Buyer shall be lawfully obligated to pay as a result of any of the Seller's Remaining Work becoming subject to the "prevailing wage" laws. After any Remaining Seller's Work which consists of Demolition Work has been completed, Buyer shall apply for the written approval by the Community Services Department of the Demolition Work, and Buyer shall give notice to Seller when such approval has been obtained. After any Remaining Seller's Work which consists of Remediation Work has been completed, Buyer shall apply for the Certificate of Closure from the Health Department, and Buyer shall give written notice to Seller when such Certificate of Closure has been obtained. After the issuance of the Certificate of Closure, the parties shall proceed to the Closing as contemplated herein. Upon the Close of Escrow, the Buyer shall pay to the Seller any unpaid portion of the Purchase Price, reduced by the costs of completion of the Remaining Seller's Work as described above. If the cost of completion of the Remaining Seller's Work, as described above, exceeds the unpaid portion of the Purchase Price, Seller shall, promptly after receipt of an invoice and evidence of costs, reimburse all such excess costs of completion of the Remaining Seller's Work.

Seller and Buyer shall each have the right, at reasonable times upon reasonable advance notice, to inspect all books and records of the other party as they relate to the performance of any of Seller's Work.

If Buyer elects to exercise its self-help remedy under this Paragraph 26.17, then it need not make any further Deposits into Escrow (nor shall there be any further releases of the Deposits from Escrow) until the Closing, at which time there shall be a reconciliation of the amount owed by Buyer to Seller, or by Seller to Buyer, as the case may be.

11

# SIGNATURE PAGE

**Seller:**

PECHINEY CAST PLATE, INC.

By: _____
        John Buras
        Manager of Insurance & Real Estate

**Buyer:**

CITY OF VERNON

By: _____
        LEONIS C. MALBURG, Mayor

ATTEST:

By: _____
        BRUCE V. MALKENHORST, JR.
        Acting City Clerk

APPROVED AS TO FORM:

By: _____
        ERIC T. FRESCH, City Attorney

12

# EXHIBIT G

# ADDENDUM TO STANDARD OFFER, AGREEMENT

# AND ESCROW INSTRUCTIONS FOR PURCHASE OF REAL ESTATE

Buyer:      City of Vernon

Seller:     Pechiney Cast Plate, Inc.

Premises:   3200 Fruitland Avenue, Vernon, CA 90058

Dated:      March 20, 2006

In the event of a conflict between the terms of the Standard Offer, Agreement and Escrow Instructions (the "Pre-Printed Form") and this Addendum (the "Addendum"), the terms of the Addendum shall control. Any initially capitalized term used in this Addendum that is not defined herein shall have the meaning ascribed to such term in the Pre-Printed Form. Collectively, the Pre-Printed Form and this Addendum are referred to as the "Agreement."

26.1    Escrow shall close (the "Expected Closing Date") on a mutually agreed upon date which is not later than ten (10) business days after the completion of Seller's Work. The Seller's Work shall be deemed completed when the Health Department of the City of Vernon (the "Health Department") has issued a Certificate of Closure or No Further Action Letter (either being referred to herein as a "Certificate of Closure") with respect to the Remediation Work (as defined herein) and Seller has received the written approval, by the Community Services Department of the City of Vernon (the "Community Services Department"), with respect to the Demolition Work (as defined herein).

26.2    **Buyer's Due Diligence:** Upon mutual execution of the Agreement, Buyer and its agents shall have immediate access to the Property to allow for necessary inspections and testing, subject to the provisions of Paragraph 14 of the Pre-Printed Form. Notwithstanding anything in the Pre-Printed Form to the contrary, Buyer shall have the right to undertake, during the Contingency Period (as defined herein), a Phase II environmental study or other environmental studies of the Property, including, without limitation, any borings or other invasive studies required to complete the Phase II study or other studies (as long as the number of borings and locations thereof are approved by Seller which approval will not be unreasonably withheld); provided, however, that Buyer's right to obtain a Phase II report or other environmental studies shall not affect the obligation of Seller to undertake all studies, reports, and borings that may be required to obtain (a) a Certificate of Closure, and (b) a Phase II environmental report, each as further described below.

1

Notwithstanding any provisions of this Agreement to the contrary, Buyer may not conduct any invasive or other testing of the Property, including but not limited to any soil borings, groundwater sampling or Phase II site assessment investigation, unless prior written notice has been given by Seller and Seller has given its approval, which will not be unreasonably withheld.

26.3    **Seller's Reports:**

Prior to the Date of Agreement, Seller has delivered to Buyer all analyses, tests, reports, or studies that Seller currently has in its possession relating to the physical condition of the Property, including all soils and geological reports, appraisals, and environmental reports, including, without limitation, a Phase I environmental report and a Phase II environmental report prepared by Geo-Matrix (collectively, the "Due Diligence Reports"). The Phase I environmental report and the Phase II environmental report have been submitted to and approved by the Health Department. All Due Diligence Reports have been (and will be) delivered to Buyer subject to the provisions of Paragraph 12 of the Pre-Printed Form, and shall be promptly returned to Seller if the transaction fails to close for any reason. Until the Closing, all such materials shall be held in confidence as provided herein.

26.4    **Purchase Price:** The Purchase Price constitutes all consideration due to Seller for the Property and the Units, and Seller hereby waives and relinquishes any relocation assistance Seller may be entitled to under local, state, or federal law.

26.5    **Contingency Period:** As used herein, the term "Contingency Period" means the time period commencing on the Date of Agreement and ending at 5:00 p.m. (Pacific Time) on a date which is thirty (30) days thereafter provided, however, that the Contingency Period shall not expire until a date which is at least fifteen (15) days after Buyer has delivered to Seller all Due Diligence Reports, the disclosure required under Paragraph 9.1(a), the Title Report, and copies of the Other Agreements. Further, if the last day of the Contingency Period is not a business day, then the Contingency Period shall be extended until 5:00 p.m. (Pacific Time) on the next business day.

26.6    **Contingencies:** Buyer shall have until the end of the Contingency Period to determine, in its sole and absolute discretion, whether it is satisfied with all aspects of the Property and the transaction, including, without limitation, those contingencies set forth in Paragraph 9 of the Pre-Printed Form and all other matters related to the Property, including economic analyses, issues related to Hazardous Substances, condition of the Property, its fitness for a particular use, marketability, prospects for future development, use, or occupancy, and any other matter related to Buyer's use of the Property. Notwithstanding anything to the contrary in Paragraph 9.3 of the Pre-Printed Form, Buyer and Seller acknowledge that Buyer may determine, in its sole and absolute discretion, during the Contingency Period, that there are issues related to the condition of the Property, such as marketability or prospects for future development or existence of Hazardous Substances on the Property, that are not subject to cure by Seller, and that Buyer may terminate this Agreement, and obtain a full refund of its Deposit, if Buyer does not approve Buyer's Contingencies within the Contingency Period. Buyer, in its

2

sole and absolute discretion, may terminate the Agreement within the Contingency Period and receive a full refund of the Deposit.

26.7    **Demolition and Remediation Obligations:**  Seller shall perform the Demolition Work (as described herein) and the Remediation Work (as described herein), at Seller's cost and expense.  Collectively, the Demolition Work and the Remediation Work are referred to as "Seller's Work".

