## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

ALCOA INC.                                )
                                          )
        Plaintiff,             )       C.A. No. 06-451-SLR
                                          )
v.                                        )
                                          )
ALCAN INC., ALCAN ROLLED                  )
PRODUCTS–RAVENSWOOD LLC, f/k/a            )
PECHINEY ROLLED PRODUCTS, LLC,            )
PECHINEY CAST PLATE, INC., and            )
CENTURY ALUMINUM COMPANY,                 )
                                          )
        Defendants.            )

### DECLARATION OF JAMES J. REARDON

JAMES J. REARDON declares pursuant to 28 U.S.C. § 1746 as follows:

1.     I am an attorney at the firm of LeBoeuf, Lamb, Greene & MacRae LLP, Goodwin Square, 225 Asylum Street, Hartford, CT 06103, counsel for Plaintiff Alcoa Inc. ("Alcoa") in this action. I am admitted to the bar of the state of Connecticut.

2.     This declaration is made upon my personal knowledge and I am competent to testify as to the facts set forth herein.

3.     As cited in its Answering Brief In Opposition to Motion to Transfer Venue and Enlarge Time to Answer or Otherwise Plead, Alcoa submits, attached hereto as exhibit 1, a true and accurate copy of a document entitled "Acquisition Agreement," dated December 22, 1998.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 5, 2006, at Hartford, Connecticut

James J. Reardon

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2006, I electronically filed the foregoing with the Clerk of Court using CM/ECF which will send notification of such filing(s) to the following and which has also been served as noted:

**BY HAND**

Steven J. Balick, Esquire
John G. Day, Esquire
Tiffany Geyer Lydon
Ashby & Geddes
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899

Christian D. Wright, Esquire
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

Steven J. Fineman (#4025)
fineman@rlf.com

# EXHIBIT 1

## ACQUISITION AGREEMENT

THIS ACQUISITION AGREEMENT (this "**Agreement**") is made the 22nd day of December, 1998, by and between **ALUMINUM COMPANY OF AMERICA**, a Pennsylvania corporation (hereinafter "**Seller**"), and **CENTURY ALUMINUM COMPANY**, a Delaware corporation (hereinafter "**Buyer**").

### BACKGROUND

1.    Seller owns the Cast Plate Business (defined below), located at 5401 Alcoa Avenue, Vernon, California 90058 (the "**Facility**").

2.    Seller transferred certain of the assets of the Cast Plate Business to "Newco," a newly created, wholly owned subsidiary of Seller.

3.    Seller desires to sell all of the common stock of Newco to Buyer, and Buyer desires to purchase the same from Seller, upon the terms and conditions set forth below.

**NOW, THEREFORE**, in consideration of the premises and the covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE 1
### DEFINITIONS

**Section 1.01 Certain Definitions.** As used in this Agreement, the following terms have the following meanings unless the context otherwise requires:

(a)    "**Affiliate**" means any Person, directly or indirectly, controlling, controlled by, or under common control with Seller. Without limiting the generality of the foregoing, a Person is considered to be in control of or to be controlled by another Person if such Person holds 50% or more of the outstanding voting equity interest in such other Person or such other Person holds 50% or more of its outstanding voting equity interest.

(b)    "**Assets**" means all of the assets of Seller of every kind, character and description, tangible and intangible (other than the Excluded Assets), used in the Cast Plate Business, located at the Facility or otherwise necessary for operation of the Cast Plate Business, including without limitation:

    (1)    all tangible assets located at the Facility, including without limitation the cast plate manufacturing facility and Real Property (defined below), all manufacturing assets including capital equipment, vehicles, supplies, personal property, inventory (including the European Inventory), office furniture, fixed assets and fixtures, materials, on-site warehouse or storage facilities, and other tangible property or improvements used in the Cast Plate Business; all licenses, permits and authorizations issued by any

governmental organization relating to the Cast Plate Business; all contracts, agreements, leases, commitments and understandings pertaining to the Cast Plate Business; all customer lists, contracts, accounts and credit records located at the Facility; and all other Books and Records.

    (2)    Transferred Property Rights.

    (3)    all research data concerning historic and current research and development efforts relating to the Cast Plate Business located at the Facility, including designs of experiments and the results of unsuccessful designs and experiments.

(c)    **"Assumed Liabilities"** means those obligations of Seller being assumed by Buyer pursuant to this Agreement, as identified on **Schedule 1.01(c)** hereto.

(d)    **"Books and Records"** means all books and records and operating data solely relating to the Cast Plate Business, including, but not limited to, all lists of customers, lists of suppliers, all sales and credit information, advertising and purchasing materials and correspondence, quotation records, resume files, payroll master files and all collection, credit and accounting records.

(e)    **"Cast Plate Business"** means the cast plate manufacturing and sales business and supporting activities of Seller as conducted at or from the Facility in Vernon, California.

(f)    **"Code"** means the Internal Revenue Code of 1986, as amended. All citations to the Code or to the regulations promulgated thereunder include any amendments or any substitute or successor provisions thereto.

(g)    **"Confidentiality Agreement"** means that certain non-disclosure agreement between Buyer and Seller, dated July 21, 1998.

(h)    **"Encumbrance"** means any mortgage, covenant, condition, restriction, easement, right of way, option, lien, pledge, lease, charge, equity, claim, conditional sales contract, or security interest.

(i)    **"Excluded Assets"** means those assets of Seller of the Cast Plate Business that Seller will retain, which assets are identified on **Schedule 1.01(i)** to this Agreement.

(j)    **"GAAP"** means generally accepted accounting principles as applied by Seller in preparation of its financial statements, as further described in **Schedule 1.01(j)**. The methodology described therein will be the methodology used to prepare the WOC Statement.

(k)    **"Intangible Assets"** means all patents, license and sublicenses, intellectual property, technical information, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, quality assurance and control procedures, design tools and simulation capability, and all manuals and technical information Seller provides to its own employees, customers, suppliers, agents or licensees.

(l)    **"Net Working Capital"** means all of Newco's accounts receivables (including for this calculation purpose the International Accounts Receivable) and inventory (including for this calculation purpose the European Inventory), minus trade payables and all other current liabilities, all properly valued to reflect actual

condition and collectability on the Closing Date and consistently prepared in accordance with GAAP.

(m)    **"Newco Employees"** means all of the salaried and hourly employees of the Cast Plate Business who are actively employed (including those employees currently on an authorized leave of absence, but excluding any employee on layoff status and any employee who retires from Seller effective January 1, 1999) by Seller as of the day before the Closing identified on **Schedule 4.06(b)**.

(n)    **"Normal Levels"** with respect to Net Working Capital means the cumulative amounts required by Newco to permit normal ongoing operation of the Cast Plate Business under normal business conditions as of the Closing Date, provided that it is any amount between $6.5 million and $7.0 million.

(o)    **"Person"** means a natural person, a corporation, a partnership or any other entity.

(p)    **"Permitted Encumbrances"** means liens disclosed on **Schedule 1.01(p)**, liens for taxes and assessments not yet payable or being contested in good faith, and other imperfections of title, the existence of which does not and is not expected to have a material adverse effect on the operation of the Cast Plate Business.

(q)    **"Property Rights"** means collectively Transferred Property Rights and Licensed Property Rights (as defined in Section 2.01).

(r)    **"Return" or "Returns"** means all returns, declarations, reports, statements, and other documents required to be filed in respect of Taxes.

(s)    **"Shares"** means all of the issued and outstanding capital stock of Newco.

(t)    **"Tax" or "Taxes"** means any federal, state, local, foreign or other taxes (including, without limitation, income (net or gross), gross receipts, profits, alternative or add-on minimum, franchise, license, capital, capital stock, intangible, services, premium, mining, transfer, sales, use, ad valorem, payroll, wage, severance, employment, occupation, property (real or personal), windfall profits, import, excise, custom, stamp, withholding or governmental charges of any kind whatsoever (including interest, penalties, additions to tax or additional amounts with respect to such items).

(u)    **"Transferred Property Rights"** means the intellectual property identified in **Schedule 4.04** and all trademarks, trade names, service marks and services names (except to the extent such intangible assets contain the name "Alcoa") used exclusively by the Cast Plate Business, as identified in Section 4.04 and as further provided in Section 9.14.

(v)    **"European Inventory"** means the product inventory held and owned by Seller's wholly-owned subsidiary, Alcoa Europe S.A., for sale to the European customers of the Cast Plate Business.

(w)    **"International Accounts Receivable"** means all accounts receivable of Seller's International selling companies for product sold to customers outside the United States and all products directly en route to customers outside the United States (and related accounts receivable).

## ARTICLE 2
## PURCHASE AND SALE

**Section 2.01  Transfer of Cast Plate Business to Newco.**  Except as otherwise provided in this Agreement, before the Closing Date, Seller will have transferred all of the Assets to Newco, except that on the Closing Date Seller will cause its wholly-owned subsidiary, Alcoa Europe S.A., to directly transfer the European Inventory from Seller's Paal, Belgium warehouse (operated by Seller's wholly-owned subsidiary, N.V. AISC Belgium) to Buyer or Buyer's designee.  In addition, prior to the Closing Date, Seller will grant a perpetual, nonexclusive, fully paid-up license to Newco in the form of **Schedule 2.01** (the "**License Agreement**"), to use, in manufacturing cast plate within the United States, all Intangible Assets, wherever located, that have been used in the manufacture of cast plate at the Facility ("**Licensed Property Rights**").

**Section 2.02  Purchase and Sale of the Shares.**  Subject to the terms and conditions set forth in this Agreement, on the Closing Date, Seller hereby agrees to transfer, sell and convey the Shares to Buyer free and clear of all Encumbrances, and Buyer hereby agrees to purchase the Shares from Seller and assume the Assumed Liabilities for the consideration specified in this Agreement.  Buyer's assumption of the Assumed Liabilities will be evidenced by the execution and delivery of an Assignment and Assumption Agreement in the form of **Schedule 2.02**.

