## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ALCOA INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | C.A. No. 06-451-SLR |
| v. ) | |
| ALCAN INC., ALCAN ROLLED ) | |
| PRODUCTS-RAVENSWOOD LLC, f/k/a ) | **DEMAND FOR JURY TRIAL** |
| PECHINEY ROLLED PRODUCTS, LLC, ) | |
| PECHINEY CAST PLATE, INC., and ) | |
| CENTURY ALUMINUM COMPANY, ) | |
| ) | |
| Defendants. ) | |

### DECLARATION OF J. MICHAEL SHOWALTER IN SUPPORT OF ALCOA'S ANSWERING BRIEF IN OPPOSITION TO CENTURY ALUMINUM COMPANY'S MOTION TO DISMISS FOR FAILURE TO JOIN A PARTY UNDER RULE 19

I, J. Michael Showalter, declare as follows:

I am a member of the Bar of the State of West Virginia and the Commonwealth of Virginia and an attorney with the law firm of Hunton & Williams, counsel for Plaintiff Alcoa Inc. I make this Declaration in support of Alcoa's Answering Brief In Opposition To Century Aluminum Company's Motion To Dismiss for Failure To Join A Party Under Rule 19. I have personal knowledge of the facts set forth herein.

1.      Attached hereto as Exhibit 1 is a true and correct copy of the Acquisition Agreement by and between Aluminum Company of American and Century Aluminum Company.

2.      Attached hereto as Exhibit 2 is a true and correct copy of the Standard Offer, Agreement and Escrow Instructions for Purchase of Real Estate, dated March 20, 2006.

3.      Attached hereto as Exhibit 3 is a true and correct copy of a letter from the City of Vernon Environmental Health Department to Pechiney Cast Plate Inc. dated March 28, 2006.

4.     Attached hereto as Exhibit 4 is a true and correct copy of a letter from John F. Cermak, Jr. at Jenkens & Gilchrist, LLP to Century Aluminum Company, dated April 17, 2006.

5.     Attached hereto as Exhibit 5 is a true and correct copy of a letter from Peter McGuire of Century Aluminum Company to Aluminum Company of America, dated May 8, 2006.

6.     Attached hereto as Exhibit 6 is a true and correct copy of a letter from Jaime Mackay to Lewis J. Pozzebon, Director of Environmental Health, City of Vernon, California, dated August 30, 2006.

7.     Attached hereto as Exhibit 7 are true and correct copies of letters from the City of Vernon.

8.     Attached hereto as Exhibit 8 is a true and correct copy of the Final Judgment in *United States v. Aluminum Corp. of America, et al.*, No. 98-1497 (D.D.C. June 15, 1998).

9.     Attached hereto as Exhibit 9 is a true and correct copy of a letter from the City of Vernon Environmental Health Department to Jamie MacKay, dated July 18, 2006.

        I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.

Dated: February 12, 2007

_____
J. Michael Showalter

2

# EXHIBIT 1

## ACQUISITION AGREEMENT

**THIS ACQUISITION AGREEMENT** (this "**Agreement**") is made the 22nd day of December, 1998, by and between **ALUMINUM COMPANY OF AMERICA**, a Pennsylvania corporation (hereinafter "**Seller**"), and **CENTURY ALUMINUM COMPANY**, a Delaware corporation (hereinafter "**Buyer**").

### BACKGROUND

1.  Seller owns the Cast Plate Business (defined below), located at 5401 Alcoa Avenue, Vernon, California  90058 (the "**Facility**").

2.  Seller transferred certain of the assets of the Cast Plate Business to "Newco," a newly created, wholly owned subsidiary of Seller.

3.  Seller desires to sell all of the common stock of Newco to Buyer, and Buyer desires to purchase the same from Seller, upon the terms and conditions set forth below.

**NOW, THEREFORE**, in consideration of the premises and the covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE 1
### DEFINITIONS

**Section 1.01  Certain Definitions.**  As used in this Agreement, the following terms have the following meanings unless the context otherwise requires:

(a)   "**Affiliate**" means any Person, directly or indirectly, controlling, controlled by, or under common control with Seller.  Without limiting the generality of the foregoing, a Person is considered to be in control of or to be controlled by another Person if such Person holds 50% or more of the outstanding voting equity interest in such other Person or such other Person holds 50% or more of its outstanding voting equity interest.

(b)   "**Assets**" means all of the assets of Seller of every kind, character and description, tangible and intangible (other than the Excluded Assets), used in the Cast Plate Business, located at the Facility or otherwise necessary for operation of the Cast Plate Business, including without limitation:

   (1)   all tangible assets located at the Facility, including without limitation the cast plate manufacturing facility and Real Property (defined below), all manufacturing assets including capital equipment, vehicles, supplies, personal property, inventory (including the European Inventory), office furniture, fixed assets and fixtures, materials, on-site warehouse or storage facilities, and other tangible property or improvements used in the Cast Plate Business; all licenses, permits and authorizations issued by any



governmental organization relating to the Cast Plate Business; all contracts, agreements, leases, commitments and understandings pertaining to the Cast Plate Business; all customer lists, contracts, accounts and credit records located at the Facility; and all other Books and Records.

(2)     Transferred Property Rights.

(3)     all research data concerning historic and current research and development efforts relating to the Cast Plate Business located at the Facility, including designs of experiments and the results of unsuccessful designs and experiments.

(c)     **"Assumed Liabilities"** means those obligations of Seller being assumed by Buyer pursuant to this Agreement, as identified on **Schedule 1.01(c)** hereto.

(d)     **"Books and Records"** means all books and records and operating data solely relating to the Cast Plate Business, including, but not limited to, all lists of customers, lists of suppliers, all sales and credit information, advertising and purchasing materials and correspondence, quotation records, resume files, payroll master files and all collection, credit and accounting records.

(e)     **"Cast Plate Business"** means the cast plate manufacturing and sales business and supporting activities of Seller as conducted at or from the Facility in Vernon, California.

(f)     **"Code"** means the Internal Revenue Code of 1986, as amended. All citations to the Code or to the regulations promulgated thereunder include any amendments or any substitute or successor provisions thereto.

(g)     **"Confidentiality Agreement"** means that certain non-disclosure agreement between Buyer and Seller, dated July 21, 1998.

(h)     **"Encumbrance"** means any mortgage, covenant, condition, restriction, easement, right of way, option, lien, pledge, lease, charge, equity, claim, conditional sales contract, or security interest.

(i)     **"Excluded Assets"** means those assets of Seller of the Cast Plate Business that Seller will retain, which assets are identified on **Schedule 1.01(i)** to this Agreement.

(j)     **"GAAP"** means generally accepted accounting principles as applied by Seller in preparation of its financial statements, as further described in **Schedule 1.01(j)**. The methodology described therein will be the methodology used to prepare the WOC Statement.

(k)     **"Intangible Assets"** means all patents, license and sublicenses, intellectual property, technical information, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, quality assurance and control procedures, design tools and simulation capability, and all manuals and technical information Seller provides to its own employees, customers, suppliers, agents or licensees.

(l)     **"Net Working Capital"** means all of Newco's accounts receivables (including for this calculation purpose the International Accounts Receivable) and inventory (including for this calculation purpose the European Inventory), minus trade payables and all other current liabilities, all properly valued to reflect actual

condition and collectability on the Closing Date and consistently prepared in accordance with GAAP.

(m) "**Newco Employees**" means all of the salaried and hourly employees of the Cast Plate Business who are actively employed (including those employees currently on an authorized leave of absence, but excluding any employee on layoff status and any employee who retires from Seller effective January 1, 1999) by Seller as of the day before the Closing identified on **Schedule 4.06(b)**.

(n) "**Normal Levels**" with respect to Net Working Capital means the cumulative amounts required by Newco to permit normal ongoing operation of the Cast Plate Business under normal business conditions as of the Closing Date, provided that it is any amount between $6.5 million and $7.0 million.

(o) "**Person**" means a natural person, a corporation, a partnership or any other entity.

(p) "**Permitted Encumbrances**" means liens disclosed on **Schedule 1.01(p)**, liens for taxes and assessments not yet payable or being contested in good faith, and other imperfections of title, the existence of which does not and is not expected to have a material adverse effect on the operation of the Cast Plate Business.

(q) "**Property Rights**" means collectively Transferred Property Rights and Licensed Property Rights (as defined in Section 2.01).

(r) "**Return**" or "**Returns**" means all returns, declarations, reports, statements, and other documents required to be filed in respect of Taxes.

(s) "**Shares**" means all of the issued and outstanding capital stock of Newco.

(t) "**Tax**" or "**Taxes**" means any federal, state, local, foreign or other taxes (including, without limitation, income (net or gross), gross receipts, profits, alternative or add-on minimum, franchise, license, capital, capital stock, intangible, services, premium, mining, transfer, sales, use, ad valorem, payroll, wage, severance, employment, occupation, property (real or personal), windfall profits, import, excise, custom, stamp, withholding or governmental charges of any kind whatsoever (including interest, penalties, additions to tax or additional amounts with respect to such items).

(u) "**Transferred Property Rights**" means the intellectual property identified in **Schedule 4.04** and all trademarks, trade names, service marks and services names (except to the extent such intangible assets contain the name "Alcoa") used exclusively by the Cast Plate Business, as identified in Section 4.04 and as further provided in Section 9.14.

(v) "**European Inventory**" means the product inventory held and owned by Seller's wholly-owned subsidiary, Alcoa Europe S.A., for sale to the European customers of the Cast Plate Business.

(w) "**International Accounts Receivable**" means all accounts receivable of Seller's International selling companies for product sold to customers outside the United States and all products directly en route to customers outside the United States (and related accounts receivable).

# ARTICLE 2
# PURCHASE AND SALE

**Section 2.01  Transfer of Cast Plate Business to Newco.**  Except as otherwise provided in this Agreement, before the Closing Date, Seller will have transferred all of the Assets to Newco, except that on the Closing Date Seller will cause its wholly-owned subsidiary, Alcoa Europe S.A., to directly transfer the European Inventory from Seller's Paal, Belgium warehouse (operated by Seller's wholly-owned subsidiary, N.V. AISC Belgium) to Buyer or Buyer's designee.  In addition, prior to the Closing Date, Seller will grant a perpetual, nonexclusive, fully paid-up license to Newco in the form of **Schedule 2.01** (the "**License Agreement**"), to use, in manufacturing cast plate within the United States, all Intangible Assets, wherever located, that have been used in the manufacture of cast plate at the Facility ("**Licensed Property Rights**").

**Section 2.02  Purchase and Sale of the Shares.**  Subject to the terms and conditions set forth in this Agreement, on the Closing Date, Seller hereby agrees to transfer, sell and convey the Shares to Buyer free and clear of all Encumbrances, and Buyer hereby agrees to purchase the Shares from Seller and assume the Assumed Liabilities for the consideration specified in this Agreement.  Buyer's assumption of the Assumed Liabilities will be evidenced by the execution and delivery of an Assignment and Assumption Agreement in the form of **Schedule 2.02**.

**Section 2.03  Purchase Price.**  As consideration for the sale of the Shares and the European Inventory to Buyer and the License Agreement, Buyer will pay to Seller (or Seller's designee) $8 million.  This sum, as it may be adjusted pursuant to Article 3 below, is the "**Purchase Price.**"

**Section 2.04  Payment of the Purchase Price.**
(a)     Buyer will pay the Purchase Price to Seller by means of:
      (1)     Seller's retention of the International Accounts Receivable as of the Closing Date;
      (2)     a cash payment at Closing by Buyer or Buyer's designee to Alcoa Europe S.A. for the European Inventory in the amount of (book value of the European Inventory/.82) as of the Closing Date; and
      (3)     a cash payment equal to $8 million less the value of items (1) and (2) of this Section 2.04(a).
The parties agree that the value of the European Inventory and International Accounts Receivable reflected on the Financials (defined below) as at November 30, 1998 will be used for purposes of calculating the Purchase Price to be paid on the Closing Date.
(b)     On the Closing Date, Buyer will transfer to banks specified by Seller and Alcoa Europe S.A. by wire transfer of immediately available funds no later than 1:00 (one o'clock) in the afternoon (Eastern Standard Time) the amount of the Purchase Price due and owing each of Seller and Alcoa Europe S.A. as set forth in Section 2.03 above and in accordance with Section 2.04(a).  If the payment is

made after 1:00 (one o'clock) in the afternoon on the day after the Closing Date, Buyer must pay to Seller, in the manner set forth above, interest on such amount at an annual rate equal to five percent (5%) from that date until payment is made, but not including the day on which payment is made.

## ARTICLE 3
## ADJUSTMENT TO PURCHASE PRICE

**Section 3.01  Preparation of WOC Statement.**  As soon as practicable, but in any event within 60 days after the Closing Date, Seller will prepare and deliver to Buyer an unaudited statement of Net Working Capital as of the Closing Date ("**WOC Statement**"). Buyer will give Seller and its independent auditors access at all reasonable times to the properties, books and records of Newco comprised in the Assets for such purpose. The WOC Statement will be prepared in accordance with GAAP.

**Section 3.02  Review of WOC Statement.**  Buyer will have 30 days from the date of submission of the WOC Statement to review the WOC Statement. Within such 30 day period, Buyer must advise Seller in writing of any adjustment Buyer believes is required to cause the WOC Statement to be consistent with GAAP. If Buyer does not request an adjustment within the 30 day period, the WOC Statement will be considered final. If any such adjustment is requested and is then disputed by Seller, Buyer and Seller must negotiate in good faith to resolve such dispute. If the parties agree that the proposed adjustment is required, the WOC Statement will be adjusted accordingly and it will then be final. If, after a period of 30 days following the date on which notice of any proposed adjustment is given, any adjustment still remains disputed, then Seller and Buyer will engage by mutual agreement (or failing mutual agreement, by lot) an independent auditor from one of the "Big Five" accounting firms (excluding the firms regularly used by Seller and Buyer) (the "**Auditor**") to resolve any remaining disputes. The decision of the Auditor is final and binding on the parties. The fees and expenses of the Auditor will be borne equally by Seller and Buyer, unless the Auditor reasonably concludes that another allocation of his or her fees and expenses is more equitable and appropriate given the legitimacy of the dispute.

**Section 3.03  Adjustment to Purchase Price.**
(a)     The Purchase Price will be adjusted as follows:
    (1)     If the value of the European Inventory as of the Closing Date is less than the November 30, 1998 value, the Purchase Price will be increased by such difference. If the value of the European Inventory as of the Closing Date is greater than the November 30, 1998 value, the Purchase Price will be decreased by such difference.
    (2)     If the value of the International Accounts Receivable as of the Closing Date is less than the November 30, 1998 value, the Purchase Price will be increased by such difference. If the value of the International Accounts Receivable as of the Closing Date is greater than the November 30, 1998 value, the Purchase Price will be decreased by such difference.

(3)    The Purchase Price is based on Normal Levels of Net Working Capital. If the Net Working Capital as determined by the WOC Statement exceeds $7.0 million, the Purchase Price will be increased by such excess. If the Net Working Capital as determined by the WOC Statement is less than $6.5 million, the Purchase Price will be decreased by such shortfall.

(b)    Any Purchase Price Adjustment required under Section 3.03(a)(1) must be made between Buyer and Alcoa Europe S.A. within seven days of finalization of the WOC Statement and paid in immediately available funds by the party owing such amount within seven business days following the determination of such adjustment. The net amount of all Purchase Price Adjustments required under either Section 3.03(a)(2) or (3) must be made within seven days of finalization of the WOC Statement and paid in immediately available funds by the party owing such amount within seven business days following the determination of such adjustment.

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF SELLER

As a material inducement to the execution, delivery and performance of this Agreement by Buyer, except as disclosed in the schedules hereto, Seller, for itself and as appropriate for Newco, hereby makes the following representations and warranties to Buyer.

**Section 4.01  Authority.**  Seller has full corporate power and authority to execute and deliver this Agreement and each of the other related agreements and instruments to be executed and delivered by Seller pursuant hereto, and to consummate the transactions contemplated thereby. This Agreement and each of the related agreements are valid and binding agreements of Seller, are enforceable in accordance with their respective terms. No further action, approvals or consents are necessary for Seller to obtain from any third persons, governmental or otherwise (other than the consents and approvals listed on **Schedule 4.01** attached hereto), to make this Agreement and the related agreements valid and binding upon and enforceable against Seller in accordance with their respective terms, or to enable Seller to perform this Agreement and the related agreements and the transactions contemplated thereby, or to enable Buyer to operate the Cast Plate Business as conducted by Seller immediately prior to the Closing Date, it being understood that Seller will, subject to Section 9.06, obtain the consents and novations of the contracting parties listed on **Schedule 4.01**.

**Section 4.02  Organization and Good Standing.**
(a)    Seller is duly organized, validly existing and in good standing under the laws of the Commonwealth of Pennsylvania and has full corporate power and authority to consummate the transactions contemplated hereby. Newco is duly organized, validly existing and in good standing under the laws of the state of Delaware and has full corporate power and authority to consummate the transactions contemplated hereby.

6

(b)     Newco does not own, either directly or indirectly, and has no obligation, commitment or understanding to purchase or otherwise acquire, any interest or investment (whether equity or debt) in any joint venture, corporation, partnership, proprietorship or other entity or business. Seller has delivered to Buyer true and correct copies of (i) Newco's Articles of Incorporation, (ii) its Bylaws (duly certified by the Corporate Secretary of Newco), and (iii) the minute and stock books of Newco. Newco's minute book delivered to the Buyer contains minutes of all meetings of Newco's shareholders and Board of Directors and all other actions taken by such shareholder and Board of Directors since Newco's inception, and no other minutes or actions exist.

**Section 4.03  Capitalization; Title to Shares.**

(a)     <u>Capital Shares.</u>  The capital stock of Newco consists solely of 100 Shares of common stock, par value of One Dollar ($1.00) per share, of which 100 Shares are issued and outstanding. All of the issued and outstanding Shares are validly issued and outstanding, fully paid and non-assessable. The Shares have been issued and will be transferred to Buyer in compliance with all applicable federal, state and foreign securities laws. There are no outstanding subscriptions, options, warrants, calls or rights of any kind to purchase or otherwise acquire, and no securities convertible into, capital stock or other securities of Newco.

(b)     <u>Title to Shares.</u>  Seller is the owner, beneficially and of record, of all of the Shares. All of the Shares are free and clear of all Encumbrances. Seller has marketable title to all Shares.

**Section 4.04  Intellectual Property Rights.  Schedule 4.04** contains a complete and correct list and description (including the name of the owner thereof) of the Transferred Property Rights. Seller or Newco is the registered and beneficial owner of all of the Property Rights free and clear of any royalty claims or other Encumbrances except as stated on **Schedule 4.04**. To Seller's knowledge, the rights of Seller and Newco in or to such Property Rights do not conflict with or infringe on the rights of any other person, and Seller has not received any claim or notice from any person to such effect nor, to Seller's knowledge, is any other person infringing such Property Rights.

**Section 4.05  Financial Information.**  The unaudited income statement and balance sheet of the Cast Plate Business dated as of November 30, 1998, for the eleven months then ended (the "**Financials**") are correct and complete and present fairly the financial position of the Cast Plate Business and Newco and the results of its operations for the respective period indicated, prepared in accordance with GAAP as consistently applied and described on **Schedule 1.01(j)**.

**Section 4.06  Labor and Employment.**  Except as set forth in **Schedule 4.06(a)**, Newco and the Cast Plate Business are not subject to any (i) collective bargaining or other labor agreement; or (ii) employment, retainer, or consulting agreement. Neither Seller nor Newco has committed, nor have been notified in writing of any claim to have committed, any unfair labor practice with respect to the Cast Plate Business. **Schedule 4.06(b)** contains a complete and accurate list of all Newco Employees and their remuneration.

Except as set forth on Schedule 4.06(b), none of the Newco Employees has given Seller or Newco notice that he/she will, or intends to, resign or seek other employment.

**Section 4.07  Title to Assets; Absence of Liens.**  Newco has good and marketable title to, or, in the case of leased assets, has a valid leasehold interest in, all of the Assets, except (i) as disclosed in **Schedule 4.07(a)** and (ii) for Permitted Encumbrances. **Schedule 4.07(b)** sets forth a full and complete list of all items leased by Newco.  Such leases are valid and assignable to Newco.

**Section 4.08  Real Property.  Schedule 4.08** sets forth a complete description of the real property owned or leased by Newco used in operation of the Cast Plate Business (the "**Real Property**").  All improvements on the Real Property are in good condition and repair, reasonable wear and tear excepted, and have been maintained in accordance with the Facility's usual business practices.

**Section 4.09  Absence of Undisclosed Liabilities.**  Except for the Assumed Liabilities, Newco does not have any other liabilities or obligations, secured or unsecured, whether accrued, absolute, contingent or otherwise.  The representations and warranties of Seller contained in this Agreement do not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make such representations and warranties not misleading.  Seller is not aware of any fact which Seller reasonably believes has or is likely to have a material adverse effect on the Cast Plate Business which has not been disclosed in writing to Buyer.

**Section 4.10  Contracts.**
(a)     Copies of all material (for purposes of this Section 4.10 "**material**" means involving payment of at least $50,000 in one lump sum or during any 12 month period) contracts, agreements or arrangements relating to the Cast Plate Business have been delivered or made available to Buyer.  Such contracts are valid and binding on the parties thereto in accordance with their respective terms and are in full force and effect and are not in default in any material respect.
(b)     Except as set forth on **Schedule 4.10**, neither Newco nor the Cast Plate Business is a party to or bound by:
    (1)     any forward contract or option for the sale or purchase of any commodity;
    (2)     any contract which, by reason of the sale of the Shares or any provision of this Agreement, gives any contracting party the right to increase or otherwise modify any obligation, right or liability of Newco or the Cast Plate Business;
    (3)     any contract under which a third party guarantees any obligation of Newco or the Cast Plate Business; or
    (4)     any contract, arrangement or understanding with Seller or an Affiliate of Seller, except to the extent Newco and Seller or an Affiliate of Seller contract for the supply of PMT header board.
(c)     No material supplier or customer of the Cast Plate Business has made a serious and credible threat to cease doing business with the Cast Plate Business.

**Section 4.11  Agreement Will Not Cause Breach.**  Neither the execution and delivery of this Agreement nor the consummation of the transactions herein contemplated will result in or constitute any of the following: (i) a default, breach or violation of any contract, lease, license, permit, franchise, promissory note, conditional sales contract, commitment, indenture, mortgage, deed of trust, security or pledge agreement or other agreement, instrument or arrangement to which Newco is a party or to which Seller is a party in relation to the Cast Plate Business; (ii) the creation or imposition of any Encumbrance on the Shares or the Assets; (iii) a violation or breach of any writ, injunction or decree of any court or governmental instrumentality to which Newco or Seller is subject; or (iv) a breach of the Articles of Incorporation of Newco or any amendment thereto or restatement thereof.

**Section 4.12  Legal Compliance.**  Except as set forth on **Schedule 4.12**, Seller and Newco have complied in all material respects with all applicable laws (including regulations, codes, plans, judgments, orders and rulings thereunder) of federal, state, local, and foreign governments (and all agencies thereof) in operating the Cast Plate Business, and no action, hearing, investigation, claim or demand has been filed or commenced, or to Seller's knowledge, threatened against Seller or Newco alleging any failure to comply.

**Section 4.13  Litigation and Proceedings; Insurance Claims.**  Except as set forth on **Schedule 4.13(a)**, there are no claims, actions, suits, proceedings or investigations, judicial or administrative, pending related to or involving the Cast Plate Business or Newco.  **Schedule 4.13(b)** sets forth a true and complete list of all claims made in the last four years against Seller's insurance policies related to the Cast Plate Business.

**Section 4.14  The Cast Plate Business.**
(a)     As a result of this Agreement and the transactions provided for herein, except for the Excluded Assets, Buyer will acquire direct or indirect beneficial ownership of all of the assets owned or used by or useful to Seller and Newco in their operation of the Cast Plate Business.
(b)     Seller hereby represents the following:
        (i)     The Cast Plate Business will be operational on the Closing Date in substantially the same manner as conducted immediately prior to the Closing Date.
        (ii)    There are no defects in the environmental, zoning or other permits pertaining to operation of the Cast Plate Business, and Seller will not undertake, directly or indirectly, any challenges to the environmental, zoning or other permits pertaining to operation of the Cast Plate Business after the Closing Date.

**Section 4.15   Approvals, Permits and Authorizations.**  Except as set forth on **Schedule 4.15**, all governmental licenses, permits, certificates of inspection, other authorizations, filings and registrations which are necessary for Newco to operate the Cast Plate Business as presently conducted (collectively, the "**Authorizations**") have

been duly and lawfully secured or made by Newco and are in full force and effect. There is no proceeding pending or, to Seller's knowledge, threatened to revoke or limit any Authorization, and Seller represents that it will not undertake, directly or indirectly, any challenges to the Authorization after the Closing Date. With respect to renewal of Authorizations, Seller or Newco has made, in a timely manner, all necessary filings, reports, notices and other communications with the appropriate governmental body, and has otherwise taken, in a timely manner, all other action, known or anticipated to be required to be taken by Seller or Newco, reasonably necessary to secure the renewal of the respective Authorizations prior to the date of their respective expirations.

**Section 4.16 Tax Matters.** Seller or Newco has filed, or will prepare and timely file, all tax returns or reports that are required to be filed by it for all periods prior to or including the Closing Date for the Cast Plate Business, and such returns or reports are (or to the extent filed between the date hereof and the Closing Date will be) correct and complete. All taxes (whether or not requiring the filing of returns or reports) of Seller and Newco related to the Cast Plate Business for the aforementioned periods have been timely and fully paid or adequately reserved.

**Section 4.17 Equipment.**
(a)     Seller has provided to Buyer a complete and correct list of all items of furniture, fixtures, vehicles, machinery and equipment owned or leased by Newco and used in operating the Cast Plate Business. Each of these items is in good working condition, reasonable wear and tear excepted, and has been maintained in accordance with Seller's usual business practices. Seller makes no representation with regard to idle equipment located at the Facility and transferred with the Cast Plate Business (a list of which is attached as **Schedule 4.17(a)**), except with respect to tooling and parts acquired in anticipation of the Alca Max casting project, which tooling and parts Seller represents are in good working condition, reasonable wear and tear excepted, and have been maintained in accordance with Seller's usual business practices.
(b)     Except as set forth on **Schedule 4.17(b)**, to the knowledge of Seller, the computer hardware and software contained in the Assets as part of the Cast Plate Business (including without limitation peripherals, communication links and storage media) are Year 2000 compliant and will not require any modification, development or upgrading to allow the Cast Plate Business to operate in the same manner as it currently operates after the year 1999.

**Section 4.18 Inventory.** The inventory of the Cast Plate Business, such as raw materials, work in process and finished goods, has been manufactured and/or maintained in accordance with Seller's usual business practices and is marketable in the ordinary course.

**Section 4.19 Employee Benefits**
(a)     **Schedule 4.19** lists each employee welfare benefit or employee pension benefit plan (individually, each an "**Employee Benefit Plan**" and collectively "**Employee**

**Benefit Plans**") for the Cast Plate Business that Seller or Newco maintains or to which Seller or Newco contributes or in which the Newco Employees participate.

(b)     Each such Employee Benefit Plan (and each related trust, insurance contract, or fund) complies in form and in operation in all respects with the applicable requirements of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), the Code, and other applicable laws.

**Section 4.20  Accounting Records.**  The Books and Records and Financials are true and correct in all material respects, and neither Seller nor Newco has received any notice or allegation that any of the same is incorrect or should be rectified.

**Section 4.21  Loss of Rights.**

(a)     Except as set forth on **Schedule 4.21**, execution of this Agreement will not cause the Cast Plate Business to lose the benefit of any right or privilege it presently enjoys.

(b)     To the best of Seller's knowledge, except as disclosed on Schedule 4.06(b), execution of this Agreement will not cause any officer or senior Newco employee to leave his or her employment with Newco.

**Section 4.22  Disclosure.**  Seller and Newco have taken and will continue to take reasonable steps to preserve the confidential nature of all technical knowledge, confidential information and know-how of the Cast Plate Business.  Neither Seller nor Newco is aware that any such knowledge, information or know-how is in the unauthorized possession of, or is in unauthorized use, by any third party.  Buyer acknowledges that Seller has within its corporate organization some residual knowledge of the technical knowledge, confidential information and know-how of the Cast Plate Business.

**Section 4.23  Creditors.**  Seller and Newco have paid all of the creditors of the Cast Plate Business within the credit periods normally applied to the Cast Plate Business by such creditors.

**Section 4.24  No Other Warranties or Representations.**  BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, THE ASSETS OF THE CAST PLATE BUSINESS ARE BEING CONVEYED ON AN "AS IS, WHERE IS, WITH ALL FAULTS" BASIS.  NEITHER SELLER NOR NEWCO MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, EXCEPT AS SET FORTH IN THIS ARTICLE FOUR.  BUYER HAS INSPECTED, HAS HAD AN OPPORTUNITY AND WILL CONTINUE TO HAVE THE OPPORTUNITY TO INSPECT THE ASSETS, OBLIGATIONS AND LIABILITIES OF THE CAST PLATE BUSINESS AND IS NOT RELYING ON ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND WHATSOEVER, EXPRESS OR IMPLIED, FROM SELLER, NEWCO OR THEIR AGENTS OR REPRESENTATIVES, AS TO ANY MATTERS CONCERNING THE SAME EXCEPT AS PROVIDED IN THIS

AGREEMENT.  NOTHING HEREIN CONTAINED IS INTENDED TO CREATE ANY THIRD PARTY BENEFICIARY RIGHTS.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

As a material inducement to the execution and delivery of this Agreement by Seller, Buyer represents and warrants to Seller as follows:

**Section 5.01  Authority.**  Buyer has full corporate power and authority to execute and deliver this Agreement and each of the other related agreements and instruments to be executed and delivered by Buyer pursuant hereto, and to consummate the transactions contemplated thereby.  This Agreement and each of the related agreements are valid and binding agreements of Buyer, are enforceable in accordance with their respective terms, and no further action, approvals or consents are necessary for Buyer to obtain any actions, approvals or consents from any third persons, governmental or otherwise (other than the consents and novations listed on **Schedule 5.01** attached hereto), to make this Agreement and the related agreements valid and binding upon and enforceable against Buyer in accordance with their respective terms, or to enable Buyer to perform this Agreement and the related agreements and the transactions contemplated thereby.

