IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| ALCOA INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 06-451-SLR |
| | ) |
| ALCAN INC., et al., | ) |
| | ) |
| Defendants. | ) |

Allen M. Terrell, Jr., Esquire and Steven J. Fineman, Esquire of Richards Layton & Finger, Wilmington, Delaware. Counsel for Plaintiff. Of Counsel: Harry M. Johnson III, Esquire and J. Michael Showalter, Esquire of Hunton & Williams LLP, Richmond, Virginia.

Christian Douglas Wright, Esquire and Mary F. Dugan, Esquire of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware. Counsel for Defendant Century Aluminum Corpany. Of Counsel: Robert M. Howard, Esquire, James R. Barrett, Esquire and Robyn L. Ginsberg, Esquire of Latham & Watkins LLP, Washington, D.C.

**MEMORANDUM OPINION**

Dated: July 17, 2007
Wilmington, Delaware

ROBINSON, Judge

## I. INTRODUCTION

Plaintiff Alcoa, Inc. ("plaintiff") filed this declaratory judgment action against Alcan, Inc. ("Alcan"), Alcan Rolled Products-Ravenswood LLC ("ARP"), f/k/a Pechiney Rolled Products LLC ("PRP"), Pechiney Cast Plate Inc. ("PCP"), and Century Aluminum Company ("Century") (collectively, "defendants") on July 25, 2006. (D.I. 1) The present case involves a dispute over who is responsible for paying to remedy environmental contamination present at a cast aluminum manufacturing and sales facility in Vernon, California ("the Vernon facility"). Plaintiff seeks a declaratory judgment that it owes no liability to Century or Alcan for the cost to remedy the contamination, and that plaintiff is entitled to indemnification from Century for any such liability. (Id.) Plaintiff also seeks attorney fees. (Id.) Presently before the court is Century's motion to dismiss for failure to join an indispensable party, pursuant to Fed. Rule Civ. P. 19(a) and (b). (D.I. 19) For the reasons that follow, the court denies Century's motion.

## II. BACKGROUND

The city of Vernon, California (the "City") is an industrial city located in Los Angeles County. (D.I. 20 at 4) The City has been authorized by the State of California to administer state laws and regulations relating to hazardous substances within its boundaries. (Id., citing CAL. CODE REGS. TIT. 27, § 15100-620) The City has also promulgated municipal ordinance No. 961 ("Ordinance 961"), which establishes a program to monitor establishments where hazardous materials are located. (D.I. 21, ex. A) Ordinance 961 specifically requires that the owner or operator of such an establishment: (1) "notify the local agency at least thirty (30) days before the

termination of hazardous material activities or closure and apply for a [c]ertificate of [c]losure"; (2) properly remove "all hazardous materials and hazardous material residues" from "equipment, structure[s] and premis[es]" within ninety (90) days of closure or termination of activities; and (3) submit, in cooperation with an independent engineer, a certificate of closure stating that the establishment has complied with the aforementioned removal requirement. (Id., §§ 13.66-68)

Plaintiff owned and operated the Vernon facility prior to 1998. (Id. at ¶ 11) In June 1998, following an antitrust suit brought by the federal government, plaintiff was ordered by the United States District Court for the District of Columbia to divest the Vernon facility to a purchaser with "the capability and intent of competing effectively" in the cast plate market. (D.I. 37, ex. 8 at 5-7) In December 1998, plaintiff sold the Vernon facility to Century pursuant to an acquisition agreement. (D.I. 21, ex. B) The acquisition agreement provided a twelve-year indemnification of Century by plaintiff for environmental liabilities outside of those associated with the operation of Century's cast plate business. (Id. at 24, 26) Specifically, the acquisition agreement states that plaintiff will "indemnify, defend and hold [Century] harmless from and against any and all [e]nvironmental [l]iabilities[,]" which are "all [l]osses . . . incurred or required to be paid as a result or arising out of: (i) [h]azardous [s]ubstances that are or were at, upon, in or under the [r]eal [p]roperty prior to the [c]losing due to the actions or inactions of [plaintiff,] the cleanup of which either is required by a **directive or order of a governmental agency** or if the parties agree that [c]leanup is reasonably required pursuant to [a]pplicable [l]aw." (D.I. 21, ex. B at §§ 10.01 & 10.03(a) (emphasis added))

