## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ALCOA INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 06-451-JFB-SRF |
| v. | ) | |
| | ) | |
| ALCAN ROLLED PRODUCTS-RAVENSWOOD LLC, f/k/a PECHINEY ROLLED PRODUCTS LLC, PECHINEY CAST PLATE INC., and CENTURY ALUMINUM COMPANY, | ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS CONSTELLIUM ROLLED PRODUCTS RAVENSWOOD, LLC (FORMERLY ALCAN ROLLED PRODUCTS-RAVENSWOOD LLC, F/K/A PECHINEY ROLLED PRODUCTS LLC) AND PECHINEY CAST PLATE, INC.'S OPPOSITION TO THE JOINT MOTION TO**
<u>**EXCLUDE THE OPINIONS AND TESTIMONY OF A.J. GRAVEL**</u>

*Of Counsel:*

John D. Parker
BAKER & HOSTETLER LLP
Key Tower
127 Public Square, Suite 2000
Cleveland, OH 44114-1214
(216) 621-0200

Ryan D. Fischbach
BAKER & HOSTETLER LLP
11601 Wilshire Boulevard, Suite 1400
Los Angeles, CA 90025-0509
(310) 820-8800

Matthew D. Thurlow
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 861-1681

Dated: August 28, 2019

ASHBY & GEDDES
John G. Day (#2403)
Tiffany Geyer Lydon (#3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
jday@ashbygeddes.com
tlydon@ashbygeddes.com

*Attorneys for Defendants Constellium Rolled Products Ravenswood LLC (formerly Alcan Rolled Products-Ravenswood LLC, f/k/a Pechiney Rolled Products LLC) and Pechiney Cast Plate, Inc.*

## TABLE OF CONTENTS

Page(s)

I.    SUMMARY OF ARGUMENT ................................................................. 1

II.   STATEMENT OF FACTS ....................................................................... 3

    A    A.J. Gravel's Background........................................................... 3

    B.   The Vernon Site and Cleanup Activities ................................. 3

    C    A.J. Gravel's Report and Cost Analysis ................................. 5

III.  LEGAL STANDARDS ............................................................................ 6

    A.   CERCLA and the National Contingency Plan........................ 6

    B.   Admission of Expert Testimony ............................................. 6

IV.  ARGUMENT ........................................................................................... 9

    A.   Mr. Gravel Is Qualified to Offer Opinions Regarding the NCP and Recoverable Costs....................................................... 9

    B.   Mr. Gravel Uses a Reliable Scientific Methodology ........................................... 15

        1.    NCP Analysis.................................................... 15

        2.    Cost Recovery Analysis.................................... 17

    C.   Mr. Gravel's Proposed Testimony Regarding Contractual Damages.................. 20

V.    CONCLUSION...................................................................................... 20

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AmeriPride Serv., Inc. v. Valley Indus. Serv., Inc.*,
  No. 5-00-113, 2011 WL 1833179 (E.D. Cal. May 12, 2011) ...................................................6

*Capitol Justice LLC v. Wachovia Bank, N.A.*,
  706 F. Supp. 2d 34 (D.D.C. 2009) ........................................................................................19

*Chitayat v. Vanderbilt Assocs.*,
  No. 03-5314, 2007 WL 2890248 (E.D.N.Y. Aug. 7, 2007) ...................................................18

*Cyprus Amax Minerals Co. v. TCI Pac. Comms., Inc.*,
  No. 11-CV-252-CVE-PJC (N.D. Okla.) .................................................................................15

*Daubert v. Merrell Dow Pharms., Inc.*,
  509 U.S. 579 (1993)...............................................................................................6, 8, 14

*Elcock v. Kmart Corp.*,
  233 F.3d 734 (3d Cir. 2000)......................................................................................................7

*George v. Celotex Corp.*,
  914 F.2d 26 (2d Cir. 1990).......................................................................................................7

*Habecker v. Copperloy Corp.*,
  893 F.2d 49 (3d Cir. 1990).....................................................................................................13

*Hatco Corp. v. W.R. Grace & Co.*,
  59 F.3d 400 (3d. Cir. 1995)..................................................................................................7, 19

*Health Ins. Plan of Greater New York v. U.S.*,
  62 Fed. Cl. 33 (Fed. Cl. 2004) ...............................................................................................19

*Holbrook v. Lykes Bros. S.S. Co., Inc.*,
  80 F.3d 777 (3d. Cir. 1996).......................................................................................................7

*Kannakeril v. Terminix Int'l Inc.*,
  128 F.3d 802 (3d Cir. 1997)......................................................................................................8

*Knight v. Otis Elevator Co.*,
  596 F.2d 84 (3d Cir. 1979)..................................................................................................7, 13

*Lauria v. Nat'l R.R. Passenger Corp.*,
  145 F.3d 593 (3d Cir. 1998).......................................................................................7-8, 10, 13

*Morrison Enters. v. McShares, Inc.*,
    13 F. Supp. 2d 1095 (D. Kan. 1998) .................................................................20

*New York State Electric & Gas Corp. v. FirstEnergy Corp.*,
    No. 03-cv-0438 (N.D.N.Y.) .............................................................................15

*Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*,
    596 F.3d 112 (2d Cir. 2010) ...............................................................................6

*Outlet City, Inc. v. West Chem. Prods, Inc.*,
    60 Fed. Appx. 922 (3d Cir. 2003) .......................................................................6

*In re Paoli R.R. Yard PCB Litig.*,
    35 F.3d 717 (3d Cir. 1994) ................................................................7, 8, 9, 14

*In re Paoli R.R. Yard PCB Litig.*,
    916 F.2d 829 (3d Cir. 1990) .............................................................................10

*Pentair Thermal Mgmt., LLC v. Rowe Indus., Inc.*
    No. 06-cv-07164, 2013 WL 1320422 ......................................................8, 18, 20

*Robinson v. GEICO General Ins. Co.*,
    447 F.3d 1096 (8th Cir. 2006) ..........................................................................15

*Smith v. Ingersoll-Rand Co.*,
    214 F.3d 1235 (10th Cir. 2000) ........................................................................14

*Town of Halfmoon v. GE*,
    No. 1:09-cv-228, 2016 WL 866343 (N.D.N.Y. Mar. 3, 2016) ................8, 10, 16, 20

*United States v. Paiva*,
    892 F.2d 148 (1st Cir. 1989) ...............................................................................7