    (a)    Demolition Work.  A description of the Demolition Work (including a timetable for the performance of the Demolition Work) shall be set forth in a plan (the "Demolition Work Plan") which shall be mutually agreed upon by Seller and Buyer prior to the end of the Contingency Period, which shall include a timetable for the performance of the Demolition Work.  If the parties cannot in good faith mutually agree upon a Demolition Work Plan by the end of such time period, then unless the parties agree in writing to extend such time period, this Agreement and the escrow shall be deemed terminated and the provisions of Paragraph 8.7 of the Pre-Printed Form shall apply.  Any changes proposed by Seller to the approved Demolition Work Plan shall be subject to written approval by Buyer and the Community Services Department.  Buyer's approval shall not be unreasonably withheld.  The Demolition Work shall be deemed complete when the Community Services Department has, in its reasonable judgment, approved the completion of the Demolition Work.  The Demolition Work shall be performed by a contractor or contractors selected by Seller and reasonably approved by Buyer.  The Demolition Work Plan shall include the following:

    (i)    All manmade improvements, items, structures, buildings, utilities, concrete, asphalt, foundations, footings, and general debris (collectively, "Structures") shall be removed.  Any salvage value shall be retained by Seller.  Buyer acknowledges that the buildings contain galbestos panels, and that the concrete within the buildings are contaminated with PCB's, all of which will be removed as part of the Demolition Work Plan (but subject to the performance standards for Remediation Work, as described herein).

    (ii)    After removal of all Structures, the site shall be left level and at current grade, in rough grade condition, with any holes filled with clean imported soil.  The soil on the site shall be recompacted to 95%.

    (b)    Remediation Work.  Based on the Phase I environmental report and the Phase II environmental report which have been delivered to Buyer and approved by the Health Department, if Remediation Work is required, Seller and Buyer shall mutually agree upon a plan (as it may be amended pursuant to this Agreement, the "Remediation Work Plan") for Seller's completion of the Remediation Work, including a timetable for the performance of the Remediation Work, that is required for the Health Department to issue the Certificate of Closure .  The parties may, but shall not be required to establish an initial Remediation Work Plan which shall not take into account any Remediation Work described in subparagraph (c) below.  Such initial Remediation Work Plan shall be subject to approval of the Health Department.

3

(c)    Final Remediation Work Plan. As soon as possible after the completion of the Demolition Work, Seller and Buyer shall mutually agree upon the scope of a final Remediation Work Plan (including changes to the initial Remediation Work Plan, if any) which are necessary to properly remediate the Property in order to obtain the Certificate of Closure, consistent with the standards customarily followed by the Health Department for the issuance of Certificates of Closure. Promptly after Seller notifies Buyer that it has completed the Demolition Work, Buyer shall notify Seller of any further environmental studies or tests (including, without limitation, supplements to the documents previously provided by Seller, or new studies) that are required by the Health Department to develop a final Remediation Work Plan and to obtain the Certificate of Closure. Seller shall be responsible for obtaining and paying for such studies or tests. If the parties cannot mutually agree upon a final Remediation Work Plan, then the arbitration provisions hereof shall apply. Any changes proposed by Seller to an approved Remediation Work Plan shall be subject to approval by Buyer and the Health Department. Buyer's approval shall not be unreasonably withheld. Issuance of the Certificate of Closure by the Health Department shall serve as evidence of satisfactory completion of the Remediation Work. Seller shall, at Seller's sole cost, obtain the Certificate of Closure prior to the Closing, which Certificate of Closure shall be issued in the name of Seller. The Remediation Work shall be performed by a contractor or contractors selected by Seller and reasonably approved by Buyer.

(d)    Performance of Seller's Work. The following provisions shall apply to Seller's Work:

(i)    Performance Standards for All of Seller's Work. Seller shall ensure that all of Seller's Work is conducted in a safe, prudent manner, in accordance with industry standards and in accordance with all applicable laws, including, without limitation, laws regulating the handling, transfer, storage, and disposal of all Hazardous Substances. Seller shall pay for all Seller's Work in accordance with the contracts between the Seller and the contractors, and shall ensure that all contractors and subcontractors are paid in full. Seller shall use best efforts to insure that no mechanics/ or materialmen's liens are filed against the Property, but if any such liens are filed, Seller will promptly (and in any event prior to any foreclosure sale related to such lien) bond around same and Seller shall indemnify Buyer from any liability in connection therewith. Seller shall obtain all permits required to perform Seller's Work.

(ii)    Performance Standards for Remediation Work. In addition to the standards set forth above, which shall apply to all of Seller's Work, the Remediation Work shall be performed by contractors competent and knowledgeable in removing and transporting Hazardous Substances. For purposes of applicable law, Seller (or another entity determined by Seller, but not Buyer) shall be named as the responsible party on all manifests, licenses, and documents regarding the storage, release, and transfer of Hazardous Substances, and shall be listed on all disposal manifests as the responsible party, and if Buyer elects to perform any of the Remediation Work under the "self-help" provisions hereof, Buyer may identify Seller as the responsible party on any such manifests, license or documents.

4

(iii)    Completion of Seller's Work. Seller shall use best efforts to cause the Seller's Work to be completed by the time periods set forth in the Demolition Work Plan and the Remediation Work Plan, subject to events which are beyond the Seller's reasonable control; provided, however, that failure to pay money shall not be an excuse for delay. Seller shall be excused from performance for the number of days of delay cause by events beyond Seller's reasonable control, and shall immediately thereafter commence and complete Seller's Work. The Title Policy obtained by Buyer at Closing shall not reflect any mechanics or materialmen's liens relating to the Seller's Work and Seller shall, prior to or at Closing, cause any such liens to be paid or bonded around in accordance with applicable law (to the extent that Seller contests any such liens). Seller shall execute and deliver all documents (including any indemnifications or other assurances) reasonably required by the Title Company to issue the Title Policy. If the Title Policy is a CLTA form policy, then Seller shall also pay for a mechanics' lien endorsement (CLTA 101 series).

(iv)    Indemnification. Notwithstanding anything herein to the contrary, Seller may elect to perform additional Remediation Work (beyond any Remediation Work which is required by Buyer and the Health Department to obtain a Certificate of Closure). In such event, all provisions of this Agreement pertaining to the establishment of a Remediation Work Plan and performance of the Remediation Work shall apply, as if Buyer had required such Remediation Work. In the event that complete remediation of the Property is not required pursuant to the Remediation Plan, and Seller elects not to do any additional Remediation Work, then Buyer shall indemnify, defend and hold Seller free and harmless from any and all liability relating to the existence or release of Hazardous Materials, or any Hazardous Materials Conditions which presently exist, previously existed or may arise in the future. Such indemnification obligation shall be evidenced by a formal indemnification agreement to be negotiated in good faith and executed by the parties at the Closing. Buyer shall not be released from its obligation to enter into such indemnification agreement as a result of any assignment of this Agreement prior to the Closing, or by any sale of the Property after the Closing.

26.8    **Role of Health Department:** It is understood that nothing in this Agreement affects or limits the Health Department's responsibilities in the administration of local, state and federal law with respect to remediation of the Property, if remediation is necessary. Seller agrees that neither Buyer's relationship to the Health Department nor anything required of Seller by the Health Department in carrying out its responsibilities under the law, shall excuse Seller's obligations under this Agreement. It is further understood that Buyer's approval of any contingency relative to the condition of the Property only includes approval by the Buyer, and does not necessarily constitute approval by the Health Department.

26.9    **INTENTIONALLY OMITTED:**

26.10   **Exclusivity:** Prior to the Closing, Seller agrees not to negotiate with other prospective buyers, or lease any or all of the Property, or enter into any other agreements which would bind the Property after the Closing without the prior written approval of the Buyer.

LOSANGELES 300320v13 49789-00010

26.11   **1031 Exchange:** Buyer and Seller agree to cooperate with exchanges allowed or provided by Internal Revenue Code Section 1031 (as amended), provided that the non-exchanging party incurs no liability and incurs no additional costs through such cooperation, and the Closing is not delayed.