**Section 2.03  Purchase Price.**  As consideration for the sale of the Shares and the European Inventory to Buyer and the License Agreement, Buyer will pay to Seller (or Seller's designee) $8 million.  This sum, as it may be adjusted pursuant to Article 3 below, is the "**Purchase Price**."

**Section 2.04  Payment of the Purchase Price.**
(a)    Buyer will pay the Purchase Price to Seller by means of:
    (1)    Seller's retention of the International Accounts Receivable as of the Closing Date;
    (2)    a cash payment at Closing by Buyer or Buyer's designee to Alcoa Europe S.A. for the European Inventory in the amount of (book value of the European Inventory/.82) as of the Closing Date; and
    (3)    a cash payment equal to $8 million less the value of items (1) and (2) of this Section 2.04(a).
The parties agree that the value of the European Inventory and International Accounts Receivable reflected on the Financials (defined below) as at November 30, 1998 will be used for purposes of calculating the Purchase Price to be paid on the Closing Date.
(b)    On the Closing Date, Buyer will transfer to banks specified by Seller and Alcoa Europe S.A. by wire transfer of immediately available funds no later than 1:00 (one o'clock) in the afternoon (Eastern Standard Time) the amount of the Purchase Price due and owing each of Seller and Alcoa Europe S.A. as set forth in Section 2.03 above and in accordance with Section 2.04(a).  If the payment is

made after 1:00 (one o'clock) in the afternoon on the day after the Closing Date, Buyer must pay to Seller, in the manner set forth above, interest on such amount at an annual rate equal to five percent (5%) from that date until payment is made, but not including the day on which payment is made.

## ARTICLE 3
## ADJUSTMENT TO PURCHASE PRICE

**Section 3.01 Preparation of WOC Statement.** As soon as practicable, but in any event within 60 days after the Closing Date, Seller will prepare and deliver to Buyer an unaudited statement of Net Working Capital as of the Closing Date ("**WOC Statement**"). Buyer will give Seller and its independent auditors access at all reasonable times to the properties, books and records of Newco comprised in the Assets for such purpose. The WOC Statement will be prepared in accordance with GAAP.

**Section 3.02 Review of WOC Statement.** Buyer will have 30 days from the date of submission of the WOC Statement to review the WOC Statement. Within such 30 day period, Buyer must advise Seller in writing of any adjustment Buyer believes is required to cause the WOC Statement to be consistent with GAAP. If Buyer does not request an adjustment within the 30 day period, the WOC Statement will be considered final. If any such adjustment is requested and is then disputed by Seller, Buyer and Seller must negotiate in good faith to resolve such dispute. If the parties agree that the proposed adjustment is required, the WOC Statement will be adjusted accordingly and it will then be final. If, after a period of 30 days following the date on which notice of any proposed adjustment is given, any adjustment still remains disputed, then Seller and Buyer will engage by mutual agreement (or failing mutual agreement, by lot) an independent auditor from one of the "Big Five" accounting firms (excluding the firms regularly used by Seller and Buyer) (the "**Auditor**") to resolve any remaining disputes. The decision of the Auditor is final and binding on the parties. The fees and expenses of the Auditor will be borne equally by Seller and Buyer, unless the Auditor reasonably concludes that another allocation of his or her fees and expenses is more equitable and appropriate given the legitimacy of the dispute.

**Section 3.03 Adjustment to Purchase Price.**
(a)    The Purchase Price will be adjusted as follows:
    (1)    If the value of the European Inventory as of the Closing Date is less than the November 30, 1998 value, the Purchase Price will be increased by such difference. If the value of the European Inventory as of the Closing Date is greater than the November 30, 1998 value, the Purchase Price will be decreased by such difference.
    (2)    If the value of the International Accounts Receivable as of the Closing Date is less than the November 30, 1998 value, the Purchase Price will be increased by such difference. If the value of the International Accounts Receivable as of the Closing Date is greater than the November 30, 1998 value, the Purchase Price will be decreased by such difference.

5

(3)    The Purchase Price is based on Normal Levels of Net Working Capital. If the Net Working Capital as determined by the WOC Statement exceeds $7.0 million, the Purchase Price will be increased by such excess. If the Net Working Capital as determined by the WOC Statement is less than $6.5 million, the Purchase Price will be decreased by such shortfall.

(b)    Any Purchase Price Adjustment required under Section 3.03(a)(1) must be made between Buyer and Alcoa Europe S.A. within seven days of finalization of the WOC Statement and paid in immediately available funds by the party owing such amount within seven business days following the determination of such adjustment. The net amount of all Purchase Price Adjustments required under either Section 3.03(a)(2) or (3) must be made within seven days of finalization of the WOC Statement and paid in immediately available funds by the party owing such amount within seven business days following the determination of such adjustment.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

As a material inducement to the execution, delivery and performance of this Agreement by Buyer, except as disclosed in the schedules hereto, Seller, for itself and as appropriate for Newco, hereby makes the following representations and warranties to Buyer.

**Section 4.01  Authority**. Seller has full corporate power and authority to execute and deliver this Agreement and each of the other related agreements and instruments to be executed and delivered by Seller pursuant hereto, and to consummate the transactions contemplated thereby. This Agreement and each of the related agreements are valid and binding agreements of Seller, are enforceable in accordance with their respective terms. No further action, approvals or consents are necessary for Seller to obtain from any third persons, governmental or otherwise (other than the consents and approvals listed on **Schedule 4.01** attached hereto), to make this Agreement and the related agreements valid and binding upon and enforceable against Seller in accordance with their respective terms, or to enable Seller to perform this Agreement and the related agreements and the transactions contemplated thereby, or to enable Buyer to operate the Cast Plate Business as conducted by Seller immediately prior to the Closing Date, it being understood that Seller will, subject to Section 9.06, obtain the consents and novations of the contracting parties listed on **Schedule 4.01**.

**Section 4.02  Organization and Good Standing.**

(a)    Seller is duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and has full corporate power and authority to consummate the transactions contemplated hereby. Newco is duly organized, validly existing and in good standing under the laws of the state of Delaware and has full corporate power and authority to consummate the transactions contemplated hereby.

(b)    Newco does not own, either directly or indirectly, and has no obligation, commitment or understanding to purchase or otherwise acquire, any interest or investment (whether equity or debt) in any joint venture, corporation, partnership, proprietorship or other entity or business. Seller has delivered to Buyer true and correct copies of (i) Newco's Articles of Incorporation, (ii) its Bylaws (duly certified by the Corporate Secretary of Newco), and (iii) the minute and stock books of Newco. Newco's minute book delivered to the Buyer contains minutes of all meetings of Newco's shareholders and Board of Directors and all other actions taken by such shareholder and Board of Directors since Newco's inception, and no other minutes or actions exist.

**Section 4.03  Capitalization; Title to Shares.**

(a)    Capital Shares.  The capital stock of Newco consists solely of 100 Shares of common stock, par value of One Dollar ($1.00) per share, of which 100 Shares are issued and outstanding. All of the issued and outstanding Shares are validly issued and outstanding, fully paid and non-assessable. The Shares have been issued and will be transferred to Buyer in compliance with all applicable federal, state and foreign securities laws. There are no outstanding subscriptions, options, warrants, calls or rights of any kind to purchase or otherwise acquire, and no securities convertible into, capital stock or other securities of Newco.

(b)    Title to Shares.  Seller is the owner, beneficially and of record, of all of the Shares. All of the Shares are free and clear of all Encumbrances. Seller has marketable title to all Shares.

**Section 4.04  Intellectual Property Rights.  Schedule 4.04** contains a complete and correct list and description (including the name of the owner thereof) of the Transferred Property Rights. Seller or Newco is the registered and beneficial owner of all of the Property Rights free and clear of any royalty claims or other Encumbrances except as stated on **Schedule 4.04**. To Seller's knowledge, the rights of Seller and Newco in or to such Property Rights do not conflict with or infringe on the rights of any other person, and Seller has not received any claim or notice from any person to such effect nor, to Seller's knowledge, is any other person infringing such Property Rights.

**Section 4.05  Financial Information.**  The unaudited income statement and balance sheet of the Cast Plate Business dated as of November 30, 1998, for the eleven months then ended (the **"Financials"**) are correct and complete and present fairly the financial position of the Cast Plate Business and Newco and the results of its operations for the respective period indicated, prepared in accordance with GAAP as consistently applied and described on **Schedule 1.01(j)**.

**Section 4.06  Labor and Employment.**  Except as set forth in **Schedule 4.06(a)**, Newco and the Cast Plate Business are not subject to any (i) collective bargaining or other labor agreement; or (ii) employment, retainer, or consulting agreement. Neither Seller nor Newco has committed, nor have been notified in writing of any claim to have committed, any unfair labor practice with respect to the Cast Plate Business. **Schedule 4.06(b)** contains a complete and accurate list of all Newco Employees and their remuneration.

Except as set forth on Schedule 4.06(b), none of the Newco Employees has given Seller or Newco notice that he/she will, or intends to, resign or seek other employment.

**Section 4.07  Title to Assets; Absence of Liens.**  Newco has good and marketable title to, or, in the case of leased assets, has a valid leasehold interest in, all of the Assets, except (i) as disclosed in **Schedule 4.07(a)** and (ii) for Permitted Encumbrances. **Schedule 4.07(b)** sets forth a full and complete list of all items leased by Newco.  Such leases are valid and assignable to Newco.

**Section 4.08  Real Property.**  **Schedule 4.08** sets forth a complete description of the real property owned or leased by Newco used in operation of the Cast Plate Business (the "**Real Property**").  All improvements on the Real Property are in good condition and repair, reasonable wear and tear excepted, and have been maintained in accordance with the Facility's usual business practices.