**Section 5.02  Organization and Good Standing.**  Buyer is duly organized, validly existing and in good standing under the laws of Delaware and has full corporate power and authority to consummate the transactions contemplated hereby.

**Section 5.03  Validity of Contemplated Transactions.**  Neither the execution and delivery of this Agreement nor the consummation of the transactions herein contemplated will contravene or violate any law, regulation, ordinance or governmental rule to which Buyer is subject, which violation would have an adverse effect on Buyer's ability to consummate the transactions contemplated hereby.  Buyer further represents and warrants that the execution and delivery of this Agreement and the consummation of the transactions herein contemplated will not cause any breach of the Articles of Incorporation or Code of Regulations or similar corporate documents of Buyer or any amendment thereto or restatement thereof.

**Section 5.04  Intent to Operate.**  Buyer is acquiring the Shares with the intention of operating the Cast Plate Business, and not with a view to the sale or distribution thereof and Buyer has no commitment or present intention to liquidate Newco or otherwise discontinue operation of the Cast Plate Business.

**Section 5.05  Litigation and Proceedings.**  Except as set forth on **Schedule 5.05**, Buyer is unaware of any claims, actions, suits, proceedings or investigations, judicial or administrative, pending or involving Buyer that seeks to restrain, prohibit or invalidate the transactions contemplated by this Agreement or that might affect the ability of the parties to consummate the transactions contemplated hereby.

**Section 5.06  Availability of Funds.** Buyer will have available on the Closing Date sufficient funds to enable it to consummate the transactions contemplated by this Agreement.

## ARTICLE 6
## COVENANTS OF SELLER PENDING CLOSING

Seller, for itself and Newco, covenants and agrees that, from and after December 1, 1998, until the Closing Date:

**Section 6.01  Conduct of Business.** Seller and Newco will, except as otherwise required by the Final Judgment (defined below):

(a)  conduct the Cast Plate Business and market the products and services in the ordinary course and in substantially the same manner as heretofore conducted and marketed;

(b)  maintain and keep its properties and equipment of the Cast Plate Business in substantially as good repair, working order and condition as at the date hereof, except for ordinary wear and tear;

(c)  keep in full force and effect insurance comparable in amount and scope of coverage to that maintained by it with respect to the Cast Plate Business before the date hereof (Seller's current insurance coverage with respect to the Cast Plate Business is set forth as **Schedule 6.01**);

(d)  not make any capital expenditure for the Cast Plate Business, or any commitment with respect thereto in excess of $100,000, except as provided in the capital budget of the Cast Plate Business;

(e)  use its best efforts to retain its present employees of the Cast Plate Business so that they will be available to provide service to the Cast Plate Business after the Closing, but not grant any compensation or benefits increases outside the ordinary course (except for retention bonuses, if any, granted by Seller to be paid by Seller for employment prior to the Closing Date);

(f)  not interfere with any negotiations by Buyer to employ any employee of the Cast Plate Business;

(g)  use its best efforts to maintain the existing relationships of the Cast Plate Business with its suppliers and customers so that they will be preserved after the Closing;

(h)  not take any affirmative action that would render Seller's representations and warranties hereunder inaccurate as of the Closing Date; and

(i)  not remove the Assets from the Facility except in the ordinary course of business.

**Section 6.02  Supplements to Disclosure.** From time to time prior to the Closing, Seller, upon notice to and agreement of Buyer, will promptly supplement or amend the Schedules hereto with respect to any matter hereafter arising which, if existing or occurring at the date of this Agreement, would have been required to be set forth or described in such schedules.

13

# ARTICLE 7
## CONDITIONS PRECEDENT TO THE CLOSING

**Section 7.01  Conditions to the Obligations of Both Parties.**  The obligations of Buyer and Seller to consummate the transactions contemplated hereby are, at the option of each party hereto, subject to the fulfillment of the following conditions precedent:

(a)     Government Order.  No injunction, writ, temporary restraining order or any order of any nature issued by any court or governmental agency may exist directing that the transactions contemplated by this Agreement not be consummated.

(b)     Government Action.  No pending or known to be threatened action, proceeding or investigation may exist before any court or governmental agency seeking as to any party hereto any injunction, writ, temporary restraining order or other such order.

(c)     Government Approval.  The United States government, in its sole discretion, must approve Buyer as an acceptable purchaser of the Cast Plate Business, and must agree that the transactions contemplated by this Agreement satisfy the requirements of the Final Judgment among the United States of America, Seller and Alumax Inc., dated June 15, 1998 ("**Final Judgment**").  Buyer and Seller may not waive this condition precedent to Closing.

(d)     No Unreasonable Conditions on Government Approval.  The United States government, in approving Buyer as an acceptable purchaser of the Cast Plate Business, must not have imposed any unreasonable conditions on Buyer to grant such approval.

**Section 7.02  Conditions Precedent to Obligation of Buyer.**  The obligation of Buyer to purchase the Shares and assume the Assumed Liabilities at the Closing is subject to the satisfaction, or the waiver by Buyer in writing, at or prior to the Closing, of the following conditions precedent:

(a)     Accuracy of Representations and Warranties.  The representations and warranties of Seller and Newco contained in this Agreement (i) qualified as to materiality must have been true and correct in all respects when made and must be true and correct in all respects at and as of Closing; and (ii) not qualified as to materiality must be true and correct in all material respects when made and must be true and correct in all material respects at and as of the Closing, except as affected by the transactions contemplated hereby.

(b)     Performance by Seller and Newco.  Seller and Newco must have duly performed and complied with, in all material respects, the terms, agreements, covenants and conditions required by this Agreement to be performed or complied with by them prior to or at the Closing.

(c)     Board Approval.  This Agreement and the transactions contemplated hereby must have been approved by Buyer's Board of Directors.

(d)     Material Changes.  Between the date of this Agreement and the Closing, there shall not have been any material adverse change to the Assets or the Cast Plate Business.

(e)     Closing Documents.  Buyer must have received all of the documents required to be delivered to Buyer pursuant to Sections 8.02 and 8.04.

**Section 7.03  Conditions Precedent to Obligation of Seller.**  The obligation of Seller to sell the Shares at the Closing is subject to the satisfaction, or waiver by Seller in writing, at or prior to the Closing, of the following conditions precedent:

(a)     Accuracy of Representations.  The representations and warranties of Buyer contained in this Agreement must have been true and correct in all material respects when made and must be true and correct in all material respects at and as of the Closing, except as affected by the transactions contemplated hereby.

(b)     Performance by Buyer.  Buyer must have duly performed and complied with, in all material respects, the terms, agreements and conditions required by this Agreement to be performed or complied with by it prior to or at the Closing.

(c)     Closing Documents.  Seller must have received all of the documents and the Purchase Price required to be delivered to Seller pursuant to Sections 8.03 and 8.04.

(d)     Final Judgment.  Buyer must have agreed to be bound by the provisions of the Final Judgment.  Seller may not waive this condition precedent to Closing.


# ARTICLE 8
# THE CLOSING

**Section 8.01  Time, Date and Place of Closing.**  The closing of the transactions contemplated in this Agreement (the **"Closing"**) will take place at the offices of Aluminum Company of America, 201 Isabella Street, Pittsburgh, Pennsylvania at 10:00 a.m. on December 31, 1998, or at such other place and time as agreed to by Seller and Buyer (the **"Closing Date"**).

**Section 8.02  Seller's Obligations at the Closing.**  At the Closing, Seller will deliver or cause to be delivered to Buyer the following:

(a)     the share certificate or certificates evidencing the Shares, duly endorsed for transfer to Buyer;

(b)     a Deed of Transfer in substantially the form of **Schedule 8.02(b)** in form and substance reasonably satisfactory to Buyer and sufficient to sell, transfer and assign to Buyer (or Buyer's designee) all right, title and interest of Alcoa Europe S.A. in the European Inventory;

(c)     resignations of all officers and directors of Newco, as well as resignations of all authorized signatories on bank accounts to the extent requested by Buyer;

(d)     copies of all consents, waivers and approvals required under this Agreement, to the extent failure to obtain any such consent, waiver or approval is or is reasonably likely to be materially adverse to the Cast Plate Business;

(e)     the License Agreement attached hereto as **Schedule 2.01**, executed by Newco and Seller; and

(f)     such other evidence of the performance of all covenants and satisfaction of all
        conditions required of Seller and Newco at or prior to Closing as Buyer may
        reasonably require; and

**Section 8.03  Buyer's Obligations at the Closing.**  At the Closing, Buyer will deliver or
cause to be delivered to Seller the following:

(a)     a wire transfer of funds in an amount equal to the Purchase Price;
(b)     the Assignment and Assumption Agreement attached hereto as **Schedule 2.02**,
        executed by Buyer; and
(c)     such other evidence of the performance of all covenants and satisfaction of all
        conditions required of Buyer at or prior to Closing as Seller may reasonably
        require.

**Section 8.04  Joint Obligations at the Closing.**  At the Closing, Buyer and Seller will
execute and deliver to the other all other documents reasonably required by Seller or
Buyer to consummate the transactions contemplated by this Agreement.

## ARTICLE 9
## ADDITIONAL COVENANTS OF BUYER AND SELLER

**Section 9.01  Press Releases.**  Except as may be required by applicable law, neither
Buyer nor Seller nor any of their respective Affiliates will issue any press release or other
public communication relating to this Agreement or the transactions contemplated hereby
without the prior consent of the other party hereto.

**Section 9.02  Alcoa Name.**  After the Closing Date, Buyer may not use the names
"Alcoa," "Aluminum Company of America" or any associated trademarks for any
purpose whatsoever; provided, however, that Buyer (i) may use preprinted advertising
brochures that use or contain the Alcoa name or trademark for up to three months so that
Buyer may obtain new brochures; and (ii) will have no obligation to repackage cast plate
products packaged in materials containing the Alcoa name or trademark in inventory on
the Closing Date (though Buyer may not use after the Closing Date any packaging
containing the Alcoa name or trademark in inventory on the Closing Date if not actually
packaging cast plate).  Buyer will use its best efforts to eliminate the Alcoa name and
trademarks, through the use of stickers or otherwise, from the packaging and brochures
during this three month transition period.

**Section 9.03  Further Assurances.**  After the Closing and for no further consideration,
Buyer and Seller will perform all such other actions and will execute, acknowledge and
deliver all such assignments, transfers, consents and other documents as the other may
reasonably request to complete the transactions contemplated hereby.

**Section 9.04  PMT Header Board.**  After the Closing, Buyer, at its option, may buy
from Seller, under reasonable terms and conditions of sale and purchase, PMT Header

Grade calcium silicate board for ingot casting molds, machined by Seller to Buyer's specifications as approved by Seller, in an amount up to Buyer's actual requirements for the Cast Plate Business at the Facility.

**Section 9.05  Pre-Closing Diligence.** Between the date of this Agreement and the Closing, Seller will give Buyer and its representatives (including, without limitation, its accountants, counsel and employees), upon reasonable notice and during normal business hours, reasonable access to the assets, properties, contracts, books, records, personnel and affairs of Seller relating to the Cast Plate Business (including without limitation all environmental, zoning and other permit documentation and information) and will cause Seller's officers and employees to furnish or otherwise make available to Buyer all documents, records and information (including without limitation financial, operational and other such information customarily provided as part of the diligence process) concerning the affairs of Seller relating to the Cast Plate Business as Buyer may reasonably request.  Upon prior notice to Seller, Buyer, in connection with its due diligence, may contact customers and/or suppliers of the Cast Plate Business and make other reasonable inquiries with other third parties regarding the status of their relationship with Seller and the Cast Plate Business.

**Section 9.06  Cooperation and Assignments.** From the date hereof and after the Closing Date, Seller will use its best efforts, and Buyer will cooperate with Seller, to secure all necessary consents, approvals, authorizations, exemptions and waivers from third parties required to enable Buyer to obtain the benefit of the transactions contemplated hereby.  If Seller is unable to obtain any such consent, Seller may, but is not required to, enter into a reasonable arrangement with Buyer, at Buyer's expense, designed to provide for Buyer the benefit of any such right, including enforcement of any and all rights of Seller against the other party to any contract, commitment or other similar agreement arising out of the breach or cancellation thereof by such party or otherwise.

**Section 9.07  Post-Closing Access and Cooperation.**
(a)     After the Closing Date as either party may from time to time reasonably request, the other party will provide the requesting party with such information regarding Newco and the Cast Plate Business as such party reasonably requires.  But, neither party will be obligated to provide the other party with any information of a commercially sensitive nature, relating to trade secrets or in violation of the Final Judgment, applicable law, rule or regulation or any contractual provision prohibiting disclosure.
(b)     Seller and Buyer will cooperate with each other in all reasonable respects in connection with the defense of any Third Party Claim (as defined below), including making available records relating to such Claim and furnishing, without expense to the defending party, management employees of the non-defending party as may be reasonably necessary for the preparation of the defense of such Claim or for testimony as a witness in any proceeding relating to such Claim.

**Section 9.08  Liabilities.**  Buyer agrees to pay, as they become due, the Assumed Liabilities and all debts and liabilities of Newco incurred after the Closing Date.  Buyer understands and agrees that from and after the Closing, except as specifically provided in this Agreement to the contrary, Seller has no liability nor responsibility for any liability or obligation of Newco of whatever kind or nature, whether contingent or absolute, and whether arising prior to or on or after the Closing Date.  Except as otherwise provided in this Agreement, however, Seller will retain responsibility for all claims, including without limitation third party claims for personal injury, filed after the Closing Date to the extent such claims relate to actions or inactions of Seller prior to the Closing Date.

**Section 9.09  Employee Matters.**  The parties intend that the sale of Newco is as an ongoing business and therefore it will not constitute a shutdown for purposes of entitling any Newco Employees to immediate payment of pension or severance benefits or any other shutdown related benefits under Seller's existing labor agreements, pension or severance plans or employment policies applicable to such employees immediately prior to the Closing.  Consistent with such intent of the parties, the parties agree to the following:

(a)     Comparable Employment.  Buyer will offer employment to all of the non-represented Newco Employees actively at work at the Cast Plate Business on the date of the Closing ("**Non-Represented Employees**") on substantially the same terms and conditions in the aggregate as that on which they were employed at the Closing.  Nothing contained herein prohibits Buyer from terminating, discharging or laying off any employees after the Closing Date.  Recall to bargaining unit positions will be governed by the provisions of the applicable labor agreement.  Non-Represented and represented Newco Employees who are absent from work at the Closing for reasons other than layoff (e.g., leave of absence or disability) will be offered employment by Buyer.  Buyer will offer employment to any active employee of Seller for the Cast Plate Business who applies for retirement from employment with Seller, effective January 1, 1999, after the date of this Agreement and prior to five days prior to the Closing Date.  Seller will provide Buyer with a list of those employees who so apply to retire within five days of the Closing Date.

(b)     Successorship.  Buyer is the successor to Seller's rights and obligations in the collective bargaining agreement and the Pension Agreement identified in **Schedule 4.06(a)** with the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America, its local No. 808 (the "**Union**").

(c)     Compensation and Benefit Plans.  For a period of one year after the Closing Date, the benefits, benefit plans and rates of pay established by Buyer and applicable to Non-Represented Employees at the Cast Plate Business who go to work for Buyer will be substantially similar in the aggregate as those applicable to such employees as of the Closing.  Buyer's benefits, benefit plans and rates of pay applicable to represented Newco Employees will be as set forth in the applicable collective bargaining agreement.  If any Non-Represented Employees participate in Buyer's benefit plans, Buyer will provide credit to such employees hired by Buyer for prior service as employees of Seller for all purposes under Buyer's

plans. For those employees who retire prior to the Closing and are hired by Buyer after the Closing, such employees will receive credit for years of prior service with Seller or an Affiliate of Seller for eligibility and vesting purposes only for all benefit plans of Buyer, except Buyer's severance plan, defined benefit plans and other post-employment benefits. Such employees also will receive service credit for seniority purposes under the bargaining agreement with the Union.

(1)     Employee Welfare Benefit Plans. As of the Closing Date, Buyer will cause Newco to maintain in accordance with their terms plans identical to Employees Group Benefit Plan of Aluminum Company of America, Plans I & II, which will exclusively cover the Newco Employees hired by Buyer (and not any other employees of Seller). As of the Closing Date, Buyer will establish new employee welfare benefit plans comparable to the employee welfare benefit plans of Seller, under which other welfare benefits will be provided to the Newco Employees hired by Buyer (e.g., Optional Life, Severance and SUB).

(2)     Defined Contribution Plans. As of the Closing Date, the Newco Employees will not be eligible for, and may no longer make contributions (or have contributions made on their behalf) to, Seller's defined contribution plans (the "**Seller DC Plans**"), other than contributions payable for periods prior to the Closing Date which have not been remitted as of the Closing Date. Seller will make all matching contributions to all Seller DC Plans with respect to the period prior to the Closing Date. Seller will cause each Newco Employee to be fully vested in such Newco Employee's account balance in a Seller DC Plan in which such Newco Employee participates as of the Closing Date. Buyer will designate one or more defined contribution plans in which the Newco Employees hired by Buyer will be eligible to participate effective as of the Closing Date (the "**Buyer DC Plans**"), and the Newco Employees hired by Buyer will be immediately eligible to participate in the Buyer DC Plans. Within 90 days of the Closing, Seller will distribute account balances of the Seller DC Plans to the Newco Employees who so elect to receive distributions. During this 90 day period, Buyer and Newco will allow the Newco Employees hired by Buyer to transfer their account balances to the Buyer DC Plans.

(3)     Defined Benefit Plans. As of the Closing Date, the Newco Employees will cease to accrue additional benefits under Seller's defined benefit pension plans. Seller will cause each such Newco Employee to be fully vested in such Newco Employee's accrued benefit under each Seller defined benefit plan in which such Newco Employee participates as of the Closing Date. As soon as practicable after the Closing Date, Seller and Buyer will transfer all benefit liabilities accrued under Seller's defined benefit plans with respect to the Newco Employees hired by Buyer, together with a corresponding amount of cash assets (as further defined below), from Seller's defined benefit plans and related trust to Buyer's defined benefit plans and related trust. Upon the completion of such liability and asset

transfers, neither Seller nor Seller's defined benefit plans will have any further liability with respect to such accrued benefits, and such accrued benefits will be the sole responsibility of Buyer under its defined benefit plans. With respect to the transfer of assets and liabilities from Seller's defined benefit plans, Buyer and Seller agree that Seller will transfer assets in an amount of cash necessary to comply with Code Section 414(l) as of the Closing Date using actuarial assumptions as determined by Seller and Buyer.

(4)     Vacation Pay. Buyer will assume responsibility for accrued but unpaid (as of the Closing Date) vacation pay of Newco Employees hired by Buyer.

(5)     OPEB. Buyer will assume responsibility and liability for other post-employment benefits (retiree medical and life insurance) for the Newco Employees hired by Buyer after the Closing Date. Seller will transfer no cash assets to Buyer for assuming this liability.

(d)     Obligations Post-Closing. Neither Buyer nor Newco will assume or be responsible for any liability in respect of benefits under Seller's benefit plans which are payable at any time to, or in respect of, any former or present employee of the Cast Plate Business not employed by Buyer after the Closing. Furthermore, Seller will be responsible for all claims of the Newco Employees of the Cast Plate Business who are employed by Buyer which (i) arise, within the meaning of any existing benefit program maintained by Seller for the employees of the business, prior to the date of the Closing (including without limitation claims for benefits filed after the Closing Date that Buyer can reasonably demonstrate relate to incidents that occurred prior to the Closing Date) and (ii) are payable under the terms and conditions of such program. Buyer will be responsible for all such claims for benefits which (i) arise, within the meaning of any benefit program maintained by Buyer for its employees, on or after the date of the Closing and (ii) are payable under the terms and conditions of such program.

(e)     Shutdown Post-Closing. Buyer will assume any pension or severance pay benefit liability or any other shutdown related benefit liability arising on account of shutdowns after the Closing. Seller will have no obligation to Buyer with respect to any liability incurred by Buyer for pension or severance pay benefits or any other shutdown of any operation after the Closing.

(f)     Cooperation. After the Closing, Buyer and Seller will each provide the other on a continuing basis at no cost to the other such information regarding former employees of Seller who are employed by Buyer as the other will reasonably request in order to permit proper administration of its various benefit plans applicable to such employees.

**Section 9.10  Seller's Right and Responsibilities for Taxes.**

(a)     Seller is responsible for preparing and filing all Returns required by law to be filed by Seller relating to the Cast Plate Business and covering or including periods ending on or before the Closing Date and for the payment of all Taxes due with respect to such periods. Buyer will cooperate in such preparation and filing of all such Returns, including the preparation and execution of tax forms and

related schedules for inclusion in Seller's Returns when such data becomes available to Buyer. Seller will retain any refunds received of federal, state or other taxes paid for periods ending on or before the Closing Date relating to the Cast Plate Business.

(b)     With respect to any future claims by taxing authorities arising from tax Returns relating to the Cast Plate Business and covering or including periods ending on or before the Closing Date, Seller may contest such claims at Seller's expense. Seller also may, at Seller's expense, amend any returns relating to the Cast Plate Business for the period prior to and including the Closing Date. But, to the extent that such amendment causes a Tax liability to Buyer for the period prior to the Closing Date, Seller will indemnify Buyer against such Tax liability.

### Section 9.11  Buyer's Rights and Responsibilities for Taxes

(a)     Buyer will provide to Seller within a reasonable period of time any information, including Books and Records, in its possession for the period ending on or before the Closing Date necessary to complete the Returns required to be filed by Seller or necessary in connection with any contest of any claims by or against a taxing authority.

(b)     Except as otherwise provided in this Agreement, Buyer is responsible, after the Closing Date, for the preparation and filing of all federal, state and other tax Returns required to be filed by it or Newco and the payment of all Taxes due thereunder with respect to the Cast Plate Business subsequent to the Closing Date. Seller will reimburse Buyer for all Taxes and interest or penalties, if any, paid by Buyer related to the Cast Plate Business for periods prior to the Closing Date.

### Section 9.12  Other Tax Matters.

(a)     At Buyer's option, exercisable in its sole discretion, at any time prior to the Closing, Buyer and Seller will jointly make the election provided for by Sections 338(g) and 338(h)(10) of the Code and Treasury Regulation Section 1.338(h)(10)-1 (and any comparable election under state or local tax law) with respect to Buyer's purchase of the Shares. In connection with such election, Buyer and Seller will cooperate with each other to take all actions as may be reasonably required, including execution and delivery by Seller within 30 days of the Closing Date a Form 8023 and the reporting by each of Seller and Buyer of the purchase of the Shares commitment with the election to any and all taxing authorities and on all Tax returns. Further, in the event of such election, the parties will in good faith, not later than 30 days after the Closing Date, agree upon and be bound by the "**Modified Aggregate Deemed Sales Price**" of the Assets and related allocations in accordance with Code Section 338(b)(5) and Treasury Regulation Section 1.338(h)(10)-(1)(f).

(b)     Buyer is responsible for all sales and transfer Taxes arising from the transfer of the Cast Plate Business to Buyer, including without limitation VAT on the sale of the European Inventory and sales and transfer Taxes arising from the transfer of the Assets to Newco. To the extent that transfer of the Assets to Newco causes a sales or transfer Tax liability to Seller, Buyer will indemnify Seller against such Tax liability.

**Section 9.13  Cash Dividends.**  Seller may cause Newco to dividend or otherwise transfer to Seller, or to any Affiliate of Seller, the cash receipts of Newco received from time to time before the Closing Date.

**Section 9.14  Alcoa Alca Plus.**  Seller agrees to cooperate with Buyer to the extent necessary to perfect ownership of that portion of the *Alcoa Alca Plus* trademark that can be transferred to Buyer without transfer of the "Alcoa" portion of that trademark.  As soon as practicable after the Closing Date, Buyer will file trademark registrations in the countries of its choice in the name of Newco to perfect its own ownership in the "Alca Plus" portion of this trademark.  Buyer may not use the *Alcoa Alca Plus* trademark.

**Section 9.15  Covenant Regarding Transferred Property Rights.**  Neither Newco nor Buyer will sue Seller or an Affiliate of Seller for infringement of the trade secrets and know-how contained in the Transferred Property Rights by Seller after the Closing Date, so long as Seller can reasonably demonstrate that Seller or an Affiliate of Seller was using such trade secrets or know-how prior to the Closing Date.  This covenant not to sue does not prohibit either Newco or Buyer from suing Seller or an Affiliate of Seller for unauthorized use of any trademark, tradename, service mark or service name contained in the Transferred Property Rights.

**Section 9.16  Subdivision of the Real Property.**  The parties acknowledge that the Real Property intended to be sold by Seller and purchased by Buyer as part of the Cast Plate Business under this Agreement is not currently a legal parcel in compliance with the Subdivision Map Act of the State of California, as interpreted by Los Angeles County or the City of Vernon.  The parties will cooperate and at Seller's expense use their best efforts to obtain a final parcel or subdivision map of the Real Property ("**Final Parcel Map**"), including without limitation cooperating with all governmental authorities.  If the Final Parcel Map has not been obtained by the Closing Date, the parties agree to enter into a leasing arrangement under which Seller will lease to Buyer, for no additional consideration, the Real Property.  Upon approval of the Final Parcel Map, Seller will immediately transfer, for no new consideration, the Real Property to Buyer in accordance with the terms of this Agreement.

**Section 9.17  Transition Services.**  For up to one year from the Closing Date, Seller will, at Buyer's cost and expense, provide such assistance and cooperation to Buyer as Buyer may reasonably request to ensure a smooth and efficient transfer of control of the Cast Plate Business from Seller to Buyer.  Seller will make the administrative services identified in **Schedule 9.17** available on a reasonable basis, after request by Buyer, giving appropriate consideration to Seller's ongoing business requirements.

**Section 9.18  Buyer Bound by Final Judgment.**  Buyer hereby agrees to be bound by all of the terms of the Final Judgment, as required by Article III.B of the Final Judgment.

## ARTICLE 10
## REAL PROPERTY AND ENVIRONMENTAL MATTERS

**Section 10.01  Definitions**.

(a)  <u>Hazardous Substance</u>.  For purposes of this Article, **"Hazardous Substance"** means any substance, chemical or waste that is listed or defined as hazardous, toxic, or dangerous under Applicable Law (defined below).

(b)  <u>Applicable Law</u>.  For purposes of this Article, **"Applicable Law"** means any and all federal, state and local laws concerning the protection of human health and the environment, including but not limited to the Comprehensive Environmental Response, Compensation and Liability Act (**"CERCLA"**), 42 U.S.C. §§ 9601 et seq.; the Resource Conservation and Recovery Act (**"RCRA"**), 42 U.S.C. §§ 6901, et seq.; the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.; the Clean Air Act, 42 U.S.C. §§ 7401, et seq.; the Hazardous Materials Transportation Act, 49 U.S.C. §§ 1471 et seq.; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; and the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; each, as amended from time to time, or any successor laws thereto, together with the rules and regulations promulgated thereunder, together with any and all environmental or land use laws, rules, ordinances, or regulations.

(c)  <u>Cleanup</u>.  For purposes of this Article, **"Cleanup"** means all actions required to: (i) clean up, remove, treat or remediate any Hazardous Substance in the indoor or outdoor environment; (ii) prevent the Release of Hazardous Substances so that they do not migrate, endanger or threaten to endanger public health or welfare or the indoor or outdoor environment; (iii) perform pre-remedial studies and investigations and post-remedial monitoring and care; or (iv) respond to any government requests for information or documents in any way relating to cleanup, removal, treatment or remediation of the indoor or outdoor environment.

(d)  <u>Release</u>.  For purposes of this Article, **"Release"** means any release, spill, emission, discharge, leaking, pumping, injection, deposit, disposal, dispersal, leaching or migration into the indoor or outdoor environment (including, without limitation, ambient air, surface water, groundwater and surface or subsurface strata) or into or out of any property, including the movement of any Hazardous Substance through or in the air, soil, surface water, groundwater or property.

(e)  <u>Environmental Liabilities</u>.  For purposes of this Article, **"Environmental Liabilities"** means all Losses (as defined in Article 12 below) incurred or required to be paid as a result of or arising out of:

(i)  Hazardous Substances that are or were at, upon, in or under the Real Property prior to the Closing due to the actions or inactions of Seller or an Affiliate of Seller, the Cleanup of which either is required by a directive or order of a governmental agency or if the parties agree that Cleanup is reasonably required pursuant to Applicable Law,

(ii)  Hazardous Substances Released at anytime at any location other than the Real Property (including Hazardous Substances emanating from the Real Property) if such Hazardous Substances were generated, stored, disposed of,

recycled, Released, used or transported, by or on behalf of Seller or an Affiliate of Seller prior to the Closing, or

(iii)  acts, omissions or any noncompliance with any Applicable Law by Seller or an Affiliate of Seller prior to the Closing if Cleanup of Hazardous Substances either is required by a directive or order of a governmental agency or if the parties agree that Cleanup is reasonably required pursuant to Applicable Law.

**Section 10.02  Buyer's Assessment.**  Buyer may conduct and complete, at its sole cost and expense, an environmental transfer assessment of the Real Property prior to Closing ("**Buyer's Assessment**").  Seller will permit Buyer or its representatives to enter upon any and all of the Real Property for the purposes of inspection, making tests, taking samples and soil borings, and/or conducting groundwater studies, upon prior notice and consent by Seller, in order to complete Buyer's Assessment.  Buyer must provide upon request a copy, excluding any portion thereof containing attorney-client privileged communications, to Seller of any reports, studies or analyses prepared by or for Buyer related to the Real Property as a result of Buyer's Assessment.  All such reports, studies and analyses and any information prepared for or received or obtained by Buyer related to the Real Property must be held in strict confidence by Buyer in accordance with the Confidentiality Agreement.  Seller may establish reasonable rules related to Buyer's access of the Real Property to conduct Buyer's Assessment, which will be consistent with Seller's responsibilities under the Final Judgment.