2

The Vernon facility was sold "as is"; plaintiff, however, agreed to "remediate to the levels required by an authorized governmental agency to obtain a 'no further action' ["NFA"] statement" or its equivalent. (Id. at 25)

"During the closure process, [ ] contamination was confirmed [in the soil] under a building that was to remain in place following [plaintiff's] departure." (D.I. 37, ex. 9) The City ultimately accepted a remediation plan of "intrinsic biodegradation"[1] for the Vernon facility for several reasons, including that: "[t]he contamination did not impact groundwater or pose a significant immediate threat to public health"; the source of the contamination was removed; major portions of the contamination were located under a building, which was a "barrier to prevent rainfall from driving the contamination deeper"; and physical removal of the contamination would cause "severe business disruption and unreasonable economic impact" when the building and equipment were in use. (Id.)

On July 26, 1999, Century sold the Vernon facility to PRP pursuant to a stock and asset purchase agreement.[2] (D.I. 21, ex. D) Century and PRP entered into a separate indemnification agreement, dated September 20, 1999, which also named PRP's subsidiaries (such as PCP) as indemnified parties. (Id. at ¶ 21; D.I. 21, ex. E) Century agreed to indemnify PRP/PCP to the same extent that plaintiff had agreed to

---

[1]Biodegradation is the process by which organic substances are broken down by other living organisms.

[2]It is unclear from the record whether the Vernon facility was considered an asset of PRP or its subsidiary PCP, since PCP subsequently contracted to sell the Vernon facility to the City. (D.I. 21, ex. F) Documents of record indicate that PRP and PCP were known collectively as "Century Cast Plate, Inc." (Id., ex. K)

3

indemnify Century. (Id.) Meanwhile, the City's Environmental Health Department (the "Vernon EHD") issued a NFA letter to plaintiff on September 2, 1999, which indicated that the City "concur[red] with [plaintiff's] recommendations to close the [Vernon] site with no further environmental assessment or remedial action at th[at] time." (D.I. 21, ex. C) The letter stated that "[f]urther review or determinations may be necessary if subsequent information, which significantly affects any decision, is found." (Id.) Plaintiff asserts that, by obtaining the NFA, it has fully complied with the provisions of the acquisition agreement. (D.I. 1 at ¶ 18)

Alcan subsequently acquired PRP.³ (Id. at ¶ 22) In November 2005, Alcan decided to cease operations at the Vernon facility and sell the facility. (Id. at ¶ 23) A contract between PCP and the City to sell the Vernon facility for a fixed price ($36,500,000) was executed in March 2006. (D.I. 21, ex. F at 2) The terms of the sale to the City (the "Alcan sale") require PCP to investigate the environmental conditions at the site and perform work on the site (pursuant to an agreed-upon remediation plan) sufficient to allow the [Vernon EHD] to issue a certificate of closure.⁴ (D.I. 21, ex. G at 3)

The City sent PCP a letter dated March 28, 2006, in which the City noted that PCP had discontinued use of the Vernon facility, and was required to provide a "closure report" as per Ordinance 961. (Id., ex. H) The City required PCP to provide the report

---

³PRP is now known as ARP, a wholly-owned subsidiary of Alcan. (D.I. 1 at ¶ 22)

⁴Several facts relating to the Alcan purchase are unclear from the record, specifically: (1) the date on which Alcan purchased PRP (D.I. 20 at 7; D.I. 36 at 2); (2) the current status of the cleanup of the Vernon facility; and whether (3) PCP has completed the sale of the Vernon facility to the City (D.I. 41 at 5).

by April 25, 2006, including "an acceptable closure work plan" wherein a list of all
hazardous materials on the property and a statement of efforts made to remediate the
contamination would be contained. (Id.)

Alcan sent a notice of its claims for indemnification to Century on April 17, 2006,
which stated that environmental pollutants called polychlorinated biphenyls ("PCBs")
were detected in the soil at the Vernon facility.[5] (D.I. 21, ex. J) This demand letter
stated that Alcan incurred costs over $300,000 for "investigation and activities
conducted based on directives of [the] Vernon EHD." (Id.) Century, in turn, asserted a
demand for indemnification on plaintiff on May 8, 2006. (Id., ex. L) Plaintiff rejected
Century's demand on June 2, 2006. (Id., ex. M) In its complaint, plaintiff states that it is
not required to indemnify Century because the basis of Century's demand arises out of
subsequent actions of Alcan, whose development of the property is not "required by
directives and/or orders of the Vernon [EHD]" as contemplated by the acquisition
agreement. (D.I. 1 at ¶¶ 35, 36)