*United States v. Velasquez*,
    64 F.3d 844 (3d Cir. 1995) ............................................................................8, 10

*Waldorf v. Shuta*,
    142 F.3d 601 (3d Cir. 1998) .............................................................................7, 9

**Statutes**

42 U.S.C. § 9607(a)(4)(B) ...................................................................................6

**Rules**

Federal Rule of Evidence 403 .............................................................................20

Federal Rule of Evidence 702 .........................................................................6, 7, 9

**Regulations**

40 C.F.R. § 300.150 ...................................................................................................................5

40 C.F.R. § 300.160 ...................................................................................................................5

40 C.F.R. § 300.400 ...................................................................................................................5

40 C.F.R. § 300.430 ...................................................................................................................5

40 C.F.R. § 300.435 ...................................................................................................................5

40 C.F.R. § 300.700 ................................................................................................................5, 6

## I.    SUMMARY OF ARGUMENT

The joint motion of Alcoa Inc. ("Alcoa") and Century Aluminum Company ("Century")

to exclude the proposed expert testimony of Pechiney Cast Plate, Inc.'s ("Pechiney's") expert

A.J. Gravel is an ugly and inaccurate attack on Mr. Gravel's background and credentials, his

methodology and analysis, and his conclusions regarding the National Contingency Plan

("NCP") and recoverable cleanup costs at the Vernon, California Site ("Vernon Site" or "Site").[1]

The Motion mischaracterizes Mr. Gravel's expert report, his deposition testimony, and the Third

Circuit's standard for admission of experts.  Mr. Gravel's proposed testimony should be admitted

by the Court because he is qualified, his proposed testimony is reliable, relevant, "fits" the case,

and will assist the factfinder in navigating the NCP's complex regulatory scheme,

comprehensive Site documents, and hundreds of invoices containing thousands of cost items.

Mr. Gravel easily satisfies the Third Circuit's requirements for expert qualification.  He

has accrued significant experience and knowledge over the past twenty-nine years working with

companies before, during, and after agency-ordered clean ups to assist them with understanding

the requirements of CERCLA and the NCP, and with evaluating response costs.  Mr. Gravel

frequently assists clients with cost recovery and NCP compliance issues outside the context of

litigation.  While it is true he has been hired on multiple occasions as a testifying expert on NCP

issues in litigation, Mr. Gravel is far from the "hired gun with no real-world experience" that

Alcoa and Century claim—a demonstrably false and tired *Daubert* motion cliché.[2]

---

[1] Century is not defending a Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") claim in this case, which calls into question whether it should even be challenging Mr. Gravel's proposed testimony and opinions regarding the NCP and recoverable costs.  Century's challenge to Mr. Gravel's report should be limited to the report's final section in which he addresses recoverable costs under Pechiney's agreement with Century. D.I. 292-2, Ex. 2 (Expert Report of A.J. Gravel, June 15, 2018 ("Gravel Report"), p. 41.

[2] D.I. 292 (Opening Brief in Support of Joint Motion to Exclude the Testimony of A.J. Gravel (hereinafter the "Motion")), p. 1.

Likewise, the Court should ignore the nonsensical claim that only a remediation professional who specializes in "on-the-ground" site cleanups can be qualified to opine on NCP and cost recovery issues.  Despite Alcoa and Century's attempts to create a false equivalence between the two specialties, remediation work in the field is not the same as NCP and cost recovery expertise.  Mr. Gravel has experience with all aspects of site cleanups and cost recovery and a thorough understanding of the NCP regulations; it is irrelevant (as a matter of fact and law) that he is not also a site cleanup specialist.  Mr. Gravel's report and proposed testimony are reliable because he offers a straightforward and independent analysis and methodology that can be replicated (and has been by other NCP experts).  Mr. Gravel's report provides not only his bottom-line conclusions, but also carefully explains how and why he arrived at those conclusions.  Each of Mr. Gravel's individual conclusions regarding the consistency of Pechiney's work with the NCP requirements is transparent.  Likewise, each of the categories of costs Mr. Gravel includes as recoverable under the NCP, or excludes as non-recoverable, can be identified in Mr. Gravel's detailed cost analysis and his voluminous supporting materials.

Finally, Mr. Gravel's proposed testimony should be admitted because his testimony "fits" the issues in this case and will assist the factfinder in understanding and navigating a complex set of facts and regulations.  Mr. Gravel's proposed testimony covers an extensive set of Site data, including hundreds of relevant case documents relating to each of the areas of Pechiney's compliance with the NCP, and thousands of documents relating to cost recovery, including 244 individual invoices containing over 2,500 distinct cost items.[3]  Mr. Gravel methodically reviewed all of these materials in forming his opinions and offering his conclusions regarding

---

[3] D.I. 292-2, Ex. 2 (Gravel Report), p. 32-40; D.I. 292-2, Ex. 3 (Updated Cost Analysis of A.J. Gravel, May 17, 2019 ("Updated Cost Analysis")), p. 2; Opposition Appendix ("Opp. Appx.), Ex. AX (Deposition of A.J. Gravel ("Gravel Depo."), 112:6-16.

cost recovery.  The fact that Mr. Gravel subsequently refined some of his initial conclusions is indicative of his commitment to providing an objective, independent, and accurate assessment of recoverable costs.  These refinements, which cut the amount of costs Pechiney is pursuing by approximately $1 million, enhance the reliability of his conclusions and should increase the Court's confidence in his proposed testimony.[4]  None of Mr. Gravel's proposed testimony should be limited by the Court in this case.