26.12   **Confidentiality:** Without the prior written consent of Seller, Buyer will not disclose, and Buyer will direct its representatives, employees, agents and consultants not to disclose to any person or entity (i) the fact that Buyer has entered into this Agreement or the terms hereof, or (ii) any of the terms of this Agreement, except as disclosure may be required by law. Notwithstanding the foregoing, Buyer shall have the right to disclose all relevant facts related to the purchase of the Property and the terms of this Agreement to (a) all of Buyer's consultants, employees, agents, and representatives, including officials and staff of the City of Vernon, who are in any way involved with the transaction; (b) the City Council of the City of Vernon (and Seller acknowledges that the agenda and proceedings of the City Council are public and of public record, and that this Agreement will be attached to a Resolution adopted by the City Council that approves the Agreement); and (c) as otherwise necessary or appropriate in order to consummate this transaction and comply with all applicable laws, including, without limitation, Govt. Code Section 7275, which states that the Purchase Price is public information.

26.13   **City Council Approval:** This Agreement, and any amendments thereto, are subject to the review and approval of the City Council of the City of Vernon.

26.14   **Buyer's Representations and Warranties:** The following constitute representations and warranties of Buyer to Seller as of the Date of Agreement and as of the Closing:

> (a)    Buyer has the legal power, right and authority to enter into this Agreement and the documents required hereby to be executed by Buyer, and to consummate the transactions contemplated hereby.

> (b)    All requisite corporate action has been taken by Buyer in connection with the entering into this Agreement and the documents required hereby to be executed by Buyer, and the consummation of the transactions contemplated hereby.

> (c)    The individuals executing this Agreement and the documents required hereby to be executed by Buyer on behalf of Buyer have the legal power, right and actual authority to bind Buyer to the terms and conditions hereof and thereof.

> (d)    This Agreement and all documents required hereby to be executed by Buyer are and will be valid, legally binding obligations of and enforceable against Buyer n accordance with their terms, subject only to applicable bankruptcy, insolvency, reorganization, moratorium laws or similar laws or equitable principles affecting or limiting the rights of contracting parties generally.

> (e)    No representation, warranty or statement of Buyer in this Agreement or in any document furnished or to be furnished to Seller pursuant hereto contains or will contain any untrue statement of a material fact, or omits or will omit to state a material

6

fact necessary to make the statements or facts contained therein not misleading. Except to the extent set forth in writing from Buyer, Buyer's representations and warranties made in this Paragraph will be continuing and will be true and correct as of the Closing with the same force and effect as if remade by Buyer at that time.

(f)     The Demolition Work (to the extent that such Demolition Work is performed by Seller and not by Buyer pursuant to the "self-help" provisions hereof) will not be work performed under a contract "paid for in whole or in part out of public funds", as such phrase is used in California Labor Code §1720, *et seq*. (and case authority interpreting such statutes), and the Demolition Work therefore will not constitute a project to which "prevailing wage" laws apply.

Buyer agrees to and does hereby indemnify, defend and hold Seller free and harmless from any and all claims, demands, lawsuits, judgments, costs, expenses and liabilities of any nature whatsoever, including reasonable attorneys' fees and costs which result from any breach or inaccuracy of any of the foregoing representations or warranties (including any claims which allege facts which, if true, would result in the breach or inaccuracy of any such representations or warranties, regardless of the actual resolution of such claims).

26.15  **ARBITRATION OF DISPUTES:**

(a)     USE OF JAMS.  THE PARTIES AGREE THAT ANY DISPUTE OR CONTROVERSY ARISING OUT OF OR RELATING TO ANY INTERPRETATION, CONSTRUCTION, PERFORMANCE, TERMINATION OR BREACH OF THE AGREEMENT OR THE PURCHASE OF THE PROPERTY BY BUYER WILL BE SETTLED BY FINAL AND BINDING ARBITRATION BY A PANEL OF ARBITRATORS TO BE HELD IN LOS ANGELES COUNTY, CALIFORNIA, IN ACCORDANCE WITH THE RULES OF THE JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("JAMS").  WITHOUT LIMITING ANY OTHER PROVISION HEREIN, THIS PARAGRAPH 26.15 SHALL SURVIVE THE TERMINATION OF THE AGREEMENT AND WILL APPLY TO ANY CLAIM, DISPUTE, OR CONTROVERSY THAT ARISES DURING OR AFTER THE TERMINATION OF THE AGREEMENT.

(b)     PROCEDURE.  THE ARBITRATION SHALL TAKE PLACE BEFORE A PANEL OF THREE RETIRED JUDGES OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA OR ANY CALIFORNIA APPELLATE COURT (THE "ARBITRATORS") UNDER THE AUSPICES OF JAMS.  SUCH ARBITRATION SHALL BE INITIATED BY THE PARTIES, OR EITHER OF THEM, WITHIN TEN (10) CALENDAR DAYS AFTER EITHER PARTY BY SERVING A NOTICE OF DEMAND TO ARBITRATE (THE "ARBITRATION NOTICE") TO THE OTHER PARTY AND TO JAMS.  THE ARBITRATION NOTICE SHALL CONTAIN A DESCRIPTION OF THE SUBJECT MATTER OF THE ARBITRATION, THE DISPUTE WITH RESPECT THERETO, THE AMOUNT INVOLVED, IF ANY, AND THE REMEDY OR DETERMINATION SOUGHT.

7

(c)  SELECTION OF ARBITRATORS. EACH PARTY SHALL SELECT AN ARBITRATOR FROM THE JAMS PANEL, AND THE TWO SELECTED ARBITRATORS SHALL MUTUALLY AGREE ON THE THIRD ARBITRATOR FROM THE JAMS PANEL. IF ONE OF THE PARTIES DOES NOT SELECT AN ARBITRATOR FROM THE JAMS PANEL WITHIN 14 CALENDAR DAYS AFTER RECEIPT OF THE PANEL FROM JAMS, JAMS WILL SELECT THE SECOND ARBITRATOR, AND THE ARBITRATOR SELECTED BY JAMS AND THE ARBITRATOR SELECTED BY THE OTHER PARTY WILL SELECT THE THIRD ARBITRATOR FOR THE PANEL.  THE THIRD ARBITRATOR IS TO BE SELECTED WITHIN 10 CALENDAR DAYS FOLLOWING THE SELECTION OF THE FIRST TWO ARBITRATORS. IN THE EVENT OF ANY SUBSEQUENT VACANCIES OR INABILITIES TO PERFORM AMONG THE ARBITRATORS APPOINTED, THE ARBITRATORS INVOLVED SHALL BE REPLACED IN ACCORDANCE WITH THE PROVISIONS OF THIS PARAGRAPH 26.15 AS IF SUCH REPLACEMENT WAS AN INITIAL APPOINTMENT TO BE MADE UNDER THIS PARAGRAPH 26.15 WITHIN THE TIME CONSTRAINTS SET FORTH IN THIS PARAGRAPH 26.15, MEASURED FROM THE DATE OF NOTICE OF SUCH VACANCY OR INABILITY TO THE PERSON OR PERSONS REQUIRED TO MAKE SUCH APPOINTMENT. NOTWITHSTANDING THE FOREGOING, IF THE AMOUNT IN CONTROVERSY IS LESS THAN ONE HUNDRED THOUSAND DOLLARS ($100,000) THEN THERE SHALL BE ONLY ONE ARBITRATOR, TO BE MUTUALLY AGREED UPON BY THE PARTIES. IF THE PARTIES CANNOT, IN GOOD FAITH, MUTUALLY AGREE UPON A SINGLE ARBITRATOR WITHIN TEN (10) DAYS AFTER RECEIPT OF THE JAMES PANEL, THEN THERE SHALL BE THREE (3) ARBITRATORS, SELECTED IN ACCORDANCE WITH THE FOREGOING PROVISIONS.