**Section 4.09  Absence of Undisclosed Liabilities.**  Except for the Assumed Liabilities, Newco does not have any other liabilities or obligations, secured or unsecured, whether accrued, absolute, contingent or otherwise.  The representations and warranties of Seller contained in this Agreement do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make such representations and warranties not misleading.  Seller is not aware of any fact which Seller reasonably believes has or is likely to have a material adverse effect on the Cast Plate Business which has not been disclosed in writing to Buyer.

**Section 4.10  Contracts.**
(a)    Copies of all material (for purposes of this Section 4.10 "**material**" means involving payment of at least $50,000 in one lump sum or during any 12 month period) contracts, agreements or arrangements relating to the Cast Plate Business have been delivered or made available to Buyer.  Such contracts are valid and binding on the parties thereto in accordance with their respective terms and are in full force and effect and are not in default in any material respect.

(b)    Except as set forth on **Schedule 4.10**, neither Newco nor the Cast Plate Business is a party to or bound by:
   (1)    any forward contract or option for the sale or purchase of any commodity;
   (2)    any contract which, by reason of the sale of the Shares or any provision of this Agreement, gives any contracting party the right to increase or otherwise modify any obligation, right or liability of Newco or the Cast Plate Business;
   (3)    any contract under which a third party guarantees any obligation of Newco or the Cast Plate Business; or
   (4)    any contract, arrangement or understanding with Seller or an Affiliate of Seller, except to the extent Newco and Seller or an Affiliate of Seller contract for the supply of PMT header board.

(c)    No material supplier or customer of the Cast Plate Business has made a serious and credible threat to cease doing business with the Cast Plate Business.

8

**Section 4.11  Agreement Will Not Cause Breach.**  Neither the execution and delivery of this Agreement nor the consummation of the transactions herein contemplated will result in or constitute any of the following: (i) a default, breach or violation of any contract, lease, license, permit, franchise, promissory note, conditional sales contract, commitment, indenture, mortgage, deed of trust, security or pledge agreement or other agreement, instrument or arrangement to which Newco is a party or to which Seller is a party in relation to the Cast Plate Business; (ii) the creation or imposition of any Encumbrance on the Shares or the Assets; (iii) a violation or breach of any writ, injunction or decree of any court or governmental instrumentality to which Newco or Seller is subject; or (iv) a breach of the Articles of Incorporation of Newco or any amendment thereto or restatement thereof.

**Section 4.12  Legal Compliance.**  Except as set forth on **Schedule 4.12**, Seller and Newco have complied in all material respects with all applicable laws (including regulations, codes, plans, judgments, orders and rulings thereunder) of federal, state, local, and foreign governments (and all agencies thereof) in operating the Cast Plate Business, and no action, hearing, investigation, claim or demand has been filed or commenced, or to Seller's knowledge, threatened against Seller or Newco alleging any failure to comply.

**Section 4.13  Litigation and Proceedings; Insurance Claims.**  Except as set forth on **Schedule 4.13(a)**, there are no claims, actions, suits, proceedings or investigations, judicial or administrative, pending related to or involving the Cast Plate Business or Newco. **Schedule 4.13(b)** sets forth a true and complete list of all claims made in the last four years against Seller's insurance policies related to the Cast Plate Business.

**Section 4.14  The Cast Plate Business.**
(a)  As a result of this Agreement and the transactions provided for herein, except for the Excluded Assets, Buyer will acquire direct or indirect beneficial ownership of all of the assets owned or used by or useful to Seller and Newco in their operation of the Cast Plate Business.
(b)  Seller hereby represents the following:
  (i)  The Cast Plate Business will be operational on the Closing Date in substantially the same manner as conducted immediately prior to the Closing Date.
  (ii)  There are no defects in the environmental, zoning or other permits pertaining to operation of the Cast Plate Business, and Seller will not undertake, directly or indirectly, any challenges to the environmental, zoning or other permits pertaining to operation of the Cast Plate Business after the Closing Date.

**Section 4.15  Approvals, Permits and Authorizations.**  Except as set forth on **Schedule 4.15**, all governmental licenses, permits, certificates of inspection, other authorizations, filings and registrations which are necessary for Newco to operate the Cast Plate Business as presently conducted (collectively, the "**Authorizations**") have

9

been duly and lawfully secured or made by Newco and are in full force and effect. There is no proceeding pending or, to Seller's knowledge, threatened to revoke or limit any Authorization, and Seller represents that it will not undertake, directly or indirectly, any challenges to the Authorization after the Closing Date. With respect to renewal of Authorizations, Seller or Newco has made, in a timely manner, all necessary filings, reports, notices and other communications with the appropriate governmental body, and has otherwise taken, in a timely manner, all other action, known or anticipated to be required to be taken by Seller or Newco, reasonably necessary to secure the renewal of the respective Authorizations prior to the date of their respective expirations.

**Section 4.16  Tax Matters.**  Seller or Newco has filed, or will prepare and timely file, all tax returns or reports that are required to be filed by it for all periods prior to or including the Closing Date for the Cast Plate Business, and such returns or reports are (or to the extent filed between the date hereof and the Closing Date will be) correct and complete. All taxes (whether or not requiring the filing of returns or reports) of Seller and Newco related to the Cast Plate Business for the aforementioned periods have been timely and fully paid or adequately reserved.

**Section 4.17  Equipment.**
(a)     Seller has provided to Buyer a complete and correct list of all items of furniture, fixtures, vehicles, machinery and equipment owned or leased by Newco and used in operating the Cast Plate Business. Each of these items is in good working condition, reasonable wear and tear excepted, and has been maintained in accordance with Seller's usual business practices. Seller makes no representation with regard to idle equipment located at the Facility and transferred with the Cast Plate Business (a list of which is attached as **Schedule 4.17(a)**), except with respect to tooling and parts acquired in anticipation of the Alca Max casting project, which tooling and parts Seller represents are in good working condition, reasonable wear and tear excepted, and have been maintained in accordance with Seller's usual business practices.
(b)     Except as set forth on **Schedule 4.17(b)**, to the knowledge of Seller, the computer hardware and software contained in the Assets as part of the Cast Plate Business (including without limitation peripherals, communication links and storage media) are Year 2000 compliant and will not require any modification, development or upgrading to allow the Cast Plate Business to operate in the same manner as it currently operates after the year 1999.

**Section 4.18  Inventory.**  The inventory of the Cast Plate Business, such as raw materials, work in process and finished goods, has been manufactured and/or maintained in accordance with Seller's usual business practices and is marketable in the ordinary course.

**Section 4.19  Employee Benefits**
(a)     **Schedule 4.19** lists each employee welfare benefit or employee pension benefit plan (individually, each an "**Employee Benefit Plan**" and collectively "**Employee**

10

**Benefit Plans**") for the Cast Plate Business that Seller or Newco maintains or to which Seller or Newco contributes or in which the Newco Employees participate.

(b)  Each such Employee Benefit Plan (and each related trust, insurance contract, or fund) complies in form and in operation in all respects with the applicable requirements of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), the Code, and other applicable laws.

**Section 4.20  Accounting Records.**  The Books and Records and Financials are true and correct in all material respects, and neither Seller nor Newco has received any notice or allegation that any of the same is incorrect or should be rectified.

**Section 4.21  Loss of Rights.**

(a)  Except as set forth on **Schedule 4.21**, execution of this Agreement will not cause the Cast Plate Business to lose the benefit of any right or privilege it presently enjoys.

(b)  To the best of Seller's knowledge, except as disclosed on Schedule 4.06(b), execution of this Agreement will not cause any officer or senior Newco employee to leave his or her employment with Newco.

**Section 4.22  Disclosure.**  Seller and Newco have taken and will continue to take reasonable steps to preserve the confidential nature of all technical knowledge, confidential information and know-how of the Cast Plate Business.  Neither Seller nor Newco is aware that any such knowledge, information or know-how is in the unauthorized possession of, or is in unauthorized use, by any third party.  Buyer acknowledges that Seller has within its corporate organization some residual knowledge of the technical knowledge, confidential information and know-how of the Cast Plate Business.

**Section 4.23  Creditors.**  Seller and Newco have paid all of the creditors of the Cast Plate Business within the credit periods normally applied to the Cast Plate Business by such creditors.

**Section 4.24  No Other Warranties or Representations.**  BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, THE ASSETS OF THE CAST PLATE BUSINESS ARE BEING CONVEYED ON AN "AS IS, WHERE IS, WITH ALL FAULTS" BASIS.  NEITHER SELLER NOR NEWCO MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, EXCEPT AS SET FORTH IN THIS ARTICLE FOUR.  BUYER HAS INSPECTED, HAS HAD AN OPPORTUNITY AND WILL CONTINUE TO HAVE THE OPPORTUNITY TO INSPECT THE ASSETS, OBLIGATIONS AND LIABILITIES OF THE CAST PLATE BUSINESS AND IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, NEWCO OR THEIR AGENTS OR REPRESENTATIVES, AS TO ANY MATTERS CONCERNING THE SAME EXCEPT AS PROVIDED IN THIS

11

AGREEMENT. NOTHING HEREIN CONTAINED IS INTENDED TO CREATE ANY THIRD PARTY BENEFICIARY RIGHTS.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

As a material inducement to the execution and delivery of this Agreement by Seller, Buyer represents and warrants to Seller as follows:

**Section 5.01  Authority.**  Buyer has full corporate power and authority to execute and deliver this Agreement and each of the other related agreements and instruments to be executed and delivered by Buyer pursuant hereto, and to consummate the transactions contemplated thereby. This Agreement and each of the related agreements are valid and binding agreements of Buyer, are enforceable in accordance with their respective terms, and no further action, approvals or consents are necessary for Buyer to obtain any actions, approvals or consents from any third persons, governmental or otherwise (other than the consents and novations listed on **Schedule 5.01** attached hereto), to make this Agreement and the related agreements valid and binding upon and enforceable against Buyer in accordance with their respective terms, or to enable Buyer to perform this Agreement and the related agreements and the transactions contemplated thereby.