**Section 10.03  Environmental Indemnification and Remediation Activities.**

(a)  Seller will, subject to the limitations set forth in Section 12.06, indemnify, defend and hold Buyer, Affiliates of Buyer and Buyer's lenders harmless from and against any and all Environmental Liabilities.  Except as disclosed to Buyer in Seller's Phase I Environmental Health and Safety Assessment Report and Limited Phase II Environmental Site Investigation and in Section 10.03(c), to Seller's knowledge, no radioactive materials, underground storage tanks, active or inactive landfills or active or inactive surface impoundments are located at the Real Property or the Facility.

(b)  Scope of Remediation.  Seller and Buyer will cooperate in response to any directive or order of a governmental agency concerning any Cleanup or any Third Party Claim (as defined in Section 12.04) seeking to hold Buyer responsible for Environmental Liabilities in accordance with this Section 10.03(b).

(i)  Notwithstanding Section 12.04 and 12.05, upon receipt by Buyer or Seller of any directive or order of a governmental agency concerning a Cleanup for which Buyer believes it is entitled to indemnification from Seller under this Article 10, Buyer and Seller will cooperate in the development of a response to the directive or order for the purposes of achieving cost effective results, consistent with Buyer's operational needs.

(ii)  Notwithstanding the foregoing, Seller shall have the sole right and obligation to defend, consistent with the requirements of Article 12, any Third Party Claim for which it is solely liable hereunder, and Buyer shall

have no right or obligation to participate or conduct the defense of such Third Party Claim.

(c)    Activities Assumed by Seller. Seller is responsible for and will complete the remedial actions set forth below. With respect to the remedial activities set forth in Sections 10.03(c)(1)-(4) and (6), Seller will remediate to the levels required by an authorized governmental agency to obtain a "no further action" statement (or other equivalent approval). With respect to the remedial activities set forth in Section 10.03(c)(5), Seller will alleviate the notice of violation ("**NOV**") as required by the governmental agency that issued the NOV. With respect to the remedial activities set forth in Section 10.03(c)(7), Seller will remediate in accordance with the requirements set forth therein.

   (1) Cleanup of all Releases of TPH and VOC known or suspected at the Real Property arising out of Stoddard solvent system contamination and one gasoline underground storage tank, as more fully described in Seller's Phase I Assessment of the Real Property or the reports referenced therein;

   (2) Cleanup of all Releases of Hazardous Substances near storm water outfalls #6 and 7, as more fully described in Seller's Phase I Assessment of the Real Property, including without limitation additional investigation and characterization of the condition of the Real Property as necessary and appropriate;

   (3) Cleanup of all Releases of PCB, VOC and TPH at the former waste disposal pit sump, as more fully described in Seller's Phase I Assessment of the Real Property or the reports referenced therein;

   (4) Investigation and Cleanup, as required by Applicable Law, of all Releases of PCB, VOC, arsenic and TPH in the subsurface soils inside and outside the southwest area of Building 112A by the scalper and planer equipment, as more fully described in Seller's Phase I Assessment of the Real Property;

   (5) Resolution of the Notice of Violation from the South Coast Air Quality Management District (AQMD) for Seller's violation of the $NO_2$ emission limit when operating furnace #5 in December 1996 and January and February 1997;

   (6) Investigation, characterization, and as required by Applicable Law, Cleanup of PCB and metals in the sludge and in the soil adjacent to the recirculating hot water system south of building 104; and

   (7) Removal of flaking lead paint and friable galbestos from interior wall areas and removal of accumulated dust and grime (composed of PCB, Title 22 heavy metals, silica and refractory fibers) from overhead steel rafters and certain horizontal surfaces at the Facility existing on the Closing Date, all at those surface areas that are described in Seller's Phase I Assessment of the Real Property and agreed to by Seller and Buyer. Seller also will conduct industrial hygiene exposure monitoring for dust using such methods and at such times as the parties agree are appropriate to ensure that the remediation activities undertaken by Seller under this Section 10.03(c)(7) have reduced the contaminants to an appropriate clean up level. Seller will provide a written management program to Buyer, which Buyer may use to manage such contaminants at the Facility after the Closing Date.

(d) <u>Seller's Failure to Remediate</u>. Seller will indemnify Buyer for any and all liabilities, obligations, responsibilities, losses, damages, deficiencies, costs of Cleanup, remediation or compliance, other costs and expenses, fines, penalties, restitutions and monetary sanctions sustained, incurred or required to be paid by Buyer as a result of Seller's failure to complete any or all of the items listed in Section 10.03(c).

(e) <u>Business Disruption</u>. In conducting remediation or Cleanup activities as required by this Article 10, Seller will use reasonable efforts to minimize disruption to Buyer's operation of the Facility. But, Seller will have no liability to Buyer for any loss of business or lost profits incurred by Buyer if Buyer suspends operation of the Cast Plate Business during Seller's remediation or Cleanup activities.

(f) <u>Limitations</u>. Seller's obligation of indemnification or reimbursement under this Section 10.03, except for Environmental Liabilities outlined in Section 10.01(e)(ii) and Section 10.03(c), is subject to, and will apply against, the Deductible and limitations set forth in Section 12.06, including without limitation the $14 million limit on liability. All claims for indemnification under this Article 10 must be made in accordance with the notice requirements and limitations of Article 12.

(g) <u>Duration</u>. The express indemnification set forth in this Section 10.03 of this Agreement will remain in full force and effect and will survive the Closing Date for a period of 12 years. The representation contained in the second sentence of Section 10.03(a) will remain in full force and effect and will survive the Closing Date for a period of 24 months. Liabilities included within the scope of Sections 10.01(e)(ii) and 10.03(c) will remain the sole obligation of Seller, and Seller will indemnify Buyer for these liabilities, in perpetuity.

**Section 10.04 Procedures.** Buyer will enter into such agreements with Seller, on reasonable terms and conditions, to cooperate with Seller and provide access to Seller to the Real Property to conduct the remediation activities provided in this Article 10.

**Section 10.05 Transfer of Liability.** Except as otherwise provided in this Agreement, as of the date of this Agreement, Buyer will assume all environmental liabilities associated with operation of the Cast Plate Business. The parties acknowledge that, except as otherwise provided in this Agreement, after expiration of the 12 year indemnification period, this Agreement shifts all liabilities arising under any Applicable Law from Seller to Buyer, and Buyer will have no claim for contribution from or against Seller, for environmental liabilities, arising out of Seller's operation of the Cast Plate Business or ownership of the Real Property prior to the Closing Date.

## ARTICLE 11
## SURVIVAL OF REPRESENTATIONS AND WARRANTIES

**Section 11.01. Survival.** All of the representations and warranties set forth in this Agreement or in any exhibit, schedule, document or other instrument delivered under this

Agreement will (unless waived in writing by the party for whose benefit such representation or warranty was made) remain in full force and effect regardless of any investigation, verification or approval by or on behalf of any party hereto, and will survive the Closing Date for a period of 24 months, except that with respect to the representations made in Section 4.16 will survive for the applicable statute of limitations plus 60 days.

**ARTICLE 12**
**INDEMNIFICATION**

For purposes of this Agreement, **"Losses"** (or **"Loss"** in the singular) means all damages, claims, losses, costs, expenses, interest, penalties, charges and liabilities (including, without limitation, reasonable attorneys' fees, costs and expenses, reasonable expert witness and consulting fees and reasonable costs of investigation and feasibility studies incurred in investigating and defending against the assertion of any of the foregoing).

**Section 12.01  Indemnification of Buyer by Seller**.  Seller agrees to indemnify, defend and hold harmless Buyer from and against any Loss arising out of or based upon or in connection with or as a result of:

(a)     the untruth, inaccuracy or breach of any representation and warranty of Seller contained in or made pursuant to this Agreement, including in any Schedule or other agreement, document or instrument delivered under this Agreement; or

(b)     the breach or nonfulfillment of any covenant or agreement of Seller contained in this Agreement or in any other agreement, document or instrument delivered under this Agreement.

(c)     the failure of Seller to discharge in full any liability or obligation of Seller or Newco related to the Cast Plate Business that existed or occurred prior to the Closing Date, which was not expressly assumed by the Buyer under this Agreement.

**Section 12.02  Indemnification of Seller by Buyer**.  Buyer agrees to indemnify, defend and hold harmless Seller from and against any Loss arising out of or based upon or in connection with or as a result of:

(a)     the untruth, inaccuracy or breach of any representation and warranty of Buyer contained in or made pursuant to this Agreement, including in any Schedule or other agreement, document or instrument delivered under this Agreement;

(b)     the breach or nonfulfillment of any covenant or agreement of Buyer contained in this Agreement or in any other agreement, document or instrument delivered under this Agreement; or

(c)     the assertion against Seller of any liability or obligation included in the Assumed Liabilities.

**Section 12.03  Procedures for Indemnification**.  **"Indemnitor"** means the party against whom indemnity is sought, and **"Indemnitee"** means the party seeking indemnification.

(a)    A claim for indemnification hereunder ("**Indemnification Claim**") must be made by Indemnitee by delivery of a written declaration to Indemnitor requesting indemnification and specifying to the extent available the basis on which indemnification is sought and, if possible, the amount of asserted Losses.

(b)    The Indemnitor will have 30 days to object to such Indemnification Claim by delivery of a written notice of such objection to Indemnitee specifying in reasonable detail the basis for such objection. Objections under this provision will not relieve the Indemnitor of its obligations to defend and indemnify Indemnitee under this Agreement. Failure to timely so object will constitute acceptance of the Indemnification Claim by the Indemnitor and the Indemnification Claim will be paid in accordance with Section 11.03(c).

(c)    Upon determination of the amount of an Indemnification Claim, whether by agreement between Indemnitor and Indemnitee or otherwise, Indemnitor will pay the amount of such Indemnification Claim within 10 days of the date such amount is determined.

**Section 12.04  Defense of Third Party Claims**. Should any claim or demand be made, cost incurred, or suit or proceeding (including, without limitation, a binding arbitration or an audit by any taxing authority) be instituted against Indemnitee which, if prosecuted successfully, could reasonably be a matter for which Indemnitee is entitled to indemnification under this Agreement (a "**Third Party Claim**"), the Indemnitor shall defend Indemnitee in a timely manner and may participate in the defense of such Third Party Claim at its cost and expense. If Indemnitor fails to defend Indemnitee, Indemnitee may select its own counsel and seek recovery of its defense costs from Indemnitor.

**Section 12.05  Settlement of Third Party Claims**. No settlement of a Third Party Claim may be made without the prior written consent of the Indemnitor and Indemnitee, which consents may not be unreasonably withheld, conditioned or delayed. Consent is presumed in the case of settlements of $100,000 or less where the Indemnitor has not responded within 10 business days of notice of a proposed settlement.

**Section 12.06  Limitations.**

(a)     Neither Seller nor Buyer will be entitled to any recovery for indemnification unless a claim for indemnification is made in accordance with Section 12.03 and within the specified time period, whether established under Section 10.03 or Section 11.01 (regardless of whether the Loss for which the party is seeking indemnification is actually incurred after expiration of such specified time periods).

(b)     Notwithstanding anything herein to the contrary, Seller is not liable to Buyer for indemnification under this Agreement except to the extent that the aggregate amount of all damages which are demanded in a valid claim(s) and thereafter are reasonably demonstrated to have been suffered by Buyer exceeds $200,000 (the "**Deductible**"), in which event the amount which Buyer is entitled to recover in respect of such claim(s) less the Deductible will be payable; provided, however, that no Deductible will apply to claims for indemnification made by Buyer against Seller under Section 12.01(c).

(c)     Except as to liabilities within the scope of Section 10.01(e)(ii) and Seller's remediation responsibilities as set forth in Section 10.03(c), in no event will Seller's liability to Buyer under this Agreement exceed in the aggregate $14 million.  Liabilities within the scope of Section 10.01(e)(ii) and costs of remediation in accordance with Section 10.03(c) will not be subject to an aggregate limit or the Deductible.

(d)     The remedies provided in this Agreement are in lieu of all other remedies available to Seller and Buyer, as the case may be, at law or in equity (except injunctive relief to the extent appropriate) arising under this Agreement or related to the subject matter of this Agreement.

## ARTICLE 13
## MISCELLANEOUS PROVISIONS

**Section 13.01  Books and Records.**  Buyer and the Facility will retain all Books and Records relating to the Cast Plate Business for all periods from January 1, 1992 up to and including the Closing Date in a readily retrievable location for a period of 10 years from the Closing Date, and thereafter will destroy such Books and Records only after having notified Seller of its intention to do so and having offered to provide the other party with copies or the original of such Books and Records.

**Section 13.02  Expenses.**  Each of the parties will pay all costs and expenses incurred or to be incurred by it in negotiating and preparing this Agreement and in closing and carrying out the transactions contemplated by this Agreement.

**Section 13.03  Notices.**  Any notice or other communication required or permitted to be given hereunder must be in writing and hand delivered or sent by certified mail (return receipt requested) or by reputable overnight courier, or sent by telex, telegram, facsimile or cable, delivered to the respective addresses set forth below or, as to each party, at such

other address as designated by such party. All such notices and communications are effective when hand delivered or, in the case of notice by mail, telex, telegram, facsimile or cable, on the next succeeding business day following the date when sent addressed as set forth below:

| | |
|---|---|
| If to Seller: | Aluminum Company of America |
| | Alcoa Corporate Center |
| | 201 Isabella Street |
| | Pittsburgh, PA 15212-5858 |
| | Attention: General Counsel |
| | |
| If to Buyer: | Century Aluminum Company |
| | 2511 Garden Road |
| | Building A, Suite 200 |
| | Monterey, CA 93940 |
| | Attention: General Counsel |

**Section 13.04  Entire Agreement.**  This Agreement, including the Schedules and other documents referred to herein which form a part hereof, represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof and supersedes all other agreements or understandings, written or oral, between the parties with respect to the subject matter hereof.  This Agreement may not be amended, supplemented or changed, nor can any provision hereof be waived, except by a written instrument signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.

**Section 13.05  Successors.**  This Agreement is binding upon and inures to the benefit of the parties hereto and their respective successors and assigns.  Neither party may assign its rights hereunder without the prior written consent of the other party, except that Seller may assign this Agreement or performance of any part hereof to any Affiliate, in whole or in part, without the consent of Buyer.

**Section 13.06  Section Headings.**  The section headings contained in this Agreement are for convenience of reference only and do not affect in any way the meaning or interpretation of this Agreement.

**Section 13.07  Bulk Transfer Laws.**  Buyer hereby waives compliance by Seller with the provisions of any so-called bulk transfer law in any jurisdiction in connection with the sale of the Assets to Buyer.  Seller will indemnify Buyer for any liability with respect to such bulk transfer laws.

**Section 13.08  Governing Law.**  This Agreement has been executed and delivered in and will be construed and enforced in accordance with the laws of the State of Delaware, without regard to its conflict of laws doctrine.

**Section 13.09  Severability.**  If at any time subsequent to the date hereof, any provision of this Agreement is held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision will be of no force and effect, but the illegality or unenforceability of such provision will have no effect upon and will not impair the enforceability of any other provision of this Agreement.

**Section 13.10  Counterparts.**  This Agreement may be executed in one or more counterparts, each of which is an original, but all of which together constitute one and the same instrument.

**Section 13.11  Parties in Interest.**  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any person other than the parties to it, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third person to any party to this Agreement, nor does any provision give any third persons any right of subrogation or action over against any party to this Agreement.

**Section 13.12  Termination.**  This Agreement may be terminated and the transactions contemplated hereby abandoned:

(1)     at any time prior to the Closing Date, by mutual consent of Buyer and Seller; or
(2)     as of the Closing Date, by Seller, if Buyer has not complied with any of the conditions set forth in Article 7 by the Closing Date; provided that Seller may not terminate this Agreement under this Section 13.12 if Seller's willful breach of this Agreement has prevented Buyer's compliance with the conditions in Article 7; or
(3)     as of the Closing Date, by Buyer, if Seller has not complied with any of the conditions provided in Article 7 by the Closing Date; provided that Buyer may not terminate this Agreement under this Section 13.12 if Buyer's willful breach of this Agreement has prevented Seller's compliance with the conditions in Article 7.

**Section 13.13  Time of the Essence.**  Time is of the essence in this Agreement.

**Section 13.14  Expenses; Prorations.**  Each of the parties to this Agreement will bear all the expenses incurred by it in connection with the negotiation and preparation of this Agreement and the consummation of the transactions contemplated by this Agreement regardless of whether this Agreement is terminated.  Except as otherwise provided in this Agreement, the following taxes, charges and payments ("**Charges**") will be prorated on a per diem basis as indicated and apportioned between Seller and Buyer as of the date of the Closing:  real property (annually), use (monthly), intangible taxes (monthly), utility charges (monthly), rental or lease charges (term of lease), license fees (term of lease), general assessments (taxable year) imposed with respect to the Assets and employee payrolls (monthly).  Seller will be liable for that portion of the Charges relating to, or arising in respect of, period on or prior to the date of the Closing and Buyer will be liable for that portion of the Charges relating to, or arising in respect of, any periods after the date of the Closing.

**IN WITNESS WHEREOF,** the parties hereto have duly executed this Agreement, as of the day and year first above written.

> **SELLER:**
> **ALUMINUM COMPANY OF AMERICA**
>
> By: _____
> Title: _____
>
>
> **BUYER:**
> **CENTURY ALUMINUM COMPANY**
>
> By: _____
> Title: _____

c:\cet\arizona\Vernon Cal Comm Acqn Agt - Final doc
01/23/07 10:43 AM

| | | |
|---|---|---|
| 1. | Schedule 1.01(c) | Assumed Liabilities |
| 2. | Schedule 1.01(i) | Excluded Assets |
| 3. | Schedule 1.01(j) | GAAP Principles |
| 4. | Schedule 1.01(p) | Permitted Encumbrances |
| 5. | Schedule 2.01 | License Agreement |
| 6. | Schedule 2.02 | Assignment and Assumption Agreement |
| 7. | Schedule 4.01 | Required Consents of Seller |
| 8. | Schedule 4.04 | Transferred Property Rights; Property Rights Encumbrances Assignment of Transferred Property Rights |
| 9. | Schedule 4.06(a) | Collective Bargaining Agreements; Employment Contracts |
| 10. | Schedule 4.06(b) | Newco Employees |
| 11. | Schedule 4.07(a) | Asset Encumbrances |
| 12. | Schedule 4.07(b) | Leased Items |
| 13. | Schedule 4.08 | Real Property Exhibit A Exhibit B |
| 14. | Schedule 4.10 | Certain Contracts of Newco |
| 15. | Schedule 4.12 | Non-Compliance Matters |
| 16. | Schedule 4.13(a) | Litigation |
| 17. | Schedule 4.13(b) | Insurance Claims |
| 18. | Schedule 4.15 | Exceptions to Authorizations |
| 19. | Schedule 4.17(a) | Idle Equipment |
| 20. | Schedule 4.17(b) | Equipment Requiring Modification for Year 2000 |
| 21. | Schedule 4.19 | Employee Benefit Plans |
| 22. | Schedule 4.21 | Loss of Rights |
| 23. | Schedule 5.01 | Required Consents of Buyer |
| 24. | Schedule 5.05 | Litigation of Buyer |
| 25. | Schedule 6.01 | Seller's Insurance Coverage |
| 26. | Schedule 8.02(b) | Deed of Transfer |
| 27. | Schedule 9.17 | Transition Services |

# EXHIBIT 2



# STANDARD OFFER, AGREEMENT AND ESCROW
# INSTRUCTIONS FOR PURCHASE OF REAL ESTATE
### (Non-Residential)
### AIR Commercial Real Estate Association

1.  **Buyer,**
    March 20, 2006
    (Date for Reference Purposes)
    1.1 City of Vernon
    hereby offers to purchase the real property, hereinafter described, from the owner thereof ("Seller") (collectively, the "Parties" or individually, a "Party"), ("Buyer")
    through an escrow ("Escrow") to close 30 or _____ days after the waiver or expiration of the Buyer's Contingencies, ("Expected Closing Date") to be held by North American Title Company (Tina DeBow) ("Escrow Holder") whose address is
    520 North Brand Boulevard, Glendale, California  91203
    upon the terms and conditions set forth in this agreement ("Agreement"). Buyer shall have the right to assign Buyer's rights hereunder, but any such assignment shall not relieve Buyer of Buyer's obligations unless Seller expressly releases Buyer.
    , Phone No.  (818) 551-5370  , Facsimile No.  (818) 240-9884
    1.2 The term "Date of Agreement" as used herein shall be the date when by execution and delivery (as defined in paragraph 20.2) of this document or a subsequent counteroffer thereto, Buyer and Seller have reached agreement in writing whereby Seller agrees to sell, and Buyer agrees to purchase, the Property upon terms accepted by both Parties.
2.  **Property.**
    2.1 The real property ("Property") that is the subject of this offer consists of (insert a brief physical description) an approximately
    1,174,740 square foot industrial site
    is located in the City of City of Vernon
    State of California                                  , County of Los Angeles
    California  90058                            , is commonly known by the street address of 3200 Fruitland Avenue, Vernon,
    and is legally described as: _____

    (APN: 6310-008-010, 011, 012 & 013  ).
    2.2  If the legal description of the Property is not complete or is inaccurate, this Agreement shall not be invalid and the legal description shall be completed or corrected to meet the requirements of
    Fidelity National Title Company (Jeff Dasse), Phone (800) 359-2625, Fax (818) 758-3263
    ("Title Company"), which shall issue the title policy hereinafter described.
    2.3 The Property includes, at no additional cost to Buyer, the permanent includes all improvements thereon, except those which including those items which pursuant to applicable law are a part of the property, as well as the following items, if any, owned by Seller and at present located on the Property: electrical distribution systems (power panel, bus ducting, conduits, disconnects, lighting fixtures); telephone distribution systems (lines, jacks and connections only); space heaters; heating, ventilating, air conditioning equipment ("HVAC"); air lines; fire sprinkler systems; security and fire detection systems; carpets; window coverings; wall coverings; and will be demolished by Seller prior to the Closing, as provided herein. In addition, the purchase and sale shall include the sale and assignment by Seller to Buyer, at no additional cost to Buyer, of all of Seller's existing sewer capacity water discharge units ("Units") which apply to the Property. The Units shall be conveyed to Buyer at the Close of Escrow by means of a bill of sale, which shall contain no representations or warranties other than the representation of Seller that the Units are free and clear of all liens, claims and encumbrances. The exact number of Units shall be determined prior to the Close of Escrow.

    (collectively, the "Improvements").
    2.4  The fire sprinkler monitor ☐ is owned by Seller and included in the Purchase Price, ☐ is leased by Seller, and Buyer will need to negotiate a new lease with the fire-monitoring company, or ☐ ownership will be determined during Escrow.

INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

**EXHIBIT**

**2**

INITIALS

FORM OFA-5-3/04E

2.5 ~~Except as provided in Paragraph 2.3, the~~ The Purchase Price does not include Seller's personal property, furniture OF and furnishings, and all of which shall be removed by Seller prior to Closing.

3.    Purchase Price.

3.1  The    purchase    price    ("Purchase    Price")    to    be    paid    by    Buyer    to    Seller    for    the    Property    shall    be $36,500,000.00 _____ , payable in cash (including the Deposit) at Closing ~~as follows:~~

~~(a)   Cash down payment, including the Deposit as defined in paragraph 4.3 (or if an all-cash transaction, the Purchase Price):~~ $ _____

~~(Strike if not applicable)~~

~~(b)   Amount of "New Loan" as defined in paragraph 5.1, if any:~~ $ _____

~~(c)   Buyer shall take title to the Property subject to and/or assume the following existing deed(s) of trust ("Existing Deed(s) of Trust") securing the existing promissory note(s) ("Existing Note(s)"):~~

~~(i)   An Existing Note ("First Note") with an unpaid principal balance as of the Closing of approximately:~~ $ _____

~~Said First Note is payable at $ _____ per month, including interest at the rate of _____ % per annum until paid (and/or the entire unpaid balance is due on _____ ):~~

~~(Strike if not applicable)~~

~~(ii)   An Existing Note ("Second Note") with an unpaid principal balance as of the Closing of approximately:~~ $ _____

~~Said Second Note is payable at $ _____ per month, including interest at the rate of _____ % per annum until paid (and/or the entire unpaid balance is due on _____ ):~~

~~(Strike if not applicable)~~

~~(d)   Buyer shall give Seller a deed of trust ("Purchase Money Deed of Trust") on the property, to secure the promissory note of Buyer to Seller described in paragraph 6 ("Purchase Money Note") in the amount of:~~ $ _____

~~Total Purchase Price:~~ $ _____

~~3.2 If Buyer is taking title to the Property subject to, or assuming, an Existing Deed of Trust and such deed of trust permits the beneficiary to demand payment of fees including, but not limited to, points, processing fees, and appraisal fees as a condition to the transfer of the Property, Buyer agrees to pay such fees up to a maximum of 1.5% of the unpaid principal balance of the applicable Existing Note.~~

4.    Deposits.

~~4.1~~ ☐ ~~Buyer has delivered to Broker a check in the sum of $ _____ , payable to Escrow Holder, to be held by Broker until both Parties have executed this Agreement and the executed Agreement has been delivered to Escrow Holder, or~~ ☒ Buyer shall deliver to Escrow Holder a check or wire transfer in the sum of $600,000.00 _____ when both Parties have executed this Agreement and the executed Agreement has been delivered to Escrow Holder. When cashed, the check (or such wire-transferred funds, when received) shall be deposited into the Escrow's trust account to be applied toward the Purchase Price of the Property at the Closing. ~~Should Buyer and Seller not enter into an agreement for purchase and sale, Buyer's check or funds shall, upon request by Buyer, be promptly returned to Buyer.~~

4.2  Additional deposits:

~~(a) Within 5 business days after the Date of Agreement, Buyer shall deposit with Escrow Holder the additional sum of $ _____ to be applied to the Purchase Price at the Closing.~~

(b) Additional deposits shall be made pursuant to Paragraph 26.16 of the Addendum attached hereto.

~~Within 5 business days after the contingencies discussed in paragraph 9.1 (a) through (1) (k) are approved or waived, Buyer shall deposit with Escrow Holder the additional sum of $ _____ to be applied to the Purchase Price at the Closing.~~

4.3  Escrow Holder shall deposit the funds deposited with it by Buyer pursuant to paragraphs 4.1 and 4.2 (collectively the "Deposit"), in a State or Federally chartered bank in an interest bearing account whose term is appropriate and consistent with the timing requirements of this transaction. The interest therefrom shall accrue to the benefit of Buyer, who hereby acknowledges that there may be penalties or interest forfeitures if the applicable instrument is redeemed prior to its specified maturity. Buyer's Federal Tax Identification Number is 95-6000080B _____ . NOTE: Such interest bearing account cannot be opened until Buyer's Federal Tax Identification Number is provided.

~~5.    Financing Contingency. (Strike if not applicable)~~

~~5.1   This offer is contingent upon Buyer obtaining from an insurance company, financial institution or other lender, a commitment to lend to Buyer a sum equal to at least _____ % of the Purchase Price, at terms reasonably acceptable to Buyer. Such loan ("New Loan") shall be secured by a first deed of trust or mortgage on the Property. If this Agreement provides for Seller to carry-back junior financing, then Seller shall have the right to approve the terms of the New Loan. Seller shall have 7 days from receipt of the commitment setting forth the proposed terms of the New Loan to approve or disapprove of such proposed terms. If Seller fails to notify Escrow Holder, in writing, of the disapproval within said 7 days it shall be conclusively presumed that Seller has approved the terms of the New Loan.~~

~~5.2   Buyer hereby agrees to diligently pursue obtaining the New Loan. If Buyer shall fail to notify its Broker, Escrow Holder and Seller, in~~

INITIALS _____

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS _____

FORM OFA-5-3/04E

~~writing within _____ days following the Date of Agreement, that the New Loan has not been obtained, it shall be conclusively presumed that Buyer has either obtained said New Loan or has waived this New Loan contingency.~~

~~5.3 If, after due diligence, Buyer shall notify its Broker, Escrow Holder and Seller, in writing, within the time specified in paragraph 5.2 hereof, that Buyer has not obtained said New Loan, this Agreement shall be terminated, and Buyer shall be entitled to the prompt return of the Deposit, plus any interest earned thereon, less only Escrow Holder and Title Company cancellation fees and costs, which Buyer shall pay.~~

~~6. Seller Financing. (Purchase Money Note). (Strike if not applicable)~~

~~6.1 The Purchase Money Note shall provide for interest on unpaid principal at the rate of _____% per annum, with principal and interest paid as follows:~~

~~_____~~
~~_____~~
~~_____~~
~~_____~~
~~_____~~

~~The Purchase Money Note and Purchase Money Deed of Trust shall be on the current forms commonly used by Escrow Holder, and be junior and subordinate only to the Existing Note(s) and/or the New Loan expressly called for by this Agreement.~~

~~6.2 The Purchase Money Note and/or the Purchase Money Deed of Trust shall contain provisions regarding the following (see also paragraph 10.3 (b)):~~

~~(a) Prepayment. Principal may be prepaid in whole or in part at any time without penalty, at the option of the Buyer.~~

~~(b) Late Charge. A late charge of 6% shall be payable with respect to any payment of principal, interest, or other charges, not made within 10 days after it is due.~~

~~(c) Due On Sale. In the event the Buyer sells or transfers title to the Property or any portion thereof, then the Seller may, at Seller's option, require the entire unpaid balance of said Note to be paid in full.~~

~~6.3 If the Purchase Money Deed of Trust is to be subordinate to other financing, Escrow Holder shall, at Buyer's expense prepare and record on Seller's behalf a request for notice of default and/or sale with regard to each mortgage or deed of trust to which it will be subordinate.~~

~~6.4 WARNING: CALIFORNIA LAW DOES NOT ALLOW DEFICIENCY JUDGEMENTS ON SELLER FINANCING. IF BUYER ULTIMATELY DEFAULTS ON THE LOAN, SELLER'S SOLE REMEDY IS TO FORECLOSE ON THE PROPERTY.~~

7.   Real Estate Brokers.

     7.1      The following real estate broker(s) ("Brokers") and brokerage relationships exist in this transaction and are consented to by the Parties (check the applicable boxes).