On July 18, 2006, the City sent plaintiff a letter stating that it had "learned that
the business operations at the [Vernon facility] have been terminated and there are
plans for [the] removal of equipment and structures that lie over the remaining
contamination."[6] (D.I. 37, ex. 9) Since "the conditions which limit[ed] physical removal

---

[5]The "notice of claims for indemnity" was provided by PRP and PCP, despite
Alcan's purchase (and the subsequent renaming) of PRP. (D.I. 21, ex. J) For
simplicity, the court will hereinafter refer to "Alcan" when discussing the parties' claims
for indemnity against Century and the City's requests for remediation to PCP.

[6]This letter references "Stoddard solvent" contamination at the Vernon facility; it
is not clear whether this is synonymous with contamination due to PCBs.

of the contamination [would] soon no longer exist," and contaminant levels still exceeded cleanup standards at that time, the City requested that plaintiff submit "a plan for active remediation" by August 31, 2006. (Id.)

On July 26, 2006, the City issued an "official notice" ordering Alcan to perform several remedial actions at the Vernon facility, including the removal of hazardous material and residue. (D.I. 21, ex. I) This notice stated that Alcan's compliance with city ordinances was required "irrespective of any previous closure letters issued with respect to this property, to the extent that subsequently discovered information (as is the case here) affects any prior closure decision." (Id.)

Plaintiff responded to the City by letter dated August 30, 2006, in which plaintiff noted that: (1) the City agreed that natural biodegradation was the proper remedy in 1998; (2) the City periodically monitored the site, and stated in 2001 that it was "very impressed" with the results of the natural attenuation process;[7] (3) a 2005 sampling confirmed that the contamination was not migrating and natural attenuation continued to be effective; and (4) Alcan has elected to demolish the building which served as a cap on the contaminated soil in preparation for sale of the Vernon facility to the City. (Id.) In view of these facts, plaintiff suggested that Alcan is responsible for remediation because Alcan changed the conditions on the premises. (Id.)

It appears from the current record that had Alcan not disturbed the building at the Vernon facility and/or the surrounding land, no cleanup would currently be required. In addition to vacating the Vernon facility, Alcan appears to be grooming the land for sale

---

[7]This letter is not of record.

6

to the City; the City, conveniently, has required that pollution exposed by this work must be remediated before its purchase is finalized. Through this arrangement, the City avoids responsibility for the costs of remediation. Effectually, this leaves Alcan either to incur an offset on its profits on its sale or to pursue indemnification itself, which ultimately implicates plaintiff's agreement with Century.

Plaintiff requests that a jury: (1) define its obligations pursuant to the acquisition agreement between plaintiff and Century; (2) interpret its obligations for the costs of Alcan's development activities under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA")[8]; and (3) define Century's obligations to plaintiff pursuant to the acquisition agreement. (D.I. 1) Plaintiff seeks judgments that it is not liable to Century or Alcan and, if it is liable to Alcan, that plaintiff is indemnified by Century. (Id.)

## III. STANDARD OF REVIEW

Rule 12(b)(7) provides for the dismissal of a claim where the plaintiff has failed to join an indispensable party. Fed. R. Civ. P. 12(b)(7). A court, in evaluating such a motion, applies the two-part test found in Fed. R. Civ. P. 19. The first part of this test is meant to determine whether the absent party is necessary for adjudication of the issue. The second part of the test is equitable in nature, and is directed to whether a necessary party is indispensable to a fair resolution of the issues. Id. Rule 19(a) provides that an absent person is a necessary party if he is subject to service of

---

[8]Plaintiff does not specify any particular provisions of CERCLA which may apply to the present case. (D.I. 1 at ¶ 46) CERCLA, also known as the Superfund Act, was enacted at 26 U.S.C. §§ 4611-12, 4661-62 and 42 U.S.C. §§ 6911a, 9601-28, 9651-52, 9654-61, 9671-75.

7

process and, in his absence, either: (1) complete relief can not be accorded among the parties; or (2) the absent person claims an interest in the subject matter and that his absence will, as a practical matter, either prejudice his ability to protect that interest or result in multiple or otherwise inconsistent obligations. Fed. R. Civ. P. 19(a).