## II.   STATEMENT OF FACTS

### A.  A.J. Gravel's Background

A.J. Gravel is a Senior Managing Director at FTI Consulting, Inc. ("FTI"), a global consulting firm, where he co-leads the Environmental Solutions practice.  Mr. Gravel's work primarily consists of providing environmental cost recovery advice, including NCP compliance assistance, to corporations, municipalities, public agencies, and potentially responsible party ("PRP") groups.  Mr. Gravel has advised clients regarding CERCLA, NCP requirements, and cost recovery for decades.  He has provided NCP and cost recovery analyses to private clients as well as to municipal, state, and federal clients (including the U.S. Department of Justice).[5]

### B.  The Vernon Site and Cleanup Activities

During its over fifty years of aluminum extrusion operations, Alcoa contaminated the Vernon Site with hazardous substances, including PCBs, Stoddard solvent, and chlorinated solvents.[6]  In 1998, Alcoa sold the Site to Century, and less than a year later, Century sold the Site to Pechiney.  In 2006, Pechiney closed its operations and agreed to sell the Site to the City

---

[4] D.I. 292-2, Ex. 3 (Updated Cost Analysis), p. 2-6.
[5] D.I. 292-2, Ex. 2 (Gravel Report), p. 2-3, Appendix A.
[6] See D.I. 302-1, Ex. A (Expert Report of Anton Raviraj Arulanantham ("Arulanantham Report"), p. 34; D.I. 303-1, Ex. P, p. 34-35 (Alcoa's Amended and Supplemental Responses to Pechiney's Requests for Admissions, Set One).

of Vernon.[7]  Pechiney then notified EPA regarding the presence of PCB contamination at the

Site.[8]  In April 2007, the DTSC asserted jurisdiction over the Site and, in July 2010, the DTSC

issued an Imminent and Substantial Endangerment Determination and Consent Order to

Pechiney (the "DTSC Order").[9]  The DTSC Order required Pechiney to clean up the hazardous

substances at the Site, and DTSC ceded authority to EPA as the lead agency for the cleanup of

PCBs. [10]  Pechiney began developing a Feasibility Study ("FS") and Remedial Action Plan

("RAP") for the Site in 2007.  In August 2013, Pechiney initiated underground demolition and

remediation of the Site.[11]  During remediation, Pechiney encountered PCB-contaminated

concrete and soil at very high concentrations, including up to 26,200 mg/kg and 27,600 mg/kg

respectively, as well as pure-liquid PCBs in hydraulic cylinders and purportedly "closed"

vaults.[12]  Pechiney completed the majority of its agency-ordered and approved remediation

activities in November 2014 and submitted closure reports for approval.  The agencies approved

completion of Pechiney's below-grade remediation of the Site, while Pechiney continues to

perform other, ongoing remediation at the Site under the supervision of the agencies.[13]

---

[7] *See* D.I. 303-1, Ex. Q; D.I. 303-1, Ex. S.

[8] *See* Opp. Appx., Ex. BB (PCB Notification Plan)

[9] *See* D.I. 303-1, Ex. W (DTSC Order), ¶1.3.

[10] *See* D.I. 303-1, Ex. W (DTSC Order), p. 9-10; 2.

[11] After removing a portion of the building slabs, however, Pechiney discovered significantly more contamination than was indicated through either Alcoa or Pechiney's prior investigations. D.I. 304-1, Ex. AG.  Pechiney notified both DTSC and EPA of the additional PCB contamination and both directed Pechiney to continue remediating the Site pursuant to the Remedial Action Plan and prior PCB approvals.  D.I. 304-1, Ex. AG, p. ALC0464851; D.I. 304-1, Ex. AH, p. ALC 0203021.

[12] *See* D.I. 304-1, Ex. AI (Phase II Completion Report), p. ALC 0274508, -538, and -545. Residual PCB-contaminated substances were also found in subgrade pipes at concentrations up to 499,000 mg/kg.  *Id.* at ALC 0274544.

[13] *See, e.g.*, D.I. 304-1, Ex. AK, AL, AM, AN, and AO.  Pechiney continues to address residual chlorinated VOC contamination in the northwest portion of the Site and Stoddard solvent contamination in the southern portion of the Site.

### C. A.J. Gravel's Report and Cost Analysis

In his opening report in this case, Mr. Gravel evaluated Pechiney's cleanup of the Vernon Site to determine whether it substantially complied with the provisions of the NCP.  40 C.F.R. Part 300.  Mr. Gravel's evaluation of NCP consistency involved a review of NCP provisions including: Worker Health and Safety (Section 300.150); Documentation and Cost Recovery (Section 300.160); Permit Requirements (Section 300.400(e)); Identification of Applicable and Relevant and Appropriate Requirements ("ARARs") (Section 300.400(g)); Remedial Investigation/Feasibility Study ("RI/FS") and Selection of Remedy (Section 300.430); Remedial Design/Remedial Action ("RD/RA"), Operation and Maintenance ("O&M") (Section 300.435); Public Information and Community Relations (Section 300.700(c)(6)); and whether Pechiney conducted a CERCLA Quality Cleanup.[14]  In his opening report, Mr. Gravel also reviewed the voluminous cost documentation associated with Pechiney's cleanup and determined that Pechiney incurred costs of $41,537,118 at the Vernon Site.[15]  After evaluating every single invoice and cost item related to Pechiney's work at the Site, Mr. Gravel determined that $26,648.918 (or 64.2%) of these costs were "necessary costs of response" under the NCP, and Pechiney should not pursue recovery of $14,888,200 (or 35.8%) of the costs.[16]

Prior to his deposition, Mr. Gravel updated his cost analysis to include additional costs incurred at the Site and prejudgment interest between December 31, 2017 and May 1, 2019.[17] Mr. Gravel also took the opportunity to refine his prior opinions regarding concrete crushing costs and the installation of groundwater wells (relating to a future remedy at the Site), and

---

[14] D.I. 292-2, Ex. 2 (Gravel Report), p. 11-31.
[15] D.I. 292-2, Ex. 2 (Gravel Report), p. 34.
[16] D.I. 292-2, Ex. 2 (Gravel Report), p. 34.
[17] D.I. 292-2, Ex. 3 (Updated Cost Analysis), p. 6.

*excluded* over $1 million in additional Site costs.[18]  Mr. Gravel's updated cost analysis concludes that $26,097,485 (60.4%) of $43,181,117 of Pechiney's total Site costs are recoverable under the NCP, and Pechiney should not pursue $17,083,632 (39.6%) of the costs.