(d)  THE DECISION.  ANY PARTY MAY BE REPRESENTED BY COUNSEL OR OTHER AUTHORIZED REPRESENTATIVE. IN RENDERING A DECISION(S), THE ARBITRATORS SHALL DETERMINE THE RIGHTS AND OBLIGATIONS OF THE PARTIES ACCORDING TO THE SUBSTANTIVE LAWS OF THE STATE OF CALIFORNIA, THE PROCEDURES FOLLOWED BY JAMS AND THE TERMS OF THE AGREEMENT.  THE DECISION OF THE ARBITRATORS SHALL BE BASED ON THE EVIDENCE INTRODUCED AT THE HEARING, AND SHALL BE BASED ON, AND ACCOMPANIED BY, A WRITTEN STATEMENT OF DECISION EXPLAINING THE FACTUAL AND LEGAL BASIS FOR THE DECISION AS TO EACH OF THE PRINCIPAL CONTROVERTED ISSUES. THE AGREEMENT OF TWO OF THE THREE ARBITRATORS AS TO THE RESOLUTION OF THE DISPUTE SHALL BE A CONCLUSIVE RESOLUTION. THE ARBITRATORS SHALL DELIVER THE WRITTEN DECISION TO THE PARTIES WITHIN 30 CALENDAR DAYS FOLLOWING THE DATE OF THE ARBITRATION HEARING, WHICH SHALL BE HELD AS EXPEDITIOUSLY AS POSSIBLY, ON A DATE ESTABLISHED BY THE ARBITRATORS, BUT NOT MORE THAN 180 DAYS AFTER THE DATE OF APPOINTMENT OF THE LAST ARBITRATOR. THE DECISION SHALL BE CONCLUSIVE AND BINDING, AND IT MAY THEREAFTER BE CONFIRMED AS A JUDGMENT BY THE SUPERIOR

8

COURT OF THE STATE OF CALIFORNIA, SUBJECT ONLY TO CHALLENGE ON THE GROUNDS SET FORTH IN THE CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 1286.2. THE VALIDITY AND ENFORCEABILITY OF THE DECISION OF THE ARBITRATORS IS TO BE DETERMINED EXCLUSIVELY BY THE CALIFORNIA COURTS. THE ARBITRATORS SHALL HAVE THE AUTHORITY TO GRANT EITHER PARTY ALL REMEDIES OTHERWISE AVAILABLE BY LAW, INCLUDING INJUNCTIONS.

(e)    PAYMENT OF ARBITRATORS AND ATTORNEYS' FEES.   THE NON-PREVAILING PARTY SHALL PAY THE COSTS OF ALL ARBITRATORS AND THE ARBITRATION PROCESS, AND THE REASONABLE ATTORNEYS' FEES OF THE PREVAILING PARTY, AS DETERMINED BY THE ARBITRATORS.

(f)    NOTICE OF WAIVER. NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURES. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION BY NEUTRAL ARBITRATION.

_____          _____
BUYER'S INITIALS              SELLER'S INITIALS

26.16   **Additional Deposits; Releases of Deposit:**   In addition to the amount set forth in Paragraph 4.1 of the Preprinted Form, Buyer shall deposit with Escrow Holder the following additional sums, which shall all be considered a part of the "Deposit", and which shall all be applied to the Purchase Price at Closing:

(a)    Not later than the third (3rd) business day after the end of the Contingency Period, the sum of Eight Million Dollars ($8,000,000).

(b)    Not later than the third (3rd) business day after completion of the "above-grade" Demolition Work (which means the demolition and removal of all portions of buildings and other structures which are aboveground, excluding, without limitation, foundations, first-level building floors, footings, and basements, and also excluding

9

paved areas) the sum of Eight Million Eight Hundred Thousand Dollars ($8,800,000). Completion of the above-grade Demolition Work shall be evidenced by the written certification of GeoMatrix. Seller shall give Buyer at least ten (10) days' advance written notice of the expected date of completion of the above-grade Demolition Work and shall again give Buyer written notice upon completion of the above-grade Demolition Work.

(c)     Not later than December 1, 2006, the sum of Eight Million Eight Hundred Thousand Dollars ($8,800,000).

(d)     Not later than the ninth (9th) business day after the issuance of a Certificate of Closure by the Health Department, the balance of the Purchase Price (Ten Million Three Hundred Thousand Dollars ($10,300,000).

Immediately upon receipt of the additional amounts of the Deposit set forth in subparagraphs (a), (b) and (c) above, without further instructions from Seller or Buyer, and notwithstanding any unilateral instructions to the contrary which Escrow Holder may hereafter receive from a party, Escrow Holder shall, immediately upon receipt of each such amount, release the full amount thereof to Seller (pursuant to Seller's wire-transfer instructions). For clarification, the original amount deposited (Six Hundred Thousand Dollars ($600,000) will not be released to Seller until the Close of Escrow. Seller and Buyer each agree to hold Escrow Holder harmless and waive any claims against Escrow Holder relating in any way to such releases of the Deposit, Buyer acknowledging that at the time of the releases it will not hold legal title to the Property and that there will be unsatisfied conditions to the Close of Escrow at the time of the releases.

26.17   **Self-Help Remedy:**  In addition to any other remedies which the Buyer may have at law or under this Agreement, and without any need to resort to the arbitration procedure as a condition to electing the remedy set forth in this Paragraph 26.17, in the event that Seller defaults under this Agreement or fails to perform the Seller's Work in accordance with the Demolition Work Plan and/or the Remediation Work Plan (including failure to perform within the timetables set forth in each Work Plan), Buyer may give notice to Seller specifying the default ("Default Notice"). Seller shall have ten (10) business days after receipt of the Default Notice to cure the default or, if the default is not reasonably capable of being cured during such ten (10) business day period, to commence the cure, provided that Seller diligently pursues the cure to completion. Seller shall not be deemed to be in default if the reason for Seller's non-performance is an event which is not within Seller's reasonable control such as, but not limited to, labor or material shortages, strikes, lockouts, adverse weather conditions, acts of war or civil insurrection. If the reason for Seller's default is the default of a contractor performing the Seller's Work, then Seller may effectuate a cure by terminating and replacing the contractor as promptly as reasonably possible. If Seller fails to cure (or commence the cure, as the case may be) within such ten (10) business day period, Buyer may elect to perform any of Seller's Work which has not yet been performed (the "Remaining Seller's Work"). Buyer may make such election by giving notice to Seller, which notice shall be at least three (3) business days before Buyer or Buyer's representatives enters upon the Property for the purpose of performing any Remaining Seller's Work. Seller hereby grants to Buyer an irrevocable license to enter upon the Property to perform the Remaining Seller's Work. The performance of the Remaining Seller's Work by Buyer shall be in conformance with

10

the performance standards set forth in Paragraph 26.7(d) of this Addendum, the Demolition Work Plan and the Remediation Work Plan.  To the extent that the contractors performing Seller's Work are not then in default and such contracts are assigned to Buyer by Seller and honored by such contractors, Buyer will continue to use such contractors to perform the remaining Demolition Work or Remediation Work, as the case may be.  The actual costs of completion of the Remaining Seller's Work shall reduce the Purchase Price.  The costs of completion of the Remaining Seller's Work shall include a fee to Buyer for Buyer's costs in supervising such work, in the amount of five percent (5%) of the total cost of the Remaining Seller's Work, but not to exceed Five Hundred Thousand Dollars ($500,000).  The costs of completion of the Remaining Seller's Work shall also include any additional amounts which Buyer shall be lawfully obligated to pay as a result of any of the Seller's Remaining Work becoming subject to the "prevailing wage" laws.  After any Remaining Seller's Work which consists of Demolition Work has been completed, Buyer shall apply for the written approval by the Community Services Department of the Demolition Work, and Buyer shall give notice to Seller when such approval has been obtained. After any Remaining Seller's Work which consists of Remediation Work has been completed, Buyer shall apply for the Certificate of Closure from the Health Department, and Buyer shall give written notice to Seller when such Certificate of Closure has been obtained. After the issuance of the Certificate of Closure, the parties shall proceed to the Closing as contemplated herein.  Upon the Close of Escrow, the Buyer shall pay to the Seller any unpaid portion of the Purchase Price, reduced by the costs of completion of the Remaining Seller's Work as described above.  If the cost of completion of the Remaining Seller's Work, as described above, exceeds the unpaid portion of the Purchase Price, Seller shall, promptly after receipt of an invoice and evidence of costs, reimburse all such excess costs of completion of the Remaining Seller's Work.