**Section 5.02  Organization and Good Standing.**  Buyer is duly organized, validly existing and in good standing under the laws of Delaware and has full corporate power and authority to consummate the transactions contemplated hereby.

**Section 5.03  Validity of Contemplated Transactions.**  Neither the execution and delivery of this Agreement nor the consummation of the transactions herein contemplated will contravene or violate any law, regulation, ordinance or governmental rule to which Buyer is subject, which violation would have an adverse effect on Buyer's ability to consummate the transactions contemplated hereby. Buyer further represents and warrants that the execution and delivery of this Agreement and the consummation of the transactions herein contemplated will not cause any breach of the Articles of Incorporation or Code of Regulations or similar corporate documents of Buyer or any amendment thereto or restatement thereof.

**Section 5.04  Intent to Operate.**  Buyer is acquiring the Shares with the intention of operating the Cast Plate Business, and not with a view to the sale or distribution thereof and Buyer has no commitment or present intention to liquidate Newco or otherwise discontinue operation of the Cast Plate Business.

**Section 5.05  Litigation and Proceedings.**  Except as set forth on **Schedule 5.05**, Buyer is unaware of any claims, actions, suits, proceedings or investigations, judicial or administrative, pending or involving Buyer that seeks to restrain, prohibit or invalidate the transactions contemplated by this Agreement or that might affect the ability of the parties to consummate the transactions contemplated hereby.

**Section 5.06  Availability of Funds.**  Buyer will have available on the Closing Date sufficient funds to enable it to consummate the transactions contemplated by this Agreement.

## ARTICLE 6
## COVENANTS OF SELLER PENDING CLOSING

Seller, for itself and Newco, covenants and agrees that, from and after December 1, 1998, until the Closing Date:

**Section 6.01  Conduct of Business.**  Seller and Newco will, except as otherwise required by the Final Judgment (defined below):

(a)     conduct the Cast Plate Business and market the products and services in the ordinary course and in substantially the same manner as heretofore conducted and marketed;

(b)     maintain and keep its properties and equipment of the Cast Plate Business in substantially as good repair, working order and condition as at the date hereof, except for ordinary wear and tear;

(c)     keep in full force and effect insurance comparable in amount and scope of coverage to that maintained by it with respect to the Cast Plate Business before the date hereof (Seller's current insurance coverage with respect to the Cast Plate Business is set forth as **Schedule 6.01**);

(d)     not make any capital expenditure for the Cast Plate Business, or any commitment with respect thereto in excess of $100,000, except as provided in the capital budget of the Cast Plate Business;

(e)     use its best efforts to retain its present employees of the Cast Plate Business so that they will be available to provide service to the Cast Plate Business after the Closing, but not grant any compensation or benefits increases outside the ordinary course (except for retention bonuses, if any, granted by Seller to be paid by Seller for employment prior to the Closing Date);

(f)     not interfere with any negotiations by Buyer to employ any employee of the Cast Plate Business;

(g)     use its best efforts to maintain the existing relationships of the Cast Plate Business with its suppliers and customers so that they will be preserved after the Closing;

(h)     not take any affirmative action that would render Seller's representations and warranties hereunder inaccurate as of the Closing Date; and

(i)     not remove the Assets from the Facility except in the ordinary course of business.

**Section 6.02  Supplements to Disclosure.**  From time to time prior to the Closing, Seller, upon notice to and agreement of Buyer, will promptly supplement or amend the Schedules hereto with respect to any matter hereafter arising which, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in such schedules.

13

## ARTICLE 7
## CONDITIONS PRECEDENT TO THE CLOSING

**Section 7.01  Conditions to the Obligations of Both Parties.**  The obligations of Buyer and Seller to consummate the transactions contemplated hereby are, at the option of each party hereto, subject to the fulfillment of the following conditions precedent:

(a)    Government Order.  No injunction, writ, temporary restraining order or any order of any nature issued by any court or governmental agency may exist directing that the transactions contemplated by this Agreement not be consummated.

(b)    Government Action.  No pending or known to be threatened action, proceeding or investigation may exist before any court or governmental agency seeking as to any party hereto any injunction, writ, temporary restraining order or other such order.

(c)    Government Approval.  The United States government, in its sole discretion, must approve Buyer as an acceptable purchaser of the Cast Plate Business, and must agree that the transactions contemplated by this Agreement satisfy the requirements of the Final Judgment among the United States of America, Seller and Alumax Inc., dated June 15, 1998 ("**Final Judgment**").  Buyer and Seller may not waive this condition precedent to Closing.

(d)    No Unreasonable Conditions on Government Approval.  The United States government, in approving Buyer as an acceptable purchaser of the Cast Plate Business, must not have imposed any unreasonable conditions on Buyer to grant such approval.

**Section 7.02  Conditions Precedent to Obligation of Buyer.**  The obligation of Buyer to purchase the Shares and assume the Assumed Liabilities at the Closing is subject to the satisfaction, or the waiver by Buyer in writing, at or prior to the Closing, of the following conditions precedent:

(a)    Accuracy of Representations and Warranties.  The representations and warranties of Seller and Newco contained in this Agreement (i) qualified as to materiality must have been true and correct in all respects when made and must be true and correct in all respects at and as of Closing; and (ii) not qualified as to materiality must be true and correct in all material respects when made and must be true and correct in all material respects at and as of the Closing, except as affected by the transactions contemplated hereby.

(b)    Performance by Seller and Newco.  Seller and Newco must have duly performed and complied with, in all material respects, the terms, agreements, covenants and conditions required by this Agreement to be performed or complied with by them prior to or at the Closing.

(c)    Board Approval.  This Agreement and the transactions contemplated hereby must have been approved by Buyer's Board of Directors.

(d)    Material Changes.  Between the date of this Agreement and the Closing, there shall not have been any material adverse change to the Assets or the Cast Plate Business.

(e)    Closing Documents. Buyer must have received all of the documents required to be delivered to Buyer pursuant to Sections 8.02 and 8.04.

**Section 7.03 Conditions Precedent to Obligation of Seller.** The obligation of Seller to sell the Shares at the Closing is subject to the satisfaction, or waiver by Seller in writing, at or prior to the Closing, of the following conditions precedent:

(a)    Accuracy of Representations. The representations and warranties of Buyer contained in this Agreement must have been true and correct in all material respects when made and must be true and correct in all material respects at and as of the Closing, except as affected by the transactions contemplated hereby.

(b)    Performance by Buyer. Buyer must have duly performed and complied with, in all material respects, the terms, agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

(c)    Closing Documents. Seller must have received all of the documents and the Purchase Price required to be delivered to Seller pursuant to Sections 8.03 and 8.04.

(d)    Final Judgment. Buyer must have agreed to be bound by the provisions of the Final Judgment. Seller may not waive this condition precedent to Closing.

### ARTICLE 8
### THE CLOSING

**Section 8.01 Time, Date and Place of Closing.** The closing of the transactions contemplated in this Agreement (the **"Closing"**) will take place at the offices of Aluminum Company of America, 201 Isabella Street, Pittsburgh, Pennsylvania at 10:00 a.m. on December 31, 1998, or at such other place and time as agreed to by Seller and Buyer (the **"Closing Date"**).

**Section 8.02 Seller's Obligations at the Closing.** At the Closing, Seller will deliver or cause to be delivered to Buyer the following:

(a)    the share certificate or certificates evidencing the Shares, duly endorsed for transfer to Buyer;

(b)    a Deed of Transfer in substantially the form of **Schedule 8.02(b)** in form and substance reasonably satisfactory to Buyer and sufficient to sell, transfer and assign to Buyer (or Buyer's designee) all right, title and interest of Alcoa Europe S.A. in the European Inventory;

(c)    resignations of all officers and directors of Newco, as well as resignations of all authorized signatories on bank accounts to the extent requested by Buyer;

(d)    copies of all consents, waivers and approvals required under this Agreement, to the extent failure to obtain any such consent, waiver or approval is or is reasonably likely to be materially adverse to the Cast Plate Business;

(e)    the License Agreement attached hereto as **Schedule 2.01**, executed by Newco and Seller; and

(f)     such other evidence of the performance of all covenants and satisfaction of all
        conditions required of Seller and Newco at or prior to Closing as Buyer may
        reasonably require; and

**Section 8.03  Buyer's Obligations at the Closing.**  At the Closing, Buyer will deliver or
cause to be delivered to Seller the following:

(a)     a wire transfer of funds in an amount equal to the Purchase Price;
(b)     the Assignment and Assumption Agreement attached hereto as **Schedule 2.02**,
        executed by Buyer; and
(c)     such other evidence of the performance of all covenants and satisfaction of all
        conditions required of Buyer at or prior to Closing as Seller may reasonably
        require.

**Section 8.04  Joint Obligations at the Closing.**  At the Closing, Buyer and Seller will
execute and deliver to the other all other documents reasonably required by Seller or
Buyer to consummate the transactions contemplated by this Agreement.

## ARTICLE 9
## ADDITIONAL COVENANTS OF BUYER AND SELLER

**Section 9.01  Press Releases.**  Except as may be required by applicable law, neither
Buyer nor Seller nor any of their respective Affiliates will issue any press release or other
public communication relating to this Agreement or the transactions contemplated hereby
without the prior consent of the other party hereto.

**Section 9.02  Alcoa Name.**  After the Closing Date, Buyer may not use the names
"Alcoa," "Aluminum Company of America" or any associated trademarks for any
purpose whatsoever; provided, however, that Buyer (i) may use preprinted advertising
brochures that use or contain the Alcoa name or trademark for up to three months so that
Buyer may obtain new brochures; and (ii) will have no obligation to repackage cast plate
products packaged in materials containing the Alcoa name or trademark in inventory on
the Closing Date (though Buyer may not use after the Closing Date any packaging
containing the Alcoa name or trademark in inventory on the Closing Date if not actually
packaging cast plate).  Buyer will use its best efforts to eliminate the Alcoa name and
trademarks, through the use of stickers or otherwise, from the packaging and brochures
during this three month transition period.