☑   **CB Richard Ellis, Inc.** _____     represents Seller exclusively ("Seller's Broker");

☑   **Cushman & Wakefield** _____     represents Buyer exclusively ("Buyer's Broker"); or

☐   _____     represents both Seller and Buyer ("Dual Agency").

The Parties acknowledge that Brokers are the procuring cause of this Agreement. See paragraph 24 regarding the nature of a real estate agency relationship. ~~Buyer shall use the services of Buyer's Broker exclusively in connection with any and all negotiations and offers with respect to the Property for a period of 1 year from the date inserted for reference purposes at the tops of page 1.~~

     7.2   Buyer and Seller each represent and warrant to the other that he/she/it has had no dealings with any person, firm, broker or finder in connection with the negotiation of this Agreement and/or the consummation of the purchase and sale contemplated herein, other than the Brokers named in paragraph 7.1, and no broker or other person, firm or entity, other than said Brokers is/are entitled to any commission or finder's fee in connection with this transaction as the result of any dealings or acts of such Party. Buyer and Seller do each hereby agree to indemnify, defend, protect and hold the other harmless from and against any costs, expenses or liability for compensation, commission or charges which may be claimed by any broker, finder or other similar party, other than said named Brokers by reason of any dealings or act of the indemnifying Party.

8.      Escrow and Closing.

     8.1   Upon acceptance hereof by Seller, this Agreement, including any counteroffers incorporated herein by the Parties, shall constitute not only the agreement of purchase and sale between Buyer and Seller, but also instructions to Escrow Holder for the consummation of the Agreement through the Escrow. Escrow Holder shall not prepare any further escrow instructions restating or amending the Agreement unless specifically so instructed by the Parties or a Broker herein. Subject to the reasonable approval of the Parties, Escrow Holder may, however, include its standard general escrow provisions so long as such standard general escrow provisions state that in the event of a conflict between the standard general escrow provisions and this Agreement, the terms of this Agreement shall control.

     8.2   As soon as practical after the receipt of this Agreement ~~and any relevant counteroffers,~~ Escrow Holder shall ascertain the Date of Agreement as defined in paragraphs 1.2 ~~and 20.2~~ and advise the Parties and Brokers, in writing, of the date ascertained.

     8.3   Escrow Holder is hereby authorized and instructed to conduct the Escrow in accordance with this Agreement, applicable law and custom and practice of the community in which Escrow Holder is located, including any reporting requirements of the Internal Revenue Code. In the event of a conflict between the law of the state where the Property is located and the law of the state where the Escrow Holder is located, the law of the state where the Property is located shall prevail.

     8.4   Subject to satisfaction of the contingencies herein described, Escrow Holder shall close this escrow (the "Closing") by recording a general warranty grant deed ~~(a grant deed in California)~~ and the other documents required to be recorded, and by disbursing the funds and documents in accordance with this Agreement.

     8.5   Buyer and Seller shall each pay one-half of the Escrow Holder's charges and Seller shall pay the usual recording fees and any required documentary transfer taxes. Seller shall pay the premium for a standard coverage owner's or joint protection policy of title insurance. Buyer shall pay for any charges for ALTA extended coverage (including the costs of any required survey), and for any title endorsements which Buyer may request.

     8.6   Escrow Holder shall verify that all of Buyer's contingencies have been satisfied or waived prior to Closing. Other provisions of this

INITIALS _____

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS _____

FORM OFA-5-3/04E

Agreement which do not constitute instructions to Escrow Holder ~~The matters contained in paragraphs 8.1 subparagraphs (b),~~ ~~(c), (d), (e), (g), (i), (n), and (o), 8.4, 8.5, 12, 13, 14, 16, 18, 20, 21, 22, and 24 are, however,~~ matters of agreement between the Parties with which Escrow Holder need not be concerned ~~only and are not instructions to Escrow Holder.~~

8.7　If this transaction is terminated for non-satisfaction and non-waiver of a Buyer's Contingency, as defined in paragraph 9.2, then neither of the Parties shall thereafter have any liability to the other under this Agreement, except to the extent of a breach of any affirmative covenant or warranty in this Agreement and except for the Buyer's Indemnities under Paragraph 14. In the event of such termination, Buyer shall be promptly refunded all funds deposited by Buyer with Escrow Holder, less only Title Company and Escrow Holder cancellation fees and costs, all of which shall be Buyer's obligation.

8.8　The Closing shall occur on the Expected Closing Date, or as soon thereafter as the Escrow is in condition for Closing; provided, however, that if the Closing does not occur by the Expected Closing Date and said Date is not extended by mutual instructions of the Parties, a Party not then in default under this Agreement may notify the other Party, Escrow Holder, and Brokers, in writing that, unless the Closing occurs within two (2) 5 business days following said notice, the Escrow shall be deemed terminated without further notice or instructions.

8.9　Except as otherwise provided herein, the termination of Escrow shall not relieve or release either Party from any obligation to pay Escrow Holder's fees and costs or constitute a waiver, release or discharge of any breach or default that has occurred in the performance of the obligations, agreements, covenants or warranties contained therein.

8.10　If this Escrow is terminated for any reason other than Seller's breach or default, then at Seller's request, ~~and as a condition to the return of~~ ~~Buyer's deposit,~~ Buyer shall within 5 days after written request deliver to Seller, at no charge, copies of all surveys, engineering studies, soil reports, maps, master plans, feasibility studies and other similar items prepared by or for Buyer that pertain to the Property. Provided, however, that Buyer shall not be required to deliver any such report if the written contract which Buyer entered into with the consultant who prepared such report specifically forbids the dissemination of the report to others. Seller acknowledges that any reports described in this Paragraph 8.10 that are delivered by Buyer to Seller, including, without limitation, any reports obtained by Buyer or prepared by any agency of Buyer, are being delivered to Seller merely as an accommodation, and without representation or warranty as to the sufficiency, accuracy, completeness or validity of such reports.

9.　Contingencies to Closing.

9.1　The Closing of this transaction is contingent upon the satisfaction or waiver of the following contingencies. IF BUYER FAILS TO NOTIFY ESCROW HOLDER AND SELLER, IN WRITING, OF THE APPROVAL DISAPPROVAL OF ANY OF SAID CONTINGENCIES WITHIN THE TIME SPECIFIED THEREIN, IT SHALL BE CONCLUSIVELY PRESUMED THAT BUYER HAS DISAPPROVED APPROVED SUCH ITEM, MATTER OR DOCUMENT. Buyer's conditional approval shall constitute disapproval, unless provision is made by the Seller within the time specified therefore by the Buyer in such conditional approval or by this Agreement, whichever is later, for the satisfaction of the condition imposed by the Buyer. Escrow Holder shall promptly provide all Parties with copies of any written disapproval or conditional approval which it receives. With regard to subparagraphs (a) through (i) the pre-printed time periods shall control unless a different number of days is inserted in the spaces provided. With regard to the contingencies set forth in this Paragraph 9.1, the time periods set forth in Paragraph 26.5 of the Addendum shall control, to the extent that they are different from the time periods set forth in this Paragraph 9.1. Further details as to Buyer's Contingencies are set forth in Paragraph 26.6 of the Addendum and shall control over any terms set forth in the Pre-Printed Form.

(a) Disclosure. Seller shall make to Buyer, through escrow, all of the applicable disclosures required by law (See the AIR Commercial Real Estate Association ("AIR") standard form entitled "Seller's Mandatory Disclosure Statement" may be used for these purposes) and provide Buyer with a completed Property Information Sheet ("Property Information Sheet") concerning the Property, duly executed by or on behalf of Seller in the current form or equivalent to that published by the AIR within 10 or _____ days following the Date of Agreement. Buyer has 30 10 days from the receipt of said disclosures to approve or disapprove the matters disclosed.

(b) Physical Inspection. Buyer has 10 or ___30___ days from the receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the physical aspects and size of the Property.

(c) Hazardous Substance Conditions Report. Buyer has 30 or _____ days from the receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the environmental aspects of the Property. Seller recommends that Buyer obtain a Hazardous Substance Conditions Report concerning the Property and relevant adjoining properties. Any such report shall be paid for by Buyer. A "Hazardous Substance" for purposes of this Agreement is defined as any substance whose nature and/or quantity of existence, use, manufacture, disposal or effect, render it subject to Federal, state or local regulation, investigation, remediation or removal as potentially injurious to public health or welfare or the environment. A "Hazardous Substance Condition" for purposes of this Agreement is defined as the existence on, under or relevantly adjacent to the Property of a Hazardous Substance that would require remediation and/or removal under applicable Federal, state or local law.

(d) Soil Inspection. Buyer has 30 or _____ days from the receipt of the Property Information Sheet or the Date of Agreement, whichever is later, to satisfy itself with regard to the condition of the soils on the Property. Seller recommends that Buyer obtain a soil test report. Any such report shall be paid for by Buyer. Seller shall provide Buyer copies of any soils report that Seller may have within 10 days of the Date of Agreement.

(e) Governmental Approvals. Buyer has 30 or _____ days from the Date of Agreement to satisfy itself with regard to approvals and permits from governmental agencies or departments which have or may have jurisdiction over the Property and which Buyer deems necessary or desirable in connection with its intended use of the Property, including, but not limited to, permits and approvals required with respect to zoning, planning, building and safety, fire, police, handicapped and Americans with Disabilities Act requirements, transportation and environmental matters.

PAGE 4 OF 14

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

(f) *Conditions of Title*. Escrow Holder shall cause a current ~~commitment for title report~~ Insurance ("Title Report Commitment") concerning the Property issued by the Title Company, as well as legible copies of all documents referred to in the Title Report Commitment ("Underlying Documents") to be delivered to Buyer within 10 or _____ days following the Date of Agreement. Buyer has ~~10~~ 30 days from the ~~receipt of the Title Commitment and Underlying Documents~~ Date of Agreement to satisfy itself with regard to the condition of title. The disapproval of Buyer of any monetary encumbrance, which by the terms of this Agreement is not to remain against the Property after the Closing, shall not be considered a failure of this contingency, as Seller shall have the obligation, at Seller's expense, to satisfy and remove such disapproved monetary encumbrance at or before the Closing.

(g) *Survey*. Buyer has 30 or _____ days from the ~~receipt of the Title Commitment and Underlying Documents~~ Date of Agreement to satisfy itself with regard to any ALTA title supplement based upon a survey prepared to American Land Title Association ("ALTA") standards for an owner's policy by a licensed surveyor, showing the legal description and boundary lines of the Property, any easements of record, and any improvements, poles, structures and things located within 10 feet of either side of the Property boundary lines. Any such survey shall be prepared at Buyer's direction and expense. If Buyer has obtained a survey and approved the ALTA title supplement, Buyer may elect within the period allowed for Buyer's approval of a survey to have an ALTA extended coverage owner's form of title policy, in which event Buyer shall pay any additional premium attributable thereto.

~~(h) Existing Leases and Tenancy Statements. Seller shall within 10 or _____ days of the Date of Agreement provide both Buyer and Escrow Holder with legible copies of all leases, subleases or rental arrangements (collectively, "Existing Leases") affecting the Property, and with a tenancy statement ("Estoppel Certificate") in the latest form or equivalent that published by the AIR, executed by Seller and/or each tenant and subtenant of the Property. Seller shall use its best efforts to have each tenant complete and execute an Estoppel Certificate. If any tenant fails or refuses to provide an Estoppel Certificate then Seller shall complete and execute an Estoppel Certificate for that tenancy. Buyer has 10 days from the receipt of said Existing Leases and Estoppel Certificates to satisfy itself with regard to the Existing Leases and any other tenancy issues.~~

(i) *Other Agreements*. Seller shall within 10 or ___5___ days of the Date of Agreement provide Buyer with legible copies of all other agreements ("Other Agreements") known to Seller that will affect the Property after Closing. Buyer has 30 ~~10~~ days from the receipt of said Other Agreements to satisfy itself with regard to such Agreements.

~~(j) Financing. If paragraph 5 hereof dealing with a financing contingency has not been stricken, the satisfaction or waiver of such New Loan contingency.~~

~~(k) Existing Notes. If paragraph 3.1(c) has not been stricken, Seller shall within 10 or _____ days of the Date of Agreement provide Buyer with legible copies of the Existing Notes, Existing Deeds of Trust and related agreements (collectively, "Loan Documents") to which the Property will remain subject after the Closing. Escrow Holder shall promptly request from the holders of the Existing Notes a beneficiary statement ("Beneficiary Statement") confirming: (1) the amount of the unpaid principal balance, the current interest rate, and the date to which interest is paid, and (2) the nature and amount of any impounds held by the beneficiary in connection with such loan. Buyer has 10 or _____ days from the receipt of the Loan Documents and Beneficiary Statements to satisfy itself with regard to such financing. Buyer's obligation to close is conditioned upon Buyer being able to purchase the Property without acceleration or change in the terms of any Existing Notes or charges to Buyer except as otherwise provided in this Agreement or approved by Buyer, provided, however, Buyer shall pay the transfer fee referred to in paragraph 3.2 hereof.~~

~~(l) Personal Property. In the event that any personal property is included in the Purchase Price, Buyer has 10 or _____ days from the Date of Agreement to satisfy itself with regard to the condition of such personal property. Seller recommends that Buyer obtain a UCC-1 report. Any such report shall be paid for by Buyer. Seller shall provide Buyer copies of any liens or encumbrances affecting such personal property that it is aware of within 10 or _____ days of the Date of Agreement.~~

~~(m) Destruction, Damage or Loss. There shall not have occurred prior to the Closing, a destruction of, or damage or loss to, the Property or any portion thereof, from any cause whatsoever, which would cost more than $10,000.00 to repair or cure. If the cost of repair or cure is $10,000.00 or less, Seller shall repair or cure the loss prior to the Closing. Buyer shall have the option, within 10 days after receipt of written notice of a loss costing more than $10,000.00 to repair or cure, to either terminate this transaction or to purchase the Property notwithstanding such loss, but without deduction or offset against the Purchase Price. If the cost to repair or cure is more than $10,000.00, and Buyer does not elect to terminate this transaction, Buyer shall be entitled to any insurance proceeds applicable to such loss. Unless otherwise notified in writing, Escrow Holder shall assume no such destruction, damage or loss has occurred prior to Closing.~~

(n) *Material Change*. Buyer shall have 10 days following receipt of written notice of a Material Change within which to satisfy itself with regard to such change. "Material Change" shall mean a change in the physical ~~status of the use, occupancy, tenants, or~~ condition of the Property that occurs after the ~~date~~ Date of Agreement ~~of this offer~~ and prior to the Closing which would materially and adversely affect Buyer's use. Unless otherwise notified in writing, Escrow Holder shall assume that no Material Change has occurred prior to the Closing.

(o) *Seller Performance*. The delivery of all documents and the due performance by Seller of each and every undertaking and agreement to be performed by Seller under this Agreement.

(p) *Warranties*. That each representation and warranty of Seller herein be true and correct in all material respects as of the Closing. Escrow Holder shall assume that this condition has been satisfied unless notified to the contrary in writing by any Party prior to the Closing.

~~(q) Brokerage Fee. Payment at the Closing of such brokerage fee as is specified in this Agreement or later written instructions to Escrow Holder executed by Seller and Brokers ("Brokerage Fee"). It is agreed by the Parties and Escrow Holder that Brokers are a third party beneficiary of this Agreement insofar as the Brokerage Fee is concerned, and that no change shall be made with respect to the payment of the Brokerage Fee specified in this Agreement, without the written consent of Brokers.~~

9.2  All of the contingencies specified in subparagraphs (a) through (p) of paragraph 9.1 are for the benefit of, and may be waived by, Buyer, and may be elsewhere herein referred to as "Buyer's Contingencies." Buyer's Contingencies are further described in Paragraph 26.6 of the Addendum and shall be in addition to those set forth in subparagraphs (a) through (g), (i), and (n) through (p) of Paragraph 9.1 of the Pre-Printed Form.

9.3  If any Buyer's Contingency or any other matter subject to Buyer's approval is not approved (with silence constituting

INITIALS                                                                                    INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                        FORM OFA-5-3/04E

disapproval) disapproved as provided for herein in a timely manner ("Disapproved Item"), Seller shall have the right but not the obligation within 10 days following the receipt of notice of Buyer's disapproval (or the end of the relevant time period relating to such Buyer's Contingency) to elect to cure such Disapproved Item prior to the Expected Closing Date ("Seller's Election"). Seller's failure to give to Buyer within such period, written notice of Seller's commitment to cure such Disapproved Item on or before the Expected Closing Date shall be conclusively presumed to be Seller's Election not to cure such Disapproved Item. If Seller elects, either by written notice or failure to give written notice, not to cure a Disapproved Item, Buyer shall have the election, within 10 days after Seller's Election to either accept title to the Property subject to such Disapproved Item, or to terminate this transaction. Buyer's failure to notify Seller in writing of Buyer's election to accept title to the Property subject to the Disapproved Item without deduction or offset shall constitute Buyer's election to terminate this transaction. Unless expressly provided otherwise herein, Seller's right to cure shall not apply to the remediation of Hazardous Substance Conditions or to the Financing Contingency. Unless the Parties mutually instruct otherwise, if the time periods for the satisfaction of contingencies or for Seller's and Buyer's said Elections would expire on a date after the Expected Closing Date, the Expected Closing Date shall be deemed extended for 3 business days following the expiration of: (a) the applicable contingency period(s), (b) the period within which the Seller may elect to cure the Disapproved Item, or (c) if Seller elects not to cure, the period within which Buyer may elect to proceed with this transaction, whichever is later.

9.4  Buyer understands and agrees that until such time as all Buyer's Contingencies have been satisfied or waived, Seller and/or its agents may solicit, entertain and/or accept back-up offers to purchase the Property.

9.5  The Parties acknowledge that extensive local, state and Federal legislation establish broad liability upon owners and/or users of real property for the investigation and remediation of Hazardous Substances. The determination of the existence of a Hazardous Substance Condition and the evaluation of the impact of such a condition are highly technical and beyond the expertise of Brokers. The Parties acknowledge that they have been advised by Brokers to consult their own technical and legal experts with respect to the possible presence of Hazardous Substances on the Property or adjoining properties, and Buyer and Seller are not relying upon any investigation by or statement of Brokers with respect thereto. The Parties hereby assume all responsibility for the impact of such Hazardous Substances upon their respective interests herein.

10.  Documents Required at or before Closing:

10.1  Five days prior to the Closing date Escrow Holder shall obtain an updated Title Report Commitment concerning the Property from the Title Company and provide copies thereof to each of the Parties.

10.2  Seller shall deliver to Escrow Holder in time for delivery to Buyer at the Closing:
    (a)  Grant or general warranty deed, duly executed and in recordable form, conveying fee title to the Property to Buyer.
    (b)  If applicable, the Beneficiary Statements concerning Existing Note(s).
    (c)  If applicable, the Existing Leases and Other Agreements together with duly executed assignments thereof by Seller to and Buyer. Notwithstanding anything herein to the contrary, any Other Agreements which involve Seller's right against any third parties (including, but not limited to, prior owners of the Property) to indemnification regarding the existence of any Hazardous Substance Condition shall not be assigned to Buyer and such rights shall belong exclusively to Seller. The assignment of Existing Leases shall be on the most recent Assignment and Assumption of Lessor's Interest in Lease form published by the AIR or its equivalent.
    (d)  If applicable, Estoppel Certificates executed by Seller and/or the tenant(s) of the Property.
    (e)  An affidavit executed by Seller to the effect that Seller is not a "foreign person" within the meaning of Internal Revenue Code Section 1445 or successor statutes. If Seller does not provide such affidavit in form reasonably satisfactory to Buyer at least 3 business days prior to the Closing, Escrow Holder shall at the Closing deduct from Seller's proceeds and remit to Internal Revenue Service such sum as is required by applicable Federal law with respect to purchases from foreign sellers.
    (f)  If the Property is located in California, an An affidavit executed by Seller to the effect that Seller is not a "nonresident" within the meaning of California Revenue and Tax Code Section 18662 or successor statutes. If Seller does not provide such affidavit in form reasonably satisfactory to Buyer at least 3 business days prior to the Closing, Escrow Holder shall at the Closing deduct from Seller's proceeds and remit to the Franchise Tax Board such sum as is required by such statute.
    (g)  If applicable, a A bill of sale, duly executed, conveying title to the Units any included personal property to Buyer. as described in Paragraph 2.3.
    (h)  If the Seller is a corporation, a duly executed corporate resolution authorizing the execution of this Agreement and the sale of the Property.

10.3  Buyer shall deliver to Seller through Escrow:
    (a)  The cash portion of the Purchase Price and such additional sums as are required of Buyer under this Agreement shall be deposited by Buyer with Escrow Holder, by federal funds wire transfer, or any other method acceptable to Escrow Holder as immediately collectable funds, no later than 2:00 P.M. on the business day prior to the Expected Closing Date.
    (b)  If a Purchase Money Note and Purchase Money Deed of Trust are called for by this Agreement, the duly executed originals of these documents, the Purchase Money Deed of Trust being in recordable form, together with evidence of fire insurance on the improvements in the amount of the full replacement cost naming Seller as a mortgage loss payee, and a real estate tax service contract (at Buyer's expense), assuring Seller of notice of the status of payment of real property taxes during the life of the Purchase Money Note.
    (c)  The Assignment and Assumption of Lessor's Interest in Lease form specified in paragraph 10.2(c) above, duly executed by Buyer.
    (d)  Assumptions duly executed by Buyer of the obligations of Seller that accrue after Closing under any Other Agreements.
    (e)  If applicable, a written assumption duly executed by Buyer of the loan documents with respect to Existing Notes.
    (f)  If the Buyer is a corporation, a duly executed corporate resolution authorizing the execution of this Agreement and the purchase of the Property.

10.4  At Closing, Escrow Holder shall cause to be issued to Buyer a standard coverage (or ALTA extended, if elected pursuant to 9.1(g)) owner's form policy of title insurance effective as of the Closing, issued by the Title Company in the full amount of the Purchase Price, insuring title to the Property vested in Buyer, subject only to the exceptions approved by Buyer. In the event there is a Purchase Money Deed of Trust in this transaction, the policy of title insurance shall be a joint protection policy insuring both Buyer and Seller.

INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM OFA-5-3/04E

IMPORTANT: IN A PURCHASE OR EXCHANGE OF REAL PROPERTY, IT MAY BE ADVISABLE TO OBTAIN TITLE INSURANCE IN CONNECTION WITH THE CLOSE OF ESCROW SINCE THERE MAY BE PRIOR RECORDED LIENS AND ENCUMBRANCES WHICH AFFECT YOUR INTEREST IN THE PROPERTY BEING ACQUIRED. A NEW POLICY OF TITLE INSURANCE SHOULD BE OBTAINED IN ORDER TO ENSURE YOUR INTEREST IN THE PROPERTY THAT YOU ARE ACQUIRING.

11.  Prorations and Adjustments.

11.1  *Taxes.*  Applicable real property taxes and special assessment bonds shall be prorated through Escrow as of the date of the Closing, based upon the latest tax bill available. The Parties agree to prorate as of the Closing any taxes assessed against the Property by supplemental bill levied by reason of events occurring prior to the Closing. Payment of the prorated amount shall be made promptly in cash upon receipt of a copy of any supplemental bill.

11.2  *Insurance.*  WARNING: Any insurance which Seller may have maintained will terminate on the Closing.  Buyer is advised to obtain appropriate insurance to cover the Property.

~~11.3  Rentals, Interest and Expenses.  Scheduled rentals, interest on Existing Notes, utilities, and operating expenses shall be prorated as of the date of Closing. The Parties agree to promptly adjust between themselves outside of Escrow any rents received after the Closing.~~

~~11.4  Security Deposit. Security Deposits held by Seller shall be given to Buyer as a credit to the cash required of Buyer at the Closing.~~

~~11.5  Post-Closing Matters. Any item to be prorated that is not determined or determinable at the Closing shall be promptly adjusted by the Parties by appropriate cash payment outside of the Escrow when the amount due is determined.~~

~~11.6  Variations in Existing Note Balances.  In the event that Buyer is purchasing the Property subject to an Existing Deed of Trust(s), and in the event that a Beneficiary Statement as to the applicable Existing Note(s) discloses that the unpaid principal balance of such Existing Note(s) at the closing will be more or less than the amount set forth in paragraph 5.1(e) hereof ("Existing Note Variation"), then the Purchase Money Note(s) shall be reduced or increased by an amount equal to such Existing Note Variation. If there is to be no Purchase Money Note, the cash required of the Closing per paragraph 3.1(a) shall be reduced or increased by the amount of such Existing Note Variation.~~

~~11.7  Variations in New Loan Balance.  In the event Buyer is obtaining a New Loan and the amount ultimately obtained exceeds the amount set forth in paragraph 5.1, then the amount of the Purchase Money Note, if any, shall be reduced by the amount of such excess.~~

12.  Representation and Warranties of Seller and Disclaimers.

12.1  Seller's warranties and representations shall survive the Closing and delivery of the deed but no action thereon may be brought by Buyer on a date which is more than 30 months after the Close of Escrow ~~for a period of 3 years~~, and, are true, material and relied upon by Buyer ~~and Brokers~~ in all respects. In the event that Buyer (independently or by Seller disclosure) learns that a Seller representation or warranty is untrue or incorrect prior to the Close of Escrow, and Buyer nevertheless elects to purchase the Property and Close Escrow, then in that event Buyer will be deemed to have waived any right that it may have to bring an action or proceeding against Seller regarding such representation or warranty.  Seller hereby makes the following warranties and representations to Buyer ~~and Brokers~~:

(a)  *Authority of Seller.* Seller is the owner of the Property and/or has the full right, power and authority to sell, convey and transfer the Property to Buyer as provided herein, and to perform Seller's obligations hereunder.

~~(b)  Maintenance During Escrow and Equipment Condition At Closing. Except as otherwise provided in paragraph 9.1(m) hereof, Seller shall maintain the Property until the Closing in its present condition, ordinary wear and tear excepted. The HVAC, plumbing, elevators, loading doors and electrical systems shall be in good operating order and condition at the time of Closing.~~

(c)  *Hazardous Substances/Storage Tanks.*  Except as may be set forth in any environmental reports which are delivered to Buyer pursuant to this Agreement, Seller has no knowledge, except as otherwise disclosed to Buyer in writing, of the existence or prior existence (during the time period that Seller owned the Property) on the Property of any Hazardous Substance, nor of the existence or prior existence (during the time period that Seller owned the Property) of any above or below ground storage tank.

(d)  *Compliance.*  Except as may be set forth in any environmental reports which are delivered to Buyer pursuant to this Agreement, Seller has no knowledge of any aspect or condition of the Property (excluding any structures thereon) which violates applicable laws, rules, regulations, codes or covenants, conditions or restrictions, or of improvements or alterations made to the Property without a permit where one was required, or of any unfulfilled order or directive of any applicable governmental agency or casualty insurance company requiring any investigation, remediation, repair, maintenance or improvement be performed on the Property (excluding any structures thereon).

(e)  *Changes in Agreements.* Prior to the Closing, Seller will not violate or modify any ~~Existing Lease or~~ Other Agreement, or create any new leases or other agreements affecting the Property, without Buyer's written approval, which approval will not be unreasonably withheld.

(f)  *Possessory Rights.*  ~~Seller has no knowledge that anyone~~ No one will, at the Closing, have any right to possession of the Property, ~~except as disclosed by this Agreement or otherwise in writing to Buyer.~~

(g)  *Mechanics' Liens.*  Seller has no knowledge of any ~~There are no~~ unsatisfied mechanics' or materialmens' lien rights concerning the Property. If any such unsatisfied liens exist as of the Close of Escrow, they shall be paid and satisfied from the funds due to Seller, unless Seller contests same, in which case Seller shall provide an appropriate bond so that such liens are not reflected on Buyer's title insurance policy.

(h)  *Actions, Suits or Proceedings.* Seller has no knowledge of any actions, suits or proceedings pending or threatened before any commission, board, bureau, agency, arbitrator, court or tribunal that would effect the Property or the right to occupy or utilize same.

INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM OFA-5-3/04E

(i) *Notice of Changes.* Seller will promptly notify Buyer and Brokers in writing of any Material Change (see paragraph 9.1(n)) affecting the Property that becomes known to Seller prior to the Closing.

(j) ~~No Tenant Bankruptcy Proceedings. Seller has no notice or knowledge that any tenant of the Property is the subject of a bankruptcy or insolvency proceeding.~~

(k) *No Seller Bankruptcy Proceedings.* Seller is not the subject of a bankruptcy, insolvency or probate proceeding.

(l) ~~Personal Property. Seller has no knowledge that anyone will, at the Closing, have any right to possession of any personal property included in the Purchase Price nor knowledge of any liens or encumbrances affecting such personal property, except as disclosed by this Agreement or otherwise in writing to Buyer.~~

~~12.2 Buyer hereby acknowledges that, except as otherwise stated in this Agreement, Buyer is purchasing the Property in its existing condition and will, by the time called for herein, make or have waived all inspections of the Property Buyer believes are necessary to protect its own interest in, and its contemplated use of, the Property. The Parties acknowledge that, except as otherwise stated in this Agreement, no representations, inducements, promises, agreements, assurances, oral or written, concerning the Property, or any aspect of the occupational safety and health laws, Hazardous Substance laws, or any other act, ordinance or law, have been made by either Party or Brokers, or relied upon by either Party hereto.~~

12.2a In the event that Buyer learns (independently or by Seller disclosure) that a Seller representation or warranty might be untrue prior to the Closing, and Buyer elects to purchase the Property anyway then, and in that event, Buyer waives any right that it may have to bring an action or proceeding against Seller or Brokers regarding said representation or warranty.