If a person is deemed necessary under Rule 19(a), the court must then ascertain the extent to which prejudice will result to the non-party; the ability of the court to shape relief to avoid prejudice to absent persons; adequacy of relief available to parties in the necessary party's absence; and the adequate remedy available to the plaintiff if the action is dismissed for nonjoinder. Fed. R. Civ. P. 19(b).

## IV. DISCUSSION

Century argues that plaintiff's complaint must be dismissed for failure to join the City, a necessary and indispensable party to this action. As an initial matter, the court notes that joinder of the City is not feasible because it is outside of the court's jurisdiction.[9] 10 Del. C. § 3104(c). Because joinder is impracticable, a finding that the City is a necessary and indispensable party would compel the dismissal of plaintiff's claims.

### A. The Nature of this Action is Contractual and Does Not Necessitate the Joinder of the City

Century avers that, because plaintiff has a "bright-line" indemnity obligation to it, plaintiff's claim is simply a collateral attack on the City's order to remediate. (D.I. 20 at 2-3) In contrast, plaintiff characterizes the issue at bar as whether Alcan's disturbance

---

[9]Plaintiff does not contest Century's argument to this effect (D.I. 36), and the court has no basis from which to conclude that jurisdiction over this California city would be proper in this case.

8

of the property or its change of the property's use excuses plaintiff from its obligations to remove hazards from the Vernon facility. (D.I. 39 at 4 ("[plaintiff] bears no responsibility for the additional costs imposed by the new remediation and development strategy [Alcan] now employs.")) Plaintiff states that "[t]he City need not be a party to this litigation for the [c]ourt to declare how the relevant contracts allocate [the necessary] costs among the Alcan defendants, Century, and [itself]." (Id. at 5) Century asserts that plaintiff's position requires the court to evaluate whether the NFA letter absolves plaintiff's liability (D.I. 20 at 2-3); plaintiff does not challenge the validity of the letter, and states that it is simply evidence "that [plaintiff] complied with its contractual duties to Century" (D.I. 36 at 9).

Though apparently conceding that the City has required that someone must remediate the Vernon facility, plaintiff argues that "[t]he City has not issued **any** official order" to it and, therefore, it does not seek to "overturn" any order.[10] (Id. at 9) Plaintiff takes this position despite acknowledging receipt of the City's July 18, 2006 letter "seeking that [plaintiff] perform remediation work." (Id. at 3) Century argues that, because plaintiff disputes that it is under an outstanding directive by the City, the court will necessarily "be asked to make rulings on the existence and scope of the City's [o]rder, determinations that necessarily implicate the City's actions and authority regarding its [o]rder and the cleanup." (D.I. 41 at 2) That is, because the City's order triggers plaintiff's obligation under the acquisition agreement, "[plaintiff] can only argue

---

[10]Plaintiff does not directly challenge the City's authority pursuant to Ordinance 961 (D.I. 36 at 12-13) or the merits of the City's decision that further remediation is now required at the site (id. at 9), as Century suggests (D.I. 41 at 13).

9

around its indemnity obligation by collaterally attacking the City's [o]rder." (<u>Id.</u> at 5; D.I. 21, ex. B at § 10.01, <u>supra</u> note 1)

Based upon the record before the court, it appears that the City has, in its official capacity, separately requested that plaintiff and Alcan remediate the Vernon facility.[11] Whether either, or both, of these requests constitute a "directive or order" as contemplated by the acquisition agreement may be a question of fact (or semantics); it does not necessarily require that the City be a party to this action.[12]

For example, a finding that the City's request(s) are a "directive or order," as contemplated by the contract sufficient to trigger plaintiff's liability, does not call the City's request (or the NFA letter) into question.[13] Alternatively, a jury may find that the remediation that the City has requested far exceeds the expectations of the parties at the time the acquisition agreement was executed, absolving plaintiff of any obligation

_____

[11]The 2006 purchase agreement between the City and Alcan also requires that the Vernon facility be remediated. (D.I. 21, ex. G at § 26.7)  Because the City unquestionably had the authority to demand remediation pursuant to Ordinance 961, the fact that the City's contract specified remediation as a condition precedent does not render the City necessary and indispensable to the inquiry of who pays for that remediation.  The court need not determine which "hat" the City was wearing when it requested remediation from Alcan, as Century suggests, only whether the City made a request under Ordinance 961.  (D.I. 41 at 16)

[12]To the extent that the intent of the City or the meaning of the City's requests are at issue, this evidence may be gleaned in discovery, for example, through deposition testimony procured through subpoenas enforceable in the City's federal judicial district.