## III.   LEGAL STANDARDS

### A.   CERCLA and the National Contingency Plan

Section 107 of CERCLA provides that "necessary costs of response" that are consistent with the NCP are recoverable under the statute.  42 U.S.C. § 9607(a)(4)(B).  The NCP provides that a party seeking cost recovery must "substantially comply" with the NCP.  40 C.F.R. 300.700(c)(1).  "Immaterial" or "insubstantial" deviations from the NCP are not a basis for barring recovery of response costs.  *Outlet City, Inc. v. West Chem. Prods, Inc.*, 60 Fed. Appx. 922, 927 (3d Cir. 2003); 40 C.F.R. 300.700(c)(4).  While the NCP requires a "cost effective" response, "the [NCP] does not mandate the cheapest possible response.  Instead, courts have held that more expensive [cleanup] options were cost effective when the added expense bought additional environmental benefit."  *AmeriPride Serv., Inc. v. Valley Indus. Serv., Inc.*, No. 5-00-113, 2011 WL 1833179, at *16 (E.D. Cal. May 12, 2011).  Courts consider compliance with a state order, like the 2010 DTSC Order in this case, as definitive evidence of NCP compliance.[19]

### B.   Admission of Expert Testimony

Expert testimony is admissible under Federal Rule of Evidence 702 and *Daubert* if it will "assist the trier of fact to understand the evidence or to determine a fact in issue."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993).  The Third Circuit has held that "[t]he Federal Rules of Evidence embody a strong and undeniable preference for admitting any

---

[18] D.I. 292-2, Ex. 3 (Updated Cost Analysis), p. 2-6.
[19] *See, e.g., Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 37 (2d Cir. 2010) ("One way of establishing compliance with the national plan is to conduct a response under the monitoring, and with the ultimate approval, of the state's environmental agency.").

evidence having some potential for assisting the trier of fact." *Holbrook v. Lykes Bros. S.S. Co., Inc.*, 80 F.3d 777, 780 (3d. Cir. 1996). Where the court is the finder of fact, as is the case for the CERCLA claims at issue here,[20] trial courts are entitled to even more deference in admitting proffered expert testimony. *See George v. Celotex Corp.*, 914 F.2d 26, 28 (2d Cir. 1990).

The Third Circuit has identified three basic requirements for admission of expert testimony, "qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000). Under the first requirement, the Third Circuit has adopted a liberal standard for the qualification of experts. *See In re Paoli R.R. Yard PCB Litig.* ("*Paoli II*"), 35 F.3d 717, 741 (3d Cir. 1994) ("Rule 702's liberal policy of admissibility extends to the substantive as well as the formal qualification of experts. We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications."). Rule 702 allows an expert to be qualified on the basis of "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. *See United States v. Paiva*, 892 F.2d 148, 160 (1st Cir. 1989) ("A witness may qualify as an expert on any one of the five listed grounds.").

Simply put, an expert is qualified in the Third Circuit if they have more skill, experience, or knowledge on a subject than the average lay witness. *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) (qualifying expert without any formal education or training). Experts can be qualified as generalists even if they lack "practical experience" in a specific field. *See Knight v. Otis Elevator Co.*, 596 F.2d 84, 88 (3d Cir. 1979) (applying liberal standard of qualification to expert without elevator design and manufacturing experience). Experts with specialized knowledge, experience, and skill also can be qualified without any formal education. *See Lauria v. Nat'l*

---

[20] CERCLA claims, including NCP issues, are tried to the bench, not the jury, in the Third Circuit. *See Hatco Corp. v. W.R. Grace & Co.*, 59 F.3d 400, 414 (3d. Cir. 1995) (holding that jury trial is not available for CERCLA Section 107 or 113 claims).

*R.R. Passenger Corp.*, 145 F.3d 593, 599 (3d Cir. 1998) (admitting expert testimony of railroad engineer with twenty years of work experience and no formal education).[21]

Under the Third Circuit's second requirement, an expert's testimony is admissible if it is based on a "process or technique" that is reliable. *Kannakeril v. Terminix Int'l Inc.*, 128 F.3d 802 (3d Cir. 1997). In evaluating "reliability," the Third Circuit's "inquiry as to whether a particular scientific technique or method is reliable is a flexible one" that considers numerous factors. *See In re Paoli II*, 35 F.3d at 742 n.8.[22] Finally, under *Daubert* and Third Circuit precedent, an expert's proposed testimony also must "fit" the facts of the case and "assist the trier of fact." Admissibility "depends in part on the proffered connection between the scientific research or test result . . . and particular disputed factual issues in the case." *Id.* at 743.

Expert testimony has been found to be particularly appropriate in assisting courts in understanding the complex regulatory scheme in CERCLA and the NCP. *See, e.g., Town of Halfmoon v. GE*, No. 1:09-cv-228, 2016 WL 866343, at *7 (N.D.N.Y. Mar. 3, 2016) ("However, as other courts have observed and as the parties are no doubt acutely aware, CERCLA and its attendant regulatory framework are just as complex as the tax code and Medicare regulations."). Numerous courts have admitted the testimony of NCP experts as reliable and helpful to the trier of fact. *See, e.g., Id.* at *17; *Pentair Thermal Mgmt., LLC v. Rowe Indus., Inc*. No. 06-cv-07164, 2013 WL 1320422, at *16 (N.D. Cal. Mar. 31, 2013).

---

[21] *See also United States v. Velasquez*, 64 F.3d 844, 851 (3d Cir. 1995) (admitting expert testimony of handwriting expert with eight years of self-directed study).

[22] The non-exclusive list of factors considered in assessing reliability includes: "(1) whether a method consists of a testable hypothesis; (2) whether the method has been subjected to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial issues to which the method has been put.").

IV.     **ARGUMENT**

    A.     **Mr. Gravel Is Qualified to Offer Opinions Regarding the NCP and Recoverable Costs**

       Mr. Gravel is qualified to offer opinions regarding the NCP and Pechiney's recoverable costs because he has twenty-nine years of relevant experience in environmental consulting, contaminated site evaluation, and cost recovery.[23]  As a Senior Managing Director at FTI, Mr. Gravel has significant experience advising companies and government agencies in both litigation and non-litigation contexts regarding NCP compliance and cost recovery.[24]  While Mr. Gravel admittedly does not work in the field on remediation projects, he has worked on hundreds, if not thousands, of contaminated sites and is intimately familiar with all aspects of site cleanups, regulatory approvals, the NCP, and cost recovery.[25]  Mr. Gravel also routinely quantifies potential environmental liabilities for clients.[26]  Because he has significant knowledge and experience with the NCP and cost recovery (the only topics covered in his proposed testimony) that vastly exceed those of the average lay person, Mr. Gravel easily satisfies the Third Circuit's liberal standard for admission of qualified experts.  *Paoli II*, 35 F.3d at 741; *Waldorf*, 142 F.3d at 625.  The Court's analysis of Mr. Gravel's qualifications need not go any further, but it is still worth noting the significant flaws in each of Alcoa and Century's attacks on Mr. Gravel's qualifications.