Seller and Buyer shall each have the right, at reasonable times upon reasonable advance notice, to inspect all books and records of the other party as they relate to the performance of any of Seller's Work.

If Buyer elects to exercise its self-help remedy under this Paragraph 26.17, then it need not make any further Deposits into Escrow (nor shall there be any further releases of the Deposits from Escrow) until the Closing, at which time there shall be a reconciliation of the amount owed by Buyer to Seller, or by Seller to Buyer, as the case may be.

11

# SIGNATURE PAGE

**Seller:**

PECHINEY CAST PLATE, INC.

By: _____

John Buras
Manager of Insurance & Real Estate

**Buyer:**

CITY OF VERNON

By: _____

LEONIS C. MALBURG, Mayor

ATTEST:

By: _____

BRUCE V. MALKENHORST, JR.
Acting City Clerk

APPROVED AS TO FORM:

By: _____

ERIC T. FRESCH, City Attorney

12

# EXHIBIT H

TO: ———▶ LINDA C



**CITY COUNCIL**

LEONIS C. MALBURG
Mayor

THOMAS A. YBARRA
Mayor Pro-Tem

WM. "BILL" DAVIS
Councilman

H. "LARRY" GONZALES
Councilman

W. MICHAEL McCORMICK
Councilman

SOL BENUDIZ
Police Chief

MARK C. WHITWORTH
Acting Fire Chief

LEWIS I. POZZEBON
Director of Environmental Health

S. KEVIN WILSON
Director of Community Services

SHARON I. DUCKWORTH
Acting City Treasurer

4305 Santa Fe Avenue, Vernon, California 90058
telephone (323) 583-8811

## ENVIRONMENTAL HEALTH DEPARTMENT
March 28, 2006

Pechiney Cast Plate Inc.
3200 Fruitland Ave.
Vernon, CA 90058
Attn: Earl Clinkenbeard

Dear Mr. Clinkenbeard:

We received information that your company has discontinued your business from the subject location in Vernon. As a Hazardous Materials Establishment, a closure report is required as specified by the Hazardous Materials Monitoring Ordinance #961 Sections 13.66, 13.67 and 13.68 (attachment).

This letter is an **Official Notice** to provide us with the details of a closure work plan by April 25, 2006. In the case of your facility, an acceptable closure work plan should include the following items:

- A list of the identities and quantities of hazardous materials moved from the premises. The list must include the items currently listed on the Hazardous Materials Inventory on file in our office.
- Address of location where hazardous materials were relocated.
- Statement describing efforts that assure proper cleanup of the equipment and facility.
- A description of the steps necessary to identify the hazardous materials and waste used or stored on the premises.
- Plans for closure of underground structures (clarifier, sumps, etc.,).
- Sampling and testing protocols to determine the presence or absence of hazardous materials/wastes residues on equipment, structures and premises.
- Remediation plans, if necessary.

In addition, indicate in your work plan whether your company or ALCOA will be responsible for addressing the stoddard solvent contamination currently present at your site. Provide the name,

address and phone number of whom our department should contact in the future with regards to this issue.

Following the approval and implementation of the closure work plan, a final report is required. This report must document the evaluation of the facility and the disposition of hazardous materials including those listed on the inventory currently on file with our office. Please note that ongoing environmental assessment work currently being conducted by Geomatrix will fulfill many of the requirements for a Certificate of Closure.

If we can be of assistance to you or if you require further information, please contact us. Your immediate action on this matter will facilitate our prompt approval of reoccupancy of these premises.

Sincerely,

Lewis J. Pozzebon
Director/Health Officer

David LeDuff, M.P.H., R.E.H.S.
Environmental Health Specialist

Attachment

Xc: City of Vernon Community Services & Water Department

# EXHIBIT I



CITY COUNCIL

LEONIS C. MALBURG
Mayor

THOMAS A. YBARRA
Mayor Pro-Tem

WM. "BILL" DAVIS
Councilman

H. "LARRY" GONZALES
Councilman

W. MICHAEL McCORMICK
Councilman

SOL BENUDIZ
Police Chief

MARK C. WHITWORTH
Acting Fire Chief

LEWIS J. POZZEBON
Director of Environmental Health

S. KEVIN WILSON
Director of Community Services

SHARON L. DUCKWORTH
Acting City Treasurer

4305 Santa Fe Avenue, Vernon, California 90058
telephone (323) 583–8811

## Health Department
July 26, 2006

Greg Sutherland, Plant Manager
Pechiney Cast Plate, Inc.
3200 Fruitland Avenue
Vernon, CA 90058

Subject: Hazardous Material Closure for Pechiney Cast Plate, Inc., 3200 Fruitland Avenue, Vernon

Dear Mr. Sutherland:

Our records show that we have received and favorably reviewed several documents prepared by Geomatrix Consultants, Inc., related to the closure of the subject facility, pursuant to the Code of the City of Vernon, including:
- o  Phase I Environmental Site Assessment Report, dated September 1, 2005,
- o  Phase II Environmental Site Assessment (ESA) Report and Proposed Supplemental Phase II ESA Work Plan, dated March 9, 2006, and
- o  Project Manual, Pechiney Cast Plate Facility Demolition Work Plan, dated May, 2006.

Information in these documents confirms that Pechiney has ceased operations at the facility, and plans to remove associated equipment, and demolish buildings and structures at the site. The Phase II ESA documents evidence that certain above grade surfaces or materials at the facility contain hazardous concentrations of lead, asbestos, and/or polychlorinated biphenyls (PCBs). In addition, the Phase II ESA documents indicate elevated below grade concentrations of volatile organic compounds, petroleum hydrocarbons, metals, and PCBs.

Because Pechiney is vacating the subject property and there is documentation of contamination at the site, we are sending you this letter as an <u>official notice,</u> ordering Pechiney to perform the following actions relative to the property at 3200 Fruitland Avenue, Vernon:
- • Adequately remove any hazardous material
- • Adequately remove any hazardous material residue
- • Properly remedy any hazardous material contamination from the subsurface structures, soil, or ground water at the site
- • Properly dispose of any hazardous waste generated by the clean-up, demolition or site remediation.

Exclusively Industrial

Compliance with this order will bring Pechiney into accord with the Code of the City of Vernon, Section 13.67, which specifies that upon termination of hazardous material activity at a property, all hazardous materials and hazardous material residues shall be properly removed from equipment, structures, and premises. Please be advised that compliance with the Code of the City of Vernon, Section 13.67, which is part of Vernon Ordinance No. 961, is required, irrespective of any previous closure letters issued with respect to this property, to the extent that subsequently discovered information (as is the case here) affects any prior closure decision.

We are aware that Pechiney is being proactive regarding the closure of the site as our department recently received preliminary information on additional below grade site assessment. In fact, we are expecting the submission of a report on this additional assessment work along with a remedial action proposal for review. Following our review of the proposal, we will be able to comment on specific clean-up requirements for the site.

In order to preplan for the timely final hazardous material closure of Pechiney's former site, you should be aware that the Code of the City of Vernon, Section 13.68, requires that Pechiney submit a final report to document the removal of hazardous materials and hazardous materials residues from the site. The report shall include a description of remedial actions taken, results of laboratory analyses of any sample taken, accounting of the disposition of hazardous materials, confirmation of hazardous residue removal, copies of hazardous waste manifests, and any other document pertaining to the clean-up, demolition and remedial activities at the site. This report, when completed, shall be submitted to the City of Vernon Health Department for review and approval for compliance with Vernon Ordinance No. 961 and the issuance of a certificate of closure.

Thank you ahead of time for your co-operation in this matter. If you have any questions or require further information, please contact us at 323-583-8811, Extension 233.