**Section 9.03  Further Assurances.**  After the Closing and for no further consideration,
Buyer and Seller will perform all such other actions and will execute, acknowledge and
deliver all such assignments, transfers, consents and other documents as the other may
reasonably request to complete the transactions contemplated hereby.

**Section 9.04  PMT Header Board.**  After the Closing, Buyer, at its option, may buy
from Seller, under reasonable terms and conditions of sale and purchase, PMT Header

16

Grade calcium silicate board for ingot casting molds, machined by Seller to Buyer's specifications as approved by Seller, in an amount up to Buyer's actual requirements for the Cast Plate Business at the Facility.

**Section 9.05  Pre-Closing Diligence.**  Between the date of this Agreement and the Closing, Seller will give Buyer and its representatives (including, without limitation, its accountants, counsel and employees), upon reasonable notice and during normal business hours, reasonable access to the assets, properties, contracts, books, records, personnel and affairs of Seller relating to the Cast Plate Business (including without limitation all environmental, zoning and other permit documentation and information) and will cause Seller's officers and employees to furnish or otherwise make available to Buyer all documents, records and information (including without limitation financial, operational and other such information customarily provided as part of the diligence process) concerning the affairs of Seller relating to the Cast Plate Business as Buyer may reasonably request.  Upon prior notice to Seller, Buyer, in connection with its due diligence, may contact customers and/or suppliers of the Cast Plate Business and make other reasonable inquiries with other third parties regarding the status of their relationship with Seller and the Cast Plate Business.

**Section 9.06  Cooperation and Assignments.** From the date hereof and after the Closing Date, Seller will use its best efforts, and Buyer will cooperate with Seller, to secure all necessary consents, approvals, authorizations, exemptions and waivers from third parties required to enable Buyer to obtain the benefit of the transactions contemplated hereby.  If Seller is unable to obtain any such consent, Seller may, but is not required to, enter into a reasonable arrangement with Buyer, at Buyer's expense, designed to provide for Buyer the benefit of any such right, including enforcement of any and all rights of Seller against the other party to any contract, commitment or other similar agreement arising out of the breach or cancellation thereof by such party or otherwise.

**Section 9.07  Post-Closing Access and Cooperation.**

(a)     After the Closing Date as either party may from time to time reasonably request, the other party will provide the requesting party with such information regarding Newco and the Cast Plate Business as such party reasonably requires.  But, neither party will be obligated to provide the other party with any information of a commercially sensitive nature, relating to trade secrets or in violation of the Final Judgment, applicable law, rule or regulation or any contractual provision prohibiting disclosure.

(b)     Seller and Buyer will cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim (as defined below), including making available records relating to such Claim and furnishing, without expense to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Claim or for testimony as a witness in any proceeding relating to such Claim.

**Section 9.08 Liabilities.** Buyer agrees to pay, as they become due, the Assumed Liabilities and all debts and liabilities of Newco incurred after the Closing Date. Buyer understands and agrees that from and after the Closing, except as specifically provided in this Agreement to the contrary, Seller has no liability nor responsibility for any liability or obligation of Newco of whatever kind or nature, whether contingent or absolute, and whether arising prior to or on or after the Closing Date. Except as otherwise provided in this Agreement, however, Seller will retain responsibility for all claims, including without limitation third party claims for personal injury, filed after the Closing Date to the extent such claims relate to actions or inactions of Seller prior to the Closing Date.

**Section 9.09 Employee Matters.** The parties intend that the sale of Newco is as an ongoing business and therefore it will not constitute a shutdown for purposes of entitling any Newco Employees to immediate payment of pension or severance benefits or any other shutdown related benefits under Seller's existing labor agreements, pension or severance plans or employment policies applicable to such employees immediately prior to the Closing. Consistent with such intent of the parties, the parties agree to the following:

(a)     Comparable Employment. Buyer will offer employment to all of the non-represented Newco Employees actively at work at the Cast Plate Business on the date of the Closing ("**Non-Represented Employees**") on substantially the same terms and conditions in the aggregate as that on which they were employed at the Closing. Nothing contained herein prohibits Buyer from terminating, discharging or laying off any employees after the Closing Date. Recall to bargaining unit positions will be governed by the provisions of the applicable labor agreement. Non-Represented and represented Newco Employees who are absent from work at the Closing for reasons other than layoff (e.g., leave of absence or disability) will be offered employment by Buyer. Buyer will offer employment to any active employee of Seller for the Cast Plate Business who applies for retirement from employment with Seller, effective January 1, 1999, after the date of this Agreement and prior to five days prior to the Closing Date. Seller will provide Buyer with a list of those employees who so apply to retire within five days of the Closing Date.

(b)     Successorship. Buyer is the successor to Seller's rights and obligations in the collective bargaining agreement and the Pension Agreement identified in **Schedule 4.06(a)** with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, its local No. 808 (the "**Union**").

(c)     Compensation and Benefit Plans. For a period of one year after the Closing Date, the benefits, benefit plans and rates of pay established by Buyer and applicable to Non-Represented Employees at the Cast Plate Business who go to work for Buyer will be substantially similar in the aggregate as those applicable to such employees as of the Closing. Buyer's benefits, benefit plans and rates of pay applicable to represented Newco Employees will be as set forth in the applicable collective bargaining agreement. If any Non-Represented Employees participate in Buyer's benefit plans, Buyer will provide credit to such employees hired by Buyer for prior service as employees of Seller for all purposes under Buyer's

18

plans. For those employees who retire prior to the Closing and are hired by Buyer after the Closing, such employees will receive credit for years of prior service with Seller or an Affiliate of Seller for eligibility and vesting purposes only for all benefit plans of Buyer, except Buyer's severance plan, defined benefit plans and other post-employment benefits. Such employees also will receive service credit for seniority purposes under the bargaining agreement with the Union.

(1)    Employee Welfare Benefit Plans. As of the Closing Date, Buyer will cause Newco to maintain in accordance with their terms plans identical to Employees Group Benefit Plan of Aluminum Company of America, Plans I & II, which will exclusively cover the Newco Employees hired by Buyer (and not any other employees of Seller). As of the Closing Date, Buyer will establish new employee welfare benefit plans comparable to the employee welfare benefit plans of Seller, under which other welfare benefits will be provided to the Newco Employees hired by Buyer (e.g., Optional Life, Severance and SUB).

(2)    Defined Contribution Plans. As of the Closing Date, the Newco Employees will not be eligible for, and may no longer make contributions (or have contributions made on their behalf) to, Seller's defined contribution plans (the "**Seller DC Plans**"), other than contributions payable for periods prior to the Closing Date which have not been remitted as of the Closing Date. Seller will make all matching contributions to all Seller DC Plans with respect to the period prior to the Closing Date. Seller will cause each Newco Employee to be fully vested in such Newco Employee's account balance in a Seller DC Plan in which such Newco Employee participates as of the Closing Date. Buyer will designate one or more defined contribution plans in which the Newco Employees hired by Buyer will be eligible to participate effective as of the Closing Date (the "**Buyer DC Plans**"), and the Newco Employees hired by Buyer will be immediately eligible to participate in the Buyer DC Plans. Within 90 days of the Closing, Seller will distribute account balances of the Seller DC Plans to the Newco Employees who so elect to receive distributions. During this 90 day period, Buyer and Newco will allow the Newco Employees hired by Buyer to transfer their account balances to the Buyer DC Plans.

(3)    Defined Benefit Plans. As of the Closing Date, the Newco Employees will cease to accrue additional benefits under Seller's defined benefit pension plans. Seller will cause each such Newco Employee to be fully vested in such Newco Employee's accrued benefit under each Seller defined benefit plan in which such Newco Employee participates as of the Closing Date. As soon as practicable after the Closing Date, Seller and Buyer will transfer all benefit liabilities accrued under Seller's defined benefit plans with respect to the Newco Employees hired by Buyer, together with a corresponding amount of cash assets (as further defined below), from Seller's defined benefit plans and related trust to Buyer's defined benefit plans and related trust. Upon the completion of such liability and asset

19

transfers, neither Seller nor Seller's defined benefit plans will have any further liability with respect to such accrued benefits, and such accrued benefits will be the sole responsibility of Buyer under its defined benefit plans. With respect to the transfer of assets and liabilities from Seller's defined benefit plans, Buyer and Seller agree that Seller will transfer assets in an amount of cash necessary to comply with Code Section 414(l) as of the Closing Date using actuarial assumptions as determined by Seller and Buyer.

    (4)    <u>Vacation Pay</u>. Buyer will assume responsibility for accrued but unpaid (as of the Closing Date) vacation pay of Newco Employees hired by Buyer.

    (5)    <u>OPEB</u>. Buyer will assume responsibility and liability for other post-employment benefits (retiree medical and life insurance) for the Newco Employees hired by Buyer after the Closing Date. Seller will transfer no cash assets to Buyer for assuming this liability.

(d)    <u>Obligations Post-Closing</u>. Neither Buyer nor Newco will assume or be responsible for any liability in respect of benefits under Seller's benefit plans which are payable at any time to, or in respect of, any former or present employee of the Cast Plate Business not employed by Buyer after the Closing. Furthermore, Seller will be responsible for all claims of the Newco Employees of the Cast Plate Business who are employed by Buyer which (i) arise, within the meaning of any existing benefit program maintained by Seller for the employees of the business, prior to the date of the Closing (including without limitation claims for benefits filed after the Closing Date that Buyer can reasonably demonstrate relate to incidents that occurred prior to the Closing Date) and (ii) are payable under the terms and conditions of such program. Buyer will be responsible for all such claims for benefits which (i) arise, within the meaning of any benefit program maintained by Buyer for its employees, on or after the date of the Closing and (ii) are payable under the terms and conditions of such program.