~~12.4 Any environmental reports, soils reports, surveys, and other similar documents which were prepared by third party consultants and provided to Buyer by Seller or Seller's representatives, have been delivered as an accommodation to Buyer and without any representation or warranty as to the sufficiency, accuracy, completeness, and/or validity of said documents, all of which Buyer relies on at its own risk. Seller believes said documents to be accurate, but Buyer is advised to retain appropriate consultants to review said documents and investigate the Property.~~

12.3   *Disclaimer of Representation or Warranties by Seller.*

(a)   Buyer acknowledges to Seller that as of the Closing it will have conducted any and all inspections, tests, analyses, reviews and studies that Buyer may have desired and will have evaluated the Property (including, without limitation, the physical and environmental condition of the Property), to the full and complete satisfaction of Buyer and that Buyer will acquire the Property solely on the basis of the foregoing and the title insurance protection afforded by the title insurance policy, and not on the basis of any information provided or any representations, warranties or covenants made by Seller, or any person acting on Seller's behalf, other than the express representations, warranties or covenants made by Seller set forth in this Agreement.

(b)   BUYER ACKNOWLEDGES AND AGREES THAT THE SALE OF THE PROPERTY HEREUNDER IS AND WILL BE MADE ON AN "AS-IS, WHERE-IS" BASIS AND WITH ALL FAULTS AS OF THE DATE OF THE CLOSE OF ESCROW, WITHOUT ANY REPRESENTATIONS OR WARRANTIES AS TO THE PHYSICAL CONDITION OR ENVIRONMENTAL CONDITION OF THE PROPERTY, OR ANY OTHER REPRESENTATIONS OR WARRANTIES, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT. EXCEPT TO THE EXTENT EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER HAS NOT MADE, DOES NOT MAKE, AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES, COVENANTS OR OBLIGATIONS OF ANY KIND OR CHARACTER WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT, FUTURE OR OTHERWISE, OF, AS, TO, CONCERNING OR WITH RESPECT TO, THE PROPERTY, OR THE MERCHANTABILITY OR FITNESS OF THE PROPERTY FOR ANY PARTICULAR PURPOSE.

(c)   Buyer further acknowledges that certain information and materials provided or to be provided by Seller or any person acting on Seller's behalf with respect to the Property may have been obtained from third parties (the "Third Party Reports"), and that Seller has not made any independent investigation or verification of information and materials set forth in the Third Party Reports, and that Seller therefore disclaims any representations or warranties as to the accuracy or the completeness of information and materials set forth in the Third Party Reports. Seller will not be liable for any negligent misrepresentation set forth in the Third Party Reports that is not the result of a misrepresentation by the Seller or its agents or employees to the consultant preparing the Third Party Reports.

(d)   As used in this Agreement, the phrase "Seller's knowledge" (or similar phrase) means the actual, present knowledge of Greg Sutherland whose title is General Manager, without any duty of inquiry or investigation. Seller represents and warrants to Buyer that Greg Sutherland is the person employed by Seller who is most knowledgeable about the condition of the Property and best able to make the representations and

INITIALS _____

INITIALS _____

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OFA-5-3/04E

warranties set forth herein.

13. Possession.

Possession of the Property shall be given to Buyer at the Closing free and clear of the possessory rights of any other person or entity ~~subject to the rights of tenants under Existing Leases~~.

14. Buyer's Entry.

At any time during the Escrow period, Buyer, and its agents and representatives, shall have the right at reasonable times upon reasonable advance notice to Seller ~~and subject to rights of tenants~~, to enter upon the Property for the purpose of making inspections and tests specified in this Agreement. No destructive or physically invasive testing shall be conducted, however, without Seller's prior approval which shall not be unreasonably withheld.  If Seller does not provide its consent to invasive testing within two (2) business days of request, the Contingency Periods set forth in Paragraph 9.1(b), (c), (d) and (g), and the date of Closing shall each be extended by the number of days of delays in Seller's consenting to such testing. Following any such entry or work, unless otherwise directed in writing by Seller, Buyer shall return the Property to the condition it was in prior to such entry or work, including the recompaction or removal of any disrupted soil or material as Seller may reasonably direct. All such inspections and tests and any other work conducted or materials furnished with respect to the Property by or for Buyer shall be paid for by Buyer as and when due and Buyer shall indemnify, defend, protect and hold harmless Seller and the Property of and from any and all claims, liabilities, losses, expenses (including reasonable attorneys' fees), damages, including those for injury to person or property, to the extent arising out of or relating to any such work or materials or the acts or omissions of Buyer, its agents or employees in connection therewith.

15. Further Documents and Assurances.

The Parties shall each, diligently and in good faith, undertake all actions and procedures reasonably required to place the Escrow in condition for Closing as and when required by this Agreement. The Parties agree to provide all further information, and to execute and deliver all further documents, reasonably required by Escrow Holder or the Title Company.

16. Attorneys' Fees.

If any Party ~~or Broker~~ brings an action or proceeding (including arbitration) involving the Property whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term "Prevailing Party" shall include, without limitation, a Party ~~or Broker~~ who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party ~~or Broker~~ of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred.

17. Prior Agreements/Amendments.

17.1 This Agreement supersedes any and all prior agreements between Seller and Buyer regarding the Property.

17.2 Amendments to this Agreement are effective only if made in writing and executed by Buyer and Seller.

~~18. Broker's Rights.~~

~~18.1 If this sale is not consummated due to the default of either the Buyer or Seller, the defaulting Party shall be liable to and shall pay to Brokers the Brokerage Fee that Brokers would have received had the sale been consummated. If Buyer is the defaulting party, payment of said Brokerage Fee is in addition to any obligation with respect to liquidated or other damages.~~

~~18.2 Upon the Closing, Brokers are authorized to publicize the facts of this transaction.~~

19. Notices.

19.1 Whenever any Party, Escrow Holder ~~or Brokers~~ herein shall desire to give or serve any notice, demand, request, approval, disapproval or other communication, each such communication shall be in writing and shall be delivered personally, by messenger or by mail, postage prepaid, to the address set forth in this Agreement or by facsimile transmission./

19.2 Service of any such communication shall be deemed made on the date of actual receipt if personally delivered. Any such communication sent by regular mail shall be deemed given 48 hours after the same is mailed. Communications sent by United States Express Mail or overnight courier that guarantee next day delivery shall be deemed delivered 24 hours after delivery of the same to the Postal Service or courier. Communications transmitted by facsimile transmission shall be deemed delivered upon telephonic confirmation of receipt (confirmation report from fax machine is sufficient), provided a copy is also delivered via delivery or mail. If such communication is received on a Saturday, Sunday or legal holiday or after 5:00 p.m. (Pacific Time), it shall be deemed received on the next business day.

19.3 Any Party ~~or Broker~~ hereto may from time to time, by notice in writing, designate a different address to which, or a different person or additional persons to whom, all communications are thereafter to be made.

~~20. Duration of Offer.~~

~~20.1 If this offer is not accepted by Seller on or before 5:00 P.M. according to the time standard applicable to the city of __ __ on the date of _____, it shall be deemed automatically revoked.~~

~~20.2 The acceptance of this offer, or of any subsequent counteroffer hereto, that creates an agreement between the Parties as described in paragraph 4.2, shall be deemed made upon delivery to the other Party or either Broker herein of a duly executed writing unconditionally accepting the last outstanding offer or counteroffer.~~

21. DEFAULT BY BUYER.  IN THE EVENT THAT THE CLOSING AND THE CONSUMMATION OF THE TRANSACTIONS HEREIN CONTEMPLATED DO NOT OCCUR BY REASON OF ANY DEFAULT OF BUYER, BUYER AND SELLER ACKNOWLEDGE THAT IT WOULD BE IMPRACTICAL AND EXTREMELY DIFFICULT TO ESTIMATE

INITIALS _____

_____ INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OFA-5-3/04E

THE DAMAGES WHICH SELLER WILL SUFFER.  THEREFORE BUYER AND SELLER HEREBY AGREE THAT A REASONABLE ESTIMATE OF THE DAMAGES THAT SELLER WOULD SUFFER IN THE EVENT THAT BUYER SO DEFAULTS IS AND WILL BE AN AMOUNT EQUAL TO THE DEPOSIT (INCLUDING ALL ACCRUED INTEREST THEREON).  SAID AMOUNT WILL BE THE FULL AGREED AND SOLE AMOUNT OF THE MONETARY DAMAGES AND SELLER'S SOLE AND EXCLUSIVE REMEDY (WHETHER AT LAW OR IN EQUITY) FOR THE DEFAULT OF BUYER, ALL OTHER CLAIMS TO DAMAGES OR OTHER REMEDIES, INCLUDING, WITHOUT LIMITATION, THE REMEDY OF SPECIFIC PERFORMANCE, BEING HEREIN EXPRESSLY WAIVED BY SELLER.  THE PAYMENT OF SUCH AMOUNT IS NOT INTENDED AS A FORFEITURE OR PENALTY, BUT IS INTENDED TO CONSTITUTE LIQUIDATED DAMAGES TO SELLER PURSUANT TO CALIFORNIA CIVIL CODE §§1671, 1676 AND 1677.  SELLER HEREBY WAIVES THE PROVISIONS OF CALIFORNIA CIVIL CODE §3389.  THIS AGREEMENT WILL THEREUPON BE TERMINATED AND NEITHER PARTY WILL HAVE ANY FURTHER RIGHTS OR OBLIGATIONS HEREUNDER, EXCEPT FOR THE RIGHT OF SELLER TO COLLECT SUCH LIQUIDATED DAMAGES FROM BUYER OR (IF APPLICABLE) FROM ESCROW HOLDER AND, IF LEGAL ACTION IS REQUIRED TO COLLECT SUCH LIQUIDATED DAMAGES, TO RECOVER ITS ATTORNEYS' FEES AND COSTS PURSUANT TO PARAGRAPH 16. NOTWITHSTANDING THE FOREGOING, AND NOTWITHSTANDING THE TERMINATION OF THE AGREEMENT, SELLER WILL STILL BE ENTITLED TO INDEMNIFICATION AS PROVIDED IN PARAGRAPH 14 OF THIS AGREEMENT.

~~21.  LIQUIDATED DAMAGES.  (This Liquidated Damages paragraph is applicable only if initialed by both Parties).~~
~~THE PARTIES AGREE THAT IT WOULD BE IMPRACTICABLE OR EXTREMELY DIFFICULT TO FIX, PRIOR TO SIGNING THIS AGREEMENT, THE ACTUAL DAMAGES WHICH WOULD BE SUFFERED BY SELLER IF BUYER FAILS TO PERFORM ITS OBLIGATIONS UNDER THIS AGREEMENT.  THEREFORE, IF, AFTER THE SATISFACTION OR WAIVER OF ALL CONTINGENCIES PROVIDED FOR THE BUYER'S BENEFIT, BUYER BREACHES THIS AGREEMENT, SELLER SHALL BE ENTITLED TO LIQUIDATED DAMAGES IN THE AMOUNT OF _____.  UPON PAYMENT OF SAID SUM TO SELLER, BUYER SHALL BE RELEASED FROM ANY FURTHER LIABILITY TO SELLER, AND ANY ESCROW CANCELLATION FEES AND TITLE COMPANY CHARGES SHALL BE PAID BY SELLER.~~

_____          _____
Buyer Initials                              Seller Initials

22.    DEFAULT BY SELLER.  IF ESCROW DOES NOT CLOSE DUE TO THE DEFAULT OR FAILURE TO PERFORM OF SELLER, BUYER MAY ELECT EITHER TO:  (A) ENFORCE SPECIFIC PERFORMANCE OF THIS AGREEMENT AGAINST SELLER AND MAKE A CLAIM FOR DAMAGES RESULTING FROM SUCH DEFAULT (BUT EXCLUDING CONSEQUENTIAL DAMAGES SUCH AS, BUT NOT LIMITED TO, LOST PROFITS, LOSS OF USE OR DIMINUTION IN VALUE), BUT THE TOTAL AMOUNT OF DAMAGES WHICH BUYER MAY OBTAIN SHALL NOT EXCEED SIX HUNDRED THOUSAND DOLLARS ($600,000.00), PLUS BUYER'S REASONABLE ATTORNEYS' FEES AND COSTS, OR (B) TERMINATE THIS AGREEMENT AND ESCROW BY WRITTEN NOTICE DELIVERED TO SELLER, IN WHICH EVENT THE DEPOSIT SHALL BE RETURNED TO BUYER AND SELLER MAY MAKE A CLAIM ONLY FOR ACTUAL, OUT-OF-POCKET EXPENSES INCURRED IN CONNECTION WITH THIS TRANSACTION.  FOLLOWING THE RESOLUTION OF ANY CLAIM MADE HEREUNDER (INCLUDING SELLER'S PAYMENT IN GOOD FUNDS OF ANY DAMAGES AWARDED TO BUYER), NEITHER PARTY HERETO SHALL HAVE ANY FURTHER OBLIGATION OR LIABILITY TO THE OTHER HEREUNDER, EXCEPT FOR THE INDEMNIFICATION OBLIGATIONS OF

INITIALS                                                                                    INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OFA-5-3/04E

BUYER AS PROVIDED IN PARAGRAPH 14 OF THIS AGREEMENT.

~~22.  ARBITRATION OF DISPUTES.  (This Arbitration of Disputes paragraph is applicable only if initialed by both Parties.)~~
~~22.1 ANY CONTROVERSY AS TO WHETHER SELLER IS ENTITLED TO THE LIQUIDATED DAMAGES AND/OR BUYER IS ENTITLED TO THE RETURN OF DEPOSIT MONEY, SHALL BE DETERMINED BY BINDING ARBITRATION BY, AND UNDER THE COMMERCIAL RULES OF THE AMERICAN ARBITRATION ASSOCIATION ("COMMERCIAL RULES"). ARBITRATION HEARINGS SHALL BE HELD IN THE COUNTY WHERE THE PROPERTY IS LOCATED. ANY SUCH CONTROVERSY SHALL BE ARBITRATED BY 3 ARBITRATORS WHO SHALL BE IMPARTIAL REAL ESTATE BROKERS WITH AT LEAST 5 YEARS OF FULL TIME EXPERIENCE IN BOTH THE AREA WHERE THE PROPERTY IS LOCATED AND THE TYPE OF REAL ESTATE THAT IS THE SUBJECT OF THIS AGREEMENT. THEY SHALL BE APPOINTED UNDER THE COMMERCIAL RULES. THE ARBITRATORS SHALL HEAR AND DETERMINE SAID CONTROVERSY IN ACCORDANCE WITH APPLICABLE LAW, THE INTENTION OF THE PARTIES AS EXPRESSED IN THIS AGREEMENT AND ANY AMENDMENTS THERETO, AND UPON THE EVIDENCE PRODUCED AT AN ARBITRATION HEARING. PRE-ARBITRATION DISCOVERY SHALL BE PERMITTED IN ACCORDANCE WITH THE COMMERCIAL RULES OR STATE LAW APPLICABLE TO ARBITRATION PROCEEDINGS. THE AWARD SHALL BE EXECUTED BY AT LEAST 2 OF THE 3 ARBITRATORS, BE RENDERED WITHIN 30 DAYS AFTER THE CONCLUSION OF THE HEARING, AND MAY INCLUDE ATTORNEYS' FEES AND COSTS TO THE PREVAILING PARTY PER PARAGRAPH 16 HEREOF. JUDGMENT MAY BE ENTERED ON THE AWARD IN ANY COURT OF COMPETENT JURISDICTION NOTWITHSTANDING THE FAILURE OF A PARTY DULY NOTIFIED OF THE ARBITRATION HEARING TO APPEAR THEREAT.~~
~~22.2 BUYER'S RESORT TO OR PARTICIPATION IN SUCH ARBITRATION PROCEEDINGS SHALL NOT BAR SUIT IN A COURT OF COMPETENT JURISDICTION BY THE BUYER FOR DAMAGES AND/OR SPECIFIC PERFORMANCE UNLESS AND UNTIL THE ARBITRATION RESULTS IN AN AWARD TO THE SELLER OF LIQUIDATED DAMAGES, IN WHICH EVENT SUCH AWARD SHALL ACT AS A BAR AGAINST ANY ACTION BY BUYER FOR DAMAGES AND/OR SPECIFIC PERFORMANCE.~~
~~22.3 NOTICE: BY INITIALING IN THE SPACE BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO DISCOVERY AND APPEAL, UNLESS SUCH RIGHTS ARE SPECIFICALLY INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION. IF YOU REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURE. YOUR AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.~~

~~WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE "ARBITRATION OF DISPUTES" PROVISION TO NEUTRAL ARBITRATION.~~

~~————————————                ————————————~~
~~Buyer Initials                     Seller Initials~~

**23.  Miscellaneous.**
    23.1 **Binding Effect.**  This Agreement shall be binding on the Parties without regard to whether or not paragraphs 21 and 22 are initialed by both of the Parties. Paragraphs 21 ~~and 22 are each~~ is incorporated into this Agreement only if initialed by both Parties at the time that the Agreement is executed.

    23.2 **Applicable Law.**  This Agreement shall be governed by, ~~and paragraph 22.3 is amended to refer to,~~ the laws of the state of *California* ~~in which the Property is located.~~
    23.3 **Time of Essence.**  Time is of the essence of this Agreement.
    23.4 **Counterparts.**    This Agreement may be executed by Buyer and Seller in counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Escrow Holder, after verifying that the counterparts are identical except for the signatures, is authorized and instructed to combine the signed signature pages on one of the counterparts, which shall then constitute the Agreement.
    23.5 **Waiver of Jury Trial.**   THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.
    23.6 **Conflict.**        Any conflict between the printed provisions of this Agreement and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.
    23.7 **1031 Exchange.** Both Seller and Buyer agree to cooperate with each other in the event that either or both wish to participate in a 1031 exchange. Any party initiating an exchange shall bear all costs of such exchange.

**24.  Disclosures Regarding The Nature of a Real Estate Agency Relationship.**
    24.1 The Parties and Brokers agree that their relationship(s) shall be governed by the principles set forth in the applicable sections of the California Civil Code, as summarized in paragraph 24.2.
    24.2 When entering into a discussion with a real estate agent regarding a real estate transaction, a Buyer or Seller should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Buyer and Seller acknowledge being advised by the Brokers in this transaction, as follows:
        (a) *Seller's Agent.* A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or subagent has the following affirmative obligations: (1) *To the Seller:* A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Seller. (2) *To the Buyer and the Seller:* a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or

————————
INITIALS

————————
INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OFA-5-3/04E

within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(b) *Buyer's Agent.* A selling agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations. (1) *To the Buyer:* A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Buyer. (2) *To the Buyer and the Seller:* a. Diligent exercise of reasonable skills and care in performance of the agent's duties. b. A duty of honest and fair dealing and good faith. c. A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(c) *Agent Representing Both Seller and Buyer.* A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer. (1) In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer: a. A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer. b. Other duties to the Seller and the Buyer as stated above in their respective sections (a) or (b) of this paragraph 24.2. (2) In representing both Seller and Buyer, the agent may not without the express permission of the respective Party, disclose to the other Party that the Seller will accept a price less than the listing price or that the Buyer will pay a price greater than the price offered. (3) The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect their own interests. Buyer and Seller should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

(d) *Further Disclosures.* Throughout this transaction Buyer and Seller may receive more than one disclosure, depending upon the number of agents assisting in the transaction. Buyer and Seller should each read its contents each time it is presented, considering the relationship between them and the real estate agent in this transaction and that disclosure. Brokers have no responsibility with respect to any default or breach hereof by either Party. The liability (including court costs and attorneys' fees), of any Broker with respect to any breach of duty, error or omission relating to this Agreement shall not exceed the fee received by such Broker pursuant to this Agreement; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

24.3   *Confidential Information:* Buyer and Seller agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

25.   Construction of Agreement. In construing this Agreement, all headings and titles are for the convenience of the parties only and shall not be considered a part of this Agreement. Whenever required by the context, the singular shall include the plural and vice versa. Unless otherwise specifically indicated to the contrary, the word "days" as used in this Agreement shall mean and refer to calendar days. This Agreement shall not be construed as if prepared by one of the parties, but rather according to its fair meaning as a whole, as if both parties had prepared it. When the words "business days" are used in this Agreement, the term shall include Monday through and including Thursday, and shall exclude Friday, Saturday, Sunday, and all holidays, it being the long time practice of the City of Vernon to be closed on Fridays.

26   Additional Provisions:

Additional provisions of this offer, if any, are as follows or are attached hereto by an addendum consisting of paragraphs _____ 26.1 _____ through _____ 26.17 _____ . (If there are no additional provisions write "NONE".)

ATTENTION: NO REPRESENTATION OR RECOMMENDATION IS MADE BY THE AIR COMMERCIAL REAL ESTATE ASSOCIATION OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS AGREEMENT OR THE TRANSACTION TO WHICH IT RELATES. THE PARTIES ARE URGED TO:

1.   SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS AGREEMENT.
2.   RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PROPERTY. SAID

INITIALS                                                                                                     INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

FORM OFA-5-3/04E

INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PROPERTY, THE INTEGRITY AND CONDITION OF ANY STRUCTURES AND OPERATING SYSTEMS, AND THE SUITABILITY OF THE PROPERTY FOR BUYER'S INTENDED USE.

WARNING: IF THE PROPERTY IS LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THIS AGREEMENT MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED.

NOTE:
1.      THIS FORM IS NOT FOR USE IN CONNECTION WITH THE SALE OF RESIDENTIAL PROPERTY.
2.      IF THE BUYER IS A CORPORATION, IT IS RECOMMENDED THAT THIS AGREEMENT BE SIGNED BY TWO CORPORATE OFFICERS.

The undersigned Buyer offers and agrees to buy the Property on the terms and conditions stated and acknowledges receipt of a copy hereof.

BROKER:                                    BUYER:

                                           CITY OF VERNON

Attn: _____                     By: _____
Title: _____                     Date: _____
Address: _____                     Name Printed: Leonis C. Malburg
                                           Title: Mayor
Telephone:(___)_____                    Telephone:(___)_____
Facsimile:(___)_____                    Facsimile:(___)_____
Email: _____
Federal ID No. _____

                                           ATTEST:

                                           By: _____
                                           Date: _____
                                           Name Printed: Bruce V. Malkenhorst, Jr.
                                           Title: Acting City Clerk
                                           Address: 4305 Santa Fe Avenue
                                                    Vernon, California  90058
                                           Telephone:(323) 583-8811
                                           Facsimile:(323) 826-1438
                                           Email: _____
                                           Federal ID No. 95-6000808

                                           APPROVED AS TO FORM:

                                           ERIC T. FRESCH, CITY ATTORNEY

27.  Acceptance.
     27.1  Seller accepts the foregoing offer to purchase the Property and hereby agrees to sell the Property to Buyer on the terms and conditions therein specified.
     27.2  Seller acknowledges that Brokers have been retained to locate a Buyer and are the procuring cause of the purchase and sale of the Property set forth in this Agreement. In consideration of real estate brokerage service rendered by Brokers, Seller agrees to pay CB Richard Ellis, Inc. Brokers a real estate Brokerage Fee pursuant to a separate agreement between Seller and CB Richard Ellis, Inc. Buyer shall pay Cushman & Wakefield a real estate brokerage fee for services rendered pursuant to a separate agreement between Buyer and Cushman & Wakefield in a sum equal to _____% of the Purchase Price divided in such shares as said Brokers shall direct in writing. This Agreement shall serve as an Irrevocable Instruction to Escrow Holder to pay such Brokerage Fee to Brokers out of the proceeds accruing to the account of Seller at the Closing.
     27.3  Seller acknowledges receipt of a copy hereof and authorizes Brokers to deliver a signed copy to Buyer.

NOTE: A PROPERTY INFORMATION SHEET IS REQUIRED TO BE DELIVERED TO BUYER BY SELLER UNDER THIS AGREEMENT.

PAGE 13 OF 14

_____                                                              _____
INITIALS                                                             INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION                       FORM OFA-S-3/04E

BROKER:

SELLER:

PECHINEY CAST PLATE, INC., a Delaware
corporation

_____

By: _____
Attn: _____     Date: / 4·3·0 6
Title: _____     Name Printed: John Buras
Address: _____     Title: Manager of Insurance and Real Estate
_____     Telephone:(___) _____
Telephone:(___) _____     Facsimile:(___) _____
Facsimile:(___) _____
Email: _____
Federal ID No. _____     By: _____
                                      Date: _____
                                      Name Printed: _____
                                      Title: _____
                                      Address: 8870 West Bryn Mawr Avenue
                                           Chicago, Illinois  60631
                                      Telephone:(773) 399-8629
                                      Facsimile:(773) 399-8648
                                      Email: _____
                                      Federal ID No: _____

These forms are often modified to meet changing requirements of law and needs of the industry. Always write or call to make sure you are
utilizing the most current form: AIR COMMERCIAL REAL ESTATE ASSOCIATION, 700 South Flower Street, Suite 600, Los Angeles, CA 90017.
(213) 687-8777.

© Copyright 2003 By AIR Commercial Real Estate Association.
All rights reserved.

No part of these works may be reproduced in any form without permission in writing.

INITIALS

©2003 - AIR COMMERCIAL REAL ESTATE ASSOCIATION

INITIALS

FORM OFA-5-3/04E

# ADDENDUM TO STANDARD OFFER, AGREEMENT

# AND ESCROW INSTRUCTIONS FOR PURCHASE OF REAL ESTATE

**Buyer:**      **City of Vernon**

**Seller:**     **Pechiney Cast Plate, Inc.**

**Premises:**   **3200 Fruitland Avenue, Vernon, CA 90058**

**Dated:**      **March 20, 2006**

In the event of a conflict between the terms of the Standard Offer, Agreement and Escrow Instructions (the "Pre-Printed Form") and this Addendum (the "Addendum"), the terms of the Addendum shall control. Any initially capitalized term used in this Addendum that is not defined herein shall have the meaning ascribed to such term in the Pre-Printed Form. Collectively, the Pre-Printed Form and this Addendum are referred to as the "Agreement."

26.1    Escrow shall close (the "Expected Closing Date") on a mutually agreed upon date which is not later than ten (10) business days after the completion of Seller's Work. The Seller's Work shall be deemed completed when the Health Department of the City of Vernon (the "Health Department") has issued a Certificate of Closure or No Further Action Letter (either being referred to herein as a "Certificate of Closure") with respect to the Remediation Work (as defined herein) and Seller has received the written approval, by the Community Services Department of the City of Vernon (the "Community Services Department"), with respect to the Demolition Work (as defined herein).

26.2    **Buyer's Due Diligence:** Upon mutual execution of the Agreement, Buyer and its agents shall have immediate access to the Property to allow for necessary inspections and testing, subject to the provisions of Paragraph 14 of the Pre-Printed Form. Notwithstanding anything in the Pre-Printed Form to the contrary, Buyer shall have the right to undertake, during the Contingency Period (as defined herein), a Phase II environmental study or other environmental studies of the Property, including, without limitation, any borings or other invasive studies required to complete the Phase II study or other studies (as long as the number of borings and locations thereof are approved by Seller which approval will not be unreasonably withheld); provided, however, that Buyer's right to obtain a Phase II report or other environmental studies shall not affect the obligation of Seller to undertake all studies, reports, and borings that may be required to obtain (a) a Certificate of Closure, and (b) a Phase II environmental report, each as further described below.

1

Notwithstanding any provisions of this Agreement to the contrary, Buyer may not conduct any invasive or other testing of the Property, including but not limited to any soil borings, groundwater sampling or Phase II site assessment investigation, unless prior written notice has been given by Seller and Seller has given its approval, which will not be unreasonably withheld.

26.3    **Seller's Reports:**

Prior to the Date of Agreement, Seller has delivered to Buyer all analyses, tests, reports, or studies that Seller currently has in its possession relating to the physical condition of the Property, including all soils and geological reports, appraisals, and environmental reports, including, without limitation, a Phase I environmental report and a Phase II environmental report prepared by Geo-Matrix (collectively, the "Due Diligence Reports"). The Phase I environmental report and the Phase II environmental report have been submitted to and approved by the Health Department. All Due Diligence Reports have been (and will be) delivered to Buyer subject to the provisions of Paragraph 12 of the Pre-Printed Form, and shall be promptly returned to Seller if the transaction fails to close for any reason. Until the Closing, all such materials shall be held in confidence as provided herein.

26.4    **Purchase Price:**  The Purchase Price constitutes all consideration due to Seller for the Property and the Units, and Seller hereby waives and relinquishes any relocation assistance Seller may be entitled to under local, state, or federal law.

26.5    **Contingency Period:**  As used herein, the term "Contingency Period" means the time period commencing on the Date of Agreement and ending at 5:00 p.m. (Pacific Time) on a date which is thirty (30) days thereafter provided, however, that the Contingency Period shall not expire until a date which is at least fifteen (15) days after Buyer has delivered to Seller all Due Diligence Reports, the disclosure required under Paragraph 9.1(a), the Title Report, and copies of the Other Agreements. Further, if the last day of the Contingency Period is not a business day, then the Contingency Period shall be extended until 5:00 p.m. (Pacific Time) on the next business day.