[13]The NFA letter specifically states that "[f]urther review or determinations may be necessary if subsequent information, which significantly affects any decision, is found." (D.I. 21, ex. C)  The July 26, 2006 letter states that compliance with Ordinance 961 is required "irrespective of any previous closure letters issued with respect to this property, to the extent that subsequently discovered information (as is the case here) affects any prior closure decision." (<u>Id.</u>, ex. I)

10

vis-a-vis Alcan's present use. Again in this scenario, the City's actions need not be disturbed. Since liability for the remediation costs can be determined without calling the governmental action into question (i.e., the City's actions need not be evaluated by the court in order to fashion the declaratory relief plaintiff has requested), the court finds that the City is not a necessary party for purposes of Rule 19. Compare Acierno v. Preit-Rubin Inc., 199 F.R.D. 157 (D. Del. 2001) (granting 12(b)(7) motion where the disposition of plaintiff's conversion and tortious interference claims against developer for an adjacent parcel of land necessarily implicated the court's review of the county's approval of defendant's development plan).[14]

## B. The City's Dual Role Does Not Necessitate its Joinder to this Action

Century further asserts that the City is a necessary and indispensable party because plaintiff's claims require the City's authority as an environmental regulator to be compared with its rights as a private party purchaser, which may include any private liability under CERCLA for cleanup costs at the site. (D.I. 20 at 2-3) The court disagrees. Regardless of which "hat" the City was wearing when it requested remediation, it is not disputed that remediation is now required. The reason(s) for this request are relevant, but not critical, to the issue of who must pay. See, gen., Gateco, Inc. v. Safeco Ins. Co. of Am., No. Civ. A. 05-2869, 2006 WL 1118047, *2 n.1 (E.D. Pa. Apr. 25, 2006) ("generally a party is not necessary simply because joinder would be convenient . . . other Courts of Appeals have held that a party to a commercial contract between two litigants is not a necessary party to adjudicate rights under the contract.")

---

[14] Century primarily relies on the Acierno case in support of its motion. (D.I. 20 at 12-18; D.I. 41 at 7-9, 19)

11

(citing <u>Northrop Corp. v. McDonnell Douglas Corp.</u>, 705 F.2d 1030, 1044 (9th Cir.

1983)).  Stated another way, the City's actions caused the present situation, but the City

is not necessarily "fundamentally intertwined" in the solution.  (D.I. 41 at 18)

      There is insufficient support on the present record from which to conclude that

the interpretation of plaintiff's agreement, and/or plaintiff's liability for cleanup pursuant

to CERCLA,[15] can not be resolved in the City's absence.  Century offers no explanation

as to how the City may be liable for cleanup costs, and there is no indication that the

City may reverse its actions to require cleanup under Ordinance 961.  There also is no

indication that the court's resolving the contractual indemnification issue in the City's

absence will prejudice the City or affect any of its interests or result in multiple or

otherwise inconsistent obligations.[16]  Fed. R. Civ. P. 19(a).  On this record, the court

declines to find that the City is a necessary and indispensable party to the present

action.[17]

---

    [15]The grounds for plaintiff's request for judgment that it has no liability to Alcan "under CERCLA or otherwise" is relatively unclear.  (D.I. 1 at ¶ 46)

    [16]Century's assertion that "the City can, and likely will, take further California-based actions respecting the Vernon facility, which will implicate the parties in this action" is highly speculative.  (D.I. 41 at 3 n.2)  Assuming Century is correct, there is no indication that the City is liable for cleanup.  Thus, even though a judgment in this case binds these parties only, <u>see</u> <u>Janney Montgomery Scott v. Shepard Niles, Inc.</u>, 11 F.3d 399, 409-10 (3d Cir. 1993), it is unclear that any environmental enforcement issues would remain for the City to litigate in California.  The City is, of course, free to litigate its contractual obligations vis-a-vis Alcan, which does not necessarily implicate issues to be addressed in this suit.

    [17]The court, therefore, need not address the extent to which any such prejudice could be avoided by alternative forms of relief or the remedies available to plaintiff if this action were dismissed.  Fed. R. Civ. P. 19(b).

## V. CONCLUSION

For the aforementioned reasons, Century's motion to dismiss is denied.  An appropriate order shall issue.