       The criticisms of Mr. Gravel's background can be summarily dismissed because Mr. Gravel meets the experience, skills, and knowledge prongs for expert qualification under Rule 702.  First, Alcoa and Century's fault-finding with Mr. Gravel's lack of formal education or

---

[23] Opp. Appx., Ex. AX (Gravel Depo.), 128:19-129:10.
[24] D.I. 292-2, Ex. 2 (Gravel Report), p. 2-4.
[25] D.I. 292-2, Ex. 2 (Gravel Report), p. 3.
[26] Opp. Appx., Ex. AX (Gravel Depo.), 132:1-7; 171:19-172:21, 174:17-175:10, 176:7-25.

training on the NCP and cost recovery does not limit his admission as an expert in this case.  *See In re Paoli R.R. Yard PCB Litig.* ("*Paoli I*"), 916 F.2d 829, 855 (3d Cir. 1990) (holding that a "district court's insistence on a certain kind of degree or background is inconsistent with our jurisprudence in this area [of expert qualification].").  Second, contrary to Alcoa and Century's false assertion that Mr. Gravel has never "written, spoken about, or been published" on the NCP,[27] Mr. Gravel has made presentations on cost recovery and NCP consistency.[28]  Mr. Gravel also has "written protocols for companies to help them document" response costs and frequently advises clients regarding NCP compliance issues.[29]  Third, Mr. Gravel's lack of legal or academic credentials has no bearing on whether he is qualified to opine on the NCP based on his knowledge, skill, and experience.  Non-lawyers are frequently admitted as experts to opine on technical legal regulations, including the NCP.  *See, e.g.*, *Town of Halfmoon,* 2016 WL 866343, at *16.  Mr. Gravel has undergraduate and graduate degrees, but he could be qualified as an expert even without a degree.  *See Lauria*, 145 F.3d at 599; *Velasquez*, 64 F.3d at 851.

Mr. Gravel has significant practical experience and knowledge of all aspects of the NCP and cost recovery.[30]  Alcoa and Century ignore or gloss over much of Mr. Gravel's relevant experience and knowledge because they wrongly equate "on-the-ground" remediation experience with NCP and cost recovery expertise.[31]  The two areas of specialization are not the same.  Mr.

---

[27] Motion, p. 6.
[28] D.I. 292-2, Ex. 2 (Gravel Report), p. 3.
[29] Opp. Appx., Ex. AX (Gravel Depo.), 155:19-156:16.
[30] D.I. 292-2, Ex. 2 (Gravel Report), p. 2-4; Opp. Appx., Ex. AX (Gravel Depo.), 156:10-16 ("And so I – I've done a lot of work in that [cost recovery] area and I've done a lot of work counseling – counseling companies on – on elements of the NCP and how to be consistent with the NCP and certain elements of the NCP or the entire NCP, it just depends on what their . . . particular lack of expertise lies in.").
[31] Motion, p. 2, 5, 6, 9.  This false equivalence between specialties is also helpful to Century because it bolsters the thin NCP credentials of its own remediation expert, Jon Rohrer, a

Gravel freely admits he is an NCP and cost recovery expert, but not an expert on remediation in the field or "on-the-ground."[32]  This is consistent with Mr. Gravel's role in this case as an expert. Mr. Gravel does not need experience directing site cleanups in order to have significant knowledge and experience regarding the remediation process, the NCP, and cost recovery.[33] Likewise, there are many engineers and consultants who spend decades directing site cleanups who know very little about the NCP and cost recovery under CERCLA.  Mr. Gravel has spent his career advising many of those remediation professionals.[34]

Despite Alcoa and Century's effort to discount Mr. Gravel's experience and knowledge and apply an artificial test for qualification based solely on experience directing site cleanups "on-the-ground," Mr. Gravel is qualified to discuss remediation in the context of the NCP because he has decades of accumulated knowledge and experience with remediation.[35]  He is qualified notwithstanding Alcoa and Century's efforts to distort and belittle this experience.

> Q.  Okay.  And I'm asking do you have any specific experience working on
> environmental – environmental remediation sites outside of the litigation context.
> A.  Yes.
> Q.  Tell me about that.
> A.  Over 20 years of experience working on environmental litigation – non-litigation
> projects, examining and being a part of teams that are doing environmental remediation.
> Q.  Right. . . .  But are you saying that you've actually done environmental remediation
> work?  Or you've gone back and examined or looked at environmental remediation work
> that other people have done?

---

hydrogeologist who has offered opinions on 21 different topics in this case. [31]  D.I. 302-2, Ex. F (Expert Report of Jon Rohrer ("Rohrer Report")).

[32] Opp. Appx., Ex. AX (Gravel Depo.), 177:5-13. ("A.  Well, they certainly -- they certainly wouldn't hire me to go and oversee the remedial action at the site, no.").

[33] Motion, p. 6.

[34] Opp. Appx., Ex. AX (Gravel Depo.), 155:19-156:16.

[35] Opp. Appx., Ex. AX (Gravel Depo.), 171:19-172: 21 (discussing experience preparing forward-looking cost estimates for environmental cleanups); 174:17-175:10 (discussing experience helping companies assess environmental liabilities during due diligence projects); 176:7-25 (discussing experience advising companies regarding potential cleanup liabilities); 217:6-25 (discussing cumulative cleanup, forensic, and cost analysis experience).

> A.  I think – I think both. . . . I've never, for example, written an environmental remediation workplan, authored it personally myself in total.  . . .   But a lot of my work in dealing with forensic history and site evaluation . . . feed into workplans that are used to establish sampling protocols, to determine PRPs, to examine liability, to look at due diligence.  All of those elements are brought into the workplan in the environmental remediation area; so it's – You know, it's not just – it's not just have I authored a workplan?  No, I haven't authored a workplan, primarily, but I've been working for 25-plus years in this area and I've worked on hundreds, if not now over thousands of sites, evaluating and contributing to environmental remediation.[36]

In their Motion, Alcoa and Century ignore or discount all of Mr. Gravel's relevant remediation experience where he reviewed, contributed to, offered insight or input, critiqued environmental investigation plans or reports (calling that work "Monday-morning quarterbacking"),[37] any work in which Mr. Gravel reviewed plans or reports, performed remediation work, or provided input as part of a team, and any work in which Mr. Gravel reviewed and analyzed environmental investigation plans or reports in the context of litigation or liability-analysis.  Based on these broad exclusions, Alcoa and Century then cite a two-page long laundry list of Site cleanup activities for which they contend that Mr. Gravel has no "real world" experience—a misleading and pointless exercise.[38]  Mr. Gravel put it best in responding to Alcoa's and Century's contrived lines of questioning at his deposition:

> A.  You, know, again, I'm saying "no" to these things for the actual activity.  But as I mentioned, a lot of my work feeds into some of the things that are associated with these, like remedial action plans, sampling plans . . . so when I say no, I haven't drilled a sample, it doesn't mean that I haven't been involved in determining where the samples would be drilled and at what depths they would be drilled and for what contaminants.