Sincerely,

Lewis Pozzebon,
Director/Health Officer

Xc: Geomatrix Consultants, 510 Superior Ave., Suite 200, Newport Beach, CA 92663
Attn: Linda Conlan

Lp/mydocs/CUPA/letters/Pechiney

# EXHIBIT J

# Jenkens & Gilchrist, LLP

12100 WILSHIRE BOULEVARD
15ᵀᴴ FLOOR
LOS ANGELES, CALIFORNIA 90025

(310) 820-8800
FACSIMILE (310) 820-8859

www.jenkens.com

John F. Cermak, Jr.
(310) 442-8885
jcermak@jenkens.com

AUSTIN, TEXAS
(512) 499-3800
CHICAGO, ILLINOIS
(312) 425-3900
DALLAS, TEXAS
(214) 855-4500
HOUSTON, TEXAS
(713) 951-3300
PASADENA, CALIFORNIA
(626) 578-7400
SAN ANTONIO, TEXAS
(210) 246-5000
WASHINGTON, D.C.
(202) 326-1500

April 17, 2006

**CERTIFIED MAIL, RETURN RECEIPT**
**REQUESTED & FIRST CLASS MAIL**

Century Aluminum Company
2511 Garden Road
Building A, Suite 200
Monterey, California 93490
Attention: General Counsel and Chief Administrative Officer

Re:    Stock and Asset Purchase Agreement by and among Century Aluminum
Company, Century Aluminum Company and West Virginia, Inc. and Pechiney
Rolled Products LLC dated as of July 26, 1999 (the "Purchase Agreement")

## NOTICE OF CLAIMS FOR INDEMNITY

Ladies and Gentlemen:

NOTICE IS HEREBY GIVEN on behalf of Pechiney Rolled Products LLC ("Purchaser")
and Pechiney Cast Plate, Inc., formerly known as Century Cast Plate, Inc. ("Pechiney Cast
Plate") of claims against Century Aluminum Company ("Century") and Century Aluminum
Company of West Virginia, Inc. ("Century WV," and collectively with Century, "Sellers") for
indemnity pursuant to the terms of the Purchase Agreement. Defined terms used in this notice
and not otherwise defined shall have the meaning ascribed to such terms in the Purchase
Agreement. This notice is given to Sellers pursuant to Section 9.04 of the Purchase Agreement,
and on behalf of Pechiney Cast Plate as an Affiliate of Purchaser.

The claims for indemnity relate to and arise out of certain environmental conditions at the
Vernon Owned Real Property which are described below. Such claims are made without
limitation or waiver of either Purchaser's or Pechiney Cast Plate's right to indemnity for other
claims or its right to indemnity regarding the same matters under other agreements, including

# Jenkens & Gilchrist, LLP

Century Aluminum Company
April 17, 2006
Page 2

without limitation, the Vernon Indemnification Agreement dated as of September 20, 1999 (the "Vernon Indemnification Agreement").[1]

At the direction of the City of Vernon Environmental Health Department ("Vernon EHD"), Pechiney Cast Plate has conducted an investigation of certain environmental conditions at the Vernon Owned Real Property. Geomatrix, an environmental consultant engaged by Purchaser, performed a Phase I investigation with respect to the Vernon Owned Real Property. The results of that investigation were described in a report dated September 1, 2005 which was submitted by Geomatrix to Vernon EHD (the "Phase I Report") and subsequently approved by Vernon EHD as set forth in a memorandum dated September 26, 2005 (the "September 26 Approval Memorandum"). Geomatrix also prepared and submitted to Vernon EHD for approval a work plan with respect to the further investigation of the Vernon Owned Real Property dated September 2, 2005 (the "Phase II Work Plan"), which Vernon EHD approved in the September 26 Approval Memorandum. Geomatrix subsequently implemented the work described in the Phase II Work Plan, and on March 9, 2006, submitted a report to Vernon EHD with respect to the further investigation of the Vernon Owned Real Property (the "Phase II Report"). With the Phase II Report, Geomatrix also submitted to Vernon EHD a proposed work plan for further investigation of certain areas and conditions (the "Supplemental Investigation Work Plan"). Vernon EHD approved the Supplemental Investigation Work Plan by letter dated March 20, 2006 (the "March 20 Approval Letter"), and the Supplemental Investigation Work Plan is currently being implemented. The Phase I Report, the September 26 Approval Memorandum, the Phase II Work Plan, the Phase II Report, the Supplemental Investigation Work Plan and the March 20 Approval Letter are enclosed, and their contents are incorporated in this notice by reference.

Based on the limited investigation completed to date, Purchaser and Pechiney Cast Plate anticipate that Pechiney Cast Plate will be required by Vernon EHD or other regulatory agencies to further investigate and/or remediate certain environmental conditions at the Vernon Owned Real Property, as identified in the Phase I Report and the Phase II Report. Such conditions include, but are not limited to, the presence of polychlorinated biphenyls ("PCBs") which have been detected in soil on the Vernon Real Property at concentrations as high as 2 million ug/kg and in concrete in various locations within the buildings on the Vernon Real Property. To date, Pechiney Cast Plate has incurred costs which exceed $300,000 with respect to the above-described investigation and activities conducted based on directives of Vernon EHD.

---

[1]    Purchaser and Pechiney Cast Plate are concurrently making a demand for indemnity with respect to such matters under the Vernon Indemnification Agreement.

# Jenkens & Gilchrist, LLP

Century Aluminum Company
April 17, 2006
Page 3


Purchaser and Pechiney Cast Plate each hereby notifies Sellers of its demand for indemnity under the Purchase Agreement for any Losses it has incurred (including but not limited to the costs and expenses described above) or may in the future incur with respect to and arising out of the environmental conditions identified in the Phase I Report, the Phase II Report or as a result of the further investigation of the Vernon Owned Real Property at the direction of Vernon EHD or other governmental agencies. The indemnity rights include, without limitation, the right to indemnity pursuant to Section 9.02(a)(iii) of the Purchase Agreement, as to Losses with respect to the above-described matters which relate to Releases of Hazardous Material at the Vernon Owned Real Property, involve an Environmental Claim, or arise out of any non-compliance or violation of an Environmental Law which are not associated with items contained in Section 3.16(a) of the Disclosure Schedule. Such indemnity rights also include, without limitation, indemnity pursuant to Section 9.02(a)(ix) of the Purchase Agreement for all costs and expenses which Purchaser and/or Pechiney Cast Plate has incurred and any additional costs, expenses and obligations which it may incur in the future and any other Liabilities arising out of the presence of PCBs at, on and in the soil and improvements located on the Vernon Owned Real Property.

The foregoing is neither intended nor should it be construed as an exhaustive statement of the facts and matters at issue, nor is it intended to include all of the claims of Purchaser and Pechiney Cast Plate for indemnification under the Purchase Agreement. The foregoing also should not be construed as a waiver or relinquishment of any claim, right, defense, damage or remedy, legal or equitable, that Purchaser and/or Pechiney Cast Plate may have with respect to this or any other matter, whether based on the Purchase Agreement, the Vernon Indemnification Agreement or any other agreement or which otherwise arises out of the matters addressed in this notice letter. All such claims, rights, defenses, damages and remedies are hereby expressly reserved.

Very truly yours,

John F. Cermak, Jr.

JFC:nlw
Enclosures

LOS ANGELES 310720v3 49789-00010

# Jenkens & Gilchrist, LLP

Century Aluminum Company
April 17, 2006
Page 4


cc:    CERTIFIED RETURN RECEIPT
       AND FIRST CLASS MAIL

       Curtis, Mallet-Prevost, Colt & Mosie
       101 Park Avenue
       New York, New York 10178
       Attention: Matias A. Vega, Esq.