(e)    <u>Shutdown Post-Closing</u>. Buyer will assume any pension or severance pay benefit liability or any other shutdown related benefit liability arising on account of shutdowns after the Closing. Seller will have no obligation to Buyer with respect to any liability incurred by Buyer for pension or severance pay benefits or any other shutdown of any operation after the Closing.

(f)    <u>Cooperation</u>. After the Closing, Buyer and Seller will each provide the other on a continuing basis at no cost to the other such information regarding former employees of Seller who are employed by Buyer as the other will reasonably request in order to permit proper administration of its various benefit plans applicable to such employees.

**Section 9.10  Seller's Right and Responsibilities for Taxes.**

(a)    Seller is responsible for preparing and filing all Returns required by law to be filed by Seller relating to the Cast Plate Business and covering or including periods ending on or before the Closing Date and for the payment of all Taxes due with respect to such periods. Buyer will cooperate in such preparation and filing of all such Returns, including the preparation and execution of tax forms and

related schedules for inclusion in Seller's Returns when such data becomes available to Buyer. Seller will retain any refunds received of federal, state or other taxes paid for periods ending on or before the Closing Date relating to the Cast Plate Business.

(b)     With respect to any future claims by taxing authorities arising from tax Returns relating to the Cast Plate Business and covering or including periods ending on or before the Closing Date, Seller may contest such claims at Seller's expense. Seller also may, at Seller's expense, amend any returns relating to the Cast Plate Business for the period prior to and including the Closing Date. But, to the extent that such amendment causes a Tax liability to Buyer for the period prior to the Closing Date, Seller will indemnify Buyer against such Tax liability.

## Section 9.11  Buyer's Rights and Responsibilities for Taxes

(a)     Buyer will provide to Seller within a reasonable period of time any information, including Books and Records, in its possession for the period ending on or before the Closing Date necessary to complete the Returns required to be filed by Seller or necessary in connection with any contest of any claims by or against a taxing authority.

(b)     Except as otherwise provided in this Agreement, Buyer is responsible, after the Closing Date, for the preparation and filing of all federal, state and other tax Returns required to be filed by it or Newco and the payment of all Taxes due thereunder with respect to the Cast Plate Business subsequent to the Closing Date. Seller will reimburse Buyer for all Taxes and interest or penalties, if any, paid by Buyer related to the Cast Plate Business for periods prior to the Closing Date.

## Section 9.12  Other Tax Matters.

(a)     At Buyer's option, exercisable in its sole discretion, at any time prior to the Closing, Buyer and Seller will jointly make the election provided for by Sections 338(g) and 338(h)(10) of the Code and Treasury Regulation Section 1.338(h)(10)-1 (and any comparable election under state or local tax law) with respect to Buyer's purchase of the Shares. In connection with such election, Buyer and Seller will cooperate with each other to take all actions as may be reasonably required, including execution and delivery by Seller within 30 days of the Closing Date a Form 8023 and the reporting by each of Seller and Buyer of the purchase of the Shares commitment with the election to any and all taxing authorities and on all Tax returns. Further, in the event of such election, the parties will in good faith, not later than 30 days after the Closing Date, agree upon and be bound by the "**Modified Aggregate Deemed Sales Price**" of the Assets and related allocations in accordance with Code Section 338(b)(5) and Treasury Regulation Section 1.338(h)(10)-(1)(f).

(b)     Buyer is responsible for all sales and transfer Taxes arising from the transfer of the Cast Plate Business to Buyer, including without limitation VAT on the sale of the European Inventory and sales and transfer Taxes arising from the transfer of the Assets to Newco. To the extent that transfer of the Assets to Newco causes a sales or transfer Tax liability to Seller, Buyer will indemnify Seller against such Tax liability.

**Section 9.13  Cash Dividends.**  Seller may cause Newco to dividend or otherwise transfer to Seller, or to any Affiliate of Seller, the cash receipts of Newco received from time to time before the Closing Date.

**Section 9.14  Alcoa Alca Plus.**  Seller agrees to cooperate with Buyer to the extent necessary to perfect ownership of that portion of the *Alcoa Alca Plus* trademark that can be transferred to Buyer without transfer of the "Alcoa" portion of that trademark.  As soon as practicable after the Closing Date, Buyer will file trademark registrations in the countries of its choice in the name of Newco to perfect its own ownership in the "Alca Plus" portion of this trademark.  Buyer may not use the *Alcoa Alca Plus* trademark.

**Section 9.15  Covenant Regarding Transferred Property Rights.**  Neither Newco nor Buyer will sue Seller or an Affiliate of Seller for infringement of the trade secrets and know-how contained in the Transferred Property Rights by Seller after the Closing Date, so long as Seller can reasonably demonstrate that Seller or an Affiliate of Seller was using such trade secrets or know-how prior to the Closing Date.  This covenant not to sue does not prohibit either Newco or Buyer from suing Seller or an Affiliate of Seller for unauthorized use of any trademark, tradename, service mark or service name contained in the Transferred Property Rights.

**Section 9.16  Subdivision of the Real Property.**  The parties acknowledge that the Real Property intended to be sold by Seller and purchased by Buyer as part of the Cast Plate Business under this Agreement is not currently a legal parcel in compliance with the Subdivision Map Act of the State of California, as interpreted by Los Angeles County or the City of Vernon.  The parties will cooperate and at Seller's expense use their best efforts to obtain a final parcel or subdivision map of the Real Property ("**Final Parcel Map**"), including without limitation cooperating with all governmental authorities.  If the Final Parcel Map has not been obtained by the Closing Date, the parties agree to enter into a leasing arrangement under which Seller will lease to Buyer, for no additional consideration, the Real Property.  Upon approval of the Final Parcel Map, Seller will immediately transfer, for no new consideration, the Real Property to Buyer in accordance with the terms of this Agreement.

**Section 9.17  Transition Services.**  For up to one year from the Closing Date, Seller will, at Buyer's cost and expense, provide such assistance and cooperation to Buyer as Buyer may reasonably request to ensure a smooth and efficient transfer of control of the Cast Plate Business from Seller to Buyer.  Seller will make the administrative services identified in **Schedule 9.17** available on a reasonable basis, after request by Buyer, giving appropriate consideration to Seller's ongoing business requirements.

**Section 9.18  Buyer Bound by Final Judgment.**  Buyer hereby agrees to be bound by all of the terms of the Final Judgment, as required by Article III.B of the Final Judgment.

**ARTICLE 10**
**REAL PROPERTY AND ENVIRONMENTAL MATTERS**

**Section 10.01 Definitions**.

(a)     Hazardous Substance. For purposes of this Article, "**Hazardous Substance**" means any substance, chemical or waste that is listed or defined as hazardous, toxic, or dangerous under Applicable Law (defined below).

(b)     Applicable Law. For purposes of this Article, "**Applicable Law**" means any and all federal, state and local laws concerning the protection of human health and the environment, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act ("**CERCLA**"), 42 U.S.C. §§ 9601 et seq.; the Resource Conservation and Recovery Act ("**RCRA**"), 42 U.S.C. §§ 6901, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.; the Clean Air Act, 42 U.S.C. §§ 7401, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1471 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; and the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; each, as amended from time to time, or any successor laws thereto, together with the rules and regulations promulgated thereunder, together with any and all environmental or land use laws, rules, ordinances, or regulations.

(c)     Cleanup. For purposes of this Article, "**Cleanup**" means all actions required to: (i) clean up, remove, treat or remediate any Hazardous Substance in the indoor or outdoor environment; (ii) prevent the Release of Hazardous Substances so that they do not migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations and post-remedial monitoring and care; or (iv) respond to any government requests for information or documents in any way relating to cleanup, removal, treatment or remediation of the indoor or outdoor environment.

(d)     Release. For purposes of this Article, "**Release**" means any release, spill, emission, discharge, leaking, pumping, injection, deposit, disposal, dispersal, leaching or migration into the indoor or outdoor environment (including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the movement of any Hazardous Substance through or in the air, soil, surface water, groundwater or property.

(e)     Environmental Liabilities. For purposes of this Article, "**Environmental Liabilities**" means all Losses (as defined in Article 12 below) incurred or required to be paid as a result of or arising out of:

    (i)     Hazardous Substances that are or were at, upon, in or under the Real Property prior to the Closing due to the actions or inactions of Seller or an Affiliate of Seller, the Cleanup of which either is required by a directive or order of a governmental agency or if the parties agree that Cleanup is reasonably required pursuant to Applicable Law,

    (ii)     Hazardous Substances Released at anytime at any location other than the Real Property (including Hazardous Substances emanating from the Real Property) if such Hazardous Substances were generated, stored, disposed of,

23

recycled, Released, used or transported, by or on behalf of Seller or an Affiliate of Seller prior to the Closing, or

(iii)   acts, omissions or any noncompliance with any Applicable Law by Seller or an Affiliate of Seller prior to the Closing if Cleanup of Hazardous Substances either is required by a directive or order of a governmental agency or if the parties agree that Cleanup is reasonably required pursuant to Applicable Law.

**Section 10.02 Buyer's Assessment.** Buyer may conduct and complete, at its sole cost and expense, an environmental transfer assessment of the Real Property prior to Closing ("**Buyer's Assessment**"). Seller will permit Buyer or its representatives to enter upon any and all of the Real Property for the purposes of inspection, making tests, taking samples and soil borings, and/or conducting groundwater studies, upon prior notice and consent by Seller, in order to complete Buyer's Assessment. Buyer must provide upon request a copy, excluding any portion thereof containing attorney-client privileged communications, to Seller of any reports, studies or analyses prepared by or for Buyer related to the Real Property as a result of Buyer's Assessment. All such reports, studies and analyses and any information prepared for or received or obtained by Buyer related to the Real Property must be held in strict confidence by Buyer in accordance with the Confidentiality Agreement. Seller may establish reasonable rules related to Buyer's access of the Real Property to conduct Buyer's Assessment, which will be consistent with Seller's responsibilities under the Final Judgment.