26.6    **Contingencies:**  Buyer shall have until the end of the Contingency Period to determine, in its sole and absolute discretion, whether it is satisfied with all aspects of the Property and the transaction, including, without limitation, those contingencies set forth in Paragraph 9 of the Pre-Printed Form and all other matters related to the Property, including economic analyses, issues related to Hazardous Substances, condition of the Property, its fitness for a particular use, marketability, prospects for future development, use, or occupancy, and any other matter related to Buyer's use of the Property. Notwithstanding anything to the contrary in Paragraph 9.3 of the Pre-Printed Form, Buyer and Seller acknowledge that Buyer may determine, in its sole and absolute discretion, during the Contingency Period, that there are issues related to the condition of the Property, such as marketability or prospects for future development or existence of Hazardous Substances on the Property, that are not subject to cure by Seller, and that Buyer may terminate this Agreement, and obtain a full refund of its Deposit, if Buyer does not approve Buyer's Contingencies within the Contingency Period. Buyer, in its

2

sole and absolute discretion, may terminate the Agreement within the Contingency Period and receive a full refund of the Deposit.

26.7    **Demolition and Remediation Obligations:** Seller shall perform the Demolition Work (as described herein) and the Remediation Work (as described herein), at Seller's cost and expense. Collectively, the Demolition Work and the Remediation Work are referred to as "Seller's Work".

(a)    Demolition Work. A description of the Demolition Work (including a timetable for the performance of the Demolition Work) shall be set forth in a plan (the "Demolition Work Plan") which shall be mutually agreed upon by Seller and Buyer prior to the end of the Contingency Period, which shall include a timetable for the performance of the Demolition Work. If the parties cannot in good faith mutually agree upon a Demolition Work Plan by the end of such time period, then unless the parties agree in writing to extend such time period, this Agreement and the escrow shall be deemed terminated and the provisions of Paragraph 8.7 of the Pre-Printed Form shall apply. Any changes proposed by Seller to the approved Demolition Work Plan shall be subject to written approval by Buyer and the Community Services Department. Buyer's approval shall not be unreasonably withheld. The Demolition Work shall be deemed complete when the Community Services Department has, in its reasonable judgment, approved the completion of the Demolition Work. The Demolition Work shall be performed by a contractor or contractors selected by Seller and reasonably approved by Buyer. The Demolition Work Plan shall include the following:

(i)    All manmade improvements, items, structures, buildings, utilities, concrete, asphalt, foundations, footings, and general debris (collectively, "Structures") shall be removed. Any salvage value shall be retained by Seller. Buyer acknowledges that the buildings contain galbestos panels, and that the concrete within the buildings are contaminated with PCB's, all of which will be removed as part of the Demolition Work Plan (but subject to the performance standards for Remediation Work, as described herein).

(ii)    After removal of all Structures, the site shall be left level and at current grade, in rough grade condition, with any holes filled with clean imported soil. The soil on the site shall be recompacted to 95%.

(b)    Remediation Work. Based on the Phase I environmental report and the Phase II environmental report which have been delivered to Buyer and approved by the Health Department, if Remediation Work is required, Seller and Buyer shall mutually agree upon a plan (as it may be amended pursuant to this Agreement, the "Remediation Work Plan") for Seller's completion of the Remediation Work, including a timetable for the performance of the Remediation Work, that is required for the Health Department to issue the Certificate of Closure . The parties may, but shall not be required to establish an initial Remediation Work Plan which shall not take into account any Remediation Work described in subparagraph (c) below. Such initial Remediation Work Plan shall be subject to approval of the Health Department.

3

(c)    Final Remediation Work Plan. As soon as possible after the completion of the Demolition Work, Seller and Buyer shall mutually agree upon the scope of a final Remediation Work Plan (including changes to the initial Remediation Work Plan, if any) which are necessary to properly remediate the Property in order to obtain the Certificate of Closure, consistent with the standards customarily followed by the Health Department for the issuance of Certificates of Closure. Promptly after Seller notifies Buyer that it has completed the Demolition Work, Buyer shall notify Seller of any further environmental studies or tests (including, without limitation, supplements to the documents previously provided by Seller, or new studies) that are required by the Health Department to develop a final Remediation Work Plan and to obtain the Certificate of Closure. Seller shall be responsible for obtaining and paying for such studies or tests. If the parties cannot mutually agree upon a final Remediation Work Plan, then the arbitration provisions hereof shall apply. Any changes proposed by Seller to an approved Remediation Work Plan shall be subject to approval by Buyer and the Health Department. Buyer's approval shall not be unreasonably withheld. Issuance of the Certificate of Closure by the Health Department shall serve as evidence of satisfactory completion of the Remediation Work. Seller shall, at Seller's sole cost, obtain the Certificate of Closure prior to the Closing, which Certificate of Closure shall be issued in the name of Seller. The Remediation Work shall be performed by a contractor or contractors selected by Seller and reasonably approved by Buyer.

(d)    Performance of Seller's Work. The following provisions shall apply to Seller's Work:

(i)    Performance Standards for All of Seller's Work. Seller shall ensure that all of Seller's Work is conducted in a safe, prudent manner, in accordance with industry standards and in accordance with all applicable laws, including, without limitation, laws regulating the handling, transfer, storage, and disposal of all Hazardous Substances. Seller shall pay for all Seller's Work in accordance with the contracts between the Seller and the contractors, and shall ensure that all contractors and subcontractors are paid in full. Seller shall use best efforts to insure that no mechanics/ or materialmen's liens are filed against the Property, but if any such liens are filed, Seller will promptly (and in any event prior to any foreclosure sale related to such lien) bond around same and Seller shall indemnify Buyer from any liability in connection therewith. Seller shall obtain all permits required to perform Seller's Work.

(ii)    Performance Standards for Remediation Work. In addition to the standards set forth above, which shall apply to all of Seller's Work, the Remediation Work shall be performed by contractors competent and knowledgeable in removing and transporting Hazardous Substances. For purposes of applicable law, Seller (or another entity determined by Seller, but not Buyer) shall be named as the responsible party on all manifests, licenses, and documents regarding the storage, release, and transfer of Hazardous Substances, and shall be listed on all disposal manifests as the responsible party, and if Buyer elects to perform any of the Remediation Work under the "self-help" provisions hereof, Buyer may identify Seller as the responsible party on any such manifests, license or documents.

4

(iii)   Completion of Seller's Work.  Seller shall use best efforts to cause the Seller's Work to be completed by the time periods set forth in the Demolition Work Plan and the Remediation Work Plan, subject to events which are beyond the Seller's reasonable control; provided, however, that failure to pay money shall not be an excuse for delay.  Seller shall be excused from performance for the number of days of delay cause by events beyond Seller's reasonable control, and shall immediately thereafter commence and complete Seller's Work.  The Title Policy obtained by Buyer at Closing shall not reflect any mechanics or materialmen's liens relating to the Seller's Work and Seller shall, prior to or at Closing, cause any such liens to be paid or bonded around in accordance with applicable law (to the extent that Seller contests any such liens).  Seller shall execute and deliver all documents (including any indemnifications or other assurances) reasonably required by the Title Company to issue the Title Policy.  If the Title Policy is a CLTA form policy, then Seller shall also pay for a mechanics' lien endorsement (CLTA 101 series).

(iv)   Indemnification.  Notwithstanding anything herein to the contrary, Seller may elect to perform additional Remediation Work (beyond any Remediation Work which is required by Buyer and the Health Department to obtain a Certificate of Closure).  In such event, all provisions of this Agreement pertaining to the establishment of a Remediation Work Plan and performance of the Remediation Work shall apply, as if Buyer had required such Remediation Work.  In the event that complete remediation of the Property is not required pursuant to the Remediation Plan, and Seller elects not to do any additional Remediation Work, then Buyer shall indemnify, defend and hold Seller free and harmless from any and all liability relating to the existence or release of Hazardous Materials, or any Hazardous Materials Conditions which presently exist, previously existed or may arise in the future.  Such indemnification obligation shall be evidenced by a formal indemnification agreement to be negotiated in good faith and executed by the parties at the Closing.  Buyer shall not be released from its obligation to enter into such indemnification agreement as a result of any assignment of this Agreement prior to the Closing, or by any sale of the Property after the Closing.

26.8   **Role of Health Department:**  It is understood that nothing in this Agreement affects or limits the Health Department's responsibilities in the administration of local, state and federal law with respect to remediation of the Property, if remediation is necessary.  Seller agrees that neither Buyer's relationship to the Health Department nor anything required of Seller by the Health Department in carrying out its responsibilities under the law, shall excuse Seller's obligations under this Agreement.  It is further understood that Buyer's approval of any contingency relative to the condition of the Property only includes approval by the Buyer, and does not necessarily constitute approval by the Health Department.

26.9   **INTENTIONALLY OMITTED:**

26.10  **Exclusivity:**  Prior to the Closing, Seller agrees not to negotiate with other prospective buyers, or lease any or all of the Property, or enter into any other agreements which would bind the Property after the Closing without the prior written approval of the Buyer.

5

26.11   **1031 Exchange:** Buyer and Seller agree to cooperate with exchanges allowed or provided by Internal Revenue Code Section 1031 (as amended), provided that the non-exchanging party incurs no liability and incurs no additional costs through such cooperation, and the Closing is not delayed.

26.12   **Confidentiality:** Without the prior written consent of Seller, Buyer will not disclose, and Buyer will direct its representatives, employees, agents and consultants not to disclose to any person or entity (i) the fact that Buyer has entered into this Agreement or the terms hereof, or (ii) any of the terms of this Agreement, except as disclosure may be required by law. Notwithstanding the foregoing, Buyer shall have the right to disclose all relevant facts related to the purchase of the Property and the terms of this Agreement to (a) all of Buyer's consultants, employees, agents, and representatives, including officials and staff of the City of Vernon, who are in any way involved with the transaction; (b) the City Council of the City of Vernon (and Seller acknowledges that the agenda and proceedings of the City Council are public and of public record, and that this Agreement will be attached to a Resolution adopted by the City Council that approves the Agreement); and (c) as otherwise necessary or appropriate in order to consummate this transaction and comply with all applicable laws, including, without limitation, Govt. Code Section 7275, which states that the Purchase Price is public information.

26.13   **City Council Approval:** This Agreement, and any amendments thereto, are subject to the review and approval of the City Council of the City of Vernon.

26.14   **Buyer's Representations and Warranties:** The following constitute representations and warranties of Buyer to Seller as of the Date of Agreement and as of the Closing:

(a)     Buyer has the legal power, right and authority to enter into this Agreement and the documents required hereby to be executed by Buyer, and to consummate the transactions contemplated hereby.

(b)     All requisite corporate action has been taken by Buyer in connection with the entering into this Agreement and the documents required hereby to be executed by Buyer, and the consummation of the transactions contemplated hereby.

(c)     The individuals executing this Agreement and the documents required hereby to be executed by Buyer on behalf of Buyer have the legal power, right and actual authority to bind Buyer to the terms and conditions hereof and thereof.

(d)     This Agreement and all documents required hereby to be executed by Buyer are and will be valid, legally binding obligations of and enforceable against Buyer n accordance with their terms, subject only to applicable bankruptcy, insolvency, reorganization, moratorium laws or similar laws or equitable principles affecting or limiting the rights of contracting parties generally.

(e)     No representation, warranty or statement of Buyer in this Agreement or in any document furnished or to be furnished to Seller pursuant hereto contains or will contain any untrue statement of a material fact, or omits or will omit to state a material

6

fact necessary to make the statements or facts contained therein not misleading. Except to the extent set forth in writing from Buyer, Buyer's representations and warranties made in this Paragraph will be continuing and will be true and correct as of the Closing with the same force and effect as if remade by Buyer at that time.

(f)    The Demolition Work (to the extent that such Demolition Work is performed by Seller and not by Buyer pursuant to the "self-help" provisions hereof) will not be work performed under a contract "paid for in whole or in part out of public funds", as such phrase is used in California Labor Code §1720, *et seq.* (and case authority interpreting such statutes), and the Demolition Work therefore will not constitute a project to which "prevailing wage" laws apply.

Buyer agrees to and does hereby indemnify, defend and hold Seller free and harmless from any and all claims, demands, lawsuits, judgments, costs, expenses and liabilities of any nature whatsoever, including reasonable attorneys' fees and costs which result from any breach or inaccuracy of any of the foregoing representations or warranties (including any claims which allege facts which, if true, would result in the breach or inaccuracy of any such representations or warranties, regardless of the actual resolution of such claims).

26.15  **ARBITRATION OF DISPUTES:**

(a)    USE OF JAMS. THE PARTIES AGREE THAT ANY DISPUTE OR CONTROVERSY ARISING OUT OF OR RELATING TO ANY INTERPRETATION, CONSTRUCTION, PERFORMANCE, TERMINATION OR BREACH OF THE AGREEMENT OR THE PURCHASE OF THE PROPERTY BY BUYER WILL BE SETTLED BY FINAL AND BINDING ARBITRATION BY A PANEL OF ARBITRATORS TO BE HELD IN LOS ANGELES COUNTY, CALIFORNIA, IN ACCORDANCE WITH THE RULES OF THE JUDICIAL ARBITRATION & MEDIATION SERVICES, INC. ("JAMS"). WITHOUT LIMITING ANY OTHER PROVISION HEREIN, THIS PARAGRAPH 26.15 SHALL SURVIVE THE TERMINATION OF THE AGREEMENT AND WILL APPLY TO ANY CLAIM, DISPUTE, OR CONTROVERSY THAT ARISES DURING OR AFTER THE TERMINATION OF THE AGREEMENT.

(b)    PROCEDURE. THE ARBITRATION SHALL TAKE PLACE BEFORE A PANEL OF THREE RETIRED JUDGES OF THE SUPERIOR COURT OF THE STATE OF CALIFORNIA OR ANY CALIFORNIA APPELLATE COURT (THE "ARBITRATORS") UNDER THE AUSPICES OF JAMS. SUCH ARBITRATION SHALL BE INITIATED BY THE PARTIES, OR EITHER OF THEM, WITHIN TEN (10) CALENDAR DAYS AFTER EITHER PARTY BY SERVING A NOTICE OF DEMAND TO ARBITRATE (THE "ARBITRATION NOTICE") TO THE OTHER PARTY AND TO JAMS. THE ARBITRATION NOTICE SHALL CONTAIN A DESCRIPTION OF THE SUBJECT MATTER OF THE ARBITRATION, THE DISPUTE WITH RESPECT THERETO, THE AMOUNT INVOLVED, IF ANY, AND THE REMEDY OR DETERMINATION SOUGHT.

7

(c)    SELECTION OF ARBITRATORS. EACH PARTY SHALL SELECT AN ARBITRATOR FROM THE JAMS PANEL, AND THE TWO SELECTED ARBITRATORS SHALL MUTUALLY AGREE ON THE THIRD ARBITRATOR FROM THE JAMS PANEL. IF ONE OF THE PARTIES DOES NOT SELECT AN ARBITRATOR FROM THE JAMS PANEL WITHIN 14 CALENDAR DAYS AFTER RECEIPT OF THE PANEL FROM JAMS, JAMS WILL SELECT THE SECOND ARBITRATOR, AND THE ARBITRATOR SELECTED BY JAMS AND THE ARBITRATOR SELECTED BY THE OTHER PARTY WILL SELECT THE THIRD ARBITRATOR FOR THE PANEL.    THE THIRD ARBITRATOR IS TO BE SELECTED WITHIN 10 CALENDAR DAYS FOLLOWING THE SELECTION OF THE FIRST TWO ARBITRATORS. IN THE EVENT OF ANY SUBSEQUENT VACANCIES OR INABILITIES TO PERFORM AMONG THE ARBITRATORS APPOINTED, THE ARBITRATORS INVOLVED SHALL BE REPLACED IN ACCORDANCE WITH THE PROVISIONS OF THIS PARAGRAPH 26.15 AS IF SUCH REPLACEMENT WAS AN INITIAL APPOINTMENT TO BE MADE UNDER THIS PARAGRAPH 26.15 WITHIN THE TIME CONSTRAINTS SET FORTH IN THIS PARAGRAPH 26.15, MEASURED FROM THE DATE OF NOTICE OF SUCH VACANCY OR INABILITY TO THE PERSON OR PERSONS REQUIRED TO MAKE SUCH APPOINTMENT. NOTWITHSTANDING THE FOREGOING, IF THE AMOUNT IN CONTROVERSY IS LESS THAN ONE HUNDRED THOUSAND DOLLARS ($100,000) THEN THERE SHALL BE ONLY ONE ARBITRATOR, TO BE MUTUALLY AGREED UPON BY THE PARTIES. IF THE PARTIES CANNOT, IN GOOD FAITH, MUTUALLY AGREE UPON A SINGLE ARBITRATOR WITHIN TEN (10) DAYS AFTER RECEIPT OF THE JAMES PANEL, THEN THERE SHALL BE THREE (3) ARBITRATORS, SELECTED IN ACCORDANCE WITH THE FOREGOING PROVISIONS.

(d)    THE DECISION.    ANY PARTY MAY BE REPRESENTED BY COUNSEL OR OTHER AUTHORIZED REPRESENTATIVE. IN RENDERING A DECISION(S), THE ARBITRATORS SHALL DETERMINE THE RIGHTS AND OBLIGATIONS OF THE PARTIES ACCORDING TO THE SUBSTANTIVE LAWS OF THE STATE OF CALIFORNIA, THE PROCEDURES FOLLOWED BY JAMS AND THE TERMS OF THE AGREEMENT.    THE DECISION OF THE ARBITRATORS SHALL BE BASED ON THE EVIDENCE INTRODUCED AT THE HEARING, AND SHALL BE BASED ON, AND ACCOMPANIED BY, A WRITTEN STATEMENT OF DECISION EXPLAINING THE FACTUAL AND LEGAL BASIS FOR THE DECISION AS TO EACH OF THE PRINCIPAL CONTROVERTED ISSUES. THE AGREEMENT OF TWO OF THE THREE ARBITRATORS AS TO THE RESOLUTION OF THE DISPUTE SHALL BE A CONCLUSIVE RESOLUTION. THE ARBITRATORS SHALL DELIVER THE WRITTEN DECISION TO THE PARTIES WITHIN 30 CALENDAR DAYS FOLLOWING THE DATE OF THE ARBITRATION HEARING, WHICH SHALL BE HELD AS EXPEDITIOUSLY AS POSSIBLY, ON A DATE ESTABLISHED BY THE ARBITRATORS, BUT NOT MORE THAN 180 DAYS AFTER THE DATE OF APPOINTMENT OF THE LAST ARBITRATOR. THE DECISION SHALL BE CONCLUSIVE AND BINDING, AND IT MAY THEREAFTER BE CONFIRMED AS A JUDGMENT BY THE SUPERIOR

8

COURT OF THE STATE OF CALIFORNIA, SUBJECT ONLY TO CHALLENGE ON
THE GROUNDS SET FORTH IN THE CALIFORNIA CODE OF CIVIL
PROCEDURE SECTION 1286.2. THE VALIDITY AND ENFORCEABILITY OF
THE DECISION OF THE ARBITRATORS IS TO BE DETERMINED EXCLUSIVELY
BY THE CALIFORNIA COURTS. THE ARBITRATORS SHALL HAVE THE
AUTHORITY TO GRANT EITHER PARTY ALL REMEDIES OTHERWISE
AVAILABLE BY LAW, INCLUDING INJUNCTIONS.

(e)    PAYMENT OF ARBITRATORS AND ATTORNEYS' FEES. THE
NON-PREVAILING PARTY SHALL PAY THE COSTS OF ALL ARBITRATORS
AND THE ARBITRATION PROCESS, AND THE REASONABLE ATTORNEYS'
FEES OF THE PREVAILING PARTY, AS DETERMINED BY THE ARBITRATORS.

(f)    NOTICE OF WAIVER. NOTICE: BY INITIALING IN THE SPACE
BELOW YOU ARE AGREEING TO HAVE ANY DISPUTE ARISING OUT OF THE
MATTERS INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION
DECIDED BY NEUTRAL ARBITRATION AS PROVIDED BY CALIFORNIA LAW
AND YOU ARE GIVING UP ANY RIGHTS YOU MIGHT POSSESS TO HAVE THE
DISPUTE LITIGATED IN A COURT OR JURY TRIAL. BY INITIALING IN THE
SPACE BELOW YOU ARE GIVING UP YOUR JUDICIAL RIGHTS TO
DISCOVERY AND APPEAL, UNLESS THOSE RIGHTS ARE SPECIFICALLY
INCLUDED IN THE 'ARBITRATION OF DISPUTES' PROVISION. IF YOU
REFUSE TO SUBMIT TO ARBITRATION AFTER AGREEING TO THIS
PROVISION, YOU MAY BE COMPELLED TO ARBITRATE UNDER THE
AUTHORITY OF THE CALIFORNIA CODE OF CIVIL PROCEDURES. YOUR
AGREEMENT TO THIS ARBITRATION PROVISION IS VOLUNTARY.

WE HAVE READ AND UNDERSTAND THE FOREGOING AND AGREE TO SUBMIT
DISPUTES ARISING OUT OF THE MATTERS INCLUDED IN THE 'ARBITRATION OF
DISPUTES' PROVISION BY NEUTRAL ARBITRATION.

 

_____          _____
BUYER'S INITIALS                 SELLER'S INITIALS

26.16  **Additional Deposits; Releases of Deposit:**  In addition to the amount set forth in
Paragraph 4.1 of the Preprinted Form, Buyer shall deposit with Escrow Holder the
following additional sums, which shall all be considered a part of the "Deposit", and
which shall all be applied to the Purchase Price at Closing:

(a)    Not later than the third (3rd) business day after the end of the Contingency
Period, the sum of Eight Million Dollars ($8,000,000).

(b)    Not later than the third (3rd) business day after completion of the "above-
grade" Demolition Work (which means the demolition and removal of all portions of
buildings and other structures which are aboveground, excluding, without limitation,
foundations, first-level building floors, footings, and basements, and also excluding

9

paved areas) the sum of Eight Million Eight Hundred Thousand Dollars ($8,800,000).
Completion of the above-grade Demolition Work shall be evidenced by the written
certification of GeoMatrix. Seller shall give Buyer at least ten (10) days' advance written
notice of the expected date of completion of the above-grade Demolition Work and shall
again give Buyer written notice upon completion of the above-grade Demolition Work.

(c)     Not later than December 1, 2006, the sum of Eight Million Eight Hundred
Thousand Dollars ($8,800,000).

(d)     Not later than the ninth (9th) business day after the issuance of a
Certificate of Closure by the Health Department, the balance of the Purchase Price (Ten
Million Three Hundred Thousand Dollars ($10,300,000).

Immediately upon receipt of the additional amounts of the Deposit set forth in subparagraphs (a),
(b) and (c) above, without further instructions from Seller or Buyer, and notwithstanding any
unilateral instructions to the contrary which Escrow Holder may hereafter receive from a party,
Escrow Holder shall, immediately upon receipt of each such amount, release the full amount
thereof to Seller (pursuant to Seller's wire-transfer instructions). For clarification, the original
amount deposited (Six Hundred Thousand Dollars ($600,000) will not be released to Seller until
the Close of Escrow. Seller and Buyer each agree to hold Escrow Holder harmless and waive
any claims against Escrow Holder relating in any way to such releases of the Deposit, Buyer
acknowledging that at the time of the releases it will not hold legal title to the Property and that
there will be unsatisfied conditions to the Close of Escrow at the time of the releases.

26.17   **Self-Help Remedy:** In addition to any other remedies which the Buyer may have at law
or under this Agreement, and without any need to resort to the arbitration procedure as a
condition to electing the remedy set forth in this Paragraph 26.17, in the event that Seller
defaults under this Agreement or fails to perform the Seller's Work in accordance with
the Demolition Work Plan and/or the Remediation Work Plan (including failure to
perform within the timetables set forth in each Work Plan), Buyer may give notice to
Seller specifying the default ("Default Notice"). Seller shall have ten (10) business days
after receipt of the Default Notice to cure the default or, if the default is not reasonably
capable of being cured during such ten (10) business day period, to commence the cure,
provided that Seller diligently pursues the cure to completion. Seller shall not be deemed
to be in default if the reason for Seller's non-performance is an event which is not within
Seller's reasonable control such as, but not limited to, labor or material shortages, strikes,
lockouts, adverse weather conditions, acts of war or civil insurrection. If the reason for
Seller's default is the default of a contractor performing the Seller's Work, then Seller
may effectuate a cure by terminating and replacing the contractor as promptly as
reasonably possible. If Seller fails to cure (or commence the cure, as the case may be)
within such ten (10) business day period, Buyer may elect to perform any of Seller's
Work which has not yet been performed (the "Remaining Seller's Work"). Buyer may
make such election by giving notice to Seller, which notice shall be at least three (3)
business days before Buyer or Buyer's representatives enters upon the Property for the
purpose of performing any Remaining Seller's Work. Seller hereby grants to Buyer an
irrevocable license to enter upon the Property to perform the Remaining Seller's Work.
The performance of the Remaining Seller's Work by Buyer shall be in conformance with

10

the performance standards set forth in Paragraph 26.7(d) of this Addendum, the Demolition Work Plan and the Remediation Work Plan. To the extent that the contractors performing Seller's Work are not then in default and such contracts are assigned to Buyer by Seller and honored by such contractors, Buyer will continue to use such contractors to perform the remaining Demolition Work or Remediation Work, as the case may be. The actual costs of completion of the Remaining Seller's Work shall reduce the Purchase Price. The costs of completion of the Remaining Seller's Work shall include a fee to Buyer for Buyer's costs in supervising such work, in the amount of five percent (5%) of the total cost of the Remaining Seller's Work, but not to exceed Five Hundred Thousand Dollars ($500,000). The costs of completion of the Remaining Seller's Work shall also include any additional amounts which Buyer shall be lawfully obligated to pay as a result of any of the Seller's Remaining Work becoming subject to the "prevailing wage" laws. After any Remaining Seller's Work which consists of Demolition Work has been completed, Buyer shall apply for the written approval by the Community Services Department of the Demolition Work, and Buyer shall give notice to Seller when such approval has been obtained. After any Remaining Seller's Work which consists of Remediation Work has been completed, Buyer shall apply for the Certificate of Closure from the Health Department, and Buyer shall give written notice to Seller when such Certificate of Closure has been obtained. After the issuance of the Certificate of Closure, the parties shall proceed to the Closing as contemplated herein. Upon the Close of Escrow, the Buyer shall pay to the Seller any unpaid portion of the Purchase Price, reduced by the costs of completion of the Remaining Seller's Work as described above. If the cost of completion of the Remaining Seller's Work, as described above, exceeds the unpaid portion of the Purchase Price, Seller shall, promptly after receipt of an invoice and evidence of costs, reimburse all such excess costs of completion of the Remaining Seller's Work.

Seller and Buyer shall each have the right, at reasonable times upon reasonable advance notice, to inspect all books and records of the other party as they relate to the performance of any of Seller's Work.

If Buyer elects to exercise its self-help remedy under this Paragraph 26.17, then it need not make any further Deposits into Escrow (nor shall there be any further releases of the Deposits from Escrow) until the Closing, at which time there shall be a reconciliation of the amount owed by Buyer to Seller, or by Seller to Buyer, as the case may be.

11

## SIGNATURE PAGE

**Seller:**

PECHINEY CAST PLATE, INC.

By: _____

    John Buras
    Manager of Insurance & Real Estate

**Buyer:**

CITY OF VERNON

By: _____
    LEONIS C. MALBURG, Mayor

ATTEST:

By: _____
    BRUCE V. MALKENHORST, JR.
    Acting City Clerk

APPROVED AS TO FORM:

By: _____
    ERIC T. FRESCH, City Attorney

12

# EXHIBIT 3

05/09/2006  10:25    323-584-1910    PECHINEY CAST PLATE    PAGE  01/02

TO: ────➤  LINDA G.



CITY COUNCIL

LEONIS C. MALBURG
Mayor

THOMAS A. YBARRA
Mayor Pro-Tem

WM. "BILL" DAVIS
Councilman

H. "LARRY" GONZALES
Councilman

W. MICHAEL McCORMICK
Councilman

SOL BENUDIZ
Police Chief

MARK C. WHITWORTH
Acting Fire Chief

LEWIS J. POZZEBON
Director of Environmental Health

S. KEVIN WILSON
Director of Community Services

SHARON D. DUCKWORTH
Acting City Treasurer

4305 Santa Fe Avenue, Vernon, California 90058
telephone (323) 583-8811

## ENVIRONMENTAL HEALTH DEPARTMENT
March 28, 2006

Pechiney Cast Plate Inc.
3200 Fruitland Ave.
Vernon, CA 90058
Attn:  Earl Clinkenbeard

Dear Mr. Clinkenbeard:

We received information that your company has discontinued your business from the subject location in Vernon.  As a Hazardous Materials Establishment, a closure report is required as specified by the Hazardous Materials Monitoring Ordinance #961 Sections 13.66, 13.67 and 13.68 (attachment).

This letter is an **Official Notice** to provide us with the details of a closure work plan by April 25, 2006.  In the case of your facility, an acceptable closure work plan should include the following items:

- A list of the identities and quantities of hazardous materials moved from the premises.  The list must include the items currently listed on the Hazardous Materials Inventory on file in our office.
- Address of location where hazardous materials were relocated.
- Statement describing efforts that assure proper cleanup of the equipment and facility.
- A description of the steps necessary to identify the hazardous materials and waste used or stored on the premises.
- Plans for closure of underground structures (clarifier, sumps, etc.).
- Sampling and testing protocols to determine the presence or absence of hazardous materials/wastes residues on equipment, structures and premises.
- Remediation plans, if necessary.

In addition, indicate in your work plan whether your company or ALCOA will be responsible for addressing the stoddard solvent contamination currently present at your site.  Provide the name,

*Exclusively Industrial*

EXHIBIT
3

05/09/2006  10:25   323-584-1910    PECHINEY CAST PLATE    PAGE  02/02

address and phone number of whom our department should contact in the future with regards to this issue.

Following the approval and implementation of the closure work plan, a final report is required. This report must document the evaluation of the facility and the disposition of hazardous materials including those listed on the inventory currently on file with our office. Please note that ongoing environmental assessment work currently being conducted by Geomatrix will fulfill many of the requirements for a Certificate of Closure.

If we can be of assistance to you or if you require further information, please contact us. Your immediate action on this matter will facilitate our prompt approval of reoccupancy of these premises.