---

[36] Opp. Appx., Ex. AX (Gravel Depo.), (Century questioning) 130:20-132:7; 593:10-594:9 (Alcoa questioning) ("Q.  I'm going to ask you a series of questions and I want to focus on where a Feasibility Study is actually being implemented as to one that – where you are *critiquing* it.  . . . And, again, I want you to *exclude things* that you've done as part of your *litigation support* activities.  Fair enough?  . . .   And I also – You know, I understand from your testimony yesterday that there were – there were times when you acted as part of a team.  And so if I ask you if you did something yourself, I – I want to know whether you did it yourself, not as somebody – somebody on your team did it.  Fair enough?") (emphasis added).
[37] Motion, p. 10.
[38] Motion, p. 7-8.

> So I just want to be clear and distinguish between actually drilling the hole and having input into the plan that's involved in drilling the hole.[39]

In Alcoa and Century's view, Mr. Gravel's extensive knowledge and experience with remediation do not count as "real-world experience" because Mr. Gravel could only grasp "[t]he many complexities and nuances of performing this type of environmental work" if he had "on-the-ground exposure."[40]  But Mr. Gravel, in fact, has much of the experience and knowledge Alcoa and Century presume can only be obtained through "on-the-ground exposure," including "technical 'know-how,'"[41] knowledge of contaminants and their characteristics,[42] experience with EPA, DOJ, and other regulatory stakeholders, and significant knowledge regarding the NCP.[43]  There is no basis to invalidate or discount Mr. Gravel's significant knowledge and remediation experience just because it is not the same experience as a cleanup specialist working in the field.

The law also does not support Alcoa and Century's contention that Mr. Gravel specifically needs "on-the-ground" remediation experience to opine on the NCP regulatory scheme and evaluate the recoverability of costs under the NCP.  *Lauria*, 145 F.3d at 598-99 (holding that the trial court abused its discretion in excluding expert testimony based on lack of specialization); *see also Habecker v. Copperloy Corp.*, 893 F.2d 49, 52 (3d Cir. 1990); *Otis Elevator Co.*, 596 F.2d at 88.  As long as expert testimony is based on facts and a reliable

---

[39] Opp. Appx., Ex. AX (Gravel Depo.), 165:24-166:10.
[40] Motion, p. 8-9.
[41] Motion, p. 9.  For example, when being quizzed regarding his knowledge of environmental sampling methods, Mr. Gravel displayed his detailed knowledge regarding EPA's sampling protocols, different sampling methods, and even different sampling tools.  But despite his detailed knowledge, Mr. Gravel also conceded he never participated in developing a PCB sampling plan himself.  Opp. Appx., Ex. AX (Gravel Depo.), 182:15-184:6.
[42] Motion, p. 9; s*ee, e.g.*, Opp. Appx., Ex. AX (Gravel Depo.), 184:11-185:18 (knowledge regarding chlorinated solvents).
[43] D.I. 292-2, Ex. 2 (Gravel Report), p. 2-4.

methodology, *Daubert* permits experts to—as Alcoa and Century put it—"Monday morning quarterback" the remediation and cost decisions of others.  Indeed, that is what many experts do, including Alcoa's and Century's proffered experts in this case.  *See Daubert*, 509 U.S. at 592 ("[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.").

There is also no bar against considering an expert's experience in the context of litigation or liability analysis, especially when the expert's area of specialization intersects with the law, as Mr. Gravel's experience does with NCP consistency and cost recovery.  *See, e.g.*, *Smith v. Ingersoll-Rand Co*., 214 F.3d 1235, 1246 (10th Cir. 2000) ("[A]n expert may be called upon to aid the jury in understanding the facts in evidence even though reference to those facts is couched in legal terms.").  Indeed, it would be surprising if most experts' projects involving the NCP and cost recovery did not touch upon litigation because that is the context in which such issues primarily arise.  While most of Mr. Gravel's work relates to environmental consulting outside of litigation, his experience advising companies regarding their potential liability, NCP consistency issues, and cost recovery in the context of pending CERCLA cases is directly relevant experience, and that experience should not be ignored or discounted in considering his qualifications—it only bolsters them.  Alcoa and Century's misguided attempt to smear Mr. Gravel as a "hired gun" confuses Mr. Gravel's technical experience with the work of a full-time litigation consultant.[44]  As Mr. Gravel testified during his deposition, "the bulk of [his] time is really spent in the consulting area, not in the litigation context."[45]

---

[44] Motion, p. 1; 10.  Notably, the Third Circuit has found even full-time litigation consultants qualified as experts.  *See Paoli II*, 35 F.3d at 753 (reversing exclusion of expert witness doctor who had appeared in 800 cases and who had stopped practicing medicine).
[45] Opp. Appx., Ex. AX (Gravel Depo.), 173:23-174:12.