       FIRST CLASS MAIL

       Eileen Burns-Lerum, Esq.
       Vice President, Legal Affairs
       Alcan, Inc.
       8770 West Bryn Mawr Avenue
       Mail Code 02V
       Chicago, IL  60631-3542

# EXHIBIT K

# Jenkens & Gilchrist, LLP

AUSTIN, TEXAS
(512) 499-3800
CHICAGO, ILLINOIS
(312) 425-3900
DALLAS, TEXAS
(214) 855-4500
HOUSTON, TEXAS
(713) 951-3300
PASADENA, CALIFORNIA
(626) 578-7400
SAN ANTONIO, TEXAS
(210) 246-5000
WASHINGTON, D.C.
(202) 326-1500

12100 WILSHIRE BOULEVARD
15TH FLOOR
LOS ANGELES, CALIFORNIA 90025

(310) 820-8800
FACSIMILE (310) 820-8859

www.jenkens.com

John F. Cermak, Jr.
(310) 442-8885
jcermak@jenkens.com

April 17, 2006

**CERTIFIED MAIL, RETURN RECEIPT**
**REQUESTED & FIRST CLASS MAIL**

Century Aluminum Company
2511 Garden Road
Building A, Suite 200
Monterey, California 93490
Attention: General Counsel and Chief Administrative Officer

Re:  Vernon Indemnification Agreement dated as of September 20, 1999
between Century Aluminum Company and Pechiney Rolled Products, LLC
(the "Vernon Indemnification Agreement")

## NOTICE OF CLAIMS FOR INDEMNITY

Ladies and Gentlemen:

NOTICE IS HEREBY GIVEN on behalf of Pechiney Rolled Products LLC and Pechiney Cast Plate, Inc., formerly known as Century Cast Plate, Inc. ("Pechiney Cast Plate"), of claims against Century Aluminum Company ("Century") for indemnity pursuant to the terms of the Vernon Indemnification Agreement. Defined terms used in this notice and not otherwise defined shall have the meaning ascribed to such terms in the Vernon Indemnification Agreement. This notice is given pursuant to Section 1.3 of the Vernon Indemnification Agreement, and by Pechiney Cast Plate in its capacity as one of the Vernon Indemnified Parties.

The claims for indemnity relate to and arise out of certain environmental conditions at the Vernon Real Property which are described below. The claims are made without limitation or waiver of its right to indemnity as to other claims or its right to indemnity regarding the same matters under other agreements, including without limitation, that certain Stock and Asset Purchase Agreement dated as of July 26, 1999 (the "Purchase Agreement").[1]

_____

[1] Pechiney Rolled Products LLC and Pechiney Cast Plate are concurrently making a demand for indemnity with respect to such matters under the Purchase Agreement.

# Jenkens & Gilchrist, LLP

Century Aluminum Company
April 17, 2006
Page 2

At the direction of the City of Vernon Environmental Health Department ("Vernon EHD"), Pechiney Cast Plate has conducted an investigation of certain environmental conditions at the Vernon Real Property. Geomatrix, an environmental consultant engaged by Pechiney Cast Plate, has performed a Phase I investigation with respect to the Vernon Real Property. The results of the investigation are contained in a report dated September 1, 2005 which was submitted by Geomatrix to Vernon EHD (the "Phase I Report") and subsequently approved by Vernon EHD, as set forth in a memorandum dated September 26, 2005 (the "September 26 Approval Memorandum"). Geomatrix submitted to Vernon EHD for approval a work plan with respect to the further investigation of the Vernon Real Property dated September 2, 2005 (the "Phase II Work Plan"), Vernon EHD approved in the September 26 Approval Memorandum. Geomatrix subsequently performed a further investigation of the Vernon Real Property, pursuant to the Phase II Work Plan, and on March 9, 2006, submitted a report to Vernon EHD with respect to the further investigation (the "Phase II Report"). With the Phase II Report, Geomatrix also submitted to Vernon EHD a proposed work plan for further investigation of certain areas and conditions (the "Supplemental Investigation Work Plan"). Vernon EHD approved the Phase I Report and the Supplemental Investigation Work Plan by letter dated March 20, 2006 (the "March 20 Approval Letter"), and the Supplement Investigation Work Plan is currently being implemented. A copy of the Phase I Report, the September 26 Approval Memorandum, the Phase II Work Plan, the Phase II Report, the Supplemental Investigation Work Plan and the March 20 Approval Letter are enclosed, and their contents are incorporated in this notice by reference.

Based on the limited investigation completed to date, it is anticipated that Pechiney Cast Plate will be required by Vernon EHD or other regulatory agencies to further investigate and/or remediate certain environmental conditions at the Vernon Real Property. Such conditions include, but are not limited to, the presence of polychlorinated biphenyls ("PCBs") which have been detected in soil on the Vernon Real Property at concentrations as high as 2 million ug/kg and in concrete in various locations within the buildings on the Vernon Real Property. To date, Pechiney Cast Plate has incurred costs which exceed $300,000 with respect to the above-described investigation and activities conducted in response to directives of the Vernon EHD.

Rolled Products and Pechiney Cast Plate each hereby give notice of a demand for indemnity pursuant to the Vernon Indemnification Agreement for any Losses it has incurred (including but not limited to the costs and expenses described above) or which it may in the future incur with respect to and arising out of the environmental conditions identified in the Phase I Report and the Phase II Report, or as a result of the further investigation of the Vernon

# Jenkens & Gilchrist, LLP

Century Aluminum Company
April 17, 2006
Page 3


Real Property conducted at the direction of Vernon EHD or other governmental agencies. Such indemnity rights include, without limitation, the right to indemnity pursuant to Section 1.2(a) of the Vernon Indemnification Agreement, for such Losses on the basis that they have been or will be incurred as result of and arising out of the presence of Hazardous Substances located at, upon, in or under the Vernon Real Property, the Cleanup of which has either been required by directives and/or orders of Vernon EHD. Such rights also include, without limitation, the right to indemnity pursuant to Section 1.2(b) of the Vernon Indemnification Agreement, insofar as conditions identified as part of the investigation involve Cleanup with respect to the remedial actions which Aluminum Company of America ("Alcoa"), pursuant to the terms of the Alcoa Agreement, was required to perform.

The foregoing is neither intended nor should it be construed as an exhaustive statement of the facts and matters at issue, nor is it intended to include all claims for indemnification under the Vernon Indemnification Agreement of either Rolled Products or Pechiney Cast Plate. The foregoing also should not be construed as a waiver or relinquishment of any claim, right, defense, damage or remedy, legal or equitable, which either Rolled Products or Pechiney may have with respect to this or any other matter, whether based on the Vernon Indemnification Agreement, the Purchase Agreement, or any other agreement, or which otherwise arises out of the matters addressed in this notice letter. All such claims, rights, defenses, damages and remedies are hereby expressly reserved.

Very truly yours,

John F. Cermak, Jr.

JFC:nlw
Enclosures

# Jenkens & Gilchrist, LLP

Century Aluminum Company
April 17, 2006
Page 4

cc:    CERTIFIED RETURN RECEIPT
       AND FIRST CLASS MAIL

       Curtis, Mallet-Prevost, Colt & Mosle
       101 Park Avenue
       New York, New York 10178
       Attention: Matias A. Vega, Esq.

       FIRST CLASS MAIL

       Eileen Burns-Lerum, Esq.
       Vice President, Legal Affairs
       Alcan, Inc.
       8770 West Bryn Mawr Avenue
       Mail Code 02V
       Chicago, IL 60631-3542

# EXHIBIT L

Peter McGuire
Vice President
Associate General Counsel

**Century** ALUMINUM

May 8, 2006

VIA CERTIFIED MAIL, RETURN RECEIPT
  REQUESTED AND TELECOPIER

Aluminum Company of America
Alcoa Corporate Center
201 Isabella Street
Pittsburgh, PA 15212-5859
Telecopier: 412-553-4064
Attn:    General Counsel\
         C/O Claire Miller

> Re:    Acquisition Agreement, dated December 22, 1998 (the "Acquisition
>        Agreement"), between Aluminum Company of America ("Alcoa")
>        and Century Aluminum Company ("Century")

Ladies and Gentlemen:

This is to inform you that Century has claims against Alcoa for indemnity under Article 10 of the Acquisition Agreement. The claims for indemnity relate to the presence of polychlorinated biphenyls at the Real Property as more fully described in the two attached letters dated April 17, 2006 and the attached letter dated April 24, 2006, each from Jenkins and Gilchrist, LLP (the "Letters"). Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Acquisition Agreement.