**Section 10.03  Environmental Indemnification and Remediation Activities.**

(a)    Seller will, subject to the limitations set forth in Section 12.06, indemnify, defend and hold Buyer, Affiliates of Buyer and Buyer's lenders harmless from and against any and all Environmental Liabilities. Except as disclosed to Buyer in Seller's Phase I Environmental Health and Safety Assessment Report and Limited Phase II Environmental Site Investigation and in Section 10.03(c), to Seller's knowledge, no radioactive materials, underground storage tanks, active or inactive landfills or active or inactive surface impoundments are located at the Real Property or the Facility.

(b)    Scope of Remediation.  Seller and Buyer will cooperate in response to any directive or order of a governmental agency concerning any Cleanup or any Third Party Claim (as defined in Section 12.04) seeking to hold Buyer responsible for Environmental Liabilities in accordance with this Section 10.03(b).

   (i)    Notwithstanding Section 12.04 and 12.05, upon receipt by Buyer or Seller of any directive or order of a governmental agency concerning a Cleanup for which Buyer believes it is entitled to indemnification from Seller under this Article 10, Buyer and Seller will cooperate in the development of a response to the directive or order for the purposes of achieving cost effective results, consistent with Buyer's operational needs.

   (ii)   Notwithstanding the foregoing, Seller shall have the sole right and obligation to defend, consistent with the requirements of Article 12, any Third Party Claim for which it is solely liable hereunder, and Buyer shall

24

have no right or obligation to participate or conduct the defense of such Third Party Claim.

(c)    Activities Assumed by Seller.  Seller is responsible for and will complete the remedial actions set forth below.  With respect to the remedial activities set forth in Sections 10.03(c)(1)-(4) and (6), Seller will remediate to the levels required by an authorized governmental agency to obtain a "no further action" statement (or other equivalent approval).  With respect to the remedial activities set forth in Section 10.03(c)(5), Seller will alleviate the notice of violation ("**NOV**") as required by the governmental agency that issued the NOV.  With respect to the remedial activities set forth in Section 10.03(c)(7), Seller will remediate in accordance with the requirements set forth therein.

(1)   Cleanup of all Releases of TPH and VOC known or suspected at the Real Property arising out of Stoddard solvent system contamination and one gasoline underground storage tank, as more fully described in Seller's Phase I Assessment of the Real Property or the reports referenced therein;

(2)   Cleanup of all Releases of Hazardous Substances near storm water outfalls #6 and 7, as more fully described in Seller's Phase I Assessment of the Real Property, including without limitation additional investigation and characterization of the condition of the Real Property as necessary and appropriate;

(3)   Cleanup of all Releases of PCB, VOC and TPH at the former waste disposal pit sump, as more fully described in Seller's Phase I Assessment of the Real Property or the reports referenced therein;

(4)   Investigation and Cleanup, as required by Applicable Law, of all Releases of PCB, VOC, arsenic and TPH in the subsurface soils inside and outside the southwest area of Building 112A by the scalper and planer equipment, as more fully described in Seller's Phase I Assessment of the Real Property;

(5)   Resolution of the Notice of Violation from the South Coast Air Quality Management District (AQMD) for Seller's violation of the $NO_2$ emission limit when operating furnace #5 in December 1996 and January and February 1997;

(6)   Investigation, characterization, and as required by Applicable Law, Cleanup of PCB and metals in the sludge and in the soil adjacent to the recirculating hot water system south of building 104; and

(7)   Removal of flaking lead paint and friable galbestos from interior wall areas and removal of accumulated dust and grime (composed of PCB, Title 22 heavy metals, silica and refractory fibers) from overhead steel rafters and certain horizontal surfaces at the Facility existing on the Closing Date, all at those surface areas that are described in Seller's Phase I Assessment of the Real Property and agreed to by Seller and Buyer.  Seller also will conduct industrial hygiene exposure monitoring for dust using such methods and at such times as the parties agree are appropriate to ensure that the remediation activities undertaken by Seller under this Section 10.03(c)(7) have reduced the contaminants to an appropriate clean up level.  Seller will provide a written management program to Buyer, which Buyer may use to manage such contaminants at the Facility after the Closing Date.

(d)    Seller's Failure to Remediate. Seller will indemnify Buyer for any and all
       liabilities, obligations, responsibilities, losses, damages, deficiencies, costs of
       Cleanup, remediation or compliance, other costs and expenses, fines, penalties,
       restitutions and monetary sanctions sustained, incurred or required to be paid by
       Buyer as a result of Seller's failure to complete any or all of the items listed in
       Section 10.03(c).

(e)    Business Disruption. In conducting remediation or Cleanup activities as required
       by this Article 10, Seller will use reasonable efforts to minimize disruption to
       Buyer's operation of the Facility. But, Seller will have no liability to Buyer for
       any loss of business or lost profits incurred by Buyer if Buyer suspends operation
       of the Cast Plate Business during Seller's remediation or Cleanup activities.

(f)    Limitations. Seller's obligation of indemnification or reimbursement under this
       Section 10.03, except for Environmental Liabilities outlined in Section
       10.01(e)(ii) and Section 10.03(c), is subject to, and will apply against, the
       Deductible and limitations set forth in Section 12.06, including without limitation
       the $14 million limit on liability. All claims for indemnification under this Article
       10 must be made in accordance with the notice requirements and limitations of
       Article 12.

(g)    Duration. The express indemnification set forth in this Section 10.03 of this
       Agreement will remain in full force and effect and will survive the Closing Date
       for a period of 12 years. The representation contained in the second sentence of
       Section 10.03(a) will remain in full force and effect and will survive the Closing
       Date for a period of 24 months. Liabilities included within the scope of Sections
       10.01(e)(ii) and 10.03(c) will remain the sole obligation of Seller, and Seller will
       indemnify Buyer for these liabilities, in perpetuity.

**Section 10.04 Procedures.** Buyer will enter into such agreements with Seller, on
reasonable terms and conditions, to cooperate with Seller and provide access to Seller to
the Real Property to conduct the remediation activities provided in this Article 10.

**Section 10.05 Transfer of Liability.** Except as otherwise provided in this Agreement,
as of the date of this Agreement, Buyer will assume all environmental liabilities
associated with operation of the Cast Plate Business. The parties acknowledge that,
except as otherwise provided in this Agreement, after expiration of the 12 year
indemnification period, this Agreement shifts all liabilities arising under any Applicable
Law from Seller to Buyer, and Buyer will have no claim for contribution from or against
Seller, for environmental liabilities, arising out of Seller's operation of the Cast Plate
Business or ownership of the Real Property prior to the Closing Date.

## ARTICLE 11
## SURVIVAL OF REPRESENTATIONS AND WARRANTIES

**Section 11.01. Survival.** All of the representations and warranties set forth in this
Agreement or in any exhibit, schedule, document or other instrument delivered under this

Agreement will (unless waived in writing by the party for whose benefit such representation or warranty was made) remain in full force and effect regardless of any investigation, verification or approval by or on behalf of any party hereto, and will survive the Closing Date for a period of 24 months, except that with respect to the representations made in Section 4.16 will survive for the applicable statute of limitations plus 60 days.

## ARTICLE 12
## INDEMNIFICATION

For purposes of this Agreement, "**Losses**" (or "**Loss**" in the singular) means all damages, claims, losses, costs, expenses, interest, penalties, charges and liabilities (including, without limitation, reasonable attorneys' fees, costs and expenses, reasonable expert witness and consulting fees and reasonable costs of investigation and feasibility studies incurred in investigating and defending against the assertion of any of the foregoing).

**Section 12.01  Indemnification of Buyer by Seller**.  Seller agrees to indemnify, defend and hold harmless Buyer from and against any Loss arising out of or based upon or in connection with or as a result of:

(a)     the untruth, inaccuracy or breach of any representation and warranty of Seller contained in or made pursuant to this Agreement, including in any Schedule or other agreement, document or instrument delivered under this Agreement; or

(b)     the breach or nonfulfillment of any covenant or agreement of Seller contained in this Agreement or in any other agreement, document or instrument delivered under this Agreement.

(c)     the failure of Seller to discharge in full any liability or obligation of Seller or Newco related to the Cast Plate Business that existed or occurred prior to the Closing Date, which was not expressly assumed by the Buyer under this Agreement.

**Section 12.02  Indemnification of Seller by Buyer**.  Buyer agrees to indemnify, defend and hold harmless Seller from and against any Loss arising out of or based upon or in connection with or as a result of:

(a)     the untruth, inaccuracy or breach of any representation and warranty of Buyer contained in or made pursuant to this Agreement, including in any Schedule or other agreement, document or instrument delivered under this Agreement;

(b)     the breach or nonfulfillment of any covenant or agreement of Buyer contained in this Agreement or in any other agreement, document or instrument delivered under this Agreement; or

(c)     the assertion against Seller of any liability or obligation included in the Assumed Liabilities.

**Section 12.03  Procedures for Indemnification**.  "**Indemnitor**" means the party against whom indemnity is sought, and "**Indemnitee**" means the party seeking indemnification.

27

(a)    A claim for indemnification hereunder ("**Indemnification Claim**") must be made by Indemnitee by delivery of a written declaration to Indemnitor requesting indemnification and specifying to the extent available the basis on which indemnification is sought and, if possible, the amount of asserted Losses.

(b)    The Indemnitor will have 30 days to object to such Indemnification Claim by delivery of a written notice of such objection to Indemnitee specifying in reasonable detail the basis for such objection. Objections under this provision will not relieve the Indemnitor of its obligations to defend and indemnify Indemnitee under this Agreement. Failure to timely so object will constitute acceptance of the Indemnification Claim by the Indemnitor and the Indemnification Claim will be paid in accordance with Section 11.03(c).