Sincerely,

Lewis J. Pozzebon
Director/Health Officer

David LeDuff, M.P.H., R.E.H.S.
Environmental Health Specialist

Attachment

Xc: City of Vernon Community Services & Water Department

# EXHIBIT 4

# Jenkens & Gilchrist, LLP

12100 WILSHIRE BOULEVARD
15TH FLOOR
LOS ANGELES, CALIFORNIA 90025

(310) 820-8800
FACSIMILE (310) 820-8859

www.jenkens.com

John F. Cermak, Jr.
(310) 442-8885
jcermak@jenkens.com

AUSTIN, TEXAS
(512) 499-3800
CHICAGO, ILLINOIS
(312) 425-3900
DALLAS, TEXAS
(214) 855-4500
HOUSTON, TEXAS
(713) 951-3300
PASADENA, CALIFORNIA
(626) 578-7400
SAN ANTONIO, TEXAS
(210) 246-5000
WASHINGTON, D.C.
(202) 326-1500

April 17, 2006

CERTIFIED MAIL, RETURN RECEIPT
REQUESTED & FIRST CLASS MAIL

Century Aluminum Company
2511 Garden Road
Building A, Suite 200
Monterey, California 93490
Attention: General Counsel and Chief Administrative Officer

Re:    Vernon Indemnification Agreement dated as of September 20, 1999
between Century Aluminum Company and Pechiney Rolled Products, LLC
(the "Vernon Indemnification Agreement")

## NOTICE OF CLAIMS FOR INDEMNITY

Ladies and Gentlemen:

NOTICE IS HEREBY GIVEN on behalf of Pechiney Rolled Products LLC and Pechiney Cast Plate, Inc., formerly known as Century Cast Plate, Inc. ("Pechiney Cast Plate"), of claims against Century Aluminum Company ("Century") for indemnity pursuant to the terms of the Vernon Indemnification Agreement. Defined terms used in this notice and not otherwise defined shall have the meaning ascribed to such terms in the Vernon Indemnification Agreement. This notice is given pursuant to Section 1.3 of the Vernon Indemnification Agreement, and by Pechiney Cast Plate in its capacity as one of the Vernon Indemnified Parties.

The claims for indemnity relate to and arise out of certain environmental conditions at the Vernon Real Property which are described below. The claims are made without limitation or waiver of its right to indemnity as to other claims or its right to indemnity regarding the same matters under other agreements, including without limitation, that certain Stock and Asset Purchase Agreement dated as of July 26, 1999 (the "Purchase Agreement").[1]

---

[1] Pechiney Rolled Products LLC and Pechiney Cast Plate are concurrently making a demand for indemnity with respect to such matters under the Purchase Agreement.

EXHIBIT

4

# Jenkens & Gilchrist, LLP

Century Aluminum Company
April 17, 2006
Page 2

At the direction of the City of Vernon Environmental Health Department ("Vernon EHD"), Pechiney Cast Plate has conducted an investigation of certain environmental conditions at the Vernon Real Property. Geomatrix, an environmental consultant engaged by Pechiney Cast Plate, has performed a Phase I investigation with respect to the Vernon Real Property. The results of the investigation are contained in a report dated September 1, 2005 which was submitted by Geomatrix to Vernon EHD (the "Phase I Report") and subsequently approved by Vernon EHD, as set forth in a memorandum dated September 26, 2005 (the "September 26 Approval Memorandum"). Geomatrix submitted to Vernon EHD for approval a work plan with respect to the further investigation of the Vernon Real Property dated September 2, 2005 (the "Phase II Work Plan"), Vernon EHD approved in the September 26 Approval Memorandum. Geomatrix subsequently performed a further investigation of the Vernon Real Property, pursuant to the Phase II Work Plan, and on March 9, 2006, submitted a report to Vernon EHD with respect to the further investigation (the "Phase II Report"). With the Phase II Report, Geomatrix also submitted to Vernon EHD a proposed work plan for further investigation of certain areas and conditions (the "Supplemental Investigation Work Plan"). Vernon EHD approved the Phase I Report and the Supplemental Investigation Work Plan by letter dated March 20, 2006 (the "March 20 Approval Letter"), and the Supplement Investigation Work Plan is currently being implemented. A copy of the Phase I Report, the September 26 Approval Memorandum, the Phase II Work Plan, the Phase II Report, the Supplemental Investigation Work Plan and the March 20 Approval Letter are enclosed, and their contents are incorporated in this notice by reference.

Based on the limited investigation completed to date, it is anticipated that Pechiney Cast Plate will be required by Vernon EHD or other regulatory agencies to further investigate and/or remediate certain environmental conditions at the Vernon Real Property. Such conditions include, but are not limited to, the presence of polychlorinated biphenyls ("PCBs") which have been detected in soil on the Vernon Real Property at concentrations as high as 2 million ug/kg and in concrete in various locations within the buildings on the Vernon Real Property. To date, Pechiney Cast Plate has incurred costs which exceed $300,000 with respect to the above-described investigation and activities conducted in response to directives of the Vernon EHD.

Rolled Products and Pechiney Cast Plate each hereby give notice of a demand for indemnity pursuant to the Vernon Indemnification Agreement for any Losses it has incurred (including but not limited to the costs and expenses described above) or which it may in the future incur with respect to and arising out of the environmental conditions identified in the Phase I Report and the Phase II Report, or as a result of the further investigation of the Vernon

# Jenkens & Gilchrist, LLP

Century Aluminum Company
April 17, 2006
Page 3

Real Property conducted at the direction of Vernon EHD or other governmental agencies. Such indemnity rights include, without limitation, the right to indemnity pursuant to Section 1.2(a) of the Vernon Indemnification Agreement, for such Losses on the basis that they have been or will be incurred as result of and arising out of the presence of Hazardous Substances located at, upon, in or under the Vernon Real Property, the Cleanup of which has either been required by directives and/or orders of Vernon EHD. Such rights also include, without limitation, the right to indemnity pursuant to Section 1.2(b) of the Vernon Indemnification Agreement, insofar as conditions identified as part of the investigation involve Cleanup with respect to the remedial actions which Aluminum Company of America ("Alcoa"), pursuant to the terms of the Alcoa Agreement, was required to perform.

The foregoing is neither intended nor should it be construed as an exhaustive statement of the facts and matters at issue, nor is it intended to include all claims for indemnification under the Vernon Indemnification Agreement of either Rolled Products or Pechiney Cast Plate. The foregoing also should not be construed as a waiver or relinquishment of any claim, right, defense, damage or remedy, legal or equitable, which either Rolled Products or Pechiney may have with respect to this or any other matter, whether based on the Vernon Indemnification Agreement, the Purchase Agreement, or any other agreement, or which otherwise arises out of the matters addressed in this notice letter. All such claims, rights, defenses, damages and remedies are hereby expressly reserved.

Very truly yours,

John F. Cermak, Jr.

JFC:nlw
Enclosures

05/08/06   12:12 FAX 8316429328          CENTURY ALUMINUM Co                    ☒006/013

# Jenkens & Gilchrist, LLP

Century Aluminum Company
April 17, 2006
Page 4


cc:   CERTIFIED RETURN RECEIPT
      AND FIRST CLASS MAIL

      Curtis, Mallet-Prevost, Colt & Mosle
      101 Park Avenue
      New York, New York 10178
      Attention:  Matias A. Vega, Esq.

      FIRST CLASS MAIL

      Eileen Burns-Lerum, Esq.
      Vice President, Legal Affairs
      Alcan, Inc.
      8770 West Bryn Mawr Avenue
      Mail Code 02V
      Chicago, IL  60631-3542

# EXHIBIT 5

Peter McGuire
Vice President
Associate General Counsel

**Century**ALUMINUM

CC (via ~~fax~~): email
LRP
JMW
Jamie Mackay
(via ~~hard copy~~ email):
JJL
RWW (please ask his
assistant to fax to him
in Tacoma, WA)

CEM

May 8, 2006

## VIA CERTIFIED MAIL, RETURN RECEIPT
## REQUESTED AND TELECOPIER

Aluminum Company of America
Alcoa Corporate Center
201 Isabella Street
Pittsburgh, PA 15212-5859
Telecopier: 412-553-4064
Attn:    General Counsel\
         C/O Claire Miller

Re:    Acquisition Agreement, dated December 22, 1998 (the "Acquisition
       Agreement"), between Aluminum Company of America ("Alcoa")
       and Century Aluminum Company ("Century")

Ladies and Gentlemen:

This is to inform you that Century has claims against Alcoa for indemnity under Article 10 of the Acquisition Agreement. The claims for indemnity relate to the presence of polychlorinated biphenyls at the Real Property as more fully described in the two attached letters dated April 17, 2006 and the attached letter dated April 24, 2006, each from Jenkins and Gilchrist, LLP (the "Letters"). Capitalized terms used herein and not defined herein shall have the meanings assigned to such terms in the Acquisition Agreement.

Century hereby gives notice of a demand for indemnity for all Losses it and its Affiliates have incurred, or which it and its Affiliates may in the future incur, with respect to the environmental conditions described in the Letters. Such indemnity rights include, without limitation, the right to indemnity pursuant to Section 10.03(a) of the Acquisition Agreement, for such Losses on the basis that they have been or will be incurred as result of and arising out of the presence of Hazardous Substances located at, upon, in or under the Real Property due to the actions or inaction of Alcoa or an Affiliate

Century Aluminum Company
2511 Garden Road
Building A, Suite 200
Monterey, CA 93940

831 642-9300 Phone
831 642-9080 Fax

EXHIBIT
5

of Alcoa, the Cleanup of which has either been required by directives and/or orders of the Vernon Environmental Health Department.  Such rights also include, without limitation, the right to indemnity pursuant to Section 10.03(c) of the Acquisition Agreement, insofar as conditions identified as part of the investigation involve Cleanup with respect to the remedial actions which Alcoa was required to perform pursuant to the terms of the Acquisition Agreement. At this time, Century does not have sufficient information to estimate the amount of Losses for which indemnity is claimed.

The foregoing is neither intended nor should it be construed as an exhaustive statement of the facts and matters at issue, nor is it intended to include all claims of Century and its Affiliates for indemnification under the Acquisition Agreement. The foregoing also should not be construed as a waiver or relinquishment of any claim, right, defense, damage or remedy, legal or equitable, which Century and its Affiliates may have with respect to this or any other matter, whether based on the Acquisition Agreement or any other agreement, or which otherwise arises out of the matters addressed in this notice letter.  All such claims, rights, defenses, damages and remedies are hereby expressly reserved.

We believe it would be advisable for representatives of Century, Pechiney and Alcoa to meet and discuss the nature and scope of the alleged contamination at the Vernon, California facility as soon as possible and look forward to discussing the foregoing with you.

Very truly yours,

Peter C. McGuire
Vice President and
Associate General Counsel

# EXHIBIT 6

ALL-STATE LEGAL 800-222-0510    ED11    RECYCLED



**ALCOA**

Alcoa Corporate Center
201 Isabella Street
at 7th Street Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 724 337 5401
Fax: 1 724 337 1854

*VIA OVERNIGHT MAIL*

August 30, 2006

Mr. Lewis J. Pozzebon, R.E.H.S.
Director of Environmental Health
City of Vernon
4305 Santa Fe Avenue
Vernon, California 90058

RE: Stoddard Solvent

Dear Mr. Pozzebon:

I have received your letter dated July 18, 2006 requesting that Alcoa Inc. submit a plan for active remediation of the Stoddard solvent on the premises at 3200 Fruitland Avenue. Your letter states that the current remedial strategy should be reevaluated due to the actions of the current premises owner, Alcan Inc. and/or its subsidiaries ("Alcan"). Accordingly, Alcoa suggests that if Alcan intends to proceed with its redevelopment plans, including the removal of the current cap on the Stoddard solvent, then your department should require Alcan to submit an appropriate remedial plan for the Stoddard solvent in light of the circumstances that Alcan has created.

As you know, Alcoa and the City of Vernon fully investigated the options for remediation of the Stoddard solvent at the time that Alcoa sold the premises in 1998. The City of Vernon agreed that natural attenuation, including biodegradation, was the proper remedy given the location and extent of the material, including the fact that much of the material was located under an existing building. The City of Vernon required periodic monitoring of the material, and your April 17, 2001 letter to A.J. Ursic noted that you were "very impressed" with the results of the natural attenuation process. In addition, sampling conducted in September 2005 confirmed that the material was not migrating beyond known boundaries and that natural attenuation continued to be an effective remedy.

Alcan has now elected to demolish the building which serves as a cap on the Stoddard solvent in preparation for sale of the premises to the City of Vernon, despite Alcan's knowledge of the existence of the solvent and the potential environmental implications of removing the building. Your letter indicates that due solely to Alcan's demolition, natural attenuation and



EXHIBIT
**6**

Mr. Lewis J. Pozzebon, R.E.H.S.
August 30, 2006
Page 2

biodegradation may no longer be an acceptable remedy. If so, Alcoa believes that the City of Vernon should look to the party responsible for changing the conditions of the premises and knowingly undermining what would otherwise be the appropriate solution to the Stoddard solvent issue.

In this regard, please be aware that Alcoa has filed suit against Alcan and the prior owner of the premises, Century Aluminum Company, seeking declaratory judgments regarding the parties' liability for various environmental issues related to the premises at issue. A copy of the Complaint is enclosed for your review. The Stoddard solvent may be one of the issues addressed in this litigation.

Alcoa remains willing to cooperate in any investigation which your department may conduct. Please let me know if you need any further information.

Very truly yours,

*Jamie K. Mackay*

Jamie K. Mackay, P.E.
Manager – Environment, Health, and Safety Resources
Alcoa Inc.

Attachment

# EXHIBIT 7



CITY COUNCIL

LEONIS C. MALBURG
Mayor

THOMAS A. YBARRA
Mayor Pro–Tem

WM. "BILL" DAVIS
Councilman

H. "LARRY" GONZALES
Councilman

W. MICHAEL MCCORMICK
Councilman

BRUCE V. MALKENHORST
City Administrator / City Clerk
FAX (323) 581–7924

EDUARDO OLIVO
City Attorney
FAX: (562) 927–S722

KEVIN WILSON
Director of Community Services & Water
FAX: (323) 588–2761

KENNETH J. DeDARIO
Director of Municipal Utilities
FAX: (323) 583—1983

DAVE TELFORD
Fire Chief
FAX: (323) 581–1385

BRUCE W. OLSON
Police Chief
FAX: (323) 583–5236

# CITY HALL

4305 SANTA FE AVENUE, VERNON, CALIFORNIA 90058
TELEPHONE (323) 583–8811

## ENVIRONMENTAL HEALTH DEPARTMENT

April 17, 2001

Environmental Protection and Compliance, Inc.
P.O. Box 1814
Upland, CA 91785-1814
Attn: A.J. Ursic Jr., REA

Subject:    Stoddard Solvent Impacted Soils Investigation in Support of Monitored Natural
            Attenuation, Former Alcoa Vernon Facility, Vernon, California

Dear Mr. Ursic:

This letter acknowledges our receipt and review of the subject report dated March 27, 2001. Based on the information submitted, we are very impressed with the results of the natural attenuation remedial technology. We concur with your project recommendations to continue the natural attenuation process, particularly biodegradation, until such time that a final closure may be issued. We would like to see continued monitoring at the site at least once every five years. Also, the impermeable cap over each of the contaminated areas shall be maintained, and no soil excavation may occur without our consent.

If you have any questions or require further assistance, please feel free to contact us.

Sincerely,

Lewis J. Pozzebon
Director/Health Officer

Leonard Grossberg, M.P.A., R.E.H.S.
Environmental Health Specialist

9cLG:CLOSURE/Stoddard solvent soils ALCOA.doc

EXHIBIT
7

CITY COUNCIL

LEONIS C. MALBURG
Mayor

THOMAS A. YBARRA
Mayor Pro-Tem

Wm. "BILL" DAVIS
Councilman

H. "LARRY" GONZALES
Councilman

W. MICHAEL McCORMICK
Councilman

BRUCE V. MALKENHORST
City Administrator / City Clerk
FAX (323) 581-7924



# CITY HALL

4305 SANTA FE AVENUE, VERNON, CALIFORNIA 90058
TELEPHONE (323) 583-8811

DAVID B. BREARLEY
City Attorney
FAX: (626) 330-5818

KEVIN WILSON
Director of Community Services & Water
FAX: (323) 588-2761

KENNETH J. DeDARIO
Director of Municipal Utilities
FAX: (323) 583-1983

DAVE TELFORD
Fire Chief
FAX: (323) 581-1385

BRUCE W. OLSON
Police Chief
FAX: (323) 583-5236

## ENVIRONMENTAL HEALTH DEPARTMENT

September 2, 1999

Aluminum Company of America
c/o Century Cast Plate
3200 Fruitland Ave.
Vernon, CA 90058
Attn: A. J. Ursic, Jr.

SUBJECT: Final Closure Documents for Parcels 6, 7, and 8 at the Aluminum Company of
America (Alcoa) site located at 5151 Alcoa Ave., Vernon, CA

Dear Mr. Ursic:

This letter acknowledges our receipt and review of the following documents related to closure
activities at the subject site:

♦ Environmental Activities report dated May 7, 1999 for Parcel 6

♦ Environmental Activities report dated July 26, 1999 for Parcel 8, Volumes 1 & 2

♦ Limited Phase II Environmental Site Investigation for the Alcoa Cast Plate Facility,
Volumes I and II, prepared by McCulley, Frick & Gilman, Inc., dated September 15,
1998

♦ Environmental Activities-Final Report dated August 16, 1999 for parcels 6, 7, and 8

Based on our review of the documents, we concur with your recommendations to close the
subject site with no further environmental assessment or remedial action at this time, and
consider the site remediation project closed. The City of Vernon Environmental Health
Department will continue to monitor Alcoa's acknowledgement of its continuing responsibilities
regarding the Stoddard Solvent issues.

Our acknowledgment of a satisfactory closure is based on the assumption that the information submitted in the documentation is complete and accurate. Further review or determinations may be necessary if subsequent information, which significantly affects any decision, is found.

If you have any questions or require further information, please feel free to contact us.

Please note that our department is very appreciative of the ongoing cooperation we have received from Alcoa representatives during this long and complicated closure project. The commitment to environmental compliance by Alcoa, and especially you, is exemplary.

Sincerely,

Lewis J. Pozzebon
Director/Health Officer

Leonard Grossberg, M.P.A., R.E.H.S.
Environmental Health Specialist

Xc: Tom Reynolds, Facility Manager, Century Cast Plate, 3200 Fruitland Ave., Vernon, CA 90058
A. J. Ursic Jr., P.O. Box 1814, Upland, CA 91785-1814
City of Vernon Community Services & Public Works Dept., Attn Richard Lucas

Lg:CLOSURE.Alcoafinal.doc

# City of Vernon



4305 Santa Fe Avenue
Vernon, California 90058
(323) 583-8811

## ENVIRONMENTAL HEALTH DEPARTMENT

September 2, 1999

Aluminum Company of America
c/o Century Cast Plate
3200 Fruitland Ave.
Vernon, CA 90058
Attn: A. J. Ursic, Jr.

SUBJECT:   Partial Site Closure Activities for Parcel 7 @ 5151 Alcoa Ave., Vernon, CA

Dear Mr. Ursic:

This letter acknowledges our receipt and review of the following documents related to closure activities at the subject site:

♦ Environmental Activities report dated May 28, 1999 for Parcel 7, Volumes 1 & 2
♦ Limited Phase II Environmental Site Investigation for the Alcoa Cast Plate Facility, Volumes I and II, prepared by McCulley, Frick & Gilman, Inc., dated September 15, 1998

Our review of the documents has substantiated that a majority of the closure activities have been satisfactorily completed. However, because of some supplemental remediation data still pending and/or under review, we are only able to confirm partial closure of Parcel 7 at this time. We are planning to review the documentation of the final remediation activities submitted August 18, 1999 and, if acceptable, we will make a final closure determination.

If you have any questions or require further information, please feel free to contact us.

Sincerely,

Lewis J. Pozzebon
Director/Health Officer

Leonard Grossberg, M.P.A., R.E.H.S.
Environmental Health Specialist

Xc:Tom Reynolds, Facility Manager, Century Cast Plate, 3200 Fruitland Ave., Vernon, CA 90058
A. J. Ursic Jr., P.O. Box 1814, Upland, CA 91785-1814
Community Services Dept.

Lg:CLOSURE.Alcoa7.doc

# City of Vernon



4305 Santa Fe Avenue
Vernon, California 90058
(323) 583-8811

## ENVIRONMENTAL HEALTH DEPARTMENT

September 1, 1999

Aluminum Company of America
c/o Century Cast Plate
3200 Fruitland Ave.
Vernon, CA  90058
Attn: A. J. Ursic, Jr.

SUBJECT:    Partial Site Closure Activities for Parcel 8 @ 5151 Alcoa Ave., Vernon, CA

Dear Mr. Ursic:

This letter acknowledges our receipt and review of the following documents related to closure activities at the subject site:

+ Environmental Activities report dated July 26, 1999 for Parcel 8, Volumes 1 & 2
+ Limited Phase II Environmental Site Investigation for the Alcoa Cast Plate Facility, Volumes I and II, prepared by McCulley, Frick & Gilman, Inc., dated September 15, 1998

Our review of the documents has substantiated that a majority of the closure activities have been satisfactorily completed. However, because of some supplemental remediation data still pending and/or under review, we are only able to confirm partial closure of Parcel 8 at this time. We are planning to review the documentation of the final remediation activities submitted August 18, 1999 and, if acceptable, we will make a final closure determination.

If you have any questions or require further information, please feel free to contact us.

Sincerely,

Lewis J. Pozzebon
Director/Health Officer

Leonard Grossberg, M.P.A., R.E.H.S.
Environmental Health Specialist

Xc: Tom Reynolds, Facility Manager, Century Cast Plate, 3200 Fruitland Ave., Vernon, CA  90058
    A. J. Ursic Jr., P.O. Box 1814, Upland, CA 91785-1814
    City of Vernon Community Services & Public Works Dept., Attn Richard Lucas

Lg:CLOSURE.Alcoa8.doc

# City of Vernon



4305 Santa Fe Avenue
Vernon, California 90058
(323) 583-8811

## ENVIRONMENTAL HEALTH DEPARTMENT
August 24, 1999

Aluminum Company of America
c/o Century Cast Plate
3200 Fruitland Ave.
Vernon, CA 90058
Attn: A. J. Ursic, Jr.

SUBJECT:  Partial Site Closure Activities for Parcel 6 @ 5151 Alcoa Ave., Vernon, CA

Dear Mr. Ursic:

This letter acknowledges our receipt and review of the following documents related to closure activities at the subject site:

- Environmental Activities report dated May 7, 1999 for Parcel 6
- Limited Phase II Environmental Site Investigation for the Alcoa Cast Plate Facility, Volumes I and II, prepared by McCulley, Frick & Gilman, Inc., dated September 15, 1998

Our review of the documents has substantiated that a majority of the closure activities have been satisfactorily completed. However, because of some supplemental remediation related to lead contamination which was accomplished after the above documents were submitted, we are only able to confirm partial closure of Parcel 6 at this time. We are planning to review the documentation of the lead remediation activities which was submitted on August 18, 1999, and, if acceptable, we will make a final closure determination.

If you have any questions or require further information, please feel free to contact us.

Sincerely,

Lewis J. Pozzebon
Director/Health Officer

Leonard Grossberg, M.P.A., R.E.H.S.
Environmental Health Specialist

Xc: Tom Reynolds, Facility Manager, Century Cast Plate, 3200 Fruitland Ave., Vernon, CA 90058
A. J. Ursic Jr., P.O. Box 1814, Upland, CA 91785-1814
Community Services Dept.

Lg:CLOSURE.Alcoa6.doc

# EXHIBIT 8

ALLSTATE® LEGAL  030322-019   ED11   RECYCLED

JUN-16-98  17:01   From:CLEARY GOTTLIEB           2029741999              1-404  P.11/35  Job-209

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

                                  Plaintiff,

            v.

ALUMINUM COMPANY OF AMERICA,
and ALUMAX INC.,

                                  Defendants.

Civil Action No.:

Filed:

98 1497

## FINAL JUDGMENT

WHEREAS, plaintiff, the United States of America ("United States"), filed its complaint in

this action on June 15, 1998, and plaintiff and defendants, Aluminum Company of America ("Alcoa")

and Alumax Inc. ("Alumax"), by their respective attorneys, having consented to the entry of this Final

Judgment without trial or adjudication of any issue of fact or law herein, and without this Final

Judgment constituting any evidence against or an admission by any party with respect to any issue

of law or fact herein;

AND WHEREAS, defendants have agreed to be bound by the provisions of this Final

Judgment pending its approval by the Court;

AND WHEREAS, the essence of this Final Judgment is the prompt and certain divestiture

of the Alcoa Cast Plate Division to assure that competition is not substantially lessened;

AND WHEREAS, plaintiff requires defendants to make certain divestitures for the purpose

of remedying the loss of competition alleged in the Complaint;

EXHIBIT

8

JUN-15-98  17:02  From:CLEARY GOTTLIEB          2029741999          T-404  P.12/36  Job-208

AND WHEREAS, defendants have represented to plaintiff that the divestiture ordered herein can and will be made and that defendants will later raise no claims of hardship or difficulty as grounds for asking the Court to modify any of the divestiture or contract provisions contained below;

NOW, THEREFORE, before the taking of any testimony, and without trial or adjudication of any issue of fact or law herein, and upon consent of the parties hereto, it is hereby ORDERED, ADJUDGED, AND DECREED as follows:

## I.

### JURISDICTION

This Court has jurisdiction over the subject matter of this action and over each of the parties hereto. The Complaint states a claim upon which relief may be granted against the defendants, as hereinafter defined, under Section 7 of the Clayton Act, as amended (15 U.S.C. § 18).

## II.

### DEFINITIONS

As used in this Final Judgment:

A.      "Alcoa" means defendant Aluminum Company of America, a Pennsylvania Corporation with its headquarters in Pittsburgh, Pennsylvania, and its successors, assigns, subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and directors, officers, managers, agents, and employees.

B.      "Alumax" means Alumax Inc., a Delaware Corporation with its headquarters in Atlanta, Georgia, and its successors, assigns, subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and directors, officers, managers, agents, and employees.

2

C.     "Alcoa Cast Plate Division" means all assets included within the cast plate operation of Alcoa's Aerospace and Commercial Rolled Products Division as of the date hereof, including:

1.     all tangible assets, including the cast plate manufacturing facility located at 1551 Alcoa Avenue, Vernon, California 90058 ("Vernon facility") and the portion of the real property on which the Vernon facility is situated that is reasonably necessary for operation of the Vernon cast plate plant; any facilities used for research and development activities; Vernon offices; cast plate-related manufacturing assets including capital equipment, vehicles, interests, supplies, personal property, inventory, office furniture, fixed assets and fixtures, materials, on-site warehouses or storage facilities, and other tangible property or improvements used in the cast plate operation; all licenses, permits and authorizations issued by any governmental organization relating to the cast plate operation; all contracts, agreements, leases, commitments and understandings pertaining to the cast plate operation; supply agreements; all customer lists, contracts, accounts, and credit records; and other records maintained by Alcoa in connection with the cast plate operation;

2.     all intangible assets, including but not limited to all patents, licenses and sublicenses, intellectual property, trademarks, trade names, service marks, service names (except to the extent such trademarks, trade names, service marks, and service names contain the name "Alcoa"), technical information, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety

3

procedures for the handling of materials and substances, quality assurance and control procedures, design tools and simulation capability, and all manuals and technical information Alcoa provides to its own employees, customers, suppliers, agents or licensees; and

3.   all research data concerning historic and current research and development efforts relating to the cast plate operation, including designs of experiments, and the results of unsuccessful designs and experiments.

D.   "Cast Plate" means an aluminum plate product manufactured by casting or by sawing cast slab purchased from an external source, ranging in gauges from 1/4 inch to 30 inches, that is used for various tooling, industrial and mold plate applications, and that is manufactured by the Alcoa Cast Plate Division.

## III.

## APPLICABILITY

A.   The provisions of this Final Judgment apply to Alcoa and Alumax, their successors and assigns, their subsidiaries, affiliates, directors, officers, managers, agents, and employees, and all other persons in active concert or participation with any of them who shall have received actual notice of this Final Judgment by personal service or otherwise.

B.   Alcoa shall require, as a condition of the sale or other disposition of all or substantially all of the assets involving Cast Plate, that the acquiring party or parties agree to be bound by the provisions of this Final Judgment.

4

IV.

## DIVESTITURE OF ASSETS

A.      Alcoa is hereby ordered and directed in accordance with the terms of this Final Judgment, within one hundred and eighty (180) calendar days after the filing of the Complaint in this matter, or five (5) days after notice of entry of this Final Judgment by the Court, whichever is later, to divest the Alcoa Cast Plate Division as an ongoing business to a purchaser acceptable to the United States in its sole discretion. With respect to the intangible assets described in Section II(C)(2) of this Final Judgment, the divestiture required hereunder shall be accomplished by entering into a perpetual, nonexclusive license (or licenses, as the case may be) with the purchaser, transferable to any future purchaser of the Vernon facility, to use, in manufacturing cast plate at the Vernon facility, all such intangible assets, wherever located, that have been used in the manufacture of cast plate at the Vernon facility.

B.      Alcoa shall use its best efforts to accomplish the divestiture as expeditiously and timely as possible. The United States, in its sole discretion, may extend the time period for any divestiture by an additional period of time not to exceed thirty (30) calendar days.

C.      In accomplishing the divestiture ordered by this Final Judgment, Alcoa promptly shall make known, by usual and customary means, the availability of the Alcoa Cast Plate Division described in this Final Judgment. Alcoa shall inform any person making an inquiry regarding a possible purchase that the sale is being made pursuant to this Final Judgment and provide such person with a copy of this Final Judgment. Alcoa shall also offer to furnish to all prospective purchasers, subject to customary confidentiality assurances, all information regarding the Alcoa Cast Plate Division customarily provided in a due diligence process except such information subject to attorney-

5

JUN-15-98  17:03  From:CLEARY GOTTLIEB          2029741999          T-404  P-16/36  Job-208

client privilege or attorney work-product privilege. Alcoa shall make available such information to the plaintiff at the same time that such information is made available to any other person.