Even if the Court accepted Alcoa and Century's faulty contentions that Mr. Gravel's twenty-nine years of experience working in the environmental field and his extensive knowledge and experience with the NCP and cost recovery issues should be discounted because he is "Monday morning quarterbacking" in collaboration with others over the decades on remediation projects, and his litigation work assessing NCP consistency and recoverable costs, those alleged "flaws" in his qualifications still would go only to the weight of Mr. Gravel's testimony, not its admissibility. *Robinson v. GEICO General Ins. Co.*, 447 F.3d 1096, 1100 (8th Cir. 2006) ("Gaps in an expert witness's qualifications or knowledge generally go to the weight of the witness's testimony, not its admissibility."). Finally, in closing its full-bore assault on Mr. Gravel's background, Alcoa and Century emphasize the entirely irrelevant and misleading point that, "[n]o court has ever qualified Gravel as an expert witness on environmental cleanup and/or NCP compliance."[46] No court has ever had an opportunity to rule on Mr. Gravel's admission as an NCP expert, so it is hardly surprising that Mr. Gravel has not been qualified. It is more apropos to note that, ***no court has ever disqualified Mr. Gravel as an expert on any basis***.[47]

### B.   Mr. Gravel Uses a Reliable Scientific Methodology

### 1.  NCP Analysis

Mr. Gravel adopts an accepted and replicable methodology in assessing NCP consistency and cost recoverability in his proposed testimony. Mr. Gravel's conclusions regarding NCP consistency were based on a multi-step process including review and analysis of: (1) applicable federal and state laws and regulations, including CERCLA and the NCP; (2) NCP evaluation

---

[46] Motion, p. 12.

[47] Opp. Appx., Ex. AX (Gravel Depo.), 272:25-273:13. Mr. Gravel has been qualified to testify as a forensic historian, and his qualification is currently pending as an NCP expert in another case. *See New York State Electric & Gas Corp. v. FirstEnergy Corp.*, No. 03-cv-0438 (N.D.N.Y.) (admitting Mr. Gravel as forensic historian); *Cyprus Amax Minerals Co. v. TCI Pac. Comms., Inc.*, No. 11-CV-252-CVE-PJC (N.D. Okla.) (admission as NCP expert pending).

criteria; (3) regulatory agency documents including the DTSC Order, EPA's PCB Notification Plan, and Vernon Ordinance 961; (4) the Site record including technical documents (including the FS, RAP, progress reports, completion reports, and other technical documents); (5) cost-related information (including contracts, invoices, financial reports, and proofs of payment); (6) deposition transcripts; (7) discussions with contractor representatives; and (8) a comparison of Vernon Site-specific response actions with the applicable provisions of the NCP.[48]  Mr. Gravel then assessed whether Pechiney substantially complied with the NCP in conducting a "CERCLA-quality cleanup."[49]  As Mr. Gravel testified at his deposition, the same methodology has been "used frequently by other experts in cases across the country."[50]

Indeed, the fact-intensive methodology used by Mr. Gravel in assessing consistency with the NCP has been approved by several courts.  Courts have also specifically rejected challenges to the fact-based nature of this methodology.  *See Town of Halfmoon*, 2016 WL 866343, at *17 ("[S]aratoga challenges [Steve] Johnson's document-based approach . . . Johnson's report does contain a factual narrative that has been drawn from his review of the paper trail leading up to the siting decision at Moreau.  But that is as it must be, since NCP compliance is evaluated by comparing a record of a party's actions against the regulations.").  This Court can therefore easily dispense with Alcoa's and Century's generic and unfounded claims that Mr. Gravel has engaged in simply "reciting evidence and making subjective opinions about the applicability of the law."[51]  That argument has already been rejected.

---

[48] D.I. 292-2, Ex. 2 (Gravel Report), p. 9-10.
[49] D.I. 292-2, Ex. 2 (Gravel Report), p. 8 ("[I]t can be tempting to take an approach that narrowly examines response action elements against the specified criteria.  However, the NCP dictates that this type of approach is inappropriate because cleanups must be evaluated as a whole to determine whether they satisfy the intent of the NCP as revised by USEPA in 1990.").
[50] Opp. Appx., Ex. AX (Gravel Depo.), 297:21-298:6; 643:15-644:1.
[51] Motion, p. 16-17.

Likewise, even a superficial review of Mr. Gravel's analysis of each of the individual elements of NCP consistency deflates the claim that Mr. Gravel did not include sufficient analysis in his report of how Pechiney's activities at the Site comported with the NCP.  As an example, Alcoa and Century claim that Mr. Gravel's review of the NCP permitting requirements was defective.[52]  While this provision of the NCP might require less analysis than other sections of the NCP (Alcoa and Century do not even mention permitting in their description of applicable NCP requirements in their Motion),[53] it still requires analysis.  Mr. Gravel's report includes a description of the NCP permitting requirement, a description of the relevant permits obtained by Pechiney and an explanation as to how those permits were relevant to the site remedy, how Mr. Gravel confirmed that no other permits were required (the required permits were outlined in the Remedial Action Plan under the DTSC Order), and his conclusion that Pechiney's actions were consistent with this NCP provision.[54]  There was nothing deficient about Mr. Gravel's analysis.

### 2.  Cost Recovery Analysis

Mr. Gravel likewise uses an objective and reliable methodology to assess Pechiney's recoverable costs under the NCP.  This methodology included: (1) identifying the response costs eligible for recovery under the NCP; (2) reviewing environmental contractor invoices and backup, proof of payment, and technical information supporting costs; (3) reviewing costs tables, invoices, and support from the consultants and proof of payment records; (4) preparing a cost summary documenting response costs incurred and confirming that costs were accurate; (5) reviewing technical data, invoices, and task descriptions to determine if total invoiced costs include non-recoverable amounts; (6) interviewing Pechiney and environmental consultant

---

[52] Motion, p. 15-16.
[53] Motion, p. 3.
[54] D.I. 292-2, Ex. 2 (Gravel Report), p. 15-16.

representatives; and (7) making a final determination regarding costs in a claimed cost summary.[55]  In his report, Mr. Gravel included summaries of claimed costs and a 100-page plus spreadsheet of data detailing each invoice, the categories of costs claimed, a description of tasks, and a breakdown of recoverable or non-recoverable costs for each invoice.[56]  In addition, Mr. Gravel disclosed worksheets containing his review methodology for the specific tasks performed by AMEC and AIS (the environmental consultants at the Site).[57]  In the Motion, Alcoa and Century simply ignore the detailed, fact-based methodology supporting Mr. Gravel's opinions.

Instead, they weakly claim that Mr. Gravel's cost recovery methodology is subjective because it consists of reviewing invoices, "outlining 'response actions,'" and conducting NCP analysis.[58]  But, once again, the same cost recovery methodology has been upheld by other courts.  *See Pentair Thermal Mgmt., LLC.*, 2013 WL 1320422, at *16 (admitting evidence of NCP expert who reviewed all costs incurred by Tyco at the Site and evaluated which costs were necessary and which were not required for cleanup).  Indeed, where NCP experts have not adopted the detailed, document-based approach used by Mr. Gravel, courts have excluded their proposed NCP cost recovery opinions.  *See Chitayat v. Vanderbilt Assocs.*, No. 03-5314, 2007 WL 2890248, at *9 (E.D.N.Y. Aug. 7, 2007) ("[The expert's] failure to review any detailed information regarding actual expenditures for specific work performed renders his opinion as one based solely on speculation and conjecture.").

Alcoa and Century also falsely claim that Mr. Gravel's cost recoverability analysis is unreliable because Mr. Gravel refined his cost opinions and *excluded* over $1 million in

---

[55] D.I. 292-2, Ex. 2 (Gravel Report), p. 33-34.
[56] Opp. Appx., Ex. AV; (Gravel Report, Appendix D).
[57] Opp. Appx., Ex. BC (AMEC Task Recoverability Worksheet); Opp. Appx., Ex. BD (AIS Task Recoverability Worksheet).
[58] Motion, p. 13-14.

previously claimed costs.[59]  Rather than acknowledge that this exclusion of previously claimed

costs for concrete crushing and fill and groundwater monitoring is evidence of Mr. Gravel's

independence and objectivity, Alcoa and Century malign Mr. Gravel and argue that it is further

evidence that his analysis is subjective, that he is "facile," and responsive to the shifting "say-so"

of his client.[60]  Once again, Alcoa and Century are on the wrong side of the law.  *See Health Ins.*

*Plan of Greater New York v. U.S.*, 62 Fed. Cl. 33, 44 n. 19 (Fed. Cl. 2004) ("[D]efendant made

much of the fact that Mr. Willis repeatedly updated his expert reports, but the court perceives

those updates as increasing, rather than decreasing, the reliability of the results ultimately

reached."); *Capitol Justice LLC v. Wachovia Bank, N.A.*, 706 F. Supp. 2d 34, 38 (D.D.C. 2009)

("[T]he Rule anticipates that in complex litigation an expert witness may refine . . . his or her

opinion as he or she prepares for trial.").  Mr. Gravel's decision to reduce Pechiney's claim for

recoverable costs (from 64.2% to 60.4% of Pechiney's incurred costs) is indicative of his

conservative approach.[61]

Finally, Alcoa and Century challenge Mr. Gravel's NCP and cost recovery opinions on

additional, generic grounds including that his opinions invade the province of the fact finder and

the Court.  They seemingly forget, again, that the Court, not a jury, is the factfinder for the

CERCLA claims in this case.  *Hatco*, 59 F.3d at 414.  Numerous courts have held that testimony

on the NCP regulatory scheme would assist them in reaching a decision.  *See, e.g., Town of*

---

[59] D.I. 292-2, Ex. 3 (Updated Costs Analysis), p. 2-6.
[60] Motion, p. 14.
[61] Opp. Appx., Ex. AX (Gravel Depo.), 112:3-16 ("Q.  Why did you go back and exclude some of the costs that you had previously included?  A.  Because – because when you're conducting a cost analysis like this where you have 244 invoices and 2,500 individual line items and you're looking at the documents constantly, I felt like there were a few items that I needed to reevaluate. And so in the interest of making sure that I was being as thorough as I could and not overstating or understating the recoverable costs, I thought it was necessary for me to make a couple of minor adjustments to the analysis.").

*Halfmoon*, 2016 WL 866343, at *17; *Pentair Thermal Mgmt., LLC*, 2013 WL 1320422, at *16. Other courts have even held that the testimony of an NCP expert was necessary to evaluate NCP compliance.  *See Morrison Enters. v. McShares, Inc.*, 13 F. Supp. 2d 1095, 1115 (D. Kan. 1998) ("It is here that expert evidence would be necessary for the court to evaluate whether Morrison's response actions were sufficient to meet the requirements of the NCP.").  Mr. Gravel's testimony will assist the Court in navigating hundreds, if not thousands, of Site documents, contracts, and invoices to evaluate NCP compliance and recoverable costs.

### C.   Mr. Gravel's Proposed Testimony Regarding Contractual Damages

Finally, there is no basis for excluding Mr. Gravel's cost compilations in the final section of his report.  This is the only section of Mr. Gravel's proposed testimony that is relevant to Century.  Ironically, Mr. Gravel's cost compilation section is exactly the same type of cost analysis provided by Century's proffered expert, Jon Rohrer.[62]  The cost compilations provided by Mr. Gravel in this section were based on the stated assumptions provided by counsel.[63]  There is no basis for exclusion of Mr. Gravel's cost compilations under Rule 403.  Again, there is no risk that the jury will be confused by this evidence because Mr. Gravel will not be presenting NCP cost evidence to the jury (CERCLA is a bench claim), and Mr. Gravel has been very clear in his report and testimony in separating the contractual damages calculations he performed from his NCP recoverable costs analysis.[64]

## V.   CONCLUSION

The Court should deny the Joint Motion to Exclude Certain Opinions of A.J. Gravel in its entirety.

---

[62] D.I. 302-2, Ex. F (Rohrer Report), p. 177-204.
[63] D.I. 292-2, Ex. 2 (Gravel Report), p. 41.
[64] D.I. 292-2, Ex. 2 (Gravel Report), p. 41.

*Of Counsel:*

John D. Parker
BAKER & HOSTETLER LLP
Key Tower
127 Public Square, Suite 2000
Cleveland, OH 44114-1214
(216) 621-0200

Ryan D. Fischbach
BAKER & HOSTETLER LLP
11601 Wilshire Boulevard
Suite 1400
Los Angeles, CA 90025-0509
(310) 820-8800

Matthew D. Thurlow
BAKER & HOSTETLER LLP
1050 Connecticut Avenue
Suite 1100
Washington, D.C. 20036-5304
(202) 861-1500

Dated:  August 28, 2019

ASHBY & GEDDES

/s/ *Tiffany Geyer Lydon*

John G. Day (#2403)
Tiffany Geyer Lydon (#3950)
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801
(302) 654-1888
 jday@ashbygeddes.com
tlydon@ashbygeddes.com

*Attorneys for Defendants*
*Constellium Rolled Products Ravenswood,*
*LLC (formerly Alcan Rolled-Products-*
*Ravenswood LLC, f/k/a Pechiney Rolled*
*Products LLC) and Pechiney Cast Plate, Inc.*