Century hereby gives notice of a demand for indemnity for all Losses it and its Affiliates have incurred, or which it and its Affiliates may in the future incur, with respect to the environmental conditions described in the Letters. Such indemnity rights include, without limitation, the right to indemnity pursuant to Section 10.03(a) of the Acquisition Agreement, for such Losses on the basis that they have been or will be incurred as result of and arising out of the presence of Hazardous Substances located at, upon, in or under the Real Property due to the actions or inaction of Alcoa or an Affiliate

Century Aluminum Company
2511 Garden Road
Building A, Suite 200
Monterey, CA 93940

831 642-9300 Phone
831 642-5080 Fax

of Alcoa, the Cleanup of which has either been required by directives and/or orders of the Vernon Environmental Health Department. Such rights also include, without limitation, the right to indemnity pursuant to Section 10.03(c) of the Acquisition Agreement, insofar as conditions identified as part of the investigation involve Cleanup with respect to the remedial actions which Alcoa was required to perform pursuant to the terms of the Acquisition Agreement. At this time, Century does not have sufficient information to estimate the amount of Losses for which indemnity is claimed.

The foregoing is neither intended nor should it be construed as an exhaustive statement of the facts and matters at issue, nor is it intended to include all claims of Century and its Affiliates for indemnification under the Acquisition Agreement. The foregoing also should not be construed as a waiver or relinquishment of any claim, right, defense, damage or remedy, legal or equitable, which Century and its Affiliates may have with respect to this or any other matter, whether based on the Acquisition Agreement or any other agreement, or which otherwise arises out of the matters addressed in this notice letter. All such claims, rights, defenses, damages and remedies are hereby expressly reserved.

We believe it would be advisable for representatives of Century, Pechiney and Alcoa to meet and discuss the nature and scope of the alleged contamination at the Vernon, California facility as soon as possible and look forward to discussing the foregoing with you.

Very truly yours,

Peter C. McGuire
Vice President and
Associate General Counsel

# EXHIBIT M

06/08/06  11:26 FAX 8316429328.       CENTURY ALUMINUM Co                    ⧄003
JUN-02-2006 FRI 03:11 PM AL. A LEGAL DEPARTMENT      FAX NO. 4. .J534064        P. 02

**Alcoa Inc.** 

June 2, 2006

<u>VIA FACSIMILE</u>
<u>AND EXPRESS MAIL</u>

Century Aluminum Company
2511 Garden Road
Building A, Suite 200
Monterey, CA 93940
<u>Facsimile No</u>: 831-642-9080
Attn:   General Counsel

Re:  **Claim for Indemnification under the Acquisition Agreement, dated December 22, 1998
       (the "Acquisition Agreement"), between Aluminum Company of America ("Alcoa")
       and Century Aluminum Corporation ("Century")**

Dear Sir:

We have received and reviewed your letter dated May 8, 2006 under which Century has given
notice of claims against Alcoa for indemnity under Article 10 of the Acquisition Agreement. We
respectfully reject all of your claims for indemnification set forth in your letter.

Century's claims for indemnity under Article 10 of the Acquisition Agreement are based upon
the claims made against Century by Jenkins & Gilchrist, LLP on behalf of Pechiney Rolled
Products LLC and Pechiney Cast Plate, Inc. (collectively "Pechiney"), under two letters dated
April 17, 2006. Yet, nothing provided in your letter dated May 8, 2006 or in the Pechiney letters
dated April 17, 2006 establishes any basis of liability on the part of Alcoa under the Acquisition
Agreement. Accordingly, we reject any and all claims for indemnification set forth in your letter
dated May 8, 2006.

At this time, we have not made arrangements to join the meeting in Los Angeles with Jenkins &
Gilchrist to discuss this matter. We would like, however, to participate in the meeting by
conference call. Please advise regarding the time and contact information for the call.

06/08/06  11:27 FAX 8316429328...    CENTURY ALUMINUM Co    ☒004
JUN-02-2006 FRI 03:11 PM ALCOA LEGAL DEPARTMENT    FAX NO. 41...534064    P. 03

Century Aluminum Company
June 2, 2006
Page 2

Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Acquisition Agreement.

Sincerely,

*John M. Wilson*

John M. Wilson
Vice President and Deputy General Counsel
Alcoa Inc.

Copies to:

Peter McGuire, Century Aluminum Company
Claire E. Miller, Alcoa Inc.
Jamie Mackay, Alcoa Inc.

# EXHIBIT N

Peter McGuire
Vice President
Associate General Counsel

**Century** ALUMINUM

August 4, 2006

VIA CERTIFIED MAIL, RETURN RECEIPT
REQUESTED AND TELECOPIER

Aluminum Company of America
Alcoa Corporate Center
201 Isabella Street
Pittsburgh, PA 15212-5858
Attn: General Counsel

> Re:    **Acquisition Agreement, dated December 22, 1998 (the "Acquisition
> Agreement"), between Aluminum Company of America ("Alcoa")
> and Century Aluminum Company ("Century")**

Ladies and Gentlemen:

Pursuant to Article 10 of the Acquisition Agreement, by letter dated May 8, 2006, Century demanded that Alcoa defend and indemnify Century regarding matters described in letters dated April 17, 2006 and April 24, 2006 from Jenkins and Gilchrist. For ease of reference, we have enclosed herewith a copy of Century's May 8, 2006 letter. Please note that capitalized terms used, but not defined, herein shall have the meanings assigned to such terms in the Acquisition Agreement.

In connection with Century's indemnity claim, please also find enclosed a copy of an order (the "Order"), dated July 26, 2006, issued by the City of Vernon Health Department to Pechiney Cast Plating, Inc. ("Pechiney"). The Order compels Pechiney to undertake environmental remedial actions that are the subject of Pechiney's claim against Century and, accordingly, Century's indemnity claim against Alcoa. Alcoa has an unambiguous obligation to defend and indemnify Century with respect to Environmental Liabilities associated with Hazardous Substances, the Cleanup of which is "required by a directive or order of a governmental agency." The City of Vernon Health Department, a governmental agency, has issued a directive or order (i.e., the Order) that has triggered Environmental Liabilities covered by Alcoa's Article 10 indemnity obligation to Century.

Century Aluminum Company
2511 Garden Road
Building A, Suite 200
Monterey, CA 93940

831 642-9300 Phone
831 642-9080 Fax

Peter McGuire
Vice President
Associate General Counsel

Century expressly reserves all claims, rights, defenses, damages and remedies in connection with this matter. We look forward to discussing the foregoing with you.

Very truly yours,

Peter C. McGuire
Vice President and
Associate General Counsel

## CERTIFICATE OF SERVICE

I hereby certify that on October 27, 2006, I electronically filed a true and correct copy of

the foregoing document with the Clerk of the Court using CM/ECF, which will send notification

that such filing is available for viewing and downloading to the following counsel of record:

> Allen M. Terrell, Jr., Esquire
> Steven J. Fineman, Esquire
> Richards, Layton & Finger, P.A.
> One Rodney Square
> 920 North King Street
> P.O. Box 551
> Wilmington, DE 19899-0551
>
> Steven J. Balick, Esquire
> John G. Day, Esquire
> Tiffany Geyer Lydon, Esquire
> Ashby & Geddes
> 222 Delaware Avenue, 17th Floor
> Wilmington, DE 19801

I further certify that on October 27, 2006,  I caused a copy of the foregoing document to

be served by hand delivery on the above-listed counsel of record.

Mary F. Dugan (No. 4704)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
mdugan@ycst.com

*Attorneys for Defendant Century Aluminum Company*