(c)    Upon determination of the amount of an Indemnification Claim, whether by agreement between Indemnitor and Indemnitee or otherwise, Indemnitor will pay the amount of such Indemnification Claim within 10 days of the date such amount is determined.

**Section 12.04  Defense of Third Party Claims.**  Should any claim or demand be made, cost incurred, or suit or proceeding (including, without limitation, a binding arbitration or an audit by any taxing authority) be instituted against Indemnitee which, if prosecuted successfully, could reasonably be a matter for which Indemnitee is entitled to indemnification under this Agreement (a "**Third Party Claim**"), the Indemnitor shall defend Indemnitee in a timely manner and may participate in the defense of such Third Party Claim at its cost and expense. If Indemnitor fails to defend Indemnitee, Indemnitee may select its own counsel and seek recovery of its defense costs from Indemnitor.

**Section 12.05  Settlement of Third Party Claims.**  No settlement of a Third Party Claim may be made without the prior written consent of the Indemnitor and Indemnitee, which consents may not be unreasonably withheld, conditioned or delayed. Consent is presumed in the case of settlements of $100,000 or less where the Indemnitor has not responded within 10 business days of notice of a proposed settlement.

**Section 12.06  Limitations.**

(a)    Neither Seller nor Buyer will be entitled to any recovery for indemnification unless a claim for indemnification is made in accordance with Section 12.03 and within the specified time period, whether established under Section 10.03 or Section 11.01 (regardless of whether the Loss for which the party is seeking indemnification is actually incurred after expiration of such specified time periods).

(b)    Notwithstanding anything herein to the contrary, Seller is not liable to Buyer for indemnification under this Agreement except to the extent that the aggregate amount of all damages which are demanded in a valid claim(s) and thereafter are reasonably demonstrated to have been suffered by Buyer exceeds $200,000 (the **"Deductible"**), in which event the amount which Buyer is entitled to recover in respect of such claim(s) less the Deductible will be payable; provided, however, that no Deductible will apply to claims for indemnification made by Buyer against Seller under Section 12.01(c).

(c)    Except as to liabilities within the scope of Section 10.01(e)(ii) and Seller's remediation responsibilities as set forth in Section 10.03(c), in no event will Seller's liability to Buyer under this Agreement exceed in the aggregate $14 million.  Liabilities within the scope of Section 10.01(e)(ii) and costs of remediation in accordance with Section 10.03(c) will not be subject to an aggregate limit or the Deductible.

(d)    The remedies provided in this Agreement are in lieu of all other remedies available to Seller and Buyer, as the case may be, at law or in equity (except injunctive relief to the extent appropriate) arising under this Agreement or related to the subject matter of this Agreement.

## ARTICLE 13
## MISCELLANEOUS PROVISIONS

**Section 13.01  Books and Records.**  Buyer and the Facility will retain all Books and Records relating to the Cast Plate Business for all periods from January 1, 1992 up to and including the Closing Date in a readily retrievable location for a period of 10 years from the Closing Date, and thereafter will destroy such Books and Records only after having notified Seller of its intention to do so and having offered to provide the other party with copies or the original of such Books and Records.

**Section 13.02  Expenses.**  Each of the parties will pay all costs and expenses incurred or to be incurred by it in negotiating and preparing this Agreement and in closing and carrying out the transactions contemplated by this Agreement.

**Section 13.03  Notices.**  Any notice or other communication required or permitted to be given hereunder must be in writing and hand delivered or sent by certified mail (return receipt requested) or by reputable overnight courier, or sent by telex, telegram, facsimile or cable, delivered to the respective addresses set forth below or, as to each party, at such

other address as designated by such party. All such notices and communications are effective when hand delivered or, in the case of notice by mail, telex, telegram, facsimile or cable, on the next succeeding business day following the date when sent addressed as set forth below:

If to Seller:                     Aluminum Company of America
                                  Alcoa Corporate Center
                                  201 Isabella Street
                                  Pittsburgh, PA  15212-5858
                                  Attention:  General Counsel

If to Buyer:                      Century Aluminum Company
                                  2511 Garden Road
                                  Building A, Suite 200
                                  Monterey, CA  93940
                                  Attention:  General Counsel

**Section 13.04  Entire Agreement.** This Agreement, including the Schedules and other documents referred to herein which form a part hereof, represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and supersedes all other agreements or understandings, written or oral, between the parties with respect to the subject matter hereof. This Agreement may not be amended, supplemented or changed, nor can any provision hereof be waived, except by a written instrument signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

**Section 13.05  Successors.** This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and assigns. Neither party may assign its rights hereunder without the prior written consent of the other party, except that Seller may assign this Agreement or performance of any part hereof to any Affiliate, in whole or in part, without the consent of Buyer.

**Section 13.06  Section Headings.** The section headings contained in this Agreement are for convenience of reference only and do not affect in any way the meaning or interpretation of this Agreement.

**Section 13.07  Bulk Transfer Laws.** Buyer hereby waives compliance by Seller with the provisions of any so-called bulk transfer law in any jurisdiction in connection with the sale of the Assets to Buyer. Seller will indemnify Buyer for any liability with respect to such bulk transfer laws.

**Section 13.08  Governing Law.** This Agreement has been executed and delivered in and will be construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflict of laws doctrine.

**Section 13.09  Severability.**  If at any time subsequent to the date hereof, any provision of this Agreement is held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision will be of no force and effect, but the illegality or unenforceability of such provision will have no effect upon and will not impair the enforceability of any other provision of this Agreement.

**Section 13.10  Counterparts.**  This Agreement may be executed in one or more counterparts, each of which is an original, but all of which together constitute one and the same instrument.

**Section 13.11  Parties in Interest.**  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any person other than the parties to it, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor does any provision give any third persons any right of subrogation or action over against any party to this Agreement.

**Section 13.12  Termination.**  This Agreement may be terminated and the transactions contemplated hereby abandoned:

(1)  at any time prior to the Closing Date, by mutual consent of Buyer and Seller; or

(2)  as of the Closing Date, by Seller, if Buyer has not complied with any of the conditions set forth in Article 7 by the Closing Date; provided that Seller may not terminate this Agreement under this Section 13.12 if Seller's willful breach of this Agreement has prevented Buyer's compliance with the conditions in Article 7; or

(3)  as of the Closing Date, by Buyer, if Seller has not complied with any of the conditions provided in Article 7 by the Closing Date; provided that Buyer may not terminate this Agreement under this Section 13.12 if Buyer's willful breach of this Agreement has prevented Seller's compliance with the conditions in Article 7.

**Section 13.13  Time of the Essence.**  Time is of the essence in this Agreement.

**Section 13.14  Expenses; Prorations.**  Each of the parties to this Agreement will bear all the expenses incurred by it in connection with the negotiation and preparation of this Agreement and the consummation of the transactions contemplated by this Agreement regardless of whether this Agreement is terminated.  Except as otherwise provided in this Agreement, the following taxes, charges and payments ("**Charges**") will be prorated on a per diem basis as indicated and apportioned between Seller and Buyer as of the date of the Closing: real property (annually), use (monthly), intangible taxes (monthly), utility charges (monthly), rental or lease charges (term of lease), license fees (term of lease), general assessments (taxable year) imposed with respect to the Assets and employee payrolls (monthly).  Seller will be liable for that portion of the Charges relating to, or arising in respect of, period on or prior to the date of the Closing and Buyer will be liable for that portion of the Charges relating to, or arising in respect of, any periods after the date of the Closing.

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement, as of the day and year first above written.

>  **SELLER:**
>  **ALUMINUM COMPANY OF AMERICA**
>
>  By: _____
>
>  Title: _____
>
>
>  **BUYER:**
>  **CENTURY ALUMINUM COMPANY**
>
>  By: _____
>
>  Title: _____

c:\cet\arizona\Vernon Cal Comm Acqn Agt - Final.doc
05/30/06 9:58 AM

32

| 1. | Schedule 1.01(c) | Assumed Liabilities |
|----|------------------|---------------------|
| 2. | Schedule 1.01(i) | Excluded Assets |
| 3. | Schedule 1.01(j) | GAAP Principles |
| 4. | Schedule 1.01(p) | Permitted Encumbrances |
| 5. | Schedule 2.01 | License Agreement |
| 6. | Schedule 2.02 | Assignment and Assumption Agreement |
| 7. | Schedule 4.01 | Required Consents of Seller |
| 8. | Schedule 4.04 | Transferred Property Rights; Property Rights Encumbrances Assignment of Transferred Property Rights |
| 9. | Schedule 4.06(a) | Collective Bargaining Agreements; Employment Contracts |
| 10. | Schedule 4.06(b) | Newco Employees |
| 11. | Schedule 4.07(a) | Asset Encumbrances |
| 12. | Schedule 4.07(b) | Leased Items |
| 13. | Schedule 4.08 | Real Property Exhibit A Exhibit B |
| 14. | Schedule 4.10 | Certain Contracts of Newco |
| 15. | Schedule 4.12 | Non-Compliance Matters |
| 16. | Schedule 4.13(a) | Litigation |
| 17. | Schedule 4.13(b) | Insurance Claims |
| 18. | Schedule 4.15 | Exceptions to Authorizations |
| 19. | Schedule 4.17(a) | Idle Equipment |
| 20. | Schedule 4.17(b) | Equipment Requiring Modification for Year 2000 |
| 21. | Schedule 4.19 | Employee Benefit Plans |
| 22. | Schedule 4.21 | Loss of Rights |
| 23. | Schedule 5.01 | Required Consents of Buyer |
| 24. | Schedule 5.05 | Litigation of Buyer |
| 25. | Schedule 6.01 | Seller's Insurance Coverage |
| 26. | Schedule 8.02(b) | Deed of Transfer |
| 27. | Schedule 9.17 | Transition Services |