D.    Alcoa shall not interfere with any negotiations by any purchaser to employ any Alcoa employee who works at, or whose principal responsibility is, the Cast Plate business.

E.    Alcoa shall permit prospective purchasers of the Alcoa Cast Plate Division to have reasonable access to personnel and to make such inspection of Alcoa Cast Plate's Vernon facility; access to any and all environmental, zoning, and other permit documents and information; and access to any and all financial, operational, or other documents and information customarily provided as part of a due diligence process.

F.    Alcoa shall warrant to the purchaser of the Alcoa Cast Plate Division that the Alcoa Cast Plate Division will be operational on the date of sale.

G.    Alcoa shall not take any action, direct or indirect, that will impede in any way the operation of the Alcoa Cast Plate Division.

H.    Alcoa shall warrant to the purchaser of the Alcoa Cast Plate Division that there are no material defects in the environmental, zoning, or other permits pertaining to the operation of the Alcoa Cast Plate Division and that Alcoa will not undertake, directly or indirectly, following the divestiture of the Alcoa Cast Plate Division, any challenges to the environmental, zoning, or other permits pertaining to the operation of the Alcoa Cast Plate Division.

I.    Alcoa shall not be permitted to locate any of its operations at the Alcoa Cast Plate Division's Vernon facility.

J.    Unless the United States otherwise consents in writing, the divestiture pursuant to Section IV, or by trustee appointed pursuant to Section V of this Final Judgment, shall include the

6

JUN-15-98  17:04  From:CLEARY GOTTLIEB            2029741959            T-404  P.17/35  Job-208

entire Alcoa Cast Plate Division, operated in place pursuant to the Hold Separate Stipulation and Order, and be accomplished by selling or otherwise conveying the Alcoa Cast Plate Division to a purchaser in such a way as to satisfy the United States, in its sole discretion, that the Alcoa Cast Plate Division can and will be used by the purchaser as part of a viable, ongoing business or businesses engaged in the manufacture of Cast Plate. The divestiture, whether pursuant to Section IV or Section V of this Final Judgment, shall be made to a purchaser for whom it is demonstrated to the United States' sole satisfaction that: (1) the purchaser has the capability and intent of competing effectively in the manufacture and sale of Cast Plate; (2) the purchaser has or soon will have the managerial, operational, and financial capability to compete effectively in the manufacture and sale of Cast Plate; and (3) none of the terms of any agreement between the purchaser and Alcoa gives Alcoa the ability unreasonably to raise the purchaser's costs, to lower the purchaser's efficiency, or otherwise to interfere in the ability of the purchaser to compete effectively.

## V.

## APPOINTMENT OF TRUSTEE

A.    In the event that Alcoa has not divested the Alcoa Cast Plate Division within the time specified in Section IV of this Final Judgment, the Court shall appoint, on application of the United States, a trustee selected by the United States to effect the divestiture of the Alcoa Cast Plate Division.

B.    After the appointment of a trustee becomes effective, only the trustee shall have the right to sell the Alcoa Cast Plate Division. The trustee shall have the power and authority to accomplish the divestiture at the best price then obtainable upon a reasonable effort by the trustee, subject to the provisions of Sections IV and VI of this Final Judgment, and shall have such other

7

JUN-16-98  17:04   From:CLEARY GOTTLIEB                    2029741999                    T-404  P.18/35  Job-208

powers as the Court shall deem appropriate. Subject to Section V(C) of this Final Judgment, the trustee shall have the power and authority to hire at the cost and expense of Alcoa any investment bankers, attorneys, or other agents reasonably necessary in the judgment of the trustee to assist in the divestiture, and such professionals and agents shall be accountable solely to the trustee. The trustee shall have the power and authority to accomplish the divestiture at the earliest possible time to a purchaser acceptable to the United States in its sole discretion and shall have such other powers as this Court shall deem appropriate. Alcoa shall not object to a sale by the trustee on any grounds other than the trustee's malfeasance. Any such objections by Alcoa must be conveyed in writing to plaintiff and the trustee within ten (10) days after the trustee has provided the notice required under Section VI of this Final Judgment.

C.     The trustee shall serve at the cost and expense of Alcoa, on such terms and conditions as the Court may prescribe, and shall account for all monies derived from the sale of the assets sold by the trustee and all costs and expenses so incurred. After approval by the Court of the trustee's accounting, including fees for its services and those of any professionals and agents retained by the trustee, all remaining money shall be paid to Alcoa and the trust shall then be terminated. The compensation of such trustee and of professionals and agents retained by the trustee shall be reasonable in light of the value of the divested business and based on a fee arrangement providing the trustee with an incentive based on the price and terms of the divestiture and the speed with which it is accomplished.

D.     Alcoa shall use its best efforts to assist the trustee in accomplishing the required divestiture, including its best efforts to effect all necessary regulatory approvals. The trustee and any consultants, accountants, attorneys, and other persons retained by the trustee shall have full and

JUN-15-98  17:04  From:CLEARY GOTTLIEB                2029741999            T-404  P.19/36  Job-208

complete access to the personnel, books, records, and facilities of the business to be divested, and Alcoa shall develop financial or other information relevant to the business to be divested customarily provided in a due diligence process as the trustee may reasonably request, subject to customary confidentiality assurances. Alcoa shall permit *bona fide* prospective acquirers of the Alcoa Cast Plate Division to have reasonable access to personnel and to make such inspection of physical facilities and any and all financial, operational or other documents and other information as may be relevant to the divestiture required by this Final Judgment.

E.     After its appointment, the trustee shall file monthly reports with the parties and the Court setting forth the trustee's efforts to accomplish the divestiture ordered under this Final Judgment; provided however, that to the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the court. Such reports shall include the name, address and telephone number of each person who, during the preceding month, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the business to be divested, and shall describe in detail each contact with any such person during that period. The trustee shall maintain full records of all efforts made to divest the business to be divested.

F.     If the trustee has not accomplished such divestiture within six (6) months after its appointment, the trustee thereupon shall file promptly with the Court a report setting forth: (1) the trustee's efforts to accomplish the required divestiture, (2) the reasons, in the trustee's judgment, why the required divestiture has not been accomplished, and (3) the trustee's recommendations; provided, however, that to the extent such reports contain information that the trustee deems confidential, such reports shall not be filed in the public docket of the Court. The trustee shall at the same time furnish

9

such report to the parties, who shall each have the right to be heard and to make additional recommendations consistent with the purpose of the trust. The Court shall enter thereafter such orders as it shall deem appropriate in order to carry out the purpose of the trust, which may, if necessary, include extending the trust and the term of the trustee's appointment by a period requested by the United States.

## VI.

## NOTIFICATION

Within two (2) business days following execution of a definitive agreement contingent upon compliance with the terms of this Final Judgment to effect, in whole or in part, any proposed divestiture pursuant to Sections IV and V of this Final Judgment, Alcoa or the trustee, whichever is then responsible for effecting the divestiture, shall notify plaintiff of the proposed divestiture. If the trustee is responsible, it shall similarly notify Alcoa. The notice shall set forth the details of the proposed transaction and list the name, address, and telephone number of each person not previously identified who offered to, or expressed an interest in or a desire to, acquire any ownership interest in the business to be divested that is the subject of the binding contract, together with full details of same. Within fifteen (15) calendar days of receipt by plaintiff of such notice, the United States, in its sole discretion, may request from Alcoa, the proposed purchaser, or any other third party additional information concerning the proposed divestiture and the proposed purchaser. Alcoa and the trustee shall furnish any additional information requested from them within fifteen (15) calendar days of the receipt of the request, unless the parties shall otherwise agree. Within thirty (30) calendar days after receipt of the notice or within twenty (20) calendar days after the plaintiff has been provided the additional information requested from Alcoa, the proposed purchaser, or any third party, whichever

10

'JUN-15-98  17:05  From:CLEARY GOTTLIEB                2025741939          T-404  P.21/35  Job-208

is later, the United States shall provide written notice to Alcoa and the trustee, if there is one, stating whether or not it objects to the proposed divestiture.  If the United States provides written notice to Alcoa and the trustee that it does not object, then the divestiture may be consummated, subject only to Alcoa's limited right to object to the sale under Section V(B) of this Final Judgment.  Absent written notice that the United States does not object to the proposed purchaser or upon objection by the United States, a divestiture proposed under Section IV or Section V shall not be consummated.  Upon objection by Alcoa under the provision in Section V(B), a divestiture proposed under Section V shall not be consummated unless approved by the Court.

VII.

AFFIDAVITS

A.    Within twenty (20) calendar days of the filing of the Complaint in this matter and every thirty (30) calendar days thereafter until the divestiture has been completed whether pursuant to Section IV or Section V of this Final Judgment, Alcoa shall deliver to plaintiff an affidavit as to the fact and manner of compliance with Section IV or Section V of this Final Judgment.  Each such affidavit shall include, *inter alia*, the name, address, and telephone number of each person who, at any time after the period covered by the last such report, made an offer to acquire, expressed an interest in acquiring, entered into negotiations to acquire, or was contacted or made an inquiry about acquiring, any interest in the business to be divested, and shall describe in detail each contact with any such person during that period.  Each such affidavit shall also include a description of the efforts that Alcoa has taken to solicit a buyer for the Alcoa Cast Plate Division and to provide required information to prospective purchasers.

11

B.    Within twenty (20) calendar days of the filing of the Complaint in this matter, Alcoa shall deliver to plaintiff an affidavit which describes in detail all actions Alcoa has taken and all steps Alcoa has implemented on an on-going basis to preserve the Alcoa Cast Plate Division pursuant to Section VIII of this Final Judgment and the Hold Separate Stipulation and Order entered by the Court. The affidavit also shall describe, but not be limited to, Alcoa's efforts to maintain and operate the Alcoa Cast Plate Division as an active competitor, maintain the management, staffing, research and development activities, sales, marketing, and pricing of the Alcoa Cast Plate Division, and maintain the Vernon facility in operable condition at current capacity configurations. Alcoa shall deliver to plaintiff an affidavit describing any changes to the efforts and actions outlined in Alcoa's earlier affidavit(s) filed pursuant to Section VII(B) within fifteen (15) calendar days after the change is implemented.

C.    Until one year after such divestiture has been completed, Alcoa shall preserve all records of all efforts made to preserve the business to be divested and effect the divestiture.

## VIII.

## HOLD SEPARATE ORDER

Until the divestitures required by the Final Judgment have been accomplished, Alcoa shall take all steps necessary to comply with the Hold Separate Stipulation and Order entered by this Court. Defendants shall take no action that would jeopardize the divestiture of the Alcoa Cast Plate Division.

## IX.

## FINANCING

Alcoa is ordered and directed not to finance all or any part of any purchase by an acquirer made pursuant to Sections IV or V of this Final Judgment.

## X.

## COMPLIANCE INSPECTION

For the purpose of determining or securing compliance with this Final Judgment, and subject to any legally recognized privilege, from time to time:

A.    Duly authorized representatives of the United States Department of Justice, upon written request of the Attorney General or the Assistant Attorney General in charge of the Antitrust Division, and on reasonable notice to defendants made to their principal offices, shall be permitted:

1.    Access during office hours of defendants to inspect and copy all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of defendants, who may have counsel present, relating to any matters contained in this Final Judgment and the Hold Separate Stipulation and Order; and

2.    Subject to the reasonable convenience of defendants and without restraint or interference from them, to interview, either informally or on the record, their officers, employees, and agents, who may have counsel present, regarding any such matters.

B.    Upon the written request of the Attorney General or of the Assistant Attorney General in charge of the Antitrust Division, made to defendants at their principal offices, defendants shall

13

submit such written reports, under oath if requested, with respect to any of the matters contained in this Final Judgment and the Hold Separate Stipulation and Order.

    C.    No information nor any documents obtained by the means provided in Sections VII or X of this Final Judgment shall be divulged by a representative of the United States to any person other than a duly authorized representative of the Executive Branch of the United States, except in the course of legal proceedings to which the United States is a party (including grand jury proceedings), or for the purpose of securing compliance with this Final Judgment, or as otherwise required by law.

    D.    If at the time information or documents are furnished by defendants to plaintiff, defendants represent and identify in writing the material in any such information or documents for which a claim of protection may be asserted under Rule 26(c)(7) of the Federal Rules of Civil Procedure, and defendants mark each pertinent page of such material, "Subject to claim of protection under Rule 26(c)(7) of the Federal Rules of Civil Procedure," then plaintiff shall give ten (10) days notice to defendants prior to divulging such material in any legal proceeding (other than a grand jury proceeding) to which defendants are not a party.

## XI.

## RETENTION OF JURISDICTION

    Jurisdiction is retained by this Court for the purpose of enabling any of the parties to this Final Judgment to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Final Judgment, for the modification of any of the provisions hereof, for the enforcement of compliance herewith, and for the punishment of any violations hereof.

JUN-15-98  17:07   From:CLEARY GOTTLIEB                    2029741999                    T-404  P.25/35  Job-208

## XII.

## TERMINATION

Unless this Court grants an extension, this Final Judgment will expire on the tenth anniversary

of the date of its entry.

## XIII.

## PUBLIC INTEREST

Entry of this Final Judgment is in the public interest.


Dated: _____


                                Court approval subject
                                to procedures of Antitrust
                                Procedures and Penalties Act,
                                15 U.S.C. § 16


                                _____

                                United States District Judge

JUN-15-98  17:07  From:CLEARY GOTTLIEB                    2029741999          T-404  P.26/35  Job-208

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,                    |    Civil Action No.:
                                             |
                              *Plaintiff.*    |    Filed:
                                             |
                     v.                      |         98 1497
                                             |
ALUMINUM COMPANY OF AMERICA,                 |
and ALUMAX INC.,                             |
                              *Defendants.*   |

## STIPULATION AND ORDER

It is hereby STIPULATED by and between the undersigned parties, by their respective

attorneys, as follows:

1.    The Court has jurisdiction over the subject matter of this action and over each of the

parties hereto, and venue of this action is proper in the United States District Court for the District

of Columbia.

2.    The parties stipulate that a Final Judgment in the form hereto attached may be filed

and entered by the Court, upon the motion of any party or upon the Court's own motion, at any time

after compliance with the requirements of the Antitrust Procedure and Penalties Act (15 U.S.C. §

16), and without further notice to any party or other proceedings, provided that plaintiff has not

withdrawn its consent, which it may do at any time before the entry of the proposed Final Judgment

by serving notice thereof on defendants and by filing that notice with the Court.

JUN-15-98  17:07  From:CLEARY GOTTLIEB                    2029741999            T-404  P.27/35  Job-208

3.   Defendants shall abide by and comply with the provisions of the proposed Final Judgment pending entry of the Final Judgment by the Court, or until expiration of time for all appeals of any Court ruling declining entry of the proposed Final Judgment, and shall, from the date of the signing of this Stipulation by the parties, comply with all the terms and provisions of the proposed Final Judgment as though they were in full force and effect as an order of the Court.

4.   This Stipulation shall apply with equal force and effect to any amended proposed Final Judgment agreed upon in writing by the parties and submitted to the Court.

5.   In the event that plaintiff withdraws its consent, as provided in paragraph 2 above, or in the event that the proposed Final Judgment is not entered pursuant to this Stipulation, the time has expired for all appeals of any Court ruling declining entry of the proposed Final Judgment, and the Court has not otherwise ordered continued compliance with the terms and provisions of the proposed Final Judgment, then the parties are released from all further obligations under this Stipulation, and the making of this Stipulation shall be without prejudice to any party in this or any other proceeding.

6. Defendants represent that the divestiture ordered in the proposed Final Judgment can and will be made, and that the defendants will later raise no claims of hardship or difficulty as grounds for asking the Court to modify any of the divestiture provisions contained therein.

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA:

_Nina Hale_
NINA B. HALE
Washington Bar # 18776

_A.K. Rosa_
ANDREW K. ROSA
Hawaii Bar # 6366
Attorneys
Antitrust Division
U.S. Department of Justice
325 Seventh St., N.W.
Washington, DC 20004
(202) 307-6316
(202) 307-0886

Dated: _June 15th, 1998_

FOR DEFENDANT
ALUMINUM COMPANY OF AMERICA:

_Phil Gelfand_
MARK LEDDY
DC Bar # 404833
DAVID I. GELFAND
DC Bar # 416596
STEVEN J. KAISER
DC Bar # 454251
CLEARY,    GOTTLIEB,    STEEN    &
HAMILTON
2000 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 974-1500

FOR DEFENDANT
ALUMAX INC.:

_Robert P. Wolf_
ROBERT P. WOLF
Virginia Bar # 1299
ALUMAX INC.
3424 Peachtree Road, N.E.
Suite 2100
Atlanta, GA 30326
(404) 846-4651

## ORDER

It is SO ORDERED, this _____ day of _____, 1998.

_____
United States District Court Judge

3

JUN-15-98  17:08  From:CLEARY GOTTLIEB                    2029741999                    T-404  P.29/35  Job-208

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

*Plaintiff,*

v.

ALUMINUM COMPANY OF AMERICA,
and ALUMAX INC.,

*Defendants.*

Civil Action No.:

Filed:

95 1497

## HOLD SEPARATE STIPULATION AND ORDER

It is hereby STIPULATED by and between the undersigned parties, subject to approval and entry by the Court, that:

I.

## DEFINITIONS

As used in this Hold Separate Stipulation and Order:

A.    "Alcoa" means defendant Aluminum Company of America, a Pennsylvania Corporation with its headquarters in Pittsburgh, Pennsylvania, and its successors, assigns, subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and directors, officers, managers, agents, and employees.

B.    "Alumax" means Alumax Inc., a Delaware Corporation with its headquarters in Atlanta, Georgia, and its successors, assigns, subsidiaries, divisions, groups, affiliates, partnerships and joint ventures, and directors, officers, managers, agents, and employees.

C.    "Alcoa Cast Plate Division" means all assets included within the cast plate

operation of Alcoa's Aerospace and Commercial Rolled Products Division as of the date hereof,

including:

1.    all tangible assets, including the cast plate manufacturing facility located at

1551 Alcoa Avenue, Vernon, California 90058 ("Vernon facility") and the

portion of the real property on which the Vernon facility is situated that is

reasonably necessary for operation of the Vernon cast plate plant; any

facilities used for research and development activities; Vernon offices; cast

plate-related manufacturing assets including capital equipment, vehicles,

interests, supplies, personal property, inventory, office furniture, fixed

assets and fixtures, materials, on-site warehouses or storage facilities, and

other tangible property or improvements used in the cast plate operation;

all licenses, permits and authorizations issued by any governmental

organization relating to the cast plate operation; all contracts, agreements,

leases, commitments and understandings pertaining to the cast plate

operation; supply agreements; all customer lists, contracts, accounts, and

credit records; and other records maintained by Alcoa in connection with

the cast plate operation;

2.    all intangible assets, including but not limited to all patents, licenses and

sublicenses, intellectual property, trademarks, trade names, service marks,

service names (except to the extent such trademarks, trade names, service

marks, and service names contain the name "Alcoa"), technical

2

JUN-15-98 17:09 From:CLEARY GOTTLIEB    2029741999    T-404 P.31/35 Job-208

information, know-how, trade secrets, drawings, blueprints, designs, design protocols, specifications for materials, specifications for parts and devices, safety procedures for the handling of materials and substances, quality assurance and control procedures, design tools and simulation capability, and all manuals and technical information Alcoa provides to its own employees, customers, suppliers, agents or licensees; and

3.    all research data concerning historic and current research and development efforts relating to the cast plate operation, including designs of experiments, and the results of unsuccessful designs and experiments.

D.    "Cast Plate" means an aluminum plate product manufactured by casting or by sawing cast slab purchased from an external source, ranging in gauges from 1/4 inch to 30 inches, that is used for various tooling, industrial and mold plate applications, and that is manufactured by the Alcoa Cast Plate Division.

## II.

## OBJECTIVES

The Final Judgment filed in this case is meant to ensure Alcoa's prompt divestiture of the Alcoa Cast Plate Division for the purpose of maintaining a viable competitor in the manufacture and sale of Cast Plate to remedy the effects that the United States alleges would otherwise result from Alcoa's proposed acquisition of Alumax.

This Hold Separate Stipulation and Order ensures, prior to such divestiture, that the Alcoa Cast Plate Division which is being divested be maintained as an independent, economically viable,

3

JUN-15-98  17:09  From:CLEARY GOTTLIEB                    2029741999                    T-404  P.32/35  Job-208

ongoing business concern, and that competition is maintained during the pendency of the divestiture.

## III.

## HOLD SEPARATE PROVISIONS

Until the divestiture required by the Final Judgment has been accomplished:

A.    Alcoa shall preserve, maintain, and operate the Alcoa Cast Plate Division as an independent competitor with management, research, development, production, sales and operations held entirely separate, distinct and apart from those of Alcoa. Alcoa shall not coordinate the manufacture, marketing or sale of products from Alcoa Cast Plate Division's business with the Cast Plate business that Alcoa will own as a result of the acquisition of Alumax. Within twenty (20) calendar days of the filing of the Complaint in this matter, Alcoa will inform plaintiff of the steps taken to comply with this provision.

B.    Alcoa shall take all steps necessary to ensure that the Alcoa Cast Plate Division will be maintained and operated as an independent, ongoing, economically viable and active competitor in Cast Plate manufacture and sale; that the management of the Alcoa Cast Plate Division will not be influenced by Alcoa, and that the books, records, competitively sensitive sales, marketing and pricing information, and decision-making associated with the Alcoa Cast Plate Division will be kept separate and apart from the operations of Alcoa. Alcoa's influence over the Alcoa Cast Plate Division shall be limited to that necessary to carry out Alcoa's obligations under this Order and the Final Judgment. Alcoa may receive historical aggregate financial information (excluding capacity or pricing information) relating to the Alcoa Cast Plate

4

Division to the extent necessary to allow Alcoa to prepare financial reports, tax returns, personnel reports, and other necessary or legally required reports.

C.    Alcoa shall use all reasonable efforts to maintain Cast Plate manufacturing at the Alcoa Cast Plate Division, and shall maintain at current or previously approved levels, whichever are higher, internal research and development funding, promotional, advertising, sales, technical assistance, marketing and merchandising support for the Alcoa Cast Plate Division.

D.    Alcoa shall provide and maintain sufficient working capital to maintain the Alcoa Cast Plate Division as an economically viable, ongoing business.

E.    Alcoa shall provide and maintain sufficient lines and sources of credit to maintain the Alcoa Cast Plate Division as an economically viable, ongoing business.

F.    Alcoa shall take all steps necessary to ensure that the Vernon facility is fully maintained in operable condition at no lower than its current rated capacity, and shall maintain and adhere to normal repair and maintenance schedules for the Alcoa Cast Plate Division.

G.    Alcoa shall not, except as part of a divestiture approved by plaintiff, remove, sell, lease, assign, transfer, pledge or otherwise dispose of or pledge as collateral for loans, any assets of the Alcoa Cast Plate Division, including intangible assets that relate to the permits described in Section II of the Final Judgment.

H.    Alcoa shall maintain, in accordance with sound accounting principles, separate, true, accurate and complete financial ledgers, books and records that report, on a periodic basis, such as the last business day of every month, consistent with past practices, the assets, liabilities, expenses, revenues, income, profit and loss of the Alcoa Cast Plate Division.

5

I.    Until such time as the Alcoa Cast Plate Division is divested, except in the ordinary course of business or as is otherwise consistent with this Hold Separate Agreement, Alcoa shall not hire and defendant shall not transfer or terminate, or alter, to the detriment of any employee, any current employment or salary agreements for any Alcoa employees who on the date of the signing of this Agreement (i) work in the Alcoa Cast Plate Division, or (ii) are members of management referenced in Section III(J) of this Order unless such individual has a written offer of employment from a third party for a like position.

J.    Until such time as the Alcoa Cast Plate Division is divested, the assets to be divested shall be managed by John Hogarth. John Hogarth shall have complete managerial responsibility for the Alcoa Cast Plate Division, subject to the provisions of this Order and the Final Judgment. In the event that John Hogarth is unable to perform his duties, Alcoa shall appoint, subject to plaintiff's approval, a replacement acceptable to plaintiff within ten (10) working days. Should Alcoa fail to appoint a replacement acceptable to plaintiff within ten (10) working days, plaintiff shall appoint a replacement.

K.    Alcoa shall take no action that would interfere with the ability of any trustee appointed pursuant to the Final Judgment to complete the divestiture pursuant to the Final Judgment to a suitable purchaser.

6

JUN-15-98  17:10  From:CLEARY GOTTLIEB                    2029741999                    T-404  P.35/35  Job-208

L.    This Hold Separate Stipulation and Order shall remain in effect until the divestiture required by the Final Judgment is complete, or until further Order of the Court.

Respectfully submitted,

FOR PLAINTIFF
UNITED STATES OF AMERICA:

*Nina Hale*

NINA B. HALE
Washington Bar # 18776

*A.K. Rosa*

ANDREW K. ROSA
Hawaii Bar # 6366
Attorneys
Antitrust Division
U.S. Department of Justice
325 Seventh St., N.W.
Washington, DC 20004
(202) 307-6316
(202) 307-0886

Dated: ___June 15th, 1998___

FOR DEFENDANT
ALUMINUM COMPANY OF AMERICA:

*Mark Leddy*

MARK LEDDY
DC Bar # 404833
DAVID L GELFAND
DC Bar # 416596
STEVEN J. KAISER
DC Bar # 454251
CLEARY, GOTTLIEB, STEEN &
HAMILTON
2000 Pennsylvania Avenue, N.W.
Washington, DC 20006
(202) 974-1500

FOR DEFENDANT
ALUMAX INC.:

*Robert P. Wolf*

ROBERT P. WOLF
Virginia Bar # 1299
ALUMAX INC.
3424 Peachtree Road, N.E.
Suite 2100
Atlanta, GA 30326
(404) 846-4651

## ORDER

It is SO ORDERED, this _____ day of _____, 1998.

_____
United States District Court Judge

7

# EXHIBIT 9



LEONIS C. MALBURG
Mayor

THOMAS A. YBARRA
Mayor Pro–Tem

WM. "BILL" DAVIS
Councilman

H. "LARRY" GONZALES
Councilman

W. MICHAEL McCORMICK
Councilman

SOL BENUDIZ
Police Chief

MARK C. WHITWORTH
Acting Fire Chief

LEWIS J. POZZEBON
Director of Environmental Health

S KEVIN WILSON
Director of Community Services

SHARON L. DUCKWORTH
Acting City Treasurer

4305 Santa Fe Avenue, Vernon, California 90058
telephone (323) 583–8811

## ENVIRONMENTAL HEALTH DEPARTMENT

**CERTIFIED MAIL**

### July 18, 2006

Jamie Mackay
ALCOA, Inc.
201 Isabella Street
Pittsburgh, PA   15212-5858

Subject: Stoddard Solvent Contamination, 3200 Fruitland Avenue, Vernon

Dear Mr. Mackay:

Our records show that Alcoa terminated business operations involving hazardous materials in 1998. At that time, our department provided hazardous material permit closure oversight pursuant to the Hazardous Materials Monitoring Program mandated by the Code of the City of Vernon (Code). During the closure process, the subject contamination was confirmed under a building that was to remain in place following Alcoa's departure. Although Section 13.67 of the Code requires the removal of all hazardous materials and hazardous material residues from the premises after hazardous material activities at those premises cease, the Stoddard solvent contamination was allowed to remain because of your company's agreement to maintain environmental responsibility for the subject contamination, the subsequent environmental investigation, and the ultimate remediation process. Our records also show that our department concurred with the remediation option of intrinsic biodegradation based on the following conditions:

1. Sufficient evidence was presented that defined the extent, including the depth, of the contamination.
2. The contamination did not impact groundwater or pose a significant immediate threat to public health.
3. Major portions of the contamination were under a building and equipment that continued to be active. Physical removal of the contamination would cause severe business disruption and unreasonable economic impact.
4. Confirmation of ongoing periodic monitoring to verify that the contamination was not migrating beyond known boundaries.
5. The source of the contamination was removed.

Recently our department received information that will require a reevaluation of remedial options for the Stoddard solvent contamination. We have learned that the business operations at

**Exclusively Industrial**

EXHIBIT
9

the subject site have eliminated and there are plans for removal of equipment and structures that lie over the remaining contamination. Removal of the structure will mean that there will no longer be a barrier to prevent rainfall from driving the contamination deeper, and the conditions which limit physical removal of the contamination will soon no longer exist. Because of these facts, and the confirmation from the most recent results of the subsurface monitoring that shows contaminant levels still exceed clean-up standards, we are requiring your company to submit, by August 31, 2006, a plan for active remediation of the Stoddard solvent contamination.

If you have any questions or require further information, please contact me at 323 583-8811, ext. 229, Monday through Thursday, 7 a.m. to 5:30 p.m.

Sincerely,

Lewis Pozzebon, R.E.H.S.
Director / Health Officer

Xc: A.J. Environmental, Inc., P.O. Box 1814, Upland, CA 91785-1814

Lp/mydoc/cupa/letters/alcoa

# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2007, I electronically filed the foregoing document

with the Clerk of Court using CM/ECF which will send notification of such filing(s) and Hand

Delivered to the following:

**BY E-FILE & HAND DELIVERY**
Steven J. Balick, Esquire
Ashby & Geddes
500 Delaware Avenue
8th Floor
P.O. Box 1150
Wilmington, DE 19899

**BY E-FILE & HAND DELIVERY**
Christian D. Wright, Esquire
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

I hereby certify that on February 12, 2007, I have sent by electronic mail, the foregoing

document to the following non-registered participants:

**BY FEDERAL EXPRESS**
Carrie A. Fino, Esquire
Jenner & Block LLP
One IBM Plaza
Chicago, IL 60611-7603

Steven J. Fineman (